UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

JOHN R. WALCOTT, FRANK
MAISANO, and MARY E. BISHOP

  Plaintiffs,

    v.

WTC CAPTIVE INSURANCE
COMPANY, INC.; CHRISTINE
LASALA; THE HONORABLE
MICHAEL BLOOMBERG; MARSH
MANAGEMENT SERVICES, INC.;
GAB ROBINS NORTH AMERICA,
INC.; MARK PAGE; LEWIS
FINKELMAN; JEFFREY
FRIEDLANDER; MEREDITH JONES;
MARK MELSON; JAMES
SCHOENBECK; and KENNETH
BECKER, ESQUIRE,

  Defendants.

---------------------------------------------------- x

**Judge Hellerstein**

Civ. Action No.

**07 CIV 7072**

NOTICE OF REMOVAL



AUG 0 8 2007

U.S.D.C. S.D. N.Y.
CASHIERS

  Please take notice that WTC Captive Insurance Company, Inc; Christine LaSala; Mark

Page;[1] Lewis Finkelman;[2] Jeffrey Friedlander; Meredith Jones; Mark Melson; James

Schoenbeck; and Kenneth Becker (collectively "Removing Defendants") hereby remove the

above-entitled action (the "Action") from the Supreme Court of the State of New York, County

of New York to the United States District Court for the Southern District of New York, pursuant

to 28 U.S.C. § 1441 and Section 408(b)(3) of the Air Transportation Safety and System

---

[1] Mr. Page is incorrectly identified in the Summons and Verified Complaint as "Marc
Page."

[2] Mr. Finkelman is incorrectly identified in the Summons and Verified Complaint as
"Lewis Finklestein."

Stabilization Act, Public Law No. 107-42, § 401 *et seq.*, 115 Stat. 230 (2001) (the "ATSSSA") (codified as amended after 49 U.S.C. § 40101 (2001)).

In support of this Notice of Removal, the Removing Defendants state as follows:

## I. BACKGROUND

1.     On or about July 17, 2007, Plaintiffs filed a Summons and Verified Complaint in the Supreme Court of the State of New York, County of New York.   True copies of the Summons and Verified Complaint are attached as Exhibit A.

2.     On July 20, 2007, the New York City Law Department received the Summons and Verified Complaint in this Action, bearing Index No. 109755/07, on behalf of Defendants Lewis Finkelman, Jeffrey Friedlander, and Kenneth Becker.   On July 23, 2007, the New York City Law Department received the Summons and Verified Complaint on behalf of Defendants Mark Page, Meredith Jones, and the Honorable Michael Bloomberg.   Also on July 23, 2007, Defendant GAB Robins North America, Inc.,[3] received the Summons and Verified Complaint, and counsel for Defendants WTC Captive Insurance Company, Inc.; Christine LaSala; James Schoenbeck; and Mark Melson received the Summons and Verified Complaint on their behalf.

## II. GROUNDS FOR REMOVAL

3.     Plaintiffs' suit is removable because (a) Plaintiffs assert claims within the original and exclusive federal jurisdiction vested in this Court by the ATSSSA, (b) Plaintiffs assert independent claims that arise under federal law, and (c) Plaintiffs' state-law claims implicate significant federal issues, such that they arise under federal law.

---

[3]     GAB Robins North America, Inc. is incorrectly identified in the Summons and Verified Complaint as "GAB Robbins."

A.    **Plaintiffs' Claims Fall Within Exclusive Federal Jurisdiction Under the ATSSSA.**

4.    Removal is permitted because this Court has original and exclusive jurisdiction over the Action based on the ATSSSA, as Plaintiffs' claims result from and relate to the September 11, 2001 terrorist-related aircraft crashes.

5.    Congress passed the ATSSSA specifically in response to the attack of September 11, 2001, creating a comprehensive mechanism for addressing numerous matters relating to the attack.  Section 408(b) of the Act includes a broad jurisdictional provision centralizing in this Court the resolution of any and all litigation claims resulting from or relating to the September 11, 2001 attack:

> The United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001.

Public Law No. 107-42, § 408(b)(3), 115 Stat. 230, 241 (2001).

6.    Plaintiffs' claims result from or are related to the terrorist-related aircraft crashes of September 11, 2001, as plaintiffs allege injuries arising from their participation in the rescue, recovery, and debris removal operations following the attack of September 11, 2001.  *See* Complaint ¶¶ 17–28.  Such claims fall within the scope of the ATSSSA's jurisdictional grant. *See In re WTC Disaster Site*, 414 F.3d 352, 375–380 (2d Cir. 2005) (hereinafter, "*McNally*").

7.    By vesting this Court with "original and exclusive" jurisdiction over such claims, "Congress clearly evinced its intent that any actions on such claims initiated in state court would be removable to [this Court]." *McNally*, 414 F.3d at 380.

8.    Because this Action falls within this Court's original and exclusive jurisdiction, removal of the Action to this Court is proper under the ATSSSA.

9.      To the extent that the ATSSSA itself does not authorize removal, removal is nevertheless appropriate, and indeed required, under 28 U.S.C. § 1441 because the ATSSSA vests original and exclusive jurisdiction over the Action in this Court.

**B.      Plaintiffs Assert Independent Federal Claims.**

10.     Removal also is permitted because Plaintiffs' claims arise under federal law, such that this Court has original jurisdiction over the Action. *See* 28 U.S.C. §§ 1331, 1441.  A case arises under federal law if the plaintiff's complaint presents a question of federal law.

11.     Plaintiffs allege that Defendants have violated Pub. L. No. 109-7, 117 Stat. 517, by funding the defense of claims asserted against the City of New York and its contractors in connection with the rescue, recovery, and debris removal operations conducted after September 11, 2001.  Complaint ¶¶ 58–62, 104, 109.  Plaintiffs further allege that Defendants have violated the terms of the Federal Emergency Management Agency (FEMA) Grant Agreement, by defending against, rather than paying, Plaintiffs' claims.  Complaint ¶¶ 76–78, 100, 110.

12.     Plaintiffs seek a declaratory judgment, *inter alia*, "(2) declaring that the WTCC has violated its duty and obligation to timely investigate, adjust, consider, and pay the Plaintiffs' claims; . . . (7) declaring that the WTCC has failed to conform with all applicable federal . . . statutes and ordinances; [and] (8) requiring the WTCC to conform with all applicable federal and state statutes and ordinances."  Complaint, Second Cause of Action Request for Relief, pages 50–51.

13.     Because Plaintiffs seek declaratory relief with respect to an alleged violation of federal law, this Action falls within this Court's federal question jurisdiction under 28 U.S.C. § 1331, and is properly removable to this Court pursuant to 28 U.S.C. § 1441.

**C.    Plaintiffs' State-Law Claims Implicate Significant Federal Law Issues.**

14.    The Supreme Court has "recognized for nearly 100 years that in certain cases, federal question jurisdiction will lie over state-law claims that implicate significant federal issues." *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Certain of Plaintiffs' claims implicate such significant federal-law issues.

15.    Plaintiffs' First Cause of Action (Breach of Fiduciary Duty) alleges that Defendants had a fiduciary duty under New York law not to violate federal law, Complaint ¶¶ 164(a), (b), and that Defendants breached such fiduciary duty by the violations of federal law alleged in Complaint ¶¶ 58–62, 76–78, 100, 104, 109, 110.    Complaint ¶¶ 165, 166, 171. Plaintiffs' First Cause of Action further seeks to compel, *inter alia*, "(5) [c]onformance with all applicable federal ... statutes and ordinances; [and] (6) [o]peration of the WTCC in conformance with the FEMA Grant and Sub-Grants." Complaint, First Cause of Action Request for Relief, 49–50.

16.    Plaintiffs' Fifth Cause of Action (Replevin) alleges that Defendants have wrongfully detained public funds "in violation of law and the public trust from the public funds held in trust by the WTC, as set forth and described" in, *inter alia*, Complaint ¶¶ 58–62, 76–78, 100, 104, 109, 110.    Plaintiff's Fifth Cause of Action therefore implicates the federal law violations asserted in Complaint ¶¶ 58–62, 76–78, 100, 104, 109, 110.

17.    Plaintiffs' Sixth Cause of Action (Conversion) alleges that Defendants "have knowingly wasted and squandered a large amount of money and has [*sic*] used and expended for unauthorized and unlawful purposes a large portion of the sums received by the WTCC, at the expense of persons, who were intended to benefit from these funds, including the Plaintiffs,

herein." Complaint ¶ 228. Plaintiffs' Sixth Cause of Action therefore implicates the federal law violations asserted in Complaint ¶¶ 58–62, 76–78, 100, 104, 109, 110.

18.     Because certain of Plaintiffs' state-law claims implicate significant federal issues, this Action falls within this Court's federal question jurisdiction under 28 U.S.C. § 1331, and is properly removable to this Court pursuant to 28 U.S.C. § 1441.

19.     To the extent that any of Plaintiffs' claims do not independently fall within this Court's federal question jurisdiction, this Court has supplemental jurisdiction over the remainder of the Action pursuant to 28 U.S.C. § 1367(a). *See Broder v. Cablevision Sys.*, 418 F.3d 187, 194 (2d Cir. 2005).

### III. COMPLIANCE WITH REMOVAL STATUTE

20.     This Notice of Removal is properly filed in the United States District Court for the Southern District of New York because (1) the Supreme Court of the State of New York, County of New York is located in this federal judicial district, *see* 28 U.S.C. § 1441(a); and (2) this Court has exclusive jurisdiction over the Action, *see* ATSSSA § 408(b)(3).

21.     This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure, as required by 28 U.S.C. § 1446(a).

22.     The New York City Law Department first received the Summons and Verified Complaint, on behalf of Lewis Finkelman, Jeffrey Friedlander, and Kenneth Becker, on July 20, 2007. Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b).

23.     Consent to removal should not be necessary given the bases for exclusive federal jurisdiction identified above. *See Ackerman v. Nat'l Property Analysts*, No. 92 Civ. 0222, 1992 U.S. Dist. LEXIS 4761, at *1 (S.D.N.Y. Apr. 10, 1992). Further, any non-served defendants need not join in or consent to this Notice of Removal. *See, e.g. Eli v. S.E.T. Landscape Design,*

*Inc.*, 34 F. Supp. 2d 188, 194 (S.D.N.Y. 1999). Nevertheless, each defendant consents to this Notice of Removal. *See* Notice of Consent to Removal (attached hereto as Exhibit B). [4]

24.     Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon Defendants in respect to this action are attached. *See* Exhibit A. Pursuant to Rule 81.1(b) of this Court's local rules, Removing Defendants will forward a copy of any and all other records and proceedings in the Supreme Court of the State of New York, County of New York within twenty days.

25.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy, along with a Notice of Filing of the Notice of Removal, is being filed with the Clerk of the Supreme Court of the State of New York, County of New York.

---

[4]     Three persons—Andrew Alper, Phyllis Taylor, and Michael Feigin—are identified as "Defendants" in the caption of Plaintiffs' Verified Complaint but are not mentioned anywhere in the body of the Complaint, nor are they listed as Defendants in the Summons accompanying the Complaint, nor have they been served. Though Removing Defendants expect that Plaintiffs' inclusion of these persons in the Complaint caption is a typographical error, Removing Defendants have nevertheless secured consent to removal from Andrew Alper and Michael Feigin out of an abundance of caution, *see* Exhibit B, and will supplement this filing with notice of consent from Phyllis Taylor as soon as possible.

## CONCLUSION

For the reasons set forth above, Removing Defendants hereby remove to this Court the

Action pending against them in the Supreme Court of the State of New York, County of New

York, bearing Index No. 109755/07.

