UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
JOHN R. WALCOTT, FRANK                   :
MAISANO, and MARY E. BISHOP              :
                                         :
          Plaintiffs,                    :        07 Civ. 7072 (AKH)
                                         :
                                         :
          v.                             :
                                         :        DECLARATION OF
WTC CAPTIVE INSURANCE                    :        ROBERT A. WEINER
COMPANY, INC.; CHRISTINE                 :
LASALA; THE HONORABLE                    :
MICHAEL BLOOMBERG; MARSH                 :
MANAGEMENT SERVICES, INC.;               :
GAB ROBINS NORTH AMERICA,                :
INC.; MARK PAGE; LEWIS                   :
FINKELMAN; JEFFREY                       :
FRIEDLANDER; MEREDITH JONES;             :
MARK MELSON; JAMES                       :
SCHOENBECK; and KENNETH                  :
BECKER, ESQUIRE,                         :
                                         :
          Defendants.                    :
-------------------------------------------------- x
```

Robert A. Weiner declares as follows pursuant to 28 U.S.C. § 1746:

1.     I am a member of the Bar of this Court and of the Firm of McDermott Will &

Emery LLP, attorneys herein for Defendants WTC Captive Insurance Company, Inc. ("WTCC"),

Christine LaSala, Mark Melson, and James Schoenbeck, and co-counsel for Defendants Mark

Page, Lewis Finkelman, Jeffrey Friedlander, Meredith Jones, and Kenneth Becker.  I make this

Declaration in order to present to the Court various documents that are referred to in Plaintiffs'

Complaint in this action and which are material to Defendants' motion to dismiss for failure to state a claim.[1]

2.      Annexed to this Declaration as Exhibit A is a true and correct copy of the FEMA Grant Agreement.

3.      Annexed hereto as Exhibit B is a true and correct copy of the Sub-Grant Agreement.

4.      Annexed hereto as Exhibit C is a true and correct copy of an Agreement between the City and WTCC ("City-WTCC Agreement").

5.      Annexed hereto as Exhibit D is a true and correct copy of Liability Insurance Policy #0001 ("Policy") form issued by the WTCC to the City of New York.

6.      Annexed hereto as Exhibit E is a true and correct copy of the Certificate of Incorporation of WTCC ("Certificate").

7.      Annexed hereto as Exhibit F is a true and correct copy of the WTCC Bylaws.


I declare under penalty of perjury that the foregoing is true and correct.

New York, New York

Dated:  August 15, 2007

Robert A. Weiner (RW-3381)

---

[1] The motion to dismiss also is made on behalf of Defendant Michael Bloomberg, who is represented by the Office of the Corporation Counsel of the City of New York, which Office joins in the accompanying brief on behalf of Mayor Bloomberg as well as those Defendants for whom it is co-counsel.

## TABLE OF CONTENTS

| Exhibit No. | Description |
|---|---|
| A | FEMA Grant Agreement. |
| B | Sub-Grant Agreement. |
| C | City-WTCC Agreement. |
| D | Liability Insurance Policy # 0001. |
| E | Certificate of Incorporation of WTCC. |
| F | WTCC Bylaws. |

# EXHIBIT A

## UNITED STATES DEPARTMENT OF HOMELAND SECURITY
## EMERGENCY PREPAREDNESS & RESPONSE DIRECTORATE

### GRANT AGREEMENT

### WTC CAPTIVE INSURANCE COMPANY PROJECT

This Agreement made by and between the Federal Emergency Management Agency (hereinafter "FEMA"), within the United States Department of Homeland Security, Emergency Preparedness and Response Directorate, having its principal place of business at 500 C Street S.W., Washington, D.C., and New York State through the State Emergency Management Office (hereinafter "SEMO" or "Grantee") having its principal place of business at 1220 Washington Ave., Building 22 Suite 101, Albany, New York 12226.

### WITNESSETH

WHEREAS, On September 11, 2001 as a result of terrorist attacks against the United States, the World Trade Center Complex in New York City and adjacent properties (hereinafter "WTC site") collapsed or were destroyed resulting in an enormous amount of debris; and

WHEREAS, The City of New York (hereinafter "City" or "Sub-Grantee") through its Office of Emergency Management, Fire Department and Police Department took control of the scene and coordinated citywide response efforts, including debris removal. The Port Authority Police Department, numerous other City and State agencies, fire departments, National Guard units and Federal assets also assisted in the response efforts; and

WHEREAS, The City, through its Department of Design and Construction (DDC), entered into four time and material agreements for the removal and hauling of debris capped at $250,000,000 each. Those agreements were with AMEC Construction Management Inc., BOVIS Lend Lease LMB, Inc., Tully Construction Co., Inc., and Turner Construction Company, who completed the work or supervised numerous other companies to complete the work (all collectively referred to herein as "contractors"); and

WHEREAS, Most debris was transported to the Fresh Kills Landfill on Staten Island via barge and truck transport. Structural steel was barged to a number of metal recyclers in New Jersey. Various piers, marine transfer stations, and sorting areas were utilized in removing the debris. The City Department of Sanitation was involved in the transportation of debris and the final disposal of processed debris at Fresh Kills Landfill; and

WHEREAS, Because of fires and disturbance of the debris in the course of its removal, allegedly numerous potentially toxic materials may have been emitted. The City was unable, however, to obtain adequate commercially reasonable liability insurance,

particularly environmental and professional liability insurance, for itself and the contractors. With FEMA reimbursement, the City did obtain $500 million in marine insurance and $79 million in general liability insurance; and

WHEREAS, By written request dated December 11, 2002, through SEMO, the Governor's Authorized Representative for FEMA disaster designated DR-1391-NY, the City requested $1 billion in funding from FEMA to establish a captive insurance company in the State of New York. This company would insure the City and the contractors for claims arising from the debris removal project, including for any environmental or professional liability; [1] and

WHEREAS, On February 20, 2003, President Bush signed the Consolidated Appropriations Resolution, 2003, P.L. 108-7, in which FEMA was directed to provide up to $1 billion to establish a captive insurance company or other appropriate insurance mechanism to insure the City and the contractors for claims arising from debris removal; and

WHEREAS, Pursuant to the Consolidated Appropriations Resolution, 2003, P.L. 108-7, the purpose of this Grant is to provide Federal financial assistance for the "WTC Captive Insurance Company Project" (hereinafter "Project"). The project will consist of the incorporation of a captive insurance company (hereinafter "Captive") by the City in the State of New York to insure the City and the contractors for claims arising from debris removal at the World Trade Center following the terrorist attacks of September 11, 2001; and

WHEREAS, The Grantee will enter into a Sub-Grant Agreement with the City incorporating the terms and conditions of this agreement; and

NOW THEREFORE, in consideration of the foregoing, the parties agree as follows:

## ARTICLE I--PROJECT REQUIREMENTS

1. The Award of Federal assistance in support of the Project described herein is effective on the date that the authorized FEMA official signs this Grant Agreement. Upon execution of this Grant Agreement by the Grantee, the Grantee affirms this Award in support of the said Project and enters into this Grant Agreement with FEMA.

2. The Grantee through its Sub-Grant Agreement with the City attached hereto and incorporated by reference (Attachment A) shall ensure that the City will establish and incorporate a captive insurance company to be known as the WTC Captive Insurance Company, Inc. in the State of New York pursuant to the Certificate of Incorporation, the By-Laws, and the Liability Insurance Policy (attached hereto and incorporated herein as Attachments B, C, and D, respectively) to insure the City and its debris removal

---

[1] As a "captive" insurance company, the company will provide insurance coverage exclusively for the City and those contractors (as defined above) that were paid to perform debris removal at the WTC site. The "captive" insurance company will not provide insurance coverage to any other persons or entities.

2

contractors, subcontractors and consultants at every tier, for claims arising from debris removal at the WTC site from September 11,2001 (post collapse) through August 30, 2002.

3. The Captive will be an independent corporate entity and will not constitute a sub-grantee of the State of New York or the City of New York. The Captive is not subject to 44 C.F.R. § 13.36 (Procurement), but shall be governed by the procurement requirements set forth in the Sub-Grant Agreement. The general management of the corporate affairs of the captive will be vested in a Board of Directors. It will have a standing advisory committee, a President, a Treasurer, a Secretary and other officers as the Board of Directors determines necessary.

4. The Grantee through the New York State Insurance Department (hereinafter SID) will regulate the Captive.

## ARTICLE II – PROJECT DESCRIPTION

1. The Grantee, through a sub-grant to the City, shall use the Grant Award for the Project as described herein and in **Attachments A-D** which are attached hereto and incorporated herein by reference.

2. The Conference Report to P.L. 108-7, the Consolidated Appropriations Resolution, 2003, directs that no FEMA funds be expended to insure claims arising from the September 11 terrorist-related aircraft crashes, as provided for in Section 408 of the Airline Transportation Safety and System Stabilization Act (49 U.S.C. § 40101). Though some claims resulting from the events of September 11, 2001 may arise from or relate to both the aircraft crashes and the subsequent debris removal, FEMA concludes that Congress did not intend with its statement in the Conference Report to prohibit the provision of insurance coverage under P.L. 108-7 for those claims arising from debris removal that also arise out of, result from or relate to the aircraft crashes pursuant to 49 U.S.C. § 40101. Therefore, the Project will provide the City and its debris removal contractors with insurance coverage for claims arising from debris removal after the collapse of the WTC towers on September 11, 2001, regardless of whether or not the claim is also a cause of action under 49 U.S.C. § 40101. In no event shall the insurance coverage authorized by this Agreement cause the limitation on liability provided by Section 408(a)(3) to exceed $350,000,000.

## ARTICLE III - PERIOD OF PERFORMANCE

Upon transfer of the Grant Award to the Captive through the City, the Captive will use the Award solely for the purposes described in the Grant Agreement, with attachments, for an initial period of up to 25 years from the effective date of this Grant Agreement. Pursuant to Section 12 of Attachment D, the Captive will endeavor to commute the Policy or have it assumed under an assumption reinsurance agreement within the initial 25-year period. When the Policy is fully commuted or assumed under an assumption reinsurance agreement, the Project and this Agreement will terminate. In the event the

Captive is unable to fully commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage, the Grant Award will be extended, subject to Article XI, in two-year increments until such time as the Captive commutes its liabilities, obtains assumption reinsurance, or the Award funds are exhausted.

## ARTICLE IV – AMOUNT AND DISBURSEMENT OF AWARD

1. The amount of this Award is Nine Hundred Ninety-Nine Million, Nine Hundred Thousand Dollars ($999,900,000) (the "Award Amount"). This is the maximum award amount for which FEMA has authority and available funding.

2. FEMA shall disburse the entire Award Amount to the Grantee to be disbursed to the Sub-Grantee and thereupon to the Captive. Of this amount, expenses of up to $3 million for obligations incurred by the Sub-Grantee and/or the Contractors in developing the Captive from March 7, 2002, through the date the Award Amount is actually disbursed shall be disbursed by the Captive to such Sub-Grantee and/or Contractors (or paid directly by the Captive to those who supplied such services) insofar as such expenses have been approved by FEMA. Documentation evidencing such expenses must be submitted to FEMA within 60 days of the disbursing of the Grant Award to the Captive.

## ARTICLE V-FEDERAL FINANCIAL ASSISTANCE

FEMA will provide Federal financial assistance for the Project equal to one hundred percent (100%) of the eligible project costs ($999,900,000). There will be no State or local share requirement.

## ARTICLE VI—PAYMENT

1. Subsequent to the execution of this Grant Agreement and SID's review and approval of the Captive application, SID will first issue a letter indicating that a license will be formally issued upon payment to the Captive of the Grant Award. After SID issues such letter (hereinafter "licensing"), the Grantee may request payment from FEMA of the Grant Award. SID will thereafter issue a captive license upon proof of payment of the FEMA funds into the Captive.

2. FEMA will make payment of the Grant Award through the HHS SMARTLINK System.

3. The Grantee shall not obligate funds to the City for any purpose except for the implementation and completion of the Project.

4. Grantee and the City must expend all Federal funds obtained for Project purposes within five (5) working days after receiving those funds. If the Grantee and City fail to expend such funds within five (5) working days of their receipt or fail to return such

funds to FEMA within a reasonable period, FEMA may revoke or temporarily suspend the Grantee's access to the HHS SMARTLINK System. In addition, Grantee's or the City's failure to adhere to these requirements may result in the implementation of other remedies or penalties as authorized by Federal law or regulation.

5. Upon the payment of the Grant Award to the Captive, income and investment earnings generated must be used by the Captive insurance company for the purposes set forth in this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. The "premium" or initial capital contribution for the captive will be $999,900,000, to be paid in its entirety by the City at the Captive's inception. Thereafter, funds will be held by the Captive in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement to be invested and used to pay all costs related to the operation of the Captive, including but not limited to losses, fees to service providers, taxes, administrative and defense costs. The Captive shall maintain an "Experience Account" reflecting the foregoing. The Captive may operate with the funds in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. FEMA shall be given written notice of investment guidelines within ten days of adoption by the Captive. The Captive will be governed in accordance with the Certificate of Incorporation and By-Laws attached as Exhibits B & C, as may be amended in accordance with this Agreement.

## ARTICLE VII—OVERSIGHT

1. FEMA, Grantee and SID will have, in addition to any rights provided by law, rule or regulation, the right to 30 days advance written notice of proposed amendments to the by-laws, policy, charter and/or proposed requests to SID for rulings or dispensations; and the right to participate as an observer at all meetings of the board of directors.

2. FEMA may request cost-cutting measures at any time during the operation of the Captive, which the Captive's Board of Directors must promptly consider and respond to in writing.

3. The Grantee shall comply with FEMA regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," 44 C.F.R. Part 13; and Office of Management and Budget Circulars Nos. A-87 and A-102.

## ARTICLE VIII – FINANCIAL AND PERFORMANCE REPORTS

1. The Grantee shall submit to FEMA and SID the following reports: a) A report from the Captive 30 days after the Captive has reported to SEMO, the City and the designated representative of the Contractors each calendar quarter of losses incurred, losses paid, changes in experience account balance, and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported ("IBNR") during the immediately preceding calendar quarter. It is agreed that in the event the Captive's

retained actuaries are unable to provide an estimate of IBNR loss reserves, the financial statements of the Captive need contain no IBNR loss reserves and such financial statements shall note the actuaries' inability to provide such an estimate. At such time as the actuaries are able to provide such an estimate, indicated IBNR loss reserves shall be established and included in the financial statements of the Captive in accordance with generally accepted accounting principles; b) The annual reports the Captive must submit to the Superintendent of SID (within 10 days of such submission); c) The annual financial statements (which shall be prepared no later than ninety days following the last day of each calendar year and audited by an independent auditor whose selection was made following 30 days notice to FEMA); and d) The minutes for all meetings of the Captive Board of Directors and Advisory Committee within five working days after the completion of such minutes.

2. The Grantee shall report quarterly, beginning June 30, 2003 and using quarterly financial statements provided by the Captive, to the Committees on Appropriations of the U.S. Congress and FEMA, regarding the expenditure of and investment earnings from the Grant Award.

3. The Grantee shall submit a Financial Status Report, SF 269, within 30 days from the end of the federal quarter that the Grantee expends the funds. The financial and performance reports required by this Article will also be utilized to satisfy the after-the-grant requirements of 44 C.F.R. § 13.50.

4. REPORT SUBMISSION: The Grantee will submit required reports to FEMA at: 500 C St., S.W., Room 334, Washington, DC 20472. Attn: Assistance Officer, Administration & Resource Planning.

## ARTICLE IX – FEMA OFFICIALS

FEMA officials for the Grant Agreement are as follows:

1. The Program Officer is the FEMA official who will be responsible for monitoring the technical performance of the Project activities described in the Project Narrative Statement.

The Program Officer is Gerald Connolly.

2. The Assistance Officer is the FEMA official who has full authority to negotiate, administer and execute all terms and conditions of the Grant.

The Assistance Officer is Richard Goodman.

**ARTICLE X – STATE OFFICIALS**

1. The Governor's Authorized Representative for DR-1391-NY or the Alternate Governor's Authorized Representative for DR-1391-NY is the State Official who has full authority to negotiate administer and execute all terms and conditions of the Grant.

The Governor's Authorized Representative is James W.Tuffey

The Alternate Governor's Authorized Representative is John A. Agostino.

2. The Grantee shall notify FEMA in writing within 15 days if a new Governor's Authorized Representative or Alternative Governor's Authorized Representative is designated.

**ARTICLE XI – GRANT AWARD AMENDMENTS**

1. ADDITIONAL FUNDING. The Grant Award is the maximum award for which FEMA has authority and funding. Absent additional authority and funding from Congress, this Grant Agreement is not subject to amendment for purposes of increasing the amount of the Award.

2. MODIFICATION OF TERMS. All material modifications must be in writing and signed by both parties to be enforceable. Such modifications include, but are not necessarily limited to, changes to the scope, amount, or purpose of the Grant, as described in this Agreement and its Attachments (A-D), and, in particular, any material amendments to Attachment D, The Liability Insurance Policy for the WTC Captive Insurance Company. For changes that will not result in a change of scope, amount or purpose of the Grant, this Agreement may be amended by FEMA providing written notice to the Grantee. Such changes include, but are not necessarily limited to, changes to FEMA's designated agency officers. This Agreement must also conform to any applicable subsequent changes in federal law. For modifications required as a result of changes in federal law, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary. For any and all modifications requested by the Grantee, the Grantee shall make a written request of FEMA and FEMA will make a good faith effort to notify the Grantee in writing within 30 days whether it will approve the Grantee's request and, if so, whether the change will require a written modification signed by both parties or whether written approval from FEMA will suffice.

3. EXTENSIONS. Requests to extend the initial 25-year Period of Performance will be considered pursuant to Article III when the Captive is unable to commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage. An extension request must be supported by adequate written justification explaining why commutation or assumption reinsurance is not commercially reasonable and cost effective and/or that assumption reinsurance providing

7



comparable coverage is unavailable. No extension requests will be processed if performance and financial status reports are not current.

## ARTICLE XII– OTHER TERMS AND CONDITIONS

Other terms and conditions of this Grant Agreement are as follows:

1. CONTRACT PROVISIONS: All contracts executed by the Grantee or Sub-Grantee under this Grant Award must contain the contract provisions listed under 44 C.F.R. § 13.36(i)(1), (2), (7), (10) and (11).

2. FEDERAL LAWS AND REGULATIONS: Federal law authorizing this Grant Award controls the Project implementation. New Federal laws, regulations, policies, and related administrative practices may be promulgated after the date of the Grant Award, and might apply to the Project. The most recent of such Federal requirements will govern the administration of the Project at any particular time, unless FEMA issues a written determination otherwise. If a new Federal requirement requires a modification to this Agreement, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary.

3. STATE AND LOCAL LAW: The Grantee shall ensure adherence to all applicable State and local laws, regulations, and ordinances. The Grantee shall further ensure that all approvals, licenses, licensing, certifications, as required by State or local laws, rules or regulations, are obtained by the Captive prior to any payment to the Captive from the Grant Award. During the term of the Captive, the Captive will comply with all applicable Federal, State, and local laws, rules and regulations. In instances when a Federal statute or regulation pre-empts State or local law, the Grantee must abide by such Federal statute or regulation. Otherwise, no provision of this Grant Agreement shall require the Grantee to observe or enforce compliance with any provision, perform any other act, or do any other thing in contravention of State or local law. If any provision herein would require the Grantee to violate State or local law, the Grantee must notify FEMA immediately in writing in order that appropriate action may be taken.

4. RESPONSIBILITY FOR COMPLIANCE: Irrespective of participation by other parties in the Project, the Grantee is responsible for compliance with all Federal requirements applicable to the Project. The Grantee is responsible for extending all applicable Federal requirements to all parties participating in the implementation of the Project.

5. NO FEDERAL GOVERNMENT OBLIGATIONS TO THIRD PARTIES. The Federal Government shall not be subject to any obligations or liabilities to any third party or any other person not a party to the Grant Agreement in connection with the performance of the Project. Notwithstanding that the Federal Government may have concurred in or approved any solicitation, sub-agreement, or third party contract, the Federal Government has no obligations or liabilities to any party, including any third party contractor.

8

6. CHANGES IN PROJECT PERFORMANCE: The Grantee will notify FEMA immediately after it receives notification from the City of any change in local law, conditions (such as its legal, financial, or technical capacity), or any other event that may significantly affect the Captive's ability to perform the Project in accordance with the terms of the Grant Agreement and the Sub-Grant Agreement.

7. ENFORCEMENT: Enforcement remedies shall be processed as specified under 44 C.F.R. § 13.43 when the Terms and Conditions of the Grant Agreement are not met.

8. TERMINATION: Either the Grantee or FEMA may terminate this Grant Agreement for cause by giving written notice at least thirty (30) calendar days prior to the effective date of the termination. All notices to FEMA must be transmitted via registered or certified mail; return receipt requested, to the Regional Director, FEMA/FEMA Region II. All notices to the Grantee must be transmitted via registered or certified mail, return receipt requested, to the Governor's Authorized Representative, New York State Emergency Management Office, 1220 Washington Avenue, Building 22, Suite 101, Albany, New York, 12226. Closeout of the Grant Award will be commenced and processed as prescribed in 44 C.F.R. § 13.50. Costs may not be incurred during the thirty (30) day notification period except for administrative close out of the project and the Grant Award. All costs incurred prior to the Termination Notice will be reconciled and deobligation instructions will be provided by FEMA for the balance of the Award.

9. RECORD RETENTION: Records shall be retained for 3 years (except in certain rare circumstances described in 44 C.F.R. § 13.42) from the date the final financial status report is submitted to FEMA in compliance with 44 C.F.R. § 13.42. The Captive's books and records shall be made available to FEMA and SEMO upon reasonable notice.

## ARTICLE XIII – AUDIT REQUIREMENTS

Grantee must follow the audit requirements under OMB Circular No. A-133. Non-Federal entities that expend the amount listed in OMB Circular No. A-133 or more of Federal funds in a year shall have a single or program-specific audit conducted for that year in accordance with the provisions of A-133.

## ARTICLE XIV – GENERAL PROVISIONS

1. The Grantee shall comply with all applicable laws and regulations.

2. A non-exclusive list of regulations and Office of Management and Budget circulars applicable to this Grant Agreement are listed below:

| | |
|---|---|
| 44 C.F.R. Part 7 | "Nondiscrimination In Federally-Assisted Programs" |
| 44 C.F.R. Part 13 | "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments" |

9

| 44 C.F.R. Part 17 | "Government-wide Debarment and Suspension (Non-procurement) and Government-wide Requirements for Drug-Free Workplace (Grants)" |
| 44 C.F.R. Part 18 | "New Restrictions on Lobbying" |
| 31 C.F.R. Part 205 | "Rules and Procedures for Efficient Funds Transfers" |
| OMB Circular A-87 | "Cost Principles for State, Local, and Indian Tribal Governments" |
| OMB Circular A-102 | "Grants and Cooperative Agreements with State and Local Governments" |
| OMB Circular A-133 | "Audits of States, Local Governments, and Non-Profit Organizations" |

3. The following is hereby incorporated into this Grant Agreement by reference:

Attachment A, The Sub-Grant Agreement between Grantee and the City.
Attachment B The Certificate of Incorporation for the WTC Captive Insurance Company.
Attachment C The By-laws of the WTC Captive Insurance Company
Attachment D The Liability Insurance Policy for the WTC Captive Insurance Company.
Application for Federal Assistance, Standard Form 424;
Summary Sheet for Assurances and Certification, FEMA Form 20-16;
Assurances – Non-Construction Program, FEMA Form 20-16A;
Certification Regarding Lobbying, Debarment, Suspension and Other Responsible Matters, and Drug-Free Workplace Requirements, FEMA Form 20-16C; and
Disclosure of Lobbying Activities, Standard Form LLL;
received by FEMA on ___11 02 04___.

**ARTICLE XV – EXECUTION OF AGREEMENT**

This Agreement comprises several identical counterparts, each to be fully executed by the parties and each deemed to be an original having identical legal effect.  When signed by FEMA, this instrument will constitute an Award that should be executed by the Grantee within thirty (30) days of FEMA's execution of the Agreement or FEMA may withdraw its Award.  Upon full execution of this Agreement, the effective date will be the date FEMA executed the Award.

FEMA has executed this Award as of November 5, 2004.

BY: _____

Michael D. Brown
Under Secretary
Emergency Preparedness and Response

The Grantee, by execution of this Agreement, ratifies and adopts all statements, representations, warranties, covenants and materials submitted by it; accepts FEMA's award of financial assistance; and, agrees to all the terms and conditions of this Agreement.

EXECUTED THIS ___ DAY of November, 2004

BY: _____

James W. Tuffey
Governor's Authorized Representative
DR-1391-NY

ATTESTED BY: _____

11

# EXHIBIT  B

## Part 1 of 2

SUB-GRANT AGREEMENT

WTC CAPTIVE INSURANCE COMPANY PROJECT

This Agreement made this 1ˢᵗ day of NOV. 2004 by and between the State of New York through the Emergency Management Office (hereinafter "SEMO" or "Grantee") having its principal place of business at 1220 Washington Ave., Building 22 Suite 101, Albany, New York 12226 and the City of New York through its Office of Management and Budget (hereinafter "City" or "Sub-Grantee") having its principal place of business at 75 Park Place, New York, New York 10007.

WITNESSETH

WHEREAS, On September 11, 2001 as a result of terrorist attacks against the United States, the World Trade Center Complex in New York City and adjacent properties (hereinafter "WTC site") collapsed or were destroyed resulting in an enormous amount of debris; and

WHEREAS, The City through its Office of Emergency Management, Fire Department and Police Department took control of the scene and coordinated citywide response efforts, including debris removal. The Port Authority Police Department, numerous other City and State agencies, fire departments, National Guard units and Federal assets also assisted in the response efforts; and

WHEREAS, The City, through its Department of Design and Construction (DDC), entered into four time and material agreements for the removal and hauling of debris capped at $250,000,000 each. Those agreements were with AMEC Construction Management Inc., BOVIS Lend Lease LMB, Inc., Tully Construction Co., Inc., and Turner Construction Company, who completed the work or supervised numerous other companies to complete the work (all collectively referred to herein as "contractors"); and

WHEREAS, Most debris was transported to the Fresh Kills Landfill on Staten Island via barge and truck transport. Structural steel was barged to a number of metal recyclers in New Jersey. Various piers, marine transfer stations, and sorting areas were utilized in removing the debris. The City Department of Sanitation was involved in the transportation of debris and the final disposal of processed debris at Fresh Kills Landfill; and

WHEREAS, Because of fires and disturbance of the debris in the course of its removal, allegedly numerous potentially toxic materials may have been emitted. The City was unable, however, to obtain adequate commercially reasonable liability insurance particularly environmental and professional liability insurance, for itself and the contractors. With Federal Emergency Management Agency (hereinafter "FEMA") reimbursement, the City did obtain $500 million in marine insurance and $79 million in general liability insurance; and

WHEREAS, By written request dated December 11, 2002, through SEMO, the Governor's Authorized Representative for FEMA disaster designated DR-1391-NY, the City requested $1 billion in funding from FEMA to establish a captive insurance company in the State of New York. This company would insure the City and the contractors for claims arising from the debris removal project, including for any environmental or professional liability; [1] and

WHEREAS, On February 20, 2003, President Bush signed the Consolidated Appropriations Resolution, 2003, P.L. 108-7, in which FEMA was directed to provide up to $1 billion to establish a captive insurance company or other appropriate insurance mechanism to insure the City and the contractors for claims arising from debris removal; and

WHEREAS, Pursuant to the Consolidated Appropriations Resolution, 2003, P.L. 108-7, the purpose of this Sub-Grant is to provide Federal financial assistance for the "WTC Captive Insurance Company Project" (hereinafter "Project"). The project will consist of the incorporation of a captive insurance company by the City in the State of New York to insure the City and the contractors for claims arising from debris removal at the World Trade Center following the terrorist attacks of September 11, 2001; and

WHEREAS, The State entered into an Agreement with FEMA attached hereto and incorporated by reference ("Attachment A") to transfer the funds approved under the Consolidated Appropriations Resolution 2003, P.L. 108-7 to the City to form a captive insurance company for the benefit of the City and the contractors; and

WHEREAS, This Agreement is necessary in order to transfer the funds to the City; and

NOW THEREFORE, in consideration of the foregoing, the parties agree as follows:

## ARTICLE I–PROJECT REQUIREMENTS

1. The Award of Federal assistance in support of the Project described herein is effective on the date that the authorized FEMA official signs the Grant Agreement between the State and FEMA. Upon execution of that Grant Agreement by the Grantee, the Grantee affirms this Award in support of said Project and enters into this Sub-Grant Agreement with the City.

2. The City agrees to establish and incorporate a captive insurance company to be known as the WTC Captive Insurance Company, Inc. (the "Captive") in the State of New York pursuant to the Certificate of Incorporation, the By-Laws, and the Liability Insurance Policy (attached hereto and incorporated herein as Attachments B, C, and D, respectively) to insure the City and its debris removal contractors, subcontractors and

---

[1] As a "captive" insurance company, the company will provide insurance coverage exclusively for the City and those contractors (as defined above) that were paid to perform debris removal at the WTC site. The captive insurance company will not provide insurance coverage to any other persons or entities.


consultants at every tier, for claims arising from debris removal at the WTC site from
September 11, 2001 (post collapse) through August 30, 2002

3. The Captive will be an independent corporate entity and will not constitute a sub-
grantee of the State of New York or the City of New York. The City will ensure that the
general management of the corporate affairs of the Captive will be vested in a Board of
Directors; it will have a standing advisory committee, a President, a Treasurer, a
Secretary and other officers as the Board of Directors determines necessary.

4. The State through the New York State Insurance Department (hereinafter "SID") will
regulate the Captive.

## ARTICLE II – PROJECT DESCRIPTION

1. The City, through this Agreement, shall use the Sub-Grant Award for the Project
   as described in **Attachments A-F** which are attached hereto and incorporated
   herein by reference. Attachment F is the Agreement between the City and the
   WTC Captive Insurance Company which incorporates all the terms and
   conditions of this Agreement.

2. The Conference Report to P.L. 108-7, the Consolidated Appropriations
   Resolution, 2003, directs that no FEMA funds be expended to insure claims
   arising from the September 11 terrorist-related aircraft crashes, as provided for in
   Section 408 of the Airline Transportation Safety and System Stabilization Act (49
   U.S.C. § 40101). Though some claims resulting from the events of September 11,
   2001 may arise from or relate to both the aircraft crashes and the subsequent
   debris removal, FEMA concludes that Congress did not intend with its statement
   in the Conference Report to prohibit the provision of insurance coverage under
   P.L. 108-7 for those claims arising from debris removal that also arise out of,
   result from or relate to the aircraft crashes pursuant to 49 U.S.C. § 40101.
   Therefore, the Project will provide the City and its debris removal contractors
   with insurance coverage for claims arising from debris removal after the collapse
   of the WTC towers on September 11, 2001, regardless of whether or not the claim
   is also a cause of action under 49 U.S.C. § 40101. In no event shall the insurance
   coverage authorized by this Agreement cause the limitation on liability provided
   by Section 408 (a)(3) to exceed $350,000,000.

## ARTICLE III - PERIOD OF PERFORMANCE

Upon transfer of the Sub-Grant Award to the Captive through the City, the Captive will
use the Award solely for the purposes described in the Sub-Grant Agreement, with
attachments, for an initial period of up to 25 years from the effective date of this Sub-
Grant Agreement, and will not use the award for any other purpose. Pursuant to Section
12 of Attachment D, the Captive will endeavor to commute the Policy or have it assumed
under an assumption reinsurance agreement within the initial 25-year period. When the
Policy is fully commuted or assumed under an assumption reinsurance agreement, the



Project and this Agreement will terminate. In the event the Captive is unable to fully commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage, the Sub-Grant Award will be extended, subject to Article XI, in two year increments until such time as the Captive commutes its liabilities, obtains assumption reinsurance, or the Award funds are exhausted. Except as provided in Article XII Section 9, the City cannot terminate the Captive without the express written approval of the Governor's Authorized Representative and the Superintendent of SID.

