UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                                         Docket No.:  07-CV-7072 (AKH)

                   Plaintiffs,

      -against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS           DECLARATION OF
FINKLESTEIN; JEFFERY FRIEDLANDER;              DENISE A. RUBIN
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                   Defendants.
------------------------------------------------------------------X

      DENISE A. RUBIN, an attorney duly licensed to practice before the Courts of the State

of New York and before this Honorable Court, hereby declares the following to be true under

penalty of perjury:

      1.      I am associated with the law firm Worby Groner Edelman & Napoli Bern, LLP,

attorneys for the plaintiffs herein, and offer this Declaration, the exhibits and Memorandum of Law

served therewith in Opposition to the Defendants' Motions to Dismiss the plaintiffs' complaint

pursuant to Fed. R. Civ. P. 12(b)(6).

      2.  In support of the motion, we offer, at Exhibit 1, a letter from Senator Patrick Leahy and

Senator Arlen Spector to defendant Christine LaSala.

      3.  In further support of the motion, we offer Exhibits B-1 through B-30, the documents

referenced in the *Walcott* Complaint. These are:

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 1. | Memorandum from Lawrence Martin, Special Insurance Counsel, New York City Law Department, Re: WTC – non-traditional types of insurance coverage | March 6, 2002 | ¶¶ 46, 51 |
| 2. | Letter from Mark Page, Director of the NYC Office of Management and Budget to Edward F. Jacoby, Jr., Governor's Representative, RE: Coordinated Insurance Program for the WTC Debris Removal Project | May 13, 2002 | ¶¶ 31, 33, 53 |
| 3. | Letter – US Congress members to Joseph M. Allbaugh, RE: Prompt review of NYC proposal to FEMA for insurance coverage of WTC Debris Removal | May 24, 2002 | ¶ 54 |
| 4. | Debris Removal Insurance Program meeting of FEMA and NY SEMO | June 24, 2002 | ¶56 |
| 5. | Letter from Joseph Picciano, FEMA to Edward Jacoby, Governor's Representative re: Coordinated Insurance Program for WTC Debris Removal Insurance | June 20, 2002 | ¶ 56 |
| 6. | Press Release – Joint release by Gov. Pataki and Mayor Bloomberg re: Captive Insurance Legislation | March 21, 2003 | ¶ 74 |
| 7. | Grant Agreement – US Dept of Homeland Security re: WTC Captive Insurance Company Project | Nov. 5, 2004 | ¶¶ 34, 76-77; 87; 100; 114-115 |
| 8. | WTC Captive Insurance Company, Inc., Liability Insurance Policy | Dec. 6, 2004 | ¶ 34; 116; 175 |
| 9. | WTC Captive Insurance Company, Inc. Bylaws | | ¶ 116-121 |
| 10. | Complaint: *WTC Captive Ins. Co., Inc. v. Liberty Mutual Fire Insureance Company, et al.*, U.S.D.C. – S.D.N.Y. 07-CV-1209 (AKH) | Feb. 16, 2007 | ¶ 127 |
| 11. | WTCC Certificate of Incorporation | July 9, 2004 | ¶¶ 78-82; 86; 116-121 |
| 12. | Minutes of WTCC Board Meeting | Dec. 2, 2004 | ¶ 90; 111 |

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 13. | WTCC Balance Statement Quarter Ending March 31, 2007 | March 31, 2007 | ¶ 93 |
| 14. | WTCC Claim Activity through quarter ending March 31, 2007 | April 24, 2007 | ¶ 93 |
| 15. | Public Authorities Accountability Act of 2005 | June 24, 2005 | ¶ 139-152; 157-158; 167; 227 |
| 16. | Testimony – JayEtta Z. Hecker, "Disaster Assistance: Federal Aid to New York City Area Following the Attacks of September 11[th] and Challenges Confronting FEMA" | Sept. 24, 2003 | ¶ 64 |
| 17. | Article: "350G Paycheck for City's 9/11 Scrooge" NY Post | Oct. 15, 2006 | ¶ 96-97 |
| 18. | FOIL Demand to WTCC by Plaintiffs' Liaison Counsel | May 4, 2006 | ¶ 137; 183; 185 |
| 19. | Letter: Congressman Nadler to Richard L. Skinner, Dept. of Homeland Security re: WTCC failure to pay Claims | July 27, 2006 | ¶ 67 |
| 20. | Letter: NYS Insurance Superintendent Howard Mills to Christine LaSala | July 28, 2006 | ¶ 75 |
| 21. | Letter: Senator Schumer to Christine LaSala, CEO of WTCC | July 31, 2006 | ¶ 65-66 |
| 22. | Letter: Christine LaSala, CEO of WTCC to NYS Insurance Superintendent Howard Mills | Aug. 1, 2006 | ¶ 104; 106 |
| 23. | Letter: Denise A. Rubin to NYS Insurance Superintendent Howard Mills re: LaSala's 8-1-06 correspondence | Aug. 4, 2006 | ¶ 102 |
| 24. | Press Release and Letter: Christine LaSala to Senator Schumer | Aug. 9, 2006 | ¶ 104; 105 |
| 25. | Letter: Marc Jay Bern to Senator Schumer, re: WTCC | Aug. 10, 2006 | ¶ 104; 105 |
| 26. | Letter: Sen. Hillary Rodham Clinton to Christine LaSala re: WTCC | Sept. 21, 2006 | ¶ 68 |
| 27. | Letter: Paul J. Napoli to Christine LaSala re: Open Meetings Law | Oct. 30, 2006 | ¶ 188; 206; 210 |

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 28. | Letter:  David Biester, WTCC General Counsel to Paul Napoli re: WTCC not subject to Open Meetings Law | Nov. 17, 2006 | ¶ 188; 206; 210 |
| 29. | Fax Transmission and Letter from Robert J. Freeman, Executive Director, NYS Department of State Committee on Open Government; Opinion Letter re: WTCC and Open Meetings Law | Dec. 22, 2006 | ¶ 134-135; 209 |
| 30. | Press Release: Mayor Bloomberg Accepts Panel Recommendations to Expand Response to Health Impacts of Attack on the World Trade Center | Feb. 13, 2007 | ¶ 129(f) |

Dated:  New York, New York
       September 19, 2007

Denise A. Rubin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                                                     Docket No.:  07-CV-7072 (AKH)

                            Plaintiffs,

    -against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS
FINKLESTEIN; JEFFERY FRIEDLANDER;
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                            Defendants.
--------------------------------------------------------------------X

=======================================================================
PLAINTIFFS' DECLARATION IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
=======================================================================

**WORBY GRONER EDELMAN & NAPOLI BERN, LLP**
*Attorneys for* :  Plaintiffs
115 Broadway, 12th Floor
New York, New York  10006
(212) 267-3700
=======================================================================

PLEASE TAKE NOTICE:
    ☐  NOTICE OF ENTRY
    that the within is a (certified) true copy of an                  duly entered in the        office
    of the   clerk of the within named court on _____200__.
    ☐  NOTICE OF SETTLEMENT
        that an order                of which the within is a true copy,  will be
        presented for settlement to the HON.              one of the judges of the
        within named Court, at          on      200___ at_____ O'clock ___.M.

Dated, _____

                      Yours, etc.

                  **WORBY GRONER EDELMAN & NAPOLI BERN,  LLP**

PATRICK J. LEAHY, VERMONT, CHAIRMAN

EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, Jr., DELAWARE
HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
BENJAMIN L. CARDIN, MARYLAND
SHELDON WHITEHOUSE, RHODE ISLAND

ARLEN SPECTER, PENNSYLVANIA
ORRIN G. HATCH, UTAH
CHARLES E. GRASSLEY, IOWA
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
SAM BROWNBACK, KANSAS
TOM COBURN, OKLAHOMA

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

August 1, 2007

Ms. Christine LaSala
President and Chief Executive Officer
WTC Captive Insurance Company, Inc.
100 William Street
New York, NY 10038

Dear Ms. LaSala:

We are writing to express our serious concerns about the management of the World Trade Center Captive Insurance Company, which Congress formed to "provide the City of New York and its debris removal contractors with coverage for claims arising from debris removal performed after the collapse of World Trade Center (WTC) buildings on September 11, 2001." H.R. Conf. Rep. No. 108-10, at 1476 (2003). It has come to our attention that close to $74 million of the tax payer money Congress appropriated to cover claims to compensate volunteers and workers who were harmed while removing the debris at ground zero has been spent on overhead costs and legal bills. It is our understanding that to date not a single worker has been compensated for exposure to harmful substances now known to have been in the air at that time, and only one worker has been compensated for any injury – specifically an injury to his ankle.

After the terrorist attacks on September 11, 2001, Congress provided $1,000,000,000 to cover claims by ground zero volunteers and workers who dutifully completed the momentous task of removing the debris of the fallen World Trade Center buildings. Reports that the World Trade Center Captive Insurance Company has spent hundreds of thousands of dollars on salaries for administrators and over $45 million to private law firms are troubling.

As the Chairman and Ranking Member of the Senate Judiciary Committee, we are interested in learning how and when the 9-11 clean up volunteers and workers will receive the $1 billion in tax payer money Congress appropriated for their injuries. Because we are considering calling for a hearing on this matter during the month of September, a prompt response would be appreciated.

Sincerely,

PATRICK LEAHY
Chairman

ARLEN SPECTER
Ranking Member

cc: The Honorable Charles Schumer
    The Honorable Hillary Rodham Clinton

## MEMORANDUM

To:        Theodore A. Monette
           Federal Coordinating Officer and Disaster Recovery Manager
           Federal Emergency Management Agency

           Larry Zensinger
           Division Director, Response and Recovery
           Federal Emergency Management Agency

From:      Lawrence M. Martin
           Special Insurance Counsel
           New York City Law Department

Date:      March 6, 2002

Re:        WTC – non-traditional types of insurance coverage

We understand that FEMA is interested in replacing the proposed legislative

indemnification of $1 billion (see Attachment A) [1] with an insurance-based mechanism.

As FEMA knows, this mechanism cannot be a traditional low-premium, risk-based policy

since the insurance industry is unwilling to provide such insurance. We must find an

alternative that is appropriate in this most extraordinary situation.

Our starting point is simple – the insurance would match the parameters of the

proposed legislative indemnification it replaces. These are listed in the footnote below.[2]

---

[1] This is the House Republican version of the bill, which we received from Paul Taylor of
the House Judiciary Committee, on February 28, 2002, following White House review
and substantive approval.

[2] Briefly, the "insureds" would be the same as the "Covered Contractors" (paragraph (b))
of the bill. "Covered Claims" (or "Scope of Coverage") would be the same as "Covered
Claims" (paragraphs (c) and, by reference, (m)). The "Limit" of the such insurance
would be the same as the limit of federal indemnification (paragraphs (i)(1)(2) and (i)(2)).

FEMA-DC00007471

Pursuant to discussions with FEMA staff, the City and its insurance advisors have identified two mechanisms that would work. They are outlined below.

<u>Finite Risk Insurance</u>

Finite risk insurance is frequently issued to entities which cannot purchase traditional policies because their losses are either extremely high or the risks are too uncertain. In return for a very substantial premium – more than 50% of the desired limit (plus taxes, fees and commissions) – a finite risk policy will simultaneously provide coverage up to a specified limit and require the insurer to return any unused funds at the end of the policy term.[3] (For a general overview of this type of insurance, see Attachment B.) This type of insurance is written by some of the largest insurers in the world, including ACE, AIG, Center Re/Zurich and X.L.

"Finite risk insurance plans are flexible and are custom-tailored to insureds' needs." (Attachment B at p. 2.) The lead broker on the WTC project advises us that a finite risk insurance plan can be devised to meet our needs. Notably, I'm told that the policy could protect FEMA from excessive payments through the naming of an independent claims administrator, who in turn could be required to follow specified cost approval protocols. If FEMA wishes, the policy could even provide for an independent auditor. (The costs of such extra protection would be reflected in the policy premium.) In addition, under no circumstances would FEMA be required to pay more than the agreed-upon premium and, at the end of the policy term, FEMA would be guaranteed the return of whatever funds (if any) remain unused.

---

[3]  Strictly speaking, the full limit is assured only if the "experience account balance" is not exhausted far sooner than anticipated. The amount of unused sums to be returned is computed according to a firm formula set forth in the policy.

FEMA-DC00007472

03/07/2002 17:31 FAX 2026462730    RR-HS    R    Ø005
MAR-06-2002  16:47    MAYOR'S PRESS OFFICE    1 212 788 2975    P.04/22

Our broker has just begun to determine the availability of a finite risk policy to meet our needs. Preliminary soundings are promising. One major international carrier is very interested in writing such a policy, and represents that it has the capacity to write the full $1 billion in coverage. We hope this interest will translate into a firm proposal and that other major carriers will also make firm proposals. Nothing is certain, however, and we would counsel FEMA not to commit, at this time, to the finite risk approach as the sole acceptable mechanism.

Captive Insurance

For any of a number of reasons, one or more entities may decide to create their own insurance company to cover them for a specified category of claims. (For an introduction to this type of insurance, see Attachment C.) The first "captive" insurance company was founded more than a century ago, and they are currently quite common. Captive insurance is particularly useful where traditional insurance is unavailable, impractical, or excessively expensive.

Like finite risk policies issued by established insurance companies, the policies issued by a captive insurer can be tailor-made. In our situation, such a policy would be materially the same as the finite risk policy outlined above. While there are certain potential advantages to captive insurance (e.g., potentially even greater flexibility) there are also contingencies (e.g., state law requirements) that may make such insurance impractical or impossible here.

Recommendation

We recommend that FEMA acknowledge that either finite risk insurance or captive insurance -- or a combination of the two, or even a third possibility -- would be

WTC memo to FEMA                    3

FEMA-DC00007473

03/07/2002 17:32 FAX 2026462730          RR-HS              R                    @006
      MAR-06-2002  16:47          MAYOR'S PRESS OFFICE              1 212 788 2975    P.05/22

appropriate under the circumstances, and agree to provide such funding as necessary to generate $1 billion in coverage. With such insurance in hand, we would hope to purchase whatever excess coverage may be needed under the circumstances.

Please call (212-278-1026), e-mail (LMartinNYC@aol.com) or fax (212-278-1733) me if you have any questions or would like further information. We appreciate FEMA's interest in helping us purchase insurance for this most extraordinary federal emergency.

WTC memo to FEMA                                    4

FEMA-DC00007474

03/07/2002 17:32 FAX 2026462730          RR-HS          R          ☑007
MAR-06-2002  16:47      MAYOR'S PRESS OFFICE          1 212 788 2975   P.06/22

APPENDIX A

FEMA-DC00007475

03/07/2002 17:32 FAX 2026462730          RR-HS                                    @008
MAR-06-2002  16:48        MAYOR'S PRESS OFFICE              1 212 788 2975    P.07/22
F:\M7\REYNOL\REYNOL.019

-------------------------------------------------

(Original Signature of Member)

107TH CONGRESS
2D SESSION      **H. R. _____**

-------------------------------------------------

## IN THE HOUSE OF REPRESENTATIVES

Mr. REYNOLDS introduced the following bill; which was referred to the
Committee on _____

-------------------------------------------------

# A BILL

To provide indemnification and liability protection to, and
facilitate the procurement of insurance for, contractors
responding to the World Trade Center attacks.

1      *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   SECTION 1. SHORT TITLE.

4        This Act may be cited as the "Ground Zero Recovery

5   Protection Act".

February 27, 2002 (11:22 AM)
F:\V7\022702\022702.029

FEMA-DC00007476

03/07/2002 17:32 FAX 2026462730        RR-HS                    R            ☑009

MAR-06-2002  16:48      MAYOR'S PRESS OFFICE            1 212 788 2975   P.08/22
                                                        H.I.C.
F:\M7\REYNOL\REYNOL.019

2

1  SEC. 2. INDEMNIFICATION, LIABILITY LIMITATION, AND FA-

2          CILITATION OF INSURANCE PROCUREMENT

3          FOR CONTRACTORS FOR THE RESPONSE TO

4          THE WORLD TRADE CENTER ATTACKS.

5      (a) IN GENERAL.—The United States Government

6  shall, subject to the limitations contained in this section,

7  indemnify World Trade Center contractors against World

8  Trade Center claims.

9      (b) COVERED CONTRACTORS.—In this section, the

10  term "World Trade Center contractor" means any person

11  or entity, including a State or political subdivision thereof,

12  involved in providing work, labor, equipment, materials,

13  or services in connection with the response to the World

14  Trade Center attacks, including—

15          (1)(A) contractors, subcontractors at any tier,

16      construction managers, engineers, and design profes-

17      sionals; and

18          (B), the parents, affiliates, officers, directors,

19      partners, and employees of the entities described in

20      subparagraph (A); and

21          (2) the persons or entities providing or con-

22      tracting for such work, labor, equipment, materials,

23      or services.

24      (c) COVERED CLAIMS.—In this section, the term

25  "World Trade Center claim" means any claim, action,

26  loss, settlement, or damage (including reasonable expenses

February 27, 2002 (11:22 AM)
F:\V7\022702\022702.029

FEMA-DC00007477

03/07/2002 17:32 FAX 2124462730    KR-BS    ☒010
MAR-06-2002  16:48    MAYOR'S PRESS OFFICE    1 212 788 2975    P.09/22
                                                               H.I.C.

F:\M7\REYNOL\REYNOL.019

3

1    of litigation and defense thereof) arising out of or result-

2    ing from the response to the World Trade Center attacks,

3    whether arising before, on, or after the date of the enact-

4    ment of this Act, for death, personal injury, or the loss

5    of, damage to, or loss of use of property. Notwithstanding

6    the preceding sentence, such term shall not include a claim

7    by a World Trade Center contractor to be paid or reim-

8    bursed for work performed, services provided, or materials

9    and equipment utilized or consumed.

10       (d) COORDINATION WITH INSURANCE.—(1) Indem-

11   nification under this section shall apply to a claim only

12   to the extent that such claim is not otherwise covered and

13   compensable by insurance procured for the risks involved

14   in the response to the World Trade Center attacks.

15       (2) After the date of the enactment of this Act, the

16   City of New York shall make reasonably diligent efforts

17   to procure such insurance in an aggregate amount of

18   $2,000,000,000, and shall purchase all such insurance to

19   the fullest extent approved by the Federal Emergency

20   Management Agency. Reimbursement of the costs and

21   premiums of such insurance shall be included in grants

22   to be provided by or through such Agency. All or part of

23   the indemnification under this section may, pursuant to

24   the terms of insurance procured after the date of the en-



FEMA-DC00007478

03/07/2008 17:37 FAX 2029462750    RK-RS    R    @011
MAR-06-2002 16:48    MAYOR'S PRESS OFFICE    1 212 788 2975    P.10/22
                                                  H.L.U.
F:\M7\REYNOL\REYNOL.019

4

1    actment of this Act, be payable before such insurance is

2    applicable.

3        (e) LIMITATION IN CASE OF WILLFUL MISCONDUCT

4    OR LACK OF GOOD FAITH.—When a claim arises from

5    willful misconduct or lack of good faith, intended to cause

6    injury to persons or damage to property, on the part of

7    a World Trade Center Contractor, such contractor shall

8    not be indemnified for such claim.

9        (f) CONTROL OF CLAIMS MANAGEMENT.—A World

10   Trade Center contractor shall, for each claim that is rea-

11   sonably expected to involve indemnification under this

12   section—

13           (1) promptly notify the Federal Emergency

14       Management Agency of such claim;

15           (2) immediately furnish to the United States

16       Government copies of all pertinent papers the Con-

17       tractor receives with respect to such claim;

18           (3) furnish evidence or proof of such claim in

19       the manner and form the United States Government

20       requires; and

21           (4) comply with the United States Govern-

22       ment's directions and execute any authorizations re-

23       quired in connection with settlement or defense of

24       such claim.



February 27, 2002 (11:22 AM)
F:\V7\022702\022702.029

FEMA-DC00007479

5

1    (g) PROCEDURE.—The United States Government

2    may direct, control, or assist in settling or defending any

3    claim to the extent that such claim is reasonably expected

4    to involve indemnification under this section.

5    (h) PAYMENT AUTHORITY.—This section constitutes

6    budget authority and represents the obligation of the

7    United States Government to provide for the payment of

8    amounts for indemnification under this section.

9    (i) LIMITATION ON LIABILITY AND INDEMNITY.—(1)

10    Aggregate liability for World Trade Center claims against

11    World Trade Center contractors shall not exceed the sum

12    of—

13    (A) the amounts covered and compensable by

14    insurance procured for the risks involved in the re-

15    sponse to the World Trade Center attacks; and

16    (B) $1,000,000,000, which shall be paid by the

17    United States Government pursuant to this section.

18    (2) The total liability of the United States Govern-

19    ment under this section may not exceed $1,000,000,000.

20    (j) LITIGATION MANAGEMENT.—World Trade Center

21    claims shall be brought under section 408(b) of the Air

22    Transportation Safety and System Stabilization Act (49

23    U.S.C. 40101 note), as amended by section 201(b)(2) of

24    the Aviation and Transportation Security Act (Public Law

25    107–71), and shall be subject to the following limits:



February 27, 2002 (11:22 AM)
F:\V7\022702\022702.028

FEMA-DC00007480

03/07/2002 17:33 FAX 2026462730          RR-HS                              ☒013
MAR-06-2002  16:49       MAYOR'S PRESS OFFICE              1 212 788 2975   P.12/22
                                                                  H.I.C.

F:\M7\REYNOL\REYNOL.019

6

1        (1) No punitive damages may be awarded, nor

2    shall any party be liable for interest prior to the

3    judgment.

4        (2) Each World Trade Center contractor

5    against whom a World Trade Center claim is

6    brought shall be liable only for the amount of dam-

7    ages allocated to such contractor in direct proportion

8    to the percentage of responsibility of such contractor

9    for causing the harm to the plaintiff.

10       (k) EXCLUSION.—(1) Nothing in this section shall in

11   any way limit the liability of any person who—

12       (A) attempts to commit, knowingly participates

13   in, aids and abets, or commits any act of terrorism,

14   or any criminal act related to, or resulting from,

15   such act of terrorism; or

16       (B) participates in a conspiracy to commit any

17   such act of terrorism or any such criminal act.

18       (2) Nothing in this section shall in any way affect,

19   alter, or amend the indemnification obligations of the

20   State of New York to the Federal Government as set forth

21   in the FEMA-State Agreement for the major disaster des-

22   ignated FEMA-1391-DR, and any amendments thereto.

23       (l) RIGHT OF SUBROGATION.—The United States

24   shall have the right of subrogation with respect to any

25   claim paid by the United States that results in indem-



February 27, 2002 (11:22 AM)
F:\V7\022702\022702.029

FEMA-DC00007481

03/07/2002 17:33 FAX 2026462730    RR-HS    R    ☑014

MAR-06-2002 16:49    MAYOR'S PRESS OFFICE    1 212 788 2975    P.13/22

F:\M7\REYNOL\REYNOL.019        H.L.C.

7

1 nification under this section. Such right of subrogation

2 shall not be applied against a World Trade Center con-

3 tractor.

4      (m) DEFINITION.—In this section, the term "re-

5 sponse to the World Trade Center attacks" means all acts

6 or failures to act by World Trade Center contractors or

7 volunteers in connection with their work at or in the vicin-

8 ity of the World Trade Center site on the rescue and evac-

9 uation, recovery of bodies, cleanup, environmental remedi-

10 ation, removal of debris, transportation of debris, control

11 of pollutants, securing of public and private property, and

12 protection of the public health, safety, and welfare. Not-

13 withstanding the preceding sentence, such term shall not

14 include efforts to build or rebuild new buildings or other

15 activities on the site of the World Trade Center attacks

16 occurring subsequent to the foregoing acts or failures to

17 act.

18      (n) SEVERABILITY.—If any provision of this section,

19 or the application hereof to any person or circumstances,

20 is held invalid, the remainder of this section, and the ap-

21 plication of such provision to other persons or cir-

22 cumstances, shall not be affected thereby.



FEMA-DC00007482

**RISK FINANCING**
CASH FLOW/ALTERNATIVE MARKET PLANS

---

## EXHIBIT IV.K.1
### CAPTIVE CONCEPTS DISCUSSED IN *RISK FINANCING*

| Topic | Pages/ This Tab | Pages/ Other Tabs |
|---|---|---|
| Captive Laws | IV.N.9 | Appendix B |
| Captive Management Firms | IV.K.28 | VIII.U.1–19 |
| Claims Management Services | IV.K.37, IV.L.9 | VIII.K.1–10 |
| European Captives | IV.N.1 | |
| Evaluating Service Providers | ———— | VIII.E.5, VIII.G.5 |
| Program Evaluation | IV.K.13 | VII.A–VII.D |
| Loss Control Services | IV.L.9 | VIII.H.15–16 |
| Loss Forecasting | IV.K.16 | II.C.1–3 |
| Reinsurance | IV.K.30 | V.B.1–23 |
| Risk Purchasing Groups | IV.M.15 | |
| Risk Retention Groups | IV.M.5 | |
| Risk Sharing | IV.L.5 | |
| SEC Compliance | IV.L.10 | |
| Tax Aspects of Captives | IV.K.12 | VI.C.1–38 |

## Historical Perspective

The captive insurance company concept is not a new one. During the late 1800s, a group of New England textile manufacturers formed a captive in response to the high fire insurance rates of the period. The company ultimately evolved into what is now known as the Factory Mutual System. Other notable captive insurers formed in the first half of the twentieth century included the Church Insurance Company (formed by the Episcopal Church in 1929) and Mahoning Insurance Company (established by Youngstown Sheet & Tube Company in 1935).

Despite these early examples, captive insurers did not become prevalent until the 1950s. At the end of that decade, it is estimated that there were close to 100 in operation. However, the next 35 years witnessed significant growth, and by 1995, about 3,500 had been established. Annual written premiums are presently in the neighborhood of $19 billion, while capital and surplus are estimated at $45 billion.[2]

The captive explosion is demonstrated by the graph in Exhibit IV.K.2, indicating that written premiums have increased by 150 percent since 1979.

---

[2] *Captive Insurance Company Reports*, January 1997.



FEMA-DC00007483

RISK FINANCING                                                          1ST REPRINT
CASH FLOW/ALTERNATIVE MARKET PLANS                                     MARCH 1997



Second, insureds were dissatisfied with the pricing of insurance coverage. This dissatisfaction took several forms: premiums were perceived as excessive given the risk involved, premiums fluctuated drastically on a year-to-year basis (thus making the planning and budgeting processes difficult), and pricing was considered exorbitant because insurers passed on what insureds believed to be their excessive overhead structures in the form of high premiums.

Third, organizations found insurers unwilling or unable to satisfy their specialized needs for services and coverage. For example, many large companies began to feel that their requirements for higher retention levels, more sophisticated loss control services, and greater control over claim settlements were not being met by the "traditional" commercial insurance marketplace.

## Types of Captives

A captive insurance company is an entity created to insure the exposures of its founding organization(s), reduce frictional costs, provide and arrange tailored risk management services, and take advantage of certain tax opportunities. The various types of captive insurers are defined in Exhibit IV.K.3. As will become apparent, some captive insurers can be classified under more than one of these definitions.

---

# EXHIBIT IV.K.3
## TYPES OF CAPTIVE INSURERS

**Single-Owner Captives.** Insure only the risks of the owner or the owner's subsidiary operations. They are also known as "pure" captives.

**Group Captives.** Are owned by multiple, nonrelated organizations (policyholders) and are designed to insure the risks of these different entities.

**Association Captives.** Are similar in purpose and organization to group captives. They are formed to insure the risks of companies involved in the same or similar industries.

**Agency Captives.** Are captives owned by insurance agencies, formed to insure the risks of the agency's clients.

**Rent-a-Captives.** Are licensed offshore insurers owned by an outside organization (e.g., a broker, reinsurer, insurance company). These facilities are available to other organizations for a fee. Although no precise figures are available, estimated annual premiums are close to $1 billion.

**Senior Captives.** Cover the exposures of outside entities in addition to those of their owners.

**Captive Pools.** Groups of individually owned captives that combine to reinsure one another.

**Risk Retention Groups.** A special kind of group captive limited to liability coverages for owner/insureds.

---



IV.K.4

TOTAL P.22

FEMA-DC00007484

Case 2:07-cv-07072-AKH    Document 20-3    Filed 09/19/2007    Page 15 of 21
03/07/2002 17:34 FAX 2026462730        RR-HS              R                    ☒018
MAR-06-2002  16:50    MAYOR'S PRESS OFFICE            1 212 788 2975    P.17/22

- The insured is allowed to commute the plan within a specified time frame. Commutation extinguishes all liabilities between the parties and is the means by which a share of the profit is returned to the insured.

---

**Commutation**

A commutation occurs when the parties to an insurance (or a reinsurance) contract agree to extinguish all liabilities between them. The previously insured organization, rather than the insurer, is then responsible for all future payments on losses, including losses that have been reported but not paid. The previously insured organization usually receives money from the insurer for agreeing to commute the agreement.

With a finite risk plan, the insurer uses commutation as a means to share its profit with the insured. In order to receive a share of the insurer's profit, the insured must exercise its option to commute.

---

A finite risk plan can be written as insurance or reinsurance. When written as reinsurance, a finite risk plan can reinsure a captive insurance company or a commercial insurance company.

## Example of a Finite Risk Plan

Finite risk is best illustrated with an example. Much of the rest of this section refers to the facts presented below for ABC Corporation.

ABC Corporation (ABC) is a publicly traded corporation that manufactures sports helmets, which are considered by insurance underwriters to be high-risk products from a liability standpoint. However, because of its high-quality manufacturing process and its consumer education campaign, ABC has an excellent historical liability loss record with its helmets, which it has been manufacturing for fifteen years.

Under its risk management program, ABC is willing to retain a great deal of the products liability risk arising from its helmets. It retains the first $5 million per occurrence through its captive insurer, which purchases no reinsurance. In the past, ABC purchased guaranteed cost products liability insurance with a limit of $45 million per occurrence and aggregate to sit above the $5 million per occurrence layer covered by its captive.

Currently, ABC's broker is renewing the insurance program and is able to obtain the same limit of guaranteed cost products liability coverage, but above an attachment point of $30 million rather than $5 million per occurrence. This leaves an uncovered layer in ABC's liability program of $25 million per occurrence excess of $5 million per occurrence as Exhibit 10-1 illustrates.

FEMA-DC00007485

03/07/2002 17:35 FAX 2026462730        RR-HS            R                    019
    MAR-06-2002  16:50       MAYOR'S PRESS OFFICE           1 212 788 2975   P.19/22

APPENDIX C

FEMA-DC00007486

Case 2:07-cv-07072-AKH    Document 20-3    Filed 09/19/2007    Page 17 of 21
03/07/2002 17:35 FAX 2026462730        RR-HS            R            Ø020
MAR-06-2002  16:50    MAYOR'S PRESS OFFICE        1 212 788 2975    P.19/22

2ND REPRINT                          RISK FINANCING
JUNE 1997              CASH FLOW/ALTERNATIVE MARKET PLANS

# CAPTIVE INSURANCE COMPANIES

Captive insurance companies are entities that are created to: insure the loss exposures of their founding organizations, reduce frictional costs, provide and arrange tailored risk management services, and take advantage of certain tax opportunities. A well-accepted definition of a "captive" follows:

> A closely held insurance company whose insurance business is primarily supplied by and controlled by its owners, and in which the original insureds are the principal beneficiaries.[1]

This chapter is divided into five sections, as follows:

- The basic concepts underlying captive insurers

- The issues of feasibility and implementation

- The factors involved in selecting a captive domicile

- The basic operating procedures of captive insurers

- The special circumstances applying to group captives and rent-a-captives

The captive insurer option has much in common with other risk financing alternatives. Regardless of the type of risk financing plan an organization utilizes (e.g., captive, self-insurance, or insurance with a deductible or retro), laws must be complied with, losses must be forecast, outside service firms must be retained, financial effects must be accounted for, and tax issues must be addressed. For this reason, many issues addressed in other sections of this manual also apply to the captive as a risk financing option. To avoid redundancy, these concepts are not addressed in this discussion (or are addressed only briefly). Instead, this section deals only with those concepts unique to captives. For your convenience, Exhibit IV.K.1 is an index of topics addressed in other sections of the manual that also apply to captives. Cross-references are continually used within the text of this section to help you find related information in other parts of the manual.

## Basic Concepts of Captive Insurance Companies

The following discussion will provide a brief historical review of the captive concept, define the different types of captives, describe the essential prerequisites for captive formation, compare the two basic types of captive insurers, and analyze both the advantages and disadvantages afforded by captives.



[1] *Captive Insurance Company Directory*, 1996, Tillinghast.

IV.K.1          Copyright © 1997 International Risk Management Institute, Inc.

FEMA-DC00007487

03/07/2002 17:34 FAX 2026462730          RR-HS          R                    @015
    MAR-06-2002  15:49          MAYOR'S PRESS OFFICE          1 212 788 2978   P.14/22

APPENDIX B

FEMA-DC00007488

03/07/2002 17:34 FAX 2026402730         KR-HS                    ☒017
MAR-06-2002 16:49      MAYOR'S PRESS OFFICE       1 212 788 2975   P.16/22

10-2   *Risk Financing*

only a limited amount of risk. This type of plan is sometimes referred to as a finite/integrated risk plan.

> A finite/integrated risk plan is an integrated risk plan written on a finite risk basis.

In general, an organization uses a finite and/or an integrated risk plan for high-severity losses above a plan that involves retention, such as a self-insurance plan, a retrospective rating plan, or a captive insurer plan. (As explained later, in certain circumstances an organization uses finite risk insurance for its working-level losses.) An insured needs a substantial annual risk cost in order to justify the expenses involved with a finite and/or an integrated risk plan. One source places this annual risk cost in excess of $1 million.[1]

# Finite Risk Plans

Finite risk plans, which are often categorized as hybrid plans, can be thought of as a blend of self-insurance and guaranteed cost insurance. With a finite risk plan, the insurer returns a portion of the premium if it makes a profit, as specified by the plan. This structure benefits an insured that is able to control its losses. Conversely, an insured that is not able to control its losses is protected because losses that exceed an aggregate retained amount are transferred to the insurer.

Most finite risk plans are somewhat similar in concept to a retrospective rating plan. A major difference between them is that a finite risk plan usually covers an insured's high-severity losses over several years under a single contract, while a retrospective rating plan is usually applied to an insured's low-to-medium-severity losses over a single year. Because a finite risk plan deals with high-severity losses, the losses that will fall under it are usually more difficult to predict than the losses that will fall under a retrospective rating plan.

Finite risk insurance plans are flexible and are custom-tailored to insureds' needs. Although no two finite risk plans are exactly alike, they do share common characteristics:

* The limits of coverage apply on an aggregate basis.
* The term of coverage is usually for multiple years (up to fifteen years in some cases, although five to ten years is more common) and is noncancelable.
* The premium is generally a substantial percentage of the policy limits (often 50 percent or more).
* The insurer shares profit with the insured, including investment income arising from the cash flow.