Dated:  August 8, 2007

McDERMOTT WILL & EMERY LLP

By: *Robert A Weiner*
       Robert A. Weiner (RW-3381)
       340 Madison Avenue
       New York, NY 10173-1922
       212-547-5400

Of Counsel:

William P. Schuman, PC
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, IL 60606-5096
212-372-2000

Margaret H. Warner
McDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, DC 20005-3096
202-756-8000

*Attorneys for Defendants WTC Captive Insurance Company, Inc.; Christine LaSala;
Mark Page; Lewis Finkelman; Jeffrey Friedlander; Meredith Jones; Mark Melson;
James Schoenbeck; and Kenneth Becker*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
JOHN R. WALCOTT, FRANK                              :
MAISANO, and MARY E. BISHOP                         :
                                                    :
            Plaintiffs,                             :        Civ. Action No. *07 CIV 7072*
                                                    :
            v.                                      :
                                                    :
WTC CAPTIVE INSURANCE                               :
COMPANY, INC.; CHRISTINE                            :
LASALA; THE HONORABLE                               :
MICHAEL BLOOMBERG; MARSH                            :        NOTICE OF
MANAGEMENT SERVICES, INC.;                          :        CONSENT TO REMOVAL
GAB ROBINS; MARK PAGE; LEWIS                        :
FINKELMAN; JEFFREY                                  :
FRIEDLANDER; MEREDITH JONES;                        :
MARK MELSON; JAMES                                  :
SCHOENBECK; and KENNETH                             :
BECKER, ESQUIRE,                                    :
                                                    :
            Defendants.                             :
---------------------------------------------------- x

        Each of the undersigned Defendants and/or persons, without waiving and specifically

reserving any and all defenses, objections, exceptions, and motions, whether directed to the

allegations in the complaint, lack of or improper service of process, jurisdiction, or any other

issues, consent to the removal of the above-captioned action from the Supreme Court of the State

of New York, County of New York, to this Court.

THE HONORABLE MICHAEL BLOOMBERG

By: _Terri Feinstein Sasanow_

Its: Terri Feinstein Sasanow (TS 5966)
Assistant Corporation Counsel
Attorney for Michael Bloomberg


MARSH MANAGEMENT SERVICES, INC.

By: _____

Its: _____


GAB ROBINS NORTH AMERICA, INC.

By: _____

Its: _____


ANDREW ALPER

By: _____

Its: _____


PHYLLIS TAYLOR

By: _____

Its: _____


MICHAEL FEIGIN

By: _____

THE HONORABLE MICHAEL BLOOMBERG

By: _____

Its: _____


MARSH MANAGEMENT SERVICES, INC.

By: _____

Its: _Counsel_____


GAB ROBINS NORTH AMERICA, INC.

By: _____

Its: _____


ANDREW ALPER

By: _____

Its: _____


PHYLLIS TAYLOR

By: _____

Its: _____


MICHAEL FEIGIN

By: _____

Its: _____

THE HONORABLE MICHAEL BLOOMBERG

By: _____

Its: _____


MARSH MANAGEMENT SERVICES, INC.

By: _____

Its: _____


GAB ROBINS NORTH AMERICA, INC.

Drinker Biddle & Reath

By: _____
    Michael O. Adelman

Its: Counsel for GAB Robins North America, Inc.


ANDREW ALPER

By: _____

Its: _____


PHYLLIS TAYLOR

By: _____

Its: _____

MICHAEL FEIGIN

By: _____

Its: _____

THE HONORABLE MICHAEL BLOOMBERG

By: _____

Its: _____

MARSH MANAGEMENT SERVICES, INC.

By: _____

Its: _____

GAB ROBINS NORTH AMERICA, INC.

By: _____

Its: _____

ANDREW ALPER

By: Robert A Weiner _____

His Its: Attorney _____

PHYLLIS TAYLOR

By: _____

Its: _____

MICHAEL FEIGIN

By: _____

Its: _____

THE HONORABLE MICHAEL BLOOMBERG

By: _____

Its: _____


MARSH MANAGEMENT SERVICES, INC.

By: _____

Its: _____


GAB ROBINS NORTH AMERICA, INC.

By: _____

Its: _____


ANDREW ALPER

By: _____

Its: _____


PHYLLIS TAYLOR

By: _____

Its: _____


MICHAEL FEIGIN

By: _____

Its: _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                    Plaintiffs,

-against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS
FINKLESTEIN; JEFFERY FRIENDLANDER;
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                    Defendants.

------------------------------------------------------------------X
TO THE ABOVE NAMED DEFENDANTS:

Index No.: 109755/07

SUMMONS

NEW YORK
COUNTY CLERK'S OFFICE

JUL 17 2007

NOT COMPARED
WITH COPY FILE

       You are hereby summoned and required to serve upon the undersigned counsel for plaintiffs an

answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive

of the day of service, or within thirty (30) days after service is complete if this summons is not personally

delivered to you within the State of New York. In case of your failure to answer, judgment will be taken

against you by default for the relief demanded in the complaint.

Dated:  New York, New York
        July 16, 2007

                    Yours, etc.,
                    WORBY GRONER & NAPOLI BERN, LLP
                    *Attorneys for Plaintiff*

                    Marc Jay Bern
                    115 Broadway, 12th Floor
                    New York, New York 10006
                    (212) 267-3700

COPY

TO:

WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

MARSH MANAGEMENT SERVICES, INC.
300 Broadhollow Road
Melville, New York 11747

GAB ROBBINS
123 William Street
NY, New York 10038

CHRISTINE LASALA
President and Chief Executive Officer
c/o WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

MARC PAGE
New York City Office Of Management And Budget
75 Park Place
New York, New York 10007

LEWIS FINKLESTEIN
c/o WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

JEFFERY FRIEDLANDER
c/o NEW YORK CITY LAW DEPARTMENT
Office of the Corporation Counsel
100 Church Street
New York, New York  10007

MEREDITH JONES
c/o WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

MARK MELSON
c/o WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

JAMES SCHOENBECK
c/o WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

KENNETH BECKER, Esq.
c/o Michael A. Cardozo
Corporation Counsel of the City of New York
100 Church Street
New York, New York 10007

THE HONORABLE MICHAEL BLOOMBERG
Mayor of the City of New York
City Hall
New York, New York

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X

JOHN R. WALCOTT, FRANK MAISANO and MARY          Index No.:
E. BISHOP

                         Plaintiffs,

-against-                                          VERIFIED COMPLAINT

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; ANDREW
ALPER; JEFFERY FRIEDLANDER; PHYLLIS
TAYLOR; MICHAEL FEIGIN; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                         Defendants.
--------------------------------------------------------------------X

        Plaintiffs JOHN WALCOTT, FRANK MAISANO and MARY E. BISHOP (hereinafter

"Plaintiffs") appearing by their counsel WORBY GRONER & NAPOLI BERN, LLP,

complaining of defendants, respectfully alleges the following upon information and belief,

except as to the allegations, which pertain to the plaintiff(s), which are alleged upon personal

knowledge.  Plaintiffs' information and belief are based upon; *inter alia*, the investigation made

by and through its attorneys and upon materials in the public domain and obtained through and

from defendants.  Plaintiff(s), as and for their complaint, hereby allege:

## PARTIES

1.       Plaintiff JOHN R. WALCOTT had served with the New York City Police

Department since June 30, 1992, and by the time of the terrorist attacks on 9/11, had risen to the

rank of Detective. Mr. Walcott is life long non-smoker, was born on September 7, 1964, and has

resided at 46 Call Hollow Road in Pomona, New York for approximately 10-12 years along with

his wife and baby daughter.  Detective Walcott was last assigned to Manhattan North Narcotics.

2.      Plaintiff FRANK MAISANO was formerly a Detective with the New York Police Department.  He is a life-long non-smoker, former Golden Gloves boxing champion for the NYPD and resides at 295 Foster Road, Staten Island, NY 10309.

3.      Plaintiff MARY E. BISHOP resides at 120-11 109th Avenue, apartment E3, South Ozone Park, NY 11420.  Ms. Bishop was employed by St. Vincent's Hospital.

4.      Defendant WTC CAPTIVE INSURANCE COMPANY, INC. ("WTCC" or "the Captive") was created pursuant to Federal and New York State legislation as a not-for-profit corporation licensed and domiciled as a captive insurance company by the New York State Insurance Department.

5.      Defendant WTCC maintains its principal place of business at 100 William Street, Suite 2001, City and State of New York, 10038.

6.      Defendant MARSH MANAGEMENT SERVICES, INC., is the Administrator of the WTCC, with its principal place of business at 300 Broadhollow Road, Melville, New York 11747.  At all times relevant, herein, Marsh Management Services, Inc., was the agent and affiliate of the WTCC.

7.      Defendant GAB ROBBINS is the third party claims administrator retained by the WTCC and at all relevant times has served as the agent and affiliate of the WTCC, with its principal place of business located at 123 William Street, NY, NY 10038.

8.      Defendant CHRISTINE LASALA is the President and Chief Executive Officer of the WTCC.

9.      Defendant MARC PAGE is a member of the WTCC Board and member of the WTCC Board of Directors' Audit Committee.

10.     Defendant LEWIS FINKLESTEIN is a member of the WTCC Board.

11.    Defendant MEREDITH JONES is a member of the WTCC Board.

12.    Defendant JEFFREY FRIEDLANDER is a member of the WTCC Board.

13.    Defendant MARL MELSON is a member of the WTCC Board.

14.    Defendant JAMES SCHOENBECK is the Chief Financial Officer and Treasurer of the WTCC.

15.    Defendant KENNETH BECKER is a member of the WTCC Advisory Committee and head of the New York City Law Department's WTC section.

16.    Defendant MICHAEL BLOOMBERG is the Mayor of the City of New York who, in part, has and continues to appoint the board of the WTCC and effectively controls its operations and actions.


## FACTUAL HISTORY

### A.  Detective Walcott's WTC Exposure and Subsequent Diagnosis.

17.    Following the attacks of September 11, 2001, Detective Wolcott was deployed at the WTC site ("Ground Zero") between September 2001 and January 2002, for approximately 36 days, from 8 to 12 hours per day.  Throughout much of this time, he was provided with no effective respiratory protection from the multiple toxic contaminants at the WTC site.

18.    On January 8, 2003, Detective Walcott underwent a medical examination as part of The World Trade Center Worker and Volunteer Medical Screening Program at Mt. Sinai Hospital. The examination detected significantly abnormal clinical chemistry parameters, including elevated liver enzymes ALT (SGPT), Gamma GT with normal hematology studies obtained.

19.    In or about May 2003, Detective Walcott was diagnosed with acute myeloid leukemia (AML) with monocytic differentiation.

3

20.     Detective Maisano was stationed at Ground Zero from September 11 through September 14, 2001.  He worked 16 to 20 hours per day without any respiratory protection while rescuing victims and recovering bodies and body parts.  Thereafter, he worked at the forensic unit located at Fresh Kills Landfill site in Staten Island, New York in February, March and May, 2002.

21.     Detective Maisano has been diagnosed with restrictive lung disease and has been advised by his physicians that he requires a bilateral lung transplant.  He was forced to retire from the police force as disabled on the line of duty on August 31, 2004.

22.     While working at Ground Zero and Fresh Kills, Plaintiff Maisano was never offered a respirator, was never told of the need for respirator use, and was never warned of any toxic exposure danger at these sites.

23.     Plaintiff Mary E. Bishop was a civilian volunteer working at Ground Zero from September 11 through October 2, 2001, at upwards of 21 hours per day.  Ms. Bishop recovered and tagged body parts on the south side of the WTC site and then escorted them to the morgue.

24.     Plaintiff Bishop has been diagnosed with sarcoidosis and cancer and suffers from shortness of breath, chest pain, headaches, a chronic and potentially fatal lung infection and digestive distress from her exposure to toxins at Ground Zero.

25.     Ms. Bishop was not offered a respirator, nor warned of the dangers of the toxic exposures  at any time during her work at and near the WTC site.  She was never advised of the need for personal protective (safety) equipment during her work at the WTC site.

26.     Following the collapse of the WTC towers, the earliest testing for Volatile Organic Compounds (VOCs), including the known carcinogens toluene and benzene, were conducted at the request of the Office of Emergency and Remedial Response of the U.S. Environmental Protection Agency (USEPA).  Specific field testing was conducted by Data Auditing Group Quality Assurance

Technical Support Laboratory of IT Corporation (Las Vegas, Nevada), which reported 17 WIG air analyses from October 3, 2001 through October 23, 2001. The analyses revealed high levels of benzene and toluene in excess of guidelines protective of human health.