## ARTICLE IV – AMOUNT AND DISBURSEMENT OF AWARD

1. The amount of this Award is Nine Hundred Ninety-Nine Million, Nine Hundred Thousand Dollars ($999,900,000) (the "Award Amount"). This is the maximum award amount for which FEMA has authority and available funding.

2. FEMA shall disburse the entire Award Amount to the State to be disbursed to the City and thereupon to the Captive. Of this amount, expenses of up to $3 million for obligations incurred by the City and/or the Contractors in developing the captive from March 7, 2002, through the date the Award Amount is actually disbursed shall be disbursed by the Captive to the City and/or Contractors (or paid directly by the Captive to those who supplied such services) insofar as such expenses have been approved by FEMA. Documentation evidencing such expenses must be submitted to FEMA within 60 days of the disbursing of the Sub-Grant Award to the Captive.

## ARTICLE V-FEDERAL FINANCIAL ASSISTANCE

FEMA will provide Federal financial assistance for the Project equal to one hundred percent (100%) of the eligible project costs ($999,900,000). There will be no State or local share requirement.

## ARTICLE VI—PAYMENT

1. Subsequent to the execution of this Sub-Grant Agreement and SID's review and approval of the Captive application, SID will first issue a letter indicating that a license will be formally issued upon payment to the Captive of the Sub-Grant Award. After SID issues such letter (hereinafter "licensing"), the Grantee may request payment from FEMA of the Grant Award. SID will thereafter issue a captive license upon proof of payment of the FEMA funds into the Captive.

2. The State shall not obligate funds to the City for any purpose except for the implementation and completion of the Project. The State shall not provide the funds to the City until the funds are received from the Federal government. This Agreement shall be deemed executory only to the extent of money available to the State for the performance of the terms hereof and no liability on account thereof shall be incurred by the State of New York beyond moneys available for the purpose thereof.

3. The City may draw down the funds in their entirety only when the Captive receives the letter from SID as referred to in Paragraph 1 above and written documentation is provided to SEMO evidencing the Agreement between the City and the Captive and the Captive is able to accept the funds. The City must expend all Federal funds obtained for Project purposes within five (5) working days after receiving those funds. The City must verify the transfer of the funds to the Captive in writing to SEMO within 3 business days of the transfer. If the City fails to transfer the funds within five (5) working days of their receipt then New York State shall take all measures necessary to recoup the funds including the imposition of any and all penalties as authorized by New York State law or regulation. In addition, the City's failure to adhere to these requirements may result in the implementation of other remedies or penalties as authorized by Federal law or regulation.

4. Upon the payment of the Sub-Grant Award to the Captive, income and investment earnings generated must be used by the Captive insurance company for the purposes set forth in this Agreement and its Attachments A-F, and any Amendments thereto made in accordance with this Agreement. The "premium" or initial capital contribution for the Captive will be $999,900,000, to be paid in its entirety by the City at the Captive's inception. Thereafter, funds will be held by the Captive in accordance with this Agreement and its Attachments A-F and any Amendments thereto made in accordance with this Agreement to be invested and used to pay all costs related to the operation of the Captive, including but not limited to, losses, fees to service providers, taxes, administrative and defense costs. The Captive shall maintain an "Experience Account" reflecting the foregoing. The Captive may operate with the funds in accordance with this Agreement and its Attachments A-F and any Amendments thereto made in accordance with this Agreement. FEMA SEMO and SID shall be given notice of investment guidelines within ten days of adoption by the Captive. The Captive will be governed in accordance with the Charter and By-Laws attached as Exhibits B & C as may be amended in accordance with this Agreement.

**ARTICLE VII—OVERSIGHT**

1. FEMA, SEMO and SID will have, in addition to any rights provided by law, rule or regulation, the right to 30 days advance written notice of proposed amendments to the by-laws, policy, charter and/or proposed requests to SID for rulings or dispensations; and the right to participate as an observer at all meetings of the board of directors.

2. FEMA may request cost-cutting measures at any time during the operation of the Captive, which the Captive's Board of Directors must promptly consider and respond to in writing.

3. The City shall comply with FEMA regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," 44 C.F.R. Part 13; and Office of Management and Budget Circulars Nos. A-87 and A-102 In addition, the City shall ensure that the Captive complies with the requirements



imposed upon the State and City by this Sub-Grant Agreement and the Grant Agreement between the State and FEMA. However, the Captive is not subject to 44 CFR 13.36 (Procurement), but shall be governed by the requirements set forth in exhibit A of the City/Captive Agreement.

## ARTICLE VIII – FINANCIAL AND PERFORMANCE REPORTS

1. The City shall submit a Financial Status Report, SF 269 or FF 20-10, within 30 days from the end of the first federal quarter following the Sub-Grant Award.

2. The City shall submit to SEMO, SID, the Office of the New York State Comptroller (OSC) and FEMA the following reports: a) A report from the Captive 30 days after each calendar quarter of losses incurred, losses paid, changes in experience account balance, and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported ("IBNR") during the immediately preceding calendar quarter. It is agreed that, in the event the Captive's retained actuaries are unable to provide an estimate of IBNR loss reserves, the financial statements of the Captive need contain no IBNR loss reserves and such financial statements shall note the actuaries' inability to provide such an estimate. At such time as the actuaries are able to provide such an estimate, indicated IBNR loss reserves shall be established and included in the financial statements of the Captive in accordance with generally accepted accounting principles: b) The annual reports the Captive must submit to the Superintendent of SID (within 10 days of submission); c) The annual financial statements (which shall be prepared no later than ninety days following the last day of each calendar year and audited by an independent auditor whose selection was made following 30 days notice to FEMA); and d) The minutes for all meetings of the Captive Board of Directors and Advisory Committee within five working days after the adoption of such minutes.

3. The State shall report quarterly, beginning June 30, 2003 and using quarterly financial statements provided by the Captive, to the Committees on Appropriations of the U.S. Congress and FEMA, regarding the expenditure of and investment earnings from the Sub-Grant Award.

4. The City shall submit a Financial Status Report, SF269, within 30 days from the end of the federal quarter that the City expends the funds. The financial and performance reports required by this Article will also be utilized to satisfy the after-the-grant requirements of 44 C.F.R. § 13.50.

5. REPORT SUBMISSION: The City will submit required reports to SEMO's Attention: Governor's Authorized Representative, DR-1391-NY at its principal place of business, 1220 Washington Avenue, Building 22, Suite 101, Albany, New York 12226.

6. The City shall place upon the Captive the same Financial and Performance Reports as described in ARTICLE VIII-FINANCIAL AND PERFORMANCE REPORTS of this Agreement.

CityState Agreement(081804).doc

**ARTICLE IX – STATE OFFICIALS**

1. The Governor's Authorized Representative for DR-1391-NY or the Alternate Governor's Authorized Representative for DR-1391-NY is the State Official who has full authority to negotiate, administer and execute all terms and conditions of the Grant.

The Governor's Authorized Representative for DR-1391-NY is James W. Tuffey.

The Alternate Governor's Authorized Representative for DR-1391-NY is John A. Agostino

The Superintendent of the State Insurance Department is the State Official who has full authority to regulate the Captive.

The Superintendent of the State Insurance Department is Gregory V. Serio.

**ARTICLE X – CITY OFFICIALS**

1. The City's Director of Management and Budget, or his Designated Alternate, is the City Official who has full authority to negotiate, administer and execute all terms and conditions of the Sub-Grant.

The Director of Management and Budget is Mark Page. His Designated Alternate is Bud Larson.

2. The City may amend this agreement to reflect changes to the designated City Officials by providing written notice to the State.

**ARTICLE XI – GRANT AWARD AMENDMENTS**

1. ADDITIONAL FUNDING. The Sub-Grant Award is the maximum award for which FEMA has authority and funding. Absent additional authority and funding from Congress, this Sub-Grant Agreement is not subject to amendment for purposes of increasing the amount of the Award.

2. MODIFICATION OF TERMS. All material modifications must be in writing and signed by both parties to be enforceable. Such modifications include, but are not necessarily limited to, changes to the scope, amount, or purpose of the Sub-Grant, as described in this Agreement and its Attachments (A-F), and, in particular, any material amendments to Attachment D, the Liability Insurance Policy for the WTC Captive Insurance Company. For changes that will not result in a change of scope, amount or purpose of the Grant, this Agreement may be amended by SEMO providing written notice to the City. Such changes include, but are not necessarily limited to, changes to SEMO's designated agency officers. This Agreement must also conform to any applicable subsequent changes in state and federal law. For modifications required as a

result of changes in State or Federal law, SEMO will notify the City that a written modification to be signed by both parties will be necessary. For any and all modifications requested by the City the City shall make a written request of SEMO and SEMO will make a good faith effort to notify the City in writing within 30 days whether it will approve the City's request and, if so, whether the change will require a written modification signed by both parties or whether written approval from SEMO will suffice.

3. EXTENSIONS. Requests to extend the initial 25-year Period of Performance will be considered pursuant to Article III when the Captive is unable to commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage. An extension request must be supported by adequate written justification explaining why commutation or assumption reinsurance is not commercially reasonable and cost effective and/or that assumption reinsurance providing comparable coverage is unavailable. No extension requests will be processed if performance and financial status reports are not current. Extension requests must be sent to SEMO six months prior to the performance period expiration date. Extensions will not be sent to FEMA for approval without adequate written justification for approval. The justification is a written explanation of the reason or reasons requiring an extension.

## ARTICLE XII– OTHER TERMS AND CONDITIONS

Other terms and conditions of this Grant Agreement are as follows:

1. CONTRACT PROVISIONS: All contracts executed under this Sub-Grant Award by the Sub-Grantee must contain the contract provisions listed under 44 C.F.R. §13.36(i)(1),(2),(7),(10), and (11).

2. FEDERAL LAWS AND REGULATIONS: Federal law authorizing this Sub-Grant Award controls the Project implementation. New Federal laws, regulations, policies, and related administrative practices may be promulgated after the date of the Sub-Grant Award, and might apply to the Project. The most recent of such Federal requirements will govern the administration of the Project at any particular time, unless FEMA issues a written determination otherwise. If a new Federal requirement requires a modification to this Agreement, FEMA will notify the Grantee who will notify the City that a written modification to be signed by both parties will be necessary.

3. STATE AND LOCAL LAW: The City shall ensure adherence to all applicable State and local laws, rules, regulations and ordinances. The City shall further ensure that all approvals, licenses, licensing, certifications, as required by State or local laws, rules or regulations, are obtained by the Captive prior to any payment to the Captive from the Sub-Grant Award. During the term of the Captive, the City will ensure that the Captive will comply with all Federal, State and Local laws, rules and regulations. In instances when a Federal statute or regulation pre-empts State or local law, the City must ensure that the Captive abide by such Federal statute or regulation. Otherwise, no provision of this Sub-Grant Agreement shall require the City to observe or enforce compliance with

any provision, perform any other act, or do any other thing in contravention of State or local law. If any provision herein would require the City to violate State or local law, the City must notify SEMO and FEMA immediately in writing in order that appropriate action may be taken.

4. RESPONSIBILITY FOR COMPLIANCE:  Irrespective of participation by other parties in the Project, the City is responsible for compliance with all Federal, State and local requirements applicable to the Project.  The City is responsible for extending all applicable Federal, State and local requirements to all parties participating in the implementation of the Project.

5. NO STATE GOVERNMENT OBLIGATIONS TO THIRD PARTIES.  The State Government shall not be subject to any obligations or liabilities to any third party or any other person not a party to the Sub-Grant Agreement in connection with the performance of the Project.  Notwithstanding that the State Government may have concurred in or approved any solicitation, sub-agreement, or third party contract, the State Government has no obligations or liabilities to any party, including any third party contractor.

6. CHANGES IN PROJECT PERFORMANCE:  The City will notify SEMO and FEMA immediately after it receives notification from the Captive of any change in local law, conditions (such as its legal, financial, or technical capacity), or any other event that may significantly affect the Captive's ability to perform the Project in accordance with the terms of the Grant Agreement and the Sub-Grant Agreement.

7. ENFORCEMENT:  Enforcement remedies shall be processed as specified under 44 C.F.R. § 13.43 when the Terms and Conditions of the Sub-Grant Agreement are not met.

8. TERMINATION:  Either the City or Grantee may terminate this Sub-Grant Agreement for cause by giving written notice at least thirty (30) calendar days prior to the effective date of the termination.  "For cause" includes, but is not limited to, any action by FEMA to terminate the Grant Agreement with the State or deobligate the funds from the State.  Notice must also be given to FEMA regarding the termination.  All notices to FEMA must be transmitted via registered or certified mail; return receipt requested, to 500 C St., S.W., Room 334, Washington, DC 20472, Attn:  Assistance Officer.  All notices to the Grantee must be transmitted via registered or certified mail, return receipt requested, to the Governor's Authorized Representative, New York State Emergency Management Office, 1220 Washington Avenue, Building 22, Suite 101, Albany, New York, 12226.  All notices to the City must be transmitted via registered or certified mail, return receipt requested, to the Director of the Office of Management and Budget, 75 Park Place, New York, New York 10007.  Closeout of the Sub-Grant Award will be commenced and processed as prescribed in 44 C.F.R. § 13.50.  Costs may not be incurred during the thirty (30) day notification period except for administrative close out of the project and the Sub-Grant Award.  All costs incurred prior to the Termination Notice will be reconciled and deobligation instructions will be provided by FEMA for the balance of the Award.

9. RECORD RETENTION:  Records shall be retained for at least 3 years (except in certain rare circumstances described in 44 C.F.R. § 13.42) from the date the final financial status report is submitted to FEMA in compliance with 44 C.F.R. § 13.42. Additionally, record retention shall not violate requirements of Appendix "A" ("Attachment E" hereto).. The Captive's books and records shall be made available to FEMA, SEMO, OSC and SID upon reasonable notice.

10.  This Agreement shall be deemed executory only to the extent of money available to the State for the performance of the terms hereof and no liability on account thereof shall be incurred by the State of New York beyond moneys available for the purpose thereof.

11.  The City agrees to abide by Appendix "A" ("Attachment E") attached hereto and made a part hereof.

12.  This is not a binding contract until signed by all parties approved by the New York State Comptroller and the New York State Attorney General.

## ARTICLE XIII – AUDIT REQUIREMENTS

The City must follow the audit requirements under OMB Circular No. A-133.  Non-Federal entities that expend the amount listed in OMB Circular No. A-133 or more of Federal funds in a year shall have a single or program-specific audit conducted for that year in accordance with the provisions of A-133.

## ARTICLE XIV – GENERAL PROVISIONS

A.  The City shall comply with all applicable Federal, State and local laws, rules and regulations.

B.  A non-exclusive list of regulations and Office of Management and Budget circulars applicable to this Sub-Grant Agreement are listed below:

| | |
|---|---|
| 44 C.F.R. Part 7 | "Nondiscrimination In Federally-Assisted Programs" |
| 44 C.F.R. Part 13 | "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments" |
| 44 C.F.R. Part 17 | "Government-wide Debarment and Suspension (Non-procurement) and Government-wide Requirements for Drug-Free Workplace (Grants)" |
| 44 C.F.R. Part 18 | "New Restrictions on Lobbying" |
| 31 C.F.R. Part 205 | "Rules and Procedures for Efficient Funds Transfers" |
| OMB Circular A-87 | "Cost Principles for State, Local, and Indian Tribal Governments" |
| OMB Circular A-102 | "Grants and Cooperative Agreements with State and Local Governments" |
| OMB Circular A-133 | "Audits of States, Local Governments, and Non-Profit Organizations" |



C. The following is hereby incorporated into this Sub-Grant Agreement by reference:

Attachment A-The Grant Agreement between the Federal Emergency Management
Agency and the State of New York
Attachment B Certificate of Incorporation for the WTC Captive Insurance Company
Attachment C By-Laws, for the WTC Captive Insurance Company
Attachment D Liability Insurance Policy for the WTC Captive Insurance Company
Attachment E Appendix A
Attachment F – The Agreement between the City of New York and WTC Captive
Insurance Company, Inc.

Application for Federal Assistance, Standard Form 424;
Summary Sheet for Assurances and Certification, FEMA Form 20-16;
Assurances – Non-Construction Program, FEMA Form 20-16A;
Certification Regarding Lobbying, Debarment, Suspension and Other Responsible
Matters, and Drug-Free Workplace Requirements, FEMA Form 20-16C; and
Disclosure of Lobbying Activities, Standard Form LLL;
received by SEMO on __11/1/04_____.

CityState Agreement(081804).doc

**ARTICLE XV – EXECUTION OF AGREEMENT**

This Agreement comprises several identical counterparts, each to be fully executed by the parties and each deemed to be an original having identical legal effect. When signed by SEMO, this instrument will constitute an Award that should be executed by the City within thirty (30) days of SEMO's execution of the Agreement or SEMO may withdraw its Award.

SEMO has executed this Award as of *NOV. 1* 2004

BY: _____

James W. Tuffey
Governor's Authorized Representative
DR-1391-NY

The City, by execution of this Agreement, ratifies and adopts all statements, representations, warranties, covenants and materials submitted by it; accepts FEMA's award of financial assistance through New York State; and, agrees to all the terms and conditions of this Agreement.

EXECUTED THIS *21* DAY OF *October*, 2004

BY: _____

Mark Page
Director of the City of New York
Office of Management and Budget

_____

Ss:
State of New York
County of *New York*
On this *29* day of *October*, 2004 before me personally came *Mark Page* to me known, who, being, by me duly sworn, did depose and say that he/she is the *Director of OMB* described in and which executed the foregoing statement by the authority of *the NYC Charter*.

_____
Notary Public

GLADYS I SANCHEZ
Notary Public - State of New York
NO. 01SA5046118
Qualified in Bronx County
My Commission Expires *8/14/05*

APPROVED AS TO FORM
NYS ATTORNEY GENERAL
NOV 19 2004
PETER K.
ASSOCIATE ATTORNEY

APPROVED
DEPT. OF AUDIT & CONTROL
NOV 29 2004
FOR THE STATE COMPTROLLER

CityState Agreement(081804).doc

# EXHIBIT  B

## Part 2 of 2

City/State
Agreement

# UNITED STATES DEPARTMENT OF HOMELAND SECURITY
## EMERGENCY PREPAREDNESS & RESPONSE DIRECTORATE

## GRANT AGREEMENT

## WTC CAPTIVE INSURANCE COMPANY PROJECT

This Agreement made by and between the Federal Emergency Management Agency (hereinafter "FEMA"), within the United States Department of Homeland Security, Emergency Preparedness and Response Directorate, having its principal place of business at 500 C Street S.W., Washington, D.C., and New York State through the State Emergency Management Office (hereinafter "SEMO" or "Grantee") having its principal place of business at 1220 Washington Ave., Building 22 Suite 101, Albany, New York 12226.

## WITNESSETH

WHEREAS, On September 11, 2001 as a result of terrorist attacks against the United States, the World Trade Center Complex in New York City and adjacent properties (hereinafter "WTC site") collapsed or were destroyed resulting in an enormous amount of debris; and

WHEREAS, The City of New York (hereinafter "City" or "Sub-Grantee") through its Office of Emergency Management, Fire Department and Police Department took control of the scene and coordinated citywide response efforts, including debris removal. The Port Authority Police Department, numerous other City and State agencies, fire departments, National Guard units and Federal assets also assisted in the response efforts; and

WHEREAS, The City, through its Department of Design and Construction (DDC), entered into four time and material agreements for the removal and hauling of debris capped at $250,000,000 each. Those agreements were with AMEC Construction Management Inc., BOVIS Lend Lease LMB, Inc., Tully Construction Co., Inc., and Turner Construction Company, who completed the work or supervised numerous other companies to complete the work (all collectively referred to herein as "contractors"); and

WHEREAS, Most debris was transported to the Fresh Kills Landfill on Staten Island via barge and truck transport. Structural steel was barged to a number of metal recyclers in New Jersey. Various piers, marine transfer stations, and sorting areas were utilized in removing the debris. The City Department of Sanitation was involved in the transportation of debris and the final disposal of processed debris at Fresh Kills Landfill; and

WHEREAS, Because of fires and disturbance of the debris in the course of its removal, allegedly numerous potentially toxic materials may have been emitted. The City was unable, however, to obtain adequate commercially reasonable liability insurance,



particularly environmental and professional liability insurance, for itself and the contractors. With FEMA reimbursement, the City did obtain $500 million in marine insurance and $79 million in general liability insurance; and

WHEREAS, By written request dated December 11, 2002, through SEMO, the Governor's Authorized Representative for FEMA disaster designated DR-1391-NY, the City requested $1 billion in funding from FEMA to establish a captive insurance company in the State of New York. This company would insure the City and the contractors for claims arising from the debris removal project, including for any environmental or professional liability; [1] and

WHEREAS, On February 20, 2003, President Bush signed the Consolidated Appropriations Resolution, 2003, P.L. 108-7, in which FEMA was directed to provide up to $1 billion to establish a captive insurance company or other appropriate insurance mechanism to insure the City and the contractors for claims arising from debris removal; and

WHEREAS, Pursuant to the Consolidated Appropriations Resolution, 2003, P.L. 108-7, the purpose of this Grant is to provide Federal financial assistance for the "WTC Captive Insurance Company Project" (hereinafter "Project"). The project will consist of the incorporation of a captive insurance company (hereinafter "Captive") by the City in the State of New York to insure the City and the contractors for claims arising from debris removal at the World Trade Center following the terrorist attacks of September 11, 2001; and

WHEREAS, The Grantee will enter into a Sub-Grant Agreement with the City incorporating the terms and conditions of this agreement; and

NOW THEREFORE, in consideration of the foregoing, the parties agree as follows:

## ARTICLE I--PROJECT REQUIREMENTS

1. The Award of Federal assistance in support of the Project described herein is effective on the date that the authorized FEMA official signs this Grant Agreement. Upon execution of this Grant Agreement by the Grantee, the Grantee affirms this Award in support of the said Project and enters into this Grant Agreement with FEMA.

2. The Grantee through its Sub-Grant Agreement with the City attached hereto and incorporated by reference (Attachment A) shall ensure that the City will establish and incorporate a captive insurance company to be known as the WTC Captive Insurance Company, Inc. in the State of New York pursuant to the Certificate of Incorporation, the By-Laws, and the Liability Insurance Policy (attached hereto and incorporated herein as Attachments B, C, and D, respectively) to insure the City and its debris removal

---

[1] As a "captive" insurance company, the company will provide insurance coverage exclusively for the City and those contractors (as defined above) that were paid to perform debris removal at the WTC site. The "captive" insurance company will not provide insurance coverage to any other persons or entities.

contractors, subcontractors and consultants at every tier, for claims arising from debris removal at the WTC site from September 11,2001 (post collapse) through August 30, 2002.

3.  The Captive will be an independent corporate entity and will not constitute a sub-grantee of the State of New York or the City of New York.  The Captive is not subject to 44 C.F.R. § 13.36 (Procurement), but shall be governed by the procurement requirements set forth in the Sub-Grant Agreement. The general management of the corporate affairs of the captive will be vested in a Board of Directors.  It will have a standing advisory committee, a President, a Treasurer, a Secretary and other officers as the Board of Directors determines necessary.

4.  The Grantee through the New York State Insurance Department (hereinafter SID) will regulate the Captive.

## ARTICLE II – PROJECT DESCRIPTION

1.  The Grantee, through a sub-grant to the City, shall use the Grant Award for the Project as described herein and in **Attachments A-D** which are attached hereto and incorporated herein by reference.

2.  The Conference Report to P.L. 108-7, the Consolidated Appropriations Resolution, 2003, directs that no FEMA funds be expended to insure claims arising from the September 11 terrorist-related aircraft crashes, as provided for in Section 408 of the Airline Transportation Safety and System Stabilization Act (49 U.S.C. § 40101).  Though some claims resulting from the events of September 11, 2001 may arise from or relate to both the aircraft crashes and the subsequent debris removal, FEMA concludes that Congress did not intend with its statement in the Conference Report to prohibit the provision of insurance coverage under P.L. 108-7 for those claims arising from debris removal that also arise out of, result from or relate to the aircraft crashes pursuant to 49 U.S.C. § 40101.  Therefore, the Project will provide the City and its debris removal contractors with insurance coverage for claims arising from debris removal after the collapse of the WTC towers on September 11, 2001, regardless of whether or not the claim is also a cause of action under 49 U.S.C. § 40101.  In no event shall the insurance coverage authorized by this Agreement cause the limitation on liability provided by Section 408(a)(3) to exceed $350,000,000.

## ARTICLE III - PERIOD OF PERFORMANCE

Upon transfer of the Grant Award to the Captive through the City, the Captive will use the Award solely for the purposes described in the Grant Agreement, with attachments, for an initial period of up to 25 years from the effective date of this Grant Agreement. Pursuant to Section 12 of Attachment D, the Captive will endeavor to commute the Policy or have it assumed under an assumption reinsurance agreement within the initial 25-year period.  When the Policy is fully commuted or assumed under an assumption reinsurance agreement, the Project and this Agreement will terminate.  In the event the

3



Captive is unable to fully commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage, the Grant Award will be extended, subject to Article XI, in two-year increments until such time as the Captive commutes its liabilities, obtains assumption reinsurance, or the Award funds are exhausted.

## ARTICLE IV – AMOUNT AND DISBURSEMENT OF AWARD

1. The amount of this Award is Nine Hundred Ninety-Nine Million, Nine Hundred Thousand Dollars ($999,900,000) (the "Award Amount"). This is the maximum award amount for which FEMA has authority and available funding.

2. FEMA shall disburse the entire Award Amount to the Grantee to be disbursed to the Sub-Grantee and thereupon to the Captive. Of this amount, expenses of up to $3 million for obligations incurred by the Sub-Grantee and/or the Contractors in developing the Captive from March 7, 2002, through the date the Award Amount is actually disbursed shall be disbursed by the Captive to such Sub-Grantee and/or Contractors (or paid directly by the Captive to those who supplied such services) insofar as such expenses have been approved by FEMA. Documentation evidencing such expenses must be submitted to FEMA within 60 days of the disbursing of the Grant Award to the Captive.

## ARTICLE V-FEDERAL FINANCIAL ASSISTANCE

FEMA will provide Federal financial assistance for the Project equal to one hundred percent (100%) of the eligible project costs ($999,900,000). There will be no State or local share requirement.

## ARTICLE VI—PAYMENT

1. Subsequent to the execution of this Grant Agreement and SID's review and approval of the Captive application, SID will first issue a letter indicating that a license will be formally issued upon payment to the Captive of the Grant Award. After SID issues such letter (hereinafter "licensing"), the Grantee may request payment from FEMA of the Grant Award. SID will thereafter issue a captive license upon proof of payment of the FEMA funds into the Captive.

2. FEMA will make payment of the Grant Award through the HHS SMARTLINK System.

3. The Grantee shall not obligate funds to the City for any purpose except for the implementation and completion of the Project.

4. Grantee and the City must expend all Federal funds obtained for Project purposes within five (5) working days after receiving those funds. If the Grantee and City fail to expend such funds within five (5) working days of their receipt or fail to return such

funds to FEMA within a reasonable period, FEMA may revoke or temporarily suspend the Grantee's access to the HHS SMARTLINK System. In addition, Grantee's or the City's failure to adhere to these requirements may result in the implementation of other remedies or penalties as authorized by Federal law or regulation.

5. Upon the payment of the Grant Award to the Captive, income and investment earnings generated must be used by the Captive insurance company for the purposes set forth in this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. The "premium" or initial capital contribution for the captive will be $999,900,000, to be paid in its entirety by the City at the Captive's inception. Thereafter, funds will be held by the Captive in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement to be invested and used to pay all costs related to the operation of the Captive, including but not limited to losses, fees to service providers, taxes, administrative and defense costs. The Captive shall maintain an "Experience Account" reflecting the foregoing. The Captive may operate with the funds in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. FEMA shall be given written notice of investment guidelines within ten days of adoption by the Captive. The Captive will be governed in accordance with the Certificate of Incorporation and By-Laws attached as Exhibits B & C, as may be amended in accordance with this Agreement.

## ARTICLE VII—OVERSIGHT

1. FEMA, Grantee and SID will have, in addition to any rights provided by law, rule or regulation, the right to 30 days advance written notice of proposed amendments to the by-laws, policy, charter and/or proposed requests to SID for rulings or dispensations; and the right to participate as an observer at all meetings of the board of directors.

2. FEMA may request cost-cutting measures at any time during the operation of the Captive, which the Captive's Board of Directors must promptly consider and respond to in writing.

3. The Grantee shall comply with FEMA regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," 44 C.F.R. Part 13; and Office of Management and Budget Circulars Nos. A-87 and A-102.

## ARTICLE VIII – FINANCIAL AND PERFORMANCE REPORTS

1. The Grantee shall submit to FEMA and SID the following reports: a) A report from the Captive 30 days after the Captive has reported to SEMO, the City and the designated representative of the Contractors each calendar quarter of losses incurred, losses paid, changes in experience account balance, and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported ("IBNR") during the immediately preceding calendar quarter. It is agreed that in the event the Captive's

retained actuaries are unable to provide an estimate of IBNR loss reserves, the financial statements of the Captive need contain no IBNR loss reserves and such financial statements shall note the actuaries' inability to provide such an estimate. At such time as the actuaries are able to provide such an estimate, indicated IBNR loss reserves shall be established and included in the financial statements of the Captive in accordance with generally accepted accounting principles; b) The annual reports the Captive must submit to the Superintendent of SID (within 10 days of such submission); c) The annual financial statements (which shall be prepared no later than ninety days following the last day of each calendar year and audited by an independent auditor whose selection was made following 30 days notice to FEMA); and d) The minutes for all meetings of the Captive Board of Directors and Advisory Committee within five working days after the completion of such minutes.

2. The Grantee shall report quarterly, beginning June 30, 2003 and using quarterly financial statements provided by the Captive, to the Committees on Appropriations of the U.S. Congress and FEMA, regarding the expenditure of and investment earnings from the Grant Award.

3. The Grantee shall submit a Financial Status Report, SF 269, within 30 days from the end of the federal quarter that the Grantee expends the funds. The financial and performance reports required by this Article will also be utilized to satisfy the after-the-grant requirements of 44 C.F.R. § 13.50.

4. REPORT SUBMISSION: The Grantee will submit required reports to FEMA at: 500 C St., S.W., Room 334, Washington, DC 20472. Attn: Assistance Officer, Administration & Resource Planning.

## ARTICLE IX – FEMA OFFICIALS

FEMA officials for the Grant Agreement are as follows:

1. The Program Officer is the FEMA official who will be responsible for monitoring the technical performance of the Project activities described in the Project Narrative Statement.

The Program Officer is Gerald Connolly.

2. The Assistance Officer is the FEMA official who has full authority to negotiate, administer and execute all terms and conditions of the Grant.

The Assistance Officer is Richard Goodman.

6



## ARTICLE X – STATE OFFICIALS

1. The Governor's Authorized Representative for DR-1391-NY or the Alternate Governor's Authorized Representative for DR-1391-NY is the State Official who has full authority to negotiate administer and execute all terms and conditions of the Grant.

The Governor's Authorized Representative is James W.Tuffey

The Alternate Governor's Authorized Representative is John A. Agostino.

2. The Grantee shall notify FEMA in writing within 15 days if a new Governor's Authorized Representative or Alternative Governor's Authorized Representative is designated.

## ARTICLE XI – GRANT AWARD AMENDMENTS

1. ADDITIONAL FUNDING. The Grant Award is the maximum award for which FEMA has authority and funding. Absent additional authority and funding from Congress, this Grant Agreement is not subject to amendment for purposes of increasing the amount of the Award.