FEMA-DC00007489

# Chapter 10

# Finite and Integrated Risk Insurance Plans

## Introduction

This chapter provides an overview of both finite risk and integrated risk insurance plans, which were introduced in Chapter 1 and Chapter 3. As explained throughout this chapter, these plans enable an organization to efficiently manage many of its enterprisewide risks. As explained in Chapter 3, a *finite risk plan* is an insurance plan whereby an insured transfers a limited (finite) amount of risk to an insurer because a large component of the insured's premium is used to fund its own losses. An *integrated risk plan* is an insurance plan that provides an insured with a single block of risk-transfer capacity over several types of risk exposures, which can include financial/market risk (such as that involving interest rate, foreign exchange, and commodity price risks) as well as hazard risk exposures.

An *integrated risk plan* is an insurance plan that provides an insured with a single block of risk-transfer capacity over several types of risk exposures, which can include financial/market risk (for example, risk related to interest rate and foreign exchange) along with hazard risk exposures.

*Finite risk plans: transfer a finite amount of risk.*

*Integrated risk plan: includes non-hazard risk*

An integrated risk plan is sometimes written on a finite risk basis. Under such a plan, the insurer provides a large block of risk-transfer capacity over several types of risk exposures, with the premium structured so that the insurer takes

10-1

FEMA-DC00007490



# EXHIBIT IV.K.2
## RECENT GROWTH IN CAPTIVES: 1985–1995
### *Total Premiums $ Billions*

Source: Tillinghast

## *Factors Prompting Captive Formation*

A number of observers believe that the growth of captives has been fueled by the failure of commercial insurers to respond to the risk financing needs of large, sophisticated organizations. Others postulate that the instability brought about by the insurance market cycles of the 1970s and 1980s provided the impetus for the captive movement. Finally, some experts consider that captive development simply mirrors the overall competitive marketplace and that captives are yet another attempt to improve upon an existing product (i.e., insurance for large organizations).

Whatever the cause of captive development, during the past 40 years, three critical factors have prompted insureds to seek alternatives to the coverage offered by "traditional" insurers.

- Availability problems

- Pricing inequity

- Lack of flexibility

 First, businesses often experienced difficulty in securing certain types of coverage, especially for industries that insurers perceived as being of the "high-risk" variety. And even if obtainable, coverage breadth or coverage limits that insurers offered were frequently insufficient given the exposures involved.

IV.K.3

**CONFIDENTIAL[1]**

# M E M O R A N D U M

TO:        **FEDERAL EMERGENCY MANAGEMENT AGENCY**
              **ATTN: BRAD GAIR**
                    **FEDERAL RECOVERY OFFICER**

FROM:     **LAWRENCE M. MARTIN**
              **CITY OF NEW YORK**

DATE:     **MAY 13, 2002**

RE:        **REQUEST FOR FUNDING – COORDINATED INSURANCE PROGRAM**
              **FOR THE WORLD TRADE CENTER PROJECT**

---

Introduction

       By memorandum dated March 6, 2002, the City of New York ("the City") requested the Federal Emergency Management Agency ("FEMA") to consider approving $1 billion in non-risk-transfer insurance for the World Trade Center Coordinated Insurance Program ("WTC CIP"), either in the form of finite risk or captive insurance, since "the insurance industry is unwilling to provide [risk-based] insurance" beyond what is already in place. The problem, as recently described by the brokers responsible for the WTC CIP, is as follows:

> [T]he marketplace has failed to offer any appropriate, commercially reasonable coverage for environmental or professional liability or to write general liability insurance excess of the $79 million we have placed. Insurance carriers have taken the position that the liabilities at issue, especially environmental, are not risks but known losses – the lawsuits and insurance costs are certain to happen – and thus they will not write traditional "risk transfer" insurance. The continuing industry-wide contraction of underwriting capacity, caused by the extraordinary losses from the September 11 attacks, has further aggravated this situation.

---

[1] This submission is being made in accordance with a letter from the US Department of Justice, dated May 8, 2002 (attached as "DOJ Letter"), concerning its protection from disclosure under the Freedom of Information Act. The City respectfully requests that its confidentiality be preserved.

FEMA-DC00004591

(Memorandum of Willis of New York, Inc. and Marsh USA, Inc., attached as "Willis/Marsh Memo,"

p. 1, emphasis added.)

FEMA responded to the City's March 6 request by letter dated March 15, 2002, and

follow-up e-mails. (FEMA's March 15 letter and e-mails are attached as "FEMA Response"). In its

response, FEMA stated that it had made a "preliminary eligibility determination" that the premiums

for finite risk or captive insurance "may be acceptable and the costs of such insurance may be

reimbursable as a direct cost of the World Trade Center debris removal activity." (Id., March 15

letter, p. 1, and e-mail.)[2]

The March 15 letter explained the framework of this determination:

> FEMA had previously agreed that the insurance premiums for an Overall Coordinated
> Insurance Policy (OCIP) [sic][3] purchased by NYC could be a reimbursable debris
> removal expense. It was contemplated that New York City would obtain insurance
> coverage for Workers' Compensation & Employer's Liability for workers on the site,
> General Liability, Excess Liability, Pollution Liability, Professional Liability, and other
> incidental types of coverage for [itself[4] and] the Contractors, Subcontractors, Consultants,
> and Subconsultants working on the City's World Trade Center Complex debris removal
> project.

(Id.)  In order to go beyond its "preliminary eligibility determination" FEMA asked the City to

address three issues:

Scope of Coverage.  In order to receive full reimbursement as a direct cost of the

debris removal project, the "scope of coverage" of such insurance may not "expand beyond an

incidental degree" beyond the scope of the WTC CIP;

---

[2] In its March 19 e-mail, FEMA left the door open to still other types of such insurance "chosen by the City."
For the record, while the City is here only proposing finite risk and captive insurance, it likewise leaves the
door open to some third type of protection that it may hereafter develop in cooperation with FEMA. We
emphasize, however, that both finite risk and captive insurance serve the goals of the WTC CIP extremely
well, and the City hopes that one of these is approved by FEMA in the very near future.

[3] The technical term for this insurance is actually "Coordinated Insurance Program" (or "CIP").

[4] In its e-mail dated March 19, 2002, a representative of FEMA makes clear that the City, just like its
contractors and subcontractors, is an insured under the WTC CIP:  "I want to clarify that FEMA's March 15,
2002 letter ... should not be interpreted as excluding the City as an insured for any coverage it obtains under
[the WTC CIP] or any other type of insurance.  It was assumed that the City would also be an insured under
any such policy."

2

<u>Need for Requested Insurance Coverage.</u>  The City needs to supply "documentation supporting the need for" the requested $1 billion in coverage;

<u>Reasonableness of Premium.</u>  The "premium cost" for such insurance must be reasonable.

The City addresses each of these issues below.  Before doing so, however, we should make the following point:  While the City (as FEMA subgrantee) is making the request, this insurance is particularly important for the private contractors and subcontractors who have worked on this project.  As the WTC CIP brokers explain, if FEMA approves this insurance, the City's contractors and subcontractors will gain broad coverage "for all their WTC debris removal operations."  (Willis/Marsh Memo, p. 4.)  Indeed, it is hard to imagine claims against them that will not be covered under this $1 billion in insurance.[5]

## Scope of Coverage

The City wishes to make a related point as plainly as possible:  The insurance discussed here – whether finite or captive – is expressly limited to the WTC debris removal project. Thus, for example, this insurance would not cover any liabilities the City may have for the September 11 attacks or for the collapse of the WTC buildings.  Similarly, it would not cover any of the City's workers compensation liabilities (its "force account"), either for the September 11 attacks and building collapse or for any part of the debris removal project.[6]  Put most simply, this insurance covers only those liabilities of the City or its contractors and subcontractors that arise out of the debris removal project itself.

---

[5] It should likewise be clarified that, while the March 15, 2002 letter and this request are phrased in terms of "debris removal," some of the work at issue may have been classified by FEMA as "emergency protective services."  The City understands that all such work, so long as the contractors or subcontractors were involved, is likewise covered by the WTC CIP, and thus by the insurance discussed here.  For the sake of simplicity, we will continue to refer to all such work as "debris removal."

[6] As FEMA knows, the workers compensation liabilities of all contractors and subcontractors have already been covered by the Liberty Mutual policy that is already in place.  The City is not an insured under that policy, and its employees are not covered thereunder.

3

FEMA-DC00004593

This fact may be demonstrated through a detailed review of the term sheet for finite risk insurance which the WTC CIP brokers distributed to the insurance marketplace (attached as Exhibit A to the Willis/Marsh Memo). The relevant provisions follow:

(1) The "Insureds" are limited to the insureds under the WTC CIP – i.e., the City of New York and its "contractors, subcontractors and consultants of every tier working on the World Trade Center clean-up and debris removal project."

(2) The "Coverages" are limited to the already-approved WTC CIP lines of coverage. These are: excess/umbrella liability (beyond the $79 million in general liability coverage already in place); environmental (or pollution) liability; professional liability; and marine excess/umbrella (beyond the marine coverage already in place).[7]

(3) The "Scope of Coverage" also expressly tracks the scope of the WTC CIP. It is accordingly defined as "[c]laims arising from the operations of the City of New York and its contractors and subcontractors in or near the World Trade Center site from the beginning of the clean-up and debris removal project on September 11, 2001 (post-collapse) through the end of such project."

(4) This insurance would not duplicate any of the policies already in place for the WTC CIP (e.g., the $79 million in general liability), which would remain primary (see "Retentions" and "Coverages").

(Ex. A to the Willis/Marsh Memo. This description of the term sheet is adapted from page 4 of the Willis/Marsh Memo.)

Captive insurance would likewise be strictly limited to the WTC debris removal project and the WTC CIP. As the WTC CIP brokers explain, captive insurance would define "Insureds," "Coverages," "Scope of Coverage," and "Retention," etc. in precisely the same way as the finite insurance term sheet. (Willis/Marsh Memo, p. 9.)

In sum, the scope of insurance sought in this request falls squarely within the scope of the WTC debris removal project and the WTC CIP. Given this, it more than meets FEMA's requirement that such insurance not "expand beyond an incidental degree" the scope of the WTC CIP (March 15 letter, p. 1).

---

[7] Among these lines of coverage only one, the marine excess/umbrella (covering barging of the WTC debris across the Hudson River), is not expressly listed in FEMA's March 15 letter. This relatively minor coverage, like the primary marine coverage already placed, is clearly appropriate, and thus falls within the March 15 letter category of "incidental type of coverage."

4

FEMA-DC00004594

Need for Requested Insurance Coverage

       Although the City is reserving the right to request all insurance coverage that is ultimately needed for the WTC CIP (see cover letter to this memorandum), the City is requesting today only a minimum aggregate limit of liability of $1 billion.

       Based on recent news accounts of toxic chemicals emanating from the WTC debris removal site (see exhibit labeled "News Reports"), a very high amount of coverage will be needed to protect the City and its contractors and subcontractors. We do not rely on such reports to substantiate the requested $1 billion in coverage, however. We rely instead on a report prepared by the firm of Ernst & Young, LLP (the "E&Y May 2002 Report"). As FEMA knows, Ernst & Young was retained by the City in late September 2001 – two weeks after the 9/11 disaster – to advise it on risk and insurance issues relating to the WTC debris removal project. A major responsibility of this assignment was the determination of the issue now before us, i.e., the amount of insurance needed for the WTC CIP.

       As FEMA knows, Ernst & Young issued a Preliminary Report in November 2001. At that point in time, Ernst & Young recommended the purchase of $2.8 billion in coverage for the WTC CIP.

       Because circumstances have changed on the WTC cleanup project since November 2001, the City recently asked Ernst & Young to prepare an updated report. This is the "E&Y May 2002 Report" attached hereto. While we hope FEMA will study the entire Report, its scope and conclusion may be reviewed here.

       As its introductory paragraph specifies, the E&Y May 2002 Report focuses exclusively on the issue at hand:

> the amount of certain types of insurance that would be desirable to be purchased for protecting the City, its contractors and subcontractors from liability for the World Trade Center (WTC) cleanup efforts. (Id., p.1)

FEMA-DC00004595

Indeed, the Report limits itself to just three lines of coverage for the debris removal project:

pollution, comprehensive general liability, and professional liability. (Id.)  Finally, the Report

specifies which risks are within its scope -- "This analysis considers only potential liability of the

City and the contractors and subcontractors arising from the cleanup" -- and which risks are outside:

> Potential liabilities associated with the actual 9/11 attack and collapse of the World Trade
> Center buildings are not included in this analysis.  Similarly, any liability the City or
> others might have for the post-attack and collapse period that does not arise from the
> cleanup project is excluded from this analysis.  Once again, our analysis -- and the dollar
> amounts in this report -- relate only to the potential liability of the City and its contractors
> and subcontractors arising from the WTC cleanup project.  (Id.)

In other words, whatever liabilities the City (or contractors) may have that are unrelated to the debris

removal project are entirely outside and additional to the liabilities evaluated by Ernst & Young.

The E&Y Report then details the major sources of risk as of May 2002 (see "Overview" at pp. 1-4)

and the means by which they were analyzed (see "Methodology," especially at pp. 4-7, and

"Appendix" at pp. 10-13).

>           The Report specifically addresses the amount of insurance that should be purchased

for this project-- what it calls the "required insurance limits" or "insurance coverage needs" (id., pp.

5, 6).  Ernst & Young presents the following conclusion:

> Based on the work performed to date, we arrive at the following requirements:
>
> | | |
> |---|---|
> | *Comprehensive General Liability:* | *$0.3 Billion* |
> | *Pollution, including asbestos and other toxic torts:* | *1.9 Billion* |
> | *Professional Liability:* | *0.1 Billion* |
> | Total: | $2.3 Billion |

(Id. p. 5.)

>           Given the foregoing, it would be reasonable to request insurance coverage totaling

$2.3 billion.  Indeed, as the table on page 6 or the Report suggests, one might even request $4.2

billion in coverage.  The City does not currently seek all such coverage.  As indicated above, we only

request, at this time, sufficient funding to purchase a minimum of $1 billion in coverage.  Such

insurance, issued in accordance with the WTC CIP, is absolutely vital to protect the City and its

contractors and subcontractors on the WTC debris removal project.

6

FEMA-DC00004596

In sum, the City more than meets FEMA's request that it supply "documentation supporting the need for...one billion dollars in coverage."

Reasonableness of Premium

We turn now to the third issue raised in FEMA's March 15 letter: the "reasonableness of premium cost." With regard to finite risk insurance, that issue can be readily answered, since finite risk insurance is available in the insurance marketplace. One need only determine the kind of finite risk coverage that is needed and then submit the terms of this coverage to appropriate insurance companies, requesting that they respond with indications and, ultimately, bids. The result of this competitive process is the lowest price for this coverage that is actually available in the real world – the very essence of a "reasonable cost."

This approach accords with the terms of FEMA's March 15 letter. Regarding the "reasonableness of premium cost," the letter states, "We hereby request a copy of the bid packages before we make final eligibility and reimbursement determinations." (March 15 letter, p. 1, first paragraph).

Following receipt of the March 15 letter, the brokers for the WTC CIP undertook a rigorous competitive process (see Willis/Marsh Memo at pp. 3-8). Working with the City, Willis and Marsh first developed a detailed term sheet setting forth the finite risk insurance coverage that would be needed for the WTC CIP. (This is attached as Exhibit A to the Willis/Marsh Memo). The term sheet specified all the essentials of this coverage – the "Insureds," "Coverages," "Scope of Coverage," and "Retention," etc. (see pages 2-3, above), and required a minimum of $1 billion in coverage and a guarantee that all unused funds would be returned to FEMA (see Willis/Marsh Memo, pp. 4-5).

Willis and Marsh then determined the limited universe of appropriate insurance companies, i.e., those capable of issuing such a policy and sufficiently secure financially to support this extremely large, long-term finite risk program. Only nine companies met this standard. Willis

7

and Marsh transmitted the term sheet to all nine companies, requesting that they supply indications (non-binding price and terms) for the insurance specified there. Eight of the nine companies responded and, of these, five provided indications. (Id., p. 5.)

As it turned out, one of these companies (Zurich) provided a completely non-conforming indication, while three provided indications that contained a significant deviation from the term sheet. This is the introduction of year-to-year limits on the funds available to pay the costs and expenses of this insurance. One company (AIG) limited available funds at the beginning of the policy to $50 million, another (Chubb) offered two alternatives, one of which limited available funds during the first year to $25 million, and a third company (XL) made only $50 million available during the entire first five years of the policy. (Id., p. 6-7.) Such limits cannot be part of any WTC CIP finite risk insurance. Very briefly, a limit on available funds renders the insurance incapable of paying claims beyond that year's limit, and thus undermines the insureds' protection.

There were, however, two indications that effectively met the requirements of the term sheet. One was by Berkshire Hathaway (the company in which Warren Buffett is a major investor), which made the full $1 billion in coverage available on the day 1 of the policy. The other, by Chubb, provided significant available funds early in the program ($250 million in year one, $400 million in year two). Berkshire Hathaway offered its policy at a premium of $850 million, plus associated costs, totaling an estimated $918 million, while Chubb offered theirs at a premium of $898,053,000, plus associated costs, totaling an estimated $967 million. Berkshire Hathaway offered an investment rate on unused funds equivalent to six-month treasury bills, while Chubb offered a flat 4.5%. (Id.)

Since these indications were received very recently, Willis and Marsh have not had the opportunity to complete the process. There remains the financial analysis of the indications (at least those of Berkshire Hathaway and Chubb) and the negotiation of complete and final bids from these companies. Willis and Marsh stand ready to take this last step. (Id., pp. 8, 13.)

8

FEMA-DC00004598

The competitive process is thus ready to generate bid packages from which FEMA can "make [its] final eligibility and reimbursement determinations." (See March 15 letter, p. 1.) In the event that FEMA decides to provide the $1 billion in insurance through finite risk insurance, this process can be completed in the near future. In this way, FEMA can simultaneously establish the "reasonableness of premium costs" and bind the coverage needed here.

The determination of a reasonable premium for $1 billion in coverage under the captive insurance approach is somewhat more difficult. As the brokers for the WTC CIP explain, since the captive insurance company would be hand-tailored to the needs of the WTC CIP, there is no way to use the competitive process to directly determine the appropriate premium. (Willis/Marsh Memo, p. 10.) Because of this and because of the essential similarity of the two insurance mechanisms (see id., especially at pp. 2-3, 8-13), Willis and Marsh suggest that the captive premium be set in accordance with the cost of finite risk insurance. Specifically, they suggest setting the captive premium at the most competitive, conforming finite risk indication (plus associated costs). (Id., pp. 10-11.)

The City essentially accepts this approach. Accordingly, if the captive alternative is selected, the appropriate – and most reasonable – premium would correspond to Berkshire Hathaway's indication (premium of $850 million, plus associated costs, totaling an estimated $918 million) or Chubb's (premium of $898,053,000, plus associated costs, totaling an estimated $967 million). More precisely, the City suggests that the captive premium be set at (or very close to) the lowest final, bindable price that is achieved for conforming finite risk insurance. With further negotiations, the City estimates that this premium would be approximately $900 million.

Conclusion

Having addressed the three issues raised in FEMA's March 15, 2002 letter, the City hereby requests such funding as needed to pay the premium, plus associated costs, for an insurance policy providing a minimum aggregate limit of liability amount equal to $1.0 billion of non-risk-

9

transfer insurance, either in the form of finite risk or captive insurance. While the exact dollar amount of this funding is uncertain, the City estimates it will be approximately $900 million (premium plus associated costs).

We thank FEMA for its attention to this crucial need of those working on the WTC debris removal project.

10

FEMA-DC00004600

# Congress of the United States

### Washington, DC 20515

May 24, 2002

Mr. Joseph M. Allbaugh
Administrator
Federal Emergency Management Agency
Federal Center Plaza
500 C Street, S.W.
Washington, D.C. 20472

Dear Mr. Administrator:

It has come to our attention that the Federal Emergency Management Agency has received a proposal from the government of New York City that would provide the City and the contractors conducting the recovery work at the World Trade Center site insurance coverage for environmental claims that might arise related to that work. We respectfully urge a prompt review and approval of the City's proposal.

As you are aware, the four principal contractors that responded to the City's call after the devastating attacks of September 11 immediately began the search for survivors and the clean-up of thousands of tons of debris that remained after the collapse of the towers. That work is now nearly completed. Due to the extraordinary circumstances of the attacks and the need to begin recovery efforts immediately, the contractors began work without securing insurance coverage. Despite the City's best efforts, the private insurance market has provided only minimal liability coverage, and none for potential environmental damages.

We want to underscore our appreciation to the administration for its commitment to fill the insurance gap by providing the resources that will enable the City to secure $1 billion in insurance on its own behalf and for the contractors. The coverage envisioned in this proposal will ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors.

We are proud that the work is nearly completed, ahead of schedule and at approximately 10% of the originally projected cost. Moreover, considering the extraordinary hazards associated with the work (over 1.8 million tons of debris have been removed from the site), the recovery effort has been one of the safest construction site projects in New York City history and will soon be available for reconstruction. Accordingly, the insurance proposal now under review is critical to any rebuilding effort at the site because many of the companies actively involved in the recovery work will be the same contractors engaged in future reconstruction projects.

Thank you again for FEMA's ongoing assistance to the City of New York and its citizens as we move forward with a new sense of renewal and purpose. We look forward to your continued consideration and cooperation.

PRINTED ON RECYCLED PAPER

CITYCM3-00030541

With best wishes,

Sincerely,

**CHARLES B. RANGEL**
Member of Congress

**BENJAMIN A. GILMAN**
Member of Congress

**CAROLYN B. MALONEY**
Member of Congress

**JOHN E. SWEENEY**
Member of Congress

**JERROLD NADLER**
Member of Congress

**SHERWOOD L. BOEHLERT**
Member of Congress

**JOHN J. LAFALCE**
Member of Congress

**AMO HOUGHTON**
Member of Congress

**MAJOR R. OWENS**
Member of Congress

**JACK QUINN**
Member of Congress

**EDOLPHUS TOWNS**
Member of Congress

**JOHN McHUGH**
Member of Congress

**GARY ACKERMAN**
Member of Congress

**PETER KING**
Member of Congress

**LOUISE SLAUGHTER**
Member of Congress

**SUE W. KELLY**
Member of Congress

**JOSE E. SERRANO**
Member of Congress

VITO FOSSELLA
Member of Congress

NITA LOWEY
Member of Congress

THOMAS REYNOLDS
Member of Congress

MICHAEL McNULTY
Member of Congress

ELIOT L. ENGEL
Member of Congress

MAURICE HINCHEY
Member of Congress

GREGORY W. MEEKS
Member of Congress

CAROLYN McCARTHY
Member of Congress

ANTHONY WEINER
Member of Congress

JOSEPH CROWLEY
Member of Congress

FELIX GRUCCI
Member of Congress

STEVE ISRAEL
Member of Congress

NYDIA VELÁZQUEZ
Member of Congress

CITYCM3-00030543

# Debris Removal Insurance Program

## June 4, 2002 Meeting
## FEMA & NY SEMO

FEMA-DC00007496



**Debris Removal Insurance Program**
**Coverage Structure**

Covers any related losses not insured under the current CIP and any losses once that program is exhausted

| Workers Compensation | General Liability | Professional Liability | Environmental Liability | Marine Liability | Fresh Kills |

1

## Scope of Coverages

- Includes :
  - Workers Compensation, provided registered as a CIP employer
  - Legal Liabilities during emergency protective measures at WTC
  - Legal Liabilities during debris removal & recovery at WTC site
  - Legal Liabilities during loading debris onto marine transport
  - Legal Liabilities during debris transport, except highways
  - Legal Liabilities during debris unloading at Fresh Kills
  - Legal Liabilities during debris removal from private properties
  - Excess Legal Liabilities during debris processing & recovery

- Does Not Include :
  - Any legal liabilities for personal injuries or property damages caused by collapse of WTC towers and any related liabilities known as "attack liabilities"
  - Workers Compensation for employees not covered under CIP such as local governments, volunteers, National Guard regardless of work sites
  - Any City legal liabilities outside of its debris removal responsibilities such restricting access to properties and loss of use, medical services
  - Debris removal or clean-up on private properties by private contractors not covered by the CIP

2

1

FEMA-DC00007497



Not
expected
losse
↓
probability only
↓
"one-time pos
they did have
much client"
(J. Smith)

## Estimates of Probable Maximum Losses (Medium)
### Presented by Ernst & Young to City in October, 2001

| Associated Risks | General Liability | EIL & Professional | Total |
|---|---|---|---|
| Standard Construction Risk | 175.0 | | 175.0 |
| Asthma Exacerbated by Dust | - | 71.4 | 71.4 |
| Asbestos – Existing Plaintiff Pool | - | 80.7 | 80.7 |
| Pollution and Asbestos | | 296.0 | 296.0 |
| Loss of Use and Value | 51.3 | 51.3 | 102.6 |
| Injuries to Volunteers | 3.4 | | 3.4 |
| Freon Entering Occupied Area | 0 | | 0 |
| Fire at site, diesel fuel | 413.1 | | 413.1 |
| Failure of Shoring | - | 27.2 | 27.2 |
| Inspection of Surrounding Buildings | | 23.6 | 23.6 |
| Litigation Costs | 25.7 | 241.6 | 267.3 |
| Totals | 668.4 | 791.8 | 1,460.2 |

Only a Range of losses can be considered due the extreme unknowns. Estimates will be updated

The litigation costs could significantly increase as disputes arise between what caused damages; post-collapse debris removal operations or the collapse of the WTC towers. If there is no insurance program for the collapse related liabilities; it can be reasonably anticipated that plaintiffs will seek damages from the debris removal insurance insurance program. Significant political and legal controversy will be generated when damages are denied by the debris removal insurance program for environmental and emotional liabilities.

4

2

FEMA-DC00007498



### Finite Insurance

- $776-850 million deposit at inception (1)
- Premium taxes are in addition to premium required by insurers (9)
- Insurer profit margins deducted - $0-30 million depending on interest rate paid on escrow account (2)
- Restrictions on amounts and timing of funds made available by insurer and credited to escrow account could create a cash shortage to pay losses (4) & (3)
- Additional premium or Loan would be required for accelerated loss payouts in excess of escrow account which reduces total available funds (6)
- Insurer makes investment arbitrage between its investment rate of return on funds held & the funds credited to escrow account (3) & (4)
- Limitations on when and how much premium can be refunded, if any based on losses [(4) minus (7)+(6)]
- Losses & legal handled by claims administrator that draws on checking account (7,8,5)

5

---

# WTC Debris Removal Insurance Program
## Alternatives to Finite Insurance

1. City owned insurance company premiums funded at different levels based on amounts recommended by actuary.

2. State or city administered special governmental fund (trust) funded upfront based on actuarial recommendations and funded as needed in the future. Loss sensitive insurance policies as needed for claims administration.

3. Loss Sensitive & Retrospective Rated Insurance Policies with little or no risk transfer. Claims Administration primary service. Premium adjustments reimbursed as paid and premium collateral expense as eligible cost. Finite considered in 2004.

4. "As Is" – Self-Insured and FEMA reimburses costs as paid.

6

3

FEMA-DC00007499

### Captive Insurance Company

- $776-850 million deposit at inception (1)
- $250,000 capital contribution for captive creation (2) contributed by city's non-profit corp
- Premium taxes required for VT and possibly NY (4)
- Captive is governed and overseen by Board of Directors appointed by city (1)
- Captive is managed by professional management firm and fees paid annually (6)
- Captive earns investment income on entire premium deposit less initial deductions and ongoing transfers into checking account (3)
- Investment portfolio managed by a professional investment manager (3)
- Losses & legal handled by claims administrator that draws on checking account (7,8,5)

7



### Incremental Funding via Trust

- $50 million deposit at inception (1) (estimate, subject to actuarial )
- Incremental funding available from current obligation & future budget obligation as needed (4)
- Trust Fund is overseen by Trustees (1,2,3,5,6)
- Investment portfolio managed by a professional investment manager (2)
- Trust Fund earns investment income on initial funding less ongoing transfers into checking account (3)
- Losses & legal handled by claims administrator that draws on checking account (5,6,3)
- Insurance policies may be purchased as deemed cost effective or for administrative ease. (7)

8

4

FEMA-DC00007500



**Federal Emergency Management Agency**
**FEMA-State Federal Recovery Office**
**80 Centre Street, 3rd Floor**
**New York, New York 10013**
**FEMA-1391-DR-NY**

June 20, 2002

Edward F. Jacoby, Jr.
Governor's Authorized Representative
State of New York
State Emergency Management Office
1220 Washington Ave.
Building 22, Suite 101
Albany, NY 12226-2251

Re: Coordinated Insurance Program for WTC Debris Removal Insurance

Dear Mr. Jacoby:

This letter is in reference to correspondence, dated May 13, 2002, from Mark Page, Director of the Office of Management and Budget for the City of New York, regarding the City's request that the Federal Emergency Management Agency ("FEMA") provide funding as needed "for an insurance policy providing a minimum aggregate limit of liability amount equal to $1.0 billion of non-risk transfer insurance, either in the form of finite risk or captive insurance." The City's request "is expressly limited to" insurance for "the WTC debris removal project" and does not include any other liabilities, including but not limited to, those the City may have for the collapse of the WTC buildings.

FEMA accepts the City's proposal of May 13, 2002, with the following stipulations:

1.  FEMA, SEMO and NYC will jointly determine the appropriate insurance mechanism and funding strategy.
2.  FEMA, SEMO and NYC will cooperate on supplemental actuarial studies to refine estimates of the probable losses associated with this insurance program to determine the need for any adjustments.
3.  There is currently no additional federal funding set aside for insurance coverage in excess of the requested $1.0 billion; however, FEMA, SEMO and NYC recognize that $1.0 billion of coverage may not cover all liability associated with the eligible components of the debris removal process. Subject to the availability of additional Federal funds, Federal participation will not exceed the reasonable costs necessary to obtain coverage for the lower of: a) the known and reasonably estimated liabilities; b) the midrange probable maximum loss amount, as established in the May, 2002 Ernst & Young report; or c) the midrange probable

maximum loss amount, as established in a risk assessment report that updates the Ernst & Young May, 2002 report.

Upon the City's acceptance of these terms, FEMA and SEMO staff will meet with NYC staff to develop the work plan and program deliverables required to provide justification for an appropriate payout schedule and type of insurance.·

Sincerely,


Joseph Picciano
Acting Regional Director
Federal Emergency Management Agency

**FOR IMMEDIATE RELEASE:**
**March 21, 2003**

## GOVERNOR PATAKI, MAYOR BLOOMBERG UNVEIL NEW CAPTIVE INSURANCE LEGISLATION TO HELP NYC, STATE'S BUSINESS COMMUNITY



**Bill Allows for Sponsored Captives for New York's Businesses and the Creation of NYC Captive for WTC Response Providing Important Coverages**

Governor George E. Pataki and New York City Mayor Michael R. Bloomberg today announced new legislation that will allow a wider range of businesses the opportunity to utilize captive insurance companies to retain, fund, and better manage some of their risk.

The proposed bill will also allow for the formation of a pure captive insurance company by New York City to provide coverages for liability relating to or arising out of activities in or near the World Trade Center site in response to the attacks of September 11, 2001.

"The new legislation will mean New York City will now have important insurance coverages it greatly needs relating to the tragedies of September 11th,"Governor Pataki said. "The Federal Emergency Management Agency specifically authorized the creation of a New York City captive and the City explored various options and decided that the formation of a captive insurance company was in its best interest for claims arising out of the clean-up effort at and near the World Trade Center.

"Our policies of cutting taxes, controlling spending, and eliminating red tape have strengthened the State's business climate. This bill reaffirms my commitment to pursuing policies that result in creating business opportunities and jobs in the State of New York," Governor Pataki said. New York City Mayor Michael Bloomberg said, "The City of New York, together with State officials and the New York Congressional delegation, has fought long and hard for federally-paid insurance to protect the City and its contractors for claims arising from the massive debris removal work done in the World Trade Center. This legislation is necessary for the City to expedite the payment of claims relating to this effort."

The new State captive legislation contains several provisions to help the State's business community. The bill provides a new risk transfer vehicle, known as a sponsored captive insurance company, which permits various participants to use the same vehicle to self-fund their risks. The bill in addition, creates additional flexibility by lowering the threshold for businesses to form single parent captives and to participate in a group captive. As well, public entities that meet appropriate standards will also be permitted to form captives.

The U.S. Congress recently passed legislation directing the Federal Emergency Management Agency (FEMA) to provide the City of New York with up to $1 billion in coverage for the City and its contractors for claims arising from debris removal performed after the collapse of the World Trade Center buildings. The federal legislation also directs the City of New York to use such funds to establish a captive insurance company or other such appropriate insurance mechanism.

Superintendent of Insurance Gregory V. Serio said, "The new State captive legislation also creates greater flexibility and allows businesses and public entities new opportunities to avail themselves of greater choices for more efficiency in managing and financing risk. Given the contraction of the

Case 2:07-cv-07072-AKH   Document 20-8   Filed 09/10/2007   Page 2 of 2

commercial insurance market around the country, the new legislation affords even more of New York's businesses a valuable option by offering the use of captives as an alternative form of insurance. The New York State Insurance Department is proud of its status as both a facilitator of insurance coverage for New York's businesses and industry regulator of safety and soundness in the best traditions of financial regulation. The Department stands ready to help New York's businesses manage their risk, save money and gain greater control of their corporate futures."

Empire State Development Corporation Chairman Charles A. Gargano said, "Companies from across the State, across the Nation, and around the world are expanding their operations and investing their futures in New York. This important legislation is yet another example of Governor Pataki working to improve the business climate of New York and his commitment to pursuing pro-business, pro-growth policies."

Governor Pataki signed New York's first captive legislation in August 1997, authorizing the formation of captive insurance companies in the State. Captives are created when a business or groups of businesses join to insure or reinsure their own risk. And allowing these insurers and their managers to operate free of most regulatory constraints, serving exclusively the companies or industries that form them.

Superintendent Serio added, "The Department's streamlined licensing process will allow New York's business community to benefit from captive formation. Once formed, a captive can reduce a business' insurance costs by reducing premiums, accessing the reinsurance market, and centralizing the enterprise's risk management operation. I encourage the State's business community to explore the possibilities and the advantages associated with the creation of captives."

The Insurance Department recently announced a newly dedicated "captive group" and the launch of a new Web site designed to fast-track applications for captive formation. In order to be even more responsive to the needs of a rapidly changing insurance marketplace, New York's businesses now have dedicated contacts in the Department of Insurance to answer all captive insurance questions and process captive applications within 30 days of the receipt of a fully completed application. The web address is http://www.nycaptives.com/



**Return to the 2003 Press Releases**
**Return to the Office of the Governor**

# UNITED STATES DEPARTMENT OF HOMELAND SECURITY
# EMERGENCY PREPAREDNESS & RESPONSE DIRECTORATE

## GRANT AGREEMENT

## WTC CAPTIVE INSURANCE COMPANY PROJECT

This Agreement made by and between the Federal Emergency Management Agency (hereinafter "FEMA"), within the United States Department of Homeland Security, Emergency Preparedness and Response Directorate, having its principal place of business at 500 C Street S.W., Washington, D.C., and New York State through the State Emergency Management Office (hereinafter "SEMO" or "Grantee") having its principal place of business at 1220 Washington Ave., Building 22 Suite 101, Albany, New York 12226.