27.    Benzene is a potent human carcinogen (Class A). Without dispute, it is generally recognized by all toxicologists that sufficient levels and duration of exposure to benzene inhalation is causally associated with the induction of acute myelogenous leukemia ("AML"). AML has a relatively short latency period of 1-2 years following chemical induction by benzene, ionizing radiation, or cytotoxic drugs. Occupational exposures at levels of 100 PPB to 1000 PPB generally require several years of exposure to induce AML.

28.    Plaintiffs' exposures ranged from 720 parts per billion (PPB) to 58,000 PPB, with an average value of 16,860 PPB. This exposure, combined with an 84-hour work week, produced equivalent exposure compared to the occupational studies linking benzene to AML. Plaintiffs were exposed for approximately 4-5 weeks at levels approximately 353-times higher than that of benzene-exposed workers in the human benzene studies with several years of exposure at lower levels. The total doses are similar. Their relatively short duration of exposure at dangerously high levels produced total benzene exposures reasonably similar to that published within the human epidemiological and toxicological studies associated with AML.

### B.  The WTC Captive Insurance Co.

29.    Following the terrorist attack of September 11, 2001 and throughout the Ground Zero debris removal project that continued until June of 2002, the City of New York and its contractors were unable to obtain sufficient insurance coverage for the massive post-9/11 debris removal effort at the site of the World Trade Center and related job sites (including Fresh Kills Landfill, the debris Transfer Stations, the Barges, etc.).

30.    The City retained the firm of Ernst & Young in late September, 2001, two weeks after 9/11, to advise on risk and insurance issues related to the WTC debris removal project.  A major component of this responsibility was the determination of the amount of insurance needed for the project, which the City named "The World Trade Center Coordinated Insurance Program ('WTC CIP')."

31.    As recounted in memoranda between the City and the Federal Emergency Management Administration ("FEMA"), including a memorandum dated May 13, 2002, from the City's Special Insurance Counsel Lawrence Martin to FEMA, the initial report was tendered to the City in October, 2001.  Ernst & Young reportedly analyzed the City and its contractors' potential liability and resulting losses for claims expected to be brought by, in part, persons exposed to toxins during the debris removal project, such as the Plaintiffs.

32.    In October 2001, Ernst & Young estimated that such future losses could reach $2.8 billion and recommended the purchase of insurance to meet that need.

33.    However, as recounted in a Memorandum from the NYC Law Department to FEMA of May 13, 2002, by October of 2001, the insurance "marketplace has failed to offer any appropriate, commercially reasonable coverage for environmental or professional liability or to write general liability insurance excess of the $79 million we have placed.  Insurance carriers have taken the position that the liabilities at issue, especially environmental, are not risks but known losses – the lawsuits and insurance costs are certain to happen – and thus they will not write traditional "risk transfer" insurance."

34.    For insurance purposes, "loss" or "losses" has a distinct meaning that is different from a "claim."  Indeed, as set forth in the insurance policy drafted by the City and the WTC Captive and subsequently incorporated into the FEMA Grant, 'Loss' is defined at page 4 to mean

6

"the amount of Damages *paid or payable* hereunder by the Company on behalf of the Insured with respect to a specific claim."  (Emphasis added).  That is, a "loss," for all relevant purposes in this matter, means the actual payment to claimants resulting from judgments or settlements arising from the ascertained liability of the City and its contractors.

35.    Thus, a little more than a month after the tragic events of 9/11, the City, its contractors and the worldwide insurance market were fully aware that Ground Zero workers, such as Plaintiffs herein, were being exposed to construction debris and substances that were toxic, in amounts "certain" to cause injury, with resulting claims and "known losses."  Despite this knowledge, the City and its contractors failed to act in a reasonable manner that would have reduced or prevented such injuries and resulting claims, when it was in their power and ability to do so.

36.    The City was able to procure some insurance during and for the debris removal project, totaling $79 million.  The premiums for these policies were paid by FEMA as part of the WTC CIP.

37.    The first layer of coverage was a Comprehensive General Liability Insurance (CGL) policy, number RG2-621-004607-01, placed with Liberty Mutual Insurance Company, with, in part, a $4 million general aggregate, $2 million completed operations aggregate and a required pre-funded defense obligation of $4 million, after which Liberty Mutual was obligated to defend until the policy limits were exhausted in indemnification payments.  This coverage for the debris removal project is primary.

38.    Excess insurance was obtained upon the London market under two policies: policy number 576/UF7278400, which has a $50 million general aggregate, project completed hazard coverage of $50 million and an obligation to defend the covered insureds without any prepayment of legal expenses.  Similarly, policy number 576/UF7280600 contains a $25 million general liability

aggregate with a $25 million project completed hazard coverage and defense obligation.  These policies come in to play, in succession, upon the exhaustion of the Liberty Mutual coverage(s).

39.    Additional coverage was placed for marine hazards that apply to the barges used in the debris removal project.

40.    The City, its contractors, FEMA and the State and Federal government, including the United States Congress, were acutely aware at the beginning of November, 2001 that the City and its contractors faced billions of dollars in future losses that were unindemnified by insurance.

41.    In November 2001, Congress amended the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230 (2001) codified as amended at 49 U.S.C. §40101, to limit the City's liability, "arising from the terrorist-related aircraft crashes of September 11, 2001, …[to] the greater of the city's insurance coverage or $350,000,000." ATSSSA §408(a)(3).  *See also* 147 Cong. Rec. H8262, H8282 (Nov. 16, 2001).

42.    No liability limit was ever enacted by any government entity that applies to the City's contractors.

43.    In November 2001, then-Mayor Giuliani wrote to New York's congressional delegation to emphasize that, although the liability limitation discussed above "would solve one large part of the City's potential liability exposure," the City had an "urgent need for indemnification in removing debris from the World Trade Center site."  *See* McNally v. Port Authority of New York and New Jersey, 414 F.3d 352, 379 (2d Cir 2005).

44.    Congress responded in February, 2002, with proposed legislation entitled "The Ground Zero Recovery Protection Act," that would have provided $1 billion in federal indemnification for injury, death and property damage claims not otherwise compensable by private insurance procured for the risks involved in the WTC debris removal efforts.

45.     Significantly, the proposed bill exempted federal indemnification for any claim that "arises from willful misconduct or lack of good faith," all of which have been plead in pending suits against the City and its contractors.

46.     By memorandum dated March 6, 2002, Lawrence Martin, the City's special insurance counsel, confirmed to FEMA the interest "in replacing the proposed legislative indemnification of $1 billion [The Ground Zero Recovery Protection Act], with an insurance-based mechanism."   The goal of the City and FEMA was to replace the federal government's role in claims handling required under the proposed legislation with an insurance mechanism that would achieve the same purpose - "Our starting point is simple – the insurance would match the parameters of the proposed legislative indemnification it replaces."

47.     Nothing in the proposed Ground Zero Recovery Protection Act limited intended claim activity to defending the City and its contractors.  To the contrary, section (g) of that Act expressly anticipated that the federal government might direct, control "or assist in settling or defending any claim… ." Further, the Act expressly gave the federal government a right of subrogation for any claims it paid.

48.     As evidenced by the Act, Congress is well aware that the duty to indemnify is separate from the duty to defend, under well-worn insurance law.

49.     From the outset, both the City and FEMA understood that any agreed upon insurance mechanism would similarly be tasked with claim indemnification, not simply claim defense.  This was expressly set forth in a March 15, 2002, letter from FEMA to Edward Jacoby, Jr., the New York Governor's authorized representative in Washington, D.C. "New York City's memo stated that the contemplated insurance should act as a substitute for indemnification for all response activity at or in the vicinity of the World Trade Center site."

9

50.    Various discussions were held and memoranda exchanged between the City and FEMA in April and May, 2002, concerning the creation of the contemplated insurance indemnification mechanism.

51.    In a Memorandum from the NYC Law Department to FEMA of May 13, 2002, the City emphasized the need for the contemplated indemnity from future "certain losses," given a revised Ernst & Young report that significantly upwardly revised the range of expected losses, with a high range of $4.2 billion and a median range of $2.3 billion.

52.    Accordingly, the City asked FEMA to consider approving $1 billion in non-risk-transfer insurance in the form of finite risk or a captive insurer, with the understanding that additional funding may be requested or applied for to meet future losses.

53.    In its formal funding request of May 13, 2002, the City acknowledged that given the "toxic chemicals emanating from the WTC debris site," the requested funding was "absolutely vital to protect the City and its contractors… ."

54.    There can be no doubt that the purpose behind the requested $1 billion insurance fund was to satisfy and pay the expected claims and resulting losses filed against the City and its contractors for toxic exposure during the debris removal work.  This was expressly made clear by the thirty (30) members of the House of Representatives in their joint correspondence to FEMA of May 24, 2002, in support of the City's application.

55.    The Congressmen stated in their aforesaid correspondence that: "The coverage envisioned in this proposal will ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors."

10

56.     FEMA formally responded to the City's May 13, 2002, request in correspondence dated June 20, 2002, directed to Edward Jacoby, Jr., the Governor's representative.   Therein, FEMA indicated that it accepted the City's proposal with the stipulation that the City cooperate in supplementing "actuarial studies to refine estimates of the probable losses associated with this insurance program…" since all parties (FEMA, SEMO and NYC) recognized that the requested $1 billion of coverage "may not cover all liability…associated with the debris removal process".

57.     Again, the insurance program was acknowledged to be vital to meet "the midrange probable maximum loss amount, as established in the May, 2002 Ernst & Young report," not simply to defend against claims.   As set forth, above, "meet the probable maximum loss amount" means "pay claims," not simply litigate them.

58.     Congress acceded to the City's funding request.   In Pub. L. No. 108-7, 117 Stat. 517, 518, (Feb. 12, 2003), a spending appropriation bill, Congress directed that FEMA "provide, from funds…. up to $1,000,000,000 to establish a captive insurance company or other appropriate insurance mechanism for claims arising from debris removal, which may include claims made by city employees."

59.     Plaintiffs are precisely the individuals for whom Congressional funding was provided.  As such, Plaintiffs have a special and protected interest in the WTC Captive fund.

60.     Congress did not, either implicitly or explicitly, instruct that a captive insurance company be established *solely to defend the City of New York and its contractors* from all rescue, recovery and debris removal related claims at all costs, nor was the goal or purpose merely to create commercially unavailable insurance coverage.

61.     Congress did not instruct that a "liability insurance protection for the City and its contractors" be funded in this authorization, as misinterpreted and argued by the WTCC and the

11

City in various court papers[1] and correspondences.  Rather, funding was provided for either a captive insurance company or "other appropriate insurance mechanism."   No particular form of insurance was specified, liability insurance was never even mentioned, nor does the statute require the formation of a captive or other appropriate insurance *entity*.  Rather, the Act requires the formation of a captive or other appropriate insurance *mechanism.*

62.    "Mechanism" means "the agency or means by which an effect is produced or a purpose is accomplished." *Random House College Dictionary*, Revised Edition, (1975).  The goal or purpose of the appropriation *was not the purchase of insurance*:  that merely served as the means to achieve the desired end.  That end was not mere insurance procurement, but procurement to provide claim payment, to which end Congress directed the City to report regularly on its distributions from the fund.  *See* 149 Cong. Rec. H1268 (Feb. 12, 2003) (conference report accompanying bill).

63.    Federal officials have subsequently confirmed that the insurance fund was intended to compensate Ground Zero workers, such as the Plaintiff, herein, for claims arising out of the debris removal process.