2. MODIFICATION OF TERMS. All material modifications must be in writing and signed by both parties to be enforceable. Such modifications include, but are not necessarily limited to, changes to the scope, amount, or purpose of the Grant, as described in this Agreement and its Attachments (A-D), and, in particular, any material amendments to Attachment D, The Liability Insurance Policy for the WTC Captive Insurance Company. For changes that will not result in a change of scope, amount or purpose of the Grant, this Agreement may be amended by FEMA providing written notice to the Grantee. Such changes include, but are not necessarily limited to, changes to FEMA's designated agency officers. This Agreement must also conform to any applicable subsequent changes in federal law. For modifications required as a result of changes in federal law, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary. For any and all modifications requested by the Grantee, the Grantee shall make a written request of FEMA and FEMA will make a good faith effort to notify the Grantee in writing within 30 days whether it will approve the Grantee's request and, if so, whether the change will require a written modification signed by both parties or whether written approval from FEMA will suffice.

3. EXTENSIONS. Requests to extend the initial 25-year Period of Performance will be considered pursuant to Article III when the Captive is unable to commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage. An extension request must be supported by adequate written justification explaining why commutation or assumption reinsurance is not commercially reasonable and cost effective and/or that assumption reinsurance providing



comparable coverage is unavailable. No extension requests will be processed if performance and financial status reports are not current.

## ARTICLE XII– OTHER TERMS AND CONDITIONS

Other terms and conditions of this Grant Agreement are as follows:

1. CONTRACT PROVISIONS: All contracts executed by the Grantee or Sub-Grantee under this Grant Award must contain the contract provisions listed under 44 C.F.R. § 13.36(i)(1), (2), (7), (10) and (11).

2. FEDERAL LAWS AND REGULATIONS: Federal law authorizing this Grant Award controls the Project implementation. New Federal laws, regulations, policies, and related administrative practices may be promulgated after the date of the Grant Award, and might apply to the Project. The most recent of such Federal requirements will govern the administration of the Project at any particular time, unless FEMA issues a written determination otherwise. If a new Federal requirement requires a modification to this Agreement, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary.

3. STATE AND LOCAL LAW: The Grantee shall ensure adherence to all applicable State and local laws, regulations, and ordinances. The Grantee shall further ensure that all approvals, licenses, licensing, certifications, as required by State or local laws, rules or regulations, are obtained by the Captive prior to any payment to the Captive from the Grant Award. During the term of the Captive, the Captive will comply with all applicable Federal, State, and local laws, rules and regulations. In instances when a Federal statute or regulation pre-empts State or local law, the Grantee must abide by such Federal statute or regulation. Otherwise, no provision of this Grant Agreement shall require the Grantee to observe or enforce compliance with any provision, perform any other act, or do any other thing in contravention of State or local law. If any provision herein would require the Grantee to violate State or local law, the Grantee must notify FEMA immediately in writing in order that appropriate action may be taken.

4. RESPONSIBILITY FOR COMPLIANCE: Irrespective of participation by other parties in the Project, the Grantee is responsible for compliance with all Federal requirements applicable to the Project. The Grantee is responsible for extending all applicable Federal requirements to all parties participating in the implementation of the Project.

5. NO FEDERAL GOVERNMENT OBLIGATIONS TO THIRD PARTIES. The Federal Government shall not be subject to any obligations or liabilities to any third party or any other person not a party to the Grant Agreement in connection with the performance of the Project. Notwithstanding that the Federal Government may have concurred in or approved any solicitation, sub-agreement, or third party contract, the Federal Government has no obligations or liabilities to any party, including any third party contractor.

6. CHANGES IN PROJECT PERFORMANCE: The Grantee will notify FEMA immediately after it receives notification from the City of any change in local law, conditions (such as its legal, financial, or technical capacity), or any other event that may significantly affect the Captive's ability to perform the Project in accordance with the terms of the Grant Agreement and the Sub-Grant Agreement.

7. ENFORCEMENT: Enforcement remedies shall be processed as specified under 44 C.F.R. § 13.43 when the Terms and Conditions of the Grant Agreement are not met.

8. TERMINATION: Either the Grantee or FEMA may terminate this Grant Agreement for cause by giving written notice at least thirty (30) calendar days prior to the effective date of the termination. All notices to FEMA must be transmitted via registered or certified mail; return receipt requested, to the Regional Director, FEMA/FEMA Region II. All notices to the Grantee must be transmitted via registered or certified mail, return receipt requested, to the Governor's Authorized Representative, New York State Emergency Management Office, 1220 Washington Avenue, Building 22, Suite 101, Albany, New York, 12226. Closeout of the Grant Award will be commenced and processed as prescribed in 44 C.F.R. § 13.50. Costs may not be incurred during the thirty (30) day notification period except for administrative close out of the project and the Grant Award. All costs incurred prior to the Termination Notice will be reconciled and deobligation instructions will be provided by FEMA for the balance of the Award.

9. RECORD RETENTION: Records shall be retained for 3 years (except in certain rare circumstances described in 44 C.F.R. § 13.42) from the date the final financial status report is submitted to FEMA in compliance with 44 C.F.R. § 13.42. The Captive's books and records shall be made available to FEMA and SEMO upon reasonable notice.

## ARTICLE XIII – AUDIT REQUIREMENTS

Grantee must follow the audit requirements under OMB Circular No. A-133. Non-Federal entities that expend the amount listed in OMB Circular No. A-133 or more of Federal funds in a year shall have a single or program-specific audit conducted for that year in accordance with the provisions of A-133.

## ARTICLE XIV – GENERAL PROVISIONS

1. The Grantee shall comply with all applicable laws and regulations.

2. A non-exclusive list of regulations and Office of Management and Budget circulars applicable to this Grant Agreement are listed below:

| | |
|---|---|
| 44 C.F.R. Part 7 | "Nondiscrimination In Federally-Assisted Programs" |
| 44 C.F.R. Part 13 | "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments" |

9

| 44 C.F.R. Part 17 | "Government-wide Debarment and Suspension (Non-procurement) and Government-wide Requirements for Drug-Free Workplace (Grants)" |
| 44 C.F.R. Part 18 | "New Restrictions on Lobbying" |
| 31 C.F.R. Part 205 | "Rules and Procedures for Efficient Funds Transfers" |
| OMB Circular A-87 | "Cost Principles for State, Local, and Indian Tribal Governments" |
| OMB Circular A-102 | "Grants and Cooperative Agreements with State and Local Governments" |
| OMB Circular A-133 | "Audits of States, Local Governments, and Non-Profit Organizations" |

3. The following is hereby incorporated into this Grant Agreement by reference:

Attachment A, The Sub-Grant Agreement between Grantee and the City.
Attachment B The Certificate of Incorporation for the WTC Captive Insurance Company.
Attachment C The By-laws of the WTC Captive Insurance Company
Attachment D The Liability Insurance Policy for the WTC Captive Insurance Company.
Application for Federal Assistance, Standard Form 424;
Summary Sheet for Assurances and Certification, FEMA Form 20-16;
Assurances – Non-Construction Program, FEMA Form 20-16A;
Certification Regarding Lobbying, Debarment, Suspension and Other Responsible Matters, and Drug-Free Workplace Requirements, FEMA Form 20-16C; and
Disclosure of Lobbying Activities, Standard Form LLL;
received by FEMA on ___11|06|04___.

10

## ARTICLE XV – EXECUTION OF AGREEMENT

This Agreement comprises several identical counterparts, each to be fully executed by the parties and each deemed to be an original having identical legal effect. When signed by FEMA, this instrument will constitute an Award that should be executed by the Grantee within thirty (30) days of FEMA's execution of the Agreement or FEMA may withdraw its Award. Upon full execution of this Agreement, the effective date will be the date FEMA executed the Award.

FEMA has executed this Award as of November 5, 2004.

BY: _Michael D. Brown_
Michael D. Brown
Under Secretary
Emergency Preparedness and Response

The Grantee, by execution of this Agreement, ratifies and adopts all statements, representations, warranties, covenants and materials submitted by it; accepts FEMA's award of financial assistance; and, agrees to all the terms and conditions of this Agreement.

EXECUTED THIS 1 DAY of November, 2004

BY: _James W. Tuffey_
James W. Tuffey
Governor's Authorized Representative
DR-1391-NY

ATTESTED BY: _John A. Agostino_

APPROVED AS TO FORM
NYS ATTORNEY GENERAL
NOV 19 2004
HELEN LAVRETTO
ASSOCIATE ATTORNEY

11

# EXHIBIT  C

## Part 1 of 2

# AGREEMENT

### between

## THE CITY OF NEW YORK

### and

## WTC CAPTIVE INSURANCE COMPANY, INC.

**Dated as of** _September 28, 2004_

City-Captive Agreement (Sept 28 04 final)

# TABLE OF CONTENTS

Page No.

ARTICLE 1    DEFINITIONS ............................................................................................2
Section 1.01    Definitions..............................................................................................2
ARTICLE 2    SCOPE AND TERM OF OPERATIONS; CONTROLLING AUTHORITY OF
FEMA GRANT AGREEMENT AND SEMO SUB-GRANT AGREEMENT.....4
Section 2.01.    Scope of Operations. ..............................................................................4
Section 2.02.    Term of Operations. ...............................................................................4
Section 2.03.    Controlling Authority of FEMA Grant Agreement and SEMO Sub-Grant
Agreement. .............................................................................................4
ARTICLE 3    ASSIGNMENT AND ASSUMPTION OF PRE-EXISTING CONTRACT ........5
Section 3.01...........................................................................................5
ARTICLE 4    CONTRACTS BY THE CORPORATION .................................................6
Section 4.01    Contract Procurement. ............................................................................6
Section 4.02    Ratification of Prior Contract Procurement Activities.................................6
ARTICLE 5    PAYMENTS BY AND TO CITY ..............................................................6
Section 5.01    Payments by City. ..................................................................................6
Section 5.02    Payments to City. ...................................................................................7
ARTICLE 6    INVESTMENT OF FUNDS ....................................................................7
Section 6.01    ...........................................................................................................7
ARTICLE 7    RECORDS; AUDITS; REPORTS..............................................................8
Section 7.01    Maintenance of Records. .........................................................................8
Section 7.02    Audits....................................................................................................8
Section 7.03    Reports. .................................................................................................9
ARTICLE 8    REPRESENTATIONS, WARRANTIES AND COVENANTS .........................9
Section 8.01    Status and Authority of the Corporation. ..................................................9
Section 8.02    Conflict of Interest. ...............................................................................10
ARTICLE 9    APPLICABLE LAWS; RULES AND REGULATIONS ................................10
Section 9.01    Governing Law. ....................................................................................10
Section 9.02    Compliance with Law. ...........................................................................11
Section 9.03    Equal Employment.................................................................................11
ARTICLE 10    TERMINATION ...................................................................................11
Section 10.01    Termination of this Agreement Without Fault. ..........................................11
Section 10.02    Disposition of Assets, Rights and Obligations Upon
Termination of FEMA Grant Agreement...................................................12
Section 10.03    No Release. ...........................................................................................12
ARTICLE 11    MISCELLANEOUS PROVISIONS ..........................................................12
Section 11.01    Action by City. ......................................................................................12
Section 11.02    Independent Contractor...........................................................................12
Section 11.03    Immunity...............................................................................................13
Section 11.04    Indemnification by the City.....................................................................13
Section 11.05    Assignment. ..........................................................................................15
Section 11.06    Investigations. .......................................................................................15

i

Section 11.07  Notices. ..................................................................................................16
Section 11.08  Insurance. ..............................................................................................17
Section 11.09  Ratification of Actions Taken by the City. .........................................17
Section 11.10  City's Right to Perform Obligations. ..................................................17
Section 11.11  No Third-Party Beneficiaries ............................................................17
Section 11.12  Confidentiality. .....................................................................................17
Section 11.13  Severability. ...........................................................................................18
Section 11.14  Modification in Writing. ......................................................................18
Section 11.15  Captions. ................................................................................................18
Section 11.16  Completeness. .......................................................................................18
Section 11.17. Work Product. .......................................................................................18

EXHIBIT A    ...............................................................................following page 20

EXHIBIT B    .......................................................................... following Exhibit A

This AGREEMENT (the "Agreement") dated as of _September 28 2004_, between the CITY OF NEW YORK (the "City"), a municipal corporation of the State of New York, having an office at City Hall, New York, New York 10007 and the WTC CAPTIVE INSURANCE COMPANY, INC., a not-for-profit pure captive insurance company pursuant to Article 70 of the Insurance Law of the State of New York, having an office in New York, New York (the "Corporation"),

## WITNESSETH:

WHEREAS, on September 11, 2001, the City sustained the worst terrorist attack in the history of the United States resulting in devastating losses to the City and the Nation, including the destruction of the World Trade Center in lower Manhattan; and

WHEREAS, immediately following the attack, the City undertook the unprecedented task of removing over 1.5 million tons of debris from the World Trade Center site, a massive effort involving City employees as well as the contractors, subcontractors, and consultants (collectively, as the "Contractors") engaged by the City; and

WHEREAS, on February 20, 2003, the President of the United States signed the Consolidated Appropriations Resolution, 2003, P.L. 108-7, which directed the Federal Emergency Management Agency ("FEMA") to provide a grant in the amount of up to one billion dollars ($1,000,000,000) (the "FEMA Grant") to the City to establish and fund a captive insurance company that would issue an insurance policy covering the City and Contractors for claims arising from debris removal from the WTC site; and

WHEREAS, the FEMA Grant will be disbursed by FEMA to the State of New York pursuant to a grant agreement (the "FEMA Grant Agreement") between FEMA and the State Emergency Management Office ("SEMO") and will then be transferred by SEMO to the City pursuant to a sub-grant agreement between SEMO and the City (the "SEMO Sub-Grant Agreement"); and

WHEREAS, the City has formed the Corporation as a not-for-profit pure captive insurance company to accept and apply the FEMA Grant in compliance with the terms and conditions of the FEMA Grant Agreement and the SEMO Sub-Grant Agreement; and

WHEREAS, the City and the Corporation desire to enter into this Agreement pursuant to the terms and conditions applicable to the Corporation's acceptance and application of the FEMA Grant in compliance with the terms and conditions of the FEMA Grant Agreement and the SEMO Sub-Grant Agreement and related matters set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the City and the Corporation agree as follows.

1

ARTICLE 1

DEFINITIONS

Section 1.01   Definitions.

The terms defined in this section, for all purposes of this Agreement, have the meanings herein specified.

"Agreement" means this contract as the same may from time to time be modified, amended or supplemented.

"Business Day" means any day other than a Saturday, Sunday or holiday on which the offices of the City are authorized or obligated by law or executive order to close.

"By-laws" means the by-laws of the Corporation (attached as part of Exhibit B hereto), as the same may be duly amended from time to time.

"Certificate of Incorporation" means the Certificate of Incorporation of the Corporation (attached as part of Exhibit B hereto), as the same may be duly amended from time to time.

"City" means The City of New York, a municipal corporation of the State of New York.

"Commencement Date" of this Agreement, as amended and restated herein, means the effective date of this Agreement as set forth in first paragraph of this Agreement.

"Comptroller" means the Comptroller of the City or his or her designee.

"Corporation" means the WTC Captive Insurance Company, Inc.

"Commencement of Investment Manager Operations" means such time as the Corporation secures the services of an independent investment manager and such investment manager undertakes its operations.

"Director" means any director of the Corporation or any alternate director when acting in the capacity of a director.

2

"FEMA" means the Federal Emergency Management Agency, within the United States Department of Homeland Security, Emergency Preparedness and Response Directorate.

"FEMA Grant" is the "Award Amount" as that term is defined in the FEMA Grant Agreement.

"FEMA Grant Agreement" means the agreement between FEMA and the State through SEMO that is attached as Exhibit B hereto and incorporated herein by reference, as well as all modifications or amendments of that agreement as may be duly issued or executed hereafter.

"Insurance Policy" means the insurance policy (attached as part of Exhibit B hereto), as it may be duly amended or modified from time to time.

"Mayor" means the Mayor of the City or his or her designee.

"Pre-existing Contract" shall have the meaning provided in Section 3.01.

"Pre-Grant Expenses" shall have the meaning provided in the FEMA Grant Agreement.

"President" means the President of the Corporation or the officer exercising a similar function.

"Requirements" means all of the laws, rules or regulations applicable to the Corporation, including all those cited in the FEMA Grant Agreement and the SEMO Sub-Grant Agreement, and applicable provisions of the Insurance Law of the State of New York, the New York City Charter and Administrative Code, and all other applicable federal, State or City laws, rules or regulations, as they may be amended from time to time.

"SEMO" means the State Emergency Management Office of New York State.

"SEMO Sub-Grant Agreement" means the agreement between the State through SEMO and the City through its Office of Management and Budget, attached to the FEMA Grant Agreement

(Exhibit B hereto) and incorporated herein by reference, as well as all modifications or amendments of that agreement as may be duly issued or executed hereafter.

"State" means the State of New York.

"Year" means the calendar year.

### ARTICLE 2

### SCOPE AND TERM OF OPERATIONS; CONTROLLING AUTHORITY OF FEMA GRANT AGREEMENT AND SEMO SUB-GRANT AGREEMENT

Section 2.01.   Scope of Operations.

By entering into this Agreement with the City, the Corporation agrees to receive and apply the FEMA Grant in accordance with the terms and conditions of the FEMA Grant Agreement, the SEMO Sub-Grant Agreement and the Requirements and to comply with and perform all of the terms, conditions and obligations imposed upon the Corporation or the City pursuant to such agreements and Requirements. In accordance therewith, the Corporation shall provide insurance pursuant to the Insurance Policy. The Corporation shall operate pursuant to, and may undertake all activities permitted by, the FEMA Grant Agreement, the SEMO Sub-Grant Agreement, the Requirements, the Certificate of Incorporation and By-laws. The Corporation shall not perform any act or do anything that would cause the City to violate the FEMA Grant Agreement, the SEMO Sub-Grant Agreement or the Requirements.

Section 2.02.   Term of Operations.

The Corporation shall perform its obligations hereunder commencing on the Commencement Date and ending on such date as the City may specify by written notice to the Corporation, provided that such termination or termination date in no way violates the FEMA Grant Agreement and the SEMO Sub-Grant Agreement.

Section 2.03.   Controlling Authority of FEMA Grant Agreement and SEMO Sub-Grant

4

Agreement.

This Agreement shall in all respects be interpreted to conform with the FEMA Grant Agreement and the SEMO Sub-Grant Agreement. In the event that any provision of this Agreement conflicts with the FEMA Grant Agreement or the SEMO Sub-Grant Agreement, then the FEMA Grant Agreement and the SEMO Sub-Grant Agreement shall govern.

ARTICLE 3

ASSIGNMENT AND ASSUMPTION OF PRE-EXISTING CONTRACT

Section 3.01

(a)    At a time that is determined by the City after the Commencement Date, the City, by written notice to the Corporation, shall assign and the Corporation shall thereupon assume all right, title and interest of the City in and to the contract between the City and PricewaterhouseCoopers LLP, dated January 22, 2004, which contract was entered into by the City for the benefit of the Corporation (the "Pre-existing Contract").  Unless the City's notice of assignment provides otherwise, upon such assignment, any and all obligations deriving from the Pre-existing Contract (including payment for previously-incurred services and expenses) shall be assumed by the Corporation, and the Corporation shall release the City from any and all claim of liability from any cause whatsoever concerning the Pre-existing Contract.  The Corporation shall also indemnify the City and hold the City harmless from any third party claim or cause of action, of any nature whatsoever, whether arising prior to or following the date of such assignment, brought against the City in connection with the Pre-existing Contract.

(b)    At any time prior to such assignment and assumption of the Pre-Existing Contract, the City may direct PricewaterhouseCoopers LLP to render services thereunder directly to the

5



Corporation. In such event, the City shall remain liable for payment for all services thereunder until such time as the Pre-Existing Contract is assigned and assumed.

## ARTICLE 4

### CONTRACTS BY THE CORPORATION

<u>Section 4.01     Contract Procurement.</u>

(a)     Contracts by the Corporation shall be procured and awarded in accordance with the rules and guidelines set forth in Exhibit A hereto provided that such rules and guidelines do not conflict with the FEMA Grant Agreement, the SEMO Sub-Grant Agreement or the Requirements.

(b)     The Corporation shall not enter into any reinsurance contract without the prior written approval of the City, FEMA and the New York Insurance Department.

<u>Section 4.02     Ratification of Prior Contract Procurement Activities.</u>

Notwithstanding the rules and guidelines set forth in Section 4.01 and Exhibit A hereto, the Corporation may at any time ratify any and all contract procurement activities previously undertaken for its benefit by the City. Such activities include, but are not limited to, those relating to the Corporation's executive search activities, custodian and other banking relationships, captive  management, third party administration, and other service providers.

## ARTICLE 5

### PAYMENTS BY AND TO CITY

<u>Section 5.01     Payments by City.</u>

The City shall have no obligation whatsoever for payment of any amounts to the Corporation, except for payment of the FEMA Grant and such amounts, if any, payable pursuant to the Insurance Policy.

6

Section 5.02    Payments to City.

(a)    In the event of a termination, reduction, return, repayment or de-obligation of any part of the FEMA Grant, the Corporation shall pay the entirety of such amount to the City immediately upon notice of such termination, reduction, return, repayment or de-obligation. The Corporation shall have no right of recovery from the City of any such moneys.

(b)    The City shall have the right to payments as appropriate under the Insurance Policy.

## ARTICLE 6

### INVESTMENT OF FUNDS

Section 6.01

(a)    Prior to receipt of the FEMA Grant, the Corporation shall open a custodial account in an appropriate bank and such other bank accounts as it deems appropriate (on terms it deems appropriate), and decide upon the general investment strategy it shall use from the time it receives the FEMA Grant through the Commencement of Investment Manager Operations. Apart from such money as the Corporation believes may be needed to pay Pre-Grant Expenses and the Corporation's current and ordinary operating expenses ), that strategy shall involve investment of such assets in United States Treasury obligations and/or a diversified portfolio of highly rated, liquid, fixed income securities of short-term to medium-term maturities (or one or more funds dedicated to such investment objectives), reinvesting or liquidating securities as needed and transferring funds among its accounts as the Corporation deems appropriate. The Corporation may at any time close any account and/or open other accounts (with the same or a different bank it deems appropriate).

(b)    Upon receipt of the FEMA Grant, the Corporation shall deposit such grant moneys in its custodial account(s) and promptly effectuate the investment strategy decided upon in accordance with subparagraph (a) above. Until the Commencement of Investment Manager Operations, the

7

Corporation shall continue investing its funds in accordance with this strategy.

(c)    After the Corporation has secured the services of an independent investment manager, the Corporation, in cooperation with such investment manager, shall establish (i) an investment strategy for the Corporation designed to emphasize the preservation of invested assets and provide sufficient liquidity for the prompt payment of the costs and expenses of its operations and claims under the Insurance Policy, and (ii) written guidelines which specify minimum criteria on the overall quality and liquidity characteristics of the investment portfolio and include limitations on the size of certain investments as well as restrictions on making certain types of investments. The Corporation, in cooperation with such investment manager, shall thereafter invest its funds pursuant to such strategy and guidelines and, from time to time, revise such strategy and guidelines as it sees fit (so long as the standards set forth in this subparagraph are met). At no time shall the Corporation invest any funds in alternative asset classes such as hedge funds or private equity funds.

## ARTICLE 7

### RECORDS; AUDITS; REPORTS

Section 7.01    Maintenance of Records.

The Corporation shall maintain complete and accurate records of all its activities in accordance with the provisions of the FEMA Grant Agreement, the SEMO Sub-Grant Agreement and the Requirements, and shall provide the State, the Superintendent of the New York Insurance Department, the Office of the State Comptroller of New York, the City, FEMA, or the Comptroller General of the United States, or their duly authorized representatives, with access to all such records.

Section 7.02    Audits.

(a)    This Agreement is subject to audit by the City, including the Comptroller, pursuant to the powers and responsibilities conferred upon the City by the New York City Charter, the

8

Administrative Code of the City of New York, and all orders and regulations promulgated pursuant thereto.

(b)    The Corporation shall cause audits to be conducted as required by the FEMA Grant Agreement, the SEMO Sub-Grant Agreement and the Requirements, and shall submit the reports of all such audits to the City and all persons required under such agreements and Requirements.

Section 7.03    Reports.

The Corporation shall prepare or have prepared all reports required by the FEMA Grant Agreement, the SEMO Sub-Grant Agreement and the Requirements, and shall submit all such reports to the City and all persons required under such agreements and Requirements.

## ARTICLE 8

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 8.01    Status and Authority of the Corporation.

(a)    The Corporation makes the following representations and warranties.

(i)    The Corporation is a not-for-profit pure captive insurance company duly organized, validly existing and in good standing under the laws of the State and has all requisite power and authority to execute, deliver and perform this Agreement.

(ii)    This Agreement has been duly authorized by all necessary corporate action on the part of the Corporation, has been duly executed and delivered by the Corporation and, assuming due execution and delivery by the City, constitutes a legal, valid, binding and enforceable obligation of the Corporation.

(b)    The Corporation covenants and agrees that it shall maintain its corporate existence under the laws of the State as a not-for-profit corporation.

9

Section 8.02    Conflict of Interest.

(a)    No Director or officer shall have a material interest, direct or indirect, in any contract, including the selection thereof, relating to the operations conducted by the Corporation, nor any contract for furnishing supplies thereto, unless authorized by the concurring vote of the entire Board of Directors with the exception of such interested director. In the event of such interest, the Director or officer concerned shall forthwith make disclosure to the Corporation of the nature and extent of his/her interest and such disclosure shall be entered in writing upon the minutes of the meeting of the Board of Directors called to authorize such contract. No Director who has such an interest shall vote on any matter relating to such interest.

(b)    All of the Corporation's Directors, officers or employees who are also officials or employees of the City of New York (or any City of New York-affiliated entity that is subject to Chapter 68 of the New York City Charter) shall comply with the standards of conduct set forth in Chapter 68 of the New York City Charter with regard to their services to the Corporation.

## ARTICLE 9

## APPLICABLE LAWS; RULES AND REGULATIONS

Section 9.01    Governing Law.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(b)    The parties agree that each and every provision of federal, State or local law, rule, regulation or order required to be inserted in this Agreement is deemed by this reference to be so inserted in its correct form, and, upon the application of any party, this Agreement shall be amended by the express insertion of such provisions not so inserted or so inserted incorrectly.

(c)    If this Agreement contains an unlawful provision not an essential part of the structure of this Agreement and that shall not be deemed to have been a controlling or material inducement to the making hereof, the same shall be deemed of no effect and shall, upon the application of any party, be stricken from this Agreement without affecting the binding force of this Agreement as it shall remain after omitting such provision.

Section 9.02    Compliance with Law.

The Corporation agrees that all acts to be performed by it in connection with this Agreement shall be performed, and all contracts to be entered into by the Corporation hereunder shall be written, in conformity with all applicable federal, State and local law, rules and regulations.

Section 9.03    Equal Employment.

This Agreement is subject to the requirements of New York City Administrative Code §6-123 and Executive Order No. 50 (1980) as revised, and the Rules and Regulations promulgated thereunder. The Corporation also agrees not to engage in any unlawful discriminatory practice as defined and pursuant to the terms of Title VII of the New York City Administrative Code.

### ARTICLE 10

### TERMINATION

Section 10.01  Termination of this Agreement Without Fault.

The City may terminate this Agreement in its sole discretion upon written notice given to the Corporation at such time as the FEMA Grant Agreement or the SEMO Sub-Grant Agreement requires or permits such termination, effective upon such date as the City may specify that is consistent with these agreements. Unless required by the FEMA Grant Agreement, the SEMO Sub-Grant Agreement or any Requirement, the Corporation shall enter into no further binding obligations after the date of the Corporation's receipt of any such notice (or such other date specified by the City)

11



and shall consult with the City with regard to the wind-up of its operations.

Section 10.02  Disposition of Assets, Rights and Obligations Upon Termination of

FEMA Grant Agreement.

Upon termination of the FEMA Grant Agreement, the assets and obligations of the

Corporation, and the Corporation's rights and obligations under any contract, shall be disposed of in

accordance with the FEMA Grant Agreement, this Agreement and any such contract.

Section 10.03  No Release.

Except as may be required by the FEMA Grant Agreement, the SEMO Sub-Grant Agreement

or the Requirements, termination of this Agreement shall not release the Corporation from any

liability to the City arising out of any act or omission of the Corporation in connection with this

Agreement.

ARTICLE 11

MISCELLANEOUS PROVISIONS

Section 11.01  Action by City.

In any instance for which action by the City itself is required in order to comply with any

provision of the FEMA Grant Agreement or the SEMO Sub-Grant Agreement, the Corporation shall

promptly notify the City in writing of any such matter, which notice shall provide with specificity the

provision of the FEMA Grant Agreement and the SEMO Sub-Grant Agreement implicated and the

action required of the City with respect thereto.

Section 11.02  Independent Contractor.

Unless otherwise specifically provided herein or required by law, it is specifically understood

and agreed that, in the performance of the terms, covenants and conditions of this Agreement, the

Corporation and any of its employees, agents, independent contractors and subcontractors shall not

12

be deemed to be acting as an agent, servant or employee of the City by virtue of this Agreement or by

virtue of any approval, permit, license, grant, right or other authorization given by the City or any of

its officers, agents or employees pursuant to this Agreement, but shall be deemed to be an

independent contractor performing services for the City or the Corporation, as the case may be, and

shall be deemed solely responsible for all acts taken by them pursuant to this Agreement.

Section 11.03    Immunity

This Agreement shall be liberally construed to maximize the rights of the Corporation's

Directors, officers and employees to be immune from any claim under any applicable law, including

Section 7005(a) of the New York Insurance Law.  Toward this end, all officers and employees duly

retained by or with the consent of the Board of Directors of the Corporation, as well as the Directors,

shall be deemed approved by the City for purposes of Section 7005(a) of the New York Insurance

Law.  A writing by the City expressly approving any particular Director, officer or employee shall

not be required for purposes of Section 7005(a) of the New York Insurance Law.

Section 11.04    Indemnification by the City.

(a)    To the extent that any of the costs (including judgments, awards, settlements and out-

of-pocket expenses) incurred (an as incurred) in the defense and/or indemnification of any claim

against a Director or officer of the Corporation (whether or not then in office) are not completely

eliminated or borne as a result of (x) such Director or officer's right to immunity pursuant to Section

7005(a) of the New York Insurance Law or otherwise, or (y) such Director's or officer's right to

defense and/or indemnification and/or being held harmless by the Corporation pursuant to its By-

laws or otherwise, or (z) covered by a policy of insurance, then the City shall (i) defend and hold

harmless such Director or officer for any claim relating to such Director's or officer's actions or

failure to act in such capacity and (ii) fully indemnify and hold harmless such Director or officer with

13

regard to any such claim except if, and to the extent that, a judgment or other final adjudication adverse to such Director or officer establishes that his or her acts of active and deliberate dishonesty were material to the cause of action so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

(b)    The City's obligations under General Municipal Law 50-k shall apply to City employees in connection with their service as Directors or officers of the Corporation, subject, to the extent permitted by law, to the terms of Section 11.04(d) and (e).

(c)    In the event a claim is asserted against any Director and officer that is subject to the City's obligation to defend under either Section 11.04(a) or 11.04(b) and both the Corporation and the Corporation's insurer(s) have failed to promptly assume the defense of such Director or officer, the City shall defend (and, if necessary and permitted by either Section 11.04(a) or 11.04(b), indemnify and hold harmless) such Director or officer.