## WITNESSETH

WHEREAS, On September 11, 2001 as a result of terrorist attacks against the United States, the World Trade Center Complex in New York City and adjacent properties (hereinafter "WTC site") collapsed or were destroyed resulting in an enormous amount of debris; and

WHEREAS, The City of New York (hereinafter "City" or "Sub-Grantee") through its Office of Emergency Management, Fire Department and Police Department took control of the scene and coordinated citywide response efforts, including debris removal. The Port Authority Police Department, numerous other City and State agencies, fire departments, National Guard units and Federal assets also assisted in the response efforts; and

WHEREAS, The City, through its Department of Design and Construction (DDC), entered into four time and material agreements for the removal and hauling of debris capped at $250,000,000 each. Those agreements were with AMEC Construction Management Inc., BOVIS Lend Lease LMB, Inc., Tully Construction Co., Inc., and Turner Construction Company, who completed the work or supervised numerous other companies to complete the work (all collectively referred to herein as "contractors"); and

WHEREAS, Most debris was transported to the Fresh Kills Landfill on Staten Island via barge and truck transport. Structural steel was barged to a number of metal recyclers in New Jersey. Various piers, marine transfer stations, and sorting areas were utilized in removing the debris. The City Department of Sanitation was involved in the transportation of debris and the final disposal of processed debris at Fresh Kills Landfill; and

WHEREAS, Because of fires and disturbance of the debris in the course of its removal, allegedly numerous potentially toxic materials may have been emitted. The City was unable, however, to obtain adequate commercially reasonable liability insurance,

particularly environmental and professional liability insurance, for itself and the contractors. With FEMA reimbursement, the City did obtain $500 million in marine insurance and $79 million in general liability insurance; and

WHEREAS, By written request dated December 11, 2002, through SEMO, the Governor's Authorized Representative for FEMA disaster designated DR-1391-NY, the City requested $1 billion in funding from FEMA to establish a captive insurance company in the State of New York. This company would insure the City and the contractors for claims arising from the debris removal project, including for any environmental or professional liability; [1] and

WHEREAS, On February 20, 2003, President Bush signed the Consolidated Appropriations Resolution, 2003, P.L. 108-7, in which FEMA was directed to provide up to $1 billion to establish a captive insurance company or other appropriate insurance mechanism to insure the City and the contractors for claims arising from debris removal; and

WHEREAS, Pursuant to the Consolidated Appropriations Resolution, 2003, P.L. 108-7, the purpose of this Grant is to provide Federal financial assistance for the "WTC Captive Insurance Company Project" (hereinafter "Project"). The project will consist of the incorporation of a captive insurance company (hereinafter "Captive") by the City in the State of New York to insure the City and the contractors for claims arising from debris removal at the World Trade Center following the terrorist attacks of September 11, 2001; and

WHEREAS, The Grantee will enter into a Sub-Grant Agreement with the City incorporating the terms and conditions of this agreement; and

NOW THEREFORE, in consideration of the foregoing, the parties agree as follows:

## ARTICLE I--PROJECT REQUIREMENTS

1. The Award of Federal assistance in support of the Project described herein is effective on the date that the authorized FEMA official signs this Grant Agreement. Upon execution of this Grant Agreement by the Grantee, the Grantee affirms this Award in support of the said Project and enters into this Grant Agreement with FEMA.

2. The Grantee through its Sub-Grant Agreement with the City attached hereto and incorporated by reference (Attachment A) shall ensure that the City will establish and incorporate a captive insurance company to be known as the WTC Captive Insurance Company, Inc. in the State of New York pursuant to the Certificate of Incorporation, the By-Laws, and the Liability Insurance Policy (attached hereto and incorporated herein as Attachments B, C, and D, respectively) to insure the City and its debris removal

---

[1] As a "captive" insurance company, the company will provide insurance coverage exclusively for the City and those contractors (as defined above) that were paid to perform debris removal at the WTC site. The "captive" insurance company will not provide insurance coverage to any other persons or entities.

contractors, subcontractors and consultants at every tier, for claims arising from debris removal at the WTC site from September 11,2001 (post collapse) through August 30, 2002.

3. The Captive will be an independent corporate entity and will not constitute a sub-grantee of the State of New York or the City of New York. The Captive is not subject to 44 C.F.R. § 13.36 (Procurement), but shall be governed by the procurement requirements set forth in the Sub-Grant Agreement. The general management of the corporate affairs of the captive will be vested in a Board of Directors. It will have a standing advisory committee, a President, a Treasurer, a Secretary and other officers as the Board of Directors determines necessary.

4. The Grantee through the New York State Insurance Department (hereinafter SID) will regulate the Captive.

## ARTICLE II – PROJECT DESCRIPTION

1. The Grantee, through a sub-grant to the City, shall use the Grant Award for the Project as described herein and in **Attachments A-D** which are attached hereto and incorporated herein by reference.

2. The Conference Report to P.L. 108-7, the Consolidated Appropriations Resolution, 2003, directs that no FEMA funds be expended to insure claims arising from the September 11 terrorist-related aircraft crashes, as provided for in Section 408 of the Airline Transportation Safety and System Stabilization Act (49 U.S.C. § 40101). Though some claims resulting from the events of September 11, 2001 may arise from or relate to both the aircraft crashes and the subsequent debris removal, FEMA concludes that Congress did not intend with its statement in the Conference Report to prohibit the provision of insurance coverage under P.L. 108-7 for those claims arising from debris removal that also arise out of, result from or relate to the aircraft crashes pursuant to 49 U.S.C. § 40101. Therefore, the Project will provide the City and its debris removal contractors with insurance coverage for claims arising from debris removal after the collapse of the WTC towers on September 11, 2001, regardless of whether or not the claim is also a cause of action under 49 U.S.C. § 40101. In no event shall the insurance coverage authorized by this Agreement cause the limitation on liability provided by Section 408(a)(3) to exceed $350,000,000.

## ARTICLE III - PERIOD OF PERFORMANCE

Upon transfer of the Grant Award to the Captive through the City, the Captive will use the Award solely for the purposes described in the Grant Agreement, with attachments, for an initial period of up to 25 years from the effective date of this Grant Agreement. Pursuant to Section 12 of Attachment D, the Captive will endeavor to commute the Policy or have it assumed under an assumption reinsurance agreement within the initial 25-year period. When the Policy is fully commuted or assumed under an assumption reinsurance agreement, the Project and this Agreement will terminate. In the event the

3

Captive is unable to fully commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage, the Grant Award will be extended, subject to Article XI, in two-year increments until such time as the Captive commutes its liabilities, obtains assumption reinsurance, or the Award funds are exhausted.

## ARTICLE IV – AMOUNT AND DISBURSEMENT OF AWARD

1. The amount of this Award is Nine Hundred Ninety-Nine Million, Nine Hundred Thousand Dollars ($999,900,000) (the "Award Amount"). This is the maximum award amount for which FEMA has authority and available funding.

2. FEMA shall disburse the entire Award Amount to the Grantee to be disbursed to the Sub-Grantee and thereupon to the Captive. Of this amount, expenses of up to $3 million for obligations incurred by the Sub-Grantee and/or the Contractors in developing the Captive from March 7, 2002, through the date the Award Amount is actually disbursed shall be disbursed by the Captive to such Sub-Grantee and/or Contractors (or paid directly by the Captive to those who supplied such services) insofar as such expenses have been approved by FEMA. Documentation evidencing such expenses must be submitted to FEMA within 60 days of the disbursing of the Grant Award to the Captive.

## ARTICLE V-FEDERAL FINANCIAL ASSISTANCE

FEMA will provide Federal financial assistance for the Project equal to one hundred percent (100%) of the eligible project costs ($999,900,000). There will be no State or local share requirement.

## ARTICLE VI—PAYMENT

1. Subsequent to the execution of this Grant Agreement and SID's review and approval of the Captive application, SID will first issue a letter indicating that a license will be formally issued upon payment to the Captive of the Grant Award. After SID issues such letter (hereinafter "licensing"), the Grantee may request payment from FEMA of the Grant Award. SID will thereafter issue a captive license upon proof of payment of the FEMA funds into the Captive.

2. FEMA will make payment of the Grant Award through the HHS SMARTLINK System.

3. The Grantee shall not obligate funds to the City for any purpose except for the implementation and completion of the Project.

4. Grantee and the City must expend all Federal funds obtained for Project purposes within five (5) working days after receiving those funds. If the Grantee and City fail to expend such funds within five (5) working days of their receipt or fail to return such

funds to FEMA within a reasonable period, FEMA may revoke or temporarily suspend the Grantee's access to the HHS SMARTLINK System. In addition, Grantee's or the City's failure to adhere to these requirements may result in the implementation of other remedies or penalties as authorized by Federal law or regulation.

5. Upon the payment of the Grant Award to the Captive, income and investment earnings generated must be used by the Captive insurance company for the purposes set forth in this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. The "premium" or initial capital contribution for the captive will be $999,900,000, to be paid in its entirety by the City at the Captive's inception. Thereafter, funds will be held by the Captive in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement to be invested and used to pay all costs related to the operation of the Captive, including but not limited to losses, fees to service providers, taxes, administrative and defense costs. The Captive shall maintain an "Experience Account" reflecting the foregoing. The Captive may operate with the funds in accordance with this Agreement and its Attachments A-D and any Amendments thereto made in accordance with this Agreement. FEMA shall be given written notice of investment guidelines within ten days of adoption by the Captive. The Captive will be governed in accordance with the Certificate of Incorporation and By-Laws attached as Exhibits B & C, as may be amended in accordance with this Agreement.

## ARTICLE VII—OVERSIGHT

1. FEMA, Grantee and SID will have, in addition to any rights provided by law, rule or regulation, the right to 30 days advance written notice of proposed amendments to the by-laws, policy, charter and/or proposed requests to SID for rulings or dispensations; and the right to participate as an observer at all meetings of the board of directors.

2. FEMA may request cost-cutting measures at any time during the operation of the Captive, which the Captive's Board of Directors must promptly consider and respond to in writing.

3. The Grantee shall comply with FEMA regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," 44 C.F.R. Part 13; and Office of Management and Budget Circulars Nos. A-87 and A-102.

## ARTICLE VIII – FINANCIAL AND PERFORMANCE REPORTS

1. The Grantee shall submit to FEMA and SID the following reports: a) A report from the Captive 30 days after the Captive has reported to SEMO, the City and the designated representative of the Contractors each calendar quarter of losses incurred, losses paid, changes in experience account balance, and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported ("IBNR") during the immediately preceding calendar quarter. It is agreed that in the event the Captive's

retained actuaries are unable to provide an estimate of IBNR loss reserves, the financial statements of the Captive need contain no IBNR loss reserves and such financial statements shall note the actuaries' inability to provide such an estimate. At such time as the actuaries are able to provide such an estimate, indicated IBNR loss reserves shall be established and included in the financial statements of the Captive in accordance with generally accepted accounting principles; b) The annual reports the Captive must submit to the Superintendent of SID (within 10 days of such submission); c) The annual financial statements (which shall be prepared no later than ninety days following the last day of each calendar year and audited by an independent auditor whose selection was made following 30 days notice to FEMA); and d) The minutes for all meetings of the Captive Board of Directors and Advisory Committee within five working days after the completion of such minutes.

2. The Grantee shall report quarterly, beginning June 30, 2003 and using quarterly financial statements provided by the Captive, to the Committees on Appropriations of the U.S. Congress and FEMA, regarding the expenditure of and investment earnings from the Grant Award.

3. The Grantee shall submit a Financial Status Report, SF 269, within 30 days from the end of the federal quarter that the Grantee expends the funds. The financial and performance reports required by this Article will also be utilized to satisfy the after-the-grant requirements of 44 C.F.R. § 13.50.

4. REPORT SUBMISSION: The Grantee will submit required reports to FEMA at: 500 C St., S.W., Room 334, Washington, DC 20472. Attn: Assistance Officer, Administration & Resource Planning.

## ARTICLE IX – FEMA OFFICIALS

FEMA officials for the Grant Agreement are as follows:

1. The Program Officer is the FEMA official who will be responsible for monitoring the technical performance of the Project activities described in the Project Narrative Statement.

The Program Officer is Gerald Connolly.

2. The Assistance Officer is the FEMA official who has full authority to negotiate, administer and execute all terms and conditions of the Grant.

The Assistance Officer is Richard Goodman.

## ARTICLE X – STATE OFFICIALS

1. The Governor's Authorized Representative for DR-1391-NY or the Alternate Governor's Authorized Representative for DR-1391-NY is the State Official who has full authority to negotiate administer and execute all terms and conditions of the Grant.

The Governor's Authorized Representative is James W.Tuffey

The Alternate Governor's Authorized Representative is John A. Agostino.

2. The Grantee shall notify FEMA in writing within 15 days if a new Governor's Authorized Representative or Alternative Governor's Authorized Representative is designated.

## ARTICLE XI – GRANT AWARD AMENDMENTS

1. ADDITIONAL FUNDING. The Grant Award is the maximum award for which FEMA has authority and funding. Absent additional authority and funding from Congress, this Grant Agreement is not subject to amendment for purposes of increasing the amount of the Award.

2. MODIFICATION OF TERMS. All material modifications must be in writing and signed by both parties to be enforceable. Such modifications include, but are not necessarily limited to, changes to the scope, amount, or purpose of the Grant, as described in this Agreement and its Attachments (A-D), and, in particular, any material amendments to Attachment D, The Liability Insurance Policy for the WTC Captive Insurance Company. For changes that will not result in a change of scope, amount or purpose of the Grant, this Agreement may be amended by FEMA providing written notice to the Grantee. Such changes include, but are not necessarily limited to, changes to FEMA's designated agency officers. This Agreement must also conform to any applicable subsequent changes in federal law. For modifications required as a result of changes in federal law, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary. For any and all modifications requested by the Grantee, the Grantee shall make a written request of FEMA and FEMA will make a good faith effort to notify the Grantee in writing within 30 days whether it will approve the Grantee's request and, if so, whether the change will require a written modification signed by both parties or whether written approval from FEMA will suffice.

3. EXTENSIONS. Requests to extend the initial 25-year Period of Performance will be considered pursuant to Article III when the Captive is unable to commute the Policy or purchase assumption reinsurance within 25 years because it is not feasible and/or cost-effective to do so and/or because of the unavailability of assumption reinsurance providing comparable coverage. An extension request must be supported by adequate written justification explaining why commutation or assumption reinsurance is not commercially reasonable and cost effective and/or that assumption reinsurance providing

7

comparable coverage is unavailable. No extension requests will be processed if performance and financial status reports are not current.

## ARTICLE XII– OTHER TERMS AND CONDITIONS

Other terms and conditions of this Grant Agreement are as follows:

1. CONTRACT PROVISIONS: All contracts executed by the Grantee or Sub-Grantee under this Grant Award must contain the contract provisions listed under 44 C.F.R. § 13.36(i)(1), (2), (7), (10) and (11).

2. FEDERAL LAWS AND REGULATIONS: Federal law authorizing this Grant Award controls the Project implementation. New Federal laws, regulations, policies, and related administrative practices may be promulgated after the date of the Grant Award, and might apply to the Project. The most recent of such Federal requirements will govern the administration of the Project at any particular time, unless FEMA issues a written determination otherwise. If a new Federal requirement requires a modification to this Agreement, FEMA will notify the Grantee that a written modification to be signed by both parties will be necessary.

3. STATE AND LOCAL LAW: The Grantee shall ensure adherence to all applicable State and local laws, regulations, and ordinances. The Grantee shall further ensure that all approvals, licenses, licensing, certifications, as required by State or local laws, rules or regulations, are obtained by the Captive prior to any payment to the Captive from the Grant Award. During the term of the Captive, the Captive will comply with all applicable Federal, State, and local laws, rules and regulations. In instances when a Federal statute or regulation pre-empts State or local law, the Grantee must abide by such Federal statute or regulation. Otherwise, no provision of this Grant Agreement shall require the Grantee to observe or enforce compliance with any provision, perform any other act, or do any other thing in contravention of State or local law. If any provision herein would require the Grantee to violate State or local law, the Grantee must notify FEMA immediately in writing in order that appropriate action may be taken.

4. RESPONSIBILITY FOR COMPLIANCE: Irrespective of participation by other parties in the Project, the Grantee is responsible for compliance with all Federal requirements applicable to the Project. The Grantee is responsible for extending all applicable Federal requirements to all parties participating in the implementation of the Project.

5. NO FEDERAL GOVERNMENT OBLIGATIONS TO THIRD PARTIES. The Federal Government shall not be subject to any obligations or liabilities to any third party or any other person not a party to the Grant Agreement in connection with the performance of the Project. Notwithstanding that the Federal Government may have concurred in or approved any solicitation, sub-agreement, or third party contract, the Federal Government has no obligations or liabilities to any party, including any third party contractor.

6. CHANGES IN PROJECT PERFORMANCE: The Grantee will notify FEMA immediately after it receives notification from the City of any change in local law, conditions (such as its legal, financial, or technical capacity), or any other event that may significantly affect the Captive's ability to perform the Project in accordance with the terms of the Grant Agreement and the Sub-Grant Agreement.

7. ENFORCEMENT: Enforcement remedies shall be processed as specified under 44 C.F.R. § 13.43 when the Terms and Conditions of the Grant Agreement are not met.

8. TERMINATION: Either the Grantee or FEMA may terminate this Grant Agreement for cause by giving written notice at least thirty (30) calendar days prior to the effective date of the termination. All notices to FEMA must be transmitted via registered or certified mail; return receipt requested, to the Regional Director, FEMA/FEMA Region II. All notices to the Grantee must be transmitted via registered or certified mail, return receipt requested, to the Governor's Authorized Representative, New York State Emergency Management Office, 1220 Washington Avenue, Building 22, Suite 101, Albany, New York, 12226. Closeout of the Grant Award will be commenced and processed as prescribed in 44 C.F.R. § 13.50. Costs may not be incurred during the thirty (30) day notification period except for administrative close out of the project and the Grant Award. All costs incurred prior to the Termination Notice will be reconciled and deobligation instructions will be provided by FEMA for the balance of the Award.

9. RECORD RETENTION: Records shall be retained for 3 years (except in certain rare circumstances described in 44 C.F.R. § 13.42) from the date the final financial status report is submitted to FEMA in compliance with 44 C.F.R. § 13.42. The Captive's books and records shall be made available to FEMA and SEMO upon reasonable notice.

## ARTICLE XIII – AUDIT REQUIREMENTS

Grantee must follow the audit requirements under OMB Circular No. A-133. Non-Federal entities that expend the amount listed in OMB Circular No. A-133 or more of Federal funds in a year shall have a single or program-specific audit conducted for that year in accordance with the provisions of A-133.

## ARTICLE XIV – GENERAL PROVISIONS

1. The Grantee shall comply with all applicable laws and regulations.

2. A non-exclusive list of regulations and Office of Management and Budget circulars applicable to this Grant Agreement are listed below:

| | |
|---|---|
| 44 C.F.R. Part 7 | "Nondiscrimination In Federally-Assisted Programs" |
| 44 C.F.R. Part 13 | "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments" |

| 44 C.F.R. Part 17 | "Government-wide Debarment and Suspension (Non-procurement) and Government-wide Requirements for Drug-Free Workplace (Grants)" |
| 44 C.F.R. Part 18 | "New Restrictions on Lobbying" |
| 31 C.F.R. Part 205 | "Rules and Procedures for Efficient Funds Transfers" |
| OMB Circular A-87 | "Cost Principles for State, Local, and Indian Tribal Governments" |
| OMB Circular A-102 | "Grants and Cooperative Agreements with State and Local Governments" |
| OMB Circular A-133 | "Audits of States, Local Governments, and Non-Profit Organizations" |

3. The following is hereby incorporated into this Grant Agreement by reference:

Attachment A, The Sub-Grant Agreement between Grantee and the City.
Attachment B The Certificate of Incorporation for the WTC Captive Insurance Company.
Attachment C The By-laws of the WTC Captive Insurance Company
Attachment D The Liability Insurance Policy for the WTC Captive Insurance Company.
Application for Federal Assistance, Standard Form 424;
Summary Sheet for Assurances and Certification, FEMA Form 20-16;
Assurances – Non-Construction Program, FEMA Form 20-16A;
Certification Regarding Lobbying, Debarment, Suspension and Other Responsible
Matters, and Drug-Free Workplace Requirements, FEMA Form 20-16C; and
Disclosure of Lobbying Activities, Standard Form LLL;
received by FEMA on ____11|02|04_____.

## ARTICLE XV – EXECUTION OF AGREEMENT

This Agreement comprises several identical counterparts, each to be fully executed by the parties and each deemed to be an original having identical legal effect. When signed by FEMA, this instrument will constitute an Award that should be executed by the Grantee within thirty (30) days of FEMA's execution of the Agreement or FEMA may withdraw its Award. Upon full execution of this Agreement, the effective date will be the date FEMA executed the Award.

FEMA has executed this Award as of November 5, 2004.

BY: _____

Michael D. Brown
Under Secretary
Emergency Preparedness and Response

The Grantee, by execution of this Agreement, ratifies and adopts all statements, representations, warranties, covenants and materials submitted by it; accepts FEMA's award of financial assistance; and, agrees to all the terms and conditions of this Agreement.

EXECUTED THIS 1 DAY of November, 2004

BY: _____

James W. Tuffey
Governor's Authorized Representative
DR-1391-NY

ATTESTED BY: _____

WTC CAPTIVE INSURANCE COMPANY, INC.

LIABILITY
INSURANCE POLICY
(Occurrence Basis)

**TABLE OF CONTENTS**

Page

SECTION  1    DEFINITIONS ........................................................................................1
SECTION  2    COVERAGE .......................................................................................7
SECTION  3    EXCLUSIONS ....................................................................................10
SECTION  4    LIMITS OF LIABILITY..................................................................... 11
SECTION  5    EXPERIENCE ACCOUNT ........................................................... 13
SECTION  6    PREMIUM .......................................................................................14
SECTION  7    CONTINGENT PREMIUM PAYMENT OBLIGATION.................. 14
SECTION  8    PARTIAL TERMINATION OF COVERAGE BY FIRST NAMED
              INSURED.........................................................................................15
SECTION  9    SUBMISSION AND PAYMENT OF CLAIMS AND SUITS;
              APPOINTMENT OF COUNSEL.................................................... 15
SECTION  10   NON-ACCEPTANCE OF CLAIMS ...............................................18
SECTION  11   REDUCED CLAIM PAyMENTS ..................................................18
SECTION  12   POLICY TERM AND RELATED MATTERS.................................. 19
SECTION  13   ARBITRATION ................................................................................22
SECTION  14   NO INSURANCE AGENT ...............................................................22
SECTION  15   GENERAL CONDITIONS ..............................................................23

**SCHEDULES**

SCHEDULE  1      Additional Named Insureds
SCHEDULE  2      Underlying Insurance Amounts
SCHEDULE  3      Payment Trigger Activation Rate

**EXHIBIT**

Form of Acknowledgment of Additional Named Insured

# WTC CAPTIVE INSURANCE COMPANY, INC.

## LIABILITY
## INSURANCE POLICY
(Occurrence Basis)

IN CERTAIN CIRCUMSTANCES CLAIMS AND EXPENSES MAY NOT BE
ACCEPTED OR NOT PAID IN FULL UNDER SECTIONS 10 AND 11 OF THIS
POLICY

### DECLARATIONS

POLICY NUMBER: 0001

ITEM 1.  INSUREDS:

(a)  First Named Insured:

City of New York

City Hall
New York, NY 10007

(b)  Additional Named Insureds:

See attached Schedule 1.

ITEM 2.  EXPOSURE PERIOD:

(a)  Effective Date:

September 11, 2001 (post collapse of World
Trade Center) as defined in Section 1 of the
Policy

(b)  Expiration Date:

August 30, 2002

ITEM 3.  ISSUE DATE:

December 3, 2004

ITEM 4.  ISSUE JURISDICTION:
New York

ITEM 5.  LIMITS OF LIABILITY:

(a)  Policy Limits:

(i)  Per Occurrence Limit:

The Experience Account Balance as
defined in Section 5 of the Policy.

(ii)  Aggregate Limit:

-i-

The Experience Account Balance as defined in Section 5 of the Policy.

(b)    Policy Sub-Limits:

(i)    Sub-Limit A (aggregate sublimit applicable to Other Than Uniformed City Worker Claims only):

$1,000,000,000 (one billion dollars) Ultimate Net Loss (or such other amount pursuant to the Policy)

(ii) Sub-Limit B (aggregate sublimit applicable to Claims subject to the liability cap set forth in Section 408(a)(3) of the Airline Transportation and System Stabilization Act):

$350,000,000 or such other amount, as further described in Section 4.04 of the Policy.

ITEM 6.    UNDERLYING INSURANCE AMOUNTS:

Per Schedule 2(a)

ITEM 7.    PREMIUM:

$999,900,000 as received by the Company pursuant to the FEMA Grant Agreement, the NYSEMO Sub-Grant Agreement and the NYC-Captive Agreement

ITEM 8.    CLAIM SUBMISSION ADDRESS:
GAB Robins North America
123 William Street, 15th Floor
New York, NY 10038

ITEM 9.    INSURANCE AGENT:
None.

This Policy shall not be valid unless countersigned below by a duly authorized representative of this Company.

Countersigned By: _____
Authorized Representative

Accepted and Agreed to By:

CITY OF NEW YORK

By: _____

Typed Name:  Kenneth A. Becker

Title:  Chief, World Trade Center Unit
        Office of the Corporation Counsel

Date:  December 6, 2004

REPRESENTATIVE OF ADDITIONAL NAMED INSUREDS

By: _____

Typed Name:  Michael Fegin

Title:  Representative of Additional Named Insureds

Date:  12/6/04

# WTC CAPTIVE INSURANCE COMPANY, INC.

LIABILITY
INSURANCE POLICY
(Occurrence Basis)

## SECTION 1
## DEFINITIONS

As used herein, the following terms in quotation marks, when capitalized, shall have the meanings set forth below and such meanings shall be applicable to both the singular and plural forms of each term:

1.01    **"Acceptance Trigger"** shall have the meaning set forth in Section 10.02 of this Policy.

1.02    **"Acceptance Trigger Rate"** shall have the meaning set forth in Section 10.02 of this Policy.

1.03    **"Actuarial Report"** shall have the meaning set forth in Section 12.02(a) of this Policy.

1.04    **"Additional Named Insureds"** shall mean, subject to Section 2.01(b) of this Policy, the contractors, subcontractors, consultants and other persons specified in Schedule 1 of this Policy and such other entities, if any, that performed Debris Removal and were compensated therefor by the First Named Insured with funds provided by FEMA, provided that any such entity submits evidence thereof that is satisfactory to the Company.  "Additional Named Insureds" shall also include any subsidiary, parent, associated or allied company, corporation, firm, or organization of the foregoing.

1.05    **"Aggregate Limit"** shall have the meaning set forth in Section 4.01(b) of this Policy.

1.06    **"Allocated Loss Adjustment Expense"** or **"ALAE"** shall have the meaning set forth in Section 4.07 of this Policy.

1.07    **"Bodily Injury"** shall mean bodily injury, sickness, disease, or mental illness sustained by any person which occurs (or exposure to the cause thereof occurs) during the Exposure Period, including death at any time resulting therefrom.  Damages because of "Bodily Injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "Bodily Injury." "Bodily Injury" shall also include any injury arising out of false arrest, detention or imprisonment; or the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; or oral or written publication of material that either violates an Insured's employee's right of privacy or slanders or libels an Insured's employee.

1.08    **"Claim"** shall mean an actual or threatened assertion by any Person, whether by commencement of a Suit or otherwise, that an Insured is or may be liable to such Person for Damages, including, but not limited to, allegations of Bodily Injury or Property Damage.

1.09    **"Commutation"** shall mean the commutation of this Policy under Section 12.02 of this Policy.

1.10    **"Company"** shall mean the WTC Captive Insurance Company, Inc.

1.11    **"Contingent Premium"** shall have the meaning set forth in Section 7.01 of this Policy.

1.12    **"Contingent Premium Payment Obligation"** shall have the meaning set forth in Section 7.04 of this Policy.

1.13    **"Damages"** shall mean any monetary damages to which this insurance applies. Damages does not include, among other things:

>    (a)    the actual or potential return or restitution of fees, expenses or costs for any services rendered or to be rendered by an Insured;

>    (b)    contract damages that do not arise from a covered Claim against an Insured;

>    (c)    any form of injunctive or declaratory relief, unless the Claim also seeks any monetary damages for which an Insured is held legally liable; or

>    (d)    fines, sanctions or statutory penalties, other than fines, sanctions or statutory penalties imposed on the Insured because of activities of the Insured reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities.

1.14    **"Debris Removal"** shall mean the activities of the Insureds during the Exposure Period arising out of or relating to the removal of debris at the World Trade Center Site following the collapse of buildings on September 11, 2001. Debris Removal activities include those relating to the physical movement of wreckage and remains at or from the World Trade Center Site; the staging of such contents at loading and unloading areas and transfer stations; the loading, unloading and reloading of such contents onto or off vehicles, including trucks and barges; the transportation, sorting and sifting of such contents; the mobilization, placement, demobilization and removal of equipment or operations; and the management, working conditions, administration and oversight of all areas relating to all of the foregoing activities.

1.15    **"Declarations"** shall mean the Declarations attached hereto.

1.16    **"Early Withdrawal"** shall have the meaning set forth in Section 12.03 of this Policy.

1.17    **"Effective Date"** shall mean the beginning of Debris Removal on the World Trade Center Site on September 11, 2001 (post-collapse of the World Trade Center).

1.18    **"Environmental Liability"** shall mean liability arising from the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants into or upon the land, water, atmosphere, or any other natural resource damage.

1.19    **"Experience Account"** shall have the meaning set forth in Section 5.01 of this Policy.

1.20    **"Experience Account Balance"** shall have the meaning set forth in Section 5.02 of this Policy.

1.21    **"Experience Account Balance Statement"** or **"EAB Statement"** shall have the meaning set forth in Section 5.03 of this Policy.

1.22    **"Expiration Date"** shall mean the date the Exposure Period terminates as specified in Item 2 (b) of the Declarations.

1.23    **"Exposure Period"** shall mean the beginning of Debris Removal at or from the World Trade Center Site on September 11, 2001 (post-collapse of the World Trade Center) (the Effective Date) through the Expiration Date.

1.24    **"FEMA"** shall mean the Federal Emergency Management Agency, Emergency, Preparedness and Response Directorate, United States Department of Homeland Security, or its successor.

1.25    **"FEMA Grant Agreement"** shall mean the United States Department of Homeland Security Emergency Preparedness and Response Directorate (the "Department of Homeland Security") Grant Agreement, WTC Captive Insurance Company Project, between the Department of Homeland Security (through FEMA) and the State of New York (through NYSEMO).

1.26    **"First Named Insured"** shall mean the insured under this Policy specified in Item 1(a) of the Declarations.

1.27    **"General Liability"** shall mean any liability arising from Bodily Injury or Property Damage.

1.28    **"IBNR"** shall mean incurred but not reported Losses.

1.29    **"Insureds"** shall mean the First Named Insured and the Additional Named Insureds, including each Insured's directors, officials, officers and employees acting within the lawful scope of their employment.  Except as specified herein, all Insureds shall have the same rights.

1.30    **"Insurance Agent"** shall have the meaning set forth in Item 8 of the Declarations and in Section 14 of this Policy.

1.31    **"Issue Date"** shall mean the date on which this Policy is issued by the Company, as specified in Item 3 of the Declarations.

1.32    **"Issue Jurisdiction"** shall mean the jurisdiction specified in Item 4 of the Declarations.

1.33    **"Liability Cap"** shall have the meaning set forth in Section 4.04 of this Policy.

1.34    **"Limits of Liability"** shall mean the limits of liability specified in Section 4 of this Policy.

1.35    **"Loss"** shall mean the amount of Damages paid or payable hereunder by the Company on behalf of the Insured with respect to a specific Claim.

1.36    **"Loss and ALAE Development Amount"** shall have the meaning set forth in Section 12.03 of the Policy.

1.37    **"Manager"** shall have the meaning set forth in Section 4.08 of this Policy.

1.38    **"Marine Liability"** shall mean liability arising from the use of barges in transit on the Hudson River and other waterways, including piers, docks and adjacent facilities for loading and unloading, on which such barges operated in furtherance of Debris Removal.

1.39    **"NYC-Captive Agreement"** shall mean the agreement between the City of New York and the Company.

1.40    **"NYSEMO"** shall mean the New York State Emergency Management Office.

1.41    **"NYSEMO Sub-Grant Agreement"** shall mean the Sub-Grant Agreement, WTC Captive Insurance Company Project, between the State of New York (through NYSEMO) and the City of New York (through its Office of Management and Budget).

1.42    **"Occurrence"** shall mean:

> (i) an accident or a happening or an event, or
>
> (ii) a series of accidents, happenings or events, or
>
> (iii) exposure to conditions, or
>
> (iv) continuous or repeated exposure to conditions

that result in Damages covered under this Policy. All such exposure to substantially the same general conditions existing at or emanating from the World Trade Center Site are deemed to be one Occurrence.

1.43    **"Other Than Uniformed City Worker Claims"** shall mean all Claims under this Policy except Uniformed City Worker Claims.

1.44    **"Paid Losses"** shall have the meaning set forth in Section 4.06 of this Policy.

1.45    **"Partial Termination"** shall have the meaning set forth in Section 8.01 of this Policy.

1.46    **"Party"** shall mean either the Company or an Insured and, in the plural form, shall mean the Company and the Insureds.

1.47    **"Payment Trigger Activation"** shall have the meaning set forth in Section 11.04 of this Policy.

1.48    **"Payment Trigger Activation Rate"** shall have the meaning set forth in Section 11.03 of this Policy.

1.49    **"Payment Trigger De-Activation"** shall have the meaning set forth in Section 11.04 of this Policy.

1.50    **"Payment Trigger Rate"** shall have the meaning set forth in Section 11.02 of this Policy.

1.51    **"Per Occurrence Limit"** shall have the meaning set forth in Section 4.01(a) of this Policy.

1.52    **"Person"** shall mean any individual, partnership, firm, association, corporation, joint-stock company, trust, or any other entity or any combination of the foregoing acting in concert. **"Person"** shall not include the United States or its agencies or instrumentalities with regard to its Claims against Insureds, except for Claims arising from activities of the Insureds, whether or not negligent, that were reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities.

1.53    **"Policy"** shall mean this Liability Insurance Policy.

1.54    **"Policy Sub-Limit A"** shall have the meaning set forth in Section 4.02 of this Policy and Item 5(b)(i) of the Declarations.

1.55    **"Policy Sub-Limit B"** shall have the meaning set forth in Section 4.04 of this Policy and Item 5(b)(ii) of the Declarations.

1.56    **"Pollutants"** shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, mold, fungus, silica, dust and any waste material incorporating such materials, including but not limited to materials to be recycled, reconditioned or reclaimed.