64.    In September 2003, an official from the General Accounting Office testified before Congress that the one-billion-dollar fund "authorized FEMA to establish an insurance company to manage a $1 billion insurance fund and to settle claims filed by, among others, city and contractor workers who suffered ill health effects as a result of working on debris removal operations."  *See* JayEtta Z. Hecker, Director of Physical Infrastructure Issues for General Accounting Office, *Disaster Assistance:  Federal Aid to the New York City Area Following the Attacks of September 11*

---

[1] *See* <u>In re: World Trade Center Disaster Site Litigation,</u> 21 MC 100 (AKH) United States District Court, Southern District of New York<u>.</u>

*and Challenges Confronting FEMA* 9, Testimony Before the Senate Subcomm. on Clean Air, Climate Change, and Nuclear Safety, Comm. on Envt. and Pub. Works (Sept. 24, 2003), at 23-24.

65.    In his July 31, 2006, letter to Defendant Christine LaSala, Senator Charles E. Schumer unequivocally stated, in part, that he "worked closely with the City, contractors and the Administration, including OMB Director Daniels to … secur[e] $1 billion in federal funds *to ensure that anyone injured at the site would be compensated."* (Emphasis added).

66.    Senator Schumer also stated in the aforesaid correspondence, that "[w]hen [he] worked with the City and the contractors, [his] intent, along with that of [his] colleagues in Congress, was to use this federal money to pay appropriate claims, not to fight claims."

67.    Similarly, in his July 27, 2006, letter to Richard L. Skinner, Inspector General of the Department of Homeland Security, Congressman Jerrold Nadler stated, in part that "it was not the Congressional intent to provide $1 billion in federal taxpayers money simply to fight 9/11 heroes in court, without any provision for paying valid claims."

68.    Senator Clinton's September 21, 2006, correspondence to Defendant Christine LaSala is in accord, stating that the WTC Captive "has *disproportionately* focused its efforts at *protecting New York City from the liability that may arise* from these claims instead of its responsibility to process the claims and disburse all due compensation to those who were injured at Ground Zero." (Emphasis added).

69.    The obligation of the congressionally funded insurance entity to pay appropriate claims was also acknowledged by State and City officials in connection with the passage of appropriate New York State legislation enabling the creation of retroactive insurance and the WTC Captive.

70.     NY Insurance Law Sections 7001-7008 contain the provisions relevant to the formation of the WTC Captive.

71.     Section 7003(c)(5) expressly permits the N. Y. Superintendent of Insurance to consider the WTC Captive's ability to meet "the unique risk insured by such captive and the source and limits of the premium payments along with any limitations on the *acceptance of claims* and the *payment of accepted claims* so long as such limitations provide an equitable basis for the allocation of the assets of such company to *pay claims*." (Emphasis added).

72.     The statutorily anticipated and approved WTC Captive claims activity of equitably allocating assets to pay claims based upon a weighted scale of merit is in sharp contrast to the Captive's actual conduct –endless litigation designed to defeat each and every claim, including through their claimed immunity.

73.     Section 7005(a)(3) expressly gives the Mayor of NYC the discretion to form a captive insurance company as either "a public benefit corporation or not-for-profit corporation…that shall be exempt from all state and local taxes."

74.     The Governor's March 21, 2003 press release announcing the swift passage of the New York enabling legislation, expressly quoted New York City Mayor Michael Bloomberg as saying: "The City of New York, together with State officials and the New York Congressional delegation, has fought long and hard for federally-paid insurance to protect the City and its contractors for claims arising from the massive debris removal work done in the World Trade Center. *This legislation is necessary for the City to expedite the payment of claims* relating to this effort."  (Emphasis added).

75.     In his July 28, 2006, correspondence to Defendant Christine LaSala, then-NY Insurance Superintendent Howard Mills informed the WTC Captive that the failure to pay claims

14

from the $1 billion fund and its use solely to fund the Defendants' immunity litigation, evident from the "financial filings" with the Department, violates the "intended purpose" for which the WTC Captive was formed.

76.    The FEMA Grant award authorized by P.L. 108-7, also expressly reiterates the duty and obligation of the WTC Captive to adjust and pay claims.  Article VI requires that the WTC Captive's funds "be invested and used to pay all costs related to the operation of the Captive, including but not limited to *losses*, fees to service providers, taxes, administrative and defense costs." (Emphasis added).

77.    Similarly, Article VIII of the FEMA grant contemplates that quarterly reports must be prepared and submitted to FEMA "of losses incurred, losses paid…and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported."

78.    Accordingly, the third section of the WTC Captive's Certificate of Incorporation, filed with the New York Secretary of State on or about July 9, 2004, indicates, that the Captive is a not-for-profit corporation formed under NY law to, in part, to insure against the "legal liability of the insured, and against *loss*, damage or expense incident to a claim of such liability (including the insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependants, beneficiaries or personal representatives of persons who are killed, irrespective of legal liability of the insured)." (Emphasis added).

79.    Section nine of the Certificate of Incorporation requires that the WTC Board create an Advisory Committee of three members that is vested with considering claim disputes referred to the Board by the Captive's third party claim administrator and with forwarding a recommendation to the Board for each such dispute.

80.     Section nine also requires that in the event that the Board "disagrees with the Advisory Committee's recommendation and there is still a dispute with respect to such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under New York law pursuant to the rules of the American Arbitration Association.  The decision rendered upon such arbitration shall be binding on the Board of Directors and the Company."

81.     Thus, according to the Certificate of Incorporation, there is supposed to be non-litigious claims resolution, including benefits for injured or deceased persons and their heirs "irrespective of legal liability of the insured."

82.     Section Four of the WTC Captive's Certificate of Incorporation establishes that it is type "D" non-profit corporation pursuant to the not-for-profit corporation law.

83.     Pursuant to New York's Not-For-Profit-Corporation Law ("N-PCL") § 201(b), a type "D" not-for-profit corporation is one formed by authority of another law, such as the previously cited Captive statute.

84.     Pursuant to N-PCL § 201(c), "[a] type D corporation is subject to all provisions of this chapter which are applicable to a type B corporation under this chapter unless provided to the contrary in, and subject to the contrary provisions of, the other corporate law authorizing formation… ."

85.     As a Type "D" non-profit insurance corporation, the WTC Captive is not the equivalent of a private, for-profit insurance company, but is nonetheless subject to all obligations attendant to such entities as a matter of law.

86.     Indeed, Section Fourteen of the WTC Captive's Certificate of Incorporation provides that the WTC Captive and the Certificate of Incorporation shall be construed to be *an integral part of the City of New York*, within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935),

and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States IRS Code of 1986, as amended.

87.     Article XII of the FEMA Grant expressly requires that the Captive comply with "all applicable Federal, State and local laws, rules and regulations."

88.     Under New York law, as a not-for-profit corporation affiliated with the City of New York, the WTC Captive is considered to be a "local authority." *See* The Public Authorities Accountability Act of 2005, 2005 Sess. Law News of N.Y. Ch. 766 (S. 5927) (McKINNEY'S), §2.

89.      The public purpose of the WTC Captive to compensate Ground Zero workers for claims against the City arising out of the debris removal was even acknowledged at one of its first board meetings, before the retention of litigation counsel and resulting litigation strategy.

90.     The December 2, 2004, meeting minutes of the WTC board, conducted shortly after the execution of the November 1, 2004, FEMA Grant, indicate at pp. 5-6, that Defendant LaSala "emphasized that the fundamental purpose behind the creation and funding of the WTC is to conserve and *disburse its assets in an equitable manner that maximizes compensation* to those parties who suffered damages as a result of the WTC debris removal program…Ms. LaSala commented that the WTC's charge is to implement a budgeting process pertaining to legal defense and other administrative expenses designed to maximize indemnity to those parties able to demonstrate harm from the debris removal.  *The Directors concurred*…" (emphasis added).

### C. WTC Captive Claim Payment History

91.     There is no WTC Captive claim payment history, but for a single non-toxic exposure claim that was primarily adjusted, paid and covered by another carrier, for which additional coverage below the Captive policy existed.  Further, despite the claim having been previously

adjusted by the insurer paying the majority of the claim, the WTCC declared and paid administrative and adjusting expenses of roughly 50% of the aforesaid payment.

92.    Since its inception, the WTC Captive has consistently refused to pay any of the Ground Zero workers who have become ill from their exposures on the worksite, including any compensation for pecuniary loss or pain and suffering, medical treatment, medical monitoring or burial expenses.

93.    At the same time, by March 31, 2007, the Captive had reportedly spent more than $9,270,000 in "overhead," such as salaries, consultants, office expenses and insurance alone.  In the same time period, the Captive spent more than $64.6 million on "loss adjustment expenses," *of which $45.7 million was for attorneys' fees alone*.

94.    The WTCC began operating in November or December 2004.  From that time to the end of the first quarter of 2007, *it has spent at least $73,870,000* without settling or resolving a single toxic exposure claim.   Given the expressed intent of the City to litigate each and every conceivable issue so as to prevent the adjudication of any claim until at least 2015, as set forth in paragraph 12, *infra*, and extrapolating past expenses to that time, the Captive will have expended at least one quarter of the billion dollar fund in administrative and defense fees before any claim is resolved.  Further, given the claim administration and adjustment expenses declared and paid of roughly 50% on the only claim partially paid by the WTCC, for which other coverage existed, overhead, adjusting and administrative expenses will similarly consume an unreasonable and disproportionate share of the remaining public funds.

95.    All WTCC administrative and defense fees are subtracted from the Fund, depleting the only source of remuneration available to the Plaintiffs, who have a protected and special interest in the Fund *res*, which was established for their benefit.

96.     As reported in the October 15, 2006 New York Post, in an article entitled "350G PAYCHECK FOR CITY'S 9/11 SCROOGE," Defendant LaSala has received an annual salary of $350,000 per year, plus $20,000 in health insurance benefits and an undisclosed amount of retirement benefits.

97.     The aforesaid NY Post article also reported that "teams of lawyers hired by WTCC to dispute and deny more than 5,000 claims for illnesses blamed on toxic exposure at Ground Zero earn up to $550 an hour for "senior partners," with other top lawyers working for the entity earn higher rates."

98.     Undisclosed to the public, the City has delegated the task of conducting hearings permitted by General Municipal Law § 50-h to defense counsel retained by the Captive, a function normally handled by City-employed attorneys.  By virtue of this assignment of the "50-h hearings" to outside defense counsel, these short depositions normally conducted with little fanfare and for minimal cost are being conducted for exorbitant legal fees, with numbers of participating attorneys and length of hearings considerably in excess of those permitted by the City for contract lawyers in other litigation or in hearings conducted by its own attorneys.  Standing alone, this represents a significant and wholly unnecessary waste of the Captive's funds.

99.     As such, the Defendants are permitting the City to treat the Captive's retained counsel as its direct agents and servants, at rates and in a manner that is otherwise unacceptable for City employees, at no expense to the City but at the expense of the Captive's available funds, which are being unnecessarily and wrongfully depleted by such expenditures.

100.     At the same time, the Captive has failed to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies, as required by the New York Unfair Claims Statute, Insurance Law § 2601 and Article XII of the FEMA Grant.

19

101.    The Plaintiffs, as well as the more than 8,056 similarly situated Ground Zero claimants, by and through their counsel, have repeatedly offered to supply the Captive with financial loss and medical records and to work with the WTCC and/or its counsel to devise a plan to determine which legitimate claims should be paid immediately and which needed further information, to no avail.

102.    The Captive has wrongly refused to accept any medical records or other documents from which individual case reserves can be calculated, future losses ascertained and aggregate reserves for losses can be established.

103.    In addition to willfully failing and refusing to fulfill its mandate, the Captive has nevertheless paid, and the Defendants have permitted the Captive to pay and/or have otherwise accepted payment, of over $8,585,736 to Defendant GAB Robbins to "adjust" claims, despite the lack of any claim data, claim activity or claim payment.

104.    Correspondence from Defendant LaSala to the members of the Senate, the Congress and to the New York State Superintendent of Insurance, indicates that the City, the Captive, the Captive's board members, officers and administrators now believe and conduct themselves as if Congress provided the billion dollar fund creating the Captive solely to provide a defense for the City of New York and its contractors.