(d)    The provisions of Sections 11.04(a), (b) and (c) shall not be construed to impair, limit or modify the obligations of any insurer under any policy of insurance. Sections 11.04(a), (b) and (c) are intended to provide excess liability protection and defense rights above that provided by any insurance providing coverage to the Corporation, any other corporation or any person to be defended, indemnified or held harmless pursuant to this Section 11.04, and the indemnification or other rights provided under Sections 11.04(a), (b) and (c) shall not be deemed to be contributing to the amount payable under such insurance. No insurance company shall be entitled to use Sections 11.04(a), (b) and (c) as the basis to proceed against the City or Corporation to recover any amount of insurance proceeds paid or to reduce the amount of insurance proceeds payable.

(e)    The obligations of the Corporation to defend, indemnify and hold harmless its Directors, officers or employees pursuant to its By-laws shall not be decreased as a result of any

14

obligation of the City pursuant to Sections 11.04(a), (b) and (c), and if both the Corporation and the City are required to defend, indemnify and hold harmless a person, the Corporation shall rely on and satisfy its own obligation to the maximum extent possible and shall not seek contribution from the City for the costs of such defense or indemnification.

(f)    In the event the City expends any funds pursuant to Sections 11.04(a), (b) or (c), the City shall be subrogated to the rights of the Director or officer at issue (or, if applicable, the Corporation) as against an insurance company or other person (including the Corporation) in the amount of such expenditure.

(g)    The City's obligations under this Section 11.04 shall survive the termination of this Agreement.

Section 11.05  Assignment.

The Corporation shall not assign its interest in this Agreement in whole or in part, except with the prior written permission of the City.

Section 11.06  Investigations.

The Corporation shall cooperate fully and faithfully with any investigation, audit or inquiry conducted by a Federal, State or City governmental agency or authority that is empowered, directly or by designation, to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit or license that is the subject of the investigation, audit or inquiry. Failure to comply with the foregoing requirement shall constitute a material breach of this Agreement.

Section 11.07  Notices.

Each written notice, demand, request or other communication in connection with this Agreement shall be deemed given if either served in person, with delivery of service acknowledged in writing by the party receiving the same, or deposited in the United States mails by certified mail, return receipt requested, postpaid, and addressed:

(a)    to the City at the following address:

New York City Law Department
100 Church Street
New York, New York 10007
          Attn:   Lawrence M. Martin
                    Special Insurance Counsel

Copy to The Corporation Counsel of the City at the following address:

New York City Law Department
100 Church Street
New York, New York 10007
          Attn:  The Corporation Counsel

(b)    to the Corporation at the following address:

WTC Captive Insurance Company, Inc.
c/o Marsh Management Services Inc.
300 Broadhollow Road, Suite 201
Melville, New York 11747
Attn: President of WTC Captive Insurance Company, Inc.

Copy to Christine LaSala, President of the Corporation, at the following address:

15 West 81 Street  #14C
New York, New York 10024
Attn: Christine LaSala

or to such other address as may be specified by written notice sent in accordance herewith.  Every notice, demand, request or other communication hereunder shall be deemed to have been given at the time of delivery or mailing as aforesaid.

16

Section 11.08  Insurance.

The Corporation shall purchase and maintain (a) all types of insurance as may be legally required (including workers' compensation insurance, if required under Section 57 of the New York State Workers Compensation Law), and (b) such other types of insurance, including directors' and officers' responsibility insurance, as the Board of Directors may authorize from time to time.

Section 11.09  Ratification of Actions Taken by the City.

The Corporation may at any time ratify actions previously undertaken for its benefit by the City.

Section 11.10  City's Right to Perform Obligations.

Notwithstanding anything in this Agreement to the contrary, the City shall have the right, at its sole discretion, to comply with and/or perform any of the terms, conditions and obligations imposed upon the City pursuant to FEMA Grant Agreement, the SEMO Sub-Grant Agreement or the Requirements.  In the event that the City exercises this right, the City shall endeavor to provide notice thereof to the Corporation.

Section 11.11  No Third-Party Beneficiaries

Except with regard to the Directors and officers of the Corporation pursuant to Section 11.04, this Agreement is not intended to and shall not be construed to grant any rights to persons or entities not parties hereto.

Section 11.12  Confidentiality.

Except as required by the FEMA Grant Agreement, the SEMO Sub-Grant Agreement, the Requirements, or this Agreement, the Corporation shall have the discretion to maintain as strictly confidential and protected from disclosure to the full extent permitted by law all records, reports, information or data, furnished to or prepared, assembled or used by the Corporation.

17

Notwithstanding the foregoing, the Corporation shall share all such documents with the City upon demand.

### Section 11.13  Severability.

If any provision of this Agreement shall, to any extent, be invalid or unenforceable, then the remainder of this Agreement shall not be affected thereby, and each provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

### Section 11.14  Modification in Writing.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose unless in writing and duly executed by the party against whom same is asserted.

### Section 11.15  Captions.

The table of contents and captions of this Agreement are for convenience of reference only, shall not be taken into account in interpreting this Agreement and in no way define, limit or describe the scope or intent of this Agreement or in any way affect this Agreement.

### Section 11.16  Completeness.

This Agreement contains all the agreements between the parties hereto regarding the subject matter of this Agreement and all prior and contemporaneous agreements and understandings between the parties with respect to the subject matter hereof are deemed merged herein.

### Section 11.17.  Work Product.

Except as otherwise required by this Agreement, the FEMA Grant Agreement, the SEMO Sub-Grant Agreement or the Requirement, upon termination of this Agreement:  (i) all books, records and any other documents, papers or work product generated by or in the possession of the Corporation; and (ii) any and all rights and interests of the Corporation in and to any obligations

18

owing to the Corporation by third parties either beneficially, by contract with such third parties or

otherwise, shall, in the case of (i) and (ii), be transferred, set over and assigned to the City; provided

that, in the case of (i) the Corporation may, at its own expense, retain copies of any such materials

and that, in the case of (ii), the City shall not be deemed to assume any responsibility for any such

obligation unless the City does so in a written instrument executed by the City and delivered to the

Corporation and to the third party involved.

     IN WITNESS WHEREOF, the City and the Corporation have executed this Agreement as of

the date first above written.

THE CITY OF NEW YORK

By: _____

WTC CAPTIVE INSURANCE COMPANY,
INC.

By: _____

Approved as to Form and Certified
as to Legal Authority:

By: _____
Acting Corporation Counsel

SEP 2 8 2004

19

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )

On this _28th_ day of _September_    _2004_ before me personally came _Michael A. Cardozo_ known to me and to me known to be the _Corporation Counsel_ of THE CITY OF NEW YORK and the same person who executed the foregoing instrument on behalf of THE CITY OF NEW YORK as said _Corporation Counsel_.

_____
Notary Public

ANDREA J. BERGER
Notary Public, State of New York
No. 31-4603632
Qualified in New York County
Commission Expires January 31, 2007


STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )

On this _29th_ day of _September 2004_, before me personally came _Christine LaSala_ known to me and to me known to be the _President of WTC Captive Insurance Company, Inc_ and the same person who executed the foregoing instrument on behalf of _WTC Captive Insurance Company Inc_ as said _President_.

_____
Notary Public

MICHAEL J. MAY
Notary Public, State of New York
No. 24-4994296
Qualified in Kings County
Commission Expires March 30, 2006

# EXHIBIT  C

## Part 2 of 2

## (Exhibits to City/WTC Captive Agreement)

# **EXHIBIT A**

In circumstances in which (and to the extent that) contracts by the Corporation are awarded pursuant to the rules and guidelines set forth in this Exhibit, such contracts shall be awarded by competitive sealed bidding pursuant to subsection (d) (Competitive Sealed Bidding), except as provided in subsection (a) (Small Purchase), subsection (b) (Sole Source Procurement), subsection (c) (Emergency Procurement), and subsection (e) (Competitive Sealed Proposals).

Methods of Contract Procurement and Award

(a)    Small Purchases.

Any procurement for goods, services, or construction for an amount from $5,000 to $100,000 may be made without Competitive Sealed Bidding or Competitive Sealed Proposals, provided the Corporation shall use reasonable efforts to obtain offers from at least three responsible persons or entities to perform the work or provide the goods. If, after such efforts, the Corporation only obtains an offer from one person or entity pursuant to this Subsection, it will not be considered a sole source procurement under this Contract. For procurements over $25,000, a written solicitation is required. With regard to procurements of less than $5,000, the Corporation shall obtain offers from one or more persons or entities as it deems appropriate. Procurement requirements shall not be artificially divided so as to constitute a small purchase under this Subsection. The Corporation shall maintain records of the persons or entities approached and their responses.

(b)    Sole Source Procurement.

A contract may be awarded for a good, service or construction item without competition when there is only one source for the required supply, service or construction item. A written determination of the basis for the sole source determination shall be included in the contract file.

1

(c)    <u>Emergency Procurements</u>.

Upon approval of FEMA, SEMO and the City (but only upon such approval), a contract may be awarded for a good, service or construction item without competition when a public exigency or emergency for the requirement will not permit a delay resulting from a competitive sealed bid or competitive sealed proposal.   A written determination of the basis for the emergency and for the selection of the particular contractor shall be included in the contract file.

(d)    <u>Competitive Sealed Bidding</u>.

(1)    <u>Conditions for Use</u>.  Contracts by the Corporation shall be awarded by competitive sealed bidding unless awarded pursuant to another authorized method.

(2)    <u>Invitation for Bids</u>.  An Invitation for Bids shall be issued and shall include (whether by attachment or reference) a clear and accurate description of the technical requirements for the material, product or service to be procured, and all contractual terms and conditions applicable to the procurement.

(3)    <u>Public Notice</u>.  Invitations for Bids shall be publicly solicited through formal advertising in an appropriate publication.

(4)    <u>Bid Opening</u>.  Bids shall be opened publicly in the presence of one or more witnesses at the time and place designated in the Invitation for Bids.  The amount of each bid, the name of each bidder and the bid security, if any, shall be recorded.

(5)    <u>Bid Acceptance and Bid Evaluation</u>.  Bids shall be evaluated based on the requirements set forth in the Invitation for Bids, which may include criteria to determine acceptability such as inspection, testing, quality, workmanship, delivery and suitability for a particular purpose. The Invitation for Bids shall set forth the evaluation criteria to be used.

2

(6)    <u>Correction or Withdrawal of Bids.    Cancellation of Awards</u>.    Correction or withdrawal of inadvertently erroneous bids before or after award, or cancellation of awards or contracts based on such bid mistakes, shall be permitted in instances in which the Corporation finds that it is in the Corporation's interest to do so.  After bid opening, no changes in bid prices or other provisions of bids prejudicial to the interest of the Corporation or fair competition shall be permitted.  All decisions to permit the correction or withdrawal of bids, or to cancel awards or contracts based on bid mistakes, shall be supported by a written determination included in the contract file.

(7)    <u>Award</u>.  The contract shall be awarded to the lowest responsible and responsive bidder whose bid meets the requirements and criteria set forth in the Invitation for Bids. Notwithstanding the foregoing, any or all bids may be rejected when the Corporation reasonably deems it is in the Corporation's interest to do so.

(e)    <u>Competitive Sealed Proposals</u>.

(1)    <u>Conditions for Use</u>.  A contract may be entered into by competitive sealed proposals when specifications cannot be made sufficiently definite and certain to permit selection based on bid price or evaluated bid price alone, or judgment is required in evaluating competing proposals, and it is in the best interests of the Corporation to require a balancing of price, quality, and other factors. Except as authorized by Subsection (a) (Small Purchases), Subsection (b) (Sole Source Procurement) and Subsection (c) (Emergency Procurements), procurement by competitive sealed proposals is the preferred method for awarding contracts for personal and professional services, including, but not limited to, reinsurance, captive management, third party administration, investment management, claim auditing, executive search consulting, information technology, legal, accounting, auditing, actuarial, financial, training, educational, management, research, and systems and other consultation

3

services.  Procurement of reinsurance through a competitive sealed proposals process shall be subject to the additional requirements set forth in paragraph (8) below.

(2)    Request for Proposals.  Proposals shall be solicited through a Request for Proposals.

(3)    Public Notice.  Requests for Proposals shall be publicized a reasonable time prior to the date set forth therein for the opening of proposals.

(4)    Receipt of Proposals.  Proposals shall be opened so as to avoid disclosure of contents to competing offerors during the process of negotiation.

(5)    Evaluation Factors.  Proposals shall be evaluated on the basis of the criteria set forth in the Request for Proposals.

(6)    Discussion with Responsible Offerors and Revisions to Proposals.  As provided in the Request for Proposals, discussions may be conducted with one or more responsible offerors who submit proposals determined to be reasonably susceptible of being selected for award for the purpose of clarification to assure full understanding of, and responsiveness to, the solicitation requirements.  Offerors selected for further discussions shall be accorded fair and equal treatment with respect to the opportunity for discussion and revision of proposals, and such revisions may be permitted after submissions and prior to award for the purpose of obtaining best and final offers.  In conducting discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors.

(7)    Award.  Award shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the Corporation in accordance with the criteria set forth in the Request for Proposals.  The contract file shall contain the basis on which the award is made.

4

(8)    Reinsurance.  In the event that the Superintendent of the New York Insurance Department and FEMA approve the purchase of reinsurance for the Corporation under Section 12.02 of the Insurance Policy, the Corporation shall promptly give the City notice of such decision and thereafter provide the City with the following documents: the Request for Proposals (promptly upon its issuance); all proposals submitted in response thereto (promptly upon their receipt by the Corporation), and all analyses or evaluations of such proposals (promptly upon their submission to the President or Board of Directors).

Miscellaneous

(a)    The Corporation will maintain records sufficient to detail the history of each procurement.  The records will include rationales for the method of procurement, selection of contract type, and contractor selection or rejection (including such considerations as price and selection criteria).

(b)    The Corporation will make awards only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement.  The Corporation shall give consideration to such matters as contractor integrity, compliance with public policy, record of past performance, and financial and technical resources.

## EXHIBIT B

**(all following pages)**

i

**EXHIBIT B TO CITY/WTC CAPTIVE AGREEMENT**

**IS DELETED HERE, BUT APPEARS AS**

**EXHIBIT E TO WEINER DECLARATION**

# EXHIBIT  D

## Part 1 of 4



**WTC** WTC CAPTIVE INSURANCE COMPANY, INC.

Liability Insurance Policy #0001

Additional Named Insured #WTC-002

AMEC CORPORATION

# WTC CAPTIVE INSURANCE COMPANY, INC.

## LIABILITY
## INSURANCE POLICY
### (Occurrence Basis)

## TABLE OF CONTENTS

Page

SECTION   1    DEFINITIONS ..................................................................................1
SECTION   2    COVERAGE ......................................................................................7
SECTION   3    EXCLUSIONS ..................................................................................10
SECTION   4    LIMITS OF LIABILITY ..................................................................11
SECTION   5    EXPERIENCE ACCOUNT ............................................................13
SECTION   6    PREMIUM ........................................................................................14
SECTION   7    CONTINGENT PREMIUM PAYMENT OBLIGATION ..............14
SECTION   8    PARTIAL TERMINATION OF COVERAGE BY FIRST NAMED
               INSURED..........................................................................................15
SECTION   9    SUBMISSION AND PAYMENT OF CLAIMS AND SUITS;
               APPOINTMENT OF COUNSEL......................................................15
SECTION  10    NON-ACCEPTANCE OF CLAIMS ................................................18
SECTION  11    REDUCED CLAIM PAyMENTS ....................................................18
SECTION  12    POLICY TERM AND RELATED MATTERS................................19
SECTION  13    ARBITRATION ................................................................................22
SECTION  14    NO INSURANCE AGENT ..............................................................22
SECTION  15    GENERAL CONDITIONS ..............................................................23

## SCHEDULES

SCHEDULE   1    Additional Named Insureds
SCHEDULE   2    Underlying Insurance Amounts
SCHEDULE   3    Payment Trigger Activation Rate

## EXHIBIT

Form of Acknowledgment of Additional Named Insured

# WTC CAPTIVE INSURANCE COMPANY, INC.

## LIABILITY
## INSURANCE POLICY
### (Occurrence Basis)

**IN CERTAIN CIRCUMSTANCES CLAIMS AND EXPENSES MAY NOT BE ACCEPTED OR NOT PAID IN FULL UNDER SECTIONS 10 AND 11 OF THIS POLICY**

### DECLARATIONS

POLICY NUMBER: 0001

ITEM 1.  INSUREDS:

    (a)  First Named Insured:

        City of New York

        City Hall
        New York, NY 10007

    (b)  Additional Named Insureds:

        See attached Schedule 1.

ITEM 2.  EXPOSURE PERIOD:

    (a)  Effective Date:

        September 11, 2001 (post collapse of World Trade Center) as defined in Section 1 of the Policy

    (b)  Expiration Date:

        August 30, 2002

ITEM 3.  ISSUE DATE:

    December 3, 2004

ITEM 4.  ISSUE JURISDICTION:
    New York

ITEM 5.  LIMITS OF LIABILITY:

    (a)  Policy Limits:

        (i)  Per Occurrence Limit:

            The Experience Account Balance as defined in Section 5 of the Policy.

        (ii)  Aggregate Limit:

-i-

The Experience Account Balance as defined in Section 5 of the Policy.

(b)    Policy Sub-Limits:

    (i)    Sub-Limit A (aggregate sublimit applicable to Other Than Uniformed City Worker Claims only):

        $1,000,000,000 (one billion dollars) Ultimate Net Loss (or such other amount pursuant to the Policy)

    (ii) Sub-Limit B (aggregate sublimit applicable to Claims subject to the liability cap set forth in Section 408(a)(3) of the Airline Transportation and System Stabilization Act):

        $350,000,000 or such other amount, as further described in Section 4.04 of the Policy.

**ITEM 6.**    UNDERLYING INSURANCE AMOUNTS:

Per Schedule 2(a)

**ITEM 7.**    PREMIUM:

$999,900,000 as received by the Company pursuant to the FEMA Grant Agreement, the NYSEMO Sub-Grant Agreement and the NYC-Captive Agreement

**ITEM 8.**    CLAIM SUBMISSION ADDRESS:
GAB Robins North America
123 William Street, 15th Floor
New York, NY 10038

**ITEM 9.**    INSURANCE AGENT:
None.

This Policy shall not be valid unless countersigned below by a duly authorized representative of this Company.

Countersigned By: _____

Authorized Representative

Accepted and Agreed to By:

CITY OF NEW YORK

By: _____

Typed Name:  Kenneth A. Becker

Title:  Chief, World Trade Center Unit
        Office of the Corporation Counsel

Date:  December 6, 2004

REPRESENTATIVE OF ADDITIONAL NAMED INSUREDS

By: _____

Typed Name:  Michael Feigin

Title:  Representative of Additional Named Insureds

Date:  12/6/04

-iii-

# WTC CAPTIVE INSURANCE COMPANY, INC.

LIABILITY
INSURANCE POLICY
(Occurrence Basis)

## SECTION 1
## DEFINITIONS

As used herein, the following terms in quotation marks, when capitalized, shall have the meanings set forth below and such meanings shall be applicable to both the singular and plural forms of each term:

1.01    **"Acceptance Trigger"** shall have the meaning set forth in Section 10.02 of this Policy.

1.02    **"Acceptance Trigger Rate"** shall have the meaning set forth in Section 10.02 of this Policy.

1.03    **"Actuarial Report"** shall have the meaning set forth in Section 12.02(a) of this Policy.

1.04    **"Additional Named Insureds"** shall mean, subject to Section 2.01(b) of this Policy, the contractors, subcontractors, consultants and other persons specified in Schedule 1 of this Policy and such other entities, if any, that performed Debris Removal and were compensated therefor by the First Named Insured with funds provided by FEMA, provided that any such entity submits evidence thereof that is satisfactory to the Company. "Additional Named Insureds" shall also include any subsidiary, parent, associated or allied company, corporation, firm, or organization of the foregoing.

1.05    **"Aggregate Limit"** shall have the meaning set forth in Section 4.01(b) of this Policy.

1.06    **"Allocated Loss Adjustment Expense"** or **"ALAE"** shall have the meaning set forth in Section 4.07 of this Policy.

1.07    **"Bodily Injury"** shall mean bodily injury, sickness, disease, or mental illness sustained by any person which occurs (or exposure to the cause thereof occurs) during the Exposure Period, including death at any time resulting therefrom. Damages because of "Bodily Injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "Bodily Injury." "Bodily Injury" shall also include any injury arising out of false arrest, detention or imprisonment; or the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; or oral or written publication of material that either violates an Insured's employee's right of privacy or slanders or libels an Insured's employee.

1.08    **"Claim"** shall mean an actual or threatened assertion by any Person, whether by commencement of a Suit or otherwise, that an Insured is or may be liable to such Person for Damages, including, but not limited to, allegations of Bodily Injury or Property Damage.

1.09    **"Commutation"** shall mean the commutation of this Policy under Section 12.02 of this Policy.

1.10    **"Company"** shall mean the WTC Captive Insurance Company, Inc.

1.11    **"Contingent Premium"** shall have the meaning set forth in Section 7.01 of this Policy.

1.12    **"Contingent Premium Payment Obligation"** shall have the meaning set forth in Section 7.04 of this Policy.

1.13    **"Damages"** shall mean any monetary damages to which this insurance applies. Damages does not include, among other things:

      (a)    the actual or potential return or restitution of fees, expenses or costs for any services rendered or to be rendered by an Insured;

      (b)    contract damages that do not arise from a covered Claim against an Insured;

      (c)    any form of injunctive or declaratory relief, unless the Claim also seeks any monetary damages for which an Insured is held legally liable; or

      (d)    fines, sanctions or statutory penalties, other than fines, sanctions or statutory penalties imposed on the Insured because of activities of the Insured reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities.

1.14    **"Debris Removal"** shall mean the activities of the Insureds during the Exposure Period arising out of or relating to the removal of debris at the World Trade Center Site following the collapse of buildings on September 11, 2001.  Debris Removal activities include those relating to the physical movement of wreckage and remains at or from the World Trade Center Site; the staging of such contents at loading and unloading areas and transfer stations; the loading, unloading and reloading of such contents onto or off vehicles, including trucks and barges; the transportation, sorting and sifting of such contents; the mobilization, placement, demobilization and removal of equipment or operations; and the management, working conditions, administration and oversight of all areas relating to all of the foregoing activities.

1.15    **"Declarations"** shall mean the Declarations attached hereto.

1.16    **"Early Withdrawal"** shall have the meaning set forth in Section 12.03 of this Policy.

1.17    **"Effective Date"** shall mean the beginning of Debris Removal on the World Trade Center Site on September 11, 2001 (post-collapse of the World Trade Center).

1.18    **"Environmental Liability"** shall mean liability arising from the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants into or upon the land, water, atmosphere, or any other natural resource damage.

1.19    **"Experience Account"** shall have the meaning set forth in Section 5.01 of this Policy.

1.20    **"Experience Account Balance"** shall have the meaning set forth in Section 5.02 of this Policy.

1.21    **"Experience Account Balance Statement"** or **"EAB Statement"** shall have the meaning set forth in Section 5.03 of this Policy.

1.22    **"Expiration Date"** shall mean the date the Exposure Period terminates as specified in Item 2 (b) of the Declarations.

1.23    **"Exposure Period"** shall mean the beginning of Debris Removal at or from the World Trade Center Site on September 11, 2001 (post-collapse of the World Trade Center) (the Effective Date) through the Expiration Date.

1.24    **"FEMA"** shall mean the Federal Emergency Management Agency, Emergency, Preparedness and Response Directorate, United States Department of Homeland Security, or its successor.

1.25    **"FEMA Grant Agreement"** shall mean the United States Department of Homeland Security Emergency Preparedness and Response Directorate (the "Department of Homeland Security") Grant Agreement, WTC Captive Insurance Company Project, between the Department of Homeland Security (through FEMA) and the State of New York (through NYSEMO).

1.26    **"First Named Insured"** shall mean the insured under this Policy specified in Item 1(a) of the Declarations.

1.27    **"General Liability"** shall mean any liability arising from Bodily Injury or Property Damage.

1.28    **"IBNR"** shall mean incurred but not reported Losses.

1.29    **"Insureds"** shall mean the First Named Insured and the Additional Named Insureds, including each Insured's directors, officials, officers and employees acting within the lawful scope of their employment. Except as specified herein, all Insureds shall have the same rights.

1.30    **"Insurance Agent"** shall have the meaning set forth in Item 8 of the Declarations and in Section 14 of this Policy.

1.31    **"Issue Date"** shall mean the date on which this Policy is issued by the Company, as specified in Item 3 of the Declarations.

1.32    **"Issue Jurisdiction"** shall mean the jurisdiction specified in Item 4 of the Declarations.

1.33    **"Liability Cap"** shall have the meaning set forth in Section 4.04 of this Policy.

1.34    **"Limits of Liability"** shall mean the limits of liability specified in Section 4 of this Policy.

1.35    **"Loss"** shall mean the amount of Damages paid or payable hereunder by the Company on behalf of the Insured with respect to a specific Claim.

1.36    **"Loss and ALAE Development Amount"** shall have the meaning set forth in Section 12.03 of the Policy.

1.37    **"Manager"** shall have the meaning set forth in Section 4.08 of this Policy.

1.38    **"Marine Liability"** shall mean liability arising from the use of barges in transit on the Hudson River and other waterways, including piers, docks and adjacent facilities for loading and unloading, on which such barges operated in furtherance of Debris Removal.

1.39    **"NYC-Captive Agreement"** shall mean the agreement between the City of New York and the Company.

1.40    **"NYSEMO"** shall mean the New York State Emergency Management Office.

1.41    **"NYSEMO Sub-Grant Agreement"** shall mean the Sub-Grant Agreement, WTC Captive Insurance Company Project, between the State of New York (through NYSEMO) and the City of New York (through its Office of Management and Budget).

1.42    **"Occurrence"** shall mean:

>    (i) an accident or a happening or an event, or

>    (ii) a series of accidents, happenings or events, or

>    (iii) exposure to conditions, or

>    (iv) continuous or repeated exposure to conditions

that result in Damages covered under this Policy. All such exposure to substantially the same general conditions existing at or emanating from the World Trade Center Site are deemed to be one Occurrence.

1.43    **"Other Than Uniformed City Worker Claims"** shall mean all Claims under this Policy except Uniformed City Worker Claims.

1.44    **"Paid Losses"** shall have the meaning set forth in Section 4.06 of this Policy.

1.45    **"Partial Termination"** shall have the meaning set forth in Section 8.01 of this Policy.

1.46    **"Party"** shall mean either the Company or an Insured and, in the plural form, shall mean the Company and the Insureds.

1.47    **"Payment Trigger Activation"** shall have the meaning set forth in Section 11.04 of this Policy.

1.48    **"Payment Trigger Activation Rate"** shall have the meaning set forth in Section 11.03 of this Policy.

1.49    **"Payment Trigger De-Activation"** shall have the meaning set forth in Section 11.04 of this Policy.

1.50    **"Payment Trigger Rate"** shall have the meaning set forth in Section 11.02 of this Policy.

1.51    **"Per Occurrence Limit"** shall have the meaning set forth in Section 4.01(a) of this Policy.

1.52    **"Person"** shall mean any individual, partnership, firm, association, corporation, joint-stock company, trust, or any other entity or any combination of the foregoing acting in concert. **"Person"** shall not include the United States or its agencies or instrumentalities with regard to its Claims against Insureds, except for Claims arising from activities of the Insureds, whether or not negligent, that were reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities.

1.53    **"Policy"** shall mean this Liability Insurance Policy.

1.54    **"Policy Sub-Limit A"** shall have the meaning set forth in Section 4.02 of this Policy and Item 5(b)(i) of the Declarations.

1.55    **"Policy Sub-Limit B"** shall have the meaning set forth in Section 4.04 of this Policy and Item 5(b)(ii) of the Declarations.

1.56    **"Pollutants"** shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, mold, fungus, silica, dust and any waste material incorporating such materials, including but not limited to materials to be recycled, reconditioned or reclaimed.

1.57    **"Pre-Existing Claim"** shall mean a Claim asserted against an Insured prior to the Issue Date of this Policy.

1.58    **"Pre-Grant Expenses"** shall mean expenses that were incurred by the Insureds in developing the Company prior to the Company's receipt of the Premium insofar as such expenses have been approved by FEMA in accordance with Article IV(2) of the FEMA Grant Agreement.

1.59    **"Premium"** shall have the meaning set forth in Section 6.01 of this Policy.

1.60    **"Professional Liability"** shall mean liability arising from any alleged act, error or omission, misstatement, misleading statement, neglect or breach of duty committed in the performance of Professional Services.

1.61    **"Professional Services"** shall mean services rendered, or which should have been rendered, by an Insured (or a person for whose conduct the Insured is responsible) in its capacity as an architect, engineer, surveyor, technical consultant, construction manager, design/builder, general contractor, subcontractor, project/program manager, or supplier, or any other capacity deemed to be "professional" by the Company.

1.62    **"Property Damage"** shall mean (1) physical injury to or destruction of tangible property which arises from an Occurrence during the Exposure Period, including the loss of use thereof at any time resulting therefrom, (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use arises from an Occurrence during the Exposure Period; or (3) physical injury to or destruction of, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by any person.

1.63    **"Reduced Payment"** shall have the meaning set forth in Section 11.01 of this Policy.

1.64    **"Representative of the Additional Named Insureds"** shall mean the person designated as such pursuant to Article III (3)(d) of the By-Laws of the Company.

1.65    **"Retained Amount"** shall have the meaning set forth in Section 12.04 of this Policy.

1.66    **"Schedule 1"** shall mean the first schedule attached hereto and entitled "Additional Named Insureds".

1.67    **"Schedule 2"** shall mean the second schedule attached hereto and entitled "Underlying Insurance Amounts".

1.68    **"Schedule 3"** shall mean the third schedule attached hereto and entitled "Payment Trigger Activation Rate".

1.69    **"Section 408(a)(3)"** shall have the meaning set forth in Section 4.04 of this Policy.

1.70    **"Suit"** shall mean a legal action or proceeding, and includes any arbitration, mediation or alternative dispute resolution proceeding to which any Insured is required to submit or to which the Insured has submitted with the Company's consent.

1.71    **"Superintendent"** shall mean the Superintendent of the New York State Insurance Department.

1.72    **"Taxes"** shall mean, if applicable, any state, local or federal taxes paid or payable by the Company, including, but not limited to, state premium taxes and federal, state and local income taxes.

1.73    **"Threshold Level"** shall have the meaning set forth in Section 7.01 of this Policy.

1.74    **"Total Reserve Amount"** shall have the meaning set forth in Section 12.04 of this Policy.

1.75    **"TPA"** shall mean the independent third party administrator appointed by the Company to administer Claims and Suits under this Policy. The Company shall give FEMA written notice 30 days in advance of its selection of the TPA (or of any successor TPA), during which time FEMA shall have the opportunity to disapprove this selection for good cause. Such TPA shall be licensed to adjust claims pursuant to the insurance law of the Issue Jurisdiction.

1.76    **"Ultimate Net Loss"** shall have the meaning set forth in Section 4.05 of this Policy.

1.77    **"Underlying Insurance Amounts"** shall mean the limits of liability for the Underlying Policies as set forth in Item 6 of the Declarations and in columns 4 and 5 of Schedule 2.

1.78    **"Underlying Insurer"** shall mean an insurance company listed in column 2 of Schedule 2.

1.79    **"Underlying Policies"** shall mean the insurance policies listed by policy number(s) in column 2 of Schedule 2.