1.57    **"Pre-Existing Claim"** shall mean a Claim asserted against an Insured prior to the Issue Date of this Policy.

1.58    **"Pre-Grant Expenses"** shall mean expenses that were incurred by the Insureds in developing the Company prior to the Company's receipt of the Premium insofar as such expenses have been approved by FEMA in accordance with Article IV(2) of the FEMA Grant Agreement.

1.59    **"Premium"** shall have the meaning set forth in Section 6.01 of this Policy.

1.60    **"Professional Liability"** shall mean liability arising from any alleged act, error or omission, misstatement, misleading statement, neglect or breach of duty committed in the performance of Professional Services.

1.61    **"Professional Services"** shall mean services rendered, or which should have been rendered, by an Insured (or a person for whose conduct the Insured is responsible) in its capacity as an architect, engineer, surveyor, technical consultant, construction manager, design/builder, general contractor, subcontractor, project/program manager, or supplier, or any other capacity deemed to be "professional" by the Company.

1.62    **"Property Damage"** shall mean (1) physical injury to or destruction of tangible property which arises from an Occurrence during the Exposure Period, including the loss of use thereof at any time resulting therefrom, (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use arises from an Occurrence during the Exposure Period; or (3) physical injury to or destruction of, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by any person.

1.63    **"Reduced Payment"** shall have the meaning set forth in Section 11.01 of this Policy.

1.64    **"Representative of the Additional Named Insureds"** shall mean the person designated as such pursuant to Article III (3)(d) of the By-Laws of the Company.

1.65    **"Retained Amount"** shall have the meaning set forth in Section 12.04 of this Policy.

1.66    **"Schedule 1"** shall mean the first schedule attached hereto and entitled "Additional Named Insureds".

1.67    **"Schedule 2"** shall mean the second schedule attached hereto and entitled "Underlying Insurance Amounts".

1.68    **"Schedule 3"** shall mean the third schedule attached hereto and entitled "Payment Trigger Activation Rate".

1.69    **"Section 408(a)(3)"** shall have the meaning set forth in Section 4.04 of this Policy.

1.70    **"Suit"** shall mean a legal action or proceeding, and includes any arbitration, mediation or alternative dispute resolution proceeding to which any Insured is required to submit or to which the Insured has submitted with the Company's consent.

1.71    **"Superintendent"** shall mean the Superintendent of the New York State Insurance Department.

1.72    **"Taxes"** shall mean, if applicable, any state, local or federal taxes paid or payable by the Company, including, but not limited to, state premium taxes and federal, state and local income taxes.

1.73    **"Threshold Level"** shall have the meaning set forth in Section 7.01 of this Policy.

1.74    **"Total Reserve Amount"** shall have the meaning set forth in Section 12.04 of this Policy.

1.75    **"TPA"** shall mean the independent third party administrator appointed by the Company to administer Claims and Suits under this Policy.  The Company shall give FEMA written notice 30 days in advance of its selection of the TPA (or of any successor TPA), during which time FEMA shall have the opportunity to disapprove this selection for good cause.  Such TPA shall be licensed to adjust claims pursuant to the insurance law of the Issue Jurisdiction.

1.76    **"Ultimate Net Loss"** shall have the meaning set forth in Section 4.05 of this Policy.

1.77    **"Underlying Insurance Amounts"** shall mean the limits of liability for the Underlying Policies as set forth in Item 6 of the Declarations and in columns 4 and 5 of Schedule 2.

1.78    **"Underlying Insurer"** shall mean an insurance company listed in column 2 of Schedule 2.

1.79    **"Underlying Policies"** shall mean the insurance policies listed by policy number(s) in column 2 of Schedule 2.

1.80    **"Uniformed City Workers"** shall mean uniformed employees of the First Named Insured's Fire Department, Police Department and Department of Sanitation.

1.81    **"Uniformed City Worker Claims"** shall mean Claims against the First Named Insured by Uniformed City Workers who worked at the World Trade Center Site during the Exposure Period.  Uniformed City Worker Claims does not include any workers' compensation or disability claims or retirement benefits.

1.82    **"World Trade Center Site"** shall mean: (a) the secured area in New York City bounded by Broadway on the east, Albany Street and Thames Street on the south, Chambers Street on the north and the Hudson River on the west; (b) the loading areas in New York City at the West Side Highway and Chambers Street, as well as Pier 92 and the Heliport at 59th Street and Hamilton Avenue; (c) the Brooklyn Marine Transfer Stations where trucks dropped off debris and debris was loaded onto barges; (d) barges in transit on the Hudson River and other waterways, together with adjacent piers, on which such barges operated; (e) trucks in transit between the World Trade Center and any location involved in the transportation of debris including such locations in Brooklyn and Staten Island/Freshkills; (f) debris loading and unloading areas, including those in Brooklyn and Staten Island/Freshkills; and (g) debris sorting/sifting areas at Staten Island/Freshkills.

SECTION 2
COVERAGE

2.01    <u>Insurance Coverage Provided; Commencement of Insured Status</u>.

   (a)    In consideration of the Premium and any Contingent Premium and subject to all of the terms, conditions and limitations of this Policy, including but not limited to the Limits of Liability under Section 4 of this Policy and the non-acceptance of Claims and Reduced Claim Payments provisions under Sections 10 and 11, respectively, of this Policy, the Company shall pay on behalf of the Insureds all sums which Insureds become legally obligated to pay as Damages because of

-7-

Claims (including Uniformed City Worker Claims and Pre-Existing Claims) arising from or relating to Debris Removal, provided the following conditions are met:

(i)     The Claim falls within the scope of General Liability, Marine Liability, Environmental Liability, or Professional Liability; and

(ii)    The Claim arises from an Occurrence during the Exposure Period.

Nothing hereunder shall preclude the Company from settling and paying a Claim prior to the commencement of a Suit.

(b)     No Person shall have any rights as an Additional Named Insured under this Policy until it has submitted a copy of this Policy to the Company containing an original, duly executed acknowledgment in the form as set forth in the Exhibit attached hereto.

2.02    <u>Underlying Insurance Amounts</u>.    Subject to Section 2.03 of this Policy, the Company will only be liable in excess of Underlying Insurance Amounts under valid Underlying Policies.

2.03    <u>Primary and Drop Down Coverage</u>.    The coverage provided hereunder will provide primary coverage for any Claim covered under Section 2.01 in the event that:

(a)     the Underlying Policy does not apply to or excludes a Claim which would be covered by this Policy;

(b)     the Underlying Policy does not insure the Insured involved in a Claim which would be covered by this Policy; or

(c)     the applicable Underlying Insurance Amount(s) are exhausted; or

(d)     the Underlying Insurer is unable to pay the Insured for all or a portion of the Underlying Insurance Amounts as a result of such insurer's insolvency, rehabilitation, conservatorship or liquidation, provided such amounts are not, in the reasonable belief of the Company after exercising due diligence, recoverable by the Insured from any state guarantee funds applicable to the insolvent Underlying Insurer; or an Underlying Insurer after proper written notice and demand fails to respond to such notice and demand or refuses to provide a defense or pay any sum for which it is or may be liable under any Underlying Insurance. In the latter event, the Company shall have the right, by subrogation to the Insured's rights or otherwise, to prosecute an action in the Insured's and/or its own name against any Underlying Insurer seeking a declaration of coverage and/or recovery of amounts it has paid with regard to such Claim or Claims. In such event, the Insured shall cooperate in accordance with Section 9.01(e) of this Policy.

2.04    <u>Defense of Suits and Related Defense Costs</u>.

(a)     Except as specified in paragraph (b) below or pursuant to Section 10 or 11 of this Policy, the Company has the right and duty to defend an Insured against any Suit seeking any Damages to which this Policy may apply, even if such Suit is groundless, false or fraudulent.

(b)     Subject to Section 2.03 of this Policy, the Company has no duty to defend any Suit that any Underlying Insurer has a duty to defend. However, the Company has the right to join in the defense or trial of any Suit that any Underlying Insurer has a duty to defend if the Company believes the Suit may create liability under this Policy. If the Company avails itself of this right, it will pay any defense costs it incurs. Once the duty to defend of any Underlying Insurer has expired with regard to a Suit covered by this Policy, the Company has a duty to defend. However, the Company has no obligation to defend any existing or future Suit once the applicable Limits of Liability under this Policy have been exhausted.

2.05    Other Costs the Company Will Pay. If a judgment is entered at trial on a Suit covered under the Policy which the Company is defending and/or the Company elects to appeal such judgment, the Company will pay, in addition to defense costs specified in Section 2.04 above, all premiums on bonds to release attachments and all premiums on appeal bonds required in any such Suit defended under this Policy but only for the amount of any judgment within the Limits of Liability of this Policy. If the judgment is for more than the Limits of Liability of this Policy, the Insured against whom the judgment has been entered must bear the cost of any bond required to appeal a judgment for the excess amount. The Company is not obligated to obtain or furnish any bond if it should decide to appeal. The Company will also pay all costs assessed against an Insured in any Suit the Company defends under this Policy. Regardless of whether or not the Company defends a Suit, the Company will pay only its proportionate share of all interest on any judgment which accrues up until the time the Company has offered to deposit or has deposited in court its share of the judgment and shall pay such interest only within the Limits of Liability of this Policy. The Company will also pay an Insured's reasonable expenses incurred in responding to the Company's request to assist it in the investigation or defense of the Claim or Suit. If the Company does not request such assistance and the Insured provides assistance in the investigation or defense of a Claim or Suit as part of its own normal practices and in compliance with Section 9.01(e) of this Policy, then the Insured shall pay its own expenses related to such assistance.

2.06    Other Primary and Excess Insurance. If the First Named Insured or any Additional Named Insured is covered under any insurance policy not listed on Schedule 2, such policy shall be considered to provide excess coverage with respect to this Policy except

(a)     In the event any Claim is not accepted in accordance with Section 10 below, then such policy shall be primary coverage with respect to Environmental Liability and Professional Liability Claims and first excess coverage (completely replacing coverage hereunder) with respect to General Liability and Marine Liability Claims or

(b)    In the event a Reduced Payment is payable or made on any Claim in accordance with Section 11 below, then such policy shall be excess coverage with liability incepting immediately above the Reduced Payment.

2.07    <u>Payment and Defense of Certain Pre-Existing Claims</u>.

(a)    In the event a Pre-Existing Claim is covered hereunder and it has been resolved, by settlement, judgment or otherwise, prior to the Issue Date, the Company shall pay on behalf of the Insured, or reimburse the Insured, for all Damages that the Insured is (or was) legally obligated to pay because of such Pre-Existing Claim, provided the Insured reports the Pre-Existing Claim to the TPA as soon as practicable after the Issue Date, the Insured provides reasonable proof of Damages, including but not limited to copies of any settlement or judgment, and the Company does not reasonably conclude that such settlement or judgment resulted from actions taken in bad faith by or on behalf of the Insured or a default judgment.  The Company shall also pay or reimburse the Insured all reasonable fees and expenses related to its defense of any Suits containing such Pre-Existing Claim subject to reasonable evidence of such services being provided to the TPA.

(b)    In the event a Pre-Existing Claim is covered hereunder and has not been resolved by settlement, judgment or otherwise prior to the Issue Date, the Company shall assume the defense of any Suit involving such Claim that meets the standards of Section 2.04 hereof pursuant to Section 9.01 hereof, pay fees and expenses pursuant to Section 9.04(d) hereof, and be responsible for any settlement, judgment or other disposition of the Claim.

SECTION 3<br>EXCLUSIONS

3.01    <u>Exclusions</u>.  This insurance does not apply to:

(a)    liabilities for punitive damages; and

(b)    payments claimed by an Insured for workers' compensation or disability or retirements benefits.  Any Suit by or on behalf of an Insured's employee against any other Insured will not be considered to be a workers' compensation claim for purposes of this Policy.  Any employer's liability claim covered under the employer's liability section of an Underlying Policy shall also not be considered a workers' compensation claim hereunder; and

(c)    fines, sanctions or statutory penalties, other than fines, sanctions or statutory penalties imposed on the Insured because of activities of the Insured reasonably necessary to Debris Removal in light of circumstances prevailing at the World Trade Center Site at the time of such activities; and

(d)    in the case of a director, official, officer, or employee of an Insured, his or her liability for intentional acts, provided, however, this exclusion shall not apply (i) to such intentional acts if they are reasonably necessary to Debris Removal in

light of circumstances prevailing at the World Trade Center Site at the time of
such activities or (ii) to any other Insured, including the Insured for whom the
individual committing such intentional acts is a director, official, officer, or
employee, unless such Insured knew or should have known that such director,
official, officer, or employee was engaging in such intentional acts.

## SECTION 4
## LIMITS OF LIABILITY

4.01    Policy Limits. Regardless of the number of Insureds under this Policy, the number of
persons or organizations sustaining injury or damage, or the number of Claims submitted, the
Company's liability hereunder with respect to Claims covered hereunder is limited (subject to
Section 10, Non-Acceptance of Claims and Section 11, Reduced Claim Payments, of this Policy)
as follows:

    (a)    Per Occurrence Limit. The most the Company will pay for all Ultimate Net Loss
    arising out of the same Occurrence shall be the amount shown in Item 5(a)(i) of
    the Declarations and described as the "Per Occurrence Limit."

    (b)    Aggregate Limit. The most the Company will pay for all Ultimate Net Loss
    arising from all Occurrences during the Policy term, as specified in Section 12.01
    of this Policy, is the amount shown in Item 5(a)(ii) of the Declarations and
    described as the "Aggregate Limit."

4.02    Policy Sub-Limit A. Except as may be modified pursuant to this Policy, including
Section 4.03 hereof, the Company's liability with respect to Other Than Uniformed City Worker
Claims is limited to $1,000,000,000 (one billion dollars) of Ultimate Net Loss allocable to such
Claims.

4.03    Adjustment to Policy Sub-Limit A. If at any time Policy Sub-Limit A is exhausted and
the First Named Insured has not been called upon to pay any Contingent Premium pursuant to
the Contingent Premium Payment Obligation, the Company shall have an independent third
party actuarial firm separately project, from this point in time, the Ultimate Net Loss based on
reported Claims allocable to (a) Uniformed City Worker Claims and (b) Other Than Uniformed
City Workers Claims. If the sum of Ultimate Net Loss allocable to Uniformed City Worker
Claims and projected future Ultimate Net Loss allocable to Uniformed City Worker Claims, is
less than $250 million (or such higher level as the First Named Insured may specify), then Policy
Sub-Limit A shall be raised by the Experience Account Balance less the projected future
Ultimate Net Loss allocable to Uniformed City Worker Claims. If the sum of Ultimate Net Loss
allocable to Uniformed City Worker Claims and projected future Ultimate Net Loss allocable to
Uniformed City Worker Claims, is greater than $250 million, then Policy Sub-Limit A shall be
raised by the Experience Account Balance less two times the projected future Ultimate Net Loss
allocable to Uniformed City Worker Claims, if such calculation results in a positive number.
Under no circumstances shall this adjustment to Policy Sub-Limit A cause the First Named
Insured to be obligated to pay any Contingent Premium pursuant to the Contingent Premium
Payment Obligation.

4.04    Policy Sub-Limit B.  With respect to Claims covered hereunder, the Company's liability is limited (subject to the further limitations imposed by Sections 4.02 and 4.03 (Policy Sub-Limit A), Section 10 (Non-Acceptance of Claims), and Section 11 (Reduced Claim Payments)) to such amount(s) as will assure that the City of New York's maximum liability pursuant to Section 408(a)(3) of the Airline Transportation and System Stabilization Act, as amended ("Section 408(a)(3)"), does not exceed $350 million (the "Liability Cap").  In the event such Liability Cap is held by a court of final jurisdiction to be unconstitutional, this Policy Sub-Limit B shall be ineffective and void.  In the event there is (i) uncertainty as to the application of Section 408(a)(3) with regard to Claims covered under this Policy (because of uncertainty in the computation of the $350 million cap or otherwise) or (ii) such statutory cap is subject to a pending constitutional challenge, but covered Claims are otherwise due and payable, the Company shall make such payments on condition that its rights and those of all Insureds are fully reserved and protected.  This Policy Sub-Limit B, like all provisions of the Policy (see Section 15.11), shall create no rights on behalf of persons other than the Company and the Insureds, nor shall it create any legal relationship between the Company and/or the Insureds and such other person.

4.05    Definition of "Ultimate Net Loss".  "Ultimate Net Loss" shall mean, with respect to this Policy, the net losses sustained by the Company, including but not limited to:

      (a)    Paid Losses plus

      (b)    paid Allocated Loss Adjustment Expenses, less

      (c)    any salvage, subrogation or other recovery.  (Such recoveries, whether recovered or received prior or subsequent to Claim settlement under this Policy, shall be applied as if recovered or received prior to such settlement and shall first be deducted from the actual Loss sustained to arrive at the Ultimate Net Loss.)

Nothing in this Section 4.05 shall be construed to mean that a Loss does not exist prior to the final determination of an Insured's liability with respect to a Claim hereunder or that Losses are not recoverable hereunder until the Ultimate Net Loss of the Company has been finally ascertained.

4.06    Definition of "Paid Losses".  "Paid Losses" shall mean the amount of Damages paid hereunder by the Company on behalf of the Insureds, as the result of a settlement, judgment or otherwise.

4.07    Definition of "Allocated Loss Adjustment Expenses".  "Allocated Loss Adjustment Expenses" (or "ALAE") for the purposes of this Policy shall mean

      (a)    all fees, costs and expenses allocable to any specific Claim (including a Suit arising from or including such Claim) that are incurred by the Company in the investigation, appraisal, adjustment, settlement, litigation, defense or appeal of a specific Claim or Suit, including legal fees, court costs, costs of appeal bonds (as specified in Section 2.05 of this Policy) and interest accrued after award or judgment and prejudgment interest awarded against the Insured (as specified in Section 2.05 of this Policy); plus

-12-

(b)     an apportionment in accordance with Section 4.08 below, of all fees, costs, taxes, and expenses incurred by the Company in the course of its business, including, but not limited to, all overhead expenses; salaries and other compensation for officers, directors or employees; fees paid to consultants, service providers or other persons. This Section 4.07(b) shall include any and all expenditures of any kind incurred by the Company that are not included in Section 4.06 or 4.07(a).

4.08    Allocation of Losses and Allocated Loss Adjustment Expenses. On a frequency requested by the Company, the Captive manager (the "Manager") shall compute the aggregate Paid Losses and Allocated Loss Adjustment Expenses allocable to Other Than Uniformed City Worker Claims and the aggregate Paid Losses and Allocated Loss Adjustment Expenses allocable to Uniformed City Worker Claims.

(a)     Paid Losses and ALAE specified in Section 4.07(a) shall be computed on a continuing basis by the TPA and allocated according to the class of Claim at issue, i.e., Uniformed City Worker Claims and Other Than Uniformed City Worker Claims. Such information shall be reported to the Manager on a frequency requested by the Manager. Allocation of the total aggregate ALAE specified in Section 4.07(b) above shall be made by the Manager based on the proportion that aggregate Paid Losses and ALAE specified in Section 4.07(a) for each class bears to the total of all aggregate Paid Losses and ALAE specified in Section 4.07(a).

(b)     If a Suit initiated by a Uniformed City Worker names both the First Named Insured and any Additional Named Insured(s) as defendants, then the TPA shall allocate Paid Losses and Allocated Loss Adjustment Expenses specified in Section 4.07(a) above to the two classes of Claims, Uniformed City Worker Claims and Other Than Uniformed City Worker Claims. In cases where separate defense counsel is appointed pursuant to Section 9.04(c) of this Policy, the defense costs for the First Named Insured shall be allocated to the Uniformed City Worker Claims and the defense costs for the Additional Named Insured(s) shall be allocated to Other Than Uniformed City Worker Claims.

(c)     With respect to all Other Than Uniformed City Worker Claims, all Paid Losses and ALAE specified in Section 4.07(a) above shall be allocated by the TPA to Other Than Uniformed City Worker Claims.

SECTION 5<br>EXPERIENCE ACCOUNT

5.01    Experience Account. A notional account (the "Experience Account") shall be established by the Company on its books and records as of the Issue Date of this Policy and shall be maintained until Commutation when there is a complete and final release from all of the Company's obligations to all Insureds.

5.02    Experience Account Balance. The Experience Account balance ("Experience Account Balance") shall be calculated as follows:

(a)    Premium received at inception by the Company and Contingent Premium received pursuant to the Contingent Premium Payment Obligation, if any, plus

(b)    Net investment return, less

(c)    Expenditures of the Company resulting from a deobligation of funds (or other required return of funds) pursuant to the FEMA Grant Agreement and/or the NYSEMO Sub-Grant Agreement and/or the NYC-Captive Agreement, less

(d)    Cumulative Ultimate Net Loss paid by the Company, less

(e)    Pre-Grant Expenses.

5.03    Experience Account Statement.  On a quarterly basis, the Company shall provide a copy of the Experience Account Balance statement (the "EAB Statement") to the First Named Insured, the Representative of the Additional Named Insureds, the Superintendent, FEMA and NYSEMO within thirty (30) days of the end of each calendar quarter.  The EAB Statement shall show the calculation of the Experience Account Balance as of the end of such quarter.

SECTION 6<br>PREMIUM

6.01    Payment of Premium.  This Policy shall not be issued until the premium specified in Item 7 of the Declarations (the "Premium") has been paid to the Company.  No Party or person shall have any rights hereunder until such issuance.  The Premium is fully earned when paid to the Company.

SECTION 7<br>CONTINGENT PREMIUM PAYMENT OBLIGATION

7.01    Contingent Premium Payment Obligation.  At the end of any calendar quarter in which Policy Sub-Limit A (either per Occurrence or in the aggregate) has not been exhausted, if the Experience Account Balance declines below a threshold level of $75 million (the "Threshold Level"), then the First Named Insured shall pay additional premium to the Company in an amount sufficient to bring the Experience Account Balance back to $85 million (the "Contingent Premium"), *provided, however*, that the maximum aggregate amount of such Contingent Premium shall not exceed one billion dollars less all Ultimate Net Loss allocable to Other Than Uniformed City Worker Claims; provided further, however, that the maximum aggregate amount of such Contingent Premium due to the Company at any time shall not exceed all amounts paid with respect to Ultimate Net Loss allocable to Uniformed City Worker Claims less all prior payments of Contingent Premium to the Company.

7.02    Notice.  As soon as a Contingent Premium due pursuant to Section 7.01 is known to the Company, it shall provide the First Named Insured with notice thereof and demand payment fifteen (15) days thereafter.  In the event the Company fails to provide such timely notice to the First Named Insured, the Company does not waive its right to demand payment of such Contingent Premium and may, at any time, send notice of such demand to the First Named Insured requiring payment fifteen (15) days thereafter.

7.03    Non-Payment of Contingent Premium.  If the First Named Insured fails to pay Contingent Premium on the date such premium is due pursuant to Sections 7.01 and 7.02 and for a period of fifteen (15) days thereafter, then the First Named Insured shall not be considered an Insured under this Policy until such time as the First Named Insured makes such payment.  Nothing contained in this Section 7.03 shall affect the obligations of the First Named Insured set forth in Section 7.01 above.

7.04    Federal or State Legislation.  In the event that any federal or state legislation, whether enacted before or after the creation of the Company, provides for a limitation of liability or indemnity for liability inclusive of Claims hereunder, the obligation to pay Contingent Premium as specified in Section 7.01 above (the "Contingent Premium Payment Obligation") shall be applicable in a maximum aggregate amount equal to such legislated limitation of liability or indemnity, less all Ultimate Net Loss paid by the Company in connection with Other Than Uniformed City Worker Claims; *provided, however*, that the amount of the Contingent Premium Payment Obligation in this case may not exceed the amount of such obligation if there were no such federal or state legislation.

SECTION 8
PARTIAL TERMINATION OF COVERAGE BY FIRST NAMED INSURED

8.01    Partial Termination Option.  At any time after the Issue Date  the First Named Insured shall have the option to cause the Company to terminate coverage of the Uniformed City Worker Claims ("Partial Termination") as of the date of such termination.  Such Uniformed City Worker Claims no longer covered by the Company shall include any such Claims open on the date of such Partial Termination or reported as new Claims thereafter.  Upon such Partial Termination, the First Named Insured shall assume the defense of itself in all Suits involving such Claims from the Company and be solely responsible for the payment of Damages and expenses with respect to such Claims, and the Company shall have no such responsibility for such Claims hereunder.  Whether or not the First Named Insured elects a Partial Termination, the First Named Insured is responsible for paying any Contingent Premium Payment Obligation if and when otherwise due under this Policy.  Upon such Partial Termination, coverage under this Policy shall continue with respect to Other Than Uniformed City Worker Claims until such time as the Ultimate Net Loss allocable to Other Than Uniformed City Worker Claims exhausts Policy Sub-Limit A.  At such time, the Company shall return to the First Named Insured such sums as it has paid as Contingent Premium payments up to the amount available in the Experience Account.  If additional funds remain in the Experience Account after any such return of Contingent Premium, the coverage under this Policy shall continue with respect to Other Than Uniformed City Worker Claims without regard to Policy Sub-Limit A as set forth in Section 4.02 hereof.

SECTION 9
SUBMISSION AND PAYMENT OF CLAIMS AND SUITS; APPOINTMENT OF COUNSEL

9.01    Insured's Duties in the Event of a Claim or Suit.  The Insured:

    (a)    shall give the Company, as soon as reasonably practicable and at the address specified in Item 8 of the Declarations, written notice of any covered Claim arising out of a demand, received by the Insured, which seeks a remedy or alleges liability or responsibility on the part of the Insured.  In the case of the First

-15-

Named Insured, the applicability of this provision for any such Claim shall not arise until the office specified in Section 15.01 of this Policy has received a Notice of Claim (as filed with the City pursuant to Section 50-e of the New York General Municipal Law) describing the Claim with sufficient particularity;

(b)    shall give to the Company, as soon as reasonably practicable and at the address specified in Item 8 of the Declarations, written notice (or "tender") of the commencement of any Suit to which the Company has a duty to defend pursuant to Section 2.04 of this Policy, and enclose therewith the Summons and Complaint or other document with which the Insured was served.  In the case of the First Named Insured, the applicability of this provision regarding any such Suit shall not arise until the office specified in Section 15.01 of this Policy has received the Summons and Complaint or other document by which the Suit was commenced;

(c)    shall not admit any liability, make any payment, assume any obligation, or incur any expense related to a Claim covered under Section 2.01, except with the prior written consent of the Company;

(d)    shall, as soon as practicable, forward to the Company all legal papers relating to any Suit being defended pursuant to Section 2.04 of this Policy;

(e)    shall cooperate with the Company and upon the Company's request shall submit to examination by a representative of the Company under oath if required.  The Insured shall attend hearings, depositions and trials.  The Insured shall assist in the conduct of Suits, effecting settlement, securing and giving evidence and obtaining the attendance of witnesses.  The Insured shall also give a written statement or statements to the Company's representatives and shall meet with such representatives for the purpose of investigation and/or defense.  The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the Insured may have, or right of subrogation which the Company may have; and

(f)    shall not demand or agree to arbitration of any Suit made against the Insured without the written consent of the Company and such consent shall not be unreasonably withheld.

The foregoing shall <u>not</u> apply retroactively to Claims made or Suits commenced prior to the Issue Date.  With respect to such Claims and Suits, the Insured shall give notice of such pending Claim or Suit pursuant to subparagraphs (a) and (b) above and thereafter adhere to its obligations pursuant to subparagraphs (c) through (f) above.

9.02    <u>Requirement of Prejudice</u>.  An Insured's failure to comply with any of the terms of Section 9.01 shall not result in the loss of coverage under this Policy unless such non-compliance resulted in material prejudice to the interests of the Company.

9.03    <u>Payment of Claims</u>.  When the amount payable on a covered Claim, pursuant to a settlement or final judgment in a Suit or otherwise, is determined and the Company has received

evidence of its obligation to pay any such amount, the Company will pay promptly the amount due.

9.04    Appointment of Defense Counsel.

(a)    Subject to Section 2.04 and except as provided in Sections 9.04(b), (c) and (d), the Company shall have the right and obligation to appoint and retain counsel for defending Suits against the Insureds tendered pursuant to Section 9.01(b), including Suits involving frivolous, false or time-barred Claims.

(b)    In the event the Company issues a reservation of rights with regard to a tendered Suit, the Insured at issue shall have the right to appoint and retain counsel (including, in the case of the First Named Insured, its Corporation Counsel), but only from a panel established in advance for such cases by the First Named Insured and Representative of the Additional Named Insureds and approved by the Company (with notice to and the opportunity to object by FEMA) to defend such Suit, the reasonable costs of which shall be paid by the Company. In the event the Company has issued a reservation of rights regarding two or more Insureds named in such a Suit and the Company reasonably believes that all or some of these Insureds are similarly situated with regard to the reservation of rights, it shall appoint from such panel a single counsel to defend such similarly situated Insureds in such Suit, the reasonable costs of which shall be paid by the Company. Any such Insured may thereafter refuse to be represented by such unitary counsel and select counsel to defend the Suit on its behalf; however, in such event, the costs of such defense shall not be paid by the Company.

(c)    If a tendered Suit by any Uniformed City Worker names both the First Named Insured and Additional Named Insured(s) as defendants, then the Company's TPA shall consult with such Insureds. If the First Named Insured and/or such Additional Named Insured(s) believe that it is appropriate to have separate defense counsel in such Suit, then the TPA shall appoint one counsel for the First Named Insured and another for the group of such Additional Named Insured(s). The First Named Insured and such Additional Named Insured(s) shall be deemed to have consented to their respective appointed counsels unless a reasonable written objection is promptly provided to the TPA. In the event the Company has issued a reservation of rights pursuant to Section 9.04(b), the First Named Insured or Additional Named Insured(s), as the case may be, shall have the rights set forth therein.

(d)    In the event an Insured has appointed counsel (including, in the case of the First Named Insured, its Corporation Counsel) with respect to a Suit that had been commenced prior to the Issue Date and such Suit remains unresolved (by settlement, judgment or otherwise), then the Insured shall be permitted to keep such counsel, subject to the TPA's approval, which shall not unreasonably be withheld. The reasonable fees and expenses of such counsel, both past and future, shall be paid by the Company, subject to reasonable evidence of such services being provided to the TPA.

-17-

## SECTION 10
## NON-ACCEPTANCE OF CLAIMS

10.01   <u>Non-Acceptance of Reported Claims</u>.  In the event the Acceptance Trigger (as defined in Section 10.02 below) is activated (as described in Section 10.03 below), the Company shall no longer accept new Claims involving Other Than Uniformed City Worker Claims that may be reported by Insureds.  In the event the Acceptance Trigger is de-activated (as described in 10.03 below), the Company shall resume the acceptance of such new Claims in the order reported by Insureds pursuant to the terms of this Policy.  All such Claims (otherwise covered under this Policy) accepted prior to the activation, or subsequent to the de-activation, of this Acceptance Trigger shall continue to be paid in full by the Company, except as provided in Section 11 below.

10.02   <u>The Acceptance Trigger</u>.  The "Acceptance Trigger" shall mean the product resulting from the multiplication of (x) the sum of (a) the Experience Account Balance at the end of each calendar quarter (or more frequently, if judged necessary by the Company) and (b) the maximum aggregate amount of Contingent Premium at such time (pursuant to Section 7.01) less all prior payments of Contingent Premium to the Company by (y) 90 percent (90%) (the "Acceptance Trigger Rate").

10.03   <u>Activation and De-Activation of the Acceptance Trigger</u>.  The Acceptance Trigger shall be calculated at the end of each calendar quarter (or more frequently, if judged necessary by the Company).  In the event the sum of reserves for reported Losses and ALAE with respect thereto for Other Than Uniformed City Worker Claims (at the time the Acceptance Trigger is calculated) is equal to or greater than the Acceptance Trigger, the Acceptance Trigger is activated.  Subsequent to such activation, if the sum of reserves for reported Losses and ALAE with respect thereto for Other Than Uniformed City Worker Claims (at the time the Acceptance Trigger is calculated) is determined to be less than the Acceptance Trigger, the Acceptance Trigger is de-activated.

10.04   <u>No Obligation By Company For Non-Accepted Claims</u>.  The Company shall have no obligation whatever with regard to any non-accepted Claim and, accordingly, shall have no obligation with regard to the disposition of any such Claim or the defense or the defense costs of any non-accepted Claim.

## SECTION 11
## REDUCED CLAIM PAYMENTS

11.01   <u>Reduced Claim Payments</u>.  In the event Payment Trigger Activation (as defined in Section 11.04 below) occurs, the Company shall no longer pay Other Than Uniformed City Worker Claims accepted prior to the activation of the Acceptance Trigger in full.  Instead, the Company shall pay such Claims (even those fully covered under this Policy) at a reduced rate (the "Payment Trigger Rate") which shall be calculated at the end of each quarter.  For each such Claim to be paid in a given quarter, the Company shall be required to make only a reduced payment to the Insured (the "Reduced Payment").  Such Reduced Payment shall be calculated by multiplying the sum of the Loss payable and related ALAE payable by the Payment Trigger Rate.  In the event Payment Trigger De-Activation (as defined in Section 11.04 below) occurs, the Company shall resume paying covered Claims accepted prior to the activation of the

-18-

Acceptance Trigger in full, provided, however, that any such Claim previously paid at the Payment Trigger Rate, shall first be paid in full. If there are insufficient funds in the Experience Account to pay all such Claims in full without again having Payment Trigger Activation occur, then the priority of payment of such Claims shall be based on the Payment Trigger Rate, with Claims having the lowest Payment Trigger Rate being paid first until such time as such Claims have been paid the second-to-lowest Payment Trigger Rate and thereafter in stages rising to a higher rate as available funds permit until payment of all such Claims have been equalized. If more than one such Claim has the same Payment Trigger Rate and there are insufficient funds in the Experience Account to pay all such Claims in full without again having Payment Trigger Activation occur, then the amount of funds available in the Experience Account prior to any such Payment Trigger Activation will be allocated pro-rata among all such Claims.

11.02    The Payment Trigger Rate. The "Payment Trigger Rate" shall mean the rate calculated at the end of every quarter by dividing (x) the sum of (a) the Experience Account Balance at such time less estimated Section 4.05(b) costs for such quarter and (b) the maximum aggregate amount of Contingent Premium at such time (pursuant to Section 7.01) less all prior payments of Contingent Premium to the Company by (y) the sum of reserves for reported Losses and ALAE with respect thereto for Other than Uniformed City Worker Claims (at the time the Payment Trigger Rate is calculated). In no case shall the Payment Trigger Rate be greater than 100%.

11.03    The Payment Trigger Activation Rate. The "Payment Trigger Activation Rate" shall mean the rate expressed as a percentage, which is specified on Schedule 3 of this Policy by the policy year in which the Payment Trigger is activated.

11.04    Payment Trigger Activation and De-Activation. "Payment Trigger Activation" shall mean a determination, at the end of any quarter, that the Payment Trigger Rate is equal to or less than the Payment Trigger Activation Rate. "Payment Trigger De-Activation" shall mean a determination, at the end of any quarter, that the Payment Trigger Rate is greater than the Payment Trigger Activation Rate.