105.    In correspondence to Senator Schumer dated August 9, 2006, Defendant LaSala, on behalf of all defendants herein, stated that "The primary duty of the WTC Captive is to its insureds as would be the case if the insurance had been available commercially…The WTC Captive was not created as a victim's compensation fund… The Captive's mandate is to protect its insureds, including preventing their facing uninsured liability, so that neither the City nor any of the

20

contractor and subcontractor policyholders incurs financial damage as a result of the responsible and public-spirited role they played in the rescue, recovery and debris removal effort on and after 9/11."

106.    In correspondence to Commissioner Mills, Defendant LaSala emphasized the import of litigating immunity issues on the behalf of public entities and their retained contractors as being in the nation's best interests, despite the lack of any such purpose or charge in either the Congressional appropriation, FEMA Grant, Certificate of Incorporation or WTCC By-Laws and despite the rejection of this position by the District Court in its denial of the City and Contractors' immunity motions, as well as by Congress itself, in its rejection of proposed legislation that would have granted immunity to such entities and contractors.

107.    In her various statements and correspondence, Defendant LaSala, on behalf of all defendants herein, confirmed that the Defendants have *de facto* materially altered the purpose for which the WTC Captive was formed and funded, as set forth in paragraphs 30 through 90, *supra*. To the contrary, the WTCC insurance fund is *unique* and completely unlike any commercially available insurance: it is retroactive, non-risk transfer insurance for the benefit of a narrow and known class of WTC rescue, recovery and debris removal workers, including the Plaintiffs, herein. That is, the coverage was obtained after the known toxic exposure occurred to an identifiable and known class of the aforesaid WTC workforce solely and exclusively for their benefit.  As set forth, above, there was no "risk" involved since "losses" - expected claim liability and payments – are and were "certain," as set forth in paragraph 33, above, when the insurance was authorized, funded and placed.

108.    Further, Defendant LaSala, on behalf of all defendants herein, confirmed that the Defendants were not conducting the WTC Captive's business consistent with its by-laws and certificate of incorporation, as set forth in paragraphs 19 through 78, *supra*.

109.    Without question, Congress, FEMA, the New York State Emergency Management Office ("SEMO"), the New York Department of Insurance nor the New York Legislature did not, either implicitly or explicitly, instruct that a captive insurance company be established solely to defend the City of New York and its contractors from all rescue, recovery and debris removal related claims, at all costs.  Indeed, by so doing, the Defendants are improperly attempting to introduce "risk" (immunity from suit) into what was both expressly intended and authorized to be a non-risk transfer insurance fund.

110.    To the contrary, Congress, FEMA, SEMO, the New York Department of Insurance and the New York Legislature intended that the City and its contractors be *indemnified*, not simply defended from, the claims made by injured WTC workers.   Moreover, unlike commercially available insurance, pursuant to P.L. 108-7, the FEMA Grant, the Sub-Grant and the New York Legislation, both the WTCC fund and WTCC insurance policy were expressly retroactively created for a known, narrow and limited class of people who were injured through their exposure to toxic debris, as set forth in paragraph 107, above.  By using the WTCC funds solely to litigate on behalf of the City and contractors' purported immunity defenses, the Defendants are squandering the appropriated non-risk transfer funds at the expense of their intended recipients:  the Heroes of 9/11, including the Plaintiff, herein.

111.    Defendant LaSala and the Board itself recognized this purpose at the November 1, 2004, board meeting, when the Board concurred with Defendant LaSala's statement that "the fundamental purpose behind the creation and funding of the WTC is to conserve and *disburse its assets in an equitable manner that maximizes compensation* to those parties who suffered damages as a result of the WTC debris removal program."

112.    Despite the payment of tens of millions of dollars for claim defense and administration, not one penny has been spent to compensate workers injured by exposure to toxic substances during their heroic work at Ground Zero.

### D.   The Captive is Controlled by the City as a Public Entity

113.    Following the acceptance and execution of the FEMA Grant Agreement, a Sub-Grant Agreement was accepted and executed on behalf of the City by Mark Page, the City's Director of the Office of Management and Budget, in November, 2004.  The Sub-Grant agreement ratified and incorporated the terms of the FEMA grant agreement.

114.    The first page of the FEMA Grant agreement expressly states that the City "took control of the scene [at Ground Zero] and coordinated citywide response efforts, including debris removal."  This factual pronouncement was ratified by the City in the Sub-Grant.

115.    Both the Grant and Sub-Grant required that the City "establish and incorporate" the WTC Captive, and provided $3 million to the City for reimbursement of this obligation, including the preparation of the Certificate of Incorporation, the Captive By-Laws and the Liability Insurance Policy, all of which were attached to and incorporated into the Grant and Sub-Grants.

116.    Pursuant to the authority vested by FEMA, the City drafted and prepared the Captive's Certificate of Incorporation, By-Laws and the Captive Insurance policy.

117.    The Certificate of Incorporation indicates that Captive is a not-for-profit corporation and that the Mayor of New York City appoints the members of, and has control over, the Captive's Board of Directors.  The Captive's Board, in turn, appoints its officers and sets their compensation, including Defendant LaSala and WTCC Secretary Thomas Jones, Esquire. The WTCC's officers attend to the day to day operation of the WTCC and submit proposals for the Board's consideration, including the selection of outside contractors, such as the law firm of McDermott Will & Emery,

23

LLP.  At no time did the WTCC Secretary, Thomas Jones, Esquire, nor McDermott Will & Emery,

ever advise the WTCC Board that there was or may be a conflict by Mr. Thomas Jones

simultaneously serving as a WTCC executive while the law firm of McDermott Will & Emery, LLP

was retained and paid by the WTCC to render advise and counsel to the WTCC, including its

conduct.

118.    Specifically, paragraph "Fifth" provides, in part,  "(a) The Board of Directors shall

consist of five directors.  All directors of the Company shall be appointed annually by the Mayor of

the City of New York prior to the Company's annual meeting."

119.    Sub-paragraph "b" provides, in part, that "Each director shall be an employee,

former employee or employee-on-leave of the City of New York or a person experienced in the

insurance, construction, financial, professional, or other business or governmental communities of

the City of New York."

120.    Sub-paragraph "c" permits the Mayor to also appoint alternates for each director,

who may attend meetings in place of absent directors.

121.    The Mayor has -- and maintains -- control of the Captive through his appointees,

who must be "acceptable to the Mayor in his sole discretion."

122.    As set forth herein, the WTC Captive was created exclusively by and for the City of

New York, performs a governmental function in place of the City's Law Department, including 50-

h hearings, with its Board directly appointed and controlled by the City's Mayor and consisting

largely of City employees.

123.    Given the substantial, if not total control exercised over the WTC Captive and its

Board, Mayor Michael Bloomberg of the City of New York controls the litigation strategy, day-to-

day operations and financial activities, at all times relevant, herein.

124.    Mayor Bloomberg has used his authority to force the Captive to consider the needs of the City to the exclusion of the needs of its contractors and of the individuals injured during the debris removal project, for whose benefit the Captive was created and funded, such as the Plaintiffs, herein.

125.    Under Mayor Bloomberg's control, the Captive, its officers, managers and directors, have assumed direct control of all pending claim litigation as if the Captive was the primary carrier, even though the Captive's coverage is expressly excess to all other available coverage under the terms of the FEMA Grant and the Captive Policy itself.

126.    By so doing, Mayor Bloomberg and the City have been able to control the litigation on behalf of the City and its contractors in a manner that may not, or would not, have been elected or permitted by the primary insurers, who must answer to their shareholders.

127.    The Captive has also jeopardized available primary coverage by failing or refusing to provide timely notice of pending claims, including the claim of the Plaintiffs, herein, even to the known primary carriers.   As set forth in the Captive's pleadings in a pending Declaratory Judgment action, belatedly filed by the law firm of McDermott Will & Emery, LLP, in February 2007, against Liberty Mutual and certain London Insurers for policies identified in paragraphs 37 & 38, *supra,* the WTCC did not provide any written claim notice to Liberty Mutual nor the London Insurers until February 9, 2006, despite the WTCC having received suit notices as early as the autumn of 2004.

128.    The Captive has also failed to investigate, locate and notify other insurers with potential coverage primary to the Captive fund, including the insurers of various contractor defendants, including Liberty Mutual, which has been sued as a direct defendant in thousands of suits, including that of the Plaintiffs, for the direct role that Liberty Mutual played as a Ground Zero site safety supervisor during the debris removal project.

129.    By so doing, Mayor Bloomberg, the WTCC and its officers, directors, agents and managers have acted unethically, in part, by:

(a)    Reducing the funds available to compensate injured claimants, such as the Plaintiffs;

(b)    Creating a conflict with the City's contractors who have been sued in pending litigation, who do not have a litigation claim cap and whose insurance coverage has been jeopardized by the WTCC's inaction;

(c)    Threatening to litigate each and every claim regardless of its merits, including that of the Plaintiff, herein, and preclude the timely and just resolution of any such claim until at least 2015;

(d)    Filing motions advocating frivolous positions, including immunity motions claiming that the City did not control and coordinate the recovery and debris removal activity at Ground Zero but that the federal government exercised such control, contradicting the factual stipulation to the contrary contained on the first page of the FEMA Grant;

(e)    causing frivolous and inflated invoices to be submitted to the WTCC for reimbursement, including a $20 million invoice for services purportedly rendered by the City's Law Department in defense of WTCC claims while the head of the City Law Department's WTC unit, Defendant Becker, simultaneously serves on the WTCC's Advisory Committee.

(f)    Preventing any medical monitoring, preventing any medical treatment, preventing the consideration of any claims, regardless of how worthy, wasting the Captive's resources, stalling the pending litigation, as set forth

26

above, and then, as set forth in Mayor Bloomberg's February 13, 2007 Press Release and Report on the Health Impact of 9/11, seeking to disband the WTCC after the passage of wasted years so that any remaining funds can be transferred to a new entity with absolute protection from liability for the City, regardless of resulting inadequate compensation and impact upon the victims of the City's contumacious failure to protect the heroes who responded to the City and Nation's call at Ground Zero, including the Plaintiffs, herein, and then the deliberate failure by Mayor Bloomberg and the City to provide desperately needed medical monitoring, evaluation, treatment and compensation for those injured by Mayor Bloomberg's, the City's (and others') wrongful conduct.

(g)     Indeed, Mayor Bloomberg and the City deliberately misrepresented the facts to the Public and the Plaintiffs, herein, by stating in the aforesaid Press Release and Report that no federal funding had been provided for the medical monitoring and treatment of "first responders," when Mayor Bloomberg and the City are fully aware that it was at their insistence that Congress authorize the creation and fund the WTCC to provide insurance that meets those needs.   Mayor Bloomberg, the City and the WTCC are well aware that thousands of these victims, including the Plaintiffs, herein, have asserted claims for such medical monitoring and treatment and that their Counsel have repeatedly offered to meet Mayor Bloomberg, the City and the WTCC to establish procedures for the efficient and fair evaluation of these claims, but that Mayor Bloomberg, the City and the WTCC have refused all

27

such efforts, despite the ready availability of federal funds and authorized use of those funds for that purpose. The conduct and statements of Mayor Bloomberg, the WTCC and the other named Defendants in this regard is cynical, deplorable and immoral.

(h)    Similarly, having sought and obtained funding to meet the needs of "first responders, "including the NYPD, NYFP and construction workers by and through a captive insurance policy and having agreed to terms and conditions in the resulting FEMA Grants, Mayor Bloomberg, the City and the WTCC now seek to continue to violate the terms and of the aforesaid Grants to consider and assess claims, pay legitimate claims, analyze and set reserves and obtain and provide accurate actuarial data and projections, none of which has accomplished with the WTCC funds awarded for those purposes. Further, Mayor Bloomberg, the City and the WTCC now seek to formally avoid these responsibilities by resurrecting the Victims' Compensation Fund and dumping their unfilled mandate upon that entity or the federal government;

(i)    retaining and paying the law firm of McDermott Will & Emery, LLP, for legal work and advice while a McDermott Will & Emery attorney, Thomas Jones, served and continues to serve, as the Secretary of the WTCC, creating both an actual conflict and the appearance of a conflict.