1.80    **"Uniformed City Workers"** shall mean uniformed employees of the First Named Insured's Fire Department, Police Department and Department of Sanitation.

1.81    **"Uniformed City Worker Claims"** shall mean Claims against the First Named Insured by Uniformed City Workers who worked at the World Trade Center Site during the Exposure Period. Uniformed City Worker Claims does not include any workers' compensation or disability claims or retirement benefits.

1.82    **"World Trade Center Site"** shall mean: (a) the secured area in New York City bounded by Broadway on the east, Albany Street and Thames Street on the south, Chambers Street on the north and the Hudson River on the west; (b) the loading areas in New York City at the West Side Highway and Chambers Street, as well as Pier 92 and the Heliport at 59th Street and Hamilton Avenue; (c) the Brooklyn Marine Transfer Stations where trucks dropped off debris and debris was loaded onto barges; (d) barges in transit on the Hudson River and other waterways, together with adjacent piers, on which such barges operated; (e) trucks in transit between the World Trade Center and any location involved in the transportation of debris including such locations in Brooklyn and Staten Island/Freshkills; (f) debris loading and unloading areas, including those in Brooklyn and Staten Island/Freshkills; and (g) debris sorting/sifting areas at Staten Island/Freshkills.

SECTION 2
COVERAGE

2.01    <u>Insurance Coverage Provided; Commencement of Insured Status</u>.

    (a)    In consideration of the Premium and any Contingent Premium and subject to all of the terms, conditions and limitations of this Policy, including but not limited to the Limits of Liability under Section 4 of this Policy and the non-acceptance of Claims and Reduced Claim Payments provisions under Sections 10 and 11, respectively, of this Policy, the Company shall pay on behalf of the Insureds all sums which Insureds become legally obligated to pay as Damages because of

-7-

Claims (including Uniformed City Worker Claims and Pre-Existing Claims) arising from or relating to Debris Removal, provided the following conditions are met:

    (i)    The Claim falls within the scope of General Liability, Marine Liability, Environmental Liability, or Professional Liability; and

    (ii)    The Claim arises from an Occurrence during the Exposure Period.

Nothing hereunder shall preclude the Company from settling and paying a Claim prior to the commencement of a Suit.

    (b)    No Person shall have any rights as an Additional Named Insured under this Policy until it has submitted a copy of this Policy to the Company containing an original, duly executed acknowledgment in the form as set forth in the Exhibit attached hereto.

2.02    <u>Underlying Insurance Amounts</u>.    Subject to Section 2.03 of this Policy, the Company will only be liable in excess of Underlying Insurance Amounts under valid Underlying Policies.

2.03    <u>Primary and Drop Down Coverage</u>.    The coverage provided hereunder will provide primary coverage for any Claim covered under Section 2.01 in the event that:

    (a)    the Underlying Policy does not apply to or excludes a Claim which would be covered by this Policy;

    (b)    the Underlying Policy does not insure the Insured involved in a Claim which would be covered by this Policy; or

    (c)    the applicable Underlying Insurance Amount(s) are exhausted; or

    (d)    the Underlying Insurer is unable to pay the Insured for all or a portion of the Underlying Insurance Amounts as a result of such insurer's insolvency, rehabilitation, conservatorship or liquidation, provided such amounts are not, in the reasonable belief of the Company after exercising due diligence, recoverable by the Insured from any state guarantee funds applicable to the insolvent Underlying Insurer; or an Underlying Insurer after proper written notice and demand fails to respond to such notice and demand or refuses to provide a defense or pay any sum for which it is or may be liable under any Underlying Insurance. In the latter event, the Company shall have the right, by subrogation to the Insured's rights or otherwise, to prosecute an action in the Insured's and/or its own name against any Underlying Insurer seeking a declaration of coverage and/or recovery of amounts it has paid with regard to such Claim or Claims. In such event, the Insured shall cooperate in accordance with Section 9.01(e) of this Policy.

2.04    <u>Defense of Suits and Related Defense Costs</u>.

(a)     Except as specified in paragraph (b) below or pursuant to Section 10 or 11 of this Policy, the Company has the right and duty to defend an Insured against any Suit seeking any Damages to which this Policy may apply, even if such Suit is groundless, false or fraudulent.

(b)     Subject to Section 2.03 of this Policy, the Company has no duty to defend any Suit that any Underlying Insurer has a duty to defend. However, the Company has the right to join in the defense or trial of any Suit that any Underlying Insurer has a duty to defend if the Company believes the Suit may create liability under this Policy. If the Company avails itself of this right, it will pay any defense costs it incurs. Once the duty to defend of any Underlying Insurer has expired with regard to a Suit covered by this Policy, the Company has a duty to defend. However, the Company has no obligation to defend any existing or future Suit once the applicable Limits of Liability under this Policy have been exhausted.

2.05    Other Costs the Company Will Pay. If a judgment is entered at trial on a Suit covered under the Policy which the Company is defending and/or the Company elects to appeal such judgment, the Company will pay, in addition to defense costs specified in Section 2.04 above, all premiums on bonds to release attachments and all premiums on appeal bonds required in any such Suit defended under this Policy but only for the amount of any judgment within the Limits of Liability of this Policy. If the judgment is for more than the Limits of Liability of this Policy, the Insured against whom the judgment has been entered must bear the cost of any bond required to appeal a judgment for the excess amount. The Company is not obligated to obtain or furnish any bond if it should decide to appeal. The Company will also pay all costs assessed against an Insured in any Suit the Company defends under this Policy. Regardless of whether or not the Company defends a Suit, the Company will pay only its proportionate share of all interest on any judgment which accrues up until the time the Company has offered to deposit or has deposited in court its share of the judgment and shall pay such interest only within the Limits of Liability of this Policy. The Company will also pay an Insured's reasonable expenses incurred in responding to the Company's request to assist it in the investigation or defense of the Claim or Suit. If the Company does not request such assistance and the Insured provides assistance in the investigation or defense of a Claim or Suit as part of its own normal practices and in compliance with Section 9.01(e) of this Policy, then the Insured shall pay its own expenses related to such assistance.

2.06    Other Primary and Excess Insurance. If the First Named Insured or any Additional Named Insured is covered under any insurance policy not listed on Schedule 2, such policy shall be considered to provide excess coverage with respect to this Policy except

(a)     In the event any Claim is not accepted in accordance with Section 10 below, then such policy shall be primary coverage with respect to Environmental Liability and Professional Liability Claims and first excess coverage (completely replacing coverage hereunder) with respect to General Liability and Marine Liability Claims or

(b)   In the event a Reduced Payment is payable or made on any Claim in accordance with Section 11 below, then such policy shall be excess coverage with liability incepting immediately above the Reduced Payment.

2.07   <u>Payment and Defense of Certain Pre-Existing Claims.</u>

(a)   In the event a Pre-Existing Claim is covered hereunder and it has been resolved, by settlement, judgment or otherwise, prior to the Issue Date, the Company shall pay on behalf of the Insured, or reimburse the Insured, for all Damages that the Insured is (or was) legally obligated to pay because of such Pre-Existing Claim, provided the Insured reports the Pre-Existing Claim to the TPA as soon as practicable after the Issue Date, the Insured provides reasonable proof of Damages, including but not limited to copies of any settlement or judgment, and the Company does not reasonably conclude that such settlement or judgment resulted from actions taken in bad faith by or on behalf of the Insured or a default judgment. The Company shall also pay or reimburse the Insured all reasonable fees and expenses related to its defense of any Suits containing such Pre-Existing Claim subject to reasonable evidence of such services being provided to the TPA.

(b)   In the event a Pre-Existing Claim is covered hereunder and has not been resolved by settlement, judgment or otherwise prior to the Issue Date, the Company shall assume the defense of any Suit involving such Claim that meets the standards of Section 2.04 hereof pursuant to Section 9.01 hereof, pay fees and expenses pursuant to Section 9.04(d) hereof, and be responsible for any settlement, judgment or other disposition of the Claim.

SECTION 3<br>EXCLUSIONS

3.01   <u>Exclusions.</u>  This insurance does not apply to:

(a)   liabilities for punitive damages; and

(b)   payments claimed by an Insured for workers' compensation or disability or retirements benefits. Any Suit by or on behalf of an Insured's employee against any other Insured will not be considered to be a workers' compensation claim for purposes of this Policy. Any employer's liability claim covered under the employer's liability section of an Underlying Policy shall also not be considered a workers' compensation claim hereunder; and

(c)   fines, sanctions or statutory penalties, other than fines, sanctions or statutory penalties imposed on the Insured because of activities of the Insured reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities; and

(d)   in the case of a director, official, officer, or employee of an Insured, his or her liability for intentional acts, provided, however, this exclusion shall not apply (i) to such intentional acts if they are reasonably necessary to Debris Removal in

-10-

light of circumstances prevailing at the World Trade Center Site at the time of such activities or (ii) to any other Insured, including the Insured for whom the individual committing such intentional acts is a director, official, officer, or employee, unless such Insured knew or should have known that such director, official, officer, or employee was engaging in such intentional acts.

**SECTION 4**
**LIMITS OF LIABILITY**

4.01    <u>Policy Limits</u>.  Regardless of the number of Insureds under this Policy, the number of persons or organizations sustaining injury or damage, or the number of Claims submitted, the Company's liability hereunder with respect to Claims covered hereunder is limited (subject to Section 10, Non-Acceptance of Claims and Section 11, Reduced Claim Payments, of this Policy) as follows:

    (a)    <u>Per Occurrence Limit</u>.  The most the Company will pay for all Ultimate Net Loss arising out of the same Occurrence shall be the amount shown in Item 5(a)(i) of the Declarations and described as the "Per Occurrence Limit."

    (b)    <u>Aggregate Limit</u>.  The most the Company will pay for all Ultimate Net Loss arising from all Occurrences during the Policy term, as specified in Section 12.01 of this Policy, is the amount shown in Item 5(a)(ii) of the Declarations and described as the "Aggregate Limit."

4.02    <u>Policy Sub-Limit A</u>.  Except as may be modified pursuant to this Policy, including Section 4.03 hereof, the Company's liability with respect to Other Than Uniformed City Worker Claims is limited to $1,000,000,000 (one billion dollars) of Ultimate Net Loss allocable to such Claims.

4.03    <u>Adjustment to Policy Sub-Limit A</u>.  If at any time Policy Sub-Limit A is exhausted and the First Named Insured has not been called upon to pay any Contingent Premium pursuant to the Contingent Premium Payment Obligation, the Company shall have an independent third party actuarial firm separately project, from this point in time, the Ultimate Net Loss based on reported Claims allocable to (a) Uniformed City Worker Claims and (b) Other Than Uniformed City Workers Claims.  If the sum of Ultimate Net Loss allocable to Uniformed City Worker Claims and projected future Ultimate Net Loss allocable to Uniformed City Worker Claims, is less than $250 million (or such higher level as the First Named Insured may specify), then Policy Sub-Limit A shall be raised by the Experience Account Balance less the projected future Ultimate Net Loss allocable to Uniformed City Worker Claims.  If the sum of Ultimate Net Loss allocable to Uniformed City Worker Claims and projected future Ultimate New Loss allocable to Uniformed City Worker Claims, is greater than $250 million, then Policy Sub-Limit A shall be raised by the Experience Account Balance less two times the projected future Ultimate Net Loss allocable to Uniformed City Worker Claims, if such calculation results in a positive number.  Under no circumstances shall this adjustment to Policy Sub-Limit A cause the First Named Insured to be obligated to pay any Contingent Premium pursuant to the Contingent Premium Payment Obligation.

4.04   Policy Sub-Limit B. With respect to Claims covered hereunder, the Company's liability is limited (subject to the further limitations imposed by Sections 4.02 and 4.03 (Policy Sub-Limit A), Section 10 (Non-Acceptance of Claims), and Section 11 (Reduced Claim Payments)) to such amount(s) as will assure that the City of New York's maximum liability pursuant to Section 408(a)(3) of the Airline Transportation and System Stabilization Act, as amended ("Section 408(a)(3)"), does not exceed $350 million (the "Liability Cap"). In the event such Liability Cap is held by a court of final jurisdiction to be unconstitutional, this Policy Sub-Limit B shall be ineffective and void. In the event there is (i) uncertainty as to the application of Section 408(a)(3) with regard to Claims covered under this Policy (because of uncertainty in the computation of the $350 million cap or otherwise) or (ii) such statutory cap is subject to a pending constitutional challenge, but covered Claims are otherwise due and payable, the Company shall make such payments on condition that its rights and those of all Insureds are fully reserved and protected. This Policy Sub-Limit B, like all provisions of the Policy (see Section 15.11), shall create no rights on behalf of persons other than the Company and the Insureds, nor shall it create any legal relationship between the Company and/or the Insureds and such other person.

4.05   Definition of "Ultimate Net Loss". "Ultimate Net Loss" shall mean, with respect to this Policy, the net losses sustained by the Company, including but not limited to:

    (a)   Paid Losses plus

    (b)   paid Allocated Loss Adjustment Expenses, less

    (c)   any salvage, subrogation or other recovery. (Such recoveries, whether recovered or received prior or subsequent to Claim settlement under this Policy, shall be applied as if recovered or received prior to such settlement and shall first be deducted from the actual Loss sustained to arrive at the Ultimate Net Loss.)

Nothing in this Section 4.05 shall be construed to mean that a Loss does not exist prior to the final determination of an Insured's liability with respect to a Claim hereunder or that Losses are not recoverable hereunder until the Ultimate Net Loss of the Company has been finally ascertained.

4.06   Definition of "Paid Losses". "Paid Losses" shall mean the amount of Damages paid hereunder by the Company on behalf of the Insureds, as the result of a settlement, judgment or otherwise.

4.07   Definition of "Allocated Loss Adjustment Expenses". "Allocated Loss Adjustment Expenses" (or "ALAE") for the purposes of this Policy shall mean

    (a)   all fees, costs and expenses allocable to any specific Claim (including a Suit arising from or including such Claim) that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense or appeal of a specific Claim or Suit, including legal fees, court costs, costs of appeal bonds (as specified in Section 2.05 of this Policy) and interest accrued after award or judgment and prejudgment interest awarded against the Insured (as specified in Section 2.05 of this Policy); plus

-12-

(b)     an apportionment in accordance with Section 4.08 below, of all fees, costs, taxes, and expenses incurred by the Company in the course of its business, including, but not limited to, all overhead expenses; salaries and other compensation for officers, directors or employees; fees paid to consultants, service providers or other persons.  This Section 4.07(b) shall include any and all expenditures of any kind incurred by the Company that are not included in Section 4.06 or 4.07(a).

4.08    Allocation of Losses and Allocated Loss Adjustment Expenses.  On a frequency requested by the Company, the Captive manager (the "Manager") shall compute the aggregate Paid Losses and Allocated Loss Adjustment Expenses allocable to Other Than Uniformed City Worker Claims and the aggregate Paid Losses and Allocated Loss Adjustment Expenses allocable to Uniformed City Worker Claims.

(a)     Paid Losses and ALAE specified in Section 4.07(a) shall be computed on a continuing basis by the TPA and allocated according to the class of Claim at issue, i.e., Uniformed City Worker Claims and Other Than Uniformed City Worker Claims.  Such information shall be reported to the Manager on a frequency requested by the Manager.  Allocation of the total aggregate ALAE specified in Section 4.07(b) above shall be made by the Manager based on the proportion that aggregate Paid Losses and ALAE specified in Section 4.07(a) for each class bears to the total of all aggregate Paid Losses and ALAE specified in Section 4.07(a).

(b)     If a Suit initiated by a Uniformed City Worker names both the First Named Insured and any Additional Named Insured(s) as defendants, then the TPA shall allocate Paid Losses and Allocated Loss Adjustment Expenses specified in Section 4.07(a) above to the two classes of Claims, Uniformed City Worker Claims and Other Than Uniformed City Worker Claims.  In cases where separate defense counsel is appointed pursuant to Section 9.04(c) of this Policy, the defense costs for the First Named Insured shall be allocated to the Uniformed City Worker Claims and the defense costs for the Additional Named Insured(s) shall be allocated to Other Than Uniformed City Worker Claims.

(c)     With respect to all Other Than Uniformed City Worker Claims, all Paid Losses and ALAE specified in Section 4.07(a) above shall be allocated by the TPA to Other Than Uniformed City Worker Claims.

## SECTION 5
## EXPERIENCE ACCOUNT

5.01    Experience Account.  A notional account (the "Experience Account") shall be established by the Company on its books and records as of the Issue Date of this Policy and shall be maintained until Commutation when there is a complete and final release from all of the Company's obligations to all Insureds.

5.02    Experience Account Balance.  The Experience Account balance ("Experience Account Balance") shall be calculated as follows:

(a)    Premium received at inception by the Company and Contingent Premium received pursuant to the Contingent Premium Payment Obligation, if any, plus

(b)    Net investment return, less

(c)    Expenditures of the Company resulting from a deobligation of funds (or other required return of funds) pursuant to the FEMA Grant Agreement and/or the NYSEMO Sub-Grant Agreement and/or the NYC-Captive Agreement, less

(d)    Cumulative Ultimate Net Loss paid by the Company, less

(e)    Pre-Grant Expenses.

5.03    <u>Experience Account Statement</u>.  On a quarterly basis, the Company shall provide a copy of the Experience Account Balance statement (the "EAB Statement") to the First Named Insured, the Representative of the Additional Named Insureds, the Superintendent, FEMA and NYSEMO within thirty (30) days of the end of each calendar quarter.  The EAB Statement shall show the calculation of the Experience Account Balance as of the end of such quarter.

SECTION 6
<u>PREMIUM</u>

6.01    <u>Payment of Premium</u>.  This Policy shall not be issued until the premium specified in Item 7 of the Declarations (the "Premium") has been paid to the Company.  No Party or person shall have any rights hereunder until such issuance.  The Premium is fully earned when paid to the Company.

SECTION 7
<u>CONTINGENT PREMIUM PAYMENT OBLIGATION</u>

7.01    <u>Contingent Premium Payment Obligation</u>.  At the end of any calendar quarter in which Policy Sub-Limit A (either per Occurrence or in the aggregate) has not been exhausted, if the Experience Account Balance declines below a threshold level of $75 million (the "Threshold Level"), then the First Named Insured shall pay additional premium to the Company in an amount sufficient to bring the Experience Account Balance back to $85 million (the "Contingent Premium"), *provided, however*, that the maximum aggregate amount of such Contingent Premium shall not exceed one billion dollars less all Ultimate Net Loss allocable to Other Than Uniformed City Worker Claims; provided further, however, that the maximum aggregate amount of such Contingent Premium due to the Company at any time shall not exceed all amounts paid with respect to Ultimate Net Loss allocable to Uniformed City Worker Claims less all prior payments of Contingent Premium to the Company.

7.02    <u>Notice</u>.  As soon as a Contingent Premium due pursuant to Section 7.01 is known to the Company, it shall provide the First Named Insured with notice thereof and demand payment fifteen (15) days thereafter.  In the event the Company fails to provide such timely notice to the First Named Insured, the Company does not waive its right to demand payment of such Contingent Premium and may, at any time, send notice of such demand to the First Named Insured requiring payment fifteen (15) days thereafter.

-14-

# EXHIBIT  D

## Part 2 of 4

7.03   Non-Payment of Contingent Premium. If the First Named Insured fails to pay Contingent Premium on the date such premium is due pursuant to Sections 7.01 and 7.02 and for a period of fifteen (15) days thereafter, then the First Named Insured shall not be considered an Insured under this Policy until such time as the First Named Insured makes such payment. Nothing contained in this Section 7.03 shall affect the obligations of the First Named Insured set forth in Section 7.01 above.

7.04   Federal or State Legislation. In the event that any federal or state legislation, whether enacted before or after the creation of the Company, provides for a limitation of liability or indemnity for liability inclusive of Claims hereunder, the obligation to pay Contingent Premium as specified in Section 7.01 above (the "Contingent Premium Payment Obligation") shall be applicable in a maximum aggregate amount equal to such legislated limitation of liability or indemnity, less all Ultimate Net Loss paid by the Company in connection with Other Than Uniformed City Worker Claims; *provided, however*, that the amount of the Contingent Premium Payment Obligation in this case may not exceed the amount of such obligation if there were no such federal or state legislation.

## SECTION 8
### PARTIAL TERMINATION OF COVERAGE BY FIRST NAMED INSURED

8.01   Partial Termination Option. At any time after the Issue Date the First Named Insured shall have the option to cause the Company to terminate coverage of the Uniformed City Worker Claims ("Partial Termination") as of the date of such termination. Such Uniformed City Worker Claims no longer covered by the Company shall include any such Claims open on the date of such Partial Termination or reported as new Claims thereafter. Upon such Partial Termination, the First Named Insured shall assume the defense of itself in all Suits involving such Claims from the Company and be solely responsible for the payment of Damages and expenses with respect to such Claims, and the Company shall have no such responsibility for such Claims hereunder. Whether or not the First Named Insured elects a Partial Termination, the First Named Insured is responsible for paying any Contingent Premium Payment Obligation if and when otherwise due under this Policy. Upon such Partial Termination, coverage under this Policy shall continue with respect to Other Than Uniformed City Worker Claims until such time as the Ultimate Net Loss allocable to Other Than Uniformed City Worker Claims exhausts Policy Sub-Limit A. At such time, the Company shall return to the First Named Insured such sums as it has paid as Contingent Premium payments up to the amount available in the Experience Account. If additional funds remain in the Experience Account after any such return of Contingent Premium, the coverage under this Policy shall continue with respect to Other Than Uniformed City Worker Claims without regard to Policy Sub-Limit A as set forth in Section 4.02 hereof.

## SECTION 9
### SUBMISSION AND PAYMENT OF CLAIMS AND SUITS; APPOINTMENT OF COUNSEL

9.01   Insured's Duties in the Event of a Claim or Suit. The Insured:

   (a)   shall give the Company, as soon as reasonably practicable and at the address specified in Item 8 of the Declarations, written notice of any covered Claim arising out of a demand, received by the Insured, which seeks a remedy or alleges liability or responsibility on the part of the Insured. In the case of the First

Named Insured, the applicability of this provision for any such Claim shall not arise until the office specified in Section 15.01 of this Policy has received a Notice of Claim (as filed with the City pursuant to Section 50-e of the New York General Municipal Law) describing the Claim with sufficient particularity;

(b)     shall give to the Company, as soon as reasonably practicable and at the address specified in Item 8 of the Declarations, written notice (or "tender") of the commencement of any Suit to which the Company has a duty to defend pursuant to Section 2.04 of this Policy, and enclose therewith the Summons and Complaint or other document with which the Insured was served.  In the case of the First Named Insured, the applicability of this provision regarding any such Suit shall not arise until the office specified in Section 15.01 of this Policy has received the Summons and Complaint or other document by which the Suit was commenced;

(c)     shall not admit any liability, make any payment, assume any obligation, or incur any expense related to a Claim covered under Section 2.01, except with the prior written consent of the Company;

(d)     shall, as soon as practicable, forward to the Company all legal papers relating to any Suit being defended pursuant to Section 2.04 of this Policy;

(e)     shall cooperate with the Company and upon the Company's request shall submit to examination by a representative of the Company under oath if required.  The Insured shall attend hearings, depositions and trials.  The Insured shall assist in the conduct of Suits, effecting settlement, securing and giving evidence and obtaining the attendance of witnesses.  The Insured shall also give a written statement or statements to the Company's representatives and shall meet with such representatives for the purpose of investigation and/or defense.  The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the Insured may have, or right of subrogation which the Company may have; and

(f)     shall not demand or agree to arbitration of any Suit made against the Insured without the written consent of the Company and such consent shall not be unreasonably withheld.

The foregoing shall **not** apply retroactively to Claims made or Suits commenced prior to the Issue Date.  With respect to such Claims and Suits, the Insured shall give notice of such pending Claim or Suit pursuant to subparagraphs (a) and (b) above and thereafter adhere to its obligations pursuant to subparagraphs (c) through (f) above.

9.02    <u>Requirement of Prejudice</u>.  An Insured's failure to comply with any of the terms of Section 9.01 shall not result in the loss of coverage under this Policy unless such non-compliance resulted in material prejudice to the interests of the Company.

9.03    <u>Payment of Claims</u>.  When the amount payable on a covered Claim, pursuant to a settlement or final judgment in a Suit or otherwise, is determined and the Company has received

-16-

evidence of its obligation to pay any such amount, the Company will pay promptly the amount due.

9.04    Appointment of Defense Counsel.

(a)    Subject to Section 2.04 and except as provided in Sections 9.04(b), (c) and (d), the Company shall have the right and obligation to appoint and retain counsel for defending Suits against the Insureds tendered pursuant to Section 9.01(b), including Suits involving frivolous, false or time-barred Claims.

(b)    In the event the Company issues a reservation of rights with regard to a tendered Suit, the Insured at issue shall have the right to appoint and retain counsel (including, in the case of the First Named Insured, its Corporation Counsel), but only from a panel established in advance for such cases by the First Named Insured and Representative of the Additional Named Insureds and approved by the Company (with notice to and the opportunity to object by FEMA) to defend such Suit, the reasonable costs of which shall be paid by the Company. In the event the Company has issued a reservation of rights regarding two or more Insureds named in such a Suit and the Company reasonably believes that all or some of these Insureds are similarly situated with regard to the reservation of rights, it shall appoint from such panel a single counsel to defend such similarly situated Insureds in such Suit, the reasonable costs of which shall be paid by the Company. Any such Insured may thereafter refuse to be represented by such unitary counsel and select counsel to defend the Suit on its behalf; however, in such event, the costs of such defense shall not be paid by the Company.

(c)    If a tendered Suit by any Uniformed City Worker names both the First Named Insured and Additional Named Insured(s) as defendants, then the Company's TPA shall consult with such Insureds. If the First Named Insured and/or such Additional Named Insured(s) believe that it is appropriate to have separate defense counsel in such Suit, then the TPA shall appoint one counsel for the First Named Insured and another for the group of such Additional Named Insured(s). The First Named Insured and such Additional Named Insured(s) shall be deemed to have consented to their respective appointed counsels unless a reasonable written objection is promptly provided to the TPA. In the event the Company has issued a reservation of rights pursuant to Section 9.04(b), the First Named Insured or Additional Named Insured(s), as the case may be, shall have the rights set forth therein.

(d)    In the event an Insured has appointed counsel (including, in the case of the First Named Insured, its Corporation Counsel) with respect to a Suit that had been commenced prior to the Issue Date and such Suit remains unresolved (by settlement, judgment or otherwise), then the Insured shall be permitted to keep such counsel, subject to the TPA's approval, which shall not unreasonably be withheld. The reasonable fees and expenses of such counsel, both past and future, shall be paid by the Company, subject to reasonable evidence of such services being provided to the TPA.

## SECTION 10
## NON-ACCEPTANCE OF CLAIMS

10.01   Non-Acceptance of Reported Claims.  In the event the Acceptance Trigger (as defined in Section 10.02 below) is activated (as described in Section 10.03 below), the Company shall no longer accept new Claims involving Other Than Uniformed City Worker Claims that may be reported by Insureds.  In the event the Acceptance Trigger is de-activated (as described in 10.03 below), the Company shall resume the acceptance of such new Claims in the order reported by Insureds pursuant to the terms of this Policy.  All such Claims (otherwise covered under this Policy) accepted prior to the activation, or subsequent to the de-activation, of this Acceptance Trigger shall continue to be paid in full by the Company, except as provided in Section 11 below.

10.02   The Acceptance Trigger.  The "Acceptance Trigger" shall mean the product resulting from the multiplication of (x) the sum of (a) the Experience Account Balance at the end of each calendar quarter (or more frequently, if judged necessary by the Company) and (b) the maximum aggregate amount of Contingent Premium at such time (pursuant to Section 7.01) less all prior payments of Contingent Premium to the Company by (y) 90 percent (90%) (the "Acceptance Trigger Rate").

10.03   Activation and De-Activation of the Acceptance Trigger.  The Acceptance Trigger shall be calculated at the end of each calendar quarter (or more frequently, if judged necessary by the Company).  In the event the sum of reserves for reported Losses and ALAE with respect thereto for Other Than Uniformed City Worker Claims (at the time the Acceptance Trigger is calculated) is equal to or greater than the Acceptance Trigger, the Acceptance Trigger is activated.  Subsequent to such activation, if the sum of reserves for reported Losses and ALAE with respect thereto for Other Than Uniformed City Worker Claims (at the time the Acceptance Trigger is calculated) is determined to be less than the Acceptance Trigger, the Acceptance Trigger is de-activated.

10.04   No Obligation By Company For Non-Accepted Claims.  The Company shall have no obligation whatever with regard to any non-accepted Claim and, accordingly, shall have no obligation with regard to the disposition of any such Claim or the defense or the defense costs of any non-accepted Claim.

## SECTION 11
## REDUCED CLAIM PAYMENTS

11.01   Reduced Claim Payments.  In the event Payment Trigger Activation (as defined in Section 11.04 below) occurs, the Company shall no longer pay Other Than Uniformed City Worker Claims accepted prior to the activation of the Acceptance Trigger in full.  Instead, the Company shall pay such Claims (even those fully covered under this Policy) at a reduced rate (the "Payment Trigger Rate") which shall be calculated at the end of each quarter.  For each such Claim to be paid in a given quarter, the Company shall be required to make only a reduced payment to the Insured (the "Reduced Payment").  Such Reduced Payment shall be calculated by multiplying the sum of the Loss payable and related ALAE payable by the Payment Trigger Rate.  In the event Payment Trigger De-Activation (as defined in Section 11.04 below) occurs, the Company shall resume paying covered Claims accepted prior to the activation of the

-18-

Acceptance Trigger in full, provided, however, that any such Claim previously paid at the Payment Trigger Rate, shall first be paid in full. If there are insufficient funds in the Experience Account to pay all such Claims in full without again having Payment Trigger Activation occur, then the priority of payment of such Claims shall be based on the Payment Trigger Rate, with Claims having the lowest Payment Trigger Rate being paid first until such time as such Claims have been paid the second-to-lowest Payment Trigger Rate and thereafter in stages rising to a higher rate as available funds permit until payment of all such Claims have been equalized. If more than one such Claim has the same Payment Trigger Rate and there are insufficient funds in the Experience Account to pay all such Claims in full without again having Payment Trigger Activation occur, then the amount of funds available in the Experience Account prior to any such Payment Trigger Activation will be allocated pro-rata among all such Claims.

11.02  <u>The Payment Trigger Rate</u>. The "Payment Trigger Rate" shall mean the rate calculated at the end of every quarter by dividing (x) the sum of (a) the Experience Account Balance at such time less estimated Section 4.05(b) costs for such quarter and (b) the maximum aggregate amount of Contingent Premium at such time (pursuant to Section 7.01) less all prior payments of Contingent Premium to the Company by (y) the sum of reserves for reported Losses and ALAE with respect thereto for Other than Uniformed City Worker Claims (at the time the Payment Trigger Rate is calculated). In no case shall the Payment Trigger Rate be greater than 100%.

11.03  <u>The Payment Trigger Activation Rate</u>. The "Payment Trigger Activation Rate" shall mean the rate expressed as a percentage, which is specified on Schedule 3 of this Policy by the policy year in which the Payment Trigger is activated.

11.04  <u>Payment Trigger Activation and De-Activation</u>. "Payment Trigger Activation" shall mean a determination, at the end of any quarter, that the Payment Trigger Rate is equal to or less than the Payment Trigger Activation Rate. "Payment Trigger De-Activation" shall mean a determination, at the end of any quarter, that the Payment Trigger Rate is greater than the Payment Trigger Activation Rate.

11.05  <u>Defense of Suits Following Payment Trigger Activation</u>. In the event of a Payment Trigger Activation, the Company shall continue to provide defense counsel to Insureds on all Suits. However, each Insured shall be responsible for any defense costs on its behalf not paid by the Company as a result of such Payment Trigger Activation.