11.05    Defense of Suits Following Payment Trigger Activation. In the event of a Payment Trigger Activation, the Company shall continue to provide defense counsel to Insureds on all Suits. However, each Insured shall be responsible for any defense costs on its behalf not paid by the Company as a result of such Payment Trigger Activation.

SECTION 12<br>POLICY TERM AND RELATED MATTERS

12.01    Policy Term. This Policy shall become effective on the Issue Date and shall continue in effect until the earliest of the following:

(a)      the Policy is terminated pursuant to the FEMA Grant Agreement or

(b)      the Experience Account Balance is exhausted or

(c)      the Policy is commuted or assumed, under an assumption reinsurance agreement, in accordance with Section 12.02 below or

-19-

(d)     the Retained Amount (pursuant to Section 12.04 below) is exhausted.

12.02   Commutation and Assumption Reinsurance.

(a)     At any time but in no event later than twenty-two and a half (22.5) years after the Issue Date, the Company shall endeavor to purchase assumption reinsurance with respect to the then outstanding liabilities of the Company. Whenever the Company elects to do so but in no event later than twenty-one and a half (21.5) years after the Issue Date, the Company shall secure an estimate by an independent third party actuarial firm of the cost and potential for future Loss and related ALAE development with respect to reported Claims as well as IBNR (the "Actuarial Report"). After reviewing the Actuarial Report, the Company shall determine if it is commercially feasible and cost effective to purchase assumption reinsurance from a New York licensed insurer (if such licensure is so required by the Superintendent) which would assume, as its direct liabilities, all such Claims and IBNR (providing coverage comparable in all material respects, but no broader than, that of the Policy). If the Company determines that it is not commercially feasible and cost effective to purchase such assumption reinsurance, the Company shall report its conclusions to FEMA and the Superintendent and re-evaluate its conclusion every two (2) years thereafter based on an update of the Actuarial Report by an independent third party actuarial firm. If the Company determines that it is commercially feasible and cost effective to purchase such assumption reinsurance, the Company shall notify the First Named Insured and the Representative of the Additional Named Insureds of the Company's desire to purchase assumption reinsurance in order to allow the Insureds to report any as-yet-unreported Claims within one hundred twenty (120) days of the mailing of the Company's notice. After the expiration of such one hundred twenty (120) day period and any further update, if necessary, of the Actuarial Report, the Company shall provide the Superintendent and FEMA with a proposal to purchase assumption reinsurance. If approval of such proposal is granted by the Superintendent and FEMA, the Company shall, after obtaining any other consents it deems necessary, purchase the assumption reinsurance and notify the Insureds of such purchase. Upon the purchase of such assumption reinsurance, the Company shall have no liability for Claims hereunder.

(b)     Twenty-three and a half (23 ½) years after the Issue Date, in the event the Policy has not otherwise been terminated, the Company shall endeavor to commute this Policy with respect to the then outstanding liabilities of the Company. The Company may also, if appropriate, pursue its options under Section 12.02(a) above and/or Section 12.04 below. If the Company determines that it is commercially feasible and cost effective to commute the Policy, the Company shall notify the First Named Insured and the Representative of the Additional Named Insureds of the Company's desire to commute the Policy in order to allow the Insureds to report any as-yet-unreported Claims within one hundred twenty (120) days of the mailing of the Company's notice. After the expiration of such one hundred twenty (120) day period and any further update, if necessary, of the Actuarial Report required under Section 12.02(a) above, the Company shall

-20-

provide the Superintendent and FEMA with a proposal to commute the Policy. If approval of such proposal is granted by the Superintendent and FEMA, the Company shall prepare documentation to effectuate such commutation and shall contact the Insureds to seek their agreement to the terms of commutation with regard to their individual Claims. If any Insured and the Company fail to agree to the terms of commutation relating to Claims against such Insured, the Company shall have the right, with regard to any such Claim or Claims, to either (i) commence a binding arbitration proceeding (or proceedings) in accordance with Section 13 hereof under which the terms of such commutation shall be determined or (ii) enter into an assumption reinsurance agreement under which a licensed New York insurer assumes such Claim or Claims as its direct liabilities and provides coverage to the Insureds that is comparable to (but not broader than) the coverage under this Policy in all material respects. Upon the purchase of such assumption reinsurance, the Company shall have no liability for such Claims. If twenty-five (25) years after the Issue Date, the Company determines that is not commercially feasible and cost effective to commute the Policy, the Company shall report its conclusions to FEMA and the Superintendent and re-evaluate its conclusion every two (2) years thereafter.

12.03  Early Withdrawal (by First Named Insured).  At any time after the end of twelve (12) years from the Issue Date, the Company, at the request and expense of the First Named Insured, may have an independent third party actuarial firm project the cost of and potential for future Loss and related ALAE development with respect to reported and incurred-but-not-reported Losses and ALAE (the "Loss and ALAE Development Amount") with respect to Other Than Uniformed City Worker Claims. If the Loss and ALAE Development Amount for Other Than Uniformed City Worker Claims is less than $250 million, then the First Named Insured shall have the option to withdraw from the Experience Account all funds in excess of the Threshold Level (the "Early Withdrawal"); provided, however, that (a) such Early Withdrawal has been approved in advance by FEMA and NYSEMO, subject to applicable laws and regulations; (b) the use of the Early Withdrawal funds is for FEMA eligible purposes only; (c) the Superintendent has been given advance notice of such Early Withdrawal and has not objected or has not asked for a reasonable amount of additional time to consider the issue; and (d) upon such Early Withdrawal, the First Named Insured's Contingent Premium Payment Obligation shall remain outstanding for a maximum aggregate amount as specified in Section 7.01.

12.04  Return of Funds in the Event the Total Reserve Amount falls below $25,000,000.  At any time after twenty-five (25) years of the Issue Date, the Company may secure an estimate by an independent third party actuarial firm of (i) outstanding Loss reserves and future development of such reserves, (ii) outstanding ALAE reserves and future development of such reserves and (iii) IBNR (all net of reinsurance that may have been purchased by the Company) (the "Total Reserve Amount"). If such firm, applying a 90% confidence level, determines that the Total Reserve Amount is less than $25,000,000 and FEMA and the Superintendent so approve, the Company shall retain assets equal to two (2) times the Total Reserve Amount (the "Retained Amount") and return any additional funds remaining in the Experience Account in the manner set forth in Section 12.05 below.

12.05  Return of Funds in Event of Termination.  In the event the Policy is terminated pursuant to Section 12.01(a) or (b) above the Company shall (a) return to the First Named Insured, for its own purposes, an amount equal to all Contingent Premium payments made to the Company prior to termination (or the entirety of such lesser amount as may remain in the Experience Account) and then (b) return all funds that may remain in the Experience Account to NYSEMO for reobligation to the First Named Insured pursuant to federal law and agreement with FEMA.

SECTION 13<br>ARBITRATION

13.01  In General.  If any dispute shall arise between the Company and one or more Insureds with respect to the rights of such Insured(s) under this Policy (including but not limited to matters governed by Section 12.02), such dispute shall be submitted to binding arbitration, which shall be the sole forum for the resolution of disputes under or in connection with this Policy, upon the written request of any Party.  If two or more Parties join on one side of the dispute, such Parties shall be deemed a "side" for purposes of the following provisions of this Section, and any appointment or other action to be taken by such side shall be made or taken by them acting together.  The Commercial Arbitration Rules of the American Arbitration Association shall apply, except with respect to the selection of arbitrators, the payment of arbitration fees and costs, the location and the entry of the arbitration award.

13.02  Selection of Arbitrators.  One arbitrator shall be chosen by one side and another arbitrator by the other side, and a third arbitrator shall be chosen by the first two arbitrators before they enter into arbitration.  All arbitrators shall be disinterested and shall be active or retired executive officers of insurance or reinsurance companies or Lloyd's Underwriters.

13.03  Payment of Arbitration Fees and Costs.  Each side shall pay the fee of its chosen arbitrator and half the fee of the third arbitrator.  The remaining costs of the arbitration, including legal fees and disbursements, shall be paid as the written decision of the arbitrators directs, with it being expressly understood that the intention is to favor reimbursement of such fees and expenses to an insured that has brought a meritorious dispute.  The fees to be borne by a side consisting of more than one Party shall be divided equally among such Parties.

13.04  Location.  Any arbitration hereunder shall take place in New York, New York, unless otherwise mutually agreed upon by the two sides.

13.05  Entry of Arbitration Award.  Judgment upon an arbitration award hereunder may be entered in, and enforced by, any court of competent jurisdiction.

SECTION 14<br>NO INSURANCE AGENT

14.01  No Insurance Agent.  The Insureds, by signing the Declarations attached hereto, represent and warrant that this Policy has been independently procured and that no insurance agent or broker (an "Insurance Agent"), as specified in item 9 of the Declarations attached hereto, has been used to procure this Policy.

SECTION 15
GENERAL CONDITIONS

15.01  Notices.  Unless otherwise specified herein, all notices under this Policy shall be in writing and given by prepaid commercial courier or certified mail/registered mail return receipt requested to:

(a)    The First Named Insured at an address to be provided to the Company in writing or, if no such address is provided, to the following address:

City of New York Office of the Corporation Counsel
    Attn:  World Trade Center Insurance Office
100 Church Street
New York, NY  10007

(b)    The Company:

WTC Captive Insurance Company, Inc.
_____ (to be filled in by Company)

(c)    Additional Named Insureds

Michael Feigin
c/o Bovis Lend Lease Holdings, Inc.
200 Park Avenue
New York, NY 10066

15.02  Inspection of Records.  Upon the Company's written request, each Insured agrees to provide copies of all records reasonably related to Claims insured hereunder and to permit the Company or the Company's representatives at all reasonable times during normal business hours to inspect all such records at the Insured's office(s).  Each Insured shall provide appropriate personnel, at the Insured's expense, to assist the Company's representatives during any agreed inspection.

15.03  Bankruptcy of Insured.  The Company's obligations under this Policy are not changed or diminished because of the bankruptcy of the First Named Insured, any Additional Named Insured, or the estate of any Additional Named Insured.

15.04  Errors and Omissions.  It is agreed that any clerical errors, inadvertent delays, errors or omissions made in connection with the administration of this Policy shall not be held to relieve either the Insureds or the Company from any liability or obligation under this Policy.  Such clerical errors, inadvertent delays, errors or omissions if promptly rectified will not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated.

15.05  Governing Law.  This Policy is subject to the laws of the Issue Jurisdiction and will be administered according to those laws.

-23-

15.06  Conflicts with Laws or Regulations.  If any provision of this Policy shall be held to be invalid, illegal or unenforceable, such provision and provisions relating thereto shall be replaced by mutually acceptable provisions, which, being valid, legal and enforceable, come closest to the intention of the Company and the Insureds at the time this Policy was issued.

15.07  Subrogation Rights.  The Company shall be subrogated, as respects any Claim which the Company pays or becomes liable to pay, but only to the extent of the amount of such payment or liability, to all the rights of the Insured against any person or other entity who may be legally responsible in damages for said Claim.  The Insured hereby agrees to enforce such rights but in the case the Insured shall refuse or neglect to do so, the Company is hereby authorized to bring any appropriate action in the name of the Insured and, subject to Section 9.01(e) of this Policy, such refusal or neglect shall not affect the Insured's rights under this Policy.  Any recovery made pursuant to this section shall be for the benefit, in the order specified, of (a) any insurer providing coverage excess of this Policy, (b) the Company and (c) the Underlying Insurer, but only up to the extent of any such insurer's (as specified in (a), (b) or (c)) payment to the Insured.  All recoveries in excess thereof will be for the benefit of the Insured.  The Insured shall be credited with the recovery less (i) the actual cost, excluding salaries of officers and employees of the Insured, and (ii) sums paid to attorneys as retain or for making such recovery.

15.08  Assignment.  No assignment of this Policy or an Insured's interest hereunder will be binding on the Company without the Company's prior written consent.

15.09  Amendment.  This Policy may be amended by the mutual consent of the Company, the First Named Insured and the Representative of the Additional Named Insureds in accordance with New York Insurance Law and any other applicable law.  FEMA shall be given 30 days prior written notice of any such amendment.  No amendment to this Policy is valid unless it is set forth in a writing signed by the First Named Insured, the Representative of the Additional Named Insureds and an officer of the Company and is attached to this Policy.  In the event the Policy is amended, notice thereof shall be made to the Insureds pursuant to Section 15.01.

15.10  Representation/Warranty Regarding Misstatement, Concealment or Fraud.  Each Insured represents and warrants that any Claim or any statement made to the Company in connection with the submission of any Claim, does not include any intentional misstatement, concealment or fraud.  If any Insured violates this provision, such violation does not affect the rights of any other Insured hereunder.

15.11  No Third Party Beneficiaries.  This is a Policy solely between the Insureds and the Company.  It shall not create any right or legal relationship whatever between the Company or any Insured and any other person.

15.12  Entire Agreement.  By acceptance of this Policy, the Insureds and the Company agree that this Policy (including the Declarations, and the Schedules attached hereto) and any written endorsements attached hereto constitute the entire agreement between the Parties.

15.13  Time Barred Suits.  The Insurer shall not be required to pay on behalf of the Insureds any Losses arising out of suits that are not commenced within the applicable limitation of time set forth in Article 2 of the New York State Civil Practice Laws and Rules or other governing law or

-24-

rule.  The Insurer's obligations concerning any untimely commenced action shall be limited to the provision of any legal defense expenses until such suit is dismissed as being time-barred by a court of final jurisdiction.

This Policy shall not be valid unless countersigned on the Declarations by a duly authorized representative of the Company.

_____
Secretary

_____
President

**SCHEDULE 1**
**Additional Named Insureds**

Subject to Section 2.01(b) of the Policy, the following are Additional Named Insureds:

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 11-2989828 | A RUSSO WRECKING |
| N/A | ACROW |
| TBDAA | ALLCOM ELECTRIC |
| 13-3803502 | AMEC CONSTRUCTION MGMT. INC. |
| 91-1641772 | AMEC EARTH AND ENVIRO. |
| 22-3619730 | ANTHONY CORTESE SPECIALIZED HAULING LLC |
| 11-3148673 | ASG PEST CONTROL |
| 46-0399480 | ATC GROUP SERV/DBA  ATC ACCOCIATES |
| 11-3366894 | ATLANTIC HEYDT CORP. |
| 22-3521719 | ATLAS CONCRETE |
| 11-3027441 | AVANTI DEMOLITION & CARTING CORP. |
| 94-3155230 | BECHTEL CONSTRUCTION, INC. |
| 22-3585254 | BERGEN CONCRETE CUTTING |
| 48-0650969 | BERKEL & CO. CONTRACTORS, INC. |
| 11-2860475 | BIG APPLE WRECKING & CONSTRUCTION |
| 13-2986742 | BOVIS LEND LEASE LMB, INC. |
| 11-2748937 | BREEZE CARTING |
| 11-2834824 | BREEZE NATIONAL INC. |
| 11-2810100 | BRER FOUR TRANSPORTATION |
| 13-4039627 | BURO HAPPOLD CONSULT ENG. |
| 13-3317808 | C & D FIREPROOFING |
| 11-3501510 | C & D PAINTING INC. |
| 13-3286452 | C.B. CONTRACTING CORP |
| 36-4185522 | CANRON CONSTRUCTION CORP |
| 13-4123804 | CANTOR SEINUK GROUP |
| 11-1889096 | CERTIFIED FENCE CORP |
| 13-3543978 | CIVETTA COUSINS |
| 11-3429377 | CLARCO ENTERPRISE CORP |
| 11-6033867 | COMPONENT ASSEMBLY SYS |
| 13-2807918 | COORDINATED METALS, INC. |
| 11-3194814 | CORD CONTRACTING CO. INC. |
| 22-3202129 | CRAIG TEST BORING |
| 41-1559487 | CRITICOM INTERNATIONAL CORP |
| 11-2931166 | DAKOTA DEMO-TECH |
| 13-4048317 | DCM ERECTORS,INC. |
| 11-2920568 | DIAMOND POINT EXCAVATION CORP |
| 11-3327634 | DIEGO CONSTRUCTION |
| 11-3404629 | DIVERSIFIED CARTING |
| 13-3743052 | DMT ENTERPRISE |

| FEIN | ADDITIONAL NAMED INSURED |
|---|---|
| 11-3093462 | D'ONOFRIO GENERAL CONTRACTORS CORP |
| 22-3303725 | EAGLE LEASING & INDSTRL SUPPLY(SEASONS) |
| 11-3193986 | EAGLE ONE ROOFING CONTRACTORS, INC. |
| 11-2480014 | EAGLE SCAFFOLDING CO.  (Seasons) |
| 13-1703591 | EJ DAVIES ,INC |
| 11-2806461 | EN-TECH CORP. |
| 88-0391100 | ENTERTAINMENT PARTNERS |
| 13-3774375 | ET ENVIRONMENTAL |
| 11-3114572 | EVERGREEN RECYCLING OF CORONA(EROC) |
| 13-2760917 | EWELL W. FINLEY, P.C. |
| 22-3712962 | EXECUTIVE MED SERVICES, PC |
| 22-2118608 | F&G MECHANICAL CORPORATION |
| 13-3399858 | FELIX EQUITIES INC |
| 22-3640918 | FLEET TRUCKING |
| 11-3152896 | FRANCIS A. LEE EXTERIOR RESTORATION |
| 13-3641321 | FRANK MICELLI JR CONTRACTING |
| N/A | FTI TRUCKING |
| 11-3279235 | G & G CONTRACTING INC. |
| 13-3595619 | GILSANZ,MURRAY,& STEFICEK |
| 14-1784943 | GINO CRACOLICI & SONS INC. |
| 06-1598088 | GOLDSTEIN ASSOCIATES PLLC |
| 11-2833290 | GRACE INDUSTRIES |
| 11-1699771 | HALLEN WELDING SERVICE |
| 04-2433707 | HELMSMAN MANAGEMENT SERVICES, INC |
| 11-3594215 | HGC CONTRACTING CORP. |
| 11-3479190 | HIGH RISE HOISTING AND SCAFFOLDING |
| 11-3272769 | HIGH-RISE ELECTRIC, INC. |
| 54-1577543 | HP ENVIRONMENTAL |
| 13-4020927 | JP EQUIPMENT RENTAL MATERIALS, INC |
| 10-7589949 | KEVIN MCMANUS |
| 13-1715679 | KOCH SKANSKA, INC. |
| 11-2227462 | LAQUILLA CONSTRUCTION INC. |
| 11-2320910 | LASTRADA  GENERAL CONTRACTING CORP. |
| 13-3147972 | LESLIE E. ROBERTSON ASSOCIATES |
| 04-1543470 | LIBERTY MUTUAL GROUP |
| N/A | LIRO |
| 11-1015370 | LOCKWOOD,KESSLER & BARTLETT(LKB) |
| 13-5318890 | LUCIUS PITKIN |
| 13-1251070 | LZA TECH-DIV OF THORTON TOMASETTI |
| 22-005878 | M.G.MCLAREN, P.C. |
| 06-0619109 | MANAFORT BROTHERS, INC. |
| 22-3072985 | MAZZOCCHI WRECKING INC. |
| 36-3329823 | MEDCOR,INC |
| N/A | MENT BROTHERS |

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 01-0644825 | MERIDIAN CONSTRUCTION  GROUP |
| N/A | MG MCLAREN P.C. |
| 22-1126840 | MORETRENCH AMERICAN CORP |
| 11-3001479 | MRA ENGINEERING, PC |
| 13-1669034 | MUESER RUTLEDGE CONSULTING ENGINEERS |
| 42-1511754 | MUSCO SPORTS LIGHTING, LLC |
| 22-3197850 | NACIREMA INDUSTRIES |
| 22-3267592 | NEW YORK CRANE & EQUIPMENT CORP |
| 25-1024823 | NICHOLSON CONSTRUCTION CO. |
| N/A | NICHOLSON./HEYWOOD JOINT VENTURE. |
| 22-3544421 | OFF ROAD WELDING, INC |
| 11-2488846 | OLYMPIC PLUMBING AND HEATING |
| 13-3473570 | OVE ARUP & PARTNERS |
| 36-4010742 | PARSON GROUP |
| 11-1805182 | PETER SCALAMANDRE & SONS |
| 11-3375596 | PINNACLE ENVIRONMENTAL |
| 13-3378361 | PLAZA CONSTRUCTION CORP |
| 13-4050886 | PRO SAFETY SERVICES , LLC |
| 22-3126192 | PT & L CONTRACTING CORP |
| 13-2751441 | REGIONAL SCAFFOLD  & HOISTING CO, INC. |
| 22-3074476 | RICH MARK ENVIRONMENTAL SERVICES, INC |
| N/A | ROBER SILMAN ASSOCIATES |
| 15-1364211 | ROBERT C STEWART |
| 11-0349221 | ROBERT ERRAT |
| 13-3426668 | ROBERT L GEROSA |
| 14-1763023 | RODAR ENTERPRISES INC. |
| 52-2266099 | ROYAL GM INC |
| 11-3122716 | SAB TRUCKING |
| 11-2860475 | SAFEWAY ENVIRONMENTAL |
| 22-1756525 | SEMCOR EQUIPMENT |
| 11-3087609 | SHELDRAKE ORGANIZATION, INC |
| 94-3367658 | SILVERADO CONTRACTORS |
| 11-2623234 | SILVERITE CONTRACTING |
| N/A | SIMPSON,GUMPERTZ,&HEGER |
| 36-1785381 | SKIDMORE,OWINGS & MERRILL LLP |
| N/A | STAR DELTA ELECTRIC |
| 22-2857112 | STIER, ANDERSON & MALONE |
| 41-1865379 | SUMMIT STRUCTURES LLC |
| 13-3685103 | TELENET COMMUNICATIONS |
| 62-1211267 | THYSSEN KRUPP ELEVATOR CO. |
| N/A | TOMASETTI GROUP |
| 13-4180006 | TORETTA TRUCKING |
| 13-3917891 | TOTAL SAFETY CONSULTING LLC |
| 13-3579470 | TUCCI EQUIPMENT RENTAL CORP |

| FEIN | ADDITIONAL NAMED INSURED |
|------|--------------------------|
| 11-2493726 | TULLY CONSTRUCTION |
| 13-1401980 | TURNER CONSTRUCTION COMPANY |
| 11-3024146 | ULTIMATE DEMOLITION/CS HAULING(JNT VEN) |
| N/A | UNITED STATES REBAR |
| 22-6094782 | VANGUARD EQUIPT RENTALS |
| 22-3490235 | VERTICAL TECHNOLOGIES |
| 13-1881649 | VOLLMER ASSOCIATES |
| 13-2926125 | W HARRIS & SON INC |
| 22-3258053 | WALTER WHITE TRUCKING |
| 13-5475810 | WEEKS MARINE, INC. |
| 13-3140140 | WEIDLINGER ASSOCIATES |
| 13-0394419 | WHITNEY CONTRACTING |
| 11-1501779 | WOLKOW BRAKER ROOFING |
| 22-1619153 | YANNUZZI & SONS, INC |
| 13-2981331 | YONKERS CONTRACTING |
| 13-4171000 | YORK HUNTER CONSTRUCTION , LLC |
| 22-2020762 | ZIEGENFUSS DRILLING |

## SCHEDULE 2
## Underlying Insurance Amounts

### Part A - World Trade Center Clean-Up Project Policies

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
|---|---|---|---|---|---|
| LIBERTY MUTUAL | VARIOUS (AS ISSUED PURSUANT TO WORLD TRADE CENTER EMERGENCY CLEAN-UP PROJECT WRAP-UP INSURANCE PROGRAM) | WORKERS' COMPENSATION | STATUTORY LIMIT | NONE | OTHER STATE'S ENDORSEMENT; U.S.L.&H.; ALTERNATE EMPLOYER ENDORSEMENT |
| | | EMPLOYER'S LIABILITY (AS PART OF WORKERS' COMPENSATION POLICY) | EACH ACCIDENT - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | DISEASE - EACH EMPLOYEE - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | DISEASE - POLICY LIMIT - UNLIMITED BY NY STATUTORY PROVISION | NONE | |
| | | | ALL OTHER STATES - EACH ACCIDENT - $1,000,000 | NONE | |

1

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | | SPECIAL PROVISIONS |
|---|---|---|---|---|---|---|
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | | COLUMN 6 |
| | | | ALL OTHER STATES - DISEASE- EACH EMPLOYEE - $1,000,000 | NONE | | |
| | | | ALL OTHER STATES - DISEASE - POLICY LIMIT - $1,000,000 | NONE | | |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF THE WORKERS' COMPENSATION POLICY | $500,000 PER OCCURRENCE, EXCEPT OCCUPATIONAL DISEASE WHICH HAS A $500,000 PER PERSON DEDUCTIBLE | NONE | | IF AN OCCURRENCE AND/OR CLAIM IS GREATER THAN $46,000,000 IT WILL BE LIBERTY MUTUAL'S RESPONSIBILITY |
| LIBERTY MUTUAL | RG2-621-004607-011 | GENERAL LIABILITY | $2,000,000 COMBINED SINGLE LIMIT | $4,000,000 - GENERAL AGGREGATE  $2,000,000 - COMPLETED OPERATIONS AGGREGATE | | ALL LIMITS EXCEPT COMPLETED OPERATIONS ARE ON AN ANNUAL BASIS.  DEFENSE COST IN ADDITION TO POLICY LIMIT - UNLESS AGGREGATE IS EXHAUSTED; 3-YEAR EXTENDED COMPLETED OPERATIONS; |

-2-

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF GENERAL LIABILITY POLICY | POLICY LIMIT - $2,000,000 PER OCCURRENCE; DEFENSE FUND - $2,000,000 PER OCCURRENCE | POLICY LIMIT - $4,000,000 GENERAL AGGREGATE; $2,000,000 - PRODUCTS/ COMPLETED OPERATIONS AGGREGATE; DEFENSE FUND - $4,000,000 AGGREGATE | EXCESS OF THE $4,000,000 AGGREGATE WILL BE LIBERTY MUTUAL'S RESPONSIBILITY |
| LLOYDS/LONDON MARKET | UF72784 | LEAD UMBRELLA | $50,000,000 - EACH OCCURRENCE | $50,000,000 AGGREGATE | FOLLOW FORM; POLICY IS EXCESS OF PRIMARY OR $2,000,000 SELF INSURED RETENTION AS A RESULT OF ANY ONE OCCURRENCE NOT COVERED BY UNDERLYING POLICIES AND/OR $250,000 AS A RESULT OF THE EXHAUSTION OF ANY AGGREGATE LIMIT IN THE UNDERLYING POLICIES; DEFENSE COSTS ARE IN ADDITION |

-3-

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| LLOYDS/LONDON MARKET | UF72806 | EXCESS LIABILITY | $25,000,000 EXCESS $50,000,000 EXCESS PRIMARY - EACH OCCURRENCE | $25,000,000 EXCESS $50,000,000 EXCESS PRIMARY - AGGREGATE COMPLETED OPERATIONS; $25,000,000 EXCESS $50,000,000 AGGREGATE FOR ALL OTHER COVERAGES | FOLLOW FORM; POLICY IS EXCESS OF UNDERLYING POLICIES OR SELF INSURED RETENTION; DEFENSE COST IN ADDITION |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | HF0048 | HULL AND MACHINERY | PER SCHEDULE OF VALUES AS ADVISED BUT NOT EXCEEDING $3,300,000 ANY ONE VESSEL | NONE | AMOUNT OF CARRIER PARTICIPATION 100%; DEDUCTIBLE $50,000 EACH CLAIM |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | HF0728A00 | PRIMARY MARINE LIABILITY | $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE FOR P&I CLAIMS | $2,000,000 AGGREGATE FOR OCCUPATIONAL DISEASE | SECTION #1 - 75.00% PARTICIPATION; SECTION #2 - 75.00% PARTICIPATION; SECTION #3 - 100.00% PARTICIPATION; SECTION #4 - 75.00% PARTICIPATION; SECTION #5 - 75.00% PARTICIPATION; SECTION #6 - 75.00% PARTICIPATION |

-4-

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| | HF9604A006 | | | | SECTION #1 - 19.92725% PARTICIPATION; SECTION #2 - 19.92725% PARTICIPATION; SECTION #3 - 00.00% PARTICIPATION; SECTION #4 - 19.92725% PARTICIPATION; SECTION #5 - 19.92725% PARTICIPATION; SECTION #6 - 19.92725% PARTICIPATION |
| | HF9604A006 | | | | SECTION #1 - 5.072475% PARTICIPATION; SECTION #2 - 5.072475% PARTICIPATION; SECTION #3 - 00.00% PARTICIPATION; SECTION #4 - 5.072475% PARTICIPATION; SECTION #5 - 5.072475% PARTICIPATION; SECTION #6 - 5.072475% PARTICIPATION |

| UNDERLYING INSURER | UNDERLYING POLICIES | | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
|---|---|---|---|---|---|---|
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | | COLUMN 6 |
| | | PRE-FUNDED DEDUCTIBLE AS PART OF TOTAL PRIMARY MARINE LIABILITY PLACEMENT | NONE | $1,435,000 ANNUAL AGGREGATE - ONCE EXHAUSTED, CLAIMS PAYABLE IN FULL WITHOUT DEDUCTIBLE | | |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | 02-0923-01 | EXCESS MARINE LIABILITY | $100,000,000 EXCESS OF $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE | NONE | | |
| UNDERWRITERS AT LLOYD'S AND INSTITUTE OF LONDON UNDERWRITERS | 02-0918-01 | EXCESS MARINE LIABILITY | $400,000,000 EXCESS OF $100,000,000 EXCESS OF $1,000,000 ANY ONE ACCIDENT OR OCCURRENCE | NONE | | |
| WATER QUALITY INSURANCE SYNDICATE | 32-23041 | MARINE POLLUTION LIABILITY | SECTION A - OIL POLLUTION - $1,000,000 PER OCCURRENCE | NONE | | 100.00% PARTICIPATION |
| | | | SECTION B - HAZARDOUS SUBSTANCES OTHER THAN OIL - $5,000,000 PER OCCURRENCE | NONE | | |

## Part B - Fresh Kills Policies

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
|---|---|---|---|---|---|
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| ST PAUL FIRE & MARINE | KK03200464 (6/1/2001 - 6/1/2002) | COMMERCIAL AND GENERAL LIABILITY | $1,000,000 PER OCCURRENCE EXCEPT $100,000 FOR FIRE DAMAGE (ANY ONE FIRE) $5,000 FOR MEDICAL EXPENSE (ANY ONE PERSON); $1,000,000 FOR PERSONAL AND ADVERTING INJURY | $2,000,000 GENERAL AGGREGATE (PER PROJECT); $2,000,000 PRODUCTS - COMPLETED OPERATIONS AGGREGATE | BLANKET ADDITIONAL INSURED |
| | | AUTOMOBILE LIABILITY | $1,000,000 COMBINED SINGLE LIMIT | | INCLUDES COVERAGE FOR ANY AUTO, HIRED AUTOS, NON-OWNED AUTOS AND HIRED CAR PHYSICAL DAMAGE |
| | KK04100850 (6/1/2002 - 6/1/2003) | COMMERCIAL AND GENERAL LIABILITY | $1,000,000 PER OCCURRENCE EXCEPT $100,000 FOR FIRE DAMAGE (ANY ONE FIRE) $5,000 FOR MEDICAL EXPENSE (ANY ONE PERSON); $1,000,000 FOR PERSONAL AND ADVERTING INJURY | $2,000,000 GENERAL AGGREGATE (PER PROJECT); $2,000,000 PRODUCTS - COMPLETED OPERATIONS AGGREGATE | BLANKET ADDITIONAL INSURED |
| | | AUTOMOBILE LIABILITY | $1,000,000 COMBINED SINGLE LIMIT | | INCLUDES COVERAGE FOR ANY AUTO, HIRED AUTOS, NON-OWNED AUTOS AND HIRED CAR PHYSICAL DAMAGE |

7

| UNDERLYING INSURER | UNDERLYING POLICIES | | UNDERLYING INSURANCE AMOUNTS | | SPECIAL PROVISIONS |
| | POLICY NUMBER(S) | LINE OF COVERAGE | PER OCCURRENCE LIMIT | AGGREGATE LIMIT | |
| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | COLUMN 6 |
| WESTCHESTER FIRE INSURANCE COMPANY | CUA150420 (6/1/2001 - 6/1/2002) | EXCESS LIABILITY | $10,000,000 PER OCCURRENCE WITH A $10,000 RETENTION | $10,000,000 AGGREGATE | |
| | CUA1511560 (6/1/2002 - 6/1/2003) | EXCESS LIABILITY | $10,000,000 PER OCCURRENCE WITH A $10,000 RETENTION | $10,000,000 AGGREGATE | |
| AMERICAN RISK FUNDING INS. | WCD0100098 WCR0100076 (6/1/2001 - 6/1/2002) | WORKERS COMPENSATION AND EMPLOYERS LIABILITY | STATUTORY LIMITS FOR WORKERS COMPENSATION; FOR EMPLOYERS LIABILITY: $500,000 EACH ACCIDENT $500,000 EACH DISEASE, EACH EMPLOYEE | FOR EMPLOYERS LIABILITY: $500,000 DISEASE POLICY LIMIT | |
| | WCD0200255 WCR0200114 (6/1/2002 - 6/1/2003) | WORKERS COMPENSATION AND EMPLOYERS LIABILITY | STATUTORY LIMITS FOR WORKERS COMPENSATION; FOR EMPLOYERS LIABILITY: $500,000 EACH ACCIDENT $500,000 EACH DISEASE, EACH EMPLOYEE | FOR EMPLOYERS LIABILITY: $500,000 DISEASE POLICY LIMIT | |

8

**SCHEDULE 3**

**Payment Trigger Activation Rate**

| Policy Year When Acceptance Trigger Activated[1] | Payment Trigger Activation Rate (1) |
|---|---|
| 2003/04 | +50% |
| 2004/05 | +50% |
| 2005/06 | +50% |
| 2006/07 | +50% |
| 2007/08 | +60% |
| 2008/09 | +65% |
| 2009/10 | +70% |
| 2010/11 | +75% |
| 2011/12 | +80% |
| 2012/13 | +85% |
| 2013/14 | +90% |
| 2014/15 | +90% |
| 2015/16 | +90% |
| 2016/17 | +90% |
| 2017/18 | +90% |
| 2018/19 | +90% |
| 2019/20 | +90% |
| 2020/21 | +90% |
| 2021/22 | +90% |
| 2022/23 | +90% |
| 2023/24 | +90% |
| 2024/25 | +90% |
| 2025/26 | +90% |
| 2026/27 | +90% |
| 2027/28 | +90% |

(1) Each policy year incepts on the month and day of the Issue Date.