130.    By so doing, the Mayor, the WTCC, its officers and directors and managers and agents (including defendants GAB ROBBINS and MARSH MANAGEMENT SERVICES, INC.),

28

have all unethically profited at the expense of the individuals for whom the Captive was created and funded, including the Plaintiffs.

### E.  The WTCC's Violation of FOIL and the Open Meeting Law

131.    Pursuant to New York law, any corporation, even a not-for-profit corporation, that is controlled by a City, intimately related with the City and performs functions in place of the City, is considered and constitutes an agency of the City within the meaning of the Public Officers Law and is subject to the requirements of the Freedom of Information Law ("FOIL").  *See*, Canandaigua Messenger, Inc., v. Wharmby,  292 A.D.2d 835 (4TH Dep't 2002).

132.    Indeed, Section 86(3) of the FOIL defines "agency" to mean "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the judiciary or the state legislature."

133.    Similarly, the Open Meetings Law is applicable to such public bodies, defining "public bodies" in Section 102(2) as including "...any entity for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law, or committee or subcommittee or other similar body of such public body."

134.    On December 7, 2006, The Executive Director of the Committee on Open Government, authorized by New York law to make decisions and issue opinions as to the applicability of FOIL and the Open Meetings Law, issued a comprehensive opinion reviewing the Captive's history, Certificate of Incorporation and By-Laws with applicable New York law.  The Committee ruled that the Captive was and is subject to both the FOIL and the Open Meeting Law,

finding, in part, that the Mayor exercises "substantial if not total control over the corporation [Captive] and its Board of Directors."

135.    The December 7, 2006, decision of the Committee on Open Government is definitive, has never been appealed, is entitled to deference and, pursuant to <u>Kwarrak v. City of New York</u>, 262 A.D.2d 171 (1st Dep't 1999) and Section XII of the FEMA Grant, the City and WTCC Captive are required to comply.

136.    As such, the WTCC is subject to requests for documents made pursuant to the FOIL and to comply with the requirements of the Open Meeting Law.

137.    The Plaintiffs, by and through their counsel, have repeatedly demanded documents from the Captive pursuant to the FOIL and redress pursuant to the Open Meetings Law, to no avail. Instead, the Captive has, and continues, to wrongly deny that it is subject to the FOIL or Open Meetings Law, in violation of New York law and Article XII of the FEMA Grant.

138.    Despite its status as a public entity or authority, the WTC Captive has acted and continues to act as if it owes no fiduciary obligations to the public in general, nor to the specific individuals for whose benefit the Captive was created and funded, such as the Plaintiffs.

**F.  The WTCC's Violation of the Public Authorities Accountability Act of 2005**

139.    As previously set forth, herein, under New York law, the WTC Captive is also considered to be a "local authority" as a not-for-profit corporation affiliated with the City of New York,  *see* The Public Authorities Accountability Act of 2005, 2005 Sess. Law News of N.Y. Ch. 766 (S. 5927) (McKINNEY'S) §2.

140.    The Act took effect "immediately and shall apply to the public authority fiscal year beginning on or after January 1, 2006… ."  NY LEGIS 766, § 31 (2005).

141.    On or after January 1, 2006, the WTCC and Mayor Bloomberg, who controls the WTCC, have been obligated under §2800.2(a) of the Act to annually file, within ninety days of the end of its fiscal year, a complete report setting forth, in part: "(1) its operations and accomplishments;  (2) its receipts and disbursements, or revenues and expenses, during such fiscal year… (3) its assets and liabilities at the end of its fiscal year including the status of reserve, depreciation, special or other funds and including the receipts and payments of these funds…(5) a compensation schedule that shall include, by position, title and name of the person holding such position or title, the salary, compensation, allowance and/or benefits provided to any officer, director or employee in a decision making or managerial position of such authority whose salary is in excess of one hundred thousand dollars; (6) the projects undertaken by such authority during the past year…(8) such authority's code of ethics; and (9) an assessment of the effectiveness of its internal control structure and procedures."

142.    The WTCC and Mayor Bloomberg has been obligated under §2800.2(b) of the Act to make the aforesaid reports available to the public, including the Plaintiffs, herein, including by posting them on a web site.

143.    The Mayor and the WTCC and its directors, officers and managers have violated the Act by failing to prepare such reports, failing to have a code of ethics and failing to post them available to the public, including the Plaintiffs.

144.    Pursuant to § 2824.1, of the Act, the WTCC and its officers, directors and managers were obligated to ensure that board members: "(a) execute direct oversight of the authority's chief executive and other senior management in the effective and ethical management of the authority; (b) understand, review and monitor the implementation of fundamental financial and management controls and operational decisions of the authority;  (c) establish policies regarding the payment of

31

salary, compensation and reimbursements to, and establish rules for the time and attendance of, the

chief executive and senior management;  (d) adopt a code of ethics applicable to each officer,

director and employee that, at a minimum, includes the standards established in section seventy-four

of the Public Officers Law… ."

145.    The Mayor, who controls the WTCC, the WTCC and its officers, directors and

managers have also violated §2824.1 by failing to operate the WTCC in an "effective and ethical"

manner, as previously set forth, herein; by failing to adopt and adhere to the required code of ethics

and to establish the required compensation and reimbursement policies.

146.    Section 2824.2 requires that WTCC board members receive state approved training

regarding their legal, ethical, fiduciary and financial responsibilities that the WTCC and its board,

officers and managers have failed to implement.

147.    Section 2824.4 provides:  "Board members of each state and local authority, or

subsidiary thereof, shall establish an audit committee to be comprised of independent members."

148.    Mayor Bloomberg, who controls the WTCC, the WTCC and its officers, directors

and managers have also violated § 2824.4 by permitting persons to be both members of the WTCC

Board and members of the WTCC Board's Audit Committee.

149.    Mayor Bloomberg, who controls the WTCC, the WTCC and its officers, directors

and managers have also violated § 2824.7 by failing to establish a governance committee comprised

of independent members.

150.    Section 2825.2 of the Act states that: "Except for members who serve as members

by virtue of holding a civil office of the state, the majority of the remaining members of the

governing body of every state or local authority shall be independent members; provided, however,

that this provision shall apply to appointments made on or after the effective date of the chapter of

32

the laws of two thousand five which added this subdivision.  The official or officials having the authority to appoint or remove such remaining members shall take such actions as may be necessary to satisfy this requirement."

151.    For purposes of § 2825.2, "independent member" is defined to mean one who:  "(a) is not, and in the past two years has not been, employed by the public authority or an affiliate in an executive capacity; (b) is not, and in the past two years has not been, employed by an entity that received remuneration valued at more than fifteen thousand dollars for goods and services provided to the public authority or received any other form of financial assistance valued at more than fifteen thousand dollars from the public authority…"

152.    The Mayor of New York City, the WTCC and its board, officers and directors have violated § 2825.2 because, as noted *supra*, the majority of the WTCC Board is not "independent." To the contrary, the entire governing body is controlled by the City, which operates the WTCC as if it were the City's private legal defense fund at the expense of persons for whom the WTCC was created and funded, such as the Plaintiffs, herein.

## AS AND FOR A FIRST CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

153.    Plaintiffs repeat, incorporate and reallege the allegations of paragraphs 1 through 152 as if set forth at length.

154.    Plaintiffs bring this Count seeking equitable relief arising out of Defendants' violations of their breaches of fiduciary duties in connection with the misuse of WTCC funds and the failure of the WTCC to fulfill and act in accord with its not-for-profit corporate purpose and its status as a publicly funded, not-for-profit public corporation.

155.    Plaintiffs are residents and citizens of New York, taxpayers and former workers injured during their service to the public during the rescue, recovery and debris removal operations identifies, herein.

156.    Plaintiffs have a special interest in the WTCC funds, are the primary beneficiaries of the WTCC's corporate purpose and seek to protect the assets of the WTCC, derived solely from public funds, from dissipation and misuse.

157.    The WTCC is a Local Public Authority under New York Law, as defined in the Public Authorities Accountability Act of 2005, which provides, in pertinent part at Section 2.2: "'local authority' shall mean (a) a public authority or public benefit corporation created by or existing under this chapter or any other law of the state of New York whose members do not hold a civil office of the state, are not appointed by the governor or are appointed by the governor specifically upon the recommendation of the local government or governments;  (b) a not-for-profit corporation affiliated with, sponsored by, or created by a county, city, town or village government; (c) a local industrial developmental agency or authority or other local public benefit corporation;  or (d) an affiliate of such local authority."

158.    Pursuant to the Act's Section 2.4, "affiliate" or "affiliated with" means "a corporate body having substantially the same ownership or control as another corporate body."

159.    At all relevant times, Defendants GAB Robbins and Marsh Management Services, Inc., have failed to act prudently and independently of the WTCC but have, instead, merely carried out the policies, strategies and instructions of Mayor Bloomberg and have otherwise effectively been under his control, by and through Mayor Bloomberg's control over the WTCC.

160.    As a "Local Authority," Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers must operate and act in accord with their duties and responsibilities created by New York Law for the proper discharge of their public trust.

161.    As a not-for-profit corporation that was created and publicly funded, Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers must operate and act in accord with their duties and responsibilities created by New York Law for the proper discharge of their public trust, in general, and to the Plaintiffs, herein, in particular.

162.    As a not-for-profit corporation, the Defendants must act to further the corporation's essential purpose, which is to "ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors."

163.    Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers, were and are fiduciaries of the Plaintiffs at all relevant times, and owed them the duty to exercise due care and diligence in the management and administration of the WTCC's affairs and in the use and preservation of its property and assets, and the duty of full and candid disclosure of all material facts related thereto.  Furthermore, the Defendants owed a duty to ensure that the WTCC

operated in full compliance with all applicable federal and state laws, rules, and regulations, and that the WTCC did not engage in any unsafe or unsound practices or waste its corporate assets.

164.    Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers were and are required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the WTCC.  By virtue of such duties, and the obligation of ordinary and reasonable care and diligence, the defendants were required, among other things:

> (a)    To manage, conduct, supervise, control, and direct the business and affairs of the WTCC in accordance with federal and state law, rules, and regulations, and the charter and bylaws of the WTCC;
>
> (b)    To neither violate nor knowingly permit any officer, director, partner, or employee of the WTCC to violate applicable federal or state laws, rules, and regulations and to exercise reasonable control and supervision over such officers and employees;
>
> (c)    To ensure the prudence and soundness of policies, practices, and internal controls undertaken or proposed to be undertaken by the WTCC, and to ensure compliance with generally accepted prudent operating standards;
>
> (d)    To otherwise establish standards, policies, and guidelines for the proper and ethical performance of the business and affairs of the WTCC and procedures or internal controls for the prevention or prompt detection of improper and unethical activities on the part of management;

(e)    To establish adequate rules and procedures to prevent or promptly detect any dishonest or unethical business practice by the WTCC and its employees;

(f)    With respect to defendant-members of the Audit Committee, to monitor the WTCC's system of internal accounting controls and oversee and evaluate the Company's internal audit function;

(g)    To review and supervise major corporate strategies, including especially the handling of claims and investigation of and notification all primary insurance coverage, to ensure that the WTCC's business was prudently managed and that the risks assumed were appropriate given the claims and obligations of creditors and shareholders; and

(h)    To preserve and enhance the WTCC's reputation as befits a public corporation, and to maintain public trust and confidence in the WTCC as a prudently managed institution fully capable of meeting its duties and obligations.

165.    As previously described, above, in paragraphs 29 through 152, *supra*, as well as paragraphs 181-214, *infra,* Mayor Bloomberg's, the WTCC and its Board, Administrators, Agents, Managers and Officers' actions during all times relevant herein violated these specific requirements and obligations.

166.    By virtue of the foregoing, Defendants Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers, failed to exercise ordinary care and were grossly negligent in the exercise of their duties. These defendants, therefore, have violated their fiduciary

duties to Plaintiffs and caused a waste of the WTCC's assets in the manner described in paragraphs 29 through 186, *supra*.