SECTION 12<br>— - <u>POLICY TERM AND RELATED MATTERS</u>

12.01  <u>Policy Term</u>. This Policy shall become effective on the Issue Date and shall continue in effect until the earliest of the following:

    (a)    the Policy is terminated pursuant to the FEMA Grant Agreement or

    (b)    the Experience Account Balance is exhausted or

    (c)    the Policy is commuted or assumed, under an assumption reinsurance agreement, in accordance with Section 12.02 below or

-19-

(d)    the Retained Amount (pursuant to Section 12.04 below) is exhausted.

12.02   Commutation and Assumption Reinsurance.

(a)    At any time but in no event later than twenty-two and a half (22.5) years after the Issue Date, the Company shall endeavor to purchase assumption reinsurance with respect to the then outstanding liabilities of the Company. Whenever the Company elects to do so but in no event later than twenty-one and a half (21.5) years after the Issue Date, the Company shall secure an estimate by an independent third party actuarial firm of the cost and potential for future Loss and related ALAE development with respect to reported Claims as well as IBNR (the "Actuarial Report"). After reviewing the Actuarial Report, the Company shall determine if it is commercially feasible and cost effective to purchase assumption reinsurance from a New York licensed insurer (if such licensure is so required by the Superintendent) which would assume, as its direct liabilities, all such Claims and IBNR (providing coverage comparable in all material respects, but no broader than, that of the Policy). If the Company determines that it is not commercially feasible and cost effective to purchase such assumption reinsurance, the Company shall report its conclusions to FEMA and the Superintendent and re-evaluate its conclusion every two (2) years thereafter based on an update of the Actuarial Report by an independent third party actuarial firm. If the Company determines that it is commercially feasible and cost effective to purchase such assumption reinsurance, the Company shall notify the First Named Insured and the Representative of the Additional Named Insureds of the Company's desire to purchase assumption reinsurance in order to allow the Insureds to report any as-yet-unreported Claims within one hundred twenty (120) days of the mailing of the Company's notice. After the expiration of such one hundred twenty (120) day period and any further update, if necessary, of the Actuarial Report, the Company shall provide the Superintendent and FEMA with a proposal to purchase assumption reinsurance. If approval of such proposal is granted by the Superintendent and FEMA, the Company shall, after obtaining any other consents it deems necessary, purchase the assumption reinsurance and notify the Insureds of such purchase. Upon the purchase of such assumption reinsurance, the Company shall have no liability for Claims hereunder.

(b)    Twenty-three and a half (23 ½) years after the Issue Date, in the event the Policy has not otherwise been terminated, the Company shall endeavor to commute this Policy with respect to the then outstanding liabilities of the Company. The Company may also, if appropriate, pursue its options under Section 12.02(a) above and/or Section 12.04 below. If the Company determines that it is commercially feasible and cost effective to commute the Policy, the Company shall notify the First Named Insured and the Representative of the Additional Named Insureds of the Company's desire to commute the Policy in order to allow the Insureds to report any as-yet-unreported Claims within one hundred twenty (120) days of the mailing of the Company's notice. After the expiration of such one hundred twenty (120) day period and any further update, if necessary, of the Actuarial Report required under Section 12.02(a) above, the Company shall

-20-

provide the Superintendent and FEMA with a proposal to commute the Policy. If approval of such proposal is granted by the Superintendent and FEMA, the Company shall prepare documentation to effectuate such commutation and shall contact the Insureds to seek their agreement to the terms of commutation with regard to their individual Claims. If any Insured and the Company fail to agree to the terms of commutation relating to Claims against such Insured, the Company shall have the right, with regard to any such Claim or Claims, to either (i) commence a binding arbitration proceeding (or proceedings) in accordance with Section 13 hereof under which the terms of such commutation shall be determined or (ii) enter into an assumption reinsurance agreement under which a licensed New York insurer assumes such Claim or Claims as its direct liabilities and provides coverage to the Insureds that is comparable to (but not broader than) the coverage under this Policy in all material respects. Upon the purchase of such assumption reinsurance, the Company shall have no liability for such Claims. If twenty-five (25) years after the Issue Date, the Company determines that is not commercially feasible and cost effective to commute the Policy, the Company shall report its conclusions to FEMA and the Superintendent and re-evaluate its conclusion every two (2) years thereafter.

12.03  Early Withdrawal (by First Named Insured).  At any time after the end of twelve (12) years from the Issue Date, the Company, at the request and expense of the First Named Insured, may have an independent third party actuarial firm project the cost of and potential for future Loss and related ALAE development with respect to reported and incurred-but-not-reported Losses and ALAE (the "Loss and ALAE Development Amount") with respect to Other Than Uniformed City Worker Claims. If the Loss and ALAE Development Amount for Other Than Uniformed City Worker Claims is less than $250 million, then the First Named Insured shall have the option to withdraw from the Experience Account all funds in excess of the Threshold Level (the "Early Withdrawal"); provided, however, that (a) such Early Withdrawal has been approved in advance by FEMA and NYSEMO, subject to applicable laws and regulations; (b) the use of the Early Withdrawal funds is for FEMA eligible purposes only; (c) the Superintendent has been given advance notice of such Early Withdrawal and has not objected or has not asked for a reasonable amount of additional time to consider the issue; and (d) upon such Early Withdrawal, the First Named Insured's Contingent Premium Payment Obligation shall remain outstanding for a maximum aggregate amount as specified in Section 7.01.

12.04  Return of Funds in the Event the Total Reserve Amount falls below $25,000,000.  At any time after twenty-five (25) years of the Issue Date, the Company may secure an estimate by an independent third party actuarial firm of (i) outstanding Loss reserves and future development of such reserves, (ii) outstanding ALAE reserves and future development of such reserves and (iii) IBNR (all net of reinsurance that may have been purchased by the Company) (the "Total Reserve Amount"). If such firm, applying a 90% confidence level, determines that the Total Reserve Amount is less than $25,000,000 and FEMA and the Superintendent so approve, the Company shall retain assets equal to two (2) times the Total Reserve Amount (the "Retained Amount") and return any additional funds remaining in the Experience Account in the manner set forth in Section 12.05 below.

12.05  Return of Funds in Event of Termination.  In the event the Policy is terminated pursuant to Section 12.01(a) or (b) above the Company shall (a) return to the First Named Insured, for its own purposes, an amount equal to all Contingent Premium payments made to the Company prior to termination (or the entirety of such lesser amount as may remain in the Experience Account) and then (b) return all funds that may remain in the Experience Account to NYSEMO for reobligation to the First Named Insured pursuant to federal law and agreement with FEMA.

## SECTION 13
## ARBITRATION

13.01  In General.  If any dispute shall arise between the Company and one or more Insureds with respect to the rights of such Insured(s) under this Policy (including but not limited to matters governed by Section 12.02), such dispute shall be submitted to binding arbitration, which shall be the sole forum for the resolution of disputes under or in connection with this Policy, upon the written request of any Party.  If two or more Parties join on one side of the dispute, such Parties shall be deemed a "side" for purposes of the following provisions of this Section, and any appointment or other action to be taken by such side shall be made or taken by them acting together.  The Commercial Arbitration Rules of the American Arbitration Association shall apply, except with respect to the selection of arbitrators, the payment of arbitration fees and costs, the location and the entry of the arbitration award.

13.02  Selection of Arbitrators.  One arbitrator shall be chosen by one side and another arbitrator by the other side, and a third arbitrator shall be chosen by the first two arbitrators before they enter into arbitration.  All arbitrators shall be disinterested and shall be active or retired executive officers of insurance or reinsurance companies or Lloyd's Underwriters.

13.03  Payment of Arbitration Fees and Costs.  Each side shall pay the fee of its chosen arbitrator and half the fee of the third arbitrator.  The remaining costs of the arbitration, including legal fees and disbursements, shall be paid as the written decision of the arbitrators directs, with it being expressly understood that the intention is to favor reimbursement of such fees and expenses to an insured that has brought a meritorious dispute.  The fees to be borne by a side consisting of more than one Party shall be divided equally among such Parties.

13.04  Location.  Any arbitration hereunder shall take place in New York, New York, unless otherwise mutually agreed upon by the two sides.

13.05  Entry of Arbitration Award.  Judgment upon an arbitration award hereunder may be entered in, and enforced by, any court of competent jurisdiction.

## SECTION 14
## NO INSURANCE AGENT

14.01  No Insurance Agent.  The Insureds, by signing the Declarations attached hereto, represent and warrant that this Policy has been independently procured and that no insurance agent or broker (an "Insurance Agent"), as specified in item 9 of the Declarations attached hereto, has been used to procure this Policy.

## SECTION 15
## GENERAL CONDITIONS

15.01  Notices.  Unless otherwise specified herein, all notices under this Policy shall be in writing and given by prepaid commercial courier or certified mail/registered mail return receipt requested to:

(a)    The First Named Insured at an address to be provided to the Company in writing or, if no such address is provided, to the following address:

City of New York Office of the Corporation Counsel
    Attn: World Trade Center Insurance Office
100 Church Street
New York, NY 10007

(b)    The Company:

WTC Captive Insurance Company, Inc.
_____ (to be filled in by Company)

(c)    Additional Named Insureds

Michael Feigin
c/o Bovis Lend Lease Holdings, Inc.
200 Park Avenue
New York, NY 10066

15.02  Inspection of Records.  Upon the Company's written request, each Insured agrees to provide copies of all records reasonably related to Claims insured hereunder and to permit the Company or the Company's representatives at all reasonable times during normal business hours to inspect all such records at the Insured's office(s).  Each Insured shall provide appropriate personnel, at the Insured's expense, to assist the Company's representatives during any agreed inspection.

15.03  Bankruptcy of Insured.  The Company's obligations under this Policy are not changed or diminished because of the bankruptcy of the First Named Insured, any Additional Named Insured, or the estate of any Additional Named Insured.

15.04  Errors and Omissions.  It is agreed that any clerical errors, inadvertent delays, errors or omissions made in connection with the administration of this Policy shall not be held to relieve either the Insureds or the Company from any liability or obligation under this Policy.  Such clerical errors, inadvertent delays, errors or omissions if promptly rectified will not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated.

15.05  Governing Law.  This Policy is subject to the laws of the Issue Jurisdiction and will be administered according to those laws.

15.06  <u>Conflicts with Laws or Regulations</u>.  If any provision of this Policy shall be held to be invalid, illegal or unenforceable, such provision and provisions relating thereto shall be replaced by mutually acceptable provisions, which, being valid, legal and enforceable, come closest to the intention of the Company and the Insureds at the time this Policy was issued.

15.07  <u>Subrogation Rights</u>.  The Company shall be subrogated, as respects any Claim which the Company pays or becomes liable to pay, but only to the extent of the amount of such payment or liability, to all the rights of the Insured against any person or other entity who may be legally responsible in damages for said Claim.  The Insured hereby agrees to enforce such rights but in the case the Insured shall refuse or neglect to do so, the Company is hereby authorized to bring any appropriate action in the name of the Insured and, subject to Section 9.01(e) of this Policy, such refusal or neglect shall not affect the Insured's rights under this Policy.  Any recovery made pursuant to this section shall be for the benefit, in the order specified, of (a) any insurer providing coverage excess of this Policy, (b) the Company and (c) the Underlying Insurer, but only up to the extent of any such insurer's (as specified in (a), (b) or (c)) payment to the Insured.  All recoveries in excess thereof will be for the benefit of the Insured.  The Insured shall be credited with the recovery less (i) the actual cost, excluding salaries of officers and employees of the Insured, and (ii) sums paid to attorneys as retain or for making such recovery.

15.08  <u>Assignment</u>.  No assignment of this Policy or an Insured's interest hereunder will be binding on the Company without the Company's prior written consent.

15.09  <u>Amendment</u>.  This Policy may be amended by the mutual consent of the Company, the First Named Insured and the Representative of the Additional Named Insureds in accordance with New York Insurance Law and any other applicable law.  FEMA shall be given 30 days prior written notice of any such amendment.  No amendment to this Policy is valid unless it is set forth in a writing signed by the First Named Insured, the Representative of the Additional Named Insureds and an officer of the Company and is attached to this Policy.  In the event the Policy is amended, notice thereof shall be made to the Insureds pursuant to Section 15.01.

15.10  <u>Representation/Warranty Regarding Misstatement, Concealment or Fraud</u>.  Each Insured represents and warrants that any Claim or any statement made to the Company in connection with the submission of any Claim, does not include any intentional misstatement, concealment or fraud.  If any Insured violates this provision, such violation does not affect the rights of any other Insured hereunder.

15.11  <u>No Third Party Beneficiaries</u>.  This is a Policy solely between the Insureds and the Company.  It shall not create any right or legal relationship whatever between the Company or any Insured and any other person.

15.12  <u>Entire Agreement</u>.  By acceptance of this Policy, the Insureds and the Company agree that this Policy (including the Declarations, and the Schedules attached hereto) and any written endorsements attached hereto constitute the entire agreement between the Parties.

15.13  <u>Time Barred Suits</u>.  The Insurer shall not be required to pay on behalf of the Insureds any Losses arising out of suits that are not commenced within the applicable limitation of time set forth in Article 2 of the New York State Civil Practice Laws and Rules or other governing law or

rule. The Insurer's obligations concerning any untimely commenced action shall be limited to the provision of any legal defense expenses until such suit is dismissed as being time-barred by a court of final jurisdiction.

This Policy shall not be valid unless countersigned on the Declarations by a duly authorized representative of the Company.

_____
Secretary

_____
President

# EXHIBIT  D

## Part 3 of 4

## SCHEDULE 1
### Additional Named Insureds

Subject to Section 2.01(b) of the Policy, the following are Additional Named Insureds:

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 11-2989828 | A RUSSO WRECKING |
| N/A | ACROW |
| TBDAA | ALLCOM ELECTRIC |
| 13-3803502 | AMEC CONSTRUCTION MGMT. INC. |
| 91-1641772 | AMEC EARTH AND ENVIRO. |
| 22-3619730 | ANTHONY CORTESE SPECIALIZED HAULING LLC |
| 11-3148673 | ASG PEST CONTROL |
| 46-0399480 | ATC GROUP SERV/DBA  ATC ACCOCIATES |
| 11-3366894 | ATLANTIC HEYDT CORP. |
| 22-3521719 | ATLAS CONCRETE |
| 11-3027441 | AVANTI DEMOLITION & CARTING CORP. |
| 94-3155230 | BECHTEL CONSTRUCTION, INC. |
| 22-3585254 | BERGEN CONCRETE CUTTING |
| 48-0650969 | BERKEL & CO. CONTRACTORS, INC. |
| 11-2860475 | BIG APPLE WRECKING & CONSTRUCTION |
| 13-2986742 | BOVIS LEND LEASE LMB, INC. |
| 11-2748937 | BREEZE CARTING |
| 11-2834824 | BREEZE NATIONAL INC. |
| 11-2810100 | BRER FOUR TRANSPORTATION |
| 13-4039627 | BURO HAPPOLD CONSULT ENG. |
| 13-3317808 | C & D FIREPROOFING |
| 11-3501510 | C & D PAINTING INC. |
| 13-3286452 | C.B. CONTRACTING CORP |
| 36-4185522 | CANRON CONSTRUCTION CORP |
| 13-4123804 | CANTOR SEINUK GROUP |
| 11-1889096 | CERTIFIED FENCE CORP |
| 13-3543978 | CIVETTA COUSINS |
| 11-3429377 | CLARCO ENTERPRISE CORP |
| 11-6033867 | COMPONENT ASSEMBLY SYS |
| 13-2807918 | COORDINATED METALS, INC. |
| 11-3194814 | CORD CONTRACTING CO. INC. |
| 22-3202129 | CRAIG TEST BORING |
| 41-1559487 | CRITICOM INTERNATIONAL CORP |
| 11-2931166 | DAKOTA DEMO-TECH |
| 13-4048317 | DCM ERECTORS,INC. |
| 11-2920568 | DIAMOND POINT EXCAVATION CORP |
| 11-3327634 | DIEGO CONSTRUCTION |
| 11-3404629 | DIVERSIFIED CARTING |
| 13-3743052 | DMT ENTERPRISE |

| FEIN | ADDITIONAL NAMED INSURED |
|---|---|
| 11-3093462 | D'ONOFRIO GENERAL CONTRACTORS CORP |
| 22-3303725 | EAGLE LEASING & INDSTRL SUPPLY(SEASONS) |
| 11-3193986 | EAGLE ONE ROOFING CONTRACTORS, INC. |
| 11-2480014 | EAGLE SCAFFOLDING CO.  (Seasons) |
| 13-1703591 | EJ DAVIES ,INC |
| 11-2806461 | EN-TECH CORP. |
| 88-0391100 | ENTERTAINMENT PARTNERS |
| 13-3774375 | ET ENVIRONMENTAL |
| 11-3114572 | EVERGREEN RECYCLING OF CORONA(EROC) |
| 13-2760917 | EWELL W. FINLEY, P.C. |
| 22-3712962 | EXECUTIVE MED SERVICES, PC |
| 22-2116608 | F&G MECHANICAL CORPORATION |
| 13-3399858 | FELIX EQUITIES INC |
| 22-3640918 | FLEET TRUCKING |
| 11-3152896 | FRANCIS A. LEE EXTERIOR RESTORATION |
| 13-3641321 | FRANK MICELLI JR CONTRACTING |
| N/A | FTI TRUCKING |
| 11-3279235 | G & G CONTRACTING INC. |
| 13-3595619 | GILSANZ,MURRAY,& STEFICEK |
| 14-1784943 | GINO CRACOLICI & SONS INC. |
| 06-1598088 | GOLDSTEIN ASSOCIATES PLLC |
| 11-2833290 | GRACE INDUSTRIES |
| 11-1699771 | HALLEN WELDING SERVICE |
| 04-2433707 | HELMSMAN MANAGEMENT SERVICES, INC |
| 11-3594215 | HGC CONTRACTING CORP. |
| 11-3479190 | HIGH RISE HOISTING AND SCAFFOLDING |
| 11-3272769 | HIGH-RISE ELECTRIC, INC. |
| 54-1577543 | HP ENVIRONMENTAL |
| 13-4020927 | JP EQUIPMENT RENTAL MATERIALS, INC |
| 10-7589949 | KEVIN MCMANUS |
| 13-1715679 | KOCH SKANSKA, INC. |
| 11-2227462 | LAQUILLA CONSTRUCTION INC. |
| 11-2320910 | LASTRADA  GENERAL CONTRACTING CORP. |
| 13-3147972 | LESLIE E. ROBERTSON ASSOCIATES |
| 04-1543470 | LIBERTY MUTUAL GROUP |
| N/A | LIRO |
| 11-1015370 | LOCKWOOD,KESSLER & BARTLETT(LKB) |
| 13-5318890 | LUCIUS PITKIN |
| 13-1251070 | LZA TECH-DIV OF THORTON TOMASETTI |
| 22-005878 | M.G.MCLAREN, P.C. |
| 06-0619109 | MANAFORT BROTHERS, INC. |
| 22-3072985 | MAZZOCCHI WRECKING INC. |
| 36-3329823 | MEDCOR,INC |
| N/A | MENT BROTHERS |

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 01-0644825 | MERIDIAN CONSTRUCTION GROUP |
| N/A | MG MCLAREN P.C. |
| 22-1126840 | MORETRENCH AMERICAN CORP |
| 11-3001479 | MRA ENGINEERING, PC |
| 13-1669034 | MUESER RUTLEDGE CONSULTING ENGINEERS |
| 42-1511754 | MUSCO SPORTS LIGHTING, LLC |
| 22-3197850 | NACIREMA INDUSTRIES |
| 22-3267592 | NEW YORK CRANE & EQUIPMENT CORP |
| 25-1024823 | NICHOLSON CONSTRUCTION CO. |
| N/A | NICHOLSON./HEYWOOD JOINT VENTURE. |
| 22-3544421 | OFF ROAD WELDING, INC |
| 11-2488846 | OLYMPIC PLUMBING AND HEATING |
| 13-3473570 | OVE ARUP & PARTNERS |
| 36-4010742 | PARSON GROUP |
| 11-1805182 | PETER SCALAMANDRE & SONS |
| 11-3375596 | PINNACLE ENVIRONMENTAL |
| 13-3378361 | PLAZA CONSTRUCTION CORP |
| 13-4050886 | PRO SAFETY SERVICES , LLC |
| 22-3126192 | PT & L CONTRACTING CORP |
| 13-2751441 | REGIONAL SCAFFOLD & HOISTING CO, INC. |
| 22-3074476 | RICH MARK ENVIRONMENTAL SERVICES, INC |
| N/A | ROBER SILMAN ASSOCIATES |
| 15-1364211 | ROBERT C STEWART |
| 11-0349221 | ROBERT ERRAT |
| 13-3426668 | ROBERT L GEROSA |
| 14-1763023 | RODAR ENTERPRISES INC. |
| 52-2266099 | ROYAL GM INC |
| 11-3122716 | SAB TRUCKING |
| 11-2860475 | SAFEWAY ENVIRONMENTAL |
| 22-1756525 | SEMCOR EQUIPMENT |
| 11-3087609 | SHELDRAKE ORGANIZATION, INC |
| 94-3367658 | SILVERADO CONTRACTORS |
| 11-2623234 | SILVERITE CONTRACTING |
| N/A | SIMPSON, GUMPERTZ, & HEGER |
| 36-1785361 | SKIDMORE, OWINGS & MERRILL LLP |
| N/A | STAR DELTA ELECTRIC |
| 22-2857112 | STIER, ANDERSON & MALONE |
| 41-1865379 | SUMMIT STRUCTURES LLC |
| 13-3685103 | TELENET COMMUNICATIONS |
| 62-1211267 | THYSSEN KRUPP ELEVATOR CO. |
| N/A | TOMASETTI GROUP |
| 13-4180006 | TORETTA TRUCKING |
| 13-3917891 | TOTAL SAFETY CONSULTING LLC |
| 13-3579470 | TUCCI EQUIPMENT RENTAL CORP |

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 11-2493726 | TULLY CONSTRUCTION |
| 13-1401980 | TURNER CONSTRUCTION COMPANY |
| 11-3024146 | ULTIMATE DEMOLITION/CS HAULING(JNT VEN) |
| N/A | UNITED STATES REBAR |
| 22-6094782 | VANGUARD EQUIPT RENTALS |
| 22-3490235 | VERTICAL TECHNOLOGIES |
| 13-1881649 | VOLLMER ASSOCIATES |
| 13-2926125 | W HARRIS & SON INC |
| 22-3258053 | WALTER WHITE TRUCKING |
| 13-5475810 | WEEKS MARINE, INC. |
| 13-3140140 | WEIDLINGER ASSOCIATES |
| 13-0394419 | WHITNEY CONTRACTING |
| 11-1501779 | WOLKOW BRAKER ROOFING |
| 22-1619153 | YANNUZZI & SONS, INC |
| 13-2981331 | YONKERS CONTRACTING |
| 13-4171000 | YORK HUNTER CONSTRUCTION , LLC |
| 22-2020762 | ZIEGENFUSS DRILLING |

## SCHEDULE 2
## Underlying Insurance Amounts

### Part A - World Trade Center Clean-Up Project Policies

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| LIBERTY MUTUAL | VARIOUS (AS ISSUED PURSUANT TO WORLD TRADE CENTER EMERGENCY CLEAN-UP PROJECT WRAP-UP INSURANCE PROGRAM) | WORKERS' COMPENSATION | STATUTORY LIMIT | NONE | OTHER STATE'S ENDORSEMENT; U.S.L.&H.; ALTERNATE EMPLOYER ENDORSEMENT |
| | | EMPLOYER'S LIABILITY (AS PART OF WORKERS' COMPENSATION POLICY) | EACH ACCIDENT - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | DISEASE - EACH EMPLOYEE - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | DISEASE - POLICY LIMIT - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | ALL OTHER STATES - EACH ACCIDENT - $1,000,000 | NONE | |

1

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | | | ALL OTHER STATES - DISEASE - EACH EMPLOYEE - $1,000,000 | NONE | |
| | | | ALL OTHER STATES - DISEASE - POLICY LIMIT - $1,000,000 | NONE | |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF THE WORKERS' COMPENSATION POLICY | $500,000 PER OCCURRENCE, EXCEPT OCCUPATIONAL DISEASE WHICH HAS A $500,000 PER PERSON DEDUCTIBLE | NONE | IF AN OCCURRENCE AND/OR CLAIM IS GREATER THAN $46,000,000 IT WILL BE LIBERTY MUTUAL'S RESPONSIBILITY |
| LIBERTY MUTUAL | RG2-621-004607-011 | GENERAL LIABILITY | $2,000,000 COMBINED SINGLE LIMIT | $4,000,000 - GENERAL AGGREGATE  $2,000,000 - COMPLETED OPERATIONS AGGREGATE | ALL LIMITS EXCEPT COMPLETED OPERATIONS ARE ON AN ANNUAL BASIS.  DEFENSE COST IN ADDITION TO POLICY LIMIT - UNLESS AGGREGATE IS EXHAUSTED; 3-YEAR EXTENDED COMPLETED OPERATIONS; |

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF GENERAL LIABILITY POLICY | POLICY LIMIT - $2,000,000 PER OCCURRENCE; DEFENSE FUND - $2,000,000 PER OCCURRENCE | POLICY LIMIT - $4,000,000 GENERAL AGGREGATE; $2,000,000 - PRODUCTS/ COMPLETED OPERATIONS AGGREGATE; DEFENSE FUND - $4,000,000 AGGREGATE | EXCESS OF THE $4,000,000 AGGREGATE WILL BE LIBERTY MUTUAL'S RESPONSIBILITY |
| LLOYD'S/LONDON MARKET | UF72784 | LEAD UMBRELLA | $50,000,000 - EACH OCCURRENCE | $50,000,000 AGGREGATE | FOLLOW FORM; POLICY IS EXCESS OF PRIMARY OR $2,000,000 SELF INSURED RETENTION AS A RESULT OF ANY ONE OCCURRENCE NOT COVERED BY UNDERLYING POLICIES AND/OR $250,000 AS A RESULT OF THE EXHAUSTION OF ANY AGGREGATE LIMIT IN THE UNDERLYING POLICIES; DEFENSE COSTS ARE IN ADDITION |

-3-

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| LLOYD'S/LONDON MARKET | UF7286B | EXCESS LIABILITY | $25,000,000 EXCESS $50,000,000 EXCESS PRIMARY - EACH OCCURRENCE | $25,000,000 EXCESS $50,000,000 EXCESS PRIMARY AGGREGATE COMPLETED OPERATIONS; $25,000,000 EXCESS $50,000,000 AGGREGATE FOR ALL OTHER COVERAGES | FOLLOW FORM; POLICY IS EXCESS OF UNDERLYING POLICIES OR SELF INSURED RETENTION; DEFENSE COST IN ADDITION |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | HF0048 | HULL AND MACHINERY | PER SCHEDULE OF VALUES AS ADVISED BUT NOT EXCEEDING $3,300,000 ANY ONE VESSEL | NONE | AMOUNT OF CARRIER PARTICIPATION 100%; DEDUCTIBLE $50,000 EACH CLAIM |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | HF0728A00 | PRIMARY MARINE LIABILITY | $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE FOR P&I CLAIMS | $2,000,000 AGGREGATE FOR OCCUPATIONAL DISEASE | SECTION #1 - 75.00% PARTICIPATION; SECTION #2 - 75.00% PARTICIPATION; SECTION #3 - 100.00% PARTICIPATION; SECTION #4 - 75.00% PARTICIPATION; SECTION #5 - 75.00% PARTICIPATION; SECTION #6 - 75.00% PARTICIPATION |

-4-

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
|---|---|---|---|---|---|
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | HF9604A006 | | | | SECTION #1 - 19.9275% PARTICIPATION; SECTION #2 - 19.9275% PARTICIPATION; SECTION #3 - 00.00% PARTICIPATION; SECTION #4 - 19.9275% PARTICIPATION; SECTION #5 - 19.9275% PARTICIPATION; SECTION #6 - 19.9275% PARTICIPATION |
| | HF9604A006 | | | | SECTION #1 - 5.07475% PARTICIPATION; SECTION #2 - 5.07475% PARTICIPATION; SECTION #3 - 00.00% PARTICIPATION; SECTION #4 - 5.07475% PARTICIPATION; SECTION #5 - 5.07475% PARTICIPATION; SECTION #6 - 5.07475% PARTICIPATION |

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF TOTAL PRIMARY MARINE LIABILITY PLACEMENT | NONE | $1,435,000 ANNUAL AGGREGATE - ONCE EXHAUSTED, CLAIMS PAYABLE IN FULL WITHOUT DEDUCTIBLE | |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | 02-0923-01 | EXCESS MARINE LIABILITY | $100,000,000 EXCESS OF $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE | NONE | |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | 02-0918-01 | EXCESS MARINE LIABILITY | $400,000,000 EXCESS OF $100,000,000 EXCESS OF $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE | NONE | |
| WATER QUALITY INSURANCE SYNDICATE | 32-23041 | MARINE POLLUTION LIABILITY | SECTION A - OIL POLLUTION - $1,000,000 PER OCCURRENCE | NONE | 100.00% PARTICIPATION |
| | | | SECTION B - HAZARDOUS SUBSTANCES OTHER THAN OIL - $5,000,000 PER OCCURRENCE | NONE | |

## Part B - Fresh Kills Policies

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| ST PAUL FIRE & MARINE | KK03200044 (6/1/2001 - 6/1/2002) | COMMERCIAL AND GENERAL LIABILITY | $1,000,000 PER OCCURRENCE EXCEPT $100,000 FOR FIRE DAMAGE (ANY ONE FIRE) $5,000 FOR MEDICAL EXPENSE (ANY ONE PERSON); $1,000,000 FOR PERSONAL AND ADVERTING INJURY | $2,000,000 GENERAL AGGREGATE (PER PROJECT); $2,000,000 PRODUCTS - COMPLETED OPERATIONS AGGREGATE | BLANKET ADDITIONAL INSURED |
| | | AUTOMOBILE LIABILITY | $1,000,000 COMBINED SINGLE LIMIT | | INCLUDES COVERAGE FOR ANY AUTO, HIRED AUTOS, NON-OWNED AUTOS AND HIRED CAR PHYSICAL DAMAGE |
| | KK04100850 (6/1/2002 - 6/1/2003) | COMMERCIAL AND GENERAL LIABILITY | $1,000,000 PER OCCURRENCE EXCEPT $100,000 FOR FIRE DAMAGE (ANY ONE FIRE) $5,000 FOR MEDICAL EXPENSE (ANY ONE PERSON); $1,000,000 FOR PERSONAL AND ADVERTING INJURY | $2,000,000 GENERAL AGGREGATE (PER PROJECT); $2,000,000 PRODUCTS - COMPLETED OPERATIONS AGGREGATE | BLANKET ADDITIONAL INSURED |
| | | AUTOMOBILE LIABILITY | $1,000,000 COMBINED SINGLE LIMIT | | INCLUDES COVERAGE FOR ANY AUTO, HIRED AUTOS, NON-OWNED AUTOS AND HIRED CAR PHYSICAL DAMAGE |

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| WESTCHESTER FIRE INSURANCE COMPANY | CUA150420 (6/1/2001 - 6/1/2002) | EXCESS LIABILITY | $10,000,000 PER OCCURRENCE WITH A $10,000 RETENTION | | |
| | CUA1511560 (6/1/2002 - 6/1/2003) | EXCESS LIABILITY | $10,000,000 PER OCCURRENCE WITH A $10,000 RETENTION | $10,000,000 AGGREGATE | |
| AMERICAN RISK FUNDING INS. | WCD0100098 WCR0100076 (6/1/2001 - 6/1/2002) | WORKERS COMPENSATION AND EMPLOYERS LIABILITY | STATUTORY LIMITS FOR WORKERS COMPENSATION; FOR EMPLOYERS LIABILITY: $500,000 EACH ACCIDENT $500,000 EACH DISEASE, EACH EMPLOYEE | FOR EMPLOYERS LIABILITY: $500,000 DISEASE POLICY LIMIT | |
| | WCD0200255 WCR0200114 (6/1/2002 - 6/1/2003) | WORKERS COMPENSATION AND EMPLOYERS LIABILITY | STATUTORY LIMITS FOR WORKERS COMPENSATION; FOR EMPLOYERS LIABILITY: $500,000 EACH ACCIDENT $500,000 EACH DISEASE, EACH EMPLOYEE | FOR EMPLOYERS LIABILITY: $500,000 DISEASE POLICY LIMIT | |

8

## SCHEDULE 3

## Payment Trigger Activation Rate

| Policy Year When Acceptance Trigger Activated[1] | Payment Trigger Activation Rate (1) |
|---|---|
| 2003/04 | +50% |
| 2004/05 | +50% |
| 2005/06 | +50% |
| 2006/07 | +50% |
| 2007/08 | +60% |
| 2008/09 | +65% |
| 2009/10 | +70% |
| 2010/11 | +75% |
| 2011/12 | +80% |
| 2012/13 | +85% |
| 2013/14 | +90% |
| 2014/15 | +90% |
| 2015/16 | +90% |
| 2016/17 | +90% |
| 2017/18 | +90% |
| 2018/19 | +90% |
| 2019/20 | +90% |
| 2020/21 | +90% |
| 2021/22 | +90% |
| 2022/23 | +90% |
| 2023/24 | +90% |
| 2024/25 | +90% |
| 2025/26 | +90% |
| 2026/27 | +90% |
| 2027/28 | +90% |

(1)  Each policy year incepts on the month and day of the Issue Date.