**BYLAWS**

**OF**

**WTC CAPTIVE INSURANCE COMPANY, INC.**

# TABLE OF CONTENTS

Page

ARTICLE I.      OFFICES ................................................................................................ 1

ARTICLE II.     MEMBERSHIP ...................................................................................... 1

ARTICLE III.    DIRECTORS ........................................................................................... 1
    Section 1.   Management of Corporate Affairs ................................................ 1
    Section 2.   Number of Directors ........................................................................ 1
    Section 3.   Appointment of Directors; Qualifications ...................................... 1
    Section 4.   Term.................................................................................................... 3
    Section 5.   Resignation ....................................................................................... 3
    Section 6.   Removal of Director ........................................................................ 3
    Section 7.   Vacancies .......................................................................................... 3
    Section 8.   Meeting of Directors ....................................................................... 4
    Section 9.   Notice of Meetings of Directors; Waiver of Notice...................... 4
    Section 10.  Action by Board of Directors Without a Meeting ........................ 5
    Section 11.  Meetings by Conference Call ......................................................... 5
    Section 12.  Quorum and Vote of Directors ...................................................... 5
    Section 13.  Procedure .......................................................................................... 6
    Section 14.  Compensation of Directors ............................................................ 6
    Section 15.  Director Questionnaire .................................................................... 6
    Section 16.  Observer Status ................................................................................ 6

ARTICLE IV.     COMMITTEES ...................................................................................... 7
    Section 1.   Committees ........................................................................................ 7
    Section 2.   Meeting of Committees .................................................................... 9
    Section 3.   Authorization .................................................................................. 10
    Section 4.   Minutes of Committee Meetings .................................................. 10
    Section 5.   Action Without a Meeting; Conference Call Meetings ............. 10

ARTICLE V.      OFFICERS ........................................................................................... 11
    Section 1.   Officers ............................................................................................ 11
    Section 2.   Term of Office ................................................................................. 12
    Section 3.   President .......................................................................................... 12
    Section 4.   Secretary and Assistant Secretary ............................................... 12
    Section 5.   Treasurer and Assistant Treasurer ............................................... 13
    Section 6.   Vice Presidents ............................................................................... 13
    Section 7.   Removal ............................................................................................ 14
    Section 8.   Compensation of Officers ............................................................. 14
    Section 9.   Bonds ................................................................................................ 14
    Section 10.  Execution of Contracts, Deeds, Leases and Other Agreements........................... 14
    Section 11.  Execution of Checks, Notes, Drafts and Other Negotiable Instruments.............. 15
    Section 12.  Service Providers .......................................................................... 15

ARTICLE VI.          INSURANCE POLICY ........................................................................ 15

ARTICLE VII.         FINANCES AND RECORDS ............................................................ 16
          Section 1.    Finances ........................................................................................ 16
          Section 2.    Fiscal Year .................................................................................... 16
          Section 3.    Keeping and Inspection of Records ............................................ 16

ARTICLE VIII.        MISCELLANEOUS ............................................................................ 17
          Section 1.    Form of Corporate Seal ................................................................ 17
          Section 2.    Indemnification of Directors, Officers and Employees ............... 17
          Section 3.    Grant Agreement ........................................................................... 18
          Section 4.    Conflicts of Interest ..................................................................... 18
          Section 5.    Reimbursement of Expenses ........................................................ 19
          Section 6.    Reinsurance ................................................................................... 19
          Section 7.    The Mayor ..................................................................................... 19
          Section 8.    Amendment of Bylaws .................................................................. 19

## ARTICLE I.

### OFFICES

The office of the Corporation shall be in the County of New York, State of New York, at such place as the Board of Directors may fix.

## ARTICLE II.

### MEMBERSHIP

The Corporation shall have one member, which member shall be the City of New York.

## ARTICLE III.

### DIRECTORS

Section 1.    <u>Management of Corporate Affairs</u>.  The general management of the affairs and property of the Corporation shall be vested in its Board of Directors.  The Board of Directors shall have the power to employ necessary staff and other personnel, authorize expenditures and take all necessary and proper steps to carry out the purposes of the Corporation and to promote its best interests.  The Corporation, through its Board of Directors and its various Committees, shall act impartially and without prejudice in administering the affairs of the Corporation, including the Policy (as hereinafter defined).

Section 2.    <u>Number of Directors</u>.  The Board of Directors of the Corporation shall consist of five (5) directors.

Section 3.    <u>Appointment of Directors; Qualifications</u>.  (a)  All directors of the Corporation shall be appointed annually by the Mayor of the City of New York prior to the Corporation's annual meeting; <u>provided</u>, <u>however</u>, that one of such directors shall be appointed by the Mayor upon nomination of a person, which person shall be acceptable to the Mayor, in his sole discretion, by the Representative (as defined in <u>Section 3(d)</u> of this <u>Article III</u>) of those entities

constituting Additional Named Insureds (the "Contractors") under the insurance policy issued by

the Corporation to the City of New York as set forth in Article VI of these bylaws; provided,

further, that in the event a nominee is not acceptable to the Mayor, the Representative, on behalf of

the Contractors, shall have the right to select additional nominees until a nominee is deemed

acceptable to the Mayor. Each year, immediately following the beginning of the Corporation's

fiscal year, the Mayor shall be notified in writing by the President of the Corporation of the

requirement to make the annual appointments to the Board of Directors of the Corporation.

Directors shall succeed to office at the next annual meeting of the Board of Directors following

their appointment.

(b)    Each director shall be an employee, former employee or employee-on-leave

of the City of New York or a person experienced in the insurance, construction, financial,

professional, or other business or governmental communities of the City of New York. Each

director shall be at least eighteen years of age and a citizen of the United States. At least two (2) of

the directors shall be residents of New York State.

(c)    The Mayor may appoint an alternate for each director, which alternate, upon

written notice to the Secretary, may attend meetings and exercise therein all the rights, powers, and

privileges of the absent director; provided that in the event an alternate for the director nominated

on behalf of the Contractors is nominated by the Representative thereof, such alternate, if

acceptable to the Mayor in his sole discretion, shall be appointed by the Mayor; provided, further,

that in the event such nominee is not acceptable to the Mayor, the Representative of the Contractors

shall have the right to select additional nominees until a nominee is deemed acceptable to the

Mayor. For purposes of these bylaws, any alternate director, when acting in the capacity of a

director, shall be considered a director.

2

(d)    The Representative of the Contractors shall be selected by a simple majority of the following:  AMEC plc, Bovis Lend Lease, Tully Construction Co., Inc. and Turner Construction Company.  This selection, and any replacement thereof, shall be transmitted in writing to the Mayor.

Section 4.    Term.  Each director shall serve as such for a term of one (1) year and until the appointment and qualification of his/her successor or until his/her prior resignation, removal or demise.

Section 5.    Resignation.  Any director may resign at any time by giving his/her written notice of resignation to the chairperson or President.  Unless otherwise specified in said notice, such resignation shall take effect upon receipt and the acceptance of such resignation shall not be necessary to make it effective.  If the chairperson or President receives such notice, he/she shall inform the other directors of the Corporation of such resignation as soon as possible after receiving such notice, though failure to do so shall not affect the effectiveness of such resignation.

Section 6.    Removal of Director.  Any director may be removed at any time with or without cause and with or without notice by the Mayor of the City of New York, provided, however, that in the event the removed director was a nominee of the Contractors, the Representative of the Contractors shall have the right to select additional nominees to replace the removed director until a nominee is deemed acceptable to the Mayor.

Section 7.    Vacancies.  Vacancies in the Board of Directors as a result of removal, resignation or otherwise shall be filled by action of the Mayor of the City of New York, as soon as practicable; provided, however, that in the event that the vacant position is that of the director nominated by the Representative of the Contractors, the replacement director for such position shall be appointed by the Mayor upon nomination by the Representative in accordance

3

with the procedures set forth in <u>Section 3</u> of this <u>Article III</u> including, without limitation, the provisos at the end of <u>Section 3(a)</u>.

Section 8.    <u>Meeting of Directors</u>.  (a)  The Board of Directors shall hold at least three (3) regular meetings (in addition to the annual meeting) each fiscal year.  Regular meetings of the Board of Directors shall be held at such time and place within or without the State of New York as the Board of Directors or the President may from time to time prescribe; <u>provided</u>, that at least one meeting per year be held in the State of New York.

(b)    The annual meeting of the Board of Directors shall be held at a location to be fixed by the Board of Directors.

(c)    Special meetings of the Board of Directors, other than those regulated by statute, shall be called by the chairperson or the President, or by either at the request in writing of at least a quorum of directors.  The chairperson or President shall fix the time and place for such meeting and give notice as required by <u>Section 9</u> of this <u>Article III</u>.

Section 9.    <u>Notice of Meetings of Directors; Waiver of Notice</u>.  (a)  Regular meetings of the Board of Directors may be held without notice if the Board of Directors fixes the time and place of such regular meetings by resolution.  For regular meetings of the Board of Directors whose time and place has not been fixed in advance by the Board of Directors, and for special meetings, written notice of each such meeting of the Board of Directors stating the time and place and, in the case of a special meeting, the purpose thereof and by or at whose direction the special meeting is called, shall be provided to each member of the Board of Directors.

(b)    Any such notice shall be given by delivery in person, by facsimile, by e-mail or by first class mail, postage prepaid, not less than ten (10) Business Days before such meeting.  In addition, each director and alternate shall receive a telephone call or a written or voicemail message

4

regarding each such meeting. The term "Business Day" shall mean any day other than a Saturday

or Sunday or any legal holiday of the City of New York or the State of New York. Each such

notice shall be directed to each director and each alternate at his/her address as it appears on the

record of directors of the Corporation, or, if such director shall have filed with the Secretary a

written request that notices to him/her be mailed to some other address, then directed to such

director or alternate at such other address.

  (c) The notice of any meeting of the Board of Directors may be waived by a

director before or after such meeting by signing a written waiver of notice or by attending such

meeting without protesting prior thereto or at its commencement, the lack of notice to him/her. No

notice need be given of any adjourned meeting. Meetings of the Board of Directors may also be

held at any place and time without notice by unanimous written consent of all the directors.

  Section 10. <u>Action by Board of Directors Without a Meeting</u>. Any action

required or permitted to be taken by the Board of Directors may be taken without a meeting if all

the members of the Board of Directors consent in writing to the adoption of a resolution

authorizing the action. The resolution and the written consents thereto shall be filed with minutes

of the proceedings of the Board of Directors.

  Section 11. <u>Meetings by Conference Call</u>. Directors may participate in meetings

of the Board of Directors by means of telephone conference or similar equipment which allows all

persons participating in the meeting to hear each other at the same time. Participation by such

means shall constitute presence in person at such a meeting.

  Section 12. <u>Quorum and Vote of Directors</u>. (a) A meeting of the Board of

Directors duly called shall not be deemed organized for the transaction of business unless a quorum

is present. A quorum for the transaction of business or of any specified item of business shall

consist of three (3) directors.  If a quorum is not present, a majority of the directors present may adjourn the meeting from time to time to such time and place as they may determine, without notice other than announcement at the meeting.  Once a quorum is present to organize a meeting, it is not broken by the subsequent withdrawal of any directors.

(b)    Except as otherwise provided by law or by these bylaws, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 13.    <u>Procedure</u>.  The order of business and all other matters of procedure at every meeting of the Board of Directors shall be determined by the presiding officer.

Section 14.    <u>Compensation of Directors</u>.  Directors of the Corporation, as such, shall receive no compensation from the Corporation; <u>provided, however,</u> that directors shall be reimbursed by the Corporation for reasonable out-of-pocket expenses incurred in connection with service as a director of the Corporation.  Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 15.    <u>Director Questionnaire</u>.  Annually, prior to his/her succession to the board, each director may be required to complete a questionnaire to be provided by the Corporation (which may be on a form prescribed by the New York City Conflicts of Interest Board) which may request information as to such director's other board, professional and business affiliations.

Section 16.    <u>Observer Status</u>.  The Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, the United States Department of Homeland Security ("FEMA"), the New York State Emergency Management Office ("NYSEMO") and the New York State Insurance Department ("NYSID") shall each have the right to designate one

6

person to attend each meeting of the Board of Directors as an observer. FEMA, NYSEMO and

NYSID shall receive notice of each such meeting in accordance with the procedures set forth in

Section 9 of this Article III and shall be provided with copies of the minutes of each such meeting

following the Board of Directors' adoption thereof.

## ARTICLE IV.

## COMMITTEES

Section 1.    Committees. (a) The Board of Directors, by resolution adopted by a

majority of the entire Board of Directors, shall create a standing advisory committee (the "Advisory

Committee"). The Advisory Committee shall consist of three (3) members appointed by the Board

of Directors. One member shall be a director (or designee of a director) nominated by the City of

New York, one member shall be the director (or designee of the director acceptable to the Board of

Directors) nominated by the Representative of the Contractors, and the third member shall be a

person with substantial expertise in the insurance industry who shall be nominated jointly by the

other two designees. Members of the Advisory Committee shall discharge their duties in good

faith with the degree of care that a prudent person would utilize in conducting their own affairs.

(b)    (i) The Advisory Committee may make recommendations with respect to

the protocols to be followed by the third party claims administrator engaged by the Corporation,

including implementation and modification of such protocols. Such recommendations shall not be

binding on the Board of Directors.

(ii) In addition, the Advisory Committee shall consider claims disputes

referred to the Board of Directors by the third party administrator and the Advisory Committee

shall forward a recommendation with respect to each dispute to the Board of Directors. The

recommendation of the Advisory Committee shall not be binding on the Board of Directors. If,

after review of the recommendation of the Advisory Committee, the Board of Directors disagrees

7

with the recommendation of the Advisory Committee and there is still a dispute with respect to

such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under

New York law pursuant to the rules of the American Arbitration Association.  The decision

rendered upon such arbitration shall be binding on the Board of Directors and the Corporation.

(iii)  In addition, the Advisory Committee may consider whether the

Corporation has taken, or is about to take, action that is inconsistent with its material obligations,

responsibilities or rights under the Policy and By-laws and, if the Advisory Committee has a

concern in this regard, it may request a prompt meeting with the President to discuss this concern,

which the President must attend within ten (10) days of such request (or such later time as they may

agree to).  If, ten (10) or more days following its meeting with the President (or immediately if the

President expressly refuses to consider the issue or does not attend the meeting), the Advisory

Committee continues to have such concern, it may, if it deems appropriate, make a

recommendation relating thereto to the Board of Directors.  The recommendation of the Advisory

Committee shall not be binding on the Board of Directors.  If, forty-five days after receiving the

recommendation of the Advisory Committee, the Board of Directors disagrees with the

recommendation of the Advisory Committee or fails to address its concerns and the Advisory

Committee so requests, the issue will be referred to an arbitration to be conducted under New York

law pursuant to the rules of the American Arbitration Association.  The Corporation shall provide

written notice to FEMA and NYSEMO within five (5) Business Days after any request of the

Advisory Committee for referral of an issue to arbitration.  Such arbitration shall be limited to the

questions of (1) whether the issue at hand constitutes a material obligation, responsibility or right

under the Policy and By-laws; and, if so, (2) whether the Board of Directors' action, or pending or

proposed action, is reasonable and in accordance with such material obligations, responsibilities or

rights. If the arbitrators reach the second issue and answer it in the negative, they shall refer such

finding to the Board of Directors for action not inconsistent with such negative answer.

(iv) Under no circumstances shall actions taken under this Article IV,

Section 1(b), cause the Board of Directors or the Corporation to delay action on any matter it

reasonably believes is necessary to protect the interests of the Corporation.

(c)     The Board of Directors, by a resolution adopted by a majority of the entire

Board of Directors, shall create a standing audit committee (the "Audit Committee") consisting of

three (3) members who are directors of the Corporation.  To the extent possible, the Board of

Directors shall endeavor to select members of the Audit Committee who possess substantial

financial or accounting experience and expertise.  The Audit Committee's primary duties and

responsibilities shall be to (i) monitor the integrity of the Corporation's financial reporting process

regarding finance, accounting, regulatory and legal compliance; (ii) monitor the qualifications of

the Corporation's independent auditors; (iii) monitor the Corporation's internal audit functions; and

(iv) provide an avenue of communication among the independent auditors, management and the

Board of Directors.

(d)     The Board of Directors, by resolution adopted by a majority of the entire

Board of Directors, may designate such other committees as it may deem appropriate from time to

time.

(e)     A quorum for each of the Advisory Committee and the Audit Committee

shall be two (2) directors.  Each such committee shall serve at the pleasure of the Board of

Directors.

Section 2.     Meeting of Committees.  Any committee of the Board of Directors

(with regard to such committee) or the Board of Directors (with regard to all committees) shall

9

have the power to fix the time and place of holding regular or special meetings of committees and the method of giving notice thereof; but unless otherwise prescribed, meetings of any committee may be called in the same manner and upon the same notice, and notice of such meetings may be waived in the same manner as provided in these bylaws with respect to meetings of the Board of Directors.

Section 3.    Authorization.  The acts of a majority of the members of a committee present at a meeting at which a quorum is present shall be the acts of such committee, unless otherwise provided by law, the Certificate of Incorporation or these bylaws.  If a quorum is not present, a majority of the members of the committee present may adjourn the meeting from time to time to such time and place as they may determine, without notice other than announcement at the meeting, until enough members of such committee to constitute a quorum shall attend.  When a quorum is present to organize a meeting, it is not broken by the subsequent withdrawal of any members of the committee.

Section 4.    Minutes of Committee Meetings.  Each committee shall keep regular minutes of all its meetings and proceedings.  The minutes shall be open to the inspection of any director at any time.  FEMA, NYSEMO and the NYSID shall each be provided with copies of the minutes of each committee meeting within five (5) Business Days after the adoption of such minutes.

Section 5.    Action Without a Meeting; Conference Call Meetings.  Any action required or permitted to be taken by any committee of the Board of Directors may be taken without a meeting if all the members of the committee consent in writing to the adoption of a resolution authorizing the action.  The resolution and written consents thereto shall be filed with minutes of the proceedings of the committee.  Members of any committee may participate in meetings by

means of a conference telephone or similar equipment that allows all persons participating in the meeting to hear each other at the same time.  Participation by such means shall constitute presence in person at the meeting.

## ARTICLE V.

## OFFICERS

Section 1.    Officers.  (a)  The officers of the Corporation shall be a President, a Treasurer, a Secretary, and such Vice Presidents, Assistant Treasurers and Assistant Secretaries as the Board of Directors may from time to time determine.

(b)    An officer need not be a director of the Corporation.  In electing a person to be an officer of the Corporation the Board of Directors shall consider such person's experience relating to insurance, government, construction, financial services, accounting, or law and other relevant factors.  Any two or more offices may be held by the same person, except the offices of President and Secretary.

(c)    The Board of Directors may elect such other officers as it shall deem necessary, who shall exercise powers and perform such duties as shall be determined from time to time by the Board of Directors.

(d)    At the discretion of the Board of Directors, any officer may serve the Corporation on a full-time or part-time basis.  In the event the Board of Directors selects a person to serve as an officer without compensation and on a part-time basis, such person may simultaneously be employed on a full-time basis by any other person, including any insured, but only so long as (i) the Board of Directors is notified of this arrangement in advance and approves it and (ii) in the event such other employment is on behalf of any insured, that person will not be involved in any claims by such insured to the Corporation.  In the event the Board of Directors selects a person to serve as an officer with compensation and on a part-time basis, such person may

11

simultaneously be employed on a part-time basis by any other person, including any insured, but only so long as (i) the Board of Directors is notified of this arrangement in advance and approves it and (ii) in the event such other part-time employment is on behalf of any insured, that person will not be involved in any claims by such insured to the Corporation. In the event that the Board of Directors selects a person to serve as an officer on a full-time basis, such officer may be an employee-on-leave from any insured or other person, but not an active employee thereof.

Section 2.    Term of Office. Each officer shall be elected annually by each newly appointed Board of Directors as soon as is practicable following the appointment of such Board of Directors, and shall hold his/her respective office until the election and qualification of his/her successor or his/her prior resignation or removal. Any vacancy occurring in any office may be filled at any ensuing meeting of the Board of Directors.

Section 3.    President. The President shall be the chief executive officer of the Corporation and shall have general charge and supervision of the business and affairs of the Corporation, subject to the control and direction of the Board of Directors. He/she shall also perform such other duties as are assigned to him/her by the Board of Directors. The President shall report to the Board of Directors. The President shall preside at meetings of the Board of Directors in the absence of the chairperson. If requested by FEMA, the President shall serve on a full-time basis until such time as the Board of Directors decides otherwise, provided that FEMA is given notice 30 days in advance of the effective date of such change in status.

Section 4.    Secretary and Assistant Secretary. (a) The Secretary shall issue notices of all meetings of directors when notices of such meetings are required by law or these bylaws. He/she shall attend the meetings of directors and keep the minutes thereof, and shall have charge of the records of the Corporation. He/she shall have custody of the corporate seal, shall

12

affix the corporate seal to, and sign such instruments as require the seal and his/her signature, and shall perform such other duties as are incident to his/her office or as are properly required of him/her by the Board of Directors or the President.

(b)     Any Assistant Secretary shall perform such duties as may be assigned to him/her by the Board of Directors, the chairperson or the President.  At the request of the Secretary or in the absence of the Secretary, an Assistant Secretary shall perform the duties and exercise the powers of the Secretary.

Section 5.     Treasurer and Assistant Treasurer.  (a) The Treasurer shall have the care and custody of all the moneys and securities of the Corporation.  He/she shall deposit moneys received by him/her for the Corporation in the name of the Corporation as provided in Article VII, Section 1.  He/she shall cause to be entered in books of the Corporation to be kept for that purpose, full and accurate accounts of all moneys received by him/her and paid by him/her on account of the Corporation.  He/she shall make and sign such reports, statements and instruments as may be required of him/her by law or the Board of Directors, and shall perform such other duties as are incident to his/her office or as are properly required of him/her by the Board of Directors or the President.

(b)     Any Assistant Treasurer shall perform such duties as may be assigned to him/her by the Board of Directors or the President.  At the request of the Treasurer or in the absence of the Treasurer, an Assistant Treasurer shall perform the duties and exercise the powers of the Treasurer.

Section 6.     Vice Presidents.  The Vice Presidents may be designated by such title or titles as the Board of Directors may determine.  At the request of the President, a Vice President shall perform the duties and exercise the functions of the President.  In addition, in the President's

13

absence, the Vice President, or Vice Presidents in such order as the chairperson may from time to time designate, shall perform the duties and exercise the functions of the President. The Vice President or Vice Presidents shall perform such other duties as may be assigned to him/her or them by the Board of Directors or the President.

Section 7.    Removal.  Any officer elected by the Board of Directors may be removed, either with or without cause, at any meeting of directors, notice of which shall have referred to the proposed action, by vote, in person of a majority of all directors entitled to vote.

Section 8.    Compensation of Officers.  The fixing of salaries of officers shall require the affirmative vote of a majority of the entire Board of Directors.  Such compensation shall be equal to or less than what is reasonable and commensurate with the services performed.

Section 9.    Bonds.  The Board of Directors may require any officer, agent or employee of the Corporation to give a bond to the Corporation for the faithful performance of his/her duties, with one or more sureties and in such amount as may be satisfactory to the Board of Directors.  The expense of such bond shall be borne by the Corporation.

Section 10.    Execution of Contracts, Deeds, Leases and Other Agreements.  (a) All contracts, deeds, leases and other agreements authorized by the Board of Directors to be signed by or on behalf of the Corporation may be executed in the name of the Corporation by the President, any Vice President, or such other officer or officers as the Board of Directors may from time to time designate for that purpose.

(b)    Each contract entered into by or on behalf of the Corporation with any person or entity providing services to or for the Corporation shall be terminable by the Corporation with or without cause upon a reasonable notice period chosen in the discretion of the Board of

14

Directors. In addition, each such contract shall contain provisions requiring the delivery of reports from such service providers to the Corporation no less frequently than quarterly.

Section 11.    Execution of Checks, Notes, Drafts and Other Negotiable Instruments. All checks, notes or drafts and other negotiable instruments shall be signed by the President, any Vice President, the Treasurer, or such officer or officers as the Board of Directors may from time to time designate for that purpose. The Secretary, any Assistant Secretary or any Assistant Treasurer shall co-sign such checks, notes, drafts and other negotiable instruments.

Section 12.    Service Providers. No party providing substantial services to the Corporation shall be an affiliate of or related to the City of New York or the Contractors, provided, however, that the Office of the Corporation Counsel may represent the City of New York in liability claims against the City under the Policy (as hereinafter defined), and be compensated therefor, insofar as permitted under Section 2.07 or Section 9.04(b), (c), or (d) of the Policy. In addition, (a) the third party administrator and the captive management company shall not be an affiliate of or related to one another and (b) the third party administrator and panel counsel shall not be an affiliate of or related to one another. The fees paid to such service providers, and the administrative costs and expenses of the Corporation, shall be customary and reasonable. Among the Corporation's service providers shall be a claims review firm, which the Corporation shall engage following 30 days notice to FEMA. Following the end of each calendar year, such firm shall review claims paid during the prior calendar year to verify that the Corporation has exercised good faith business judgment in accordance with normal insurance industry practices.

## ARTICLE VI.

## INSURANCE POLICY

Section 1.    (a) The Corporation shall issue an occurrence basis, liability insurance policy (the "Policy") to the City of New York as the named insured and the Contractors

15

as additional named insureds, with an effective date being the beginning of Debris Removal (as defined in the Policy) at the World Trade Center Site (as defined in the Policy) on September 11, 2001.

(b)     Given that the funds from which the Corporation will make payments are limited to funds received pursuant to the Policy and investment income earned on such funds, the Policy, under certain circumstances, (i) will limit (A) claims that will be accepted under the Policy and (B) the percentage of the value of individual claims and related expenses to be paid under the Policy and (ii) will be subject to termination pursuant to the Policy.

### ARTICLE VII.

### FINANCES AND RECORDS

Section 1.     Finances.  The funds of the Corporation shall be deposited in its name with such bank or banks, trust company or trust companies as the Board of Directors may from time to time designate.  No officers, agents or employees of the Corporation, alone or with others, shall have the power to make any checks, notes, drafts or other negotiable instruments in the name of the Corporation or to bind the Corporation, thereby, except as herein provided.

Section 2.     Fiscal Year.  The fiscal year of the Corporation shall end on December 31 of each year, unless otherwise provided by the Board of Directors.

Section 3.     Keeping and Inspection of Records.  There shall be kept, at the principal office of the Corporation (or the offices of its service providers), a complete set of books and records of the Corporation.  They shall include, but not be limited to, the bylaws, minutes of meetings and such other books, records and papers of the Corporation as the Board of Directors shall require.  These records shall be open to inspection by any director within ten (10) days after receipt by the Secretary of a written request for such inspection.

16

## ARTICLE VIII.

## <u>MISCELLANEOUS</u>

Section 1.    <u>Form of Corporate Seal</u>.  The seal of the Corporation shall be circular in form with the words "WTC CAPTIVE INSURANCE COMPANY, INC." in the outer circle and the words, "Corporate Seal 2004 New York" in the inner circle.  The seal on any corporate obligation for the payment of money may be facsimile, engraved or printed.

Section 2.    <u>Indemnification of Directors, Officers and Employees</u>.  (a)  To the maximum extent permitted by law, the Corporation shall defend, indemnify and hold harmless each director and officer, whether or not then in office, who is made or threatened to be made a party to any action, suit or proceeding, civil or criminal, arising out of such director's or officer's act or omission to act as a director or officer of the Corporation, against (i) the reasonable expenses, costs and counsel fees incurred by him/her in the defense of such action, suit or proceeding and (ii) amounts paid or incurred pursuant to a judgment or in settlement of any such action, suit or proceeding.

(b)    Subject to the provisions of this <u>Article VIII</u>, <u>Section 2</u>, the Corporation shall indemnify and hold harmless each employee who is not an officer or director of the Corporation, whether or not then so employed, who is made or threatened to be made a party to any action, suit or proceeding, civil or criminal, arising out of the scope of his/her employment against (i) the reasonable expenses, costs and counsel fees incurred by him/her in the defense of such action, suit or proceeding and (ii) amounts paid or incurred pursuant to a judgment or in settlement of any such action, suit or proceeding.  Such indemnification shall be conditional upon (x) a finding made by the Board of Directors that the employee acted in good faith for a purpose which he/she reasonably believed to be in the best interest of the Corporation and that he/she had no reasonable cause to believe that his/her conduct was unlawful, (y) the employee's reasonably prompt delivery to the

17

Corporation of written notice of the action, suit or proceeding and (z) unless defended by the Corporation, the employee's retention of counsel satisfactory to the Corporation and the Corporation's determination that the defense and any settlement of such action, suit or proceeding is satisfactory. The foregoing right of indemnification shall not be exclusive of other rights to which any employee may be entitled as a matter of law.

(c)    The Corporation may obtain such insurance as the Board of Directors shall from time to time determine to protect the Corporation against losses caused by the fraudulent or dishonest acts of any director, officer, or employee, to reimburse the Corporation for any obligation incurred pursuant to the previous paragraphs of this Article VIII, Section 2, and to indemnify directors and officers under circumstances permitted by law.

Section 3.    Grant Agreement. The Corporation shall receive grant funds provided by FEMA pursuant to a Grant Agreement for the WTC Captive Insurance Company Project between FEMA and NYSEMO. The Corporation shall provide FEMA and NYSEMO with such reports, notices, inspection rights, and other rights and information required pursuant to the Grant Agreement. In addition, the Corporation shall not take any action, including amending these bylaws or the Policy, that conflicts in substance with the provisions of such Grant Agreement without prior written notice to FEMA, and the Corporation shall conduct its affairs in substantial compliance with the terms of the Grant Agreement.

Section 4.    Conflicts of Interest. (a) No director or officer shall have a material interest, direct or indirect, in any contract, including the selection thereof, relating to the operations conducted by the Corporation, nor any contract for furnishing supplies thereto, unless authorized by the concurring vote of the entire Board of Directors with the exception of such interested director. In the event of such interest, the director or officer concerned shall forthwith make

18

disclosure to the Corporation of the nature and extent of his/her interest and such disclosure shall be entered in writing upon the minutes of the meeting of the Board of Directors called to authorize such contract. No director who has such an interest shall vote on any matter relating to such interest.

(b)    All of the Corporation's directors, officers and employees who are also officials or employees of the City of New York (or any City of New York-affiliated entity that is subject to Chapter 68 of the New York City Charter) shall be subject to the restrictions set forth in Chapter 68 of the New York City Charter. The Corporation shall consult with and be guided by the New York City Conflicts of Interest Board in connection with the application of Chapter 68 to such directors, officers or employees of the Corporation.

Section 5.    Reimbursement of Expenses. The Corporation shall reimburse the City of New York and /or the Contractors for all expenses incurred in developing the Corporation (or pay the obligations for such expenses directly to the provider of such services) to the extent that such expenses have been approved by FEMA and NYSEMO.

Section 6.    Reinsurance. The Corporation shall have the ability to reinsure some or all of its obligations by entering into indemnity or assumption reinsurance agreements or other similar agreements with the prior consent of FEMA and NYSID.

Section 7.    The Mayor. References herein to the Mayor of the City of New York shall mean the person who holds the office of the Mayor of the City of New York at the time the action is taken by such person pursuant to these bylaws.

Section 8.    Amendment of Bylaws. These bylaws may be added to, amended, altered, or repealed at any meeting of the directors by an affirmative vote of at least a majority of the entire Board of Directors; provided, however, that amendments that adversely affect the rights

19

of the nominee of the Contractors to the Board of Directors or the designee of such director to the Advisory Committee shall require the unanimous vote of the entire Board of Directors, and provided further that no amendment may retroactively reduce or limit the rights of directors, officers or employees pursuant to Article VIII, Section 2, hereof.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------ x

WTC CAPTIVE INSURANCE COMPANY,
INC.,

                    Plaintiff,

        v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY; CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON, AND CERTAIN
LONDON MARKET INSURANCE
COMPANIES; ASSICURAZIONI GENERALI
S.P.A.; and ODYSSEY RE HOLDINGS CORP.,
as successor in interest to GENERAL
SECURITY INDEMNITY COMPANY,

                  Defendants.

------------------------------------------------ x

07 CV 1209

2007 Civ.

COMPLAINT FOR DECLARATORY
JUDGMENT AND FURTHER RELIEF

RECEIVED
FEB 1 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff WTC Captive Insurance Company, Inc., by its attorneys, McDermott Will &
Emery LLP, for its Complaint avers as follows:

## STATEMENT OF THE CASE

1.    In the aftermath of the September 11, 2001, terrorist attack on New York City, Liberty
Mutual Fire Insurance Company ("Liberty Fire") and Certain Underwriters at Lloyd's, London,
and Certain London Market Insurance Companies, including Assicurazioni Generali S.P.A. and
Odyssey Re Holdings Corp, successor in interest to General Security Indemnity Company
(collectively, "the London Insurers"), contracted to defend and indemnify the City of New York
and its contractors involved in the heroic rescue, recovery, and debris removal efforts for
personal injury and property damage claims arising out of the World Trade Center Emergency
Clean-up Project.

2.    The City paid millions of dollars in premiums to Liberty Fire and the London Insurers for
insurance liability coverage.

3.      Liberty Fire and the London Insurers have refused to defend the City and its contractors in the 21 MC 100 (AKH) lawsuits ("the Disaster Site Litigation") pending in this Court in which thousands of claimants seek damages for personal injury, especially respiratory injury, allegedly sustained as a result of the rescue, recovery, and debris removal efforts at the World Trade Center site.

4.      As a result, the WTC Captive Insurance Company ("WTC Captive"), a not-for-profit captive insurance company funded by a grant from the Federal Emergency Management Agency, has expended millions of dollars to defend the City and its contractors in the Disaster Site Litigation.

5.      This lawsuit is necessary to compel Liberty Fire and the London Insurers to reimburse the WTC Captive and to fulfill their defense obligations to the City and its contractors pursuant to the terms of their respective insurance contracts.

6.      This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201 seeking a declaration of the rights, duties, and responsibilities of defendant Liberty Fire under insurance policy RG2-621-004607-011 ("the Liberty Policy") and defendants the London Insurers under insurance policies 576/UF7278400 and 576/UF7280600 (collectively, "the London Policies") issued to the City of New York, and which name as Additional Named Insureds the City's contractors paid by the City of New York, for claims arising from the rescue, recovery, and debris removal efforts in the aftermath of the September 11, 2001, terrorist attack.

7.      Plaintiff WTC Captive is an interested party that has thus far spent millions of dollars defending the City of New York and its contractors in the Disaster Site Litigation.

8.      This action seeks further relief pursuant to 28 U.S.C. § 2202 for equitable contribution and breach of fiduciary duty to recover from Liberty Fire and the London Insurers those sums

that plaintiff WTC Captive has expended in defending the City of New York and its contractors in the Disaster Site Litigation.

9.      In particular, the WTC Captive seeks reimbursement of defense fees it has expended to date for the defense of the City and its contractors in the Disaster Site Litigation, and seeks a declaration that Liberty Fire and the London Insurers have a duty to defend the City of New York and its contractors in the Disaster Site Litigation.

## PARTIES

10.     Plaintiff WTC Captive is a New York corporation with its principal place of business at 100 William Street, Suite 2001, New York, New York.