167.    In addition, The Public Authorities Accountability Act of 2005 expressly applies Section 74 of the Public Authorities Law and its standards to the aforesaid Defendants.

168.    Public Officers Law §74(3)(f) provides:  "An officer or employee of a state agency, member of the legislature or legislative employee should not by his conduct give reasonable basis for the impression that any person can improperly influence him or unduly enjoy his favor in the performance of his official duties, or that he is affected by the kinship, rank, position or influence of any party or person."

169.    Given the enormous and excessive salary and benefits paid to Defendant LaSala, as well as the fees WTCC has paid Defendants Marsh Management Services, Inc. and GAB Robbins, actual influence or the appearance of such influence exists and has existed at all relevant times, herein.  Further, such undue influence is real and/or apparent, given the total subservience of Defendants LaSala and the officers, administrators, managers, agents and board members of the WTCC to Mayor Bloomberg and his interests.

170.    Public Officers Law §73(3)(h) provides: "An officer or employee of a state agency, member of the legislature or legislative employee should endeavor to pursue a course of conduct which will not raise suspicion among the public that he is likely to be engaged in acts that are in violation of his trust."

171.    As previously set forth, above, in paragraphs 29 through 152, *supra*, as well as paragraphs 181-214, *infra*, the improper acts of omission and commission perpetrated by Defendants Michael Bloomberg, the WTCC and its Board, Administrators, Agents, Managers and Officers violate the public trust in both fact and appearance.

172.    Because at least a majority of the directors and officers of the WTCC are potentially liable for a breach of their fiduciary duties and are otherwise under the control of Mayor Bloomberg, there is not an independent majority of the Board of Directors who could impartially consider a demand for action.  Indeed, such demands have been publicly made by various New York public officials, including Senators Schumer and Clinton, Congressman Nadler and Commissioner Mills, as well as counsel for the Plaintiffs to the aforesaid, to no avail.

173.    By virtue of the aforesaid, the Plaintiffs have been and in the future will be irreparably injured unless immediate redress is obtained from this Honorable Court that, in part, removes the current WTCC board and officers, who have been tainted by the control exercised over them by Mayor Bloomberg and his administration, and replaced with a Court-appointed receiver who can fairly, ethically, independently and properly administer the WTCC and prevent the misuse of public funds at the Plaintiffs' expense, as more fully requested, below.

## AS FOR A SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT

174.    Plaintiffs repeat, reallege and incorporate the averments of paragraphs 1 through 173 as though set forth at length, herein.

175.    The WTCC insurance policy is a unique and unlike commercially available insurance coverage, in part, because it is non-risk transfer insurance, publicly funded, retroactively obtained after known incidents of liability-causing and injury-causing activity occurred for the benefit of a limited and expected class of injured rescue, recovery and debris removal workers.

176.    The Plaintiffs are such injured rescue, recovery and/or debris removal workers who have sustained injuries caused by their heroic post-9/11 efforts, as previously set forth, *supra*.

177.    The Plaintiffs have timely and properly asserted claims seeking benefits for their injuries against the City and its contractors in pending litigation but, as set forth, *supra*, the Defendants have wrongfully refused to even consider, investigate or pay their claims, and any claims, in breach of the WTCC corporate charter, the WTCC by-laws and the WTCC insurance policy and in violation of the Plaintiffs' rights. Upon information and belief, the Defendants will continue their wrongful conduct in the future.

178.    In the meantime, the Defendants have and continue to deplete, waste and squander the WTCC funds entrusted to them, as set forth, *supra,* to the Plaintiffs' detriment.

179.    The Plaintiffs have been harmed by the Defendants' wrongful conduct and will be so harmed in the future.

180.    The Plaintiffs are without an adequate remedy at law.

## AS AND FOR A THIRD CAUSE OF ACTION: VIOLATION OF THE FREEDOM OF INFORMATION LAW

181.    Plaintiffs repeat, incorporate and reallege the averments of paragraphs 1 through 180 as though set forth at length, herein.

182.    This Count is a proceeding under CPLR Article 78 and Public Officers Law Article 6, the New York State Freedom of Information Law (FOIL) seeking a judgment ordering the Defendants to produce for inspection, and if subsequently requested, to provide copies of all documents previously requested by Plaintiffs, by and through their Counsel.

183.    Upon information and belief, the WTCC now has in its possession reports, records, data, correspondence and other documents relating to the formation of the WTCC, its purpose, investigations of its conduct by state and federal officials, the investigation of other insurance, notification to other insurers, actuary reports and projections and other related issues that were the subject of prior written document requests.

184.    The material referred to in paragraph 154, *supra*, are agency records according to the terms of Public Officers Law § 86(4).

185.    On divers days, including May 3, 2006 and March 15, 2007, Plaintiffs, by their counsel, filed requests for records in accordance with the New York State Freedom of Information Law with the WTCC and requested copies of various WTCC records.

186.    FOIL requires, in part, that within five business days of a written request for a record, the public authority must respond and either (a) make the record available, (b) deny the request in writing, or (c) furnish a written acknowledgment of the receipt of the request and a statement of the approximate date when the request and a statement of the approximate date when the request will be granted or denied.  *See* Public Officers Law § 89(3).

187.    Five business days went by and more following Plaintiffs' counsel's request for documents.  However, the WTCC has never responded to Plaintiffs' FOIL requests.

188.    In response the aforesaid Committee on Open Government opinion, the WTCC, by and through its counsel, communicated that it disagreed with the opinion and was not bound to follow it.  The WTCC maintained that it was not subject to the FOIL nor the Open Meeting Law and that the WTCC was free to ignore advisory opinions issued by the Committee on Open Government.

189.    At no time did the WTCC claim that the Plaintiffs' requested material fell within any of the nine narrow and specific categories of records that it could legally and lawfully withhold in accordance with the New York State Freedom of Information Law.

190.    The WTCC's refusal to even acknowledge the Plaintiffs' FOIL requests, to comply with the statute or to acknowledge the authority of the Committee of Open Government to make any determinations renders any administrative appeals futile.

191.    The Plaintiffs' subsequent request, nonetheless, constitutes an appeal pursuant to 21 N.Y.C.R.R. §1401.7(h), following which, the WTCC was required to "inform the Plaintiffs and the Committee on Open Government of its determination in writing within ten business days of receipt."

192.    The ten-day appeals period expired by the end of March, 2007.  Indeed, more than 90 business days have elapsed, and despite this and to this date, the WTCC has not notified Plaintiffs that a determination has been made on the appeal.  Upon information and belief, the WTCC has made no such determination.

193.    The failure to issue a timely determination to either record request constitutes a constructive denial and a continuing refusal to respond to Plaintiffs' legitimate and lawfully made FOIL requests.

194.    Plaintiffs are aggrieved by the WTCC's denial of access to its agency records because information is being withheld from them to which Plaintiffs have a lawful right of access.

195.    Consequently, and as a matter of law, the Defendants' conduct is inconsistent with appropriate, applicable New York State statutes and regulations. Therefore, petitioner is presented with a question that may be raised in this Court pursuant to CPLR 7803.

196.    Under the above-outlined circumstances, Plaintiffs have exhausted their administrative remedies, that are otherwise futile, and review by this Court is ripe and authorized pursuant to CPLR 7801(1) and Public Officer Law.

197.    No prior application to any court has been made for the relief requested here.

198.    The Public records requested by the Plaintiffs from the WTCC are clearly of significant interest to the Plaintiffs, other similarly situated persons and the general public.  They deal with the ability of thousands of the heroes of 9/11 who were injured in the rescue, recovery and

debris removal efforts to obtain redress from a Congressionally created and financed insurance fund for that purpose.

199.    The Defendants associated with the WTCC have withheld the requested records without a reasonable basis in law to do so and despite the requirement in the FEMA Grant that the WTCC comply with all applicable New York laws.

200.    If Plaintiffs prevail in this action, and for the aforesaid reasons, it is appropriate pursuant to Public Officers Law § 89(4)(c) for the Court to Order an award of reasonable attorneys' fees and other litigation costs.

**AS AND FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE OPEN MEETINGS LAW**

201.    Plaintiffs repeat, incorporate and reallege the averments of paragraphs 1 through 200 as though set forth at length, herein.

202.    This Count is brought under CPLR Article 78 pursuant to Public Officers Law § 107(1) to enforce the provisions of the New York State Open Meetings Law (Public Officers Law §§100 to 111) and for judgment pursuant to CPLR 3001, declaring that Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Officers and Managers, violated Plaintiffs' rights by conducting closed meetings of the WTCC.  At the aforementioned meetings, the WTCC and its Board, Officers and Managers, illegally voted in secret to allocate WTCC funds held in public trust by the aforesaid Defendants and took other actions at said closed meetings in willful and contumacious violation of the provisions of the N.Y. State Open Meetings Law.

203.    Plaintiffs bring the present action, in part, to require Mayor Bloomberg, the WTCC and its Board, Administrators, Agents, Officers and Managers, to comply with the provisions of the New York State Open Meetings Law and to annul the actions taken at the closed, non-public meetings held in violation of the Open Meetings Law.

43

204.    Public Officers Law §107(1) provides that parties aggrieved by violations of the Open Meetings Law, such as the Plaintiffs, herein, may bring an action pursuant to CPLR Article 78 and CPLR 3001.

205.    Plaintiffs, by and through their counsel, wrote to the WTCC in October, 2006, requesting permission to attend WTCC meetings when not in executive session.

206.    Defendants responded by refusing such access, denying that the WTCC was subject to the Open Meeting Law.

207.    Plaintiffs, by and through their counsel, again wrote to the WTCC on or about October 30, 2006, citing various statutory authority and reported decisions of New York Courts requiring public access to meetings similar to those at issue, to no avail.

208.    No response was received from the WTCC.

209.    On or about December 7, 2006, The Executive Director of the Committee on Open Government, authorized by New York law to make decisions and issue opinions as to the applicability of FOIL and the Open Meetings Law, issued a comprehensive opinion that found, in part, ruled that the WTCC was and is subject to both the FOIL and the Open Meeting Law, finding, in part, that the Mayor exercises "substantial if not total control over the corporation [Captive] and its Board of Directors."

210.    As previously set forth in response to FOIL and open meeting requests, the WTCC denied that it was subject to the Open Meeting Law and asserted that it was free to disregard the findings of the Committee on Open Government.

211.    Upon information and belief, minutes from some WTCC meetings indicate that most business is not conducted in executive session.  Moreover, these minutes indicate that business was discussed and binding votes were taken allocating and disbursing WTCC funds, in violation of

44

Public Officers Law §105(1), which requires all votes on expenditures of public funds to be taken in public sessions.

212. The violations of the Open Meetings Law is especially serious in this case because:

(a) Plaintiffs have a special interest in the WTCC funds, which were earmarked by Congress and entrusted to the WTCC to "ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors;"

(b) All funds disbursed by the WTCC reduce the funds available to satisfy such legitimate claims;

(c) WTCC funds have been disbursed in inflated amounts and/or for expenditures not authorized by the Congress, FEMA Grant or the WTCC Charter, including funds to reimburse or subsidize the City Law Department;

(d) WTCC actions have been taken that are not authorized or are counter to the FEMA Grant, WTCC Charter and WTCC Insurance Policy, including the management of all litigation against the City and its contractors without timely or properly notifying the City's and Contractors' primary insurers, reducing the funds available to satisfy legitimate claims, such as those of the Plaintiffs, herein;

(e) The violations included excessive, unreasonable and inappropriate payments to Defendants Marsh Management Services, Inc. and GAB Robbins, contractors, affiliates and agents of the WTCC, for purported management and claims adjusting, even though only "place saving" amounts were

allocated to all toxic exposure claims, including those of the Plaintiffs,

herein, without regard to the true facts underlying each or any claim, as

reported in the WTCC's financial statements, due to the failure and refusal of

the WTCC to legitimately operate as an insurer by investigating and

adjusting claims.