1

# EXHIBIT  D

## Part 4 of 4

**EXHIBIT**

**Form of Acknowledgment of Insured**
**(on following page)**


**WTC** WTC CAPTIVE INSURANCE COMPANY, INC.

December 9, 2004

      Re:    WTC Captive Insurance Company, Inc.
               Liability Insurance Policy Number 0001

Dear Sir/Madam:

      Enclosed please find a packet of information concerning the World Trade Center Captive Insurance Company, Inc. (hereinafter "WTC Captive"). The packet includes the insurance policy issued by the WTC Captive, your company's Insured ID number, an Acknowledgement of Additional Named Insured and Claim Notification Instructions. Your company will need these initial materials to understand the WTC Captive and to initiate coverage under the insurance provided by the WTC Captive.

      Shortly after the collapse of the World Trade Center on September 11, 2001, the City of New York (the "City") and four of its major construction contractors began rescue efforts and debris removal at the World Trade Center site. Due to the extraordinary circumstances, the City and its contractors began work without the insurance coverage that normally would have been in place. When subsequent efforts to procure the necessary coverage in the private markets proved unsuccessful, the City and the contractors turned to the Federal Government for help.

      Pursuant to Federal and New York State legislation, the City created a not-for-profit corporation licensed and domiciled as a captive insurance company by the New York State Insurance Department. On December 3, 2004, the WTC Captive received slightly less than $1 billion from the Federal Emergency Management Agency ("FEMA") as premium for a single liability policy (the "Policy"), by which it will insure the City and its approximately 150 contractors and subcontractors (collectively, the "Insureds") on the FEMA-funded debris removal project at the World Trade Center site. The New York State Insurance Department licensed the WTC Captive to conduct the business of insurance in the State of New York effective December 3, 2004.

      The Policy extends coverage retroactive to the beginning of debris removal work on September 11, 2001 (post-collapse of the buildings). The Policy provides general liability, environmental liability, professional liability and marine liability coverage for a wide range of third-party claims against the Insureds. Where the City previously had procured commercial insurance for the debris removal project (notably general/excess liability and marine liability) for the Insureds, the Policy will operate as umbrella excess to those coverages; where the City had not purchased such insurance (notably, environmental and professional liability) for the Insureds, the Policy will provide first-dollar coverage.

      We enclose WTC Captive Policy Number 0001, issued to the City as First Named Insured on December 6, 2004 (the "Policy"). We are sending the Policy to you because your

December 9, 2004
Page 2

company has been identified as a potential Additional Named Insured under the Policy. The WTC Captive will issue only one Policy, numbered 0001, but has identified each potential additional insured with an insured ID number. The cover page to the Policy shows the policy number and your company's insured ID number.

The management of the corporate affairs of the WTC Captive is vested in a Board of Directors. I am the President and Chief Executive Officer. The WTC Captive will conduct business from offices housed at 100 William Street, New York, New York 10038.

The WTC Captive has retained certain service providers to assist the WTC Captive in carrying out its stated function. They include:

| Role | Service Provider/Contact Information |
|------|-------------------------------------|
| Captive Administrator | Marsh Management Services, Inc.<br>300 Broadhollow Road<br>Melville, New York 11747<br>Donna M. Manzo<br>(631) 425-3207<br>Donna.Manzo@Marsh.com |
| Third Party Administrator | GAB Robins<br>123 William Street<br>New York, New York 10038<br>(212) 815-8900<br>Patricia Dern<br>(212) 815-8952<br>dernp@gabrobins.com |
| Corporate/Coverage Counsel | McDermott Will & Emery LLP<br>50 Rockefeller Plaza<br>New York, New York 10020-1605<br>(212) 547-5400<br>Margaret H. Warner<br>(202) 756-8228<br>mwarner@mwe.com |
| Lead Defense Counsel | Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York 10022-4834<br>(212) 906-1200<br>James E. Tyrrell, Jr.<br>(973) 639-7267<br>james.tyrrell@lw.com |

December 9, 2004
Page 3

It is important for you to know that Section 2.01(b) of the Policy states as follows:

> No Person shall have any rights as an Additional Named
> Insured under this Policy until it has submitted a copy of this
> Policy to the Company containing an original, duly executed
> acknowledgment in the form as set forth in the Exhibit
> attached hereto.

The Acknowledgement of Additional Named Insured ("the Acknowledgment"), attached as an Exhibit to the Policy, requires the WTC Captive's Insureds to acknowledge and confirm certain important details relating to each Insured's relationship with the WTC Captive. Accordingly, please read the Acknowledgement closely, execute it immediately before a Notary Public and return the notarized original with a copy of the Policy to the following address:

WTC Captive Insurance Company, Inc.
c/o Marsh Management Services, Inc.
300 Broadhollow Road
Melville, New York 11747

The WTC Captive intends to provide all its insureds with a vigorous and unified defense of all claims potentially covered under the Policy. The WTC Captive intends also to preserve the assets of the WTC Captive for the protection of its insureds and the payment of valid third-party claims. The WTC Captive has engaged Latham & Watkins to serve as unitary defense counsel for all such claims. Latham & Watkins is recognized nationally as a leading law firm in the area of toxic tort liability cases.

Section 1.52 of the Policy states that "Pre-Existing Claim shall mean a Claim asserted against an Insured prior to the Issue Date of this Policy." The WTC Captive is aware that many of its Insureds currently have claims and/or lawsuits related to their debris removal work pending against them. The WTC Captive will assume the defense of any Pre-Existing Claims or lawsuits against its Insureds that come within the coverage extended under the Policy. We encourage you to send all pending World Trade Center Site-related claims (as defined in Section 1.82 of the Policy) to the WTC Captive so that a coverage determination may be made and, if appropriate, the defense may be transferred to the WTC Captive. Please send all Pre-Existing Claims to GAB Robins as noted in the enclosed Claim Notification Instructions. We have included in this packet information on how to report both pre-existing and new claims.

Upon receipt of your Acknowledgment, and your tender of one or more claims potentially covered under the Policy, we will advise you of the WTC Captive's coverage position for each tendered claim. For each claim where coverage potentially exists, the WTC Captive will assign your defense to Latham & Watkins. Latham & Watkins will submit an engagement letter to you.

December 9, 2004
Page 4

     Should you have any questions regarding this letter, the WTC Captive, or the Policy, please do not hesitate to contact Christine LaSala at (212) 873-5095 or Margaret Warner at (202) 756-8228.

     We look forward to working with you.

                      Sincerely,

                      Christine LaSala
                      President, WTC Captive Insurance Company, Inc.

Enclosures

## ACKNOWLEDGMENT OF ADDITIONAL NAMED INSURED

### (the "Acknowledgment")

As a condition precedent to having any rights under the Liability Insurance Policy No. 0001 (the "Policy") issued by the WTC Captive Insurance Company, Inc. (the "Company"), the Additional Named Insured set forth below (the "Acknowledging Party") hereby acknowledges and confirms that:

(1)  the Acknowledging Party has read, understood, accepted and agreed to all of the terms and conditions of the Policy, including, but not limited to, all of the Company's rights and all of the limitations on the Company's obligations set forth therein, including, but not limited to, Section 8 (Partial Termination of Coverage by First Named Insured), Section 9 (Submission and Payment of Claims and Suits; Appointment of Counsel), Section 10 (Non-Acceptance of Claims), Section 11 (Reduced Claim Payments) and Section 12 (Policy Term and Related Matters) of the Policy; and

(2)  the Acknowledging Party hereby gives its prior approval, should any such approval be required by law, to the Company's reinsuring any of its obligations under the Policy by entering into any reinsurance agreement and/or assumption reinsurance agreement and/or any similar agreement at any time whatsoever; and

(3)  the Acknowledging Party hereby agrees that the Company may contact the Acknowledging Party for any purpose relating to this Policy at the address listed below (unless the Acknowledging Party has previously provided the Company with written notice of a new address) and that notice by the Company sent to such address shall be deemed adequate for all purposes.

The Acknowledging Party represents and warrants that:

(1)     it has the requisite power and authority to enter into this Acknowledgment;

(2)     the execution and delivery by the Acknowledging Party of this Acknowledgment have been duly authorized; and

(3)     this Acknowledgment, when duly executed and delivered by the Acknowledging Party, will be a valid and binding obligation of the Acknowledging Party, enforceable against the Acknowledging Party, its permitted successors and assigns, in accordance with its terms.

IN WITNESS WHEREOF, the Additional Named Insured has caused this Acknowledgment to be executed by its duly authorized representative.

[NAME OF ADDITIONAL NAMED INSURED]
[ADDRESS]

Attest:
By:                                                          By: _____
Typed Name:                                         Typed Name: _____
Title: [If corporation, Secretary]           Title: _____
Date:                                                       Date: _____

Personally appeared before me the above named _____ personally known to me, who being duly sworn, deposes and says that he/she executed the above instrument and that the statements contained therein are true and correct to the best of his/her knowledge and belief.

Subscribed and sworn to before me this _____ day of _____, 20__.

_____
(Notary Public)

NOTARY
SEAL

-2-

Notary Public Authorized by State of _____
to administer oaths.  My commission expires _____

-4-

NYB 561100.33 09566 00128 9/7/2004



# WTC CAPTIVE INSURANCE COMPANY, INC.

### Claim Notification Instructions[1]

To All Insureds:

All claim documents (legal papers, demand letters, etc.) received by Insureds pertaining to new and pre-existing claims should be sent to GAB Robins as soon as practicable.  File transfer arrangements for pre-existing claims will be made shortly after notice is received by GAB Robins.  Please mail or fax to:

**GAB ROBINS NORTH AMERICA**
**123 William Street**
**15th Floor**
**New York, NY. 10038**
**Phone:  1-866-226-4343 or Fax:  212-267-3597**

**Attention: Patricia Dern, Claims Manager**
**WTC Captive Insurance Company, Inc.**
**Direct Line:  212-815-8952**
**E-mail:  dernp@gabrobins.com**

**Alternate Contact:  Kathleen Kross, Supervisor**
**Direct Line:  212 815 8937**
**E Mail:  krossk@gabrobins.com**

Please report new claims in one of the following manners:

1. Written ~~notice~~ provided to GAB Robins at the address set forth above.

2. Claims can be reported via the web.  The dedicated web reporting claim site is:

## www.wtcclaim.org

---

[1]     This information is provided to facilitate notice of claims as required by the Policy, and does not amend or alter the terms of the Policy.  Please consult the Policy to determine the applicable notice requirements.

If you have any questions regarding these instructions or any other matter pertaining to actual or potential claims, you may contact us through the GAB Robins Call Center via this exclusive telephone number:

**To speak to a live operator the number is:**

## 1-877-WTC-Claim



# EXHIBIT E

*State of New York* }
*Department of State* }  *ss:*

*I hereby certify that the annexed copy has been compared with the original document filed by the Department of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*

**July 09, 2004**



*Secretary of State*

DOS-200 (Rev. 03/02)

F040701000635

# CERTIFICATE OF INCORPORATION

## OF

## WTC CAPTIVE INSURANCE COMPANY, INC.

Under Section 402 of the Not-For-Profit Corporation Law

FIRST: The name of the Company shall be WTC Captive Insurance Company, Inc. (the "Company").

SECOND: The Company is a corporation as defined in Section 102(a)(5) of the Not-for-Profit Corporation Law. The office of the Company shall be located in the County of New York, State of New York. For the purposes of Section 7003(b)(3) of the Insurance Law of the State of New York, this office shall be deemed to be the principal office of the Company.

THIRD: The purpose for which the Company is formed is to provide insurance on an occurrence basis for events occurring on or after September 11, 2001 for liabilities incurred by the City of New York and its affiliated companies (as that term is defined in Section 7002(a) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003) related to or arising out of activities in or near the World Trade Center site in response to the attacks of September 11, 2001. The Company is a pure captive insurance company formed by the City of New York as a not-for-profit corporation pursuant to Section 7005(a)(3) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003. The Company shall insure the City of New York and the contractors, subcontractors and consultants of any tier of the City of New York (such contractors, subcontractors and consultants being hereinafter referred to collectively as the "Contractors"), as additional named insureds, for liability related to or arising out of activities in or near the World Trade Center site in response to the attacks of September 11, 2001. The Company shall be

*1*

subject to such other restrictions and limitations, if any, as may be provided in the Insurance

Law, the Not-for-Profit Corporation Law and in any other applicable law with respect to pure

captive insurance companies formed as not-for-profit corporations pursuant to

Section 7005(a)(3) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003.

Subject to such restrictions and limitations, the kinds of insurance businesses to be transacted by

the Company are those kinds of business specified in paragraph 13, 14, 19 and 20 of

Section 1113(a) of the Insurance Law of the State of New York as follows:

"Personal injury liability insurance," as authorized by paragraph (13) of Section 1113(a)

of the Insurance Law of the State of New York, meaning insurance against legal liability of the

insured, and against loss, damage or expense incident to a claim of such liability (including the

insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons,

and funeral and death benefits to dependents, beneficiaries or personal representatives of persons

who are killed, irrespective of legal liability of the insured), arising out of death or injury of any

person, or arising out of injury to the economic interests of any person, as the result of

negligence in rendering expert, fiduciary or professional service, but excluding any kind of

insurance specified in paragraph fifteen of Section 1113(a) of the Insurance Law of the State of

New York except insurance to protect an insured against liability for indemnification or

contribution to a third party held responsible for injury to the insured's employee arising out of

and in the course of employment when such insurance is written pursuant to paragraph (13) and

not written pursuant to paragraph fifteen of said Section 1113(a).

"Property damage liability insurance," as authorized by paragraph (14) of Section 1113(a)

of the Insurance Law of the State of New York, meaning insurance against legal liability of the

2

insured, and against loss, damage or expense incident to a claim of such liability, arising out of the loss or destruction of, or damage to, the property of any other person, but not including any kind of insurance specified in paragraph thirteen or fifteen of subsection (a) of Section 1113 of the New York Insurance Law.

"Motor vehicle and aircraft physical damage insurance," as authorized by paragraph (19) of Section 1113(a) of the Insurance Law of the State of New York, meaning insurance against loss of or damage to motor vehicles or aircraft and their equipment resulting from any cause; and insurance reimbursing a driver for costs including replacement car rental, commercial transportation and accommodations resulting from an automobile accident or mechanical breakdown occurring fifty miles or more from the driver's principal place of residence or garaging.

"Marine and inland marine insurance," as authorized by paragraph (20) of Section 1113(a) of the Insurance Law of the State of New York, meaning insurance against any and all kinds of loss of or damage to: (A) vessels, hulls, craft, aircraft, cars, automobiles, trailers and vehicles of every kind, and all goods, freights, cargoes, merchandise, effects, disbursement, profits, moneys, bullion, precious stones, securities, choses in action, evidences of debt, valuable papers, bottomry and respondentia interests and all other kinds of property and interests therein, in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on or under any seas or other waters, on land or in the air, or while being assembled, packed, crated, baled, compressed or similarly prepared for shipment or while awaiting the same or during any delays, storage, transshipment, or reshipment incident thereto, including marine builder's risks and all personal property floater risks;

3

(B) person or property in connection with or appertaining to marine, inland marine, transit or transportation insurance, including liability for loss of or damage to either, arising out of or in connection with the construction, repair, operation, maintenance or use of the subject matter of such insurance (but not including life insurance or surety bonds nor insurance against loss by reason of bodily injury to the person arising out of ownership, maintenance or use of automobiles); (C) precious stones, jewels, jewelry, gold, silver and other precious metals, whether used in business or trade or otherwise and whether the same be in course of transportation or otherwise; and (D) bridges, tunnels and other instrumentalities of transportation and communication (excluding buildings, their improvements and betterments, furniture and furnishings, fixed content and supplies held in storage), including auxiliary facilities and equipment attendant thereto; piers, wharves, docks and slips; other aids to navigation and transportation, including dry docks and marine railways; but not including insurance of vessels, crafts, their cargoes, marine builders' risks, or other similar risks, commonly insured only under ocean marine insurance policies;

and any amendments to such paragraphs or provisions in substitution therefor which may be hereafter adopted; and such other kind or kinds of business to the extent necessary or properly incidental to the kind or kinds of insurance business which the Company is authorized to do.

The Company shall also have all other rights, powers, and privileges now or hereafter authorized or granted by the Not-For-Profit Corporation Law and by the Insurance Law of the State of New York or any other law or laws of the State of New York relating to not-for-profit pure captive insurance companies having the power to do the kind or kinds of business hereinabove referred to on a not-for-profit basis and any and all other rights, powers, and privileges of a Company now or hereafter granted by the laws of the State of New York and not

prohibited to such not-for-profit pure captive insurance companies. Subject to such restrictions and limitations, if any, as may be provided in any applicable law with respect to pure captive insurance companies formed as not-for-profit corporations pursuant to Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188 of the Laws of 2003, the Company may be a partner in any not-for-profit enterprise which the Company would have the power to conduct itself, to the extent authorized by Article 70 of the Insurance Law of the State of New York.

In furtherance of the foregoing purposes, the Company shall have all the general powers enumerated in Section 202 of the Not-for-Profit Corporation Law and such other powers as are now or hereafter permitted by law for a corporation organized for the foregoing purposes, including, without limitation, the power to maintain a fund or funds of real and/or personal property in furtherance of such purposes. Subject to such restrictions and limitations, if any, as may be provided in any applicable law with respect to pure captive insurance companies formed as not-for-profit corporations pursuant to Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188 of the Laws of 2003, the Company shall have the power to reinsure its insurance obligations by entering into indemnity reinsurance or assumption reinsurance agreements or other similar agreements at any time.

FOURTH: The Company shall be a Type D corporation pursuant to Section 201 of the Not-For-Profit Corporation Law; formation of the Company as a not-for-profit corporation is authorized by Section 7005(a)(3) of the Insurance Laws, as amended by Chapter 188 of the Laws of 2003.



FIFTH:  (a)  The Board of Directors shall consist of five directors.  All directors of the Company shall be appointed annually by the Mayor of the City of New York prior to the Company's annual meeting; provided, however, that one of such directors shall be appointed by the Mayor upon nomination of a person, which person shall be acceptable to the Mayor, in his sole discretion, by the Representative of the Contractors (as selected in accordance with paragraph (d) of this Article FIFTH); provided, further, that in the event a nominee is not acceptable to the Mayor, the Representative, on behalf of the Contractors, shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor.  Each year, immediately following the beginning of the Company's fiscal year, the Mayor shall be notified in writing by the President of the Company of the requirement to make the annual appointments to the Board of Directors of the Company.  Directors shall succeed to office at the next annual meeting of the Board of Directors following their appointment.

(b)  Each director shall be an employee, former employee or employee-on-leave of the City of New York or a person experienced in the insurance, construction, financial, professional, or other business or governmental communities of the City of New York.  Each director shall be at least eighteen years of age and a citizen of the United States.  At least two (2) of the directors shall be residents of New York State.

(c)  The Mayor may appoint an alternate for each director, which alternate, upon written notice to the Secretary, may attend meetings and exercise therein all the rights, powers, and privileges of the absent director; provided that in the event an alternate for the director nominated on behalf of the Contractors is nominated by the Representative thereof, such alternate, if acceptable to the Mayor in his sole discretion, shall be appointed by the Mayor; provided, further, that in the event such nominee is not acceptable to the Mayor, the

*6*

Representative of the Contractors shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor.

(d) The Representative of the Contractors shall be selected by a simple majority of the following: AMEC plc, Bovis Lend Lease, Tully Construction Co. Inc. and Turner Construction Company. This selection, and any replacement thereof, shall be transmitted in writing to the Mayor.

(e) The Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, U.S. Department of Homeland Security ("FEMA"), the New York State Emergency Management Office ("NYSEMO") and the New York State Insurance Department ("NYSID") shall have the right to designate one person to attend each meeting of the Board of Directors as an observer. FEMA, NYSEMO and NYSID shall receive notice of each such meeting in accordance with the procedures set forth in the bylaws and shall be provided with copies of the minutes of each such meeting.

SIXTH: Vacancies in the Board of Directors as a result of removal, resignation or otherwise shall be filled by action of the Mayor of the City of New York, as soon as practicable; provided, however, that in the event that the vacant position is that of the director nominated by the Representative of the Contractors, the replacement director for such position shall be appointed by the Mayor upon nomination by the Representative in accordance with the procedures set forth in Article FIFTH hereof.

SEVENTH: Any director may be removed at any time with or without cause and with or without notice by the Mayor of the City of New York, provided, however, that in the event the removed director was a nominee of the Contractors, the Representative of the Contractors shall

7

have the right to select additional nominees to replace the removed director until a nominee is

deemed acceptable to the Mayor.

EIGHTH:  The names and post office residence addresses of the initial Board of

Directors are:

| Name | Address |
|------|---------|
| Andrew M. Alper | New York City Economic Development Corporation 110 William Street New York, NY  10038 |
| Jeffrey D. Friedlander | New York City Law Department Office of the Corporation Counsel 100 Church Street New York, NY  10007 |
| Mark Page | New York City Office of Management and Budget 75 Park Place New York, NY  10007 |
| Phyllis Taylor | New York City Office of the Comptroller 1 Centre Street New York, NY  10007 |
| Michael M. Feigin | Bovis Lend Lease 200 Park Avenue New York, NY  10176 |

NINTH:  (a)  (i) The Board of Directors, by resolution adopted by a majority of the entire

Board of Directors, shall create a standing advisory committee (the "Advisory Committee").  The

Advisory Committee shall consist of three (3) members.  One member shall be a director (or

designee of a director) nominated by the City of New York, one member shall be the director (or

designee of the director) nominated by the Representative of the Contractors, and the third

8

member shall be a person with substantial expertise in the insurance industry who shall be nominated jointly by the other two designees.

(ii)    The Advisory Committee may make recommendations with respect to the protocols to be followed by the third party claims administrator engaged by the Company, including implementation and modification of such protocols. Such recommendations shall not be binding on the Board of Directors. In addition, the Advisory Committee shall consider claims disputes referred to the Board of Directors by the third party administrator and the Advisory Committee shall forward a recommendation with respect to each dispute to the Board of Directors. The recommendation of the Advisory Committee shall not be binding on the Board of Directors. If, after review of the recommendation of the Advisory Committee, the Board of Directors disagrees with the recommendation of the Advisory Committee and there is still a dispute with respect to such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under New York law pursuant to the rules of the American Arbitration Association. The decision rendered upon such arbitration shall be binding on the Board of Directors and the Company.

(iii)    In addition, the Advisory Committee may consider whether the Company has taken, or is about to take, action that is inconsistent with its material obligations, responsibilities or rights under the Policy and By-laws and, if the Advisory Committee has a concern in this regard, it may request a prompt meeting with the President to discuss this concern, which the President must attend within ten (10) days of such request (or such later time as they may agree to). If, ten (10) or more days following its meeting with the President (or immediately if the President expressly refuses to consider the issue or does not attend the meeting), the Advisory Committee continues to have such concern, it may, if it deems

9

appropriate, make a recommendation relating thereto to the Board of Directors. The

recommendation of the Advisory Committee shall not be binding on the Board of Directors. If,

forty-five days after receiving the recommendation of the Advisory Committee, the Board of

Directors disagrees with the recommendation of the Advisory Committee or fails to address its

concerns and the Advisory Committee so requests, the issue will be referred to an arbitration to

be conducted under New York law pursuant to the rules of the American Arbitration

Association. The Company shall provide written notice to FEMA, NYSEMO and NYSID within

five (5) Business Days after any request of the Advisory Committee for referral of an issue to

arbitration. Such arbitration shall be limited to the questions of (1) whether the issue at hand

constitutes a material obligation, responsibility or right under the Policy and By-laws; and, if so,

(2) whether the Board of Directors' action, or pending or proposed action, is reasonable and in

accordance with such material obligations, responsibilities or rights. If the arbitrators reach the

second issue and answer it in the negative, they shall refer such finding to the Board of Directors

for action not inconsistent with such negative answer.

      (iv)    Under no circumstances shall actions taken under this Article NINTH

subsection (a) cause the Board of Directors or the Company to delay action on any matter it

reasonably believes is necessary to protect the interests of the Company.

      (b)    The Board of Directors, by a resolution adopted by a majority of the entire Board

of Directors, shall create a standing audit committee (the "Audit Committee") consisting of three

(3) members who are directors of the Company. To the extent possible, the Board of Directors

shall endeavor to select members of the Audit Committee who possess substantial financial or

accounting experience and expertise. The Audit Committee's primary duties and responsibilities

shall be to (i) monitor the integrity of the Company's financial reporting process regarding

10

finance, accounting, regulatory and legal compliance; (ii) monitor the qualifications of the

Company's independent auditors; (iii) monitor the Company's internal audit functions; and (iv)

provide an avenue of communication among the independent auditors, management and the

Board of Directors.

(c)    The Board of Directors, by resolution adopted by a majority of the entire Board of

Directors, may designate such other committees as it may deem appropriate from time to time.

(d)    A quorum for each of the Advisory Committee and the Audit Committee shall be

two (2) directors. Each such committee shall serve at the pleasure of the Board of Directors.

TENTH:  The Secretary of State of the State of New York is designated as agent of the

Company upon whom process against it may be served.  The address within or without this state

to which the Secretary of State shall mail a copy of any process accepted on behalf of the

Company is:

> c/o CT Corporation System
> 111 Eighth Avenue
> New York, NY  10011

ELEVENTH:  Pursuant to Section 7003 (b)(5) of the New York Insurance Law, the

Superintendent of Insurance of the State of New York is designated as agent of the Company

upon whom process against it may be served.  The address within or without this state to which

the Superintendent of Insurance shall mail a copy of any process accepted on behalf of the

Company is:

> c/o CT Corporation System
> 111 Eighth Avenue
> New York, NY  10011

11

TWELFTH:  The name and address in this state of the registered agent upon whom

process against the Company may be served is:

        CT Corporation System
        111 Eighth Avenue
        New York, NY  10011

THIRTEENTH:  This Certificate of Incorporation may be amended at any time in

accordance with the provisions of Article 8 of the Not-For-Profit Corporation Law as the same

may be amended from time to time; provided, however, that the Company shall provide written

notice to FEMA at least thirty (30) days prior to any such amendment.

FOURTEENTH:  It is intended that the Company be free from Federal taxes as an

integral part of the City of New York within the meaning of G.C.M. 14407, XIV-1 C.B. 103

(1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States

Internal Revenue Code of 1986, as amended.  This Certificate of Incorporation shall be construed

accordingly, and the Company's activities shall be limited accordingly; provided, however, that

nothing in this Article FOURTEENTH shall cause this Certificate of Incorporation to be

construed in a manner that is inconsistent with any applicable provision of the Not-for Profit

Corporation Law of the State of New York or Insurance Law of the State of New York, and

provided further that nothing in this Article Fourteenth shall be construed as permitting the

Company to engage in any activity in which a pure captive insurance company formed as a not-

for profit corporation pursuant to Section 7005(a)(3) of the Insurance Law (as amended by

Chapter 188 of the Laws of 2003) is not permitted to engage.

FIFTEENTH:  (a)  The Company shall issue an occurrence basis, liability insurance

policy (the "Policy") to the City of New York as the named insured and, subject to such



restrictions and limitations, if any, as may be provided in any applicable law with respect to pure

captive insurance companies formed as not-for-profit corporations pursuant to

Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188

of the Laws of 2003, the Contractors as additional named insureds, with an effective date being

the beginning of Debris Removal (as defined in the Policy) on the World Trade Center Site (as

defined in the Policy) on September 11, 2001 (post-collapse of the World Trade Center).

(b)     Given that the funds from which the Company will make payments are limited to

funds received pursuant to the Policy and investment income earned on such funds, the Policy,

under certain circumstances, (i) will limit (A) claims that will be accepted under Policy and (B)

the percentage of the value of individual claims and related expenses to be paid under the Policy

and (ii) will be subject to termination pursuant to the Policy.

SIXTEENTH:  No party providing substantial services to the Company shall be an

affiliate of or related to the City of New York or the Contractors.  In addition, (a) the third party

administrator and the captive management company shall not be an affiliate of or related to one

another and (b) the third party administrator and panel counsel shall not be an affiliate of or

related to one another.

SEVENTEENTH:  As provided, in Section 7005(a) of the New York Insurance Law,

neither the Mayor of the City of New York nor any of the officers, directors, employees or

agents appointed by or with the approval of the City of New York, nor any officials, officers,

employees or agents of the City of New York, while acting within the scope of their authority

shall be subject to any personal liability resulting from the exercise or carrying out of any of the

13

City of New York's or the Company's purposes or powers under Article 70 of the New York

Insurance Law.

14

IN WITNESS WHEREOF this Certificate of Incorporation has been signed this 24th day

of June, 2004.

Name of Incorporator: (typed)  P. Bruce Wright, Esq.

Signature of Incorporator: _P Bruce Wright_

Address of Incorporator:  c/o LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY  10019

15



**STATE OF NEW YORK**
**INSURANCE DEPARTMENT**
ONE COMMERCE PLAZA
ALBANY, NEW YORK  12257

George E. Pataki
Governor

Gregory V. Serio
Superintendent

February 24, 2004

P. Bruce Wright, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY  10019-5389

Re:  WTC Captive Insurance Company, Inc.

Dear Mr. Wright:

In reply to your recent inquiry, you are hereby advised that this Department consents to the use of the name WTC Captive Insurance Company, Inc. in New York, pursuant to Section 301(a)(5)(B) of the Not-For-Profit Corporation Law.  The Department also consents to formation of this entity as a not-for-profit captive insurance company, in accordance with the provisions of Insurance Law Article 70, as amended by the laws of 2003.