11.     Upon information and belief, defendant Liberty Fire is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

12.     Upon information and belief, the London Insurers are Certain London Market Insurance Companies that are foreign corporations with principal places of business outside the State of New York, and Certain Underwriters at Lloyd's, London, an unincorporated association of individuals who, at times relevant to this litigation, were underwriting members at Lloyd's, London, conducting insurance business, through managing agents, at Lloyd's, London, and had a principal place of business in London, England.

13.     Upon information and belief, defendant Assicurazioni Generali S.P.A. ("Generali") is a corporation formed under the laws of Italy, which has its principal place of business in Italy, is the parent company of the Generali Group of insurance companies and is engaged in the insurance business.

14.     Upon information and belief, Odyssey Re Holdings Corp. ("Odyssey Re") is a Delaware corporation which has its principal place of business in Stamford, Connecticut, and is the owner

of and successor in interest to an insurance company called "Hudson Specialty Insurance Company," which was formerly known as "General Security Indemnity Company."

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a)(3) because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

16.    This Court has original and exclusive jurisdiction over this civil action pursuant to 49 U.S.C. § 40101, the Air Transportation Safety and System Stabilization Act, § 408(b)(3) because it is an action brought for a claim resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001, and because it involves claims raising issues of law or fact involving the events of September 11, 2001, and their immediate aftermath.

17.    In the London Policies, the London Insurers agreed that they "will submit to the jurisdiction of a Court of competent jurisdiction within the United States."

18.    The Southern District of New York is a proper venue for this civil action because this Court has original and exclusive jurisdiction over this civil action pursuant to 49 U.S.C. § 40101, the Air Transportation Safety and System Stabilization Act, § 408(b)(3).

19.    Venue also is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York and a substantial part of the property that is the subject of this action is located in the Southern District of New York.

## FACTUAL ALLEGATIONS

### The Liberty Fire Policy

20.    Liberty Fire issued Commercial General Liability Policy No. RG2-621-004607-011 to First Named Insured City of New York; City of New York Department of Design and Construction (collectively "the City") for the Policy Period starting September 11, 2001, at 6:01 PM, standard time and ending September 11, 2002.

21.    Liberty Fire later extended the coverage period to December 31, 2002, per Endorsement Serial No. 24. A copy of the Liberty Policy is attached hereto as Exhibit 1.

22.    By an endorsement, the Liberty Policy adds Additional Named Insureds identified as "All enrolled contractors, subcontractors, consultants and subconsultants of any tier, as their interest may appear, for whom the First Named Insured has agreed by contract to provide general liability coverage under the Coordinated Insurance Program ('CIP'), excluding vendors, suppliers, off-site fabricators, material dealers and others who merely make deliveries to or from the Project Site(s)." Liberty Policy at Endorsement Serial Number 2.

23.    All contractors paid by the City for the World Trade Center disaster rescue, recovery, and debris removal efforts were enrolled as Additional Named Insureds on the Liberty Policy by the City.

24.    The Liberty Policy's Designated Project Schedule delineates the Designated Project as the "World Trade Center Emergency Clean-up Project" and identifies the World Trade Center, certain debris loading areas, "trucks in transit between the WTC Project Site and the Staten Island Freshkill [sic] Site," and "unloading areas at the Staten Island Freshkill [sic] Site" as "Project Site(s)."

25.    Under the terms of the Liberty Policy, Liberty Fire agreed that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(Liberty Policy, Commercial General Liability Coverage Form, Insuring Agreement at 1.)

26.    By Amendatory Endorsement Serial No. 1, the Liberty Policy was amended so that the term "bodily injury" was replaced with the term "personal injury" throughout the Liberty Policy and the term "personal injury" was defined to mean "bodily injury," subject to limited exceptions.

27.    By Amendatory Endorsement Serial No. 2, the Liberty Policy was amended to "only apply to 'bodily injury', 'property damage' or 'personal injury':

    A.    Arising out of:

    1.    Management and/or supervision operations performed by the First Named Insured at a Project Site(s) listed in the Designated Project Schedule; or

    2.    Operations performed by an Additional Named Insured at a Project Site(s) listed in the Designated Project Schedule

        but not within the "Products-Completed Operations Hazard".

28.    By Amendatory Endorsement Serial No. 2, the Liberty Policy was amended to provide products/completed operations hazard coverage to "only apply to 'bodily injury,' 'property damage' or 'personal injury':

    B.    Arising out of the following with respect to completed operations:

    1.    a.    Management and/or supervision operations performed by the First Named Insured at a Project Site(s) listed in the Designated Project Schedule; or

   b. Operations performed by an Additional Named Insured at a Project Site(s) listed in the Designated Project Schedule; and

  2. within the "products-completed operations hazard",

   but only if such "bodily injury", "property damage" or "personal injury" occurs within three years from the earliest of: a. policy expiration, or b. acceptance of the project by the City of New York. "Bodily injury", "property damage" or "personal injury" covered under this paragraph that occurs after the policy period will be deemed to have occurred during the latest annual policy period during which a policy issued by us was in effect.

29. The Liberty Policy provides "Limits of Insurance" for Personal Injury and Property Damage Liability of $2,000,000 each occurrence.

30. The Liberty Policy has a General Aggregate Limit (Other Than Products–Completed Operations) of $4,000,000.

31. The Liberty Policy has separate "Limits of Insurance" for Products–Completed Operations of $2,000,000 in the aggregate.

32. Under Endorsement Serial No. 3 of the Liberty Policy, the Personal Injury and Property Damage coverage is subject to a combined deductible of $2,000,000 each occurrence and $4,000,000 aggregate.

33. The City met its deductible obligation by the payment of $4,000,000 to Liberty Fire to establish a pre-funded deductible liability insurance loss fund.

34. Under Endorsement Serial No. 23 of the Liberty Policy, the policy coverage is subject to a Defense Limit of $2,000,000 per occurrence, a Defense Deductible of $2,000,000 per occurrence, and a Defense Aggregate of $4,000,000.

35. The City met its Defense Deductible obligation by the payment of $4,000,000 to Liberty Fire to establish a pre-funded defense deductible fund.

36.    Endorsement Serial No. 23 of the Liberty Policy provides that Liberty Fire's duty to defend ends only when Liberty Fire has "used up the applicable limit of insurance in the payment of judgments or settlements ... or ... used up the Defense Limit, if applicable, in the payment of Supplementary Payments."

37.    Endorsement Serial No. 23 of the Liberty Policy provides that Supplementary Payments includes defense costs, i.e., "fees, salaries and expenses of attorneys ... we retain."

38.    Endorsement Serial No. 23 of the Liberty Policy defines the Defense Limit as "the most [Liberty] will pay for Supplementary Payments because of all 'personal injury' and 'property damage' arising out of any one 'occurrence'" and provides that the Defense Limit is "reduced by amounts you become obligated to pay and/or reimburse us within the Defense Deductible."

39.    Endorsement Serial No. 23 of the Liberty Policy provides that the City is obligated for all Supplementary Payments up to the Defense Deductible, which is $2,000,000 per occurrence.

40.    Endorsement Serial No. 23 of the Liberty Policy provides that the Defense Deductible to which the City is obligated "is subject to an Aggregate Defense Deductible" of $4,000,000 and that "[a]fter amounts paid within the Defense Deductible for Supplementary Payments exceed the Defense Aggregate Deductible, the Defense Limit and the Defense Deductible shall no longer apply."

41.    Under the terms of the Liberty Policy, therefore, once the $4,000,000 Aggregate Defense Deductible is exceeded by the payment of defense costs, the Defense Limit and the Defense Deductible no longer apply and Liberty Fire's defense obligations end only when the indemnity limits are used up by the payment of judgments or settlements.

**The London Insurers' Policy 576/UF7278400**

42.    The London Insurers issued Excess Liability Insurance Policy 576/UF7278400 ("London Policy 576/UF7278400") to the City of New York and City of New York Department of Design and Construction for a Period of Insurance from September 11, 2001, to September 11, 2002, both days at 6:00 PM Local Standard Time (Post-collapse).

43.    The London Insurers later extended the coverage period to December 31, 2002, per Endorsement Ref. 011 of London Policy 576/UF7278400.    A copy of London Policy 576/UF7278400 is attached hereto as Exhibit 2.

44.    London Policy 576/UF7278400 names as insureds the "City of New York and City of New York Department of Design and Construction including all associated subsidiaries, and affiliated companies and corporations, or joint ventures, as now exist or may hereafter be constituted or acquired including general Contractors, Subcontractors of any tier and Consultants and Sub-Consultants of any tier, for whom any afore-mentioned Insureds have agreed by contract to furnish the insurance coverage provided under this policy, per the project."

45.    London Policy 576/UF7278400's Designated Project Endorsement identifies Covered Projects to include the World Trade Center and certain debris unloading areas.

46.    Under the terms of London Policy 576/UF7278400, the London Insurers agreed that:

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence which takes place at the designated Project Site.  The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.
>
> If we are prevented by law or statute from paying an behalf of the

Insured, then we will, where permitted by law or statute, indemnify
the Insured for those sums in excess of the Retained Limit.

47.    The amount that the London Insurers agreed they will pay for damages for personal
injury and property damage under the terms of London Policy 576/UF7278400 Insuring
Agreement III, Limits of Insurance, is $50,000,000 for each occurrence.

48.    London Policy 576/UF7278400 has a general aggregate limit (other than Products–
Completed Operations Hazard) of $50,000,000.

49.    Under London Policy 576/UF7278400 Endorsement 2, the London Insurers agreed that
"as respects the Products–Completed Operations Hazard, Bodily Injury and/or Property Damage
occurring within 3 years from the date of final acceptance of the Project by the Owner shall be
deemed to be an Occurrence within the policy period of this policy."

50.    Under London Policy 576/UF7278400 Endorsement 2, the London Insurers agreed that
"[t]he Products–Completed Operations Hazard Aggregate Limit [of $50,000,000] will apply as a
separate aggregate limit for the entire period."

51.    Under London Policy 576/UF7278400, the London Insurers have a right and duty to
defend as follows:

> We shall have the right and duty to defend any claim or suit
> seeking damages covered by the terms and conditions of this
> policy when:
>
> 1.    The applicable Limits of Insurance of the underlying
>       policies listed in the Schedule of Underlying Insurance and
>       the Limits of Insurance of any other underlying insurance
>       providing coverage to the Insured have been exhausted by
>       payment of claims to which this policy applies; or
>
> 2.    Damages are sought for Bodily Injury, Property Damage,
>       Personal Injury or Advertising Injury covered by this policy
>       but not covered by any underlying insurance listed in the
>       Schedule of Underlying Insurance or any other underlying
>       insurance providing coverage to the Insured.

52.    Under London Policy 576/UF7278400, "[a]ll expenses [the London Insurers] incur in the defense of any suit or claim are in addition to [the London Insurers'] Limits of Insurance."

53.    London Policy 576/UF7278400's Schedule of Underlying Insurances lists the limits of liability as follows:

> General Liability (All Named Insureds)
>
> $2,000,000 Bodily Injury and Property Damage each Occurrence combined single limit.
>
> $2,000,000 Each Occurrence in respect of Personal and Advertising Injury
>
> $2,000,000 in the Aggregate in respect of Products-Completed Operations
>
> $4,000,000 General Aggregate,

which amounts are the limits of the Liberty Policy.

54.    London Policy 576/UF7278400's Schedule of Underlying Limits does not list the limits of any policy issued by the WTC Captive Insurance Company as underlying limits.

55.    Under London Policy 576/UF7278400, the London Insurers have a duty to defend claims or suits covered potentially by those policies when the Liberty Policy is exhausted or does not apply.

**The London Insurers' Policy 576/UF7280600**

56.    The London Insurers issued Excess Liability Insurance Policy 576/UF7280600 ("London Policy 576/UF7280600"), to the City of New York and City of New York Department of Design and Construction, both for a Period of Insurance from September 11, 2001, to September 11, 2002, both days at 6:00 PM Local Standard Time (Post-collapse).

57.    The London Insurers later extended the coverage period to December 31, 2002, per Endorsement Ref. 010 of Policy 576/UF7280600.  A copy of London Policy 576/UF7280600 is attached hereto as Exhibit 3.

58.    London Policy 576/UF7280600 names as insureds the "City of New York and City of New York Department of Design and Construction including all associated subsidiaries, and affiliated companies and corporations, or joint ventures, as now exist or may hereafter be constituted or acquired including general Contractors, Subcontractors of any tier and Consultants and Sub-Consultants of any tier, for whom any afore-mentioned Insureds have agreed by contract to furnish the insurance coverage provided under this policy, per the project."

59.    London Policy 576/UF7280600 lists the Underlying Excess Liability Policy as London Policy 576/UF7278400.

60.    London Policy 576/UF72780600 does not list any policy issued by the WTC Captive Insurance Company as an Underlying Excess Liability Policy.

61.    London Policy 576/UF7280600 is subject to the same terms, definitions, exclusions and conditions as London Policy 576/UF7278400 except as regards the premium, the amount and limits of liability, and except as otherwise provided in London Policy 576/UF7280600.

62.    The Limits of Liability of London Policy 576/UF7280600 are $25,000,000 each Occurrence, $25,000,000 in the Aggregate in respect of Products–Completed Operations coverage, $25,000,000 in the aggregate all other coverages combined; EXCESS OF: $50,000,000 each Occurrence, $50,000,000 in the Aggregate in respect of Products–Completed Operations coverage, $50,000,000 in the Aggregate all other coverages combined; WHICH IS EXCESS OF: Schedule of Underlying Insurances or Self Insured Retention.

**The Disaster Site Litigation**

63.     Beginning in 2002, the City and certain of its contractors involved in the World Trade Center disaster rescue, recovery, and debris removal efforts were named as defendants in lawsuits that have been removed and consolidated with the Disaster Site Litigation. In these lawsuits, thousands of claimants seek damages for bodily injury, especially respiratory injury, allegedly sustained as a result of the rescue, recovery, and debris removal efforts at the World Trade Center site.  Complaints in the Disaster Site Litigation are continuing to be filed.

64.     Plaintiffs in the Disaster Site Litigation generally allege that the City and its various contractors carelessly, negligently, and recklessly failed to maintain a safe workplace, failed to provide workers with proper safety equipment, failed properly to monitor conditions at the site, failed to notify plaintiffs of the hazardous conditions, and failed to comply with local, state, and federal labor and safety laws.

65.     In particular, plaintiffs in the Disaster Site Litigation allege that the careless, negligent, and reckless failures on the part of the City and its contractors resulted in the claimants' injuries and entitles them to money damages and medical monitoring.

66.     Plaintiffs in the Disaster Site Litigation allege personal injury/bodily injury arising out of management and/or supervision operations performed by the City (Liberty Fire's and the London Insurers' First Named Insured) at the World Trade Center and Loading Areas (Project Site(s) listed in the Liberty Policy's and London Policies' Designated Project Schedule), as well as personal injury/bodily injury arising out of operations performed by the City's contractors (Liberty Fire's and the London Insurers' Additional Named Insureds) at the World Trade Center and Loading Areas (Project Site(s) listed in the Liberty Policy's and London Policies'

Designated Project Schedule) that is within the Personal Injury Liability coverage in the Liberty Policy and London Policies.

67.    Plaintiffs in the Disaster Site Litigation further allege personal injury/bodily injury arising out of management and/or supervision operations performed by the City (Liberty Fire's and the London Insurers' First Named Insured) at the World Trade Center and Loading Areas (Project Site(s) listed in the Liberty Policy's and London Policies' Designated Project Schedule), as well as personal injury/bodily injury arising out of operations performed by the City's contractors (Liberty Fire's and the London Insurers' Additional Named Insureds) at the World Trade Center and Loading Areas (Project Site(s) listed in the Liberty Policy's and London Policies' Designated Project Schedule) that is within the Products–Completed Operations Hazard, as defined in the Liberty Policy and London Policies.

68.    Specifically, plaintiffs in the Disaster Site Litigation allege personal injury/bodily injury occurring within three years from the earlier of: a) policy expiration, or b) acceptance of the project by the City.

69.    Among other things, the plaintiffs in the Disaster Site Litigation seek "redress for injuries they have suffered in the past, and will continue to suffer, as a result of their participation in work performed at the World Trade Center Site in the aftermath of the events of September 11, 2001." (Amended Master Complaint Against Contractor Defendants ¶ 6.)

70.    Further, the Disaster Site Litigation claimants allege that they "continue to suffer a significantly increased risk of contracting a serious injury or latent disease" and are "at high risk for latent and progressive respiratory injuries." (*Id.* ¶¶ 1233, 1237.)

71.    The City and its contractors timely tendered claim notices to Liberty Fire requesting defense and indemnity as insureds under the Liberty Policy with respect to the Disaster Site Litigation.

72.    In response thereto, Liberty Fire denied the City's and its contractors' request for defense and indemnity for the Disaster Site Litigation.

73.    The City and/or its contractors timely tendered claim notices to the London Insurers requesting defense and indemnity as insureds under the London Policies with respect to the Disaster Site Litigation.

74.    In response thereto, the London Insurers have failed to respond to and/or have denied the City's and/or its contractors' request for defense and indemnity for the Disaster Site Litigation.

**The WTC Policy**

75.    The WTC Captive issued Policy Number 0001 ("WTC Policy") to First Named Insured City of New York with an effective date of September 11, 2001 (post–collapse of World Trade Center) and an expiration date of August 30, 2002. The WTC Policy is attached hereto as Exhibit 4.

76.    Schedule 1 of the WTC Policy lists as Additional Named Insureds the City's contractors involved in the rescue, recovery, and debris removal efforts in the aftermath of the September 11, 2001, terrorist attack on New York City.

77.    Under the terms of the WTC Policy, the WTC Captive is only liable in excess of Underlying Insurance Amounts under valid Underlying Policies.

78.    The WTC Policy lists the Liberty Policy as an Underlying Policy and Liberty Fire as an Underlying Insurer.

79.     The WTC Policy lists the London Policies as Underlying Policies and the London Insurers, identified as "Lloyd's/London Market," as Underlying Insurers.

80.     Under the terms of the WTC Policy, the WTC Captive has no duty to defend any Suit that any Underlying Insurer has a duty to defend.

81.     The WTC Captive accepted the defense of the Disaster Site Litigation, subject to the availability of Underlying Insurance, including the Liberty Policy and the London Policies.

82.     Beginning in the autumn of 2004, the WTC Captive has provided a defense to the City and its contractors in the Disaster Site Litigation due to Liberty Fire's refusal to defend. The WTC Captive has expended and will continue to expend funds for these defense costs.

83.     The defense costs paid by the WTC Captive reduce the WTC Policy's limits of insurance available to the City and its contractors to resolve the Disaster Site Litigation.

84.     All of the WTC Captive's Additional Named Insureds for whom the WTC Captive has paid defense costs in the Disaster Site Litigation are also Additional Named Insureds under the Liberty Policy and London Policies.

85.     On or about February 9, 2006, the WTC Captive provided written notice to Liberty Fire that the WTC Captive was defending the City and its contractors in the Disaster Site Litigation in light of Liberty Fire's denial of coverage and that, at a minimum, Liberty Fire has a duty to defend the City and its contractors in the Disaster Site Litigation.

86.     The WTC Captive's February 9, 2006, notice further demanded that Liberty Fire undertake the defense of the City and its contractors in the Disaster Site Litigation and reimburse the WTC Captive for defense costs incurred due to Liberty Fire's breach of its duty to defend the City and its contractors.

87. By letter dated March 10, 2006, Liberty Fire declined the WTC Captive's demand that Liberty Fire assume the defense of the City and its contractors in the Disaster Site Litigation and reimburse the WTC Captive for defense costs.

88. Liberty Fire claims that as of approximately June 26, 2006, it has paid $4,000,000 for claims not alleging respiratory injury and has exhausted the General Aggregate Limit for general liability under the Liberty Policy.

89. Liberty Fire claims that as of the time of alleged exhaustion of the Liberty Policy, Liberty Fire had expended less than $950,000 of the $4,000,000 defense fund pre-funded by the City, leaving more than $3,050,000 of the City's pre-funded defense fund in the hands of Liberty Fire.

90. Liberty Fire has not paid any dollar amount for claims under the "Limits of Insurance" for Products–Completed Operations under the Liberty Policy.

91. On or about February 22, 2006, the WTC Captive provided written notice to the London Insurers that the WTC Captive was defending the City and its contractors in the Disaster Site Litigation and that, in light of Liberty Fire's denial of coverage and potential exhaustion due to payment of claims, the London Insurers had a duty to defend the City and its contractors in the Disaster Site Litigation.

92. The WTC Captive's February 22, 2006, notice further demanded that the London Insurers undertake the defense of the City and its contractors in the Disaster Site Litigation.

93. The London Insurers did not respond to the WTC Captive's February 22, 2006, letter.

94. On or about August 16, 2006, the WTC Captive wrote to the London Insurers advising that: it had received no response to its February 22, 2006, letter; that Liberty Fire's general aggregate limits were allegedly exhausted by the payment of claims; that under London Policy 576/UF7278400, the London Insurers have a duty to defend claims or suits covered potentially

by those policies when the Liberty Policy is exhausted or does not apply; that the London Insurers had a duty to defend the City and its contractors in the Disaster Site Litigation; and that the WTC Captive was defending the City and its contractors in the Disaster Site Litigation because the underlying insurers had failed to do so.

95.    The WTC Captive's August 16, 2006, letter further demanded that the London Insurers undertake the defense of the City and its contractors in the Disaster Site Litigation and reimburse the WTC Captive for defense costs incurred.

96.    By letter dated January 8, 2007, the London Insurers, through counsel, declined the WTC Captive's demand that London Insurers assume the defense of the City and its contractors in the Disaster Site Litigation and also denied the WTC Captive's request for reimbursement of defense costs.

97.    In their January 8, 2007, letter, the London Insurers assert that "the Insured [the City and its contractors] is responsible for $2 million, plus defense costs, for each and every claim before the Excess Policy [London Policy 576/UF7278400] will respond to any covered claim."

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment Against Liberty Fire

98.    The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 as if fully set forth herein.

99.    The allegations against the City and its contractors contained in the complaints in the Disaster Site Litigation give rise to potentially covered claims under the Liberty Policy.

100.    The allegations against the City and its contractors contained in the complaints in the Disaster Site Litigation provide a legal or factual basis on which Liberty Fire is obligated to indemnify the City and its contractors.

101.    Under the terms of the Liberty Policy, Liberty Fire has a duty to defend the City and its contractors in the Disaster Site Litigation.

102.    The City and its contractors have satisfied all conditions precedent to such defense, including but not limited to providing Liberty Fire with timely notice of the Disaster Site Litigation.

103.    Liberty Fire wrongly denied coverage to the City and its contractors under the Liberty Policy.

104.    To date, the WTC Captive has expended and will continue to expend millions of dollars to provide a defense to the City and its contractors in the Disaster Site Litigation, lawsuits for which Liberty Fire should be providing a defense.  As such, the WTC Captive is an interested person with standing to seek declaratory relief under 28 U.S.C. § 2201.

105.    An actual controversy has arisen between the WTC Captive and Liberty Fire as to whether Liberty Fire is obligated under the Liberty Policy of insurance to defend the City and its contractors in the Disaster Site Litigation.

106.    The WTC Captive has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment Against the London Insurers

107.    The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 as if fully set forth herein.

108.    The allegations against the City and its contractors contained in the complaints in the Disaster Site Litigation give rise to potentially covered claims under the London Policies.

109.   The allegations against the City and its contractors contained in the complaints in the Disaster Site Litigation provide a legal or factual basis on which the London Insurers are obligated to indemnify the City and its contractors.

110.   Under the terms of the London Policies, the London Insurers have a duty to defend the City and its contractors in the Disaster Site Litigation.

111.   The City and/or its contractors have satisfied all conditions precedent to such defense, including but not limited to providing the London Insurers with timely notice of the Disaster Site Litigation.

112.   The London Insurers wrongly denied coverage to the City and its contractors under the London Policies.

113.   To date, the WTC Captive has expended and will continue to expend millions of dollars to provide a defense to the City and its contractors in the Disaster Site Litigation, lawsuits for which the London Insurers should be providing a defense.  As such, the WTC Captive is an interested person with standing to seek declaratory relief under 28 U.S.C. § 2201.

114.   An actual controversy has arisen between the WTC Captive and the London Insurers as to whether the London Insurers are obligated under the London Policies to defend the City and its contractors in the Disaster Site Litigation.

115.   The WTC Captive has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty Against Liberty Fire

116.   The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 and 99 through 106 as if fully set forth herein.

117.    As a primary insurer, Liberty Fire owes the WTC Captive, an excess insurer, the same fiduciary obligation that the primary insurer owes to its insured, namely, a duty to proceed in good faith and in the exercise of honest discretion, the violation of which exposes the primary carrier to liability.

118.    Liberty Fire breached its fiduciary duty to the WTC Captive by placing its own interests above those of the WTC Captive.  In particular, Liberty Fire breached its duty by improperly denying the City's and its contractors' requests for a defense in the Disaster Site Litigation, failing to pay the City's and its contractors' defense costs according to the Liberty Policy, and forcing the WTC Captive to assume the defense of the City and its contractors in the Disaster Site Litigation.

119.    As a direct and proximate result of Liberty Fire's breach of its fiduciary duty, the WTC Captive has been damaged, will continue to be damaged, has incurred millions of dollars in costs, and will continue to incur millions of dollars in costs in providing a defense to the City and its contractors in the Disaster Site Litigation.

## FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty Against the London Insurers

120.    The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 and 108 through115 as if fully set forth herein.

121.    As underlying insurers, the London Insurers owe the WTC Captive, an excess insurer, the same fiduciary obligation that the primary insurer owes to its insured, namely, a duty to proceed in good faith and in the exercise of honest discretion, the violation of which exposes the underlying carrier to liability.

122.   The London Insurers breached their fiduciary duty to the WTC Captive by placing their own interests above those of the WTC Captive.  In particular, the London Insurers breached their duty by improperly denying the City's and its contractors' requests for a defense in the Disaster Site Litigation, failing properly to disclaim coverage to the City and its contractors, failing to pay the City's and its contractors' defense costs according to the London Policies, and forcing the WTC Captive to assume the defense of the City and its contractors in the Disaster Site Litigation.

123.   As a direct and proximate result of the London Insurers' breach of their fiduciary duty, the WTC Captive has been damaged, will continue to be damaged, has incurred millions of dollars in costs, and will continue to incur millions of dollars in costs in providing a defense to the City and its contractors in the Disaster Site Litigation.

## FIFTH CLAIM FOR RELIEF

### Equitable Contribution Against Liberty Fire

124.   The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 and 99 through 106 as if fully set forth herein.

125.   Liberty Fire, the primary insurer, has refused to participate in the defense of the City and its contractors in, and has disclaimed coverage for, the Disaster Site Litigation.

126.   The WTC Captive, an excess insurer, has assumed the defense obligation and is providing a defense to the City and its contractors in the Disaster Site Litigation.

127.   The WTC Captive is not voluntarily providing a defense to the City and its contractors in the Disaster Site Litigation, but undertook to do so only after defendant Liberty Fire refused to participate and disclaimed coverage.

128.   As a direct and proximate result of Liberty Fire's refusal to participate in the defense of the City and its contractors and its disclaimer of coverage to the City and its contractors, the

WTC Captive has incurred millions of dollars in costs that Liberty Fire should have paid and will continue to incur millions of dollars in costs that Liberty Fire is obligated to pay to provide a defense to the City and its contractors in the Disaster Site Litigation.

129.    Liberty Fire has been unjustly enriched as a result of its refusal to participate in the defense of the City and its contractors and its disclaimer of coverage to the City and its contractors.

### SIXTH CLAIM FOR RELIEF

### Equitable Contribution Against The London Insurers

130.    The WTC Captive repeats and realleges the averments contained in Paragraphs 1 through 97 and 108 through 115 as if fully set forth herein.

131.    The London Insurers, underlying insurers to the WTC Captive, have refused to participate in the defense of the City and its contractors in, and have disclaimed coverage for, the Disaster Site Litigation.

132.    The WTC Captive, an excess insurer, has assumed the defense obligation and is providing a defense to the City and its contractors in the Disaster Site Litigation.

133.    The WTC Captive is not voluntarily providing a defense to the City and its contractors in the Disaster Site Litigation, but undertook to do so only after underlying insurers refused to participate and disclaimed coverage.

134.    As a direct and proximate result of the London Insurers' refusal to participate in the defense of the City and its contractors, and their disclaimer of coverage to the City and its contractors, the WTC Captive has incurred millions of dollars in costs that the London Insurers should have paid, and will continue to incur millions of dollars in costs that the London Insurers

are obligated to pay to provide a defense to the City and its contractors in the Disaster Site Litigation.

135.    The London Insurers have been unjustly enriched as a result of their refusal to participate in the defense of the City and its contractors and their disclaimer of coverage to the City and its contractors.

WHEREFORE, plaintiff WTC Captive Insurance Company, Inc., requests that this Court grant to it the following relief:

(i)    As to the First Claim For Relief, an order (i) declaring that defendant Liberty Mutual Fire Insurance Company is obligated to defend the City and its contractors in the Disaster Site Litigation, and that the duty to defend continues until the General Aggregate Limit and the "Limits of Insurance" for Products–Completed Operations under the Liberty Policy are exhausted and (ii) requiring defendant Liberty Mutual Fire Insurance Company to defend the City and its contractors in the Disaster Site Litigation;

(ii)    As to the Second Claim For Relief, an order (i) declaring that defendants Certain Underwriters of Lloyd's, London, and Certain London Market Insurers, including Assicurazioni Generali S.P.A. and Odyssey Re Holdings Corp., successor in interest to General Security Indemnity Company, are obligated to defend the City and its contractors in the Disaster Site Litigation, and that the duty to defend continues until the General Aggregate Limit and the Aggregate in respect of Products–Completed Operations under the London Policies are exhausted and (ii) requiring defendants Certain Underwriters of Lloyd's, London, and Certain London Market Insurers, including Assicurazioni Generali S.P.A. and Odyssey Re Holdings Corp., successor in interest to General Security Indemnity Company, to defend the City and its contractors in the Disaster Site Litigation

(iii)    As to the Third Claim For Relief, enter judgment in favor of plaintiff WTC Captive Insurance Company, Inc., in an amount to be determined at trial as damages for Liberty Mutual Fire Insurance Company's breach of fiduciary duty, plus interest;

(iv)    As to the Fourth Claim For Relief, enter judgment in favor of plaintiff WTC Captive Insurance Company, Inc., in an amount to be determined at trial as damages for each of the defendant London Insurers' breach of fiduciary duty, plus interest;

(v)    As to the Fifth Claim For Relief, enter judgment in favor of plaintiff WTC Captive Insurance Company, Inc., and against Liberty Mutual Fire Insurance Company in an amount to be determined at trial as equitable contribution for the WTC Captive having assumed the defense obligation and having provided a defense to the City and its contractors in the Disaster Site Litigation, plus interest;

(vi)    As to the Sixth Claim For Relief, enter judgment in favor of plaintiff WTC Captive Insurance Company, Inc., and against each of the defendant London Insurers in an amount to be determined at trial as equitable contribution for the WTC Captive having assumed the defense obligation and having provided a defense to the City and its contractors in the Disaster Site Litigation, plus interest

(vii)    With respect to all claims for relief, an award of reasonable attorneys' fees as well as the costs and disbursements incurred by the WTC Captive Insurance Company, Inc., in connection with this action, as well as such other and further relief as this Court may deem just and proper.

Dated:  February 16, 2007

McDERMOTT WILL & EMERY LLP


By: _Robert A. Weiner_
Robert A. Weiner (RW-3381)
340 Madison Avenue
New York, NY 10173-1922
212-547-5400

Of Counsel:

Margaret H. Warner
Gregory A. Krauss
Mark A. Collins
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC  20005-3096
202-756-8000

Attorneys for Plaintiff
WTC Captive Insurance Company, Inc.


WDC99 1348477-1.072210.0011

*State of New York    }*
*Department of State }* *ss:*

*I hereby certify that the annexed copy has been compared with the original document filed by the Department of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*

**July 09, 2004**



*Secretary of State*

DOS-200 (Rev. 03/02)

F040701000635

## CERTIFICATE OF INCORPORATION

### OF

### WTC CAPTIVE INSURANCE COMPANY, INC.

Under Section 402 of the Not-For-Profit Corporation Law

FIRST:  The name of the Company shall be WTC Captive Insurance Company, Inc. (the "Company").

SECOND:  The Company is a corporation as defined in Section 102(a)(5) of the Not-for-Profit Corporation Law.  The office of the Company shall be located in the County of New York, State of New York.  For the purposes of Section 7003(b)(3) of the Insurance Law of the State of New York, this office shall be deemed to be the principal office of the Company.

THIRD:  The purpose for which the Company is formed is to provide insurance on an occurrence basis for events occurring on or after September 11, 2001 for liabilities incurred by the City of New York and its affiliated companies (as that term is defined in Section 7002(a) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003) related to or arising out of activities in or near the World Trade Center site in response to the attacks of September 11, 2001.  The Company is a pure captive insurance company formed by the City of New York as a not-for-profit corporation pursuant to Section 7005(a)(3) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003.  The Company shall insure the City of New York and the contractors, subcontractors and consultants of any tier of the City of New York (such contractors, subcontractors and consultants being hereinafter referred to collectively as the "Contractors"), as additional named insureds, for liability related to or arising out of activities in or near the World Trade Center site in response to the attacks of September 11, 2001.  The Company shall be

subject to such other restrictions and limitations, if any, as may be provided in the Insurance

Law, the Not-for-Profit Corporation Law and in any other applicable law with respect to pure

captive insurance companies formed as not-for-profit corporations pursuant to

Section 7005(a)(3) of the Insurance Law, as amended by Chapter 188 of the Laws of 2003.

Subject to such restrictions and limitations, the kinds of insurance businesses to be transacted by

the Company are those kinds of business specified in paragraph 13, 14, 19 and 20 of

Section 1113(a) of the Insurance Law of the State of New York as follows:

"Personal injury liability insurance," as authorized by paragraph (13) of Section 1113(a)

of the Insurance Law of the State of New York, meaning insurance against legal liability of the

insured, and against loss, damage or expense incident to a claim of such liability (including the

insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons,

and funeral and death benefits to dependents, beneficiaries or personal representatives of persons

who are killed, irrespective of legal liability of the insured), arising out of death or injury of any

person, or arising out of injury to the economic interests of any person, as the result of

negligence in rendering expert, fiduciary or professional service, but excluding any kind of

insurance specified in paragraph fifteen of Section 1113(a) of the Insurance Law of the State of

New York except insurance to protect an insured against liability for indemnification or

contribution to a third party held responsible for injury to the insured's employee arising out of

and in the course of employment when such insurance is written pursuant to paragraph (13) and

not written pursuant to paragraph fifteen of said Section 1113(a).

"Property damage liability insurance," as authorized by paragraph (14) of Section 1113(a)

of the Insurance Law of the State of New York, meaning insurance against legal liability of the

2

insured, and against loss, damage or expense incident to a claim of such liability, arising out of the loss or destruction of, or damage to, the property of any other person, but not including any kind of insurance specified in paragraph thirteen or fifteen of subsection (a) of Section 1113 of the New York Insurance Law.