213.    By willfully and contumaciously conducting the business of a public body in closed

session, including the allocation of public funds entrusted to the WTCC, Mayor Bloomberg, the

WTCC and its Board, Officers and Managers, failed to perform a duty required by Public Officers

Law §105(1).

214.    The foregoing actions injured the Plaintiffs who, as members of the public and as

persons for whom the WTCC was established and funded, are persons intended to be protected by

the Public Meetings Law.


### AS AND FOR A FIFTH CAUSE OF ACTION: REPLEVIN

215.    Plaintiffs repeat, incorporate and reallege the averments of paragraphs 1 through 214

as though set forth at length, herein.

216.    At the time of the commencement of the above-captioned action and at all times

hereinafter mentioned, Plaintiffs were -- and still are -- the persons for whose benefit the WTCC

was created and funded, Plaintiffs are taxpayers and citizens with a direct interest in the public funds

entrusted to the WTCC for their benefit, so that the Plaintiffs are the constructive owners and

entitled to claim, on behalf of the WTCC, the immediate possession and return of all funds

improperly or excessively paid to any defendants and in particular, to Defendant GAB Robbins.

217.    The value of the aforesaid property wrongfully in the hands of GAB Robbins is known, upon information and belief, to currently be $8,585,736.  The value of similar property in the possession of other Defendants must be determined by and through discovery and a thorough and independent accounting.

218.    The Defendant(s) remain in the possession of the aforesaid sums and wrongfully detain it from the Plaintiffs, who seek its recovery on behalf of, and to, the WTCC so that the funds can be used for their intended purpose.

219.    The detention of the public funds by the Defendant(s) is or are wrongful because they were knowingly obtained in violation of law and the public trust from the public funds held in trust by the WTCC, as set forth and described in paragraphs 1-214, herein.

220.    Prior to the commencement of the above-captioned action, and on divers days, Plaintiffs, by and through their counsel and public representatives, duly demanded the return and possession of the aforesaid sums from the Defendant(s), to no avail.

221.    By reason of such wrongful detention and dissemination of the public funds by Defendant(s), Plaintiffs have sustained known damages in the amount of $8,585,736,with additional sums to be determined as set forth above, herein.

## AS AND FOR A SIXTH CAUSE OF ACTION:
## CONVERSION

222.    Plaintiffs repeat, incorporate and reallege the averments of paragraphs 1 through 221 as though set forth at length, herein and further allege:

223.    That at the times and circumstances referred to, above, the Defendants sought, obtained, approved, permitted and/or made payments from the public WTCC funds.

224.    That the aforesaid payments were approved and permitted by the WTCC's Audit Committee, Officers and Board, as well as the Mayor Bloomberg, who exercises control over the actions of the WTCC.

225.    That the WTCC funds were to be held in trust and disbursed for their intended purpose, which was and remains to ensure that sufficient resources are available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors.

226.    Upon information and belief, the Defendants knowingly sought, obtained, approved, permitted and/or made payments from the public WTCC funds solely to protect the City at the expense of individuals affected by the recovery operations, including the Plaintiffs, herein, without administering, adjusting or paying any legitimate claims.

227.    That the Plaintiffs are without knowledge of the exact amounts of money so sought, obtained, approved, permitted and/or received and realized by the Defendants and which the Defendants have knowingly wasted and squandered and knowingly used for unauthorized, unethical and illegal purposes and that Plaintiffs, by virtue of the violation of FOIL, the Open Meetings Law and the Public Authority Accountability Act of 2005, in part, are ignorant of all the purposes and amounts for which defendant has used the WTCC public funds and of the particular manner in which it has been wasted and squandered, except as previously set forth, above.

228.    That by so doing the Defendants have knowingly wasted and squandered a large amount of the money and has used and expended for unauthorized and unlawful purposes a large portion of the sums received by the WTCC, at the expense of persons, who were intended to benefit from these funds, including the Plaintiffs, herein.

229.    That heretofore and prior to the commencement of this action, Plaintiffs have duly demanded of the Defendants, by and through their counsel and various public representatives and officials, that Defendants cease their improper activities and account for their acts relating the use of WTCC funds, that they turn over to the Plaintiffs records in the Defendant's possession relating to the use of WTCC funds and that they administer, consider, adjust and pay legitimate claims from injured WTC workers, but the Defendants have failed and refused to do so and have never rendered a true and valid accounting for the monies and other property approved, paid or received by them, nor have they paid any portion of the WTCC funds to satisfy legitimate claims, such as those of the Plaintiffs, herein.

230.    That the Plaintiffs have no adequate remedy at law and that without the relief now sought from this Honorable Court, Plaintiffs will continue to injured in the future, without redress.

WHEREFORE, as to the FIRST CAUSE OF ACTION, Plaintiffs demand judgment as follows:

(1)    A full and thorough and independent forensic audit and accounting;

(2)    Recovery and reimbursement of all sums improperly and unreasonably expended, including the return of all salaries and other monies paid during the period of wrongdoing;

(3)    Removal of the present WTCC Board, Officers and Managers;

(4)    The appointment of a receiver to head the WTCC;

(5)    Conformance with all applicable federal and state statutes and ordinances;

49

(6)    Operation of the WTCC in conformance with the FEMA Grant and Sub-Grants;

(7)    Reimbursement of all reasonable fees and costs, including attorneys' fees, required for the prosecution of this action, the payment of which is not to come from funds held by the WTCC in trust for the Plaintiffs; and

WHEREFORE, AS TO THE SECOND CAUSE OF ACTION, Plaintiffs seek a declaratory judgment, together with ancillary injunctive and monetary relief, pursuant to CPLR 3017(b) as follows:

(1)    Judgment declaring that the WTCC has the duty and obligation to timely investigate, consider, adjust and pay valid claims;

(2)    Judgment declaring that the WTCC has violated its duty and obligation to timely investigate, adjust, consider and pay the Plaintiffs' claims;

(3)    Judgment requiring that the WTCC timely investigate, adjust, consider and pay the Plaintiffs' claims;

(4)    Judgment declaring that the Defendants have wasted, squandered and depleted funds entrusted or paid to them for the Plaintiffs' benefit;

(5)    Judgment permanently enjoining the Defendants from wasting, squandering and depleting the WTCC funds and requiring the recovery and reimbursement of all sums improperly and

50

unreasonably expended, including the return of all salaries and

other monies paid during the period of wrongdoing;

(6)    Judgment removing of the present WTCC Board, Officers and

Managers and appointing a receiver or trustee to head the

WTCC;

(7)    Judgment declaring that the WTCC has failed to conform with

all applicable federal and state statutes and ordinances;

(8)    Judgment requiring the WTCC to conform with all applicable

federal and state statutes and ordinances

(9)    An Order retaining jurisdiction in this Court pending all such

action and relief sought in the above-captioned matter and/or

required to effectuate this Court's Judgment; and

(10)    Such other, further and different relief which the Court may

deem just and owing, including costs and counsel fees incurred

in prosecuting this matter.

WHEREFORE, AS TO THE THIRD CAUSE OF ACTION, the Plaintiffs, by and

through their counsel, respectfully seek an Order:

(1)    Declaring that Mayor Bloomberg, the WTCC and its Officers,

Board and Managers, have violated the FOIL and ordering that

they immediately provide Plaintiffs, by and through their

counsel, with access to, and if subsequently requested, to

provide copies of, all demanded and wrongfully withheld

documents, now and in the future;

51

(2)    Order Mayor Bloomberg, the WTCC and its Board, Officers and Managers to pay the reasonable attorneys' fees with respect to, and other litigation costs reasonably incurred for, this proceeding, but not from Congressional funding now held in trust by the WTCC; and

WHEREFORE, AS TO THE FOURTH CAUSE OF ACTION, Plaintiffs, by and through their counsel, seek an Order:

(1)    Granting judgment for Plaintiffs pursuant to CPLR Article 78 and CPLR 3001, declaring that Mayor Bloomberg, the WTCC and its Board, Officers and Managers, acted in violation of the New York State Open Meetings Law;

(2)    Requiring a detailed, thorough and independent forensic accounting of all funds disbursed by the WTCC by virtue of all non-open meetings, to date;

(3)    Declaring that the allocation of WTCC funds and other binding decisions taken at such closed meetings are null and void, as provided for in Public Officers Law §107(1);

(4)    Requiring that the WTCC adhere to the requirements of the New York State Open Meetings Law in all future meetings;

(5)    Awarding Plaintiffs costs and attorneys fees, as provided for in Public Officers Law §107(2), the payment of which is not to come from funds held by the WTCC in trust for the Plaintiffs;

(6) Awarding punitive damages to Plaintiffs for the willful and contumacious violations of the Open Meetings Law, the payment of which is not to come from funds held by the WTCC in trust for the Plaintiffs; and

WHEREFORE, AS TO THE FIFTH CAUSE OF ACTION, Plaintiffs, by and through their counsel, demand judgment as follows:

(1) Return of the public funds wrongfully possessed by the Defendant(s), plus interest, to the WTCC;

(2) Reimbursement of all reasonable fees and costs, including attorneys' fees, required for the prosecution of this action, the payment of which is not to come from funds held by the WTCC in trust for the Plaintiffs; and

WHEREFORE, AS TO THE SIXTH CAUSE OF ACTION, Plaintiffs, by and through their counsel, demand judgment as follows:

(1) That the Defendants account to the Plaintiffs for all money received and disbursed or assigned by them and of all their acts and doings in connection with the WTCC Captive with a thorough, independent, forensic accounting;

(2) That the Plaintiffs have judgment against the Defendants for any sum or balance found to be improperly or wastefully paid or received due Plaintiffs from the defendant;

(3) Reimbursement of all reasonable fees and costs, including attorneys' fees, required for the prosecution of this action, the

payment of which is not to come from funds held by the WTCC

in trust for the Plaintiffs; and

AS TO ALL CAUSES OF ACTION, such other and additional relief that the Court deems

just and appropriate.


DATED:     NEW YORK, NEW YORK
           July 16, 2007

Marc Jay Bern

WORBY GRONER & NAPOLI BERN, LLP
Attorneys for the Plaintiffs
115 Broadway, 12th Floor
New York, New York 10006
(212) 267-3700

54

**ATTORNEY'S VERIFICATION**

Marc Jay Bern, an attorney duly licensed to practice before the Courts of the State of New York, hereby verifies by his execution, below, that he has read the foregoing Summons and Complaint and knows the contents thereof, and that upon information and belief, the factual and legal statements contained therein are true and correct, and that these papers are not frivolous as that term is defined in 22 NYCRR § 130-1.1(c). The reason that this verification is made by the undersigned attorney is that the Plaintiffs named herein do not reside in New York County where counsel maintains his office.

MARC JAY BERN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY          Index No.:
E. BISHOP

                        Plaintiffs,

-against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; ANDREW
ALPER; JEFFERY FRIEDLANDER; PHYLLIS
TAYLOR; MICHAEL FEIGIN; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                        Defendants.

------------------------------------------------------------------X
=================================================================
                 SUMMONS AND VERIFIED COMPLAINT
=================================================================

                **WORBY GRONER & NAPOLI BERN, LLP**
                        *Attorneys for* : Plaintiff
                        115 Broadway, 12th Floor
                        New York, New York 10006
                        (212) 267-3700
=================================================================
The undersigned attorney hereby certifies, pursuant to 22 NYCRR §130-1.1-a, that I have read the within
papers and that to the best of my knowledge and belief they are not frivolous as that term is defined in 22
NYCRR § 130-1.1(c).

                        Attorney name: Marc Jay Bern
=================================================================
PLEASE TAKE NOTICE:
    ☐ NOTICE OF ENTRY
    that the within is a (certified) true copy of an              duly entered in the        office
    of the   clerk of the within named court on _____ 200__.
    ☐ NOTICE OF SETTLEMENT
        that an order                    of which the within is a true copy,  will be
        presented for settlement to the HON.                one of the judges of the
        within named Court, at          on      200___ at_____ O'clock ___.M.

Dated, _____
                        Yours, etc.

                WORBY GRONER & NAPOLI BERN, LLP