Very truly yours,

Patrick M. Harrigan
Associate Attorney
Office of General Counsel
(518) 474-6623

http://www.ins.state.ny.us

16

F 0 4 0 7 0 1 0 0 0 635

# CERTIFICATE OF INCORPORATION

## OF

## WTC CAPTIVE INSURANCE COMPANY, INC.

Under Section 402 of the Not-For-Profit Corporation Law

Filed by: P. Bruce Wright, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, New York 10019

bcc

STATE OF NEW YORK
DEPARTMENT OF STATE

JUL 0 1 2004

FILED
TAX $
BY:

RECEIVED
2004 JUL -1 PH 12: 31

0 4 0 7 0 1 0 0 0 699

17

2004 JUL -1 PH 4: 17

# EXHIBIT F

BYLAWS

OF

**WTC CAPTIVE INSURANCE COMPANY, INC.**

## TABLE OF CONTENTS

Page

ARTICLE I.        OFFICES .................................................................................................. 1

ARTICLE II.       MEMBERSHIP ........................................................................................ 1

ARTICLE III.      DIRECTORS ............................................................................................ 1
     Section 1.    Management of Corporate Affairs ........................................................ 1
     Section 2.    Number of Directors .............................................................................. 1
     Section 3.    Appointment of Directors; Qualifications ............................................ 1
     Section 4.    Term ....................................................................................................... 3
     Section 5.    Resignation ............................................................................................ 3
     Section 6.    Removal of Director .............................................................................. 3
     Section 7.    Vacancies ............................................................................................... 3
     Section 8.    Meeting of Directors ............................................................................. 4
     Section 9.    Notice of Meetings of Directors; Waiver of Notice ............................. 4
     Section 10.   Action by Board of Directors Without a Meeting ................................ 5
     Section 11.   Meetings by Conference Call ............................................................... 5
     Section 12.   Quorum and Vote of Directors ............................................................. 5
     Section 13.   Procedure ............................................................................................... 6
     Section 14.   Compensation of Directors ................................................................... 6
     Section 15.   Director Questionnaire .......................................................................... 6
     Section 16.   Observer Status ..................................................................................... 6

ARTICLE IV.       COMMITTEES ......................................................................................... 7
     Section 1.    Committees ............................................................................................ 7
     Section 2.    Meeting of Committees ......................................................................... 9
     Section 3.    Authorization ......................................................................................... 10
     Section 4.    Minutes of Committee Meetings ........................................................... 10
     Section 5.    Action Without a Meeting; Conference Call Meetings ........................ 10

ARTICLE V.        OFFICERS ............................................................................................... 11
     Section 1.    Officers .................................................................................................. 11
     Section 2.    Term of Office ....................................................................................... 12
     Section 3.    President ................................................................................................ 12
     Section 4.    Secretary and Assistant Secretary ........................................................ 12
     Section 5.    Treasurer and Assistant Treasurer ........................................................ 13
     Section 6.    Vice Presidents ..................................................................................... 13
     Section 7.    Removal ................................................................................................. 14
     Section 8.    Compensation of Officers ..................................................................... 14
     Section 9.    Bonds ..................................................................................................... 14
     Section 10.   Execution of Contracts, Deeds, Leases and Other Agreements ........... 14
     Section 11.   Execution of Checks, Notes, Drafts and Other Negotiable Instruments ............. 15
     Section 12.   Service Providers .................................................................................. 15

i

ARTICLE VI.          INSURANCE POLICY ................................................................ 15

ARTICLE VII.         FINANCES AND RECORDS ................................................... 16
    Section 1.      Finances ........................................................................ 16
    Section 2.      Fiscal Year ..................................................................... 16
    Section 3.      Keeping and Inspection of Records ............................... 16

ARTICLE VIII.        MISCELLANEOUS ................................................................ 17
    Section 1.      Form of Corporate Seal .................................................. 17
    Section 2.      Indemnification of Directors, Officers and Employees ........ 17
    Section 3.      Grant Agreement ........................................................... 18
    Section 4.      Conflicts of Interest ...................................................... 18
    Section 5.      Reimbursement of Expenses .......................................... 19
    Section 6.      Reinsurance .................................................................. 19
    Section 7.      The Mayor ..................................................................... 19
    Section 8.      Amendment of Bylaws ................................................... 19

ii

## ARTICLE I.

### OFFICES

The office of the Corporation shall be in the County of New York, State of New York, at such place as the Board of Directors may fix.

## ARTICLE II.

### MEMBERSHIP

The Corporation shall have one member, which member shall be the City of New York.

## ARTICLE III.

### DIRECTORS

Section 1.    Management of Corporate Affairs.  The general management of the affairs and property of the Corporation shall be vested in its Board of Directors.  The Board of Directors shall have the power to employ necessary staff and other personnel, authorize expenditures and take all necessary and proper steps to carry out the purposes of the Corporation and to promote its best interests.  The Corporation, through its Board of Directors and its various Committees, shall act impartially and without prejudice in administering the affairs of the Corporation, including the Policy (as hereinafter defined).

Section 2.    Number of Directors.  The Board of Directors of the Corporation shall consist of five (5) directors.

Section 3.    Appointment of Directors; Qualifications.  (a)  All directors of the Corporation shall be appointed annually by the Mayor of the City of New York prior to the Corporation's annual meeting; provided, however, that one of such directors shall be appointed by the Mayor upon nomination of a person, which person shall be acceptable to the Mayor, in his sole discretion, by the Representative (as defined in Section 3(d) of this Article III) of those entities

constituting Additional Named Insureds (the "Contractors") under the insurance policy issued by the Corporation to the City of New York as set forth in Article VI of these bylaws; provided, further, that in the event a nominee is not acceptable to the Mayor, the Representative, on behalf of the Contractors, shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor. Each year, immediately following the beginning of the Corporation's fiscal year, the Mayor shall be notified in writing by the President of the Corporation of the requirement to make the annual appointments to the Board of Directors of the Corporation. Directors shall succeed to office at the next annual meeting of the Board of Directors following their appointment.

(b)    Each director shall be an employee, former employee or employee-on-leave of the City of New York or a person experienced in the insurance, construction, financial, professional, or other business or governmental communities of the City of New York. Each director shall be at least eighteen years of age and a citizen of the United States. At least two (2) of the directors shall be residents of New York State.

(c)    The Mayor may appoint an alternate for each director, which alternate, upon written notice to the Secretary, may attend meetings and exercise therein all the rights, powers, and privileges of the absent director; provided that in the event an alternate for the director nominated on behalf of the Contractors is nominated by the Representative thereof, such alternate, if acceptable to the Mayor in his sole discretion, shall be appointed by the Mayor; provided, further, that in the event such nominee is not acceptable to the Mayor, the Representative of the Contractors shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor. For purposes of these bylaws, any alternate director, when acting in the capacity of a director, shall be considered a director.

2

(d)     The Representative of the Contractors shall be selected by a simple majority of the following:  AMEC plc, Bovis Lend Lease, Tully Construction Co., Inc. and Turner Construction Company.  This selection, and any replacement thereof, shall be transmitted in writing to the Mayor.

Section 4.     Term.  Each director shall serve as such for a term of one (1) year and until the appointment and qualification of his/her successor or until his/her prior resignation, removal or demise.

Section 5.     Resignation.  Any director may resign at any time by giving his/her written notice of resignation to the chairperson or President.  Unless otherwise specified in said notice, such resignation shall take effect upon receipt and the acceptance of such resignation shall not be necessary to make it effective.  If the chairperson or President receives such notice, he/she shall inform the other directors of the Corporation of such resignation as soon as possible after receiving such notice, though failure to do so shall not affect the effectiveness of such resignation.

Section 6.     Removal of Director.  Any director may be removed at any time with or without cause and with or without notice by the Mayor of the City of New York, provided, however, that in the event the removed director was a nominee of the Contractors, the Representative of the Contractors shall have the right to select additional nominees to replace the removed director until a nominee is deemed acceptable to the Mayor.

Section 7.     Vacancies.  Vacancies in the Board of Directors as a result of removal, resignation or otherwise shall be filled by action of the Mayor of the City of New York, as soon as practicable; provided, however, that in the event that the vacant position is that of the director nominated by the Representative of the Contractors, the replacement director for such position shall be appointed by the Mayor upon nomination by the Representative in accordance

3

with the procedures set forth in <u>Section 3</u> of this <u>Article III</u> including, without limitation, the provisos at the end of <u>Section 3(a)</u>.

      Section 8.    <u>Meeting of Directors</u>. (a) The Board of Directors shall hold at least three (3) regular meetings (in addition to the annual meeting) each fiscal year. Regular meetings of the Board of Directors shall be held at such time and place within or without the State of New York as the Board of Directors or the President may from time to time prescribe; <u>provided</u>, that at least one meeting per year be held in the State of New York.

      (b)    The annual meeting of the Board of Directors shall be held at a location to be fixed by the Board of Directors.

      (c)    Special meetings of the Board of Directors, other than those regulated by statute, shall be called by the chairperson or the President, or by either at the request in writing of at least a quorum of directors. The chairperson or President shall fix the time and place for such meeting and give notice as required by <u>Section 9</u> of this <u>Article III</u>.

      Section 9.    <u>Notice of Meetings of Directors; Waiver of Notice</u>. (a) Regular meetings of the Board of Directors may be held without notice if the Board of Directors fixes the time and place of such regular meetings by resolution. For regular meetings of the Board of Directors whose time and place has not been fixed in advance by the Board of Directors, and for special meetings, written notice of each such meeting of the Board of Directors stating the time and place and, in the case of a special meeting, the purpose thereof and by or at whose direction the special meeting is called, shall be provided to each member of the Board of Directors.

      (b)    Any such notice shall be given by delivery in person, by facsimile, by e-mail or by first class mail, postage prepaid, not less than ten (10) Business Days before such meeting. In addition, each director and alternate shall receive a telephone call or a written or voicemail message

regarding each such meeting. The term "Business Day" shall mean any day other than a Saturday or Sunday or any legal holiday of the City of New York or the State of New York. Each such notice shall be directed to each director and each alternate at his/her address as it appears on the record of directors of the Corporation, or, if such director shall have filed with the Secretary a written request that notices to him/her be mailed to some other address, then directed to such director or alternate at such other address.

(c)    The notice of any meeting of the Board of Directors may be waived by a director before or after such meeting by signing a written waiver of notice or by attending such meeting without protesting prior thereto or at its commencement, the lack of notice to him/her. No notice need be given of any adjourned meeting. Meetings of the Board of Directors may also be held at any place and time without notice by unanimous written consent of all the directors.

Section 10.    Action by Board of Directors Without a Meeting.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all the members of the Board of Directors consent in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto shall be filed with minutes of the proceedings of the Board of Directors.

Section 11.    Meetings by Conference Call.  Directors may participate in meetings of the Board of Directors by means of telephone conference or similar equipment which allows all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at such a meeting.

Section 12.    Quorum and Vote of Directors.  (a)  A meeting of the Board of Directors duly called shall not be deemed organized for the transaction of business unless a quorum is present. A quorum for the transaction of business or of any specified item of business shall

5

consist of three (3) directors.  If a quorum is not present, a majority of the directors present may

adjourn the meeting from time to time to such time and place as they may determine, without

notice other than announcement at the meeting.  Once a quorum is present to organize a meeting, it

is not broken by the subsequent withdrawal of any directors.

      (b)     Except as otherwise provided by law or by these bylaws, the vote of a

majority of the directors present at a meeting at which a quorum is present shall be the act of the

Board of Directors.

      Section 13.    <u>Procedure</u>.  The order of business and all other matters of procedure

at every meeting of the Board of Directors shall be determined by the presiding officer.

      Section 14.    <u>Compensation of Directors</u>.  Directors of the Corporation, as such,

shall receive no compensation from the Corporation; <u>provided, however,</u> that directors shall be

reimbursed by the Corporation for reasonable out-of-pocket expenses incurred in connection with

service as a director of the Corporation.  Nothing herein contained shall be construed to preclude

any director from serving the Corporation in any other capacity and receiving compensation

therefor.

      Section 15.    <u>Director Questionnaire</u>.  Annually, prior to his/her succession to the

board, each director may be required to complete a questionnaire to be provided by the Corporation

(which may be on a form prescribed by the New York City Conflicts of Interest Board) which may

request information as to such director's other board, professional and business affiliations.

      Section 16.    <u>Observer Status</u>.  The Federal Emergency Management Agency,

Emergency Preparedness and Response Directorate, the United States Department of Homeland

Security ("FEMA"), the New York State Emergency Management Office ("NYSEMO") and the

New York State Insurance Department ("NYSID") shall each have the right to designate one

6

person to attend each meeting of the Board of Directors as an observer. FEMA, NYSEMO and

NYSID shall receive notice of each such meeting in accordance with the procedures set forth in

Section 9 of this Article III and shall be provided with copies of the minutes of each such meeting

following the Board of Directors' adoption thereof.

## ARTICLE IV.

### COMMITTEES

Section 1.    Committees. (a) The Board of Directors, by resolution adopted by a

majority of the entire Board of Directors, shall create a standing advisory committee (the "Advisory

Committee"). The Advisory Committee shall consist of three (3) members appointed by the Board

of Directors. One member shall be a director (or designee of a director) nominated by the City of

New York, one member shall be the director (or designee of the director acceptable to the Board of

Directors) nominated by the Representative of the Contractors, and the third member shall be a

person with substantial expertise in the insurance industry who shall be nominated jointly by the

other two designees. Members of the Advisory Committee shall discharge their duties in good

faith with the degree of care that a prudent person would utilize in conducting their own affairs.

(b)      (i) The Advisory Committee may make recommendations with respect to

the protocols to be followed by the third party claims administrator engaged by the Corporation,

including implementation and modification of such protocols. Such recommendations shall not be

binding on the Board of Directors.

(ii) In addition, the Advisory Committee shall consider claims disputes

referred to the Board of Directors by the third party administrator and the Advisory Committee

shall forward a recommendation with respect to each dispute to the Board of Directors. The

recommendation of the Advisory Committee shall not be binding on the Board of Directors. If,

after review of the recommendation of the Advisory Committee, the Board of Directors disagrees

7

with the recommendation of the Advisory Committee and there is still a dispute with respect to

such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under

New York law pursuant to the rules of the American Arbitration Association.  The decision

rendered upon such arbitration shall be binding on the Board of Directors and the Corporation.

        (iii)  In addition, the Advisory Committee may consider whether the

Corporation has taken, or is about to take, action that is inconsistent with its material obligations,

responsibilities or rights under the Policy and By-laws and, if the Advisory Committee has a

concern in this regard, it may request a prompt meeting with the President to discuss this concern,

which the President must attend within ten (10) days of such request (or such later time as they may

agree to).  If, ten (10) or more days following its meeting with the President (or immediately if the

President expressly refuses to consider the issue or does not attend the meeting), the Advisory

Committee continues to have such concern, it may, if it deems appropriate, make a

recommendation relating thereto to the Board of Directors.  The recommendation of the Advisory

Committee shall not be binding on the Board of Directors.  If, forty-five days after receiving the

recommendation of the Advisory Committee, the Board of Directors disagrees with the

recommendation of the Advisory Committee or fails to address its concerns and the Advisory

Committee so requests, the issue will be referred to an arbitration to be conducted under New York

law pursuant to the rules of the American Arbitration Association.  The Corporation shall provide

written notice to FEMA and NYSEMO within five (5) Business Days after any request of the

Advisory Committee for referral of an issue to arbitration.  Such arbitration shall be limited to the

questions of (1) whether the issue at hand constitutes a material obligation, responsibility or right

under the Policy and By-laws; and, if so, (2) whether the Board of Directors' action, or pending or

proposed action, is reasonable and in accordance with such material obligations, responsibilities or

rights. If the arbitrators reach the second issue and answer it in the negative, they shall refer such finding to the Board of Directors for action not inconsistent with such negative answer.

(iv)  Under no circumstances shall actions taken under this Article IV, Section 1(b), cause the Board of Directors or the Corporation to delay action on any matter it reasonably believes is necessary to protect the interests of the Corporation.

(c)    The Board of Directors, by a resolution adopted by a majority of the entire Board of Directors, shall create a standing audit committee (the "Audit Committee") consisting of three (3) members who are directors of the Corporation.  To the extent possible, the Board of Directors shall endeavor to select members of the Audit Committee who possess substantial financial or accounting experience and expertise.  The Audit Committee's primary duties and responsibilities shall be to (i) monitor the integrity of the Corporation's financial reporting process regarding finance, accounting, regulatory and legal compliance; (ii) monitor the qualifications of the Corporation's independent auditors; (iii) monitor the Corporation's internal audit functions; and (iv) provide an avenue of communication among the independent auditors, management and the Board of Directors.

(d)    The Board of Directors, by resolution adopted by a majority of the entire Board of Directors, may designate such other committees as it may deem appropriate from time to time.

(e)    A quorum for each of the Advisory Committee and the Audit Committee shall be two (2) directors.  Each such committee shall serve at the pleasure of the Board of Directors.

Section 2.    Meeting of Committees.  Any committee of the Board of Directors (with regard to such committee) or the Board of Directors (with regard to all committees) shall

9

have the power to fix the time and place of holding regular or special meetings of committees and the method of giving notice thereof; but unless otherwise prescribed, meetings of any committee may be called in the same manner and upon the same notice, and notice of such meetings may be waived in the same manner as provided in these bylaws with respect to meetings of the Board of Directors.

Section 3.     <u>Authorization</u>.  The acts of a majority of the members of a committee present at a meeting at which a quorum is present shall be the acts of such committee, unless otherwise provided by law, the Certificate of Incorporation or these bylaws.  If a quorum is not present, a majority of the members of the committee present may adjourn the meeting from time to time to such time and place as they may determine, without notice other than announcement at the meeting, until enough members of such committee to constitute a quorum shall attend.  When a quorum is present to organize a meeting, it is not broken by the subsequent withdrawal of any members of the committee.

Section 4.     <u>Minutes of Committee Meetings</u>.  Each committee shall keep regular minutes of all its meetings and proceedings.  The minutes shall be open to the inspection of any director at any time.  FEMA, NYSEMO and the NYSID shall each be provided with copies of the minutes of each committee meeting within five (5) Business Days after the adoption of such minutes.

Section 5.     <u>Action Without a Meeting; Conference Call Meetings</u>.  Any action required or permitted to be taken by any committee of the Board of Directors may be taken without a meeting if all the members of the committee consent in writing to the adoption of a resolution authorizing the action.  The resolution and written consents thereto shall be filed with minutes of the proceedings of the committee.  Members of any committee may participate in meetings by

10

means of a conference telephone or similar equipment that allows all persons participating in the meeting to hear each other at the same time.  Participation by such means shall constitute presence in person at the meeting.

### ARTICLE V.

### OFFICERS

Section 1.     Officers. (a) The officers of the Corporation shall be a President, a Treasurer, a Secretary, and such Vice Presidents, Assistant Treasurers and Assistant Secretaries as the Board of Directors may from time to time determine.

(b)     An officer need not be a director of the Corporation.  In electing a person to be an officer of the Corporation the Board of Directors shall consider such person's experience relating to insurance, government, construction, financial services, accounting, or law and other relevant factors.  Any two or more offices may be held by the same person, except the offices of President and Secretary.

(c)     The Board of Directors may elect such other officers as it shall deem necessary, who shall exercise powers and perform such duties as shall be determined from time to time by the Board of Directors.

(d)     At the discretion of the Board of Directors, any officer may serve the Corporation on a full-time or part-time basis.  In the event the Board of Directors selects a person to serve as an officer without compensation and on a part-time basis, such person may simultaneously be employed on a full-time basis by any other person, including any insured, but only so long as (i) the Board of Directors is notified of this arrangement in advance and approves it and (ii) in the event such other employment is on behalf of any insured, that person will not be involved in any claims by such insured to the Corporation.  In the event the Board of Directors selects a person to serve as an officer with compensation and on a part-time basis, such person may

11

simultaneously be employed on a part-time basis by any other person, including any insured, but only so long as (i) the Board of Directors is notified of this arrangement in advance and approves it and (ii) in the event such other part-time employment is on behalf of any insured, that person will not be involved in any claims by such insured to the Corporation. In the event that the Board of Directors selects a person to serve as an officer on a full-time basis, such officer may be an employee-on-leave from any insured or other person, but not an active employee thereof.

Section 2.    Term of Office. Each officer shall be elected annually by each newly appointed Board of Directors as soon as is practicable following the appointment of such Board of Directors, and shall hold his/her respective office until the election and qualification of his/her successor or his/her prior resignation or removal. Any vacancy occurring in any office may be filled at any ensuing meeting of the Board of Directors.

Section 3.    President. The President shall be the chief executive officer of the Corporation and shall have general charge and supervision of the business and affairs of the Corporation, subject to the control and direction of the Board of Directors. He/she shall also perform such other duties as are assigned to him/her by the Board of Directors. The President shall report to the Board of Directors. The President shall preside at meetings of the Board of Directors in the absence of the chairperson. If requested by FEMA, the President shall serve on a full-time basis until such time as the Board of Directors decides otherwise, provided that FEMA is given notice 30 days in advance of the effective date of such change in status.

Section 4.    Secretary and Assistant Secretary. (a) The Secretary shall issue notices of all meetings of directors when notices of such meetings are required by law or these bylaws. He/she shall attend the meetings of directors and keep the minutes thereof, and shall have charge of the records of the Corporation. He/she shall have custody of the corporate seal, shall

affix the corporate seal to, and sign such instruments as require the seal and his/her signature, and shall perform such other duties as are incident to his/her office or as are properly required of him/her by the Board of Directors or the President.

(b)      Any Assistant Secretary shall perform such duties as may be assigned to him/her by the Board of Directors, the chairperson or the President. At the request of the Secretary or in the absence of the Secretary, an Assistant Secretary shall perform the duties and exercise the powers of the Secretary.

Section 5.      <u>Treasurer and Assistant Treasurer</u>. (a) The Treasurer shall have the care and custody of all the moneys and securities of the Corporation. He/she shall deposit moneys received by him/her for the Corporation in the name of the Corporation as provided in <u>Article VII</u>, <u>Section 1</u>. He/she shall cause to be entered in books of the Corporation to be kept for that purpose, full and accurate accounts of all moneys received by him/her and paid by him/her on account of the Corporation. He/she shall make and sign such reports, statements and instruments as may be required of him/her by law or the Board of Directors, and shall perform such other duties as are incident to his/her office or as are properly required of him/her by the Board of Directors or the President.

(b)      Any Assistant Treasurer shall perform such duties as may be assigned to him/her by the Board of Directors or the President. At the request of the Treasurer or in the absence of the Treasurer, an Assistant Treasurer shall perform the duties and exercise the powers of the Treasurer.

Section 6.      <u>Vice Presidents</u>. The Vice Presidents may be designated by such title or titles as the Board of Directors may determine. At the request of the President, a Vice President shall perform the duties and exercise the functions of the President. In addition, in the President's

13



absence, the Vice President, or Vice Presidents in such order as the chairperson may from time to time designate, shall perform the duties and exercise the functions of the President. The Vice President or Vice Presidents shall perform such other duties as may be assigned to him/her or them by the Board of Directors or the President.

Section 7.    Removal. Any officer elected by the Board of Directors may be removed, either with or without cause, at any meeting of directors, notice of which shall have referred to the proposed action, by vote, in person of a majority of all directors entitled to vote.

Section 8.    Compensation of Officers. The fixing of salaries of officers shall require the affirmative vote of a majority of the entire Board of Directors. Such compensation shall be equal to or less than what is reasonable and commensurate with the services performed.

Section 9.    Bonds. The Board of Directors may require any officer, agent or employee of the Corporation to give a bond to the Corporation for the faithful performance of his/her duties, with one or more sureties and in such amount as may be satisfactory to the Board of Directors. The expense of such bond shall be borne by the Corporation.

Section 10.    Execution of Contracts, Deeds, Leases and Other Agreements. (a) All contracts, deeds, leases and other agreements authorized by the Board of Directors to be signed by or on behalf of the Corporation may be executed in the name of the Corporation by the President, any Vice President, or such other officer or officers as the Board of Directors may from time to time designate for that purpose.

(b)    Each contract entered into by or on behalf of the Corporation with any person or entity providing services to or for the Corporation shall be terminable by the Corporation with or without cause upon a reasonable notice period chosen in the discretion of the Board of

14

Directors. In addition, each such contract shall contain provisions requiring the delivery of reports from such service providers to the Corporation no less frequently than quarterly.

Section 11.    Execution of Checks, Notes, Drafts and Other Negotiable Instruments. All checks, notes or drafts and other negotiable instruments shall be signed by the President, any Vice President, the Treasurer, or such officer or officers as the Board of Directors may from time to time designate for that purpose. The Secretary, any Assistant Secretary or any Assistant Treasurer shall co-sign such checks, notes, drafts and other negotiable instruments.

Section 12.    Service Providers. No party providing substantial services to the Corporation shall be an affiliate of or related to the City of New York or the Contractors, provided, however, that the Office of the Corporation Counsel may represent the City of New York in liability claims against the City under the Policy (as hereinafter defined), and be compensated therefor, insofar as permitted under Section 2.07 or Section 9.04(b), (c), or (d) of the Policy. In addition, (a) the third party administrator and the captive management company shall not be an affiliate of or related to one another and (b) the third party administrator and panel counsel shall not be an affiliate of or related to one another. The fees paid to such service providers, and the administrative costs and expenses of the Corporation, shall be customary and reasonable. Among the Corporation's service providers shall be a claims review firm, which the Corporation shall engage following 30 days notice to FEMA. Following the end of each calendar year, such firm shall review claims paid during the prior calendar year to verify that the Corporation has exercised good faith business judgment in accordance with normal insurance industry practices.

## ARTICLE VI.

## INSURANCE POLICY

Section 1.    (a) The Corporation shall issue an occurrence basis, liability insurance policy (the "Policy") to the City of New York as the named insured and the Contractors

15

as additional named insureds, with an effective date being the beginning of Debris Removal (as defined in the Policy) at the World Trade Center Site (as defined in the Policy) on September 11, 2001.

(b)     Given that the funds from which the Corporation will make payments are limited to funds received pursuant to the Policy and investment income earned on such funds, the Policy, under certain circumstances, (i) will limit (A) claims that will be accepted under the Policy and (B) the percentage of the value of individual claims and related expenses to be paid under the Policy and (ii) will be subject to termination pursuant to the Policy.

## ARTICLE VII.

### FINANCES AND RECORDS

Section 1.     Finances.  The funds of the Corporation shall be deposited in its name with such bank or banks, trust company or trust companies as the Board of Directors may from time to time designate.  No officers, agents or employees of the Corporation, alone or with others, shall have the power to make any checks, notes, drafts or other negotiable instruments in the name of the Corporation or to bind the Corporation, thereby, except as herein provided.

Section 2.     Fiscal Year.  The fiscal year of the Corporation shall end on December 31 of each year, unless otherwise provided by the Board of Directors.

Section 3.     Keeping and Inspection of Records.  There shall be kept, at the principal office of the Corporation (or the offices of its service providers), a complete set of books and records of the Corporation.  They shall include, but not be limited to, the bylaws, minutes of meetings and such other books, records and papers of the Corporation as the Board of Directors shall require.  These records shall be open to inspection by any director within ten (10) days after receipt by the Secretary of a written request for such inspection.

## ARTICLE VIII.

## MISCELLANEOUS

Section 1.    Form of Corporate Seal.  The seal of the Corporation shall be circular in form with the words "WTC CAPTIVE INSURANCE COMPANY, INC." in the outer circle and the words, "Corporate Seal 2004 New York" in the inner circle.  The seal on any corporate obligation for the payment of money may be facsimile, engraved or printed.

Section 2.    Indemnification of Directors, Officers and Employees.  (a)  To the maximum extent permitted by law, the Corporation shall defend, indemnify and hold harmless each director and officer, whether or not then in office, who is made or threatened to be made a party to any action, suit or proceeding, civil or criminal, arising out of such director's or officer's act or omission to act as a director or officer of the Corporation, against (i) the reasonable expenses, costs and counsel fees incurred by him/her in the defense of such action, suit or proceeding and (ii) amounts paid or incurred pursuant to a judgment or in settlement of any such action, suit or proceeding.

(b)    Subject to the provisions of this Article VIII, Section 2, the Corporation shall indemnify and hold harmless each employee who is not an officer or director of the Corporation, whether or not then so employed, who is made or threatened to be made a party to any action, suit or proceeding, civil or criminal, arising out of the scope of his/her employment against (i) the reasonable expenses, costs and counsel fees incurred by him/her in the defense of such action, suit or proceeding and (ii) amounts paid or incurred pursuant to a judgment or in settlement of any such action, suit or proceeding.  Such indemnification shall be conditional upon (x) a finding made by the Board of Directors that the employee acted in good faith for a purpose which he/she reasonably believed to be in the best interest of the Corporation and that he/she had no reasonable cause to believe that his/her conduct was unlawful, (y) the employee's reasonably prompt delivery to the

17

Corporation of written notice of the action, suit or proceeding and (z) unless defended by the Corporation, the employee's retention of counsel satisfactory to the Corporation and the Corporation's determination that the defense and any settlement of such action, suit or proceeding is satisfactory. The foregoing right of indemnification shall not be exclusive of other rights to which any employee may be entitled as a matter of law.

(c)    The Corporation may obtain such insurance as the Board of Directors shall from time to time determine to protect the Corporation against losses caused by the fraudulent or dishonest acts of any director, officer, or employee, to reimburse the Corporation for any obligation incurred pursuant to the previous paragraphs of this Article VIII, Section 2, and to indemnify directors and officers under circumstances permitted by law.

Section 3.    Grant Agreement. The Corporation shall receive grant funds provided by FEMA pursuant to a Grant Agreement for the WTC Captive Insurance Company Project between FEMA and NYSEMO. The Corporation shall provide FEMA and NYSEMO with such reports, notices, inspection rights, and other rights and information required pursuant to the Grant Agreement. In addition, the Corporation shall not take any action, including amending these bylaws or the Policy, that conflicts in substance with the provisions of such Grant Agreement without prior written notice to FEMA, and the Corporation shall conduct its affairs in substantial compliance with the terms of the Grant Agreement.

Section 4.    Conflicts of Interest. (a) No director or officer shall have a material interest, direct or indirect, in any contract, including the selection thereof, relating to the operations conducted by the Corporation, nor any contract for furnishing supplies thereto, unless authorized by the concurring vote of the entire Board of Directors with the exception of such interested director. In the event of such interest, the director or officer concerned shall forthwith make

18

disclosure to the Corporation of the nature and extent of his/her interest and such disclosure shall be entered in writing upon the minutes of the meeting of the Board of Directors called to authorize such contract. No director who has such an interest shall vote on any matter relating to such interest.

(b)     All of the Corporation's directors, officers and employees who are also officials or employees of the City of New York (or any City of New York-affiliated entity that is subject to Chapter 68 of the New York City Charter) shall be subject to the restrictions set forth in Chapter 68 of the New York City Charter. The Corporation shall consult with and be guided by the New York City Conflicts of Interest Board in connection with the application of Chapter 68 to such directors, officers or employees of the Corporation.

Section 5.     <u>Reimbursement of Expenses</u>.  The Corporation shall reimburse the City of New York and /or the Contractors for all expenses incurred in developing the Corporation (or pay the obligations for such expenses directly to the provider of such services) to the extent that such expenses have been approved by FEMA and NYSEMO.

Section 6.     <u>Reinsurance</u>.  The Corporation shall have the ability to reinsure some or all of its obligations by entering into indemnity or assumption reinsurance agreements or other similar agreements with the prior consent of FEMA and NYSID.

Section 7.     <u>The Mayor</u>.  References herein to the Mayor of the City of New York shall mean the person who holds the office of the Mayor of the City of New York at the time the action is taken by such person pursuant to these bylaws.

Section 8.     <u>Amendment of Bylaws</u>.  These bylaws may be added to, amended, altered, or repealed at any meeting of the directors by an affirmative vote of at least a majority of the entire Board of Directors; <u>provided</u>, <u>however</u>, that amendments that adversely affect the rights

19

of the nominee of the Contractors to the Board of Directors or the designee of such director to the

Advisory Committee shall require the unanimous vote of the entire Board of Directors, and

provided further that no amendment may retroactively reduce or limit the rights of directors,

officers or employees pursuant to Article VIII, Section 2, hereof.

20