"Motor vehicle and aircraft physical damage insurance," as authorized by paragraph (19) of Section 1113(a) of the Insurance Law of the State of New York, meaning insurance against loss of or damage to motor vehicles or aircraft and their equipment resulting from any cause; and insurance reimbursing a driver for costs including replacement car rental, commercial transportation and accommodations resulting from an automobile accident or mechanical breakdown occurring fifty miles or more from the driver's principal place of residence or garaging.

"Marine and inland marine insurance," as authorized by paragraph (20) of Section 1113(a) of the Insurance Law of the State of New York, meaning insurance against any and all kinds of loss of or damage to:  (A) vessels, hulls, craft, aircraft, cars, automobiles, trailers and vehicles of every kind, and all goods, freights, cargoes, merchandise, effects, disbursement, profits, moneys, bullion, precious stones, securities, choses in action, evidences of debt, valuable papers, bottomry and respondentia interests and all other kinds of property and interests therein, in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on or under any seas or other waters, on land or in the air, or while being assembled, packed, crated, baled, compressed or similarly prepared for shipment or while awaiting the same or during any delays, storage, transshipment, or reshipment incident thereto, including marine builder's risks and all personal property floater risks;

(B) person or property in connection with or appertaining to marine, inland marine, transit or

transportation insurance, including liability for loss of or damage to either, arising out of or in

connection with the construction, repair, operation, maintenance or use of the subject matter of

such insurance (but not including life insurance or surety bonds nor insurance against loss by

reason of bodily injury to the person arising out of ownership, maintenance or use of

automobiles); (C) precious stones, jewels, jewelry, gold, silver and other precious metals,

whether used in business or trade or otherwise and whether the same be in course of

transportation or otherwise; and (D) bridges, tunnels and other instrumentalities of transportation

and communication (excluding buildings, their improvements and betterments, furniture and

furnishings, fixed content and supplies held in storage), including auxiliary facilities and

equipment attendant thereto; piers, wharves, docks and slips; other aids to navigation and

transportation, including dry docks and marine railways; but not including insurance of vessels,

crafts, their cargoes, marine builders' risks, or other similar risks, commonly insured only under

ocean marine insurance policies;

and any amendments to such paragraphs or provisions in substitution therefor which may be

hereafter adopted; and such other kind or kinds of business to the extent necessary or properly

incidental to the kind or kinds of insurance business which the Company is authorized to do.

The Company shall also have all other rights, powers, and privileges now or hereafter

authorized or granted by the Not-For-Profit Corporation Law and by the Insurance Law of the

State of New York or any other law or laws of the State of New York relating to not-for-profit

pure captive insurance companies having the power to do the kind or kinds of business

hereinabove referred to on a not-for-profit basis and any and all other rights, powers, and

privileges of a Company now or hereafter granted by the laws of the State of New York and not

NYB 549020.18 09566 00128 06/29/04 11:48am

prohibited to such not-for-profit pure captive insurance companies. Subject to such restrictions and limitations, if any, as may be provided in any applicable law with respect to pure captive insurance companies formed as not-for-profit corporations pursuant to Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188 of the Laws of 2003, the Company may be a partner in any not-for-profit enterprise which the Company would have the power to conduct itself, to the extent authorized by Article 70 of the Insurance Law of the State of New York.

In furtherance of the foregoing purposes, the Company shall have all the general powers enumerated in Section 202 of the Not-for-Profit Corporation Law and such other powers as are now or hereafter permitted by law for a corporation organized for the foregoing purposes, including, without limitation, the power to maintain a fund or funds of real and/or personal property in furtherance of such purposes. Subject to such restrictions and limitations, if any, as may be provided in any applicable law with respect to pure captive insurance companies formed as not-for-profit corporations pursuant to Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188 of the Laws of 2003, the Company shall have the power to reinsure its insurance obligations by entering into indemnity reinsurance or assumption reinsurance agreements or other similar agreements at any time.

FOURTH: The Company shall be a Type D corporation pursuant to Section 201 of the Not-For-Profit Corporation Law; formation of the Company as a not-for-profit corporation is authorized by Section 7005(a)(3) of the Insurance Laws, as amended by Chapter 188 of the Laws of 2003.

5

FIFTH: (a) The Board of Directors shall consist of five directors. All directors of the Company shall be appointed annually by the Mayor of the City of New York prior to the Company's annual meeting; provided, however, that one of such directors shall be appointed by the Mayor upon nomination of a person, which person shall be acceptable to the Mayor, in his sole discretion, by the Representative of the Contractors (as selected in accordance with paragraph (d) of this Article FIFTH); provided, further, that in the event a nominee is not acceptable to the Mayor, the Representative, on behalf of the Contractors, shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor. Each year, immediately following the beginning of the Company's fiscal year, the Mayor shall be notified in writing by the President of the Company of the requirement to make the annual appointments to the Board of Directors of the Company. Directors shall succeed to office at the next annual meeting of the Board of Directors following their appointment.

(b) Each director shall be an employee, former employee or employee-on-leave of the City of New York or a person experienced in the insurance, construction, financial, professional, or other business or governmental communities of the City of New York. Each director shall be at least eighteen years of age and a citizen of the United States. At least two (2) of the directors shall be residents of New York State.

(c) The Mayor may appoint an alternate for each director, which alternate, upon written notice to the Secretary, may attend meetings and exercise therein all the rights, powers, and privileges of the absent director; provided that in the event an alternate for the director nominated on behalf of the Contractors is nominated by the Representative thereof, such alternate, if acceptable to the Mayor in his sole discretion, shall be appointed by the Mayor; provided, further, that in the event such nominee is not acceptable to the Mayor, the

Representative of the Contractors shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor.

(d) The Representative of the Contractors shall be selected by a simple majority of the following: AMEC plc, Bovis Lend Lease, Tully Construction Co. Inc. and Turner Construction Company. This selection, and any replacement thereof, shall be transmitted in writing to the Mayor.

(e) The Federal Emergency Management Agency, Emergency Preparedness and Response Directorate, U.S. Department of Homeland Security ("FEMA"), the New York State Emergency Management Office ("NYSEMO") and the New York State Insurance Department ("NYSID") shall have the right to designate one person to attend each meeting of the Board of Directors as an observer. FEMA, NYSEMO and NYSID shall receive notice of each such meeting in accordance with the procedures set forth in the bylaws and shall be provided with copies of the minutes of each such meeting.

SIXTH: Vacancies in the Board of Directors as a result of removal, resignation or otherwise shall be filled by action of the Mayor of the City of New York, as soon as practicable; provided, however, that in the event that the vacant position is that of the director nominated by the Representative of the Contractors, the replacement director for such position shall be appointed by the Mayor upon nomination by the Representative in accordance with the procedures set forth in Article FIFTH hereof.

SEVENTH: Any director may be removed at any time with or without cause and with or without notice by the Mayor of the City of New York, provided, however, that in the event the removed director was a nominee of the Contractors, the Representative of the Contractors shall

7

have the right to select additional nominees to replace the removed director until a nominee is deemed acceptable to the Mayor.

EIGHTH: The names and post office residence addresses of the initial Board of Directors are:

| Name | Address |
|---|---|
| Andrew M. Alper | New York City Economic Development Corporation<br>110 William Street<br>New York, NY 10038 |
| Jeffrey D. Friedlander | New York City Law Department<br>Office of the Corporation Counsel<br>100 Church Street<br>New York, NY 10007 |
| Mark Page | New York City Office of Management and Budget<br>75 Park Place<br>New York, NY 10007 |
| Phyllis Taylor | New York City Office of the Comptroller<br>1 Centre Street<br>New York, NY 10007 |
| Michael M. Feigin | Bovis Lend Lease<br>200 Park Avenue<br>New York, NY 10176 |

NINTH: (a) (i) The Board of Directors, by resolution adopted by a majority of the entire Board of Directors, shall create a standing advisory committee (the "Advisory Committee"). The Advisory Committee shall consist of three (3) members. One member shall be a director (or designee of a director) nominated by the City of New York, one member shall be the director (or designee of the director) nominated by the Representative of the Contractors, and the third

8

member shall be a person with substantial expertise in the insurance industry who shall be nominated jointly by the other two designees.

(ii)    The Advisory Committee may make recommendations with respect to the protocols to be followed by the third party claims administrator engaged by the Company, including implementation and modification of such protocols. Such recommendations shall not be binding on the Board of Directors. In addition, the Advisory Committee shall consider claims disputes referred to the Board of Directors by the third party administrator and the Advisory Committee shall forward a recommendation with respect to each dispute to the Board of Directors. The recommendation of the Advisory Committee shall not be binding on the Board of Directors. If, after review of the recommendation of the Advisory Committee, the Board of Directors disagrees with the recommendation of the Advisory Committee and there is still a dispute with respect to such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under New York law pursuant to the rules of the American Arbitration Association. The decision rendered upon such arbitration shall be binding on the Board of Directors and the Company.

(iii)    In addition, the Advisory Committee may consider whether the Company has taken, or is about to take, action that is inconsistent with its material obligations, responsibilities or rights under the Policy and By-laws and, if the Advisory Committee has a concern in this regard, it may request a prompt meeting with the President to discuss this concern, which the President must attend within ten (10) days of such request (or such later time as they may agree to). If, ten (10) or more days following its meeting with the President (or immediately if the President expressly refuses to consider the issue or does not attend the meeting), the Advisory Committee continues to have such concern, it may, if it deems

9

appropriate, make a recommendation relating thereto to the Board of Directors. The

recommendation of the Advisory Committee shall not be binding on the Board of Directors. If,

forty-five days after receiving the recommendation of the Advisory Committee, the Board of

Directors disagrees with the recommendation of the Advisory Committee or fails to address its

concerns and the Advisory Committee so requests, the issue will be referred to an arbitration to

be conducted under New York law pursuant to the rules of the American Arbitration

Association. The Company shall provide written notice to FEMA, NYSEMO and NYSID within

five (5) Business Days after any request of the Advisory Committee for referral of an issue to

arbitration. Such arbitration shall be limited to the questions of (1) whether the issue at hand

constitutes a material obligation, responsibility or right under the Policy and By-laws; and, if so,

(2) whether the Board of Directors' action, or pending or proposed action, is reasonable and in

accordance with such material obligations, responsibilities or rights. If the arbitrators reach the

second issue and answer it in the negative, they shall refer such finding to the Board of Directors

for action not inconsistent with such negative answer.

(iv)     Under no circumstances shall actions taken under this Article NINTH

subsection (a) cause the Board of Directors or the Company to delay action on any matter it

reasonably believes is necessary to protect the interests of the Company.

(b)     The Board of Directors, by a resolution adopted by a majority of the entire Board

of Directors, shall create a standing audit committee (the "Audit Committee") consisting of three

(3) members who are directors of the Company. To the extent possible, the Board of Directors

shall endeavor to select members of the Audit Committee who possess substantial financial or

accounting experience and expertise. The Audit Committee's primary duties and responsibilities

shall be to (i) monitor the integrity of the Company's financial reporting process regarding

*10*

finance, accounting, regulatory and legal compliance; (ii) monitor the qualifications of the Company's independent auditors; (iii) monitor the Company's internal audit functions; and (iv) provide an avenue of communication among the independent auditors, management and the Board of Directors.

(c)    The Board of Directors, by resolution adopted by a majority of the entire Board of Directors, may designate such other committees as it may deem appropriate from time to time.

(d)    A quorum for each of the Advisory Committee and the Audit Committee shall be two (2) directors. Each such committee shall serve at the pleasure of the Board of Directors.

TENTH: The Secretary of State of the State of New York is designated as agent of the Company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process accepted on behalf of the Company is:

>    c/o CT Corporation System
>    111 Eighth Avenue
>    New York, NY 10011

ELEVENTH: Pursuant to Section 7003 (b)(5) of the New York Insurance Law, the Superintendent of Insurance of the State of New York is designated as agent of the Company upon whom process against it may be served. The address within or without this state to which the Superintendent of Insurance shall mail a copy of any process accepted on behalf of the Company is:

>    c/o CT Corporation System
>    111 Eighth Avenue
>    New York, NY 10011

TWELFTH: The name and address in this state of the registered agent upon whom process against the Company may be served is:

CT Corporation System
111 Eighth Avenue
New York, NY 10011

THIRTEENTH: This Certificate of Incorporation may be amended at any time in accordance with the provisions of Article 8 of the Not-For-Profit Corporation Law as the same may be amended from time to time; provided, however, that the Company shall provide written notice to FEMA at least thirty (30) days prior to any such amendment.

FOURTEENTH: It is intended that the Company be free from Federal taxes as an integral part of the City of New York within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States Internal Revenue Code of 1986, as amended. This Certificate of Incorporation shall be construed accordingly, and the Company's activities shall be limited accordingly; provided, however, that nothing in this Article FOURTEENTH shall cause this Certificate of Incorporation to be construed in a manner that is inconsistent with any applicable provision of the Not-for-Profit Corporation Law of the State of New York or Insurance Law of the State of New York, and provided further that nothing in this Article Fourteenth shall be construed as permitting the Company to engage in any activity in which a pure captive insurance company formed as a not-for-profit corporation pursuant to Section 7005(a)(3) of the Insurance Law (as amended by Chapter 188 of the Laws of 2003) is not permitted to engage.

FIFTEENTH: (a) The Company shall issue an occurrence basis, liability insurance policy (the "Policy") to the City of New York as the named insured and, subject to such

NYB 549020.18 09566 00128 07/01/04 11:22am

restrictions and limitations, if any, as may be provided in any applicable law with respect to pure

captive insurance companies formed as not-for-profit corporations pursuant to

Section 7005(a)(3) of the Insurance Law of the State of New York, as amended by Chapter 188

of the Laws of 2003, the Contractors as additional named insureds, with an effective date being

the beginning of Debris Removal (as defined in the Policy) on the World Trade Center Site (as

defined in the Policy) on September 11, 2001 (post-collapse of the World Trade Center).

     (b)     Given that the funds from which the Company will make payments are limited to

funds received pursuant to the Policy and investment income earned on such funds, the Policy,

under certain circumstances, (i) will limit (A) claims that will be accepted under Policy and (B)

the percentage of the value of individual claims and related expenses to be paid under the Policy

and (ii) will be subject to termination pursuant to the Policy.

     SIXTEENTH: No party providing substantial services to the Company shall be an

affiliate of or related to the City of New York or the Contractors. In addition, (a) the third party

administrator and the captive management company shall not be an affiliate of or related to one

another and (b) the third party administrator and panel counsel shall not be an affiliate of or

related to one another.

     SEVENTEENTH: As provided, in Section 7005(a) of the New York Insurance Law,

neither the Mayor of the City of New York nor any of the officers, directors, employees or

agents appointed by or with the approval of the City of New York, nor any officials, officers,

employees or agents of the City of New York, while acting within the scope of their authority

shall be subject to any personal liability resulting from the exercise or carrying out of any of the

13

City of New York's or the Company's purposes or powers under Article 70 of the New York

Insurance Law.

14

IN WITNESS WHEREOF this Certificate of Incorporation has been signed this 29th day

of June, 2004.

Name of Incorporator: (typed)  P. Bruce Wright, Esq.

Signature of Incorporator: _P. Bruce Wright_

Address of Incorporator:  c/o LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY  10019

15



**STATE OF NEW YORK**
**INSURANCE DEPARTMENT**
ONE COMMERCE PLAZA
ALBANY, NEW YORK 12257

George E. Pataki
Governor

Gregory V. Serio
Superintendent

February 24, 2004

P. Bruce Wright, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, NY 10019-5389

Re:  WTC Captive Insurance Company, Inc.

Dear Mr. Wright:

In reply to your recent inquiry, you are hereby advised that this Department consents to the use of the name WTC Captive Insurance Company, Inc. in New York, pursuant to Section 301(a)(5)(B) of the Not-For-Profit Corporation Law. The Department also consents to formation of this entity as a not-for-profit captive insurance company, in accordance with the provisions of Insurance Law Article 70, as amended by the laws of 2003.



Very truly yours,

Patrick M. Harrigan
Associate Attorney
Office of General Counsel
(518) 474-6623

http://www.ins.state.ny.us

*16*

F0407010000635

## CERTIFICATE OF INCORPORATION

### OF

### WTC CAPTIVE INSURANCE COMPANY, INC.

Under Section 402 of the Not-For-Profit Corporation Law

Filed by:  P. Bruce Wright, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, New York 10019

STATE OF NEW YORK
DEPARTMENT OF STATE

JUL 0 1 2004

FILED
TAX $
BY:

RECEIVED
2004 JUL -1 PH 12: 31

0407010000661

17

2004 JUL -1 PH 4: 17

## MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
## OF THE WTC CAPTIVE INSURANCE COMPANY, INC.

### December 2, 2004

A meeting of the Board of Directors (the "Board") of The WTC Captive Insurance Company, Inc. (the "WTC") was held on December 2, 2004, commencing at 10:00 a.m. EST at 110 William Street, Sixth Floor, New York, New York. Christine LaSala, WTC's President, chaired the meeting and Tom Jones, WTC's Secretary, served as secretary of the meeting.

All Directors of WTC, constituting a quorum, were present:

     Andrew Alper

     Michael Fengin

     Jeffrey Friedlander

     Mark Page

     Phyllis Taylor

Also present were:

     Christine LaSala – WTC President
     Thomas Jones – McDermott Will & Emery LLP & WTC Secretary
     Jay Olson - New York City Office of Management and Budget & WTC Treasurer
     Patrice Andrews –New York City Office of the Comptroller
     Gerald Connolly – Federal Emergency Management Agency
     Joseph Hopkins – Latham & Watkins LLP
     Meredith Jones – New York City Economic Development Corporation
     William Kelly – PricewaterhouseCoopers LLP
     Bud Larson – New York City Office of Management and Budget
     Lawrence Martin – City of New York Law Department
     James Tyrrell, Jr. – Latham & Watkins LLP
     Margaret Warner – McDermott Will & Emery LLP
     Jody Wald – NYS Insurance Department

### Notice, Quorum and Funding Update

Ms. LaSala took the Chair, noting that proper notice of the meeting had been given and that a quorum was present. She opened the meeting by expressing her continued gratitude for the Directors' time and efforts expended on behalf of WTC. She stated indications are that the funding of WTC could occur as soon as the next day, December 3, and that a license to conduct an insurance business in New York as a "pure" (i.e., single parent) captive insurance company could be issued to WTC the same day provided the NYS Insurance Department receives official notice that the required funds have been deposited in WTC's bank account.

## Approval of Prior Minutes

The minutes of the Directors' meeting held on October 4, 2004, a draft of which was previously distributed, were approved as written with correction of a minor item on page 5. Ms. LaSala informed the Directors that drafting of the minutes of the meeting held on October 29, 2004 was in process and that they would be distributed prior to the next meeting.

## Assumption of Pre-existing Contracts

Ms. LaSala next raised the matter of the formal assignment by the City and the assumption by WTC of two pre-existing contracts pursuant to Section 3.01 of the Agreement between the City and WTC, dated as of September 28, 2004. She noted that the subject contracts covered services rendered for the benefit of WTC by PricewaterhouseCoopers LLP and Korn Ferry International. Consistent with her recommendation, the Directors agreed to review and act upon the necessary documentation at the next meeting.

## Consideration of Insurance Management Services Contract

Ms. LaSala turned to a previously distributed draft of the proposed Management Agreement between WTC and Marsh Management Services, Inc. ("MMSNY"), introducing the subject by describing certain "due diligence" steps recently taken by WTC in light of pending allegations against its parent corporation and certain of its affiliates asserted by, among other governmental agencies, the Office of the Attorney General of the State of New York and the New York State Insurance Department. The Directors reviewed a letter of affirmation, signed by the Chair of Marsh's Global Captive Management Practice, averring to, inter alia, the following:

- MMSNY, as a legal entity, is not itself named in any pending investigation or regulatory investigation or action;

- MMSNY has never and does not now engage in any of the business activities referenced in the Attorney General's complaint dated October 14, 2004;

- To the best knowledge of Marsh, MMSNY always has operated on a "fee-for-service" basis and has never accepted "contingent commissions";

- No current or past officer, director or employee of MMSNY is known to be a defendant in or the subject of a civil, criminal or administrative action involving duties performed for or on behalf of Marsh or any of its affiliates;

- To the best of MMSNY's knowledge, its license to manage captive insurance companies such as WTC or to provide the services contemplated in the Management Agreement

-2-

granted by the NYSID will not be suspended, revoked or otherwise adversely impacted due to current allegations or future regulatory or legal proceedings.

After some discussion of MMSNY's overall suitability and the relative merits of considering an alternate captive manager, the Directors unanimously agreed to pursue finalization of the Management Agreement with MMSNY

Ms. LaSala pointed out a single modification to the distributed document, namely that at least during its first year of operation, WTC should receive monthly rather than quarterly financial statements and reports from MMSNY. The incremental fee requested by MMSNY for producing 12 rather than 4 sets of reports during 2005 would be $10,000   A Director questioned the need for such frequency, after discussion of which the Directors determined to commence operations using a monthly reporting basis with a possible reduction to quarterly later in the year.

A Director then indicated a possible inconsistency in the compensation schedule appended to the Management Agreement in the event of an early termination of the relationship. Ms. LaSala directed Mr. Jones, as corporate counsel, to redraft to the extent desirable, such pro ration clauses and generally review the contract, after which the new draft will be represented to MMSNY and the Directors for finalization.

In closing this topic, Ms. LaSala reported that she had just had a productive meeting with Donna Manzo and Nisain Weerasooriya at MMSNY, covering, among other matters, policy distribution, banking, financial, accounting and communication issues.

## Status of Third Party Administrator Relationship

Ms. LaSala informed the Directors that the contract between WTC and GAB Robins North America, Inc. was in its third draft with an expectation that it will be circulated and considered at the next meeting of the Directors. She mentioned that she and WTC corporate counsel would meet with GAB shortly after this meeting to map out relative roles and optimal channels of communication on setting up, maintaining and managing claims files.

## Ratification of Office Lease and Associated Promissory Note

Ms. LaSala generally described the salient terms of the final version of the Agreement of Lease between WTC, as Tenant, and WdI/Lighthouse 100 William L.L.C., as Owner, covering the lease of office space comprised of a specified portion of the 20th floor of the commercial building located at 110 William Street in the Borough of Manhattan. One of the terms is the requirement of a deposit, the funds for which were lent to WTC under a Promissory Note to be repaid in full from forthcoming FEMA funds. She also noted that Doris Sherrill will become an employee of WTC in the capacity of Ms. LaSala's office assistant. Ms. LaSala disclosed that Ms. Sherrill had served as her assistant in her prior career with a national insurance brokerage firm. After reviewing a synopsis of the annual rental rates,

IT WAS RESOLVED THAT the Agreement of Lease, in substantially the form negotiated and presented, is hereby approved and ratified:

-3-

IT WAS FURTHER RESOLVED THAT any authorized officer of WTC is hereby empowered to execute said Agreement of Lease on behalf of WTC; and

IT WAS FURTHER RESOLVED THAT execution by the WTC President and Treasurer of a non-interest bearing Promissory Note in the principal amount of $15,242.50, dated November 9, 2004, evidencing funds borrowed by WTC from the New York City Economic Development Corporation for the purpose of making the requisite deposit specified by the Agreement of Lease, is hereby ratified and approved in all respects.

Phyllis Taylor abstained from the voting on the foregoing three resolutions.

### Constitution of Auditing Committee

Ms. LaSala reminded the Directors of the requirement in WTC's organic documents for appointing a 3-Director standing Audit Committee. She indicated that she is working on the written charter for this important committee and that she will be contacting several Directors with accounting or financial backgrounds regarding potential participation. Candidates for this and other committees will be voted on by this Board.

### Status of Investment Advisor and Auditor RFPs

Ms. LaSala next introduced Bill Kelly of PricewaterhouseCoopers to report on the search for an investment adviser and auditor. He stated that there had been 12 respondents to the investment manager RFP of varying sizes, geographical locations, specializations and fee schedules. He noted that the RFP provides flexibility for WTC to select more than one investment manager if the Directors concur that would be in WTC's best interest. Further, he remarked that some of the candidates have custodial capabilities through affiliates whereas for others a separate custodian and custodian agreement will be needed. Ms. LaSala pointed out that, if necessary, Citibank could be used on an interim basis until a systematic process for custody was undertaken.

As to responses to the auditor RFP, Mr. Kelly said that there had been 8 requests to receive the RFP. Given the more specialized nature of captive insurance auditing and potential conflict of interest issues, he felt that the choice ultimately would be between just a few candidates. Ms. LaSala estimated that she would send to each Director an evaluation and recommendation report for both services providers by mid-month. Mr. Page suggested that in addition to the organizational strength of each candidate, specific attention should be given to the particular individuals who actually would service the WTC account. Ms. LaSala concurred.

### Update on Key Operational Matters

Ms. LaSala described to the Directors progress made to date on various important matters, summarized as follows:

- A regime has been established for prompt and accurate dissemination of the WTC policy, which will include an explanatory cover letter and a Claim Notification Form compatible with the GAB Robins claim induction and processing systems. Confirmed courier delivery with as complete an address list as could be compiled will be used. Ms. LaSala

-4-

noted that not every relevant subcontractor will be listed and that some addresses will require correction, but that timely delivery of the policy during the month of December to all appropriate parties will be given highest priority.

- Two pending regulatory matters will be pursued: (i) a declaration from the Attorney General's Office in the form of a letter to the NYSID that implementation of the alternate director regime set forth in the WTC Certificate of Incorporation is acceptable, and (ii) clarification from the Attorney General's Office that WTC, notwithstanding it is a not-for-profit corporation, need not register or file reports with the AG's Office as a charity because of its unique status as an insurance company licensed and regulated by the NYSID.

- Protocols on record retention and avoidance of conflicts of interest will be prepared and presented to the Directors early next year. Mr. Page requested that if at all possible the content and format of WTC disclosure forms should be coordinated with existing documents currently in use by the City of New York. Ms. LaSala agreed and Mr. Page promised to provide her with samples. Ms. LaSala indicated the conflicts disclosure statements would apply to WTC service providers as well as to its officers, directors and employees.

## Investment of Incoming Premium

Ms. LaSala requested Mr. Olson to explain briefly alternative pre-arrangements that have been made at Citibank to maximize short term investment income depending on the exact date and time of day when the FEMA funds arrive. He described various cut-off times (the earlier the higher the yield), noting that with the expected back-to-back wire transfers it may be possible for WTC to earn approximately $60,000 in interest over the coming weekend.

*******************************************

## MINUTES OF EXECUTIVE SESSION OF THE BOARD OF DIRECTORS

The meeting went into Executive Session with Ms. LaSala thanking and excusing all attendees except for the Directors, Officers and presenters.

## Litigation Status Report

Ms. LaSala introduced Ms. Warner and Mr. Tyrrell.

She emphasized that the fundamental purpose behind the creation and funding of WTC is to conserve and disburse its assets in an equitable manner that maximizes compensation to those parties who suffered damage as a result of the WTC site debris removal program.

-5-

Ms. LaSala requested Ms. Warner and Mr. Tyrrell to provide an overview of several matters: currently pending litigation, the anticipated nature and number of future claims, and anticipated defense strategies and tactics. Ms. Warner stressed, in the context of pending and future litigation, the need for confidentiality and protection from inappropriate discovery disclosure via the attorney/client and other professional privileges. Properly defining WTC's "control group" and limiting internal discussions and written communications to those individuals and their legal counsel should assist in this effort.

**IT WAS RESOLVED THAT** the term "control group" means the existing Directors and proposed Alternate Directors of WTC.

Mr. Tyrrell and Ms. Warner then analogized WTC's situation to their prior experience with coverage of litigation involving other "mass tort" environmental and similar claims. They emphasized the importance of understanding and challenging the scientific and medical bases underlying the alleged torts. Ms. LaSala commented that WTC's charge is to implement a budgeting process pertaining to legal defense and other administrative expenses designed to maximize indemnity to those parties able to demonstrate harm from the debris removal. The Directors concurred and indicated their receptivity to WTC's considering the hiring of an in-house legal counsel if senior management so recommends.

## ADJOURNMENT

There being no additional business, the meeting was duly adjourned at 12:15 p.m. EST with Ms LaSala indicating that the next meeting would occur at the same locale on a date in mid-January 2005 to be announced.

Thomas M. Jones
Secretary

-6-

# WTC CAPTIVE INSURANCE COMPANY, INC.
## Experience Account Balance Statement
### As of the Quarter Ended March 31, 2007

|       |                                     | **Current Quarter** | **Cumulative** |
|-------|-------------------------------------|--------------------:|---------------:|
|       | Premium Received at Inception       |                     | 999,900,000    |
| *Add:* | Contingent Premium Received        | -                   | -              |
| *Add:* | Net Investment Return              | 14,102,241          | 90,812,059     |
| *Less:* | Deobligation of Funds             | -                   | -              |
| *Less:* | Cumulative Ultimate Net Losses Paid | 10,506,456        | 74,531,253     |
| *Less:* | Pre-Grant Expenses                | -                   | 1,293,094      |
|       | Balance                             |                     | 1,014,887,712  |

*FEMA Grant Number - 1391DRNY900000001*

**WTC CAPTIVE INSURANCE COMPANY**
**BALANCE SHEET - UNAUDITED**

|  | | AS OF 03/31/07 | | AS OF 12/31/06 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| | | | | |
| Cash & Investments | $ | 1,014,876,500 | $ | 1,011,231,609 |
| Funds Held on Deposit | | 5,081 | | 5,081 |
| Loss Fund | | 191,246 | | 156,333 |
| Prepaid Expenses | | 119,193 | | 208,587 |
| | | | | |
| **TOTAL ASSETS** | $ | **1,015,192,020** | $ | **1,011,601,610** |
| | | | | |
| | | | | |
| **LIABILITIES** | | | | |
| | | | | |
| Accrued Expenses | $ | 304,308 | $ | 309,683 |
| | | | | |
| **NON-CURRENT LIABILITIES** | | | | |
| | | | | |
| Deposit Liability | | 898,540,460 | | 901,136,150 |
| Residual Liability | | 100,000,000 | | 100,000,000 |
| Accumulated Adjustments to Residual Liability-Last Year | | 10,155,777 | | 2,155,761 |
| Accumulated Adjustments to Residual Liability-Current Year | | 6,191,475 | | 8,000,016 |
| **TOTAL NON-CURRENT LIABILITIES** | | 1,014,887,712 | | 1,011,291,927 |
| | | | | |
| **TOTAL LIABILITIES** | $ | **1,015,192,020** | $ | **1,011,601,610** |

**WTC CAPTIVE INSURANCE COMPANY**
**INCOME STATEMENT AND LOSS ADJUSTMENT EXPENSES**
**FOR THE QUARTER ENDED MARCH 31, 2007**

**INCOME STATEMENT**

| | CURRENT QUARTER | YEAR TO DATE | PRIOR YEAR END |
|---|---|---|---|
| **REVENUES** | | | |
| Investment Income | $    13,991,719 | $    13,991,719 | $    43,973,201 |
| Bank Interest | 110,522 | 110,522 | 387,635 |
| Inv. Income before Accretion Expense | 14,102,241 | 14,102,241 | 44,360,836 |
| | | | |
| Interest Accretion Expense | 6,659,323 | 6,659,323 | 32,190,794 |
| | | | |
| **Net Investment Income** | 7,442,918 | 7,442,918 | 12,170,042 |
| | | | |
| **EXPENSES** | | | |
| | | | |
| **General Administrative** | | | |
| Salaries, Benefits & Payroll Taxes | 214,884 | 214,884 | 902,391 |
| Office Expenses | 25,183 | 25,183 | 131,608 |
| Insurance | 106,787 | 106,787 | 425,439 |
| Other | - | - | - |
| Subtotal | 346,854 | 346,854 | 1,459,438 |
| | | | |
| **Professional Service Fees** | | | |
| Management, Actuarial & Accounting | 113,153 | 113,153 | 206,491 |
| Portfolio | 305,282 | 305,282 | 1,191,587 |
| Corporate Counsel | 444,232 | 444,232 | 1,127,361 |
| Other Consulting | 41,922 | 41,922 | 185,149 |
| Subtotal | 904,589 | 904,589 | 2,710,588 |
| **Total Operating Expenses** | 1,251,443 | 1,251,443 | 4,170,026 |
| | | | |
| **Net Income (Loss)** | $    6,191,475 | $    6,191,475 | $    8,000,016 |

**LOSS & LOSS ADJUSTMENT EXPENSES**

| | | | |
|---|---|---|---|
| **Losses Paid** | - | - | 45,000 |
| | | | |
| **Loss Adjustment Expenses** | | | |
| Claims Administration | 1,078,130 | 1,078,130 | 4,371,242 |
| Lead Defense | 4,507,484 | 4,507,484 | 17,772,812 |
| Document Management | 2,998,426 | 2,998,426 | 6,879,574 |
| Coverage Counsel | 265,769 | 265,769 | 1,430,811 |
| Pre-Existing Claims Counsel | 405,203 | 405,203 | 1,957,266 |
| | | | |
| **Total Claims Related Expenses** | $    9,255,012 | $    9,255,012 | $    32,456,705 |

**WTC CAPTIVE INSURANCE COMPANY**
**STATEMENT OF CASH FLOWS**
**FOR THE QUARTER ENDED MARCH 31, 2007**

|  | 2007 | 2006 |
|---|---|---|
| **Cash Flows from Operating Activities** |  |  |
| Cash paid for employee salary and benefits | $ (214,884) | $ (939,405) |
| Cash paid for other assets | (34,913) | (7,750) |
| Loss and loss adjustment expenses paid | (9,255,012) | (32,456,705) |
| Professional and management fees paid | (909,964) | (1,538,007) |
| General and administrative expenses paid | (42,576) | (1,748,634) |
| Interest income collected | 12,027,378 | 50,985,062 |
| Net cash flows from operating activities | 1,570,029 | 14,294,561 |
| **Cash Flows from Investing Activities** |  |  |
| Purchase of investments | (1,126,086,409) | (3,080,351,254) |
| Sales and maturities of investments | 1,121,740,452 | 3,074,985,980 |
| Net cash flows from investment activities | (4,345,957) | (5,365,274) |
| Increase in cash and cash equivalents | (2,775,928) | 9,174,425 |
| Cash and cash equivalents, beginning of year | 71,202,865 | 62,028,440 |
| Cash and cash equivalents, end of period | $ 68,426,937 | $ 71,202,865 |

**Reconciliation of Operating Income to Net Cash Flows from Operating Activities:**

|  | 2007 | 2006 |
|---|---|---|
| Net operating income | $ 6,191,475 | $ 8,000,016 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Deduct items not affecting cash: |  |  |
| Realized gains on sales of investments | (779,145) | 2,213,265 |
| Unrealized losses(gains) on investments | (1,620,073) | 2,028,345 |
| Changes in operating assets and liabilities: |  |  |
| Accrued investment income | 324,356 | 2,382,616 |
| Prepaid expenses | 89,394 | - |
| Other assets | (34,913) | (7,750) |
| Deposit liability | (2,595,690) | (265,911) |
| Accrued expenses | (5,375) | (56,020) |
| Net cash flows from operating activities | $ 1,570,029 | $ 14,294,561 |