UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                                                    Docket No.:  07-CV-7072 (AKH)

                        Plaintiffs,

     -against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS           DECLARATION OF
FINKLESTEIN; JEFFERY FRIEDLANDER;              DENISE A. RUBIN
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                          Defendants.
-------------------------------------------------------------------X

      DENISE A. RUBIN, an attorney duly licensed to practice before the Courts of the State

of New York and before this Honorable Court, hereby declares the following to be true under

penalty of perjury:

      1.      I am associated with the law firm Worby Groner Edelman & Napoli Bern, LLP,

attorneys for the plaintiffs herein, and offer this Declaration, the exhibits and Memorandum of Law

served therewith in Opposition to the Defendants' Motions to Dismiss the plaintiffs' complaint

pursuant to Fed. R. Civ. P. 12(b)(6).

      2.  In support of the motion, we offer, at Exhibit 1, a letter from Senator Patrick Leahy and

Senator Arlen Spector to defendant Christine LaSala.

      3.  In further support of the motion, we offer Exhibits B-1 through B-30, the documents

referenced in the *Walcott* Complaint. These are:

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 1. | Memorandum from Lawrence Martin, Special Insurance Counsel, New York City Law Department, Re: WTC – non-traditional types of insurance coverage | March 6, 2002 | ¶¶ 46, 51 |
| 2. | Letter from Mark Page, Director of the NYC Office of Management and Budget to Edward F. Jacoby, Jr., Governor's Representative, RE: Coordinated Insurance Program for the WTC Debris Removal Project | May 13, 2002 | ¶¶ 31, 33, 53 |
| 3. | Letter – US Congress members to Joseph M. Allbaugh, RE: Prompt review of NYC proposal to FEMA for insurance coverage of WTC Debris Removal | May 24, 2002 | ¶ 54 |
| 4. | Debris Removal Insurance Program meeting of FEMA and NY SEMO | June 24, 2002 | ¶56 |
| 5. | Letter from Joseph Picciano, FEMA to Edward Jacoby, Governor's Representative re: Coordinated Insurance Program for WTC Debris Removal Insurance | June 20, 2002 | ¶ 56 |
| 6. | Press Release – Joint release by Gov. Pataki and Mayor Bloomberg re: Captive Insurance Legislation | March 21, 2003 | ¶ 74 |
| 7. | Grant Agreement – US Dept of Homeland Security re: WTC Captive Insurance Company Project | Nov. 5, 2004 | ¶¶ 34, 76-77; 87; 100; 114-115 |
| 8. | WTC Captive Insurance Company, Inc., Liability Insurance Policy | Dec. 6, 2004 | ¶ 34; 116; 175 |
| 9. | WTC Captive Insurance Company, Inc. Bylaws | | ¶ 116-121 |
| 10. | Complaint: *WTC Captive Ins. Co., Inc. v. Liberty Mutual Fire Insureance Company, et al.*, U.S.D.C. – S.D.N.Y. 07-CV-1209 (AKH) | Feb. 16, 2007 | ¶ 127 |
| 11. | WTCC Certificate of Incorporation | July 9, 2004 | ¶¶ 78-82; 86; 116-121 |
| 12. | Minutes of WTCC Board Meeting | Dec. 2, 2004 | ¶ 90; 111 |

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 13. | WTCC Balance Statement Quarter Ending March 31, 2007 | March 31, 2007 | ¶ 93 |
| 14. | WTCC Claim Activity through quarter ending March 31, 2007 | April 24, 2007 | ¶ 93 |
| 15. | Public Authorities Accountability Act of 2005 | June 24, 2005 | ¶ 139-152; 157-158; 167; 227 |
| 16. | Testimony – JayEtta Z. Hecker, "Disaster Assistance: Federal Aid to New York City Area Following the Attacks of September 11th and Challenges Confronting FEMA" | Sept. 24, 2003 | ¶ 64 |
| 17. | Article: "350G Paycheck for City's 9/11 Scrooge" NY Post | Oct. 15, 2006 | ¶ 96-97 |
| 18. | FOIL Demand to WTCC by Plaintiffs' Liaison Counsel | May 4, 2006 | ¶ 137; 183; 185 |
| 19. | Letter: Congressman Nadler to Richard L. Skinner, Dept. of Homeland Security re: WTCC failure to pay Claims | July 27, 2006 | ¶ 67 |
| 20. | Letter: NYS Insurance Superintendent Howard Mills to Christine LaSala | July 28, 2006 | ¶ 75 |
| 21. | Letter: Senator Schumer to Christine LaSala, CEO of WTCC | July 31, 2006 | ¶ 65-66 |
| 22. | Letter: Christine LaSala, CEO of WTCC to NYS Insurance Superintendent Howard Mills | Aug. 1, 2006 | ¶ 104; 106 |
| 23. | Letter: Denise A. Rubin to NYS Insurance Superintendent Howard Mills re: LaSala's 8-1-06 correspondence | Aug. 4, 2006 | ¶ 102 |
| 24. | Press Release and Letter: Christine LaSala to Senator Schumer | Aug. 9, 2006 | ¶ 104; 105 |
| 25. | Letter: Marc Jay Bern to Senator Schumer, re: WTCC | Aug. 10, 2006 | ¶ 104; 105 |
| 26. | Letter: Sen. Hillary Rodham Clinton to Christine LaSala re: WTCC | Sept. 21, 2006 | ¶ 68 |
| 27. | Letter: Paul J. Napoli to Christine LaSala re: Open Meetings Law | Oct. 30, 2006 | ¶ 188; 206; 210 |

| | DOCUMENT | DATE | IN WTCC COMPLAINT AT: |
|---|---|---|---|
| 28. | Letter:  David Biester, WTCC General Counsel to Paul Napoli re: WTCC not subject to Open Meetings Law | Nov. 17, 2006 | ¶ 188; 206; 210 |
| 29. | Fax Transmission and Letter from Robert J. Freeman, Executive Director, NYS Department of State Committee on Open Government; Opinion Letter re: WTCC and Open Meetings Law | Dec. 22, 2006 | ¶ 134-135; 209 |
| 30. | Press Release: Mayor Bloomberg Accepts Panel Recommendations to Expand Response to Health Impacts of Attack on the World Trade Center | Feb. 13, 2007 | ¶ 129(f) |

Dated:  New York, New York
      September 19, 2007

                                        Denise A. Rubin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                                                          Docket No.:  07-CV-7072 (AKH)

                                  Plaintiffs,

        -against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS
FINKLESTEIN; JEFFERY FRIEDLANDER;
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                                  Defendants.
------------------------------------------------------------------X

=================================================================
PLAINTIFFS' DECLARATION IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
=================================================================
**WORBY GRONER EDELMAN & NAPOLI BERN, LLP**
*Attorneys for* :  Plaintiffs
115 Broadway, 12th Floor
New York, New York  10006
(212) 267-3700
=================================================================

PLEASE TAKE NOTICE:
□ <u>NOTICE OF ENTRY</u>
that the within is a (certified) true copy of an                      duly entered in the        office
of the    clerk of the within named court on _____200__.
□ <u>NOTICE OF SETTLEMENT</u>
        that an order                              of which the within is a true copy,  will be
        presented for settlement to the HON.                            one of the judges of the
        within named Court, at                on          200___  at_____ O'clock ___.M.

Dated, _____

                                Yours, etc.

                        **WORBY GRONER EDELMAN & NAPOLI BERN,  LLP**

PLEASE NOTE THAT

EXHIBIT B14

THE WTCC CLAIMS ACTIVITY

FOR FIRST QUARTER 2007, CAN

NOT BE UPLOADED TO THE ECF

SYSTEM.  ALL PARTIES HAVE

RECEIVED A COPY OF THIS

DOCUMENT VIA EMAIL SERVICE.

**STATE OF NEW YORK**

_____

5927

2005-2006 Regular Sessions

**IN SENATE**

June 24, 2005
_____

Introduced  by  Sens. LEIBELL, BRUNO, A. SMITH, ALESI, BALBONI, BONACIC,
 DeFRANCISCO, FARLEY, FLANAGAN, FUSCHILLO, GOLDEN, HANNON, JOHNSON,
 LARKIN, LAVALLE, LIBOUS, LITTLE, MALTESE, MARCELLINO, MARCHI, MAZIARZ,
 MEIER, MORAHAN, NOZZOLIO, PADAVAN, RATH, ROBACH, SALAND, SEWARD,
 SKELOS, SPANO, TRUNZO, VOLKER, WINNER, WRIGHT, YOUNG -- (at request of
 the Governor) -- read twice and ordered printed, and when  printed  to
 be committed to the Committee on Rules

AN  ACT to amend the public authorities law, the environmental conserva-
 tion  law, the legislative law and chapter 899 of  the  laws  of  1984
 relating  to  creating  a public benefit corporation to plan, develop,
 operate and maintain Roosevelt Island, in  relation  to  enacting  the
 public  authorities accountability act of 2005 and to amend the execu-
 tive law, in relation to the office of the state inspector general

 <u>**The People of the State of New York, represented in Senate and  Assem-**</u>
 <u>**bly, do enact as follows:**</u>

 1    Section  1.  Short  title. This act shall be known and may be cited as
 2  the "public authorities accountability act of 2005".
 3    § 2. The public authorities law is amended by adding a new  section  2
 4  to read as follows:
 5    <u>**§ 2. Definitions. As used in this chapter:**</u>
 6    <u>**1. "state  authority" shall mean a public authority or public benefit**</u>
 7  <u>**corporation created by or existing under this chapter or any  other  law**</u>
 8  <u>**of  the  state of New York, with one or more of its members appointed by**</u>
 9  <u>**the governor or who serve as members by virtue of holding a civil office**</u>
 10  <u>**of the state, other than an interstate  or  international  authority  or**</u>
 11  <u>**public  benefit  corporation, including  subsidiaries  of  such  public**</u>
 12  <u>**authority or public benefit corporation.**</u>
 13    <u>**2. "local authority" shall mean (a) a public authority or public bene-**</u>
 14  <u>**fit corporation created by or existing under this chapter or  any  other**</u>
 15  <u>**law of the state of New York whose members do not hold a civil office of**</u>
 16  <u>**the  state,  are  not  appointed by the governor or are appointed by the**</u>

EXPLANATION--Matter in <u>**italics**</u> (underscored) is new; matter in brackets
          [ ] is old law to be omitted.
                    LBD12078-07-5

S. 5927                2

1 **governor specifically upon the recommendation of the local government or**
2 **governments; (b) a not-for-profit corporation affiliated with, sponsored**
3 **by, or created by a county, city, town or village government; (c) a**
4 **local industrial developmental agency or authority or other local public**
5 **benefit corporation; or (d) an affiliate of such local authority.**
6 **3. "interstate or international authority" shall mean an international**
7 **or interstate public authority created pursuant to agreement or compact**
8 **with another state or with a foreign power, including any and all affil-**
9 **iates or subsidiaries.**
10 **4. "affiliate" or "affiliated with" shall mean a corporate body having**
11 **substantially the same ownership or control as another corporate body.**
12 **5. "subsidiary" shall not include, for the purposes of this chapter,**
13 **corporations that have been certified by the parent corporation to the**
14 **entity created pursuant to section twenty-seven of the chapter of the**
15 **laws of two thousand five which added this section as being inactive for**
16 **the past twelve months, having an identical board of its parent corpo-**
17 **ration, or not having separate and independent operational control.**
18 **Provided, however, the parent corporation, in response to any request,**
19 **shall address any provision or provisions of this chapter.**
20 § 3. Subdivision 1 of section 352 of the public authorities law, as
21 amended by chapter 55 of the laws of 1992, is amended to read as
22 follows:
23 1. A board to be known as "New York state thruway authority" is hereby
24 created. Such board shall be a body corporate and politic constituting a
25 public corporation. It shall consist of [**three**] **seven** members appointed
26 by the governor by and with the advice and consent of the senate. The
27 members first appointed shall serve for terms ending three, six and nine
28 years, respectively from January first next succeeding their appoint-
29 ment. **Provided, however, that two board members first appointed on or**
30 **after the effective date of the chapter of the laws of two thousand five**
31 **which amended this subdivision shall serve an initial term of two years;**
32 **provided further that two other board members first appointed on or**
33 **after the effective date of the chapter of the laws of two thousand five**
34 **which amended this subdivision shall serve an initial term of three**
35 **years.** Their successors shall be appointed for terms of nine years each.
36 A member to be designated as chairman in his or her appointment as a
37 member shall be chairman of such board until his or her term as member
38 expires. The chairman and the other members shall serve without salary
39 or other compensation, but shall be entitled to reimbursement for their
40 actual and necessary expenses incurred in the performance of their offi-
41 cial duties. [**The chairman shall be the chief executive officer of the**
42 **authority and shall be primarily responsible for the discharge of the**
43 **administrative functions of the authority.**]
44 § 4. Subdivision 1 of section 527 of the public authorities law, as
45 amended by chapter 189 of the laws of 1947, is amended to read as
46 follows:
47 1. The board known as the "New York State Bridge Authority," is hereby
48 continued. Such board shall be a body corporate and politic, shall have
49 a corporate seal and be capable of suing and being sued. It shall
50 consist of [**five**] **seven** members who shall be appointed by the governor
51 by and with the advice and consent of the senate. The present members of
52 the board shall continue in office, unless a vacancy occurs, for the
53 remainder of the time for which they were respectively appointed. Of the
54 additional members, one shall be appointed for a term to expire February
55 first, nineteen hundred fifty-one, and one for a term to expire February
56 first, nineteen hundred fifty-two. Their successors **and any additional**

S. 5927                3

1  **appointees** shall be appointed, one annually, for terms of five years
2  each from the first day of February; provided that the person appointed
3  as successor to the member heretofore appointed for a three year term
4  which expired February first, nineteen hundred forty-seven, shall be
5  appointed for a term to expire February first, nineteen hundred fifty.
6  Vacancies in the office of such board occurring otherwise than by expi-
7  ration of term also shall be filled by the governor by appointment by
8  and with the advice and consent of the senate for the unexpired term,
9  and the provisions of section thirty-nine of the public officers law
10  relating to recess appointments shall apply to such board. Such board
11  shall choose from its members a chairman. The members of such board
12  shall be paid or reimbursed for their necessary expenses incurred under
13  this title, but shall receive no compensation for their services.
14  § 5. Subdivision 1 of section 552 of the public authorities law, as
15  amended by chapter 929 of the laws of 1986, is amended to read as
16  follows:
17  1. A board, to be known as "Triborough bridge and tunnel authority" is
18  hereby created. Such board shall be a body corporate and politic
19  constituting a public benefit corporation. It shall consist of seventeen
20  members, all serving ex officio. Those members shall be the persons who
21  from time to time shall hold the offices of chairman and members of
22  metropolitan transportation authority. The chairman of such board shall
23  be the chairman of metropolitan transportation authority, serving ex
24  officio, and the executive director of the authority shall be the execu-
25  tive director of the metropolitan transportation authority, serving ex
26  officio. The [**chairman shall be the chief executive officer of the**
27  **authority and shall be responsible for the discharge of the executive**
28  **and administrative functions and powers of the authority. He shall be**
29  **empowered to delegate any one or more of his powers or functions to the**
30  **executive director, provided, however, that the chairman shall delegate**
31  **to the executive director such functions and powers, including, without**
32  **limitation, that of appointment, discipline and removal of officers and**
33  **employees, as are necessary for the executive director to discharge his**
34  **responsibilities, and the**] executive director shall be empowered to
35  delegate his **or her** function and power to appoint, discipline and remove
36  officers and employees to the executive officer of the Triborough bridge
37  and tunnel authority or to such person as may succeed to the powers and
38  duties of said executive officer. The chairman and other members of the
39  board hereby created, and the executive director, shall not be entitled
40  to compensation for their services hereunder but shall be entitled to
41  reimbursement for their actual and necessary expenses incurred in the
42  performance of their official duties.
43  § 6. Section 1003 of the public authorities law, as amended by chapter
44  506 of the laws of 1995, is amended to read as follows:
45  § 1003. Trustees. The authority shall consist of [**five**] **seven** trus-
46  tees, [**who**] **five of whom** shall serve respectively for terms of one, two,
47  three, four and five years, to be appointed by the governor, by and with
48  the advice and consent of the senate. **The sixth and seventh trustees**
49  **shall be appointed by the governor, by and with the advice and consent**
50  **of the senate, and shall serve initial terms of one and two years**
51  **respectively.** Each trustee shall hold office until a successor has been
52  appointed and qualified. At the expiration of the term of each trustee
53  and of each succeeding trustee the governor shall, by and with the
54  advice and consent of the senate, appoint a successor, who shall hold
55  office for a term of five years, or until a successor has been appointed
56  and qualified. In the event of a vacancy occurring in the office of the

S. 5927          4

1 trustee by death, resignation or otherwise, the governor shall, by and
2 with the advice and consent of the senate, appoint a successor, who
3 shall hold office for the unexpired term. [**Three**] **Four** trustees shall
4 constitute a quorum for the purpose of organizing the authority and
5 conducting the business thereof.
6   The trustee chosen as chairman as provided in section one thousand
7 four of this title, [**if not otherwise an officer in the employ of the**
8 **authority,**] shall receive an annual salary which shall be set by the
9 trustees of the authority, and which shall not exceed the salary
10 prescribed for the positions listed in paragraph (f) of subdivision one
11 of section one hundred sixty-nine of the executive law. Each other
12 trustee shall not receive a salary or other compensation. Each trustee
13 shall receive his or her reasonable expenses in the performance of his
14 or her duties hereunder. The trustee chosen as chairman may elect to
15 become a member of the New York state and local employees' retirement
16 system on the basis of such compensation to which he or she shall be
17 entitled as herein provided notwithstanding the provisions of any gener-
18 al, special or local law, municipal charter, or ordinance.
19   § 7. Section 1004 of the public authorities law, as amended by chapter
20 506 of the laws of 1995, is amended to read as follows:
21   § 1004. Officers and employees; expenses. The trustees shall choose
22 from among their own number a chairman and vice-chairman. They shall
23 from time to time select such officers and employees, including a chief
24 executive officer [**who may be selected from their own number**] and such
25 engineering, marketing and legal officers and employees, as they may
26 require for the performance of their duties and shall prescribe the
27 duties and compensation of each officer and employee. They shall adopt
28 by-laws and rules and regulations suitable to the purposes of this
29 title. As long as and to the extent that the authority is dependent upon
30 appropriations for the payment of its expenses, it shall incur no obli-
31 gations for salary, office or other expenses prior to the making of
32 appropriations adequate to meet the same.
33   § 8. Subdivision 2 of section 1201 of the public authorities law, as
34 amended by chapter 280 of the laws of 1980, is amended to read as
35 follows:
36   2. The chairman of such board shall be the chairman of metropolitan
37 transportation authority, serving ex officio, and the executive director
38 of the authority shall be the executive director of the metropolitan
39 transportation authority, serving ex officio. The [**chairman shall be the**
40 **chief executive officer of the authority and shall be responsible for**
41 **the discharge of the executive and administrative functions and powers**
42 **of the authority. He shall be empowered to delegate any one or more of**
43 **his functions or powers to the executive director, provided, however,**
44 **that the chairman shall delegate to the executive director such func-**
45 **tions and powers, including, without limitation, that of appointment,**
46 **discipline and removal of officers and employees, as are necessary for**
47 **the executive director to discharge his responsibilities, and the**] exec-
48 utive director shall be empowered to delegate his **or her** function and
49 power to appoint, discipline and remove officers and employees to one or
50 more officers or employees designated by him **or her.**
51   § 9. The opening paragraph and paragraph (a) of subdivision 4 of
52 section 1263 of the public authorities law, as amended by chapter 275 of
53 the laws of 1979, are amended to read as follows:
54   [**The chairman shall be the chief executive officer of the authority**
55 **and shall be responsible for the discharge of the executive and adminis-**
56 **trative functions and powers of the authority.**] (a) On recommendation of

S. 5927                5

1 the chairman, the authority shall appoint an executive director who
2 shall be responsible for **the discharge of the executive and administra-**
3 **tive functions and powers of the authority, including** the administration
4 and the day-to-day operations of the authority and who shall not be a
5 member of the authority. [**The chairman shall be empowered to delegate**
6 **any one or more of his functions or powers to the executive director,**
7 **provided, however, that the chairman shall delegate to the executive**
8 **director such functions and powers, including, without limitation, that**
9 **of appointment, discipline and removal of officers or employees, as are**
10 **necessary for the executive director to discharge his responsibilities.**]
11    § 10. Subdivision 1 of section 1282 of the public authorities law, as
12 amended by chapter 464 of the laws of 1975, is amended to read as
13 follows:
14    1. The "New York state pure waters authority" is hereby reconstituted
15 and continued as the "New York state environmental facilities corpo-
16 ration". Reference in any provision of law, general, special or local,
17 or in any rule, regulation or public document to the New York state pure
18 waters authority shall be deemed to be and construed as a reference to
19 the corporation continued by this section. The corporation shall be a
20 body corporate and politic constituting a public benefit corporation.
21 Its membership shall consist of seven directors: the commissioner of
22 environmental conservation who shall be [**chairman and chief executive**
23 **officer of the corporation**] **chair**, the commissioner of health, the
24 secretary of state, and four directors appointed by the governor by and
25 with the advice and consent of the senate. The directors appointed by
26 the governor who are not state officers, shall serve for terms of six
27 years each, provided, however, that of the directors first appointed,
28 two shall serve for terms of two years, the remaining two for terms of
29 four and six years, respectively, from January first next succeeding
30 their appointment. The appointed members of the New York state pure
31 waters authority in office on the effective date of this [**act**] **title**
32 shall be deemed to be directors first appointed in accordance with the
33 foregoing and shall hold office for the balance of the terms for which
34 they were severally appointed. Any vacancy occurring otherwise than by
35 expiration of term shall be filled in the same manner as the original
36 appointment for the balance of the unexpired term. **The board of direc-**
37 **tors of the corporation shall appoint, by resolution, the president of**
38 **the corporation. The president shall be the chief executive officer of**
39 **the corporation and shall serve at the pleasure of the board of direc-**
40 **tors of the corporation.**
41    § 11. The first undesignated paragraph of section 1651 of the public
42 authorities law, as amended by chapter 45 of the laws of 1962, is
43 amended to read as follows:
44    The industrial exhibit authority heretofore established under this act
45 as a public benefit corporation is hereby continued for the accomplish-
46 ment of the purposes hereinafter indicated. The authority shall be
47 composed and consist of the commissioner of agriculture and markets, the
48 director of the budget, the director of the New York state fair and
49 [**three**] **four** other persons, to be appointed by the governor. Each of the
50 three members heretofore appointed by the governor as such and now in
51 office shall continue in office until July first, nineteen hundred
52 fifty-seven and until his successor is appointed and has qualified. The
53 term of each member hereafter appointed by the governor shall be for
54 three years, but the initial term of the three members first hereafter
55 appointed, otherwise than for the remainder of an unexpired term, shall
56 be such that the term of one member shall expire on July first, nineteen

S. 5927                6

1  hundred  fifty-eight, the term of one member shall expire on July first,
2  nineteen hundred fifty-nine, and the term of one member shall expire  on
3  July first, nineteen hundred sixty.  **The term of the fourth member to be**
4  **appointed  by the governor on or after the effective date of the chapter**
5  **of the laws of two thousand five which amended this subdivision shall be**
6  **for three years but the initial term  of  the  member  first  appointed,**
7  **otherwise  than  for the remainder of an unexpired term, shall expire on**
8  **July first, two thousand eight.** A vacancy occurring in any  such  office
9  of  any  member  required herein to be appointed by the governor as such
10  shall be filled by the governor by appointment for the  unexpired  term.
11  The  members  of  the  industrial exhibit authority (hereinafter in this
12  title referred to as the "authority") shall receive no compensation from
13  the authority for their services as such members,  but  shall  be  reim-
14  bursed  by  the authority for the  expenses  actually and necessarily
15  incurred by them in the performance of their  duties  under  this  [**act**]
16  **title**.   Such authority shall have perpetual existence and the power to
17  acquire by the exercise of the right of eminent domain or otherwise such
18  real estate and other property as may be necessary, to sue and be  sued,
19  to  incur  debts,  liabilities and obligations, to issue bonds and other
20  evidences of indebtedness, to have a seal, and to  exercise  all  powers
21  authorized  by this title and reasonably necessary for accomplishing its
22  purposes, subject to the provisions herein contained and  the  constitu-
23  tion  and  laws  of the United States and of New York state. Such powers
24  shall be exercised in the name of the authority.
25    § 12. Subdivision 3 of section 1852 of the public authorities law,  as
26  amended  by  chapter  857  of  the  laws of 1977, is amended to read as
27  follows:
28    3. The chairman shall [**be the chief executive  officer**]  **preside  over**
29  **meetings**  of  the  authority and shall [**be primarily responsible for the**
30  **discharge of the executive and administrative functions of the  authori-**
31  **ty**]  **serve  as  the  primary  liaison  between the members and authority**
32  **staff**.  A vice-chairman may be elected by the authority from  among  its
33  other  members  to  serve  as such at the pleasure of the authority. The
34  vice-chairman shall preside over all meetings of the  authority  in  the
35  absence of the chairman and shall have such other duties as the authori-
36  ty may prescribe.  **The president shall be the chief president officer of**
37  **the  authority  and  shall be primarily responsible for the discharge of**
38  **the executive and administrative functions of the authority.**
39    § 13. Subdivision 1 of section 1973 of the public authorities law,  as
40  amended  by  chapter  624  of  the  laws of 1969, is amended to read as
41  follows:
42    (1) There is hereby created the  battery  park  city  authority  which
43  shall  be  a  body  corporate and politic, constituting a public benefit
44  corporation. Its membership shall consist of [**three**] **seven** members to be
45  appointed by the governor with the advice and consent of the senate. One
46  of the members first appointed shall serve for a term ending four  years
47  from  January first next succeeding his appointment; one of such members
48  shall serve for a term ending five years from such date; and one of such
49  members shall serve  for  a  term  ending  six  years  from  such  date.
50  **Provided,  however,  that  two board members first appointed on or after**
51  **the effective date of the chapter of the laws of two thousand five which**
52  **amended this subdivision shall serve  an  initial  term  of  two  years;**
53  **provided  further  that  two  other  board members first appointed on or**
54  **after the effective date of the chapter of the laws of two thousand five**
55  **which amended this subdivision shall  serve  an  initial  term  of  four**
56  **years.** Their successors shall serve for terms of six years each. Members

S. 5927                7

1  shall  continue in office until their successors have been appointed and
2  qualified and the provisions of section thirty-nine of the public  offi-
3  cers  law shall apply. In the event of a vacancy occurring in the office
4  of  a  member  by  death,  resignation  or otherwise, the governor shall
5  appoint a successor with the advice and consent of the senate  to  serve
6  for the balance of the unexpired term.
7    § 14. Subdivision 1 of section 2562 of the public authorities law, as
8  amended by chapter 3 of the laws of 2004, is amended to read as follows:
9    1. To effectuate the purposes and provisions of this title,  there  is
10  hereby  created the "New York convention center operating corporation",
11  which shall be a body corporate and politic constituting a public  bene-
12  fit  corporation.  The corporation's board of directors shall consist of
13  twenty-one persons to be appointed with the advice  and  consent  of  the
14  senate, including fifteen persons appointed by the governor; two persons
15  appointed by the temporary president of the senate; one person appointed
16  by  the  minority  leader  of  the  senate; two persons appointed by the
17  speaker of the assembly; and one person appointed by the minority leader
18  of the assembly. Four of the members appointed by the governor shall  be
19  appointed  on the written recommendation of the mayor of the city of New
20  York. One of the directors shall be designated by the governor as  chair
21  of the board of directors to serve as such at the pleasure of the gover-
22  nor.  Upon  recommendation  of  the chair of the board of directors, the
23  board of directors shall appoint an executive  director  of  the  corpo-
24  ration. Notwithstanding any general, special or local law concerning the
25  holding  of  dual offices,  an  officer or employee of the state may be
26  appointed as an officer or employee of the corporation, and officers and
27  employees of the state may be appointed  as  members  of  the  board  of
28  directors  of  the  corporation**, provided however, that the chair of the**
29  **board of directors shall not be an officer or  employee  of  the  corpo-**
30  **ration,  and  the  executive  director of the corporation shall not be a**
31  **member of the board of directors**.
32    § 15. Section 2800 of the public authorities law, as amended by  chap-
33  ter 479 of the laws of 1975 and as renumbered by chapter 838 of the laws
34  of 1983, is amended to read as follows:
35    § 2800.  Annual reports by authorities. **1. State authorities. (a)** For
36  the purpose of furnishing the state with systematic information  regard-
37  ing  the  status  and  the activities of public authorities, every **state**
38  authority [**or commission**] continued or created by this  chapter  **or  any**
39  **other  chapter  of the laws of the state of New York** shall submit to the
40  governor, the chairman and ranking minority member of the senate finance
41  committee, the chairman and ranking minority member of the assembly ways
42  and means committee and the state comptroller, within ninety days  after
43  the  end  of  its fiscal year, a complete and detailed report **or reports**
44  setting forth: (1) its operations and accomplishments; (2) its  receipts
45  and  disbursements, or revenues and expenses, during such fiscal year in
46  accordance with the categories or classifications  established  by  such
47  authority [**or commission**] for its  own  operating and capital outlay
48  purposes; (3) its assets and liabilities at the end of its  fiscal  year
49  including  the  status  of reserve, depreciation, special or other funds
50  and including the receipts and payments of these funds; [**and**]  (4)  a
51  schedule  of  its  bonds  and notes outstanding at the end of its fiscal
52  year, together with a statement of the amounts  redeemed  and  incurred
53  during  such  fiscal  year **as  part of a schedule of debt issuance that**
54  **includes the date of issuance, term, amount, interest rate and means  of**
55  **repayment.  Additionally, the debt schedule shall also include all refi-**
56  **nancings, calls, refundings, defeasements and interest rate exchange  or**

1  other such agreements, and for any debt issued during the reporting
2  year, the schedule shall also include a detailed list of costs of issu-
3  ance for such debt; (5) a compensation schedule that shall include, by
4  position, title and name of the person holding such position or title,
5  the salary, compensation, allowance and/or benefits provided to any
6  officer, director or employee in a decision making or managerial posi-
7  tion of such authority whose salary is in excess of one hundred thousand
8  dollars; (6) the projects undertaken by such authority during the past
9  year; (7) a listing of (i) all real property of such authority having an
10 estimated fair market value in excess of fifteen thousand dollars that
11 the authority intends to dispose of; (ii) all such property held by the
12 authority at the end of the period covered by the report; and (iii) all
13 such property disposed of during such period. The report shall contain
14 an estimate of fair market value for all such property held by the
15 authority at the end of the period and the price received by the author-
16 ity and the name of the purchaser for all such property sold by the
17 authority during such period; (8) such authority's code of ethics; and
18 (9) an assessment of the effectiveness of its internal control structure
19 and procedures.
20   (b) To the extent practicable, each state authority shall make acces-
21 sible to the public via its official internet web site documentation
22 pertaining to its mission, current activities, most recent annual finan-
23 cial reports, current year budget and its most recent independent audit
24 report unless such information is covered by subdivision two of section
25 eighty-seven of the public officers law.
26   2. Local authorities. (a) Every local authority, continued or created
27 by this chapter or any other chapter of the laws of the state of New
28 York shall submit to the chief executive officer, the chief fiscal offi-
29 cer, the chairperson of the legislative body of the local government or
30 local governments and the entity established pursuant to section twen-
31 ty-seven of the chapter of the laws of two thousand five which added
32 this subdivision, within ninety days after the end of its fiscal year, a
33 complete and detailed report or reports setting forth: (1) its oper-
34 ations and accomplishments; (2) its receipts and disbursements, or
35 revenues and expenses, during such fiscal year in accordance with the
36 categories or classifications established by such authority for its own
37 operating and capital outlay purposes; (3) its assets and liabilities at
38 the end of its fiscal year including the status of reserve, depreci-
39 ation, special or other funds and including the receipts and payments of
40 these funds; (4) a schedule of its bonds and notes outstanding at the
41 end of its fiscal year, together with a statement of the amounts
42 redeemed and incurred during such fiscal year as part of a schedule of
43 debt issuance that includes the date of issuance, term, amount, interest
44 rate and means of repayment. Additionally, the debt schedule shall also
45 include all refinancings, calls, refundings, defeasances and interest
46 rate exchange or other such agreements, and for any debt issued during
47 the reporting year, the schedule shall also include a detailed list of
48 costs of issuance for such debt; (5) a compensation schedule that shall
49 include, by position, title and name of the person holding such position
50 or title, the salary, compensation, allowance and/or benefits provided
51 to any officer, director or employee in a decision making or managerial
52 position of such authority whose salary is in excess of one hundred
53 thousand dollars; (6) the projects undertaken by such authority during
54 the past year; (7) a listing of (i) all real property of such authority
55 having an estimated fair market value in excess of fifteen thousand
56 dollars that the authority intends to dispose of; (ii) all such property

S. 5927                 9

1  **held  by  the  authority at the end of the period covered by the report;**
2  **and (iii) all such property disposed of during such period.  The  report**
3  **shall  contain  an  estimate  of fair market value for all such property**
4  **held by the authority at the end of the period and the price received by**
5  **the  authority  and the name of the purchaser for all such property sold**
6  **by the authority during  such  period;  (8)  such  authority's  code  of**
7  **ethics;  and  (9)  an  assessment  of  the effectiveness of its internal**
8  **control structure and procedures.**
9  **  (b) To the extent practicable, each local authority shall make  acces-**
10 **sible  to  the  public  via its official internet web site documentation**
11 **pertaining to its mission, current activities, most recent annual finan-**
12 **cial reports, current year budget and its most recent independent  audit**
13 **report  unless such information is covered by subdivision two of section**
14 **eighty-seven of the public officers law.**
15 **  3. Every financial  report  submitted  under  this  section  shall  be**
16 **approved  by  the  board  and shall be certified in writing by the chief**
17 **executive officer and the chief financial officer of such authority that**
18 **based on the officer's knowledge (a) the information provided therein is**
19 **accurate, correct and does not contain any untrue statement of  material**
20 **fact; (b) does not omit any material fact which, if omitted, would cause**
21 **the  financial statements to be misleading in light of the circumstances**
22 **under which such statements are made; and (c) fairly  presents  in  all**
23 **material  respects  the financial condition and results of operations of**
24 **the authority as of, and for, the periods  presented  in  the  financial**
25 **statements**.
26   § 16. Section 2801 of the public authorities law, as amended by chap-
27 ter 479 of the laws of 1975 and as renumbered by chapter 838 of the laws
28 of 1983, is amended to read as follows:
29   § 2801. Budget reports by [**public**] authorities. **1. State  authorities.**
30 Every **state** authority or commission heretofore or hereafter continued or
31 created by this chapter **or any other chapter of the laws of the state of**
32 **New  York**  shall  submit  to the governor, chairman and ranking minority
33 member of the senate finance committee, and chairman and ranking minori-
34 ty member of the assembly ways and means committee, for  their  informa-
35 tion, annually not less than [**sixty**] **ninety** days before the commencement
36 of  its  fiscal  year, in the form submitted to its members or trustees,
37 budget information on operations and capital construction setting  forth
38 the estimated receipts and expenditures for the next fiscal year and the
39 current  fiscal  year,  and the actual receipts and expenditures for the
40 last completed fiscal year.
41 **  2. Local authorities.  For the local authority fiscal year  ending  on**
42 **or  after  December thirty-first, two thousand seven and annually there-**
43 **after, every  local  authority  heretofore  or  hereafter  continued  or**
44 **created by this chapter or any other chapter of the laws of the state of**
45 **New  York  shall submit to the chief executive officer, the chief fiscal**
46 **officer, the chairperson of the legislative body of the local government**
47 **or governments and the entity established pursuant  to  section  twenty-**
48 **seven  of  the chapter of the laws of two thousand five which added this**
49 **subdivision, for their information, annually not less  than  sixty  days**
50 **before the commencement of its fiscal year, in the form submitted to its**
51 **members  or  trustees,  budget  information  on  operations  and capital**
52 **construction setting forth the estimated receipts and  expenditures  for**
53 **the  next  fiscal  year  and  the  current  fiscal  year, and the actual**
54 **receipts and expenditures for the last completed fiscal year.**

1   § 17. Section 2802 of the public authorities law, as amended by chap-
2   ter 479 of the laws of 1975 and as renumbered by chapter 838 of the laws
3   of 1983, is amended to read as follows:
4   § 2802. [**Audit**] **Independent audits and audit** reports of [**public**]
5   authorities. **1. State authorities.** Every **state** authority or commission
6   heretofore or hereafter continued or created by this chapter **or any**
7   **other chapter of the laws of the state of New York** shall submit to the
8   governor, chairman and ranking minority member of the senate finance
9   committee, chairman and ranking minority member of the assembly ways and
10  means committee and the state comptroller, within thirty days after
11  receipt thereof by such authority [**or commission**], a copy of the [**report**
12  **of every**] **annual independent audit report, performed by a certified**
13  **public accounting firm in accordance with generally accepted government**
14  **auditing standards, and management letter and any other** external exam-
15  ination of the books and accounts of such authority [**or commission**]
16  other than copies of the reports of [**such**] **any** examinations made by the
17  state comptroller.
18  **2. Local authorities. For the local authority fiscal year ending on or**
19  **after December thirty-first, two thousand seven and annually thereafter,**
20  **every local authority heretofore or hereafter continued or created by**
21  **this chapter or any other chapter of the laws of the state of New York**
22  **shall submit to the chief executive officer, the chief fiscal officer,**
23  **the chairperson of the legislative body of the local government or local**
24  **governments and to the entity established pursuant to section twenty-**
25  **seven of the chapter of the laws of two thousand five which added this**
26  **subdivision, within thirty days after receipt thereof by such authority,**
27  **a copy of the annual independent audit report, performed by a certified**
28  **public accounting firm in accordance with generally accepted government**
29  **auditing standards, and management letter and any other external exam-**
30  **ination of the books and accounts of such authority other than copies of**
31  **the reports of examinations made by the state comptroller.**
32  **3. Each certified independent public accounting firm that performs for**
33  **any state or local authority any audit required by this chapter shall**
34  **timely report to the audit committee of such authority: (a) all critical**
35  **accounting policies and practices to be used; (b) all alternative treat-**
36  **ments of financial information within generally accepted accounting**
37  **principles that have been discussed with management officials of such**
38  **authority, ramifications of the use of such alternative disclosures and**
39  **treatments, and the treatment preferred by the certified independent**
40  **public accounting firm; and (c) other material written communications**
41  **between the certified independent public accounting firm and the manage-**
42  **ment of such authority, such as the management letter along with manage-**
43  **ment's response or plan of corrective action, material corrections iden-**
44  **tified or schedule of unadjusted differences, where applicable.**
45  **4. Notwithstanding any other provision of law to the contrary, the**
46  **certified independent public accounting firm providing such authority's**
47  **annual independent audit will be prohibited in providing audit services**
48  **to the respective authority if the lead (or coordinating) audit partner**
49  **(having primary responsibility for the audit), or the audit partner**
50  **responsible for reviewing the audit, has performed audit services for**
51  **that issuer in each of the five previous fiscal years of such authority.**
52  **5. The certified independent public accounting firm performing such**
53  **authority's audit shall be prohibited from performing any non-audit**
54  **services to such authority contemporaneously with the audit, unless**
55  **receiving previous written approval by the audit committee including:**
56  **(a) bookkeeping or other services related to the accounting records or**

S. 5927              11

1 **financial statements of such authority; (b) financial information**
2 **systems design and implementation; (c) appraisal or valuation services,**
3 **fairness opinions, or contribution-in-kind reports; (d) actuarial**
4 **services; (e) internal audit outsourcing services; (f) management func-**
5 **tions or human services; (g) broker or dealer, investment advisor, or**
6 **investment banking services; and (h) legal services and expert services**
7 **unrelated to the audit.**
8 **6. It shall be prohibited for any certified independent public**
9 **accounting firm to perform for such authority any audit service if the**
10 **chief executive officer, comptroller, chief financial officer, chief**
11 **accounting officer, or any other person serving in an equivalent posi-**
12 **tion for such authority, was employed by that certified independent**
13 **public accounting firm and participated in the audit of**
14 **such authority during the one year period preceding the date of the**
15 **initiation of the audit.**
16 **7. Notwithstanding any provision of law to the contrary, a public**
17 **authority may exempt information from disclosure or report, if the coun-**
18 **sel of such authority deems that such information is covered by subdivi-**
19 **sion two of section eighty-seven of the public officers law.**
20 § 18. Title 2 of article 9 of the public authorities law is amended by
21 adding a new section 2824 to read as follows:
22 **§ 2824. Role and responsibilities of board members. 1. Board members**
23 **of state and local authorities shall (a) execute direct oversight of the**
24 **authority's chief executive and other senior management in the effective**
25 **and ethical management of the authority; (b) understand, review and**
26 **monitor the implementation of fundamental financial and management**
27 **controls and operational decisions of the authority; (c) establish poli-**
28 **cies regarding the payment of salary, compensation and reimbursements**
29 **to, and establish rules for the time and attendance of, the chief execu-**
30 **tive and senior management; (d) adopt a code of ethics applicable to**
31 **each officer, director and employee that, at a minimum, includes the**
32 **standards established in section seventy-four of the public officers**
33 **law; (e) establish written policies and procedures on personnel includ-**
34 **ing policies protecting employees from retaliation for disclosing infor-**
35 **mation concerning acts of wrongdoing, misconduct, malfeasance, or other**
36 **inappropriate behavior by an employee or board member of the authority,**
37 **investments, travel, the acquisition of real property and the disposi-**
38 **tion of real and personal property and the procurement of goods and**
39 **services; and (f) adopt a defense and indemnification policy and**
40 **disclose such plan to any and all prospective board members;**
41 **2. Individuals appointed to the board of a public authority shall**
42 **participate in state approved training regarding their legal, fiduciary,**
43 **financial and ethical responsibilities as directors of an authority**
44 **within one year of appointment to a board. Board members shall partic-**
45 **ipate in such continuing training as may be required to remain informed**
46 **of best practices, regulatory and statutory changes relating to the**
47 **effective oversight of the management and financial activities of public**
48 **authorities and to adhere to the highest standards of responsible gover-**
49 **nance.**
50 **3. No board member, including the chairperson, shall serve as a public**
51 **authority's chief executive officer, executive director, chief financial**
52 **officer, comptroller, or hold any other equivalent position while also**
53 **serving as a member of the board.**
54 **4. Board members of each state and local authority, or subsidiary**
55 **thereof, shall establish an audit committee to be comprised of independ-**
56 **ent members. The committee shall recommend to the board the hiring of a**

1  **certified  independent accounting firm for such authority, establish the**
2  **compensation to be paid to the accounting firm and provide direct over-**
3  **sight  of  the  performance  of  the  independent audit performed by the**
4  **accounting firm hired for such purposes.**
5    **5. Notwithstanding any provision of any general, special or local law,**
6  **municipal  charter  or ordinance to the contrary, no board of a state or**
7  **local authority shall, directly or  indirectly,  including  through  any**
8  **subsidiary, extend  or  maintain  credit, arrange for the extension of**
9  **credit, or renew an extension of credit, in the form of a personal  loan**
10  **to  or for any officer, board member or employee (or equivalent thereof)**
11  **of the authority.**
12    **6. To the extent practicable, members of the audit committee should be**
13  **familiar with corporate financial and accounting practices.**
14    **7. Board members of each state  and  local  authority,  or  subsidiary**
15  **thereof, shall establish a governance committee to be comprised of inde-**
16  **pendent  members.  It  shall be the responsibility of the members of the**
17  **governance committee to keep the board informed of current  best  gover-**
18  **nance  practices;  to  review corporate governance trends; to update the**
19  **authority's corporate governance principles; and  to  advise  appointing**
20  **authorities  on  the  skills and experiences required of potential board**
21  **members.**
22    § 19. Section 2825 of the public authorities law, as amended by  chap-
23  ter 914 of the laws of 1957 and as renumbered by chapter 838 of the laws
24  of 1983, is amended to read as follows:
25    § 2825.  Membership on authorities and commissions**; independence; and**
26  **financial disclosure**. Notwithstanding the  provisions  of  any  general,
27  special or local law, municipal charter or ordinance[**, no**]**: 1. No** public
28  officer  or  employee shall be ineligible for appointment [**by the gover-**
29  **nor**] as a trustee or member of the governing body of  [**an**]  **a  state  or**
30  **local** authority [**or commission continued or created by this chapter**]**, as**
31  **defined  in  section  two  of  this  chapter,**  and any public officer or
32  employee may accept such appointment and serve as such trustee or member
33  without forfeiture of any other public  office  or  position  of  public
34  employment by reason thereof.
35    **2. Except  for  members  who  serve as members by virtue of holding a**
36  **civil office of the state, the majority of the remaining members of  the**
37  **governing  body  of  every state or local authority shall be independent**
38  **members; provided, however, that this provision shall apply to  appoint-**
39  **ments  made on or after the effective date of the chapter of the laws of**
40  **two thousand five which added this subdivision.  The official  or  offi-**
41  **cials  having  the  authority to appoint or remove such remaining members**
42  **shall take such actions as may be necessary to satisfy this requirement.**
43  **For the purposes of this section, an independent member is one who:**
44    **(a) is not, and in the past two years has not been,  employed  by  the**
45  **public authority or an affiliate in an executive capacity;**
46    **(b) is  not,  and  in the past two years has not been, employed by an**
47  **entity that received remuneration valued at more than  fifteen  thousand**
48  **dollars  for  goods  and  services  provided  to the public authority or**
49  **received any other form of financial  assistance  valued  at  more  than**
50  **fifteen thousand dollars from the public authority;**
51    **(c) is not a relative of an executive officer or employee in an execu-**
52  **tive position of the public authority or an affiliate; and**
53    **(d) is not, and in the past two years has not been, a lobbyist regis-**
54  **tered under a state or local law and paid by a client to  influence  the**
55  **management  decisions, contract awards, rate determinations or any other**
56  **similar actions of the public authority or an affiliate.**

1   **3. Notwithstanding any other provision of any general, special or**
2 **local law, municipal charter or ordinance to the contrary, board**
3 **members, officers, and employees of a state authority shall file annual**
4 **financial disclosure statements as required by section seventy-three-a**
5 **of the public officers law. Board members, officers, and employees of a**
6 **local public authority shall file annual financial disclosure statements**
7 **with the county board of ethics for the county in which the local public**
8 **authority has its primary office pursuant to article eighteen of the**
9 **general municipal law.**
10   § 20. Article 9 of the public authorities law is amended by adding a
11 new title 5-A to read as follows:

12                **TITLE 5-A**
13      **DISPOSITION OF PROPERTY BY PUBLIC AUTHORITIES**
14 **Section 2895. Definitions.**
15      **2896. Duties of public authorities with respect to the disposal**
16           **of property.**
17      **2897. Disposal of public authority property.**
18   **§ 2895. Definitions. For the purposes of this title, unless a differ-**
19 **ent meaning is required by the context:**
20   **1. "Contracting officer" shall mean the officer or employee of a**
21 **public authority who shall be appointed by resolution of the board of**
22 **the public authority to be responsible for the disposition of property.**
23   **2. "Dispose" or "disposal" shall mean transfer of title or any other**
24 **beneficial interest in personal or real property in accordance with**
25 **section twenty-eight hundred ninety-seven of this title.**
26   **3. "Property" shall mean personal property in excess of five thousand**
27 **dollars in value, real property, and any inchoate or other interest in**
28 **such property, to the extent that such interest may be conveyed to**
29 **another person for any purpose, excluding an interest securing a loan or**
30 **other financial obligation of another party.**
31   **§ 2896. Duties of public authorities with respect to the disposal of**
32 **property. 1. Every authority, as defined in section two of this chapter,**
33 **shall adopt by resolution comprehensive guidelines which shall (a)**
34 **detail the public authority's operative policy and instructions regard-**
35 **ing the use, awarding, monitoring and reporting of contracts for the**
36 **disposal of property, and (b) designate a contracting officer who shall**
37 **be responsible for the public authority's compliance with, and enforce-**
38 **ment of, such guidelines. Such guidelines shall be consistent with, and**
39 **shall require the public authority's contracting activities to comply**
40 **with this section, the authorities enabling legislation and any other**
41 **applicable law for the disposal of property, except that such guidelines**
42 **may be stricter than the provisions of this section, the authorities**
43 **enabling legislation and any other applicable law for the disposal of**
44 **property if the public authority determines that additional safeguards**
45 **are necessary to assure the integrity of its disposition activities.**
46 **Guidelines approved by the public authority shall be annually reviewed**
47 **and approved by the governing body of the public authority. On or**
48 **before the thirty-first day of March in each year, the public authority**
49 **shall file with the comptroller a copy of the guidelines most recently**
50 **reviewed and approved by the public authority, including the name of the**
51 **public authority's designated contracting officer. At the time of**
52 **filing such guidelines with the comptroller, every public authority**
53 **shall also post such guidelines on the public authority's internet**
54 **website. Guidelines posted on the public authority's internet website**
S. 5927       14

1 **shall be maintained on such website at least until the procurement**

2  **guidelines for the following year are posted on such website.**
3  **2. Each public authority shall:**
4  **a. maintain adequate inventory controls and accountability systems for**
5  **all property under its control;**
6  **b. periodically inventory such property to determine which property**
7  **shall be disposed of;**
8  **c. produce a written report of such property in accordance with subdi-**
9  **vision three of this section;**
10  **d. transfer or dispose of such property as promptly as possible in**
11  **accordance with section twenty-eight hundred ninety-seven of this title.**
12  **3. a. Each public authority shall publish, not less frequently than**
13  **annually, a report listing all real property of the public authority.**
14  **Such report shall consist of a list and full description of all real and**
15  **personal property disposed of during such period. The report shall**
16  **contain the price received by the public authority and the name of the**
17  **purchaser for all such property sold by the public authority during such**
18  **period.**
19  **b. The public authority shall deliver copies of such report to the**
20  **comptroller, the director of the budget, the commissioner of general**
21  **services, and the legislature.**
22  **§ 2897. Disposal of public authority property. 1. Supervision and**
23  **direction. Except as otherwise provided in this section, the contracting**
24  **officer designated by each public authority shall have supervision and**
25  **direction over the disposition of property of such public authority.**
26  **2. Custody and control. The custody and control of the property of a**
27  **public authority, pending its disposition, and the disposal of such**
28  **property, shall be performed by the public authority in possession ther-**
29  **eof or by the commissioner of general services when so authorized under**
30  **this section.**
31  **3. Method of disposition. Subject to section twenty-eight hundred**
32  **ninety-six of this title, any public authority may dispose of property**
33  **for not less than the fair market value of such property by sale,**
34  **exchange, or transfer, for cash, credit, or other property, with or**
35  **without warranty, and upon such other terms and conditions as the**
36  **contracting officer deems proper, and it may execute such documents for**
37  **the transfer of title or other interest in property and take such other**
38  **action as it deems necessary or proper to dispose of such property under**
39  **the provisions of this section. Provided, however, that no disposition**
40  **of real property, any interest in real property, or any other property**
41  **which because of its unique nature is not subject to fair market pricing**
42  **shall be made unless an appraisal of the value of such property has been**
43  **made by an independent appraiser and included in the record of the tran-**
44  **saction.**
45  **4. Sales by the commissioner of general services. When it shall be**
46  **deemed advantageous to the state, any public authority may enter into an**
47  **agreement with the commissioner of general services where under such**
48  **commissioner may dispose of property of such public authority under**
49  **terms and conditions agreed to by the public authority and the commis-**
50  **sioner of general services. In disposing of any such property of a**
51  **public authority, the commissioner of general services shall be bound by**
52  **the terms of this title and references to the contracting officer shall**
53  **be deemed to refer to such commissioner.**
54  **5. Validity of deed, bill of sale, lease, or other instrument. A deed,**
55  **bill of sale, lease, or other instrument executed by or on behalf of any**
56  **public authority, purporting to transfer title or any other interest in**

S. 5927                    15

1  **property of a public authority under this title shall be conclusive**

2  evidence of compliance with the provisions of this title insofar as
3  concerns title or other interest of any bona fide grantee or transferee
4  who has given valuable consideration for such title or other interest
5  and has not received actual or constructive notice of lack of such
6  compliance prior to the closing.
7  6. Bids for disposal; advertising; procedure; disposal by negotiation;
8  explanatory statement. a. All disposals or contracts for disposal of
9  property of a public authority made or authorized by the contracting
10  officer shall be made after publicly advertising for bids except as
11  provided in paragraph c of this subdivision.
12  b. Whenever public advertising for bids is required under paragraph a
13  of this subdivision:
14  (i) the advertisement for bids shall be made at such time prior to the
15  disposal or contract, through such methods, and on such terms and condi-
16  tions as shall permit full and free competition consistent with the
17  value and nature of the property;
18  (ii) all bids shall be publicly disclosed at the time and place stated
19  in the advertisement; and
20  (iii) the award shall be made with reasonable promptness by notice to
21  the responsible bidder whose bid, conforming to the invitation for bids,
22  will be most advantageous to the state, price and other factors consid-
23  ered; provided, that all bids may be rejected when it is in the public
24  interest to do so.
25  c. Disposals and contracts for disposal of property may be negotiated
26  or made by public auction without regard to paragraphs a and b of this
27  subdivision but subject to obtaining such competition as is feasible
28  under the circumstances, if:
29  (i) the personal property involved is of a nature and quantity which,
30  if disposed of under paragraphs a and b of this subdivision, would
31  adversely affect the state or local market for such property, and the
32  estimated fair market value of such property and other satisfactory
33  terms of disposal can be obtained by negotiation;
34  (ii) the fair market value of the property does not exceed fifteen
35  thousand dollars;
36  (iii) bid prices after advertising therefor are not reasonable, either
37  as to all or some part of the property, or have not been independently
38  arrived at in open competition;
39  (iv) the disposal will be to the state or any political subdivision,
40  and the estimated fair market value of the property and other satisfac-
41  tory terms of disposal are obtained by negotiation;
42  (v) the disposal is for an amount less than the estimated fair market
43  value of the property, the terms of such disposal are obtained by public
44  auction or negotiation, the disposal of the property is intended to
45  further the public health, safety or welfare or an economic development
46  interest of the state or a political subdivision (to include but not
47  limited to, the prevention or remediation of a substantial threat to
48  public health or safety, the creation or retention of a substantial
49  number of job opportunities, or the creation or retention of a substan-
50  tial source of revenues, or where the authority's enabling legislation
51  permits), the purpose and the terms of such disposal are documented in
52  writing and approved by resolution of the board of the public authority;
53  or
54  (vi) such action is otherwise authorized by law.
55  d. (i) An explanatory statement shall be prepared of the circumstances
56  of each disposal by negotiation of:

S. 5927                    16

1  (A) any personal property which has an estimated fair market value in

2 **excess of fifteen thousand dollars;**
3 **(B) any real property that has an estimated fair market value in**
4 **excess of one hundred thousand dollars, except that any real property**
5 **disposed of by lease or exchange shall only be subject to clauses (C)**
6 **through (E) of this subparagraph;**
7 **(C) any real property disposed of by lease for a term of five years or**
8 **less, if the estimated fair annual rent is in excess of one hundred**
9 **thousand dollars for any of such years;**
10 **(D) any real property disposed of by lease for a term of more than**
11 **five years, if the total estimated rent over the term of the lease is in**
12 **excess of one hundred thousand dollars; or**
13 **(E) any real property or real and related personal property disposed**
14 **of by exchange, regardless of value, or any property any part of the**
15 **consideration for which is real property.**
16 **(ii) Each such statement shall be transmitted to the persons entitled**
17 **to receive copies of the report required under section twenty-eight**
18 **hundred ninety-six of this title not less than ninety days in advance of**
19 **such disposal, and a copy thereof shall be preserved in the files of the**
20 **public authority making such disposal.**
21   § 21. Subdivision 1 of section 2925 of the public authorities law, as
22 amended by chapter 356 of the laws of 1993, is amended to read as
23 follows:
24   1. Every public authority and every public benefit corporation [**other**
25 **than an industrial development agency or an industrial development**
26 **authority,**] whether or not such corporation is otherwise governed by
27 this chapter, (such entities to be hereinafter in this title referred to
28 as "corporation") shall by resolution adopt comprehensive investment
29 guidelines which detail the corporation's operative policy and
30 instructions to officers and staff regarding the investing, monitoring
31 and reporting of funds of the corporation. The investment guidelines
32 approved by the corporation shall be annually reviewed and approved by
33 the corporation.
34   § 22. Section 3054 of the public authorities law, as added by chapter
35 187 of the laws of 1995, is amended to read as follows:
36   § 3054. Administration of the corporation. The corporation shall be
37 administered by a board of directors, consisting of [**five**] **seven** direc-
38 tors, none of whom shall be officers or employees of the federal govern-
39 ment or of the state or political subdivisions thereof. [**Three**] **Five** of
40 the directors shall be appointed by the governor. One of the directors
41 shall be appointed by the majority leader of the senate and one of the
42 directors shall be appointed by the speaker of the assembly. Each of the
43 members of the board of directors shall serve at the pleasure of the
44 appointed official. Directors of the corporation may also be members of
45 the supervisory board created for the city of Troy pursuant to section
46 ten of chapter seven hundred twenty-one of the laws of nineteen hundred
47 ninety-four, as amended from time to time. The corporation shall have
48 the power to make and execute contracts to pay the expenses of operation
49 of the supervisory board for the city of Troy, within the appropriation
50 available therefor.
51   § 23. Paragraph (a) of subdivision 1 of section 3234 of the public
52 authorities law, as amended by chapter 2 of the laws of 1991, is amended
53 to read as follows:
54   (a) The corporation shall be administered by [**three**] **seven** directors,
55 one of whom shall be the comptroller, one of whom shall be the director
56 of the budget and [**one**] **five** of whom shall be appointed by the governor.

S. 5927                    17

1 A director who is not a state official shall serve for a term expiring

2 at the end of the term actually served by the officer making the
3 appointment and may be removed for cause by such officer after hearing
4 on ten days notice.
5   § 24. Subdivision 3 of section 15-2137 of the environmental conserva-
6 tion law is amended to read as follows:
7   3. Notwithstanding any provision of titles 21, 23 and 25 of this arti-
8 cle, a board of the Hudson River-Black River Regulating District is
9 hereby created to consist of [**five**] **seven** members to be appointed by the
10 [**Governor**] **governor** not less than [**two**] **three** of whom shall be [**resident**
11 **freeholders**] **residents** of the territory comprising the Black River area
12 and not less than [**two**] **three** of whom shall be [**resident freeholders**]
13 **residents** of the territory comprising the Hudson River area. The [**Gover-**
14 **nor**] **governor** shall appoint one member for a term ending September 1,
15 1960, one for a term ending September 1, 1961, one for a term ending
16 September 1, 1962, one for a term ending September 1, 1963, and one for
17 a term ending September 1, 1964, and thereafter, on the expiration of
18 their respective terms of office, appointments shall be made for terms
19 of five years. **The governor shall appoint two additional board members,**
20 **each of whom shall serve for a term of five years from the effective**
21 **date of his or her appointment; provided, however, that the board**
22 **members first appointed on or after the effective date of the chapter of**
23 **the laws of two thousand five which amended this subdivision shall serve**
24 **an initial term of two years from the effective date of such appoint-**
25 **ment.** The [**Governor**] **governor** shall fill any vacancy on such board with-
26 in thirty days after it occurs for the remainder of the term of office.
27   § 25. Section 30 of the legislative law, as amended by chapter 131 of
28 the laws of 1927, is amended to read as follows:
29   § 30. Duties of finance and ways and means committees and secretaries.
30 The committees and their secretaries shall have access at all reasonable
31 times to offices of state departments, commissions, boards, bureaus and
32 offices, to institutions and to all **state authorities and** public works
33 of the state and they may, for the purpose of obtaining information as
34 to the method of operation, general condition, management and needs
35 thereof, examine the books, papers and public records therein. Notwith-
36 standing any other provision of law such state departments, commissions,
37 boards, bureaus, offices**, state authorities** and institutions shall
38 through their proper officers or deputies furnish to such committees
39 such data, information or statements as may be necessary for the proper
40 exercise of their powers and duties and for the purpose of carrying into
41 effect the provisions of this article. The finance and ways and means
42 committee in exercising the powers and performing the duties prescribed
43 by this article may act jointly, or separately, as they deem advisable.
44   § 26. Subdivision 2 of section 3 of chapter 899 of the laws of 1984,
45 relating to creating a public benefit corporation to plan, develop,
46 operate and maintain and manage Roosevelt Island, as amended by chapter
47 493 of the laws of 2002, is amended to read as follows:
48   2. The board of directors of the corporation shall be composed of nine
49 members. One member shall be the commissioner, who shall serve as the
50 [**chairman and chief executive officer of the corporation**] **chair**; one
51 member shall be the director of the budget; and seven public members
52 shall be appointed by the governor with the advice and consent of the
53 senate. Of the seven public members, two members, one of whom shall be a
54 resident of Roosevelt Island, shall be appointed upon the recommendation
55 of the mayor of the city; and four additional members shall be residents
56 of Roosevelt Island. Each member shall serve for a term of four years

S. 5927              18

1 and until his **or her** successor shall have been appointed and shall have

2  qualified, except that (a) two of the initial public members appointed
3  by the governor, one of whom is a resident of Roosevelt Island, and the
4  Roosevelt Island resident member appointed upon the recommendation of
5  the mayor of the city shall serve for terms of two years each, and (b)
6  the commissioner and the director of the budget shall serve so long as
7  they continue to hold their respective offices. Any action taken by the
8  directors of the corporation shall be taken by majority vote of the
9  directors then in office. The elected public officials who represent
10  Roosevelt Island shall be representatives to the board of directors of
11  the corporation entitled to receive notice of and attend all meetings of
12  such board but shall not be entitled to vote. Failure to give such
13  notice shall not effect the validity of any action taken at a meeting of
14  such board.
15  § 27. 1. There shall be established an organization to be known as the
16  "Authority Budget Office" to provide the governor and the legislature
17  with conclusions and opinions concerning the performance of public
18  authorities and to study, review and report on the operations, practices
19  and finances of public authorities as defined by section 2 of the public
20  authorities law.
21  2. Powers and duties. The organization established by the governor
22  shall (a) conduct reviews and analysis of the operations, practices and
23  reports of public authorities to assess compliance with the provisions
24  of this act and other applicable provisions of law, (b) maintain a
25  comprehensive inventory of public authorities and subsidiaries and the
26  annual reports of such public authorities as defined in section 2800 of
27  the public authorities law, (c) assist public authorities improve
28  management practices and the procedures by which the activities and
29  financial practices of public authorities are disclosed to the public,
30  (d) make recommendations to the governor and the legislature concerning
31  opportunities to improve the performance, reporting, reformation, struc-
32  ture and oversight of public authorities, (e) provide such additional
33  information and analysis as may be reasonably requested by the legisla-
34  ture and state comptroller, and (f) on July 1, 2007 and annually there-
35  after issue reports on its findings and analysis to the governor, the
36  chairman and ranking minority member of the senate finance committee,
37  the chairman and ranking minority member of the assembly ways and means
38  committee, the chairman and ranking minority member of the senate stand-
39  ing committee on corporations, authorities and commissions, the chairman
40  and ranking minority member of the assembly standing committee on corpo-
41  rations, authorities and commissions, the state comptroller and the
42  attorney general.
43  3. Other powers and duties. The organization established pursuant to
44  this section shall have the authority to request and receive from any
45  public authority, agency, department or division of the state or poli-
46  tical subdivision such assistance, personnel, information, books,
47  records, other documentation and cooperation as may be necessary to
48  perform its duties.
49  4. The reports received by and prepared by the organization shall be
50  made available to the public, to the extent practicable, through the
51  internet.
52  § 28. The executive law is amended by adding a new article 4-A to read
53  as follows:

54                    **ARTICLE 4-A**
55         **OFFICE OF THE STATE INSPECTOR GENERAL**
     S. 5927                    19

1  **Section 51. Jurisdiction.**

2    **52. Establishment and organization.**
3    **53. Functions and duties.**
4    **54. Powers.**
5    **55. Responsibilities of covered agencies, state officers and**
6    **employees.**

7    **§ 51. Jurisdiction. This article shall, subject to the limitations**
8    **contained herein, confer upon the office of the state inspector general,**
9    **jurisdiction over all covered agencies. For the purposes of this article**
10   **"covered agency" shall include all executive branch agencies, depart-**
11   **ments, divisions, officers, boards and commissions, public authorities**
12   **(other than multi-state or multi-national authorities), and public bene-**
13   **fit corporations, the heads of which are appointed by the governor and**
14   **which do not have their own inspector general by statute. Wherever a**
15   **covered agency is a board, commission, a public authority or public**
16   **benefit corporation, the head of the agency is the chairperson thereof.**
17   **§ 52. Establishment and organization. 1. There is hereby established**
18   **the office of the state inspector general in the executive department.**
19   **The head of the office shall be the state inspector general who shall be**
20   **appointed by the governor.**
21   **2. The state inspector general shall hold office until the end of the**
22   **term of the governor by whom he or she was appointed and until his or**
23   **her successor is appointed and has qualified.**
24   **3. The state inspector general shall report to the secretary to the**
25   **governor.**
26   **4. The state inspector general may appoint one or more deputy inspec-**
27   **tors general to serve at his or her pleasure, who shall be responsible**
28   **for conducting investigations in the agencies to which they are desig-**
29   **nated and in which they are deemed employed.**
30   **5. The salary of the inspector general shall be established by the**
31   **governor within the limit of funds available therefore; provided, howev-**
32   **er, such salary shall be no less than the salaries of certain state**
33   **officers holding the positions indicated in paragraph (a) of subdivision**
34   **one of section one hundred sixty-nine of the executive law.**
35   **§ 53. Functions and duties. The state inspector general shall have the**
36   **following duties and responsibilities:**
37   **1. receive and investigate complaints from any source, or upon his or**
38   **her own initiative, concerning allegations of corruption, fraud, crimi-**
39   **nal activity, conflicts of interest or abuse in any covered agency;**
40   **2. inform the heads of covered agencies of such allegations and the**
41   **progress of investigations related thereto, unless special circumstances**
42   **require confidentiality;**
43   **3. determine with respect to such allegations whether disciplinary**
44   **action, civil or criminal prosecution, or further investigation by an**
45   **appropriate federal, state or local agency is warranted, and to assist**
46   **in such investigations;**
47   **4. prepare and release to the public written reports of such investi-**
48   **gations, as appropriate and to the extent permitted by law, subject to**
49   **redaction to protect the confidentiality of witnesses. The release of**
50   **all or portions of such reports may be deferred to protect the confiden-**
51   **tiality of ongoing investigations;**
52   **5. review and examine periodically the policies and procedures of**
53   **covered agencies with regard to the prevention and detection of**
54   **corruption, fraud, criminal activity, conflicts of interest or abuse;**

S. 5927                 20

1    **6. recommend remedial action to prevent or eliminate corruption,**
2    **fraud, criminal activity, conflicts of interest or abuse in covered**
3    **agencies;**

4  **7. establish programs for training state officers and employees**
5  **regarding the prevention and elimination of corruption, fraud, criminal**
6  **activity, conflicts of interest or abuse in covered agencies.**
7  **§ 54. Powers. The state inspector general shall have the power to:**
8  **1. subpoena and enforce the attendance of witnesses;**
9  **2. administer oaths or affirmations and examine witnesses under oath;**
10  **3. require the production of any books and papers deemed relevant or**
11  **material to any investigation, examination or review;**
12  **4. notwithstanding any law to the contrary, examine and copy or remove**
13  **documents or records of any kind prepared, maintained or held by any**
14  **covered agency;**
15  **5. require any officer or employee in a covered agency to answer ques-**
16  **tions concerning any matter related to the performance of his or her**
17  **official duties. No statement or other evidence derived therefrom may be**
18  **used against such officer or employee in any subsequent criminal prose-**
19  **cution other than for perjury or contempt arising from such testimony.**
20  **The refusal of any officer or employee to answer questions shall be**
21  **cause for removal from office or employment or other appropriate penal-**
22  **ty;**
23  **6. monitor the implementation by covered agencies of any recommenda-**
24  **tions made by state inspector general;**
25  **7. perform any other functions that are necessary or appropriate to**
26  **fulfill the duties and responsibilities of office.**
27  **§ 55. Responsibilities of covered agencies, state officers and employ-**
28  **ees. 1. Every state officer or employee in a covered agency shall report**
29  **promptly to the state inspector general any information concerning**
30  **corruption, fraud, criminal activity, conflicts of interest or abuse by**
31  **another state officer or employee relating to his or her office or**
32  **employment, or by a person having business dealings with a covered agen-**
33  **cy relating to those dealings. The knowing failure of any officer or**
34  **employee to so report shall be cause for removal from office or employ-**
35  **ment or other appropriate penalty. Any officer or employee who acts**
36  **pursuant to this subdivision by reporting to the state inspector general**
37  **improper governmental action as defined in section seventy-five-b of the**
38  **civil service law shall not be subject to dismissal, discipline or other**
39  **adverse personnel action.**
40  **2. The head of any covered agency shall advise the governor within**
41  **ninety days of the issuance of a report by the state inspector general**
42  **as to the remedial action that the agency has taken in response to any**
43  **recommendation for such action contained in such report.**
44  § 29. Subdivision 3 of section 63 of the executive law, as amended by
45  chapter 814 of the laws of 1969, is amended to read as follows:
46  3. Upon request of the governor, comptroller, secretary of state,
47  commissioner of transportation, superintendent of insurance, superinten-
48  dent of banks, commissioner of taxation and finance [**or**]**,** commissioner
49  of motor vehicles, **or the state inspector general,** or the head of any
50  other department, authority, division or agency of the state, investi-
51  gate the alleged commission of any indictable offense or offenses in
52  violation of the law which the officer making the request is especially
53  required to execute or in relation to any matters connected with such
54  department, and to prosecute the person or persons believed to have
55  committed the same and any crime or offense arising out of such investi-
   S. 5927         21

1  gation or prosecution or both, including but not limited to appearing
2  before and presenting all such matters to a grand jury.
3  § 30. Severability clause. If any clause, sentence, paragraph, subdi-
4  vision, section or part of this act shall be adjudged by any court of

5  competent  jurisdiction  to  be invalid, such judgment shall not affect,
6  impair, or invalidate the remainder thereof, but shall  be  confined  in
7  its  operation  to the clause, sentence, paragraph, subdivision, section
8  or part thereof directly involved in the controversy in which such judg-
9  ment shall have been rendered. It is hereby declared to be the intent of
10  the legislature that this act would  have  been  enacted  even  if  such
11  invalid provisions had not been included herein.
12    § 31.  This  act shall take effect immediately and shall apply to the
13  public authority fiscal year beginning on  or  after January  1,  2006,
14  provided however that section twenty-seven of this act shall take effect
15  April 1, 2006.

**United States General Accounting Office**

# GAO

Testimony

Before the Subcommittee on Clean Air, Climate Change, and Nuclear Safety, Committee on Environment and Public Works, U.S. Senate

For Release on Delivery
Expected at 9:00 a.m. EST
Wednesday, September 24, 2003

# DISASTER ASSISTANCE

# Federal Aid to the New York City Area Following the Attacks of September 11th and Challenges Confronting FEMA

Statement of JayEtta Z. Hecker, Director Physical Infrastructure Issues



**G A O**

Accountability * Integrity * Reliability

Mr. Chairman and Members of the Subcommittee:

I appreciate the opportunity to be here to discuss issues related to the federal government's response to recovery efforts regarding the September 11, 2001, terrorist attacks, particularly the role of the Federal Emergency Management Agency (FEMA), as well as management challenges facing FEMA as the agency adjusts to its transfer to the Department of Homeland Security (DHS). The terrorist attacks resulted in one of the largest catastrophes this country has ever experienced. The federal government has been a key participant in the efforts to provide aid after the attacks, and it has been providing the New York City area with funds and other forms of assistance. The magnitude of the disaster in New York and the size and scope of the federal government's response in aiding the city has generated significant interest in the nature and progress of this federal assistance.

In my testimony today, I will focus on (1) how much and what types of assistance the federal government provided to the New York City area following the September 11 terrorist attacks, (2) how the federal government's response to this disaster differed from previous disaster response efforts, and (3) the ongoing challenges FEMA faces as it, and its mission, are subsumed into the Department of Homeland Security. My comments will be based on the following GAO work on FEMA issues, including our January 2003 Performance and Accountability Reports that highlighted both FEMA and DHS management challenges and program risks[1] and our August 2003 report on FEMA public assistance we issued to the Full Senate Committee on Environment and Public Works, as well as ongoing work we are conducting for the Committee on the overall federal assistance to the New York City area in the wake of September 11. (See appendix 1 for further discussion of the objectives, scope, and methodology.)

The President pledged, and the Congress authorized an estimated $20 billion in assistance to the New York City area following the terrorist attacks.[2] Many agencies of the federal government were involved in

---

[1]U.S. General Accounting Office, *Major Management Challenges and Program Risks: Department of Homeland Security*, GAO-03-102 (Washington, D.C.: January 2003) and *Major Management Challenges and Program Risks: Federal Emergency Management Agency*, GAO-03-113 (Washington, D.C.: January 2003).

[2]The $20 billion in federal assistance does not include the Victim's Compensation Fund or income tax deferrals.

administering this funding, but most of the federal aid—96 percent—has been provided through four sources: FEMA, the Department of Housing and Urban Development (HUD), the Department of Transportation (DOT), and the Liberty Zone tax benefits[3]. The assistance provided through these sources targeted different aspects of the response and recovery efforts, and in our work for the Committee, we have found that it is useful to discuss the federal aid to the New York City area in terms of four broad types of assistance instead of by each federal source of assistance. Consequently, I will discuss the aid in the following four broad categories:

- Initial response efforts, which include activities to save lives, recover victims, remove debris, and restore basic functionality to city services;

- Compensation for disaster-related costs and losses, which includes compensation for losses incurred by individuals, businesses, and governments;

- Infrastructure restoration, which includes efforts to restore and enhance infrastructure that was severely destroyed by the collapse of the World Trade Center towers and the subsequent response efforts; and

- Economic revitalization, which includes activities to help improve the lower Manhattan economy that was harmed by the disaster.

In summary,

---

[3]The Liberty Zone tax benefits are benefits primarily targeted to the area of New York City damaged on September 11, designated as the New York Liberty Zone

• As of June 30, 2003, an estimated $20 billion of federal assistance has been committed to the New York City area, primarily through FEMA, DOT, HUD, and the Liberty Zone tax benefits. Figure 1 shows the amount of assistance in each of the four broad categories.

**Figure 1: Primary Purpose and Amount of Disaster Assistance Committed By FEMA, HUD, DOT, and Liberty Zone Tax Benefits**






Initial response

$2.55 Billion

Compensation for losses

$4.81 Billion

Infrastructure restoration

$5.57[a] Billion

Economic revitalization

$5.54[a] Billion

Total funds committed to specific projects.

Source: GAO.

[a]HUD's plans for $1.16 billion have not been finalized. These funds are not included in the purposes listed above and according to HUD will mostly likely be directed to either infrastructure restoration or economic revitalization.

The $2.55 billion for initial response efforts included numerous assistance programs, such as search and rescue operations, debris removal operations, emergency transportation measures, and emergency utility service repair. FEMA provided the bulk of the federal funds for initial response efforts—$2.20 billion—but DOT and HUD also provided funds. Compensation for disaster-related costs and losses totaled about $4.81 billion. This funding, provided by FEMA and HUD, compensated state and local organizations, individuals, and businesses for disaster-related costs, such as mortgage and rental assistance to individuals and grants to businesses to cover economic losses. The amount committed for infrastructure restoration and improvement efforts is $5.57 billion. The majority of this funding is a combination of FEMA and DOT funds to rebuild and enhance the lower Manhattan transportation system, including the construction or repair of roads, subways, ferries, and railroads. HUD is funding efforts to improve utility infrastructure. Efforts to revitalize the economy in lower Manhattan include the Liberty Zone tax benefit plan—

an estimated benefit of $5.03 billion[4]—and $515 million in HUD funding for business attraction and retention programs. Once the city, state, and HUD finalize plans for the remaining $1.16 billion, these funds will most likely be directed to infrastructure restoration and improvements and/or economic revitalization.

- The $20 billion to assist the New York City area differed from previous disaster response efforts in that it was the first time in which the amount of federal disaster assistance to be provided was set early in the response and recovery efforts, which resulted in two major changes to the federal approach. First, the specified level of funding for the entire federal response to this disaster changed the traditional approach to administering FEMA funds. In an effort to ensure that all FEMA funds were expended for this disaster, FEMA broadly interpreted its provisions within the Stafford Act, and the Congress authorized FEMA to compensate the city and state for costs such as increased security that it could not otherwise have funded within provisions of the Stafford Act. Secondly, this specific level of funding for the disaster prompted Congressional appropriations that authorized numerous forms of non-traditional assistance by agencies other than FEMA, such as the Liberty Zone tax benefit plan and improvements to the transportation infrastructure that exceeded normal replacement cost.

- Simultaneous to FEMA's efforts to assist the New York City area's recovery from September 11, FEMA faced the challenge of being transferred into the newly formed DHS. As we previously reported in our 2003 Performance and Accountability Series, FEMA faces ongoing management challenges resulting from its transfer into DHS, and DHS itself faces the daunting challenge of combining FEMA and 21 other agencies with various missions into an effective and collaborative agency. Recognizing the magnitude of the overall challenge in establishing DHS, GAO has designated the implementation and transformation of the department as high-risk. Several of the specific challenges that FEMA faces include the need to (1) ensure effective coordination of preparedness and response efforts, (2) enhance provision and management of disaster assistance for efficient and effective response, and (3) reduce the impact of natural hazards by improving the efficiency of mitigation and flood programs. We have ongoing work that is focusing

---

[4]The Liberty Zone tax benefits are benefits targeted primarily to the area of lower Manhattan damaged on September 11, designated as the New York Liberty Zone. The amount of the tax benefit is an estimate prepared by the Joint Committee on Taxation.

GAO-03-1174T

on FEMA's challenges in each of these areas and will be reporting on these efforts in the near future.

# Background

After a disaster, the federal government, in accordance with provisions of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the Stafford Act)[5],assists state and local governments with costs associated with response and recovery efforts that exceed a state or locale's capabilities. FEMA is the agency responsible for coordinating federal disaster response efforts under the Federal Response Plan, an agreement among 27 agencies and the Red Cross to deliver federal disaster assistance. FEMA was established in 1978 to consolidate and coordinate emergency management functions in one agency. In November 2002, the Congress enacted legislation establishing DHS in an effort to consolidate numerous homeland security functions in a single entity, which involved subsuming 22 agencies, including FEMA. FEMA's primary functions have remained intact and have been placed primarily in DHS' Emergency Preparedness and Response Directorate.

FEMA not only coordinates the federal disaster response, it also provides significant assistance through a variety of programs funded through its Disaster Relief Fund. This assistance is provided when disaster costs exceed state and local government capabilities to respond and insurance damage proceeds. These programs include FEMA's individual assistance program that provides aid to victims affected by a disaster and its hazard mitigation program that provides funds to state and local governments to reduce the risk of damage from future disasters. However, FEMA's public assistance program is typically the largest source of disaster relief. It is designed to provide grants to eligible state and local governments and specific types of private non-profit organizations that provide services of a governmental nature, such as utilities, fire departments, emergency and medical facilities, and educational institutions, to help cover the costs of emergency response efforts and work associated with recovering from the disaster.

Many other agencies play active roles in federal disaster relief. For example, the Federal Highway Administration (FHWA), an agency of DOT, has existing authority to assist in disaster relief. FHWA can provide up to $100 million in emergency relief funding for each natural disaster or

---

[5]Pub. L. No. 93-288, 88 Stat. 143 (1974), as amended.

catastrophic failure event that is found eligible within the provisions of the Emergency Relief Program. Other agencies within DOT, such as the Federal Transit Administration (FTA) and the Federal Railroad Administration, also have had roles in previous disaster relief efforts. HUD, which has had authority to assist in disaster relief efforts at different times in the last few decades, once again became actively involved in providing disaster recovery assistance following Hurricane Andrew in 1992. Since that disaster occurred, the Congress has made available more than $5.7 billion in 15 supplemental appropriations to HUD for disaster assistance.[6] Typically, HUD awards funds to the affected state or local government, and then the funds are administered at the state or local level.

The President's declaration of September 11 as a federal disaster activated 27 agencies, including the American Red Cross in response and recovery efforts. On September 12, 2001, President Bush pledged to commit at least $20 billion to help the New York City area recover. The President sent a letter to the Speaker of the House requesting that the Congress pass emergency appropriations to provide immediate resources. Over the next 11 months, the Congress enacted three emergency supplemental appropriation acts that provided more than $15 billion in direct federal assistance as well as an estimated $5 billion economic stimulus package for the New York City area.

## Federal Disaster Assistance to the New York City Area

The greatest role in providing federal assistance fell to FEMA, HUD, and DOT. The funds appropriated to these agencies, along with the Liberty Zone tax benefits, constitute over 96 percent of all federal assistance designated to the New York City area. FEMA, the largest single provider of assistance, was appropriated $8.80 billion for debris removal, rescue efforts, and other assistance. Congress appropriated HUD $3.48 billion to provide the New York City area assistance to aid businesses and individuals and spur economic revitalization. DOT received $2.37 billion to assist in the restoration and enhancement of the transit system in the New York City area. The Liberty Zone tax benefits is estimated by the Joint Committee on Taxation to reduce federal tax revenue—and in turn increase the funds retained by taxpayers—by $5.03 billion. An additional $0.82 billion in assistance to the New York City area has been appropriated to 15 other agencies to conduct numerous activities, such as environmental studies and federal building restoration. Figure 2 shows the

---

[6]All dollars are in nominal terms.

amount of federal assistance, in both amount and percentage, committed to the New York City area by the federal government.

**Figure 2: Federal Assistance to the New York City Area by the Federal Government**



Other agencies
$0.82 billion

DOT
$2.37 billion

HUD
$3.48 billion

Liberty Zone
$5.03 billion

FEMA
$8.80 billion

4%
11.5%
42.9%
17%
24.5%

Source: Congressional Budget Office and GAO.

Note: Numbers do not total 100 percent due to rounding.

As the large majority of federal assistance to the New York City area is primarily through FEMA, DOT, HUD, and the Liberty Zone tax benefits, I would now like to discuss the assistance these sources did, or will, provide in the four board categories I discussed earlier: (1) initial response efforts, (2) compensation for disaster-related costs and losses, (3) infrastructure restoration, and (4) economic revitalization.

## Initial Response Activities Totaled $2.55 Billion

Initial response assistance in New York City began immediately after the hijacked aircraft collided with the World Trade Center towers and totaled $2.55 billion. This assistance was predominately funded by FEMA. Figure 3 shows the amount each agency funded in this category of assistance.

**Figure 3: Amount of Assistance Committed to Initial Response Activities, by Agency**

Total funds committed to specific projects.



| Initial response | Compensation for losses | Infrastructure restoration | Economic revitalization |
|---|---|---|---|
| $2.55 Billion | $4.81 Billion | $5.57[a] Billion | $5.54[a] Billion |



**FEMA** - $2.20 Billion

**DOT** - $0.10 Billion

**HUD** - $0.25 Billion

Source: GAO.

[a]HUD's plans for $1.16 billion have not been finalized. These funds are not included in the purposes listed above, and according to HUD, will most likely be directed to either infrastructure restoration or economic revitalization.

Initial response activities included urban search and rescue; debris removal operations; emergency transportation measures; other initial response assistance by FEMA, such as cleaning buildings; and emergency and temporary utility service.

**Urban Search and Rescue Operations**

The terrorist attacks of September 11 prompted the largest search and rescue operation in U.S. history, a $22 million effort. FEMA oversees 28 national Urban Search and Rescue Task Forces across the country and 20 were activated to respond to the attacks in New York. The teams operate under FEMA authority and were deployed as part of the National Urban Search and Rescue Response System. Almost 1,300 members of the Urban

Search and Rescue teams and 80 dogs worked at the World Trade Center site.

**Debris Removal Operations, Including Liability Insurance Coverage**

Immediately after the World Trade Center towers collapsed, the debris removal operation began in order to help workers look for survivors. The effort eventually transformed to a victim and evidence recovery operation as well as a clean-up site. Debris removal operations totaled $1.70 billion, although over one-half of those funds—$1 billion dollars—is to be used to establish an insurance company with the intended purpose of covering the City and its contractors for potential claims resulting from debris removal at the World Trade Center site. The New York City Department of Design and Construction and the New York City Department of Sanitation completed the daunting task of removing debris piled from several stories below street level to 11 stories above ground and weighing nearly 1.6 million tons, with support from FEMA, the Federal Highway Administration, and the U.S. Army Corps of Engineers. FEMA provided $630 million to reimburse the city for the costs associated with removal of the debris from the World Trade Center site and barge it to a landfill on Staten Island, New York, for screening, sorting, and disposal. Initial estimates projected that the recovery effort and cleanup would take two years and cost $7 billion; however, the effort was completed substantially below these time and cost estimates. As of September 3, 2003, FEMA had obligated $1 billion for the insurance program; however, no funds will be disbursed until details for the establishment of the dedicated insurance company are finalized.

**Emergency Transportation Measures**

The collapse of the World Trade Center buildings and subsequent recovery efforts wreaked havoc on lower Manhattan's transportation system: subway stations and the PATH commuter rail terminal were destroyed, sections of local roads became impassable due to damage or recovery efforts, and subways and ferries were overcrowded as commuters returned to work using different means or routes of transportation. FEMA and DOT coordinated with a variety of transportation, public works, public safety, and utility providers to plan emergency/interim projects to address issues such as shifts in travel demand after September 11, capacity issues, and system delays associated with revised travel patterns.[7] Overall,

---

[7]As debris removal efforts were completed, FEMA and FTA released the "Emergency/Interim Transportation Disaster Recovery Plan" in spring 2002, which identified 100 projects proposed by local agencies to use available FEMA and FTA funds.

FEMA and DOT provided approximately $299 million for emergency transportation measures, including:

- Clean-up and emergency repair of local roads and tunnels,
- Construction of a temporary PATH terminal,
- Expanded ferry service, and
- Capital projects to improve commuter transportation.

**Other FEMA Initial Response Assistance**

FEMA provided $285 million for other initial response assistance. For example, as authorized by the Congress, FEMA entered into an interagency agreement with the Department of Health and Human Services to conduct a project to screen and monitor emergency services personnel for long-term health effects of work at the World Trade Center site.[8] In addition, FEMA worked with EPA officials to conduct clean-up efforts that included vacuuming streets, parks, and other areas covered by dust from debris and fires and in conjunction with New York City officials conducted an indoor cleaning and testing program at private residences.

**Emergency and Temporary Utility Service**

The collapse of the World Trade Center buildings and subsequent debris removal efforts resulted in widespread damage to the energy and telecommunications utility infrastructure. Utility firms worked to provide service for rescue operations in the days immediately following the disaster and to stabilize delivery of service to lower Manhattan, including the reopening of the New York Stock Exchange 6 days after the attacks. The Congress appropriated $250 million to HUD to reimburse utility companies for uncompensated costs associated with restoring service. Eligible firms will be reimbursed up to 100 percent of actual, incurred, uncompensated, and documented costs. These funds have not been disbursed to utility companies; however, HUD approved a city plan for distributing these funds on September 15, 2003, and HUD officials expect funds to begin being obligated.

**Compensation for Disaster-Related Costs and Losses Totaled $4.81 Billion**

Approximately $4.81 billion in federal assistance is committed to compensating state and local organizations, individuals, and businesses for disaster-related costs and losses. The majority of the assistance provided under this category was provided by FEMA. Figure 4 shows how much each agency has committed to compensate for disaster-related costs and losses.

---

[8]P.L. 108-7.

**Figure 4: Amount of Assistance Committed to Compensate Disaster-Related Costs and Losses, by Agency**



Total funds committed to specific projects.

Initial response

$2.55 Billion

Compensation for losses

$4.81 Billion

Infrastructure restoration

$5.57$^a$ Billion

Economic revitalization

$5.54$^a$ Billion

**FEMA** - $3.84 Billion

**HUD** - $0.96 Billion

Source: GAO.

$^a$HUD's plans for $1.16 billion have not been finalized. These funds are not included in the purposes listed above, and according to HUD, will most likely be directed to either infrastructure restoration or economic revitalization.

Note: Numbers do not equal total due to rounding.

FEMA provided funds through its Public Assistance Program, as congressionally authorized, non-traditional assistance to New York City and State; under its Hazard Mitigation Grant Program; Mortgage and Rental Assistance Program, Crisis Counseling Assistance Program, Individual and Family Grant Program, and also through a variety of other assistance efforts. HUD provided assistance under its residential grant program and business assistance programs.

| Public Assistance to New York State, City, and Other Organizations | FEMA reimbursed New York State, City, and other organizations about $1.49 billion through its public assistance program to compensate for disaster-related costs and losses. Of this funding, $643 million was provided to the New York City Police and Fire Departments to pay benefits and wages to emergency workers during response and recovery efforts and to replace vehicles and other equipment. As first responders, these departments suffered heavy casualties and damages and received compensation for overtime costs, death benefits, and funeral costs. FEMA also reimbursed costs to the City to relocate several agencies' offices; establish a Family Assistance Center; reschedule elections that were being held on September 11 and replace damaged voting equipment; and pay for instructional time for students who missed school due to closures, delayed openings, and school relocations.[9] |
|---|---|
| | FEMA also provided assistance to other entities, including the Port Authority, counties, and private nonprofit organizations; and it also provided funds to the state of New Jersey. The Port Authority was reimbursed for costs to replace equipment it lost when its World Trade Center facilities were destroyed and for office relocation costs. Additional assistance was provided to all New York counties for cancelled election costs and to some private-non-profits, such as Pace University, for temporary relocation. FEMA additionally provided $88 million to New Jersey for emergency protective measures. |
| Congressionally Authorized Non-traditional Assistance to New York City and State | In addition to the traditional public assistance FEMA provided to city and state agencies, the Congress also authorized FEMA to provide funding to the city and state for expenses associated with the disaster, but were unreimbursable under the Stafford Act. The legislation ensured that FEMA would be authorized to spend the entirety of the appropriated assistance for New York recovery efforts—$8.80 billion—by allowing the city and state to be provided reimbursement for disaster-related costs that FEMA otherwise could not have funded. Non-traditional assistance that FEMA was authorized to fund included reimbursements for heightened security in the aftermath of the terrorist attacks and cost-of-living adjustments to the pensions of survivors of firefighters and police officers killed in the line of duty in the attacks. In order for FEMA to determine how much funding was available for non-traditional assistance, FEMA officials implemented an expedited close-out process, identifying and deobligating any funds unspent as of April 30, 2003. These funds—totaling over $1 |

---

[9] House Report 107-593.

billion—were just recently provided to both the city and state and they will ultimately have discretion to use the funds as they deem suitable.

**Hazard Mitigation Grant Program**

FEMA also provided $377 million in hazard mitigation grants to New York State. Created in 1988 by the Stafford Act, the Hazard Mitigation Grant Program provides funds to states affected by major disasters to undertake mitigation measures. At the time of the New York disaster, FEMA could provide mitigation grants in an amount up to 15 percent on top of the total amount of other assistance provided.[10] However, in the New York recovery effort, the President limited mitigation funds to 5 percent of the funds appropriated within the total amount of funds. According to FEMA officials, the agency reduced the percentage of hazard mitigation grant funds available to New York initially because it was unclear how much the disaster would actually cost in FEMA funds, and public assistance funds were being provided at 100 percent Federal share. According to FEMA officials, as a result of the broadened authority authorized in the Consolidated Appropriations Resolution, New York has requested less for the Mitigation Grant program—which contains a state and/or local matching requirement—so that it could use funds to reimburse other disaster-related costs.

**Mortgage and Rental Assistance Program**

Individuals suffering financial hardships as a result of September 11 could obtain mortgage and rental assistance from FEMA. Prior to September 11, FEMA had provided a total of $18 million in mortgage and rental assistance grants in all previous disasters, which provided rent or mortgage payments to individuals in danger of losing their homes through foreclosure or eviction as a result of a major disaster. In the wake of September 11, this program increased tremendously, as FEMA provided nearly $200 million in this type of assistance for the New York City area. Initially, applicants were eligible if they resided in certain zones around the World Trade Center site. FEMA, as directed by the Congress, extended assistance to those working anywhere in Manhattan and to those whose employers were not located in Manhattan but were economically dependent on a Manhattan firm; and anyone living in Manhattan who commuted off the island and who suffered financially because of post-September 11 disruptions. The Mortgage and Rental Assistance program

---

[10]The Disaster Mitigation Act of 2000 increases this amount to 20 percent of total estimated federal assistance for states that meet enhanced planning criteria. For states without an approved enhanced plan, the Consolidated Appropriations Resolution of 2003 reduces the amount available for mitigation grants to 7.5 percent of the other assistance provided. However, neither of these provisions were applicable on September 11, 2001.

closed on January 31, 2003, and as of August 5, 2003, $194 million had been disbursed of the $200 million available. FEMA officials expect all funds to be disbursed as applicants receive monthly assistance.[11]

Crisis Counseling Assistance Program

The Crisis Counseling Assistance Program, funded by FEMA, led to the creation of "Project Liberty." Project Liberty, administered by the New York State Office of Mental Health, provides short-term outreach, education, referrals to mental health services, and a Regular Services Program to provide support to individuals with longer-term issues. In the past, only individuals from a declared disaster area were eligible to receive counseling services; however, because of the broad impact of the disaster, grants for this program were also provided to eligible individuals in New Jersey, Connecticut, Massachusetts, and Pennsylvania. FEMA provided more than $166 million for crisis counseling; this sum is more than all previous counseling grants since 1974 combined. Of these funds, $99 million has been obligated and disbursed.

Individual and Family Grant Program

FEMA is authorized by the Stafford Act to provide individual and family grants for individuals' necessary expenses related to disasters that were not covered through insurance, other federal assistance, or voluntary programs. For the September 11 disaster, FEMA's Individual and Family Grant Program provided eligible residents of New York City assistance for home repairs, replacement of personal property, reimbursement for air quality products, and repair or replacement of air conditioners. The New York State Department of Labor was tasked with implementing and administering the program. The Individual and Family Grant program closed on November 30, 2002. As of August 5, 2003, $97 million had been disbursed of the $110 million available through this program.

Other FEMA Assistance

In addition to Mortgage and Rental Assistance and Individual and Family Grants, FEMA also provided other temporary housing assistance, including Minimal Home Repair and Transient Accommodations programs totaling $34 million. Both programs address short-term needs such as lodging expenses and temporary housing repairs. In addition, the Stafford Act authorizes FEMA to provide unemployment assistance to individuals who are unemployed as a result of the disaster but not eligible for regular State Unemployment Insurance. For the New York City area, FEMA provided $17 million for disaster unemployment insurance administered by the State of New York.

---

[11]Eligible applicants received up to 18 months of assistance as part of this program.

| | |
|---|---|
| **HUD Funded Residential Grant Program** | In addition to FEMA assistance programs, $281 million in HUD funds were used for the administration of the Residential Grant Program to provide compensation to those affected by the disaster who remained in the area, address the vacancy rate increases, and provide incentives to attract residents to the area.[12] The program consisted of three different grants—a two-year commitment grant, a September 11 resident's grant, and a family grant. Applicants could apply for all three types of grants; each grant's value depended on the applicant's location and housing/rental costs. The Residential Grant Program closed on May 30, 2003. As of June 30, 2003, over 31,000 applications totaling $172 million were approved and $106 million had been disbursed in grants.[13] |
| **HUD Funded Business Assistance Programs** | In addition, HUD funds were used for a variety of business assistance programs, such as recovery grants and loans to compensate for economic losses and recovery efforts. Almost 18,000 businesses in New York City, representing approximately 563,000 employees, were disrupted or forced to relocate as a result of the terror attacks. Approximately 30 million square feet of commercial space was damaged or destroyed. While businesses near the World Trade Center site suffered physical damage, businesses all across the city felt the economic impact of the disaster. The Empire State Development Corporation (ESDC), as a grantee for HUD funds, administered five programs in cooperation with New York City to compensate businesses for economic losses and to assist in their recovery. HUD funds provided $683 million for business assistance programs, and as of June 30, 2003, $510 million had been disbursed. The Business Recovery Grant Program, HUD's largest September 11 business assistance program, closed December 31, 2003, and provided $488 million to over 14,000 businesses in lower Manhattan as of June 30, 2003.[14] Other programs that are still available include a $33 million plan to provide assistance to businesses that lost a disproportionate amount of workforce due to the disaster, and a $41 million Business Recovery Loan Program. |

---

[12]Although the Residential Grant program and its incentives helped to revitalize the economy of lower Manhattan, we categorized it as compensation for disaster-related losses because of its short-term nature and intended affect on the City in terms of restoring pre-disaster occupancy rates.

[13]In July 2003, HUD officials announced that $50 million unallocated from the Residential Grant Program would be used for an affordable housing initiative in lower Manhattan.

[14]ESDC provided funds to small and large businesses through its recovery grant program. In August 2003, HUD approved allocation of additional funds to allow full disbursement of these programs, for a total of $578 million.

## About $5.57 Billion Has Been Committed for Projects to Restore and Enhance Infrastructure

The terrorist attacks at the World Trade Center severely damaged the public transportation system that was used by more than 85 percent of commuters to lower Manhattan—the highest percentage of people commuting to work by public transit of any commercial district in the nation. About $5.57 billion has been committed for projects to restore and enhance infrastructure in lower Manhattan and the amount of assistance each agency has committed is shown in figure 5.

**Figure 5: Amount of Assistance Committed for Infrastructure Restoration and Improvement, by Agency**



Source: GAO.

[a]HUD's plans for $1.16 billion have not been finalized. These funds are not included in the purposes listed above, and according to HUD, will most likely be directed to either infrastructure restoration or economic revitalization.

Infrastructure efforts being funded by FEMA, DOT, and /or HUD include restoration and enhancement of the lower Manhattan transportation system, including a new Port Authority Trans-Hudson (PATH) terminal and new subway stations; permanent utility infrastructure repairs and

improvements; and short-term capital projects, such as parks and open space enhancements.

**Projects Planned to Restore and Enhance the Lower Manhattan Transportation System**

The Congress has appropriated a total of $4.55 billion for transit projects, including $1.80 billion in Capital Investment Grants to FTA for replacing, rebuilding, or enhancing the public transportation systems serving Manhattan,[15] and $2.75 billion in FEMA funds. Under an August 2002 Memorandum of Agreement between FTA and FEMA, FTA was designated the lead federal agency in charge of administration and oversight. The three largest projects identified are the restoration and improvement of the PATH Transit Terminal, and the enhancements of the Fulton Street Transit Center and South Ferry Subway Station.

- **PATH Transit Terminal**—The PATH commuter rail terminal, located underneath the World Trade Center site, was completely destroyed in the terrorist attacks. The Port Authority is requesting $1.4 billion to $1.7 billion to build a permanent PATH terminal that Port Authority officials report will be a substantial improvement over the destroyed World Trade Center terminal. This terminal will serve PATH commuter trains and four subway lines and is to be completed in the 2007 to 2008 timeframe.

- **Fulton Street Transit Center**—The current Fulton Street—Broadway Nassau Subway Station Complex provides access to the most heavily used subway lines in lower Manhattan and lies one block east of the World Trade Center site. The complex is comprised of four separate subway stations that serve nine subway lines and 62,000 riders during weekday peak periods. The complex was not damaged on September 11, but according to FTA and Metropolitan Transit Authority (MTA) officials, it is difficult to navigate and not easily accessible. The MTA is planning a $750 million project to improve the existing Fulton Street—Broadway Nassau Subway Station Complex to create a Fulton Transit Center designed to have a visible street level entrance pavilion, improved intermodal connectivity, expanded platforms and mezzanines, and new underground pedestrian concourses. The project is estimated for completion in December 2007.

- **South Ferry Subway Station**—The South Ferry subway station, which is located a half-mile from the World Trade Center site, was not damaged on September 11; however, according to MTA officials, the South Ferry station is outmoded: only five cars of a ten-car subway train can open onto

---

[15]PL 107-206.

the platform at one time; the tunnel is curved in such a fashion that trains have to slow down substantially to negotiate it; and it has no direct passenger connections to nearby subway stations. MTA is planning to improve the South Ferry subway station so that it would accommodate the length of a standard ten-car subway train and would provide connection to the Whitehall Street station that serves two other subway lines. FTA officials anticipate that the project will cost $400 million and be completed in the 2007/2008 timeframe.

The permanent PATH terminal, the Fulton Transit Center, and the South Ferry station account for $2.55 billion to $2.85 billion of the $4.55 billion designated for lower Manhattan transit projects. At this time, projects to be funded with the remaining $1.7 billion to $2 billion have yet to be determined. In April 2003, various New York City and State agencies[16] released a report entitled Lower Manhattan Transportation Strategies that identified priority transportation projects. However, the total cost of these projects far exceeds the remaining federal transportation assistance funds. High priority projects highlighted in the report include access to JFK Airport and Long Island, enhancement of West Street, construction of a tour bus facility, and construction of World Trade Center underground infrastructure. To date no decisions have been made on which of these projects will be funded within the $4.55 billion cap. A portion of remaining $1.16 billion in HUD funds will most likely be directed to infrastructure improvement activities depending on the results of on-going studies.

In addition to the transit system, the Congress appropriated $442 million for restoration and improvements to the local roads and enhancements to ferry terminals and railroad tunnels. The Federal Highway Administration is overseeing plans for $242 million in resurfacing and reconstructing lower Manhattan streets through the Emergency Relief program. These streets were damaged by the direct impact of the collapsed World Trade Center buildings as well as wear and tear from response vehicles and debris removal activities, and from emergency telecommunications repairs. Ferry terminals were not damaged on September 11; however, FHWA was appropriated $100 million in Miscellaneous Highway funds for ferry and ferry facility construction projects.[17] Various ferry terminals are under consideration for significant enhancements in both New York and

---

[16]LMDC, Port Authority of New York and New Jersey, Metropolitan Transit Authority, the New York State Department of Transportation and the City of New York.

[17]PL 107-117.

New Jersey. Further, the Federal Railroad Administration was appropriated $100 million to renovate the New York rail tunnels. The funds are to be used by Amtrak to modernize ventilation systems, install communication systems, improve emergency exits from the tunnels, and structurally rehabilitate four East River tunnels, two Hudson River tunnels, and the subterranean section of Penn Station.

**Permanent Utility Infrastructure Repairs and Improvements**

The Congress also appropriated HUD funds to provide assistance to utility firms as they complete permanent repairs and improvements to the damaged infrastructure around the World Trade Center site. In addition to the $250 million for emergency repairs previously discussed, the Congress appropriated $500 million to HUD to provide funds to affected utility firms for permanent repairs and rebuilding. The goals of the permanent repair program are to prevent businesses and residences from bearing the cost of rebuilding and to enhance the redevelopment of lower Manhattan by supporting investment in energy and telecommunication infrastructure. New York State officials worked with utility firms, and state and local agencies to develop the program in order to help utility firms while developing an improved system to attract new businesses to the area. Applicants will have until December 31, 2007, to apply for certain programs.[18]

**Short-term Capital Projects**

A New York State Agency worked with community groups, local businesses, and city and state governments to select short-term capital projects for HUD funding as part of its effort to improve the accessibility and appearance of lower Manhattan. A plan submitted to HUD was approved on August 6, 2003, detailing $68 million of proposed projects that could be completed within one year of approval, such as parks and open space enhancements, West Street pedestrian connections, building and streetscape improvements, and a new school, Millennium High School. In addition, a portion of these funds will be used to conduct an outreach campaign to keep residents informed of rebuilding efforts.

**Efforts to Revitalize the New York Economy Include Tax Benefits and Assistance to Businesses**

The terrorist attacks of September 11 disrupted New York City's economy and resulted in billions in lost [or forgone] income and tax revenues. The attacks caused tens of thousands of job losses and severely impacted lower Manhattan's commercial and retail sectors. In response, the Congress enacted the Liberty Zone tax benefits, estimated by the Joint

---

[18]HUD approved the utility plan September 15, 2003.

Committee on Taxation to be $5.03 billion in lost federal revenue, and appropriated funds to HUD, of which $515 million will aid in revitalizing the lower Manhattan economy. Figure 6 shows a breakdown of economic revitalization assistance.

**Figure 6: Estimated Amount of Assistance Committed for Economic Revitalization, by HUD and Liberty Zone Tax Credits**

Total funds committed to specific projects.



Initial response

$2.55 Billion



Compensation for losses

$4.81 Billion



Infrastructure restoration

$5.57[a] Billion



Economic revitalization

$5.54[a] Billion

**HUD** - $0.52 Billion



**Liberty Zone** - $5.03 Billion

Source: GAO.

[a]HUD's plans for $1.16 billion have not been finalized. These funds are not included in the purposes listed above, and according to HUD, will most likely be directed to either infrastructure restoration or economic revitalization.

Note: Numbers do not equal total due to rounding.

**Liberty Zone Tax Benefits**

In Title III of the Job Creation and Worker Assistance Act of 2002[19], Congress instituted tax benefits primarily targeted to the Liberty Zone, the

---

[19]Job Creation and Worker Assistance Act of 2002 (Public Law 107-147)

area of New York City most severely impacted by the terrorist attacks, as shown in figure 7.

**Figure 7: New York Liberty Zone**



Source: GAO.

The amount of benefits to New York that will result from the Liberty Zone tax provisions is unclear and likely to remain unknown. Before the Job Creation and Worker Assistance Act was passed, the Joint Committee on Taxation estimated the amount of tax revenue projected to be lost to the U.S. Treasury from the Liberty Zone provisions. However, an estimate of potential lost revenue is not the same as an estimate of the benefits received by taxpayers. Furthermore, there are uncertainties with any estimate. As with many tax benefits, usage of the Liberty Zone tax benefits will depend on a variety of difficult to predict economic factors that can influence the magnitude of the benefits. For example, an economic downturn could slow rebuilding efforts in the New York City area, reducing the use of benefits such as depreciation allowances. Conversely, an economic upturn could increase benefit usage above existing estimates. Additionally, information on usage of most Liberty Zone tax benefits is not being collected or reported by federal, state or local agencies, and the total amount of the benefits accruing to New York is likely to remain unknown.

| HUD Business Assistance Programs and Planning for Rebuilding and Permanent Memorial | In addition to the Liberty Zone tax benefits, the Congress appropriated funds to HUD to revitalize lower Manhattan. New York State agencies are administering $515 million to provide programs to attract and retain businesses to the area and for other projects to revitalize lower Manhattan. Damage around the World Trade Center site displaced an estimated 1,025 firms employing more than 75,000 workers, and many more were displaced by subsequent recovery efforts. Of the $515 million committed for a variety of economic revitalization efforts, $475 million is provided to create incentives for existing small and large businesses to remain in the area and to attract new businesses to lower Manhattan. As of June 30, 2003, $161 million had been disbursed for these programs, providing assistance for 985 businesses. An additional $40 million had also been committed to help plan and coordinate rebuilding and revitalization efforts |
|---|---|

# The Designation of a Specific Level of Assistance Contributed to a Unique Federal Government Response for this Disaster

In its effort to provide assistance to the New York City area following the terrorist attacks, the federal government provided aid in all categories of assistance—initial response efforts, compensation for disaster-related costs and losses, infrastructure restoration and improvements, and economic revitalization—that differed from that provided in any previous disaster. However, the most significant difference in the federal government's response to this disaster was the designation of a specific level of funding for disaster assistance. The designation of $20 billion to assist the New York City area was the first time in which the total amount of federal disaster assistance was set early in the response and recovery efforts, and resulted in two major changes to the federal approach to this disaster.

- Designating a specific level of funding for the entire federal response to this disaster changed the traditional approach to administering FEMA funds.

- This specific level of funding for the entire disaster prompted Congressional authorization of numerous forms of non-traditional assistance to be provided by other agencies.

## Designation of a Specific Level of Funding Altered the Traditional FEMA Disaster Assistance Process

The specific level of funding that was targeted by the President and passed by the Congress changed the traditional approach taken to administer FEMA funds. Ordinarily, FEMA assistance has no dollar limit . When a qualifying disaster event occurs, the President declares that a major disaster or emergency exists. This declaration activates numerous FEMA disaster assistance programs. The funding for responding to a specific disaster is not set; instead, the only factor limiting the amount of assistance for response and recovery efforts is reimbursement eligibility

under the Stafford Act. Historically, FEMA approves all applications for grants and other assistance if—and only if—the applications meet the program requirements under the act. For example, compensation to rebuild a public road would be an eligible project, but compensation to improve a public road would not be. Economic losses to a city from reduced tourism associated with a disaster would not be eligible. Further, as some projects can be long term and are reimbursed upon completion, it may take years to fully reconcile how much assistance was provided for certain disasters.

In responding to September 11, however, this traditional practice was not followed, as the President pledged at least $20 billion in federal assistance to New York, and subsequent to that pledge, the Congress, in authorizing this specific level of federal assistance, appropriated over $8.80 billion to FEMA—the first time that a specified amount of funds had been designated to FEMA to respond to a disaster. Consequently, FEMA officials viewed the amounts legislated as the amount of money to be spent in responding to the disaster and administered their programs accordingly to ensure that this amount of funding was provided to the New York area.

In addition, in order to respond to the amount of damage resulting from the attacks and to provide the entire appropriated amount for this disaster, FEMA expanded eligibility guidelines for many of its programs. FEMA officials said that they broadly interpreted the Stafford Act to provide public assistance for several projects. For example, FEMA—in conjunction with DOT—provided funds for lower Manhattan transportation system improvements. Previously, FEMA only provided funds to restore damaged infrastructure to its pre-disaster condition. In recognizing the interdependence of lower Manhattan's transportation system, FEMA officials reported that they interpreted their guidelines to allow maximum flexibility to permit the rebuilding of the transportation system as a whole instead of only what was damaged. Another example of the broadened guidelines FEMA followed in this case is its determination that costs associated with an EPA program to clean the interior of private residences—the first of its kind—were eligible for reimbursement under the Stafford Act. In this instance, FEMA determined that the dust associated with the collapse of the World Trade Center towers was a type of debris, and therefore costs associated with interior cleaning could be reimbursed.

Further, the Congress reinforced FEMA's flexible approach to eligibility for assistance in two ways. First, the Congress authorized FEMA to

expand the eligibility guidelines of certain programs due to the unique circumstances of the disaster and the unprecedented amounts of assistance available for response and recovery efforts.[20] For example, nearly a year after September 11, Congress authorized FEMA to make the Mortgage and Rental Assistance program more broadly available and directed FEMA to review applications that had been previously denied. With these new eligibility requirements, FEMA provided funds to individuals working anywhere in Manhattan and to those whose employers were not located in Manhattan, but who were economically dependent on a Manhattan firm. Further, the Congress authorized FEMA to establish an insurance company to manage a $1 billion insurance fund and to settle claims filed by, among others, city and contractor workers who suffered ill health effects as a result of working on debris removal operations.[21] Although FEMA regularly reimburses applicants for insurance costs that are part of a contract for services, FEMA has never reimbursed for insurance to cover a city for suits brought by its own employees.

Second, despite FEMA's broadened eligibility guidelines interpretation and the Congress' authorization of certain activities, there were still not enough projects eligible within the authority provided by the Stafford Act for which the New York City area could be reimbursed to reach the $8.80 billion target level for FEMA assistance. As a result, the Congress passed the Consolidated Appropriations Resolution that ensured that FEMA would spend the entirety of the FEMA-appropriated assistance for New York by authorizing the agency to reimburse costs that it otherwise could not have funded. This is the first time that FEMA has been given such expansive authority to fund projects outside of provisions of the Stafford Act. New York officials believe this was necessary because the Stafford Act was too restrictive for responding to a major terrorist event, as it does not allow FEMA to reimburse affected communities for many costs directly related to the disaster. With the authority granted by the Consolidated Appropriations Resolution, FEMA adapted its programs and conducted an expedited close-out process that allowed for disbursement of remaining funds to New York years sooner than in past disasters. As part of the expedited closeout process, FEMA provided funds for projects that the city or state had already completed and paid for. New York City and State officials will ultimately have discretion to use these federal

---

[20]Further discussion and additional examples of public assistance projects that we identified as non-traditional can be seen in GAO-03-926.

[21]Public Law 108-7.

funds as they deem appropriate, in contrast to the established process under which FEMA officials oversee distribution of federal funds to assure that only projects eligible within the provisions of the Stafford Act are funded. The expedited close-out resulted in FEMA reconciling the most expensive public assistance disaster in its history years before the process is typically accomplished.

As a result of the different approach taken to respond to this disaster, FEMA recently initiated an effort to develop a concept for redesigning its public assistance program. As we noted in our August 2003 report on FEMA's public assistance program efforts in New York, a working group of the Public Assistance Program Redesign Project was formed at the request of the director of FEMA's Recovery Division, and held its first meeting in May 2003.[22] Members included FEMA public assistance and research and evaluation staff and state program managers to provide a broader perspective on the issues and concerns. The project was established to suggest proposals to improve the public assistance program and make it more efficient and capable of meeting community needs for all types and sizes of disasters, including those resulting from terrorism. Among other things, the project seeks to transform the program to one that is flexible enough to meet the demands of disasters of all types and sizes and eliminate redundancies in decision-making and processes. The working group will examine potential options for redesigning the program that include an annual block grant program managed by the states, a disaster-based state management program, and a capped funding amount. The working group plans to develop a basic design concept for revising the program by September 30, 2003.

## Designation of a Specific Level of Assistance Spurred Congressional Appropriation and Authorization of Other Forms of Non-Traditional Disaster Assistance

Not only was FEMA's traditional disaster response effort changed in assisting the New York area, but the specific level of funding that was targeted by the President and passed by the Congress also spurred authorization of other forms of non-traditional assistance for the New York City area. The most notable of these is the Liberty Zone tax benefits. To address the economic impact of the September 11 attacks on New York, Congress passed the estimated $5.03 billion New York Liberty Zone tax benefit package.[23] This is a unique way for the Congress to provide assistance for the area affected by the disaster as, according to IRS

---

[22]GAO-03-926.

[23]Job Creation and Worker Assistance Act of 2002 (PL 107-147)

officials, the Congress has never before passed a tax benefits package in response to a disaster. Further, this tax package was targeted to a geographic area, which has not generally occurred in the past.

Additionally, DOT was authorized to fund transportation projects to improve the overall transportation system substantially beyond pre-disaster condition. In most disasters, DOT is authorized to provide funds only to rebuild or restore damaged infrastructure back to its pre-disaster condition. However, in response to September 11, the Congress authorized DOT not only to restore transportation infrastructure directly damaged in the disaster, but also to enhance the overall lower Manhattan transportation system.

Further, the Congress also directed HUD to compensate businesses for economic losses—the first time its funds have been used for this purpose. In previous disasters, HUD funds were typically provided to address long-term effects of the disaster, including economic redevelopment efforts. However, after September 11, the Congress directed HUD to focus on different aspects of relief efforts than in previous disasters, such as compensating businesses and individuals for economic losses and funding programs to promote tourism initiatives in lower Manhattan, which had not been done before, according to HUD officials.

## FEMA Faces Major Management Challenges While Making the Transition to the Department of Homeland Security

The integration of FEMA into DHS, a department whose focus is on security against terrorism, while maintaining FEMA's current roles is likely to present both FEMA and DHS officials with major challenges. In January of this year, we published the 2003 Performance and Accountability Series[24] that focused on major management challenges and program risks facing the federal government. In that series, we published reports on challenges to both FEMA and DHS. In our report on DHS, we noted that the creation of DHS, involving the integration of FEMA and 21 other agencies specializing in various disciplines, is a daunting challenge; yet only through the effective integration and collaboration of entities can the synergy expected of the department be achieved. Recognizing the magnitude of the overall challenge in establishing DHS, we designated the implementation and transformation of the department as high-risk. Our

---

[24]U.S. General Accounting Office, *Major Management Challenges and Program Risks: Department of Homeland Security*, GAO-03-102 (Washington, D.C.: January 2003) and *Major Management Challenges and Program Risks: Federal Emergency Management Agency*, GAO-03-113 (Washington, D.C.: January 2003).

Performance and Accountability report on FEMA pointed to specific areas where its homeland security and non-homeland security missions were being transferred to separate DHS directorates. This divisional separation could complicate FEMA's historical all-hazards approach—a comprehensive approach focused on preparing for and responding to all types of disaster, either natural or man-made. The separation of disaster and emergency responsibilities across two directorates of the new department will present coordination challenges for the appropriate Undersecretaries within DHS.

Our FEMA Performance and Accountability report noted a number of other challenges. These include:

- **Enhancing the provision and management of disaster assistance for efficient and effective response**. FEMA has demonstrated its ability to quickly get resources to stricken communities and disaster victims, but has had problems ensuring the effective use of such assistance, according to the Office of Management and Budget (OMB). Among other things, FEMA will be challenged to (1) improve its criteria for determining state and local eligibility to receive federal disaster assistance, (2) assess the extent of and approach to assistance for future major disasters based on the recovery efforts undertaken in the New York City area, (3) enhance disaster assistance staff training and resource planning, and (4) improve its existing information system before it is used as a building block for a multi-agency disaster management website.

- **Reducing the impact of natural hazards by improving the efficiency of mitigation and flood programs**. For many years, FEMA has focused increased emphasis on reducing the impact of natural hazards, not only to lessen the impact to property and individuals, but also to reduce federal disaster costs. Two of the agency's major efforts in this regard have been its mitigation programs and the National Flood Insurance Program. These programs seek to strengthen structures against the effects of hazards or remove them from harm's way and to minimize the need for future FEMA disaster assistance. However, concerns exist in both these efforts that may limit their effectiveness in achieving these objectives. Moreover, the placement of FEMA within DHS represents a substantially changed environment in which FEMA will conduct its missions in the future, and missions that focus on reducing the impacts of natural hazards, such as hazard mitigation and flood insurance, may receive decreased emphasis. Sustained attention to these programs will be needed to ensure they maintain or improve their effectiveness in protecting the nation against, and reducing federal costs associated with, natural disasters.

We continue to view these areas as challenges for FEMA and expect to assist the Congress in its efforts to examine these challenges. In this regard, we have a number of assignments ongoing or planned that address many of these issues, and we will be reporting on these in the near future.

Mr. Chairman, this concludes my prepared statement. I would be happy to answer any questions you or Members of the Subcommittee may have.

For further information on this testimony, please contact JayEtta Z. Hecker at (202) 512-2834 or William O. Jenkins at (202) 512-8777. Individuals making key contributions to this testimony include Kevin F. Copping, Matthew F. Ebert, Kara A. Finnegan-Irving, John T. McGrail, and John R. Schulze.

# Appendix I: Objectives, Scope, and Methodology

The Subcommittee on Clean Air, Climate Change, and Nuclear Safety, Senate Committee on Environment and Public Works, asked us to describe the federal government's response and recovery efforts to New York City and how the federal government's response to this disaster differed from previous disasters. Additionally, we were asked to describe the management challenges FEMA faces as it integrates into the Department of Homeland Security (DHS).

In addressing the first and second objective, we limited our work to the four federal sources of assistance that comprise 96 percent of the $20 billion in aid pledged by the President to help the New York City area response to and recover from the terrorist attacks. We used information in our August 29, 2003 report on the Federal Emergency Management Agency's Public Assistance Program and our ongoing work on the overall federal response to the New York City area that we are conducting for the Senate Committee on Environment and Public Works. To develop the information for our ongoing work that we used in this statement, we reviewed relevant legislation and obtained and reviewed information from the appropriate budget documents, funding plans, status reports and other documents from the respecting agencies. We also reviewed available Executive Orders, Presidential correspondence, Office of Management and Budget reports, and Congressional Budget Office reports related to federal response and recovery efforts for New York City. We interviewed federal officials from the Office of Management and Budget, FEMA, the Department of Housing and Urban Development, the Federal Transit Administration, the Federal Highway Administration, the Federal Railroad Administration, and the Internal Revenue Service to get their perspectives on to what purposes the assistance has been and will be used. We also obtained pertinent documents from and interviewed officials with New York State and New York City agencies, including the Lower Manhattan Development Corporation, the Empire State Development Corporation, the New York State Department of Transportation, the Metropolitan Transit Administration, and Port Authority of New York and New Jersey. We also interviewed officials from nonprofit planning and research organizations in New York to gain their perspectives on use of the funding in the city's redevelopment process. We reviewed relevant agency documentation of program plans and execution including budget documents and databases. We also compared agency historical data to documentation from the New York response and recovery.

To address management challenges facing FEMA as it transfers to the Department of Homeland Security, we used information from two reports from GAO's Performance and Accountability Series. These were *Major*

*Management Challenges and Program Risks: Federal Emergency Management Agency* (January 2003 GAO-03-113) and *Major Management Challenges and Program Risks: Department of Homeland Security* (January 2003 GAO-03-102.)

The work we drew upon for this statement was conducted from July 2002 through September 2003 in accordance with generally accepted government accounting standards.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics. <br><br> Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to e-mail alerts" under the "Order GAO Products" heading. |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: <br><br> U.S. General Accounting Office <br> 441 G Street NW, Room LM <br> Washington, D.C. 20548 <br><br> To order by Phone:  Voice:  (202) 512-6000 <br> TDD:  (202) 512-2537 <br> Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800 <br> U.S. General Accounting Office, 441 G Street NW, Room 7149 <br> Washington, D.C. 20548 |

 PRINTED ON RECYCLED PAPER

350G PAYCHECK FOR CITY'S 9/11 ... 10/15/2006
The New York Post
777300 All Editions
News
Published: 10/15/2006
Page: 006
Keywords: News Exclusive
350G PAYCHECK FOR CITY'S 9/11 SCROOGE
Byline: By SUSAN EDELMAN

The woman in charge of the $1 billion fund that's fighting claims by sickened World Trade Center rescue and recovery workers is collecting $350,000 a year plus benefits from the federal fund - a pay package that has stunned and angered advocates for the 9/11 responders.

Christine LaSala, president and CEO of the city-controlled WTC Captive Insurance Co., which is managing the 9/11 fund created by Congress, gets the entity's top salary - which has never before been publicly revealed - plus $20,000 in health benefits for herself and her family, documents obtained by The Post show.

Meanwhile, teams of lawyers hired by the fund to dispute and deny more than 5,000 claims for illnesses blamed on toxic exposure at Ground Zero earn up to $550 an hour for "senior partners," the records show. Other top lawyers working for the entity earn higher rates, sources said.

The Post has reported that Captive, a self-insurance fund set up by the city in 2004 to cover claims from the WTC cleanup, had spent more than $40 million as of four months ago on overhead and lawyers. The company has refused to pay a single ill Ground Zero responder.

LaSala, 56, a former partner at insurance brokerage Johnson & Higgins, took the helm of the captive in mid-2004.

"It's amazing that Ms. LaSala gets $20,000 for health insurance while the 9/11 heroes she's fighting often have no health coverage at all," said Rep. Carolyn Maloney ( D-N.Y.).

"If the city wanted someone to do nothing, I'm sure they could find someone a lot cheaper than $370,000 per year," Maloney said.

"This salary could have helped a lot of sick and injured workers take care of their families." Patrick Lynch, president of the Patrolmen's Benevolent Association, which keeps a registry of cops suffering respiratory illness, cancer and other diseases since working at the toxic WTC pit and Fresh Kills landfill, was taken aback.

"They're paying that kind of salary to someone overseeing a campaign where lawyers are working to deprive people of benefits for the illnesses they developed at Ground Zero," Lynch said. "9/11 responders are struggling with medical bills." LaSala's pay exceeds by $100,000 the $250,000 salary of Schools Chancellor Joel Klein, the highest-paid city employee, who oversees a $14 billion budget, 110,000 employees and 1.1 million kids.

In the money
  * Christine LaSala (left), president and CEO, WTC Captive Insurance Co. $350,000
  * Joel Klein, city schools chancellor $250,000
  * Nicholas Scoppetta, fire commissioner $162,800
  * Raymond Kelly, police commissioner $162,800
  * Kenneth Ringler Jr., Port Authority executive director $231,000

# Worby Groner Edelman & Napoli Bern LLP

David E. Worby •
William H. Groner • ʃ
Michael R. Edelman •

Richard S. Vecchio •
Michael L. Taub •
Howard G. Frederick •
John Raymond Mechmann, Jr. •

Charles N. Rock •
Sam Rosmarin •
Hon. Carl A. Vergari •
Harvey B. Ginsberg •
Paul J. Campson • ʃ ‡

• Admitted In New York
ʃ Admitted In New Jersey
ⁱ Admitted In Wisconsin
§ Admitted In Pennsylvania
◊ Admitted In Florida
¥ Admitted In Oklahoma
♪ Of Counsel

A Partnership of Limited Liability Partnerships
**115 Broadway**
**New York, New York 10006**
(877) 982-4376
-----------
www.wgenb.com

Marc Jay Bern • †
Paul J. Napoli •
Jeffrey A. Guzman •
Steven Krentsel •

Peter L. Benza •
W. Steven Berman • ⁱ ¶
William J. Dubanevich •
Christopher R. LoPalo •
Ernest N. Reece •
Denise A. Rubin •
Joy R. Simon •
Jeremy Thurman ᵞ
Heather Wasserman ᵞ

Richard Corcoran ˢ ⁽
Mario D'Angelo § •
Brian Guillorn ♪ •
Noble McIntyre ⁱ ᵞ

May 4, 2006

**Via Certified Mail**
WTC Captive Insurance Company, Inc.
100 Williams Street, Suit 2001
New York, New York 10038

**Re: Freedom of Information Law Request**

To the Records Access Officer:

Under the provisions of the New York Freedom of Information Law, Article 6 of the Public Officers Law, I hereby request any records or portions thereof maintained by your agency pertaining to the WTC Captive Insurance Company, Inc.:

a.  all correspondence and documents in whatever form, emails and/or written communications to and from the New York State Emergency Management Office (SEMO);

b.  all correspondence and documents in whatever form, emails and/or written communications to and from New York State Office of the Comptroller;

c.  all correspondence, emails and/or written communications to and from Federal Emergency Management Agency (FEMA);

d.  all correspondence and documents in whatever form, emails and/or written communications to and from New York State Insurance Department (NYSID);

e.  all correspondence and documents in whatever form, emails and/or written communications to and from John A. Agostino;

f.  all correspondence and documents in whatever form, emails and/or written communications to  and from Dan Agosto;

g.  all correspondence and documents in whatever form, emails and/or written communications to and from Kenneth A. Becker;

h.  all correspondence and documents in whatever form, emails and/or written communications to and from Gerard Connolly;

i.  all correspondence and documents in whatever form, emails and/or written communications to and from Michael M. Feigin;

j.  all correspondence and documents in whatever form, emails and/or written communications to and from McDermott Will & Emory;

k.  all correspondence and documents in whatever form, emails and/or written communications to and from Jody T. Wald;

l.  all correspondence and documents in whatever form, emails and/or written communications to and from Citibank;

m.  all correspondence and documents in whatever form, emails and/or written communications to and from Marsh Management Services, Inc.;

n.  all correspondence and documents in whatever form, emails and/or written communications to and from WTC Captive Insurance Company, Inc.;

o.  all correspondence and documents in whatever form, emails and/or written communications to and from Korn/Ferry International;

p.  all correspondence and documents in whatever form, emails and/or written communications to and from Gravity Systems;

q.  all correspondence and documents in whatever form, emails and/or written communications to and from St. Paul Travelers – Commercial & Fire Co.;

r.  all correspondence and documents in whatever form, emails and/or written communications to and from Christine LaSala;

s.  all correspondence and documents in whatever form, emails and/or written communications to and from Milliman Consultants and Actuaries;

t.  all correspondence and documents in whatever form, emails and/or written communications to and from GAB Robins;

u.  all correspondence and documents in whatever form, emails and/or written communications to and from Johnson Lambert & Co.;

v.  all correspondence and documents in whatever form, emails and/or written communications to and from David Biester;

w.  all correspondence and documents in whatever form, emails and/or written communications to and from Patricia Dern;

x.  all correspondence and documents in whatever form, emails and/or written communications to and from Arthur Kirkner;

y.  all correspondence and documents in whatever form, emails and/or written communications to and from John Prescott;

z.      all correspondence and documents in whatever form, emails and/or written communications to and from James Schwartzman;

aa.     all correspondence and documents in whatever form, emails and/or written communications to and from Margaret Warner;

bb.     all correspondence and documents in whatever form, emails and/or written communications to and from Nisala Werasooriya;

cc.     all correspondence and documents in whatever form, emails and/or written communications to and from Dereck A. Jones;

dd.     all correspondence and documents in whatever form, emails and/or written communications to and from Thomas Jones;

ee.     all correspondence and documents in whatever form, emails and/or written communications to and from BlackRock Investment Management;

ff.     all correspondence and documents in whatever form, emails and/or written communications to and from Price Waterhouse Coopers;

gg.     the names and job titles of all Captive employees;

hh.     the salaries and benefits of all Captive employees;

ii.     the names of all past and current independent contractors and consultants;

jj.     the fees paid to all past and current independent contractors and consultants;

kk.     the names, addresses of all Captive board members;

ll.     the identity of any and all boards on which sit the board members identified in response to request gg;

mm.     identify of all board members' employers;

nn.     the names, addresses and affiliations of all Captive Directors & Officers;

oo.     the details on remuneration any and all Captive Board Members receive as sitting  Board Members;

pp.     identity of any and all boards on which sit the Directors & Officers identified in response to request ii;

qq.     all correspondence and documents in whatever form, emails and/or written communications to and from with all Captive board members

rr.     minutes and records from all Captive board meetings;

ss.     any and all contracts (final and/or draft) with Patton & Boggs;

tt.     any and fee agreements (final and/or draft) with from Patton & Boggs;

uu.     any and all contracts (final and/or draft) with Latham & Watkins;

vv.     any and fee agreements (final and/or draft) with Latham & Watkins;

ww.     any and all contracts (final and/or draft) with James Tyrrell;

xx.     any and fee agreements (final and/or draft) with James Tyrrell;

yy.     any and all contracts (final and/or draft) with LeBoeuf, Lamb, Greene & MacRae LLP;

zz.     any and fee agreements (final and/or draft) with LeBoeuf, Lamb, Greene & MacRae LLP;

aaa.     any and all contracts (final and/or draft) with Milliman Consultants and Actuaries;

bbb.     any and fee agreements (final and/or draft) with Milliman Consultants and Actuaries;

ccc.     any and all contracts (final and/or draft) with Citibank;

ddd.     any and fee agreements (final and/or draft) with Citibank;

eee.     any and all contracts (final and/or draft) with Marsch Management Services, Inc.;

fff.     any and fee agreements (final and/or draft) with Marsch Management Services, Inc.;

ggg.     any and all contracts (final and/or draft) with Price Waterhouse Coopers;

hhh.     any and fee agreements (final and/or draft) with Price Waterhouse Coopers;

iii.     any and all contracts (final and/or draft) with BalckRock;

jjj.     any and fee agreements (final and/or draft) with BlackRock;

kkk.     all correspondence and documents in whatever form, emails and/or written communications to and from: the City of New York, Mayor Bloomberg and/or New York City Department of Design and Construction, New York City Department of Health and any other New York City agency and/or Department, officials, and employees;

lll.     all correspondence and documents in whatever form, emails and/or written communications to and from Bovis/Lend Lease;

mmm. all correspondence and documents in whatever form, emails and/or written communications to and from AMEC;

nnn.     all correspondence and documents in whatever form, emails and/or written communications to and from Tully Construction;

ooo.     all correspondence and documents in whatever form, emails and/or written communications to and from Turner Construction;

ppp.     all correspondence and documents in whatever form, emails and/or written communications to and from Larry Silverstein Properties;

qqq.     all correspondence and documents in whatever form, emails and/or written communications to and from World Trade Center Properties;

rrr.    all correspondence and documents in whatever form, emails and/or written communications to and from any consultants, experts or physicians, including but not limited to, epidemiologists, hygienists, public health professionals, toxic remediation or exposure experts, pertaining to the post-9/11 World Trade Center Site;

sss.    any and all contracts (final and/or draft) with McDermott Will & Emory;

ttt.    any and fee agreements (final and/or draft) with McDermott Will & Emory;

uuu.    any and all contracts (final and/or draft) with Korn/Ferry International;

vvv.    any and fee agreements (final and/or draft) with Korn/Ferry International;

www.    all Captive quarterly reports;

xxx.    all documents related to policy limits, including any reservation of rights;

yyy.    all documents related to insurance coverage;

zzz.    all Captive claims activity reports;

aaaa.    all Captive loss expense reports;

bbbb.    all Captive loss adjusting expense reports;

cccc.    all Captive income statements;

dddd.    all Captive balance sheets;

eeee.    all Captive investment reports;

ffff.    all liability reports;

gggg.    all insurance reports;

hhhh.    all experience account balance statement reports;

iiii.    all expense reports, including justifications;

jjjj.    all detailed budget pages;

kkkk.    all income received reports;

llll.    all account balance statements;

mmmm.    identify and provide copies of any and all grants previously and currently held;

nnnn.    all copies of Request for Funding Proposal;

oooo.    all pre-grant expenses;

pppp.    all leases;

qqqq.    all office expenses;

rrrr.    all legal expenses;

ssss.    all investment expenses;

tttt.   identify all memberships held by Captive-related individuals;

uuuu.   identify all dues paid and/or to be paid for memberships held;

vvvv.   identify all consulting fees;

wwww.        all investment income;

xxxx.   all documents related to claims evaluations;

yyyy.   all documents that identify the dollar amount for case reserves;

zzzz.   all documents that identify cumulative ultimate net losses;

aaaaa.  all documents related to the modeling of expected losses;

bbbbb.  all documents related to the modeling of expected costs and expenses;

ccccc.  all documents related to the bid process of contractors and consultants;

ddddd.  all drafts of the Captive insurance policy;

eeeee.  all copies of insurance policies;

fffff.  copies of all cancelled checks and similar documents;

Please place any missing documents on "special locate" status and notify the undersigned that you have done so. Additionally, kindly advise me of any destruction of records sought above and include the date of and authority for such destruction. Should some of the requested records not be readily available as others, kindly produce those documents/records that are immediately available without waiting for the outstanding matter, which can be produced at a later date when such missing records are found, redacted, or otherwise prepared for release.

If there are any fees for copying the records requested, please supply the records without informing me if the fees are not in excess of $35.

Very truly yours,

William J. Dubanevich

JUDICIARY COMMITTEE
SUBCOMMITTEES:
**RANKING MEMBER**
CONSTITUTION
COMMERCIAL AND
ADMINISTRATIVE LAW

**TRANSPORTATION AND
INFRASTRUCTURE COMMITTEE**
SUBCOMMITTEES:
HIGHWAYS AND TRANSIT
RAILROADS

ASSISTANT WHIP

JERROLD NADLER
8TH DISTRICT, NEW YORK

REPLY TO:

☐ WASHINGTON OFFICE:
2334 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-5635

☐ DISTRICT OFFICE:
201 VARICK STREET
SUITE 669
NEW YORK, NY 10014
(212) 367-7350

☐ DISTRICT OFFICE:
445 NEPTUNE AVENUE
BROOKLYN, NY 11224
(718) 373-3198

Web: http://www.house.gov/nadler

# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 27, 2006

The Honorable Richard L. Skinner
Inspector General
U.S. Department of Homeland Security
Washington, DC 20528

Dear Mr. Skinner:

I am writing to request that your office immediately conduct an investigation of the World Trade Center Captive Insurance Company's (WTCC) possible mishandling of claims brought by individuals who have suffered deleterious health effects as a result of their rescue and recovery work at the World Trade Center (WTC) site.

In 2003, Congress provided the Federal Emergency Management Agency with $1 billion to establish a captive insurance company, or other appropriate insurance mechanism, to handle claims arising from debris removal at the World Trade Center site. In March of 2003, the State and City of New York established the WTCC, but it appears that the company has never developed any procedures to award legitimate claims. Rather, every single claim is being litigated by the WTCC in court. As a result, approximately 8,000 individual claims have been submitted, but zero claims have been paid out. At the same time, more than $20 million in federal funds have been spent on legal fees by the WTCC as it defends the City and other named insureds against these claims.

Certainly, a firefighter, police officer, or laborer who removed debris from the WTC site, and who now suffers adverse health effects, such as respiratory impairment or cancer, deserves to be compensated for lost wages and other related expenses. It is outrageous that millions of dollars in federal funds are being used to automatically dispute every single claim. At the very least, there should be a mechanism in place to process clearly legitimate claims without forcing every claimant to resort to protracted litigation.

Therefore, I respectfully request that your office conduct an investigation to determine why the WTCC has chosen to use a $1 billion federal fund to litigate all 8,000 claims instead of settling whenever possible and appropriate? Why have no procedures been established to receive, review and pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependants, beneficiaries or personal representatives of persons who were killed?

Clearly, it was not the Congressional intent to provide $1 billion in federal taxpayers money simply to fight 9/11 heroes in court, without any provision for paying valid claims. Thousands of first responders and other workers served their country, and the people of New York, heroically in the days and months following the terrorist attacks of September 11, 2001.  Many of these heroes are now sick, and some have even passed away, as a result of exposure to World Trade Center debris.  Federal funds should be used not to fight those who served their country so admirably, but to provide those that need them with the benefits they deserve.

Thank you for your prompt attention this matter. If you have any questions, please do not hesitate to contact me.

Sincerely,

Jerrold Nadler
Member of Congress

cc: Christine LaSala, President & CEO
WTC Captive Insurance Company



STATE OF NEW YORK
INSURANCE DEPARTMENT
25 BEAVER STREET
NEW YORK, NEW YORK 10004

George E. Pataki                                                                                          Howard Mills
Governor                                                                                                    Superintendent

July 28, 2006

Ms. Christine LaSala, President
WTC Captive Insurance Company
110 Wiliam Street-Suite 2001
New York, NY 10038-4512

Dear President LaSala:

Almost five years ago, thousands of brave men and women worked tirelessly over many months to remove the debris from the former site of the World Trade Center (WTC). Indeed, their sacrifices are why the WTC Captive Insurance Company was formed with $1 billion in federal taxpayer monies, to insure New York City and the various contractors, subcontractors and others New York City engaged during that tumultuous time against claims arising out of the debris removal process that began immediately in the aftermath of Sept. 11, 2001.

The extraordinary heroism of our firefighters, police officers, emergency service workers, and everyday citizens in the wake of history's most horrendous, destructive and murderous terrorist attack is something we'll all remember forever. But the indomitable spirit of New Yorkers in the contracting industry who spent months at the WTC site remain on our minds to this day, too.

The WTC Captive Insurance Company's financial filings with the New York State Insurance Department indicate that few, if any, claims have been paid but substantial sums have been expended by your organization since 2004 for professional services. The New York State Insurance Department is concerned that the approximately $1 billion payment to the WTC Captive Insurance Company from the Federal Government may not be being used in accordance with its intended purpose. It is essential that you expeditiously provide my office with a detailed analysis of claims paid and expenses incurred since the WTC Captive Insurance Company's inception.

Very truly yours,

Howard Mills
Superintendent of Insurance

CHARLES E. SCHUMER
NEW YORK

# United States Senate

WASHINGTON, DC 20510

COMMITTEES:

BANKING
JUDICIARY
RULES
FINANCE

July 31, 2006

Ms. Christine LaSala
Chief Executive Officer
WTC Captive Insurance Company, Inc.
100 Willam Street
New York, New York 10038

Dear Ms. LaSala,

I write to express my concern over the way the captive insurance fund is handling the claims and litigation for Ground Zero recovery workers. I am disappointed the federally-financed fund – which I shepherded through Congress – is not fulfilling the mission it was charged with: making sure these brave men and women have the resources they need to address the health impacts that resulted from clearing debris at the World Trade Center site.

Today, I am calling on the WTC Captive Insurance Company, Inc., to abandon its efforts of fighting every claim tooth and nail, and begin working on establishing the protocols and objective criteria so that this money can be distributed to needy recipients as quickly as possible. No one, including myself, involved with the establishment of this fund expected it to behave like a stingy, bottom-line obsessed corporation. Rather, it was birthed out of recognition that the City should not be held responsible for the liability resulting from terrorist attacks and those who suffered injuries while working at ground zero would deserve compensation.

As you know, after the tragic attacks of September 11, 2001, thousands of first responders and construction workers rushed to the site to assist with search and rescue operations, recovery and debris removal. These brave men and women began their work without a thought to whether they would be compensated for any injuries received while at the site.

It quickly became apparent that no private insurer would take on the risks associated with the site and I met with city leaders and contractors to find a resolution. We agreed that the federal government should step up and fill this gap. I worked closely with the City, contractors and the Administration, including OBM Director Daniels to craft a solution, including securing $1 billion in federal funds to ensure that anyone injured at the site would be compensated. To ensure coverage for the nearly 40,000 workers who gave of themselves at Ground Zero, the federal funds were to act as a premium payment to a captive insurance company controlled by the City and established under New York law. This federal funding was obtained, in part, as a

recognition that neither the City nor the contractors should bear the responsibility for these costs caused by the terrorist attacks.

Unfortunately, the WTC Captive Insurance Co. is spending significant resources litigating a technical legal question rather than moving forward with paying claims of those who were injured at the site. Pursuing a question of the City's immunity might be a technically appropriate legal recourse, but considering the unprecedented event of 9/11 and the $1 billion that was set aside to assist these workers, I believe it is wrong. When I worked with the City and the contractors, my intent, along with that of my colleagues in Congress, was to use this federal money to pay appropriate claims, not to fight claims.

These workers were injured serving our nation in its time of greatest need, and we must not turn our backs on them now -- especially when there is money already allocated to do just that. The cases of those that have already died – Firefighter Stephen Johnson, Police Officer James Godbee, Detective James Zadroga and Emergency Medical Service paramedic Debbie Reeve – should receive particular attention.

Those injured as a part of the response, recovery and debris removal of the ground zero site deserve much better treatment. They worked tirelessly to clear the twisted steel of the Twin Towers and to search for the remains of the nearly 3,000 souls who perished that day. They gave of themselves and, as a result, the health of many suffered terribly. They deserve our profound appreciation in addition to fair compensation for injuries.

I urge the captive insurance company to immediately stop litigating this technical, legal question and begin the process of reviewing and paying appropriate claims of those who are sick or injured. At the end of the day, the $1 billion dollars allocated by the federal government should go to those who are sick or injured as a result of their work at ground zero as quickly as possible.

Sincerely,

Chuck Schumer

Charles E. Schumer
United States Senator



August 1, 2006

Mr. Howard Mills
Superintendent of Insurance
State of New York
Insurance Department
25 Beaver Street
New York, New York 10004-2319

Dear Mr. Mills:

This will respond to your letter of July 28, 2006. It also confirms our request to meet with you as soon as possible to review the purpose and operation of the WTC Captive Insurance Company. We made this request to Jody Wald yesterday morning upon receipt of your letter, already in the hands of both the New York Post and the Daily News. In addition, we note that your letter does not refer to any material available to your office and previously provided by the Captive as a matter of course, such as our quarterly reports. These reports provide claim and other financial information.

Prior to our meeting, I want to reiterate some facts to put the operation and purpose of the WTC Captive Insurance Company in context.

Congress's intent in forming the WTC Captive was to fill a gap in insurance coverage that would ordinarily have been purchased from commercial insurers. As you may know, FEMA contractors often purchase third party coverage for the work they do, with FEMA absorbing the cost of that insurance. In the case of the rescue, recovery, and debris removal at the World Trade Center after the terrorist attack on September 11, 2001, there was insufficient insurance coverage available in the commercial markets. While the New York Legislature passed enabling legislation and the Insurance Department amended New York insurance law in 2003, the WTC Captive was, in fact, formed by the City of New York and incorporated under Section 402 of the Not for Profit Corporation Law. Subsequently, on December 3, 2004, the WTC Captive was funded by FEMA and licensed by the New York State Insurance Department as a third party liability insurer, providing liability insurance through a retroactive policy.

This purpose is also clearly reflected in the Grant Agreement between the US Department of Homeland Security Emergency Preparedness & Response Directorate and New York State through the State Emergency Management Office. (The "Grant Agreement.") The Grant Agreement attached and incorporated other key documents, including notably the Liability Insurance Policy to be issued by the WTC Captive. As is typical for third party liability insurance, the policy includes a "duty to defend" – to provide and pay for legal counsel for the WTC Captive's insureds in case of lawsuits. The WTC Captive takes seriously this obligation to

Howard Mills
August 1, 2006
Page 2 of 3

its insureds, the City of New York and its contractors, who are presently involved in litigation of thousands of claims filed by plaintiffs and pending in the US District Court for the Southern District of New York.

The WTC Captive's insureds are obliged to comply with the mandates of the judge overseeing that complex and important litigation. Because of the sheer number of individual plaintiffs and the huge volume of documents, this work is inevitably costly—but no more so than in most mass tort litigations of comparable scale and complexity. The litigation has focused on immunity issues under procedures established by the court and endorsed by both plaintiffs and defendants. These motions are important not only to how the City and contractors responded to the extraordinary circumstances created by the terrorists, but also to how government and private contractors may respond to the next calamity.

The judge's orders required a period of initial discovery and motions practice, as well as an important interlocutory appeal to the United States Court of Appeals for the 2nd Circuit. Currently, as a result of his case management procedures, Judge Hellerstein is considering defendants' dismissal motions based on principles of state and federal immunity. When plaintiffs' claims will be resolved is subject to the Court's management.

To date, there has been no procedure adopted by the Court to provide for the discovery of information relating to the medical condition of any of the plaintiffs. In fact, only a small percentage of the plaintiffs have provided any specific information as to their condition either to the defendants or to the WTC Captive. Plaintiffs' counsel has so far included in that litigation not just the City of New York, but contractors both large and very small. Plaintiffs' lawyers have sued back-office accountants, lighting companies, scaffolding suppliers, structural engineering consultants, carting companies, electrical contractors, painting contractors, and others, with little or no explanation or allegation as to what these companies are supposed to have done wrong.

The WTC Captive is not like the Victim's Compensation Fund. In fact, FEMA required that the WTC Captive be set up as a third party liability insurance mechanism. By that very nature, the primary duty of the WTC Captive is to the insureds it was designed to protect, just as would be the case if the insurance had been available commercially. As such, we have sought to fulfill our duties under the Liability Insurance Policy, a copy of which is available in your office. In so doing, the WTC Captive has provided a defense to its many insureds, and is mindful of both current and future potential claims.

We look forward to discussing the WTC Captive with you.

Sincerely,

Christine LaSala
President and CEO

cc:    Peter J. Molinaro, State of New York Insurance Department
       Jody T. Wald, State of New York Insurance Department

# Worby Groner Edelman & Napoli Bern LLP

A Partnership of Limited Liability Partnerships

**115 Broadway**
**New York, New York 10006**

(877) 982-4376

----------

www.wgenb.com

**DENISE A. RUBIN**
*Associate - New York Office*
drubin@napolibern.com

August 4, 2006

Mr. Howard Mills
Superintendent
New York State Insurance Department
One Commerce Plaza
Albany, NY 12257

Re:    WTC Captive Insurance Fund

Dear Mr. Mills:

This office is Co-Liaison counsel for the plaintiffs in the World Trade Center Disaster Site litigations now pending before the Honorable Alvin K. Hellerstein in the United States District Court for the Southern District of New York.  Our clients are the firefighters, police officers and construction and other workers who labored in the clean up and debris removal activities at the site of the World Trade Center in the weeks and months following the terrorist attacks of September 11, 2001.

In recent weeks, there has been a great deal of media coverage about monies held and distributed by the WTC Captive Insurance Co., Inc. (the "Captive").  As you are aware, the Captive has paid out many millions of dollars to defense attorneys fighting the Ground Zero workers in court, but has not paid a single claim by a worker made ill by his or her exposures to toxic substances at the WTC site.  Thus far, at least five of these workers, all of whom had no remarkable health problems prior to 9/11, have died of the illnesses caused by their exposures at Ground Zero.

We have seen letters on this issue by Congressman Jerrold Nadler dated July 27, 2006 (addressed to the Department of Homeland Security) and by Senator Charles E. Schumer dated July 31, 2006 (addressed to Ms. LaSala).  We have also read, with interest, both your letter to Christine LaSala at the Captive, as well as her response to you dated August 1, 2006.  Having read her letter we find it necessary to clarify some striking inaccuracies in the assertions in response to your inquiry.

In her letter to you, Ms. LaSala states:

> The WTC Captive's insured are obliged to comply with the mandates of the judge overseeing that complex and important litigation [referring to Judge Hellerstein and the WTC Disaster Site litigation].  Because of the sheer number of individual plaintiffs

Mr. Howard Mills
New York State Department of Insurance
Re: WTC Captive Insurance Fund, Inc.
August 4, 2006, page 2

> and the huge volume of documents, this work is inevitably costly --
> *but no more so than in most mass tort litigations* of comparable
> scale and complexity. *The litigation has focused on immunity*
> *issues under procedures established by the court and endorsed by*
> *both plaintiffs and defendants.* …

> To date, there has been no procedure adopted by the Court to
> provide for the discovery of information relating to the medical
> condition of any of the plaintiffs. *In fact, only a small percentage*
> *of the plaintiffs have provided any specific information as to their*
> *condition* either to the defendants or to the WTC Captive. …

> *When Plaintiffs' claims are resolved is subject to the Court's*
> *management.*

*See* LaSala Letter of August 1, 2006, at page 2 (emphasis added). We will address these
contentions seriatim.

> *"...[T]his work is inevitably costly -- but no more so than in most*
> *mass tort litigations of comparable scale and complexity.*

As you can plainly see from the Captive's quarterly reports the costs are -- by any stretch
of the imagination -- extraordinarily high. The Court has instructed all sides to try and limit
costs to preserve any monies for payments to "legitimate claimants" rather than for defense
costs. The captive has already wasted tens of millions of dollars on a litigation where not even a
single answer has even been issued by the defendants on the vast majority of these cases. Having
recognized the judge's concerns, plaintiffs voluntarily offered to help mitigate litigation costs in
an attempt to resolve legitimate claims. We first offered a tolling agreement that would allow the
cases to be discussed without being filed. This would save costs on both sides and preserve the
corpus of the funds. The Captive denied this request, thus expending huge amounts of money to
receive the complaints. Second we agreed to voluntarily exchange medical records and devise a
plan to determine which legitimate claims should be paid immediately and which needed further
information. Once again the captive rebuffed our requests made in the interest of saving time
and money and helping the heroes. As an attorney who has both defended and prosecuted claims
in many mass tort cases, as well as assisted a New York State Supreme Court Justice in
overseeing another such litigation (the New York State Blood Products/HIV cases), I cannot
think of any other where so much money has been spent on doing so little at the expense of such
brave victims.

> *"The litigation has focused on immunity issues under procedures*
> *established by the court and endorsed by both plaintiffs and*
> *defendants..."*

While, to date, the litigation has been focused on immunity issues, that is at the Captive's
and the defendants' counsel's urging, and not the Court's or plaintiffs'. Initially the Court

Mr. Howard Mills
New York State Department of Insurance
Re: WTC Captive Insurance Fund, Inc.
August 4, 2006, page 3

indicated the cases should be resolved quickly with the least amount of money spent on unnecessary motion practice. Instead the Captive and its lawyers choose to reject these attempts by the Court to marshal a resolution and to fight each of the WTC heroes, thus raking up huge defense costs. The fact that the litigation and motion practice have thus far been confined to issues of immunity is not the result of any endorsement by the plaintiffs, but part of a concerted effort by the Captive and its lawyers to deny as many workers as possible any remuneration for their suffering. The Captive's hope is to crush the claims of as many heroes as possible based upon an outdated and obscure law from the 1950's. Faced with the defendants' unwillingness to talk about legitimate claims, the Court was forced to pursue these preliminary dismissal motions.

Even more disturbing, the Captive, through its insureds' counsel, has already indicated in phone conferences that if they lose this preliminary motion it has decided on a series of additional motions designed to deny workers any portion of the compensation Congress intended for their benefit. Thus, the defendants' attorneys will rack up even more expenses that could go to the victims. On at least one occasion an attorney with the City's Law Department who is in charge of this litigation indicated that the claims of most workers would not start being paid *if at all* until 2015 and beyond. This continued motion practice, and the delay it causes in allowing our clients' claims to move forward, was certainly not as a result of the "plaintiffs' endorsement." We are bound by the Court's rulings, however, and have proceeded accordingly.

> *"In fact, only a small percentage of the plaintiffs have provided*
> *any specific information as to their condition..."*

As stated above, Judge Hellerstein has suggested on several occasions that it might be useful for representative of the Captive to sit down with plaintiffs' counsel and discuss the possibility of reaching a settlement of these litigations. To date, despite the plaintiffs' stated interest in and willingness to do so, the Captive has steadfastly refused to engage in any discussions with the plaintiffs. Most troubling is Ms. LaSala's contention that "only a small percentage of the plaintiffs have provided" medical records or medical information to them. In the interest of settlement, the plaintiffs have offered to produce all of their medical records and documentation to the Captive, and have been rebuffed.

> *"The WTC Captive is not like the Victim's Compensation Fund. In*
> *fact, FEMA required that the WTC Captive be set up as a third*
> *party liability insurance mechanism. By that very nature the*
> *primary duty of the WTC Captive is to the insureds..."*

As both Senator Schumer and Congressman Nadler have already stated in their letters about this very issue, the billion dollars set aside by Congress was *expressly* intended for the purpose of compensating the brave men and women who labored in the WTC site and in doing so, sacrificed their health and in some cases, their livelihoods and lives.

In his letter to Ms. LaSala, Senator Schumer wrote:

> I am disappointed that the federally-financed fund -- which I
> shepherded through Congress -- is not fulfilling the mission it was
> charged with: making sure these brave men and women have the

Mr. Howard Mills
New York State Department of Insurance
Re: WTC Captive Insurance Fund, Inc.
August 4, 2006, page 4

resources they need to address the health impacts that resulted from clearing debris at the World Trade Center site.

Today, I am calling on the WTC Captive Insurance Company, Inc., to abandon its efforts of fighting every claim tooth and nail, and being working on establishing the protocols and objective criteria so that this money can be distributed to needy recipients as quickly as possible. No one, including myself, involved with the establishment of this fund expected it to behave like a stingy, bottom-line obsessed corporation. …

It quickly became apparent that no private insurer would take on the risks associated with the site and I met with city leaders and contractors to find a resolution. We agreed that the federal government should step up and fill this gap. I worked closely with the City, contractors and the Administration, including OMB Director Daniels to craft a solution, including securing $1 billion in federal funds *to ensure that anyone injured at the site would be compensated.*

…These workers were injured serving our nation in its time of greatest need, and we must not turn our backs on them now -- especially when there is money already allocated to do just that.

… I urge the captive insurance company to immediately stop litigating this technical, legal question and begin the process of reviewing and paying appropriate claims of those who are sick or injured. ***At the end of the day, the $1 billion dollars allocated by the federal government should go to those who are sick or injured as a result of their work at ground zero as quickly as possible.***

Letter of Senator Charles E. Schumer to Christine LaSala, July 31, 2006 (emphasis added).

If, in implementing Congress' intent, FEMA determined that the fund was to be used "primarily" for the insureds, rather than the injured workers, FEMA has plainly mishandled those funds and the WTC Captive is not carrying out the intent of Congress.

> *"When Plaintiffs' claims are resolved is subject to the Court's management."*

This statement is an out-and-out falsehood. The sole control over the settlement of these claims lies within the Captive's Articles Of Incorporation, with the Mayor's office and the Board the Mayor nominates and elects each year. The Mayor should by now have instructed his Corporation Counsel and the board he elects to mediate this case but thus far he has refused to do so. It is Mayor Bloomberg alone who possesses the authority to help these victims of 911 -- not Judge Hellerstein. To date Mr. Bloomberg has failed to act. If it was up to the Judge in this case, the matter would have been resolved years ago.

Mr. Howard Mills
New York State Department of Insurance
Re: WTC Captive Insurance Fund, Inc.
August 4, 2006, page 5

     Mr. Mills, we cannot stress strongly enough that our clients deserve to have your office enforce the intent of the United States Congress, to see that the WTC Captive Insurance Fund, Inc. directs its attorneys to stop their frontal assault on our clients' attempts to seek reasonable compensation for the loss of their health, their ability to support their families, and their lives. We stand available to supply your office any documentation or research you require to accomplish the goal of being sure that the injured heroes of 9/11 and the months thereafter are cared for as the people and government of this Country intended.

     We also request that copies of the Captive's quarterly reports be forwarded to our office. Despite our efforts to obtain those reports, particularly the most recently filed report, we have been unable to do so.


     Respectfully submitted,

     WORBY GRONER EDELMAN & NAPOLI BERN, LLP
     *Co-Liaison Counsel for the Plaintiffs*
     *World Trade Center Disaster Site Litigation*

     Denise A. Rubin


Enclosures:
     Senator Schumer's letter to Christine LaSala
     Congressman Nadler's letter to Department of Homeland Security

Contacts:    Roy Winnick/Caroline Gentile
             Kekst and Company
             (212) 521-4800

**WTC CAPTIVE INSURANCE COMPANY SENDS LETTER TO SENATOR SCHUMER**

NEW YORK, Aug. 9, 2006 — The WTC Captive Insurance Company, Inc. (the "WTC Captive") today sent a letter to U.S. Senator Charles E. Schumer of New York responding to the Senator's July 31 letter criticizing the WTC Captive for its role in the World Trade Center disaster site litigation currently before the Hon. Judge Alvin K. Hellerstein of the U.S. District Court for the Southern District of New York.

In the letter to Sen. Schumer, Christine LaSala, President and Chief Executive Officer of the WTC Captive, assured Sen. Schumer that the WTC Captive has been faithfully executing its legislative mandate and would continue to do so.  Ms. LaSala also noted that under the federal statute through which it was formed, as well as under the terms of its grant from FEMA, the WTC Captive is not a victims' compensation fund but an insurance company whose sole purpose is to provide liability coverage to the City of New York and the contractors the City engaged on and after 9/11.  Both the City and its contractors made repeated, but ultimately unsuccessful, efforts to secure the agreement of the federal government to pay claims directly for anyone injured during the rescue, recovery and clean-up work at the World Trade Center site.

Ms. LaSala pointed out that as an insurance company, the WTC Captive is required to provide for the legal defense of its Insureds—the City of New York and its contractors, who answered the City's call for help in the rescue, recovery and debris removal process that began on 9/11—against the thousands of lawsuits filed against them.

The litigation to date has been focused on immunity issues under procedures established by the Court and endorsed by both plaintiffs and defendants.  The immunity motions pending before the Court address whether the defendants should be liable at all.  These motions, Ms. LaSala noted, are of fundamental importance, not just in this litigation but in determining the ability of our government, and the willingness of the private sector, to respond quickly and effectively to any future national disaster.

The letter points out that, should it wish to do so, Congress could instead establish a fund for the direct relief of any injured workers, while also confirming the immunity of the City and its contractors from legal action, avoiding the costs of tort litigation to both plaintiffs and defendants.

The full text of Ms. LaSala's letter to Sen. Schumer follows:

2

August 9, 2006

Honorable Charles E. Schumer
United States Senate
313 Hart Senate Building
Washington, DC 20510

Dear Senator Schumer,

I write in response to your letter of July 31, 2006 concerning the purpose and obligations of the WTC Captive Insurance Company, Inc. ("WTC Captive"), and to give you an overview of what the WTC Captive is doing pursuant to its Congressional mandate to provide insurance coverage to the City of New York and the contractors it engaged to assist it in the rescue, recovery and debris removal work on and after 9/11.

The letter also explains some of the crucial work that is on-going in the tort litigation brought against the City of New York and those contractors in connection with the rescue, recovery and debris removal operations.

Because of adverse insurance market conditions resulting from the terrorist attack, insurance coverage was not available for the massive post 9/11 debris removal work. Accordingly, in 2004, the WTC Captive was established under FEMA's direction and in conformity with the federal statute as a liability insurance company to provide essential third party liability insurance through a retroactive policy.

Your letter accurately describes the process whereby the WTC Captive, after the fact, stepped in where the commercial insurance markets had failed, but then suggests that the statutory aim of the program was to "ensure coverage for the nearly 40,000 workers."  There is, however, no provision in the insurance policy, Public Law 108-7, or in the Grant Agreement under which the Captive was funded, that refers to the possibility of creating a direct payment fund for the benefit of injured workers.   This is despite repeated efforts by the City of New York and the contractors to secure the agreement of the federal government to pay claims directly to anyone injured during the rescue, recovery and clean-up work at the World Trade Center site.  Moreover, there is substantial question whether, under the Stafford Act, FEMA was even permitted to provide funding for the risks involved other than through an insurance mechanism.

The WTC Captive, pursuant to the laws under which it was established and the Grant Agreement, provides liability insurance to the City and its contractors. Importantly, as is typical with third party liability insurance, the policy issued by the WTC Captive includes a "duty to defend" – to provide and pay for legal counsel for the WTC Captive's insureds in the event of any lawsuits.  The WTC Captive takes seriously this duty to defend its insureds, the City of New York and its contractors, who have been sued in tort litigation filed by thousands of plaintiffs and currently before Judge Alvin Hellerstein in the US District Court for the Southern District of New York.

The litigation to date has focused on immunity issues under procedures established by the court and endorsed by both plaintiffs and defendants.  The immunity motions that Judge Hellerstein now has under advisement are a matter of fundamental public policy and not a "technical legal question."  The resolution of these issues is important not only with regard to how the City and its contractors responded to the extraordinary circumstances created by the terrorist attack, but also in determining the ability of our government and the willingness of private-sector contractors to respond to any future calamity be it a terrorist attack or a natural disaster.

The WTC Captive's insureds are obliged to comply with the mandates of the judge overseeing this complex and important litigation.  The judge's orders required a period of initial discovery and motions practice, and there also was an important interlocutory appeal to the United States Court of Appeals for the Second Circuit. Those steps streamlined the determination of important issues that relate to all of the thousands of claims.  The court has not yet decreed a procedure for the discovery of information relating to the medical condition of any of the plaintiffs.

The court, on repeated occasions, chastised the plaintiffs' lawyers for their failure to provide even basic information about plaintiffs' identity and complaints.   Although this litigation is more than three years old, plaintiffs' lawyers have filed far less than half of the court ordered individual complaints on behalf of their clients.  Moreover, plaintiffs' counsel has chosen to join in the tort litigation not just the City of New York, but contractors both large and very small with no apparent attempt to distinguish these contractors' respective roles at the WTC site.   Among the defendants are accountants, lighting companies, scaffolding suppliers, structural engineering consultants, carting companies, electrical contractors, painting contractors, and others, with little or no explanation or allegation as to what these companies are supposed to have done wrong.

Your letter states "neither the City nor the contractors should bear the responsibility for these costs caused by the terrorist attacks."  The WTC Captive agrees, and has proceeded accordingly.  Bearing in mind that many serious illnesses, including most cancers, take years if not decades to develop, it would be irresponsible (and unauthorized) for the WTC Captive to pay out all of its taxpayer funds immediately.  The WTC Captive was created to provide long-term protection to its insureds, and it may not and must not pay out all of its resources immediately, without appropriate development of the factual and scientific record.  This approach is required under any compensation mechanism so that it is possible to identify what conditions may exist and which claims are appropriate.

The primary duty of the WTC Captive is to its insureds as would be the case if the insurance had been available commercially.  At all times we have sought to fulfill our duties under the Liability Insurance Policy (a copy of which is enclosed) and the court's orders.  The WTC Captive is providing a defense to its many insureds and is mindful of

both current and future potential claims.   We intend to resolve those claims in a manner that best protects the City and its contractors.

The WTC Captive was not created as a victims' compensation fund.  It is, of course, within the legislative prerogative to establish such a fund outside the tort system to pay workers directly and establish immunity from suit for the City and its contractors, avoiding both costs of defense and contingency fees for plaintiffs' counsel.  In the meantime, the WTC Captive issued an insurance policy with obligations it is duty bound to fulfill.

I request and would welcome the opportunity to meet with you to discuss these matters.

Sincerely,

Christine LaSala
President and CEO

* * *


**About the WTC Captive Insurance Company, Inc.**
The WTC Captive Insurance Company, Inc. (the "WTC Captive") is a not-for-profit corporation formed (with a $1 billion grant from the Federal Emergency Management Agency) to insure the City of New York and various contractors and subcontractors the City engaged against claims arising from their role in the rescue, recovery and debris removal work that began immediately after the collapse of the Twin Towers of the World Trade Center on September 11, 2001.  The Captive's mandate is to protect its insureds, including preventing their facing uninsured liability, so that neither the City nor any of the contractor and subcontractor policyholders incurs financial damage as a result of the responsible and public-spirited role they played in the rescue, recovery and debris removal effort on and after 9/11.

# NAPOLI BERN RIPKA LLP
Attorneys • At • Law

Marc Jay Bern
*Senior Partner*
mjbern@nbrlawfirm.com

August 10, 2006

*Via Facsimile: Fax: 212-486-7693*

The Honorable Charles E. Schumer
757 Third Avenue, Suite 17-02
New York, NY 10017

Re:    World Trade Center Captive Insurance Fund

Dear Senator Schumer:

As you will recall from our prior letter to your office last week, my office is Co-Liaison Counsel for the plaintiffs in the World Trade Center Disaster Site Litigation currently pending before the Hon. Alvin K. Hellerstein in the United States District Court for the Southern District of New York.

We have reviewed with interest the August 9, 2006, correspondence to you from the WTC Captive Insurance Fund, Inc.'s ["the Captive"] President and CEO, Christine LaSala. Ms. LaSala's letter responds to your earlier criticism of the Captive's determination to fight in Court every claim made by a WTC worker in lieu of resolving injury claims that stem from the 9/11 debris removal operations. The Captive's unfortunate litany of excuses and half-truths must not be permitted to obscure their abject failure to fulfill the purpose for which the WTC Captive was formed: to expedite the processing and payment of claims related to the WTC disaster rescue, recovery and debris removal efforts.

At issue is Ms. LaSala's failure to understand that even in the commercial insurance realm the insurer's duty to defend an insured's liability, in proper circumstances, means to pay those legitimate claims as are made. Insuring a client also means that the client's liability (*e.g., responsibility*) for its negligent acts does not result in its liability *to pay* claims made out of its own coffers.

Rather than accept any responsibility for their failures, Ms. LaSala and the WTC Captive now see fit to blame a growing list of parties they deem responsible for the current atmosphere of antagonism and litigation that now includes: the Congress, the New York Legislature, the elected public officials who oversaw and caused the WTC Captive legislation to be enacted and funded, the enacting and funding legislation itself, the plaintiffs, the plaintiffs' counsel, The Honorable Alvin K. Hellerstein and the federal judicial process, medical science and future plaintiffs. The list goes on infinitum. This reaction by the Captive and its CEO are appalling and, more to the point, are nonsense, given the WTC Captive's clear legislative mandate, as evidenced by its legislative history, corporate documents and the statements made by yourself, Congressman Nadler and Howard Mills, the Superintendent of the New York State Department of Insurance.

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 2

As has been previously and repeatedly cited, P.L. 108-7 directed FEMA

> to provide, from funds.... up to $1,000,000,000 to establish a
> captive insurance company or other appropriate insurance
> mechanism for claims arising from debris removal, which may
> include claims made by city employees.

Congress did not, either implicitly or explicitly, instruct that a captive insurance company be established solely to defend the City of New York and its contractors from all rescue, recovery and debris removal related claims at all costs, as Ms. LaSala's correspondence suggests. Rather, the intent was, as you have said, to indemnify the City and its contractors for the claims made by injured WTC workers.

Notably, the mandating statute does not mention defending the City or any other entity. Congress was well aware that the *duty to indemnify* is separate from the *duty to defend*, under well worn insurance law. Even if, arguably, "claims arising from debris removal" includes defending the City and its contractors against a finding of liability, it does not follow that defending liability means that the insurer has a duty to avoid paying legitimate claims. Rather, consistent with the congressional intent, defending the City and contractors' "liability" should be understood to mean determining a claimant's eligibility to maintain a claim and the size and monetary value of such a claim. This interpretation is logically consistent with the statutory language that "a captive insurance company or other appropriate insurance mechanism" be created to pay claims. Indeed, the use of the word "mechanism" clearly evidences the intent that the insurance entity created was merely a "mechanism" to process and pay claims.

Moreover, the quoted phrase authorizes various remedial options that are not limited to Ms. LaSala's narrow and limited interpretation, *i.e.,* that the Captive is a mere agent to fund the City and contractors' defense. Ms. Lasala and the WTC Captive would do well to point to any authority (legislative history, language in the enabling legislation, related statutory language, for example) instead of assigning blame to others for her organization's shameful mishandling of the taxpayers' dollars.

Interestingly, Ms. LaSala supports her arguments about the importance of litigating these issues rather than paying the injured workers, by claiming that

> The immunity motions that Judge Hellerstein now has under
> advisement are a matter of fundamental public policy and not a
> "technical legal question." The resolution of these issues is
> important not only with regard to how the City and its contractors
> responded to the extraordinary circumstances created by the
> terrorist attack, but also in determining the ability of our
> government and the willingness of private-sector contractors to
> respond to any future calamity be it a terrorist attack or natural
> disaster.

*See* LaSala letter, at p. 3. Congress has addressed precisely this issue with regard to the aftermath of Hurricane Katrina and comparison to the current claims ongoing in New York with regard to the WTC site. In our motion papers before the District Court, we cited discussions held

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 3

on this point with regard to anticipated claims of injuries by workers remediating the aftermath of Hurricane Katrina. In a hearing where a number of your colleagues in the Senate agreed that the City of New Orleans and other entities should not have to shoulder the expense of claims made for injuries during the remediation efforts, it was also eminently clear that the Senate did not believe that a blanket immunity from suit was appropriate. Moreover, these concerns are not appropriately before the Captive and should not be factored into any claim determination. It is not for the Captive to make these policy decisions. It is disingenuous for Ms. LaSala to raise these policy concerns as a defense to the growing chorus of complaints about the Captive's failure to fulfill its mandate. Plainly, the Captive does not understand its mandate.

In March 2003, the New York Legislature amended its insurance statutes to permit the creation of captive insurance that is explicitly applicable to retroactive WTC claims. The Governor's March 21, 2003, press release stated, in part, that :

> "The new legislation will mean New York City will now have important insurance coverages [sic] it greatly needs relating to the tragedies of September 11th," Governor Pataki said. "The Federal Emergency Management Agency specifically authorized the creation of a New York City captive and *the City explored various options and decided that the formation of a captive insurance company was in its best interest for claims* arising out of the clean-up effort at and near the World Trade Center."

> New York City Mayor Michael Bloomberg said, "The City of New York, together with State officials and the New York Congressional delegation, has fought long and hard for federally-paid insurance to protect the City and its contractors for claims arising from the massive debris removal work done in the World Trade Center. *This legislation is necessary for the City to expedite the payment of claims* relating to this effort." (Emphasis added).

Thus, it was not FEMA, as alleged by the Captive's recent correspondence, that required the formation of the particular WTC Captive entity, but Mayor Bloomberg, who decided that it was in the City's and the claimants' best interests. *It bears repeating that since the March 21, 2003 press release, no claims have been paid, expeditiously or otherwise.*

New York Insurance Law §§ 7001-7008 contain the relevant WTC Captive provisions. Section 7003(c)(5) expressly recognizes "the unique risk insured by such captive and the source and limits of the premium payments along with any limitations on the acceptance of claims and the payment of accepted claims so long as such limitations provide an equitable basis for the allocation of the assets of such company to pay claims." We note the statutory emphasis on equitably allocating assets to pay claims based upon a weighted scale of merit – not endlessly defend the City and its Contractors by denying each and every claim, regardless of individual merits. Equally important, there is no mention in this statutory provision, nor anywhere else in the legislation, that permits the "source and limits of the premium payments" to be exhausted by litigation expenses. To the contrary, these funds are to be allocated solely to the equitable payment of claims.

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 4

Section 7005(a)(3) confirms the information about the formation of the WTC Captive Insurance Fund, Inc. contained in the Governor's press release. That section expressly gives the Mayor of the City of New York discretion to form a captive insurance company as either "a public benefit corporation or not-for-profit corporation...that shall be exempt from all state and local taxes." The WTC Captive, then, is not required to function as a "third party liability insurance mechanism," as inaccurately maintained by Ms. LaSala's recent correspondence. To the contrary, the Statute expressly requires the opposite, that is, that the Captive function as either a "public benefit corporation" or a "not-for-profit corporation," both of which, by definition, serve the public and owe duties to the public. There is no primary duty to defend the City and its contractors, as Ms. LaSala mistakenly claims.

Nor, moreover, does the WTC Captive's Certificate of Incorporation lend any support to the excuses for inaction and wasteful spending that has come to be synonymous with, and the only products of, the Captive's formation. Article or Section three of that Certificate states that

> THIRD: The Purpose for which the Company is formed is to provide insurance on an occurrence basis for events occurring on or after September 11, 2001.....the kinds of business to be transacted by the Company are....."Personal injury liability insurance,"....meaning insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability (including the insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependants, beneficiaries or personal representatives of persons who are killed, **irrespective of legal liability of the insured**).... .

(emphasis added). This is entirely inconsistent with the positions taken by Ms. LaSala and the Captive in their recent correspondence, as well as their actions over the past several years. While the phrase "legal liability of the insured" could, in a vacuum, be interpreted as justifying the current litigation, it must properly be understood within its historic context that the New York legislature found to be a "unique risk." That is to say that in this context, the phrase "legal liability of the insured" must be viewed as the City's *financial* liability for equitable claim payment, and not the denial of the duty to pay any claims in any amount to anyone.

This interpretation is lent further credence by Section or Article Nine of the Certificate of Incorporation, which requires that the Captive Board create an Advisory Committee of three members, vested with authority to consider claim disputes referred to the Board by the Captive's third party claims administrator and with forwarding a recommendation to the Board for each such dispute. In the event that the Board disagrees with the Advisory Committee's recommendation

> and there is still a dispute with respect to such claim, the Board of Directors shall refer the dispute to an arbitration to be conducted under New York law pursuant to the rules of the American Arbitration Association. The decision rendered upon such

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 5

                      arbitration shall be binding on the Board of Directors and the
                      Company.

Thus, according to the Certificate of Incorporation, there is to be *non-litigious claims resolution*, including benefits for injured or deceased persons and their heirs "irrespective of legal liability of the insured."

This is in sharp contrast with the actual functioning of the WTC Captive. As verified by the Quarterly Statement for the second quarter of 2006, there has been no payment of claim benefits, of any kind, to anyone. Indeed, the Captive has even failed and refused to adjust any claims, apparently assigning the random value of $1,000.00 to each and every claim.[1] At the same time, the Captive has spent $28,474,546 in "DCC" or attorney's fees and overhead and estimates that it will spend up to $66,450,000 in "DCC," with claim losses remaining at $6,645,000. This leaves a 10 to 1 ratio of anticipated attorney's fees and overhead compared to claim payments.

The actions of the WTC Captive would not be tolerated on the commercial, for-profit, insurance market and is in stark contrast to its not-for-profit status and purpose, let alone Congressional mandate, NY Captive Insurance Statute and the Captive's Certificate of Incorporation. Pursuant to the New York Unfair Claims Statute, no insurer, including the WTC Captive, may fail "to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies," and related failures. McKinney's Insurance Law, § 2601. The Captive has consistently failed to adopt any such standards and has failed to pay any claims owed "irrespective of the legal liability of [its] insured," as set forth in the WTC Captive Certificate of Incorporation, Section Three. The WTC Captive is violating New York law and is acting in bad faith.

Ms. LaSala and the WTC Captive take great pains to repeatedly point out that they are not authorized to pay claims directly to anyone, nor are they a "victim's compensation fund." These are meaningless straw-man arguments. Moreover, they fail to constructively explain what the Captive is supposed to be doing. Section or Article Four of the WTC Captive's Certificate of Incorporation establishes that it is type "D" non-profit corporation pursuant to the not-for-profit corporation law. As set forth in McKinney's N-PCL § 201(b), a type "D" not-for-profit corporation is one formed by authority of another law, such as the previously cited Captive statute. Pursuant to § 201(c), "[a] type D corporation is subject to all provisions of this chapter which are applicable to a type B corporation under this chapter unless provided to the contrary in, and subject to the contrary provisions of, the other corporate law authorizing formation... ." A Type B "not-for-profit corporation of this type may be formed for any one or more of the following non-business purposes: charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals." § 201(b).

---

[1] The quarterly statement indicates that there are 6,645 pending claims with $6,645,000 set for loss reserves. It is assumed that these figures are no coincidence and that $1,000.00 has been randomly assigned to each of the 6,645 cases to reach the loss reserve. Nevertheless, the quarterly statement claims an expense of $5,209,532 for "loss expense related to claims adjusting."

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 6

So, by incorporating as a Type "D" non-profit, the WTC Captive does not owe duties solely to its named insureds in the same manner as a general, private personal injury liability insurer. It is the extent of the duty owed to injured claimants, not the existence of that duty, that should be at issue. As a not-for-profit insurance corporation, the WTC Captive should be held to owe a duty of good faith to the WTC claimants akin to that owed to first-party, uninsured/underinsured claimants under New York law. That, in essence, is what the Captive is: a Congressionally mandated uninsured fund to pay WTC injury claims.

By contrast, Ms. LaSala compares the pending claims to ordinary personal injury cases between a plaintiff and the carrier's insured. However, the Captive's attempts to analogize the pending cases to generic personal injury actions are unavailing. The pending claims were not filed in an historic and statutory vacuum. The Captive is a government created, publicly funded, not-for-profit corporation designed to protect the City from paying claims related to debris removal.

Moreover, Section Fourteen of the WTC Captive's Certificate of Incorporation provides that

> It is intended that the Company be free from Federal taxes **as an integral part of the City of New York**, within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States IRS Code of 1986, as amended. **This Certificate of Incorporation shall be construed accordingly**...

(emphasis added)  Revenue Ruling 71-132 basically held income derived from the operation of liquor stores by the Oregon Liquor Control Commission to be not subject to federal income tax. IRS Code Section 115 holds that gross income does not include "(1) income derived from any public utility or for the exercise of any essential governmental function and accruing to a State or any political subdivision thereof."

Clearly, then, the WTC Captive is not the private insurance entity claimed by Ms. LaSala. It is an "integral" part of New York City government, akin to a "public utility" or exercising an "essential governmental function" – not a purely private insurance corporation with contractual duties owed only to its named insureds.

Similarly, Ms. LaSala failed to reference express authority permitting the Captive to fund litigation at the expense of claim reserves. There is no indication that the policy is or was to be a "wasting" policy, in which defense costs exhaust the amount of funds available to pay claims. Indeed, the policy language appears to be to the contrary. The aggregate limit of the policy is defined in §4.01(b), with §4.02 referring to one billion dollars. Section 4.05 defines "ultimate net loss" as the paid losses and, in addition thereto, expenses and recovery such as salvage and or subrogation.

In other words, it appears that WTC Captive policy does not expressly authorize reducing its outer limit of coverage of one billion dollars by investigation costs or defense costs, nor has any such reduction been authorized by any mandating authority. Simply put, the WTC Captive funds were never intended nor authorized to be used as a legal defense fund, the only use to which these funds have been used over the past several years.

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 7

Moreover, there was never any mention in any statute, press release or corporate certificate of the right to dispute whether the Captive fund was available to cover the pending claims. Such a defense must be considered *ultra vires,* with all funds spent in furtherance of these improper pursuits reimbursed so that victims can be compensated.

The lack of constructive action and negative positions taken by Ms. LaSala and the WTC Captive are indicative of the miasma that has afflicted our great county, at home and abroad, over the past several years. Our elected public servants recognized the existence of a problem stemming from an emergency and created the tools necessary for redress. Once again, the mandate to use those tools has been ignored by those to whom the task was entrusted. This is particularly intolerable in this, our Nation's greatest city. The Heroes of 9/11 deserve better.

But of all of the unfounded and unsupportable arguments offered by Ms. LaSala in response to your inquiry, perhaps the most offensive is her contention that current claims should not be paid out of a concern that the fund will be depleted and unable to provide "long term protection to its insureds." Concern about fund depletion is no excuse for a refusal to pay a single claim. These men and women are sick and dying today, not in some future world of maybe. *See, e.g.,* "Please Help Me Go On Living: WTC Volunteer Needs Swift Action To Survive," NEW YORK DAILY NEWS, August 10, 2006, editorial:[2]

> Like thousands of others, Valenti is at the mercy of a workers' compensation system that is ill-suited, if not hostile, to reimbursing them for lost wages and picking up health care costs. New York's compensation law was written to cover standard accidents, such as falling off a ladder, and illnesses directly related to a specific occupation, such as repetitive stress nerve damage among meat cutters. The law was not designed for illnesses that emerge over time from the inhalation of unprecedented amounts of toxins by 40,000 workers with disparate jobs.
>
> As a result, Valenti is among a vast legion who are barred from filing claims because they realize they are sick more than two years after 9/11, the time limit for starting a case. His only hope rests in legislation that would extend the filing period for 9/11 responders. Such a bill is on Pataki's desk. So Valenti lives on $1,430 a month in Social Security and cannot afford drugs to treat his illness and prepare him for a transplant.
>
> "He is dying," said Dr. Maria Padilla, medical director of Mount Sinai Medical Center's lung transplantation program, who began seeing Valenti in April 2005. "Unless he can get coverage for his medications and get ready for a transplant, there is no hope."

---

[2] http://www.nydailynews.com/front/story/442271p-372474c.html

The Hon. Charles E. Schumer
Re: WTC Captive - Response to LaSala Letter
August 10, 2006, page 8


     Senator, we thank you for your kind consideration of the foregoing.  We appreciate the opportunity to work with you and with your office to see that these heroic workers whose lives and health are now in jeopardy, are properly cared for with the funds expressly set aside for that purpose by the Senate.


            Very truly yours,

            WORBY GRONER EDELMAN & NAPOLI BERN, LLP
            *Plaintiff's Liaison Counsel*

            Marc Jay Bern


cc:    The Hon. Carolyn Maloney
       The Hon. Jerrold Nadler
       The Hon. George Pataki
       The Hon. Michael Bloomberg
       Mr. David Hantman
       Mr. Martin Brennan

HILLARY RODHAM CLINTON
NEW YORK
SENATOR

RUSSELL SENATE OFFICE BUILDING
SUITE 476
WASHINGTON, DC 20510–3204
202–224–4451

COMMITTEES:
ARMED SERVICES
ENVIRONMENT AND PUBLIC WORKS
HEALTH, EDUCATION, LABOR, AND PENSIONS
SPECIAL COMMITTEE ON AGING

# United States Senate

WASHINGTON, DC 20510–3204

September 21, 2006

Ms. Christine LaSala
Chief Executive Officer
WTC Captive Insurance Company, Inc.
100 William Street
New York, New York 10038

Dear Ms. LaSala:

One of the primary purposes of the Captive Insurance Fund when it was established by Congress was to "provide the City of New York and its debris removal contractors with coverage for claims arising from debris removal performed after the collapse of the WTC buildings." Undoubtedly, there were significant liability risks assumed by the City and the private contractors who swiftly and professionally responded to the attacks. Subsequently, the $1 billion federal grant establishing a World Trade Center (WTC) Captive Insurance Fund addressed those coverage needs and recognized the unique circumstances that were created by the 9/11 response.

However, I am troubled by the reports that the WTC Captive Insurance Company, which was created from the Captive Insurance Fund, has disproportionately focused its efforts at protecting New York City from the liability that may arise from these claims instead of its responsibility to process the claims and disburse all due compensation to those who were injured at Ground Zero.

While the WTC Captive Insurance Company must follow all due diligence in addressing these claims and protect the legal interests of New York City, we must not lose sight of the fact that it was also intended that the fund address the needs of those workers who risked their health and their lives at Ground Zero. The horrific circumstances of 9/11, the heroic response of those workers who rushed to Ground Zero following the attacks, and the tragic health consequences faced by thousands of those workers demand that every possible step be taken to provide them with financial relief as soon as possible.

Therefore, I urge you to make every effort to move this process forward to begin providing for the workers who to this day suffer the health consequences of their selfless and courageous actions at Ground Zero. Thank you for your prompt attention to this matter.

Sincerely yours,

Hillary Rodham Clinton

Hillary Rodham Clinton

# Worby Groner Edelman & Napoli Bern LLP

A Partnership of Limited Liability Partnerships

**115 Broadway**
**New York, New York 10006**

(877) 982-4376

-----------

www.wgenb.com

October 30, 2006

Ms. Christine LaSala
Chief Executive Officer
WTC Captive Insurance Fund, Inc.
100 William Street
New York, New York  10038

> Re:    Meetings of the WTC Captive Insurance Fund, Inc.'s
>        Board of Directors

Dear Ms. LaSala:

As you are likely aware, I serve as plaintiff's Co-Liaison Counsel in the litigation now pending before the Honorable Alvin K. Hellerstein in the United States District Court for the Southern District of New York (*In re: World Trade Center Disaster Site Litigation*, Docket 21 MC 100 [AKH]).  We write today to formally request notification of all future meetings of the WTC Captive pursuant to the New York State "Open Meetings Law."

The Open Meetings Law is designed to ensure that public business is conducted in an observable manner; to promote this goal, the provisions of the Open Meetings Law are to be liberally construed (*see, Matter of Gordon v. Village of Monticello,* 87 N.Y.2d 124, 126-127 [1995]).  McKinney's Public Officers Law § 102 defines what is a meeting and what is a public body within the New York Open Meetings statute.  Specifically, it states that a "'Meeting' means the official convening of a public body for the purpose of conducting public business, including the use of videoconferencing for attendance and participation by the members of the public body."  The statute then goes on to define a "'Public body' means any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law, or committee or subcommittee or other similar body of such public body."

Based on our research, we believe that the Captive is subject to the open meetings laws.  First, section fourteen of the WTC Captive's Certificate of Incorporation states that "The Company shall be a type D corporation pursuant to the not-for-profit corporation law."   According to McKinney's N-PCL § 201(b), a type "D" not-for-profit corporation is one formed by authority of another law, such as the previously cited Captive statute.  Pursuant to § 201(c),

Ms. Christine LaSala
CEO, WTC Captive Insurance Co., Inc.
October 30, 2006, page 2

> "[a] type D corporation is subject to all provisions of this chapter
> which are applicable to a type B corporation under this chapter
> unless provided to the contrary in, and subject to the contrary
> provisions of, the other corporate law authorizing formation…"

A Type B "not-for-profit corporation of this type may be formed for any one or more of the following non-business purposes: charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals." § 201(b). So, by incorporating as a Type D non-profit, the WTC Captive does not owe duties solely to its named insureds in the same manner as a general, private personal injury liability insurer. It is the extent of the duty owed to injured claimants, not the existence of that duty, that should be at issue.

Additionally, section fourteen of the WTC Captive's Certificate of Incorporation provides that "it is intended that the Company be free from Federal taxes **as an integral part of the City of New York**, within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States IRS Code of 1986, as amended. **This Certificate of Incorporation shall be construed accordingly**… ." (Emphasis added).

The Court of Appeals held in *Smith v. City University of New York*, 92 N.Y.2d 707, 708 (1999) that:

> in determining whether an entity is a public body, various criteria
> or benchmarks are material. They include the authority under
> which the entity was created, the power distribution or sharing
> model under which it exists, the nature of its role, the power it
> possesses and under which it purports to act, and a realistic
> appraisal of its functional relationship to affected parties and
> constituencies. This Court has noted that the powers and functions
> of an entity should be derived from State law in order to be
> deemed a public body for Open Meetings Law purposes ( *see,
> Matter of American Socy. for Prevention of Cruelty to Animals v.
> Board of Trustees of State Univ. of N. Y.,* 79 N.Y.2d 927, 929, 582
> N.Y.S.2d 983, 591 N.E.2d 1169).

The *Smith* Court also discussed the nature of entities subject to the open meetings law by stating one

> may be that an entity exercising only an advisory function would
> not qualify as a public body within the purview of the Open
> Meetings Law [internal citations omitted]. … More pertinently
> here, however, a formally chartered entity with officially delegated
> duties and organizational attributes of a substantive nature, as this
> Association, Inc. enjoys, should be deemed a public body that is
> performing a governmental function [citations omitted]. It is
> invested with decision-making authority to implement its own
> initiatives and, as a practical matter, operates under protocols and

Ms. Christine LaSala
CEO, WTC Captive Insurance Co., Inc.
October 30, 2006, page 3

practices where its recommendations and actions are executed unilaterally and finally, or receive merely perfunctory review or approval.

Further, *Matter of American Socy. for Prevention of Cruelty to Animals v. Board of Trustees of State Univ. of N. Y.* states that Public Officers Law § 103(a) provides that "[e]very meeting of a public body shall be open to the general public," except for executive sessions (*see,* Public Officers Law § 105). A "public body," in turn, is defined as "any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the *state* or for an agency or department thereof, or for a *public corporation as defined in section sixty-six of the general construction law,* or committee or subcommittee or other similar body of such public body." (Public Officers Law § 102[2]; emphasis added).

Given the foregoing, it is clear that the WTC captive was created under the authority of another law, such as the previously cited Captive statute. Clearly, given the nature of the Captive's role, the formation of a captive insurance company was in its best interest for claims arising out of the clean-up effort at and near the World Trade Center. The power it possesses and under which it purports to act was statutory; these facts expressly require the WTC Captive to function as either a "public benefit corporation" or a "not-for-profit corporation," both of which, by definition, serve the public and owe duties to the public.

In the future, kindly see that this office is apprised of all upcoming meetings in a timely fashion to facilitate our attendance.

Very truly yours,

Paul J. Napoli

cc:

Andrew J. Carboy, Esq.
Sullivan Papain, Block, McGrath & Cannavo, P.C.
120 Broadway
New York, New York 10271



November 17, 2006


Paul Napoli, Esq.
Worby Groner Edelman Napoli  & Bern, LLP
115 Broadway, 12th Floor
New York, New York 10006

Dear Mr. Napoli:

I write in response to your letter of October 31 inquiring about the WTC Captive's
Board of Directors meetings.  Having reviewed your letter, the WTC Captive
remains of the view that it is not subject to the Open Meetings Law.


Sincerely yours,

David R. Biester
General Counsel

NEW YORK NY 100

0730 00-370-400 77 75
0911

MAILED FROM ZIP CODE 10038

**WTC**
WTC CAPTIVE INSURANCE COMPANY, INC.

100 WILLIAM STREET
SUITE 2001
NEW YORK, NY 10038

Paul Napoli, Esq.
Worby Groner Edelman Napoli & Bern, LLP
115 Broadway, 12th Floor
New York, New York 10006



# FAX TRANSMISSION SHEET

## NYS DEPARTMENT OF STATE
### COMMITTEE ON OPEN GOVERNMENT
### (518) 474-2518
### (518) 474-1927-Fax

WEBSITE ADDRESS: http://www.dos.state.ny.us/coog/coogwww.html

**TO:** DENISE RUBIN

**FROM:** BOB FREEMAN

**MESSAGE:** AS PROMISED. I'D BE CURIOUS TO KNOW YOUR REACTION.

Happy Holidays!

---

Number of Sheets (including this cover sheet) 8

If there is a question or problem, please call 518/474-2518.



**STATE OF NEW YORK**
**DEPARTMENT OF STATE**
**COMMITTEE ON OPEN GOVERNMENT**

*7011 - Ao -*
*OML - Ao -*

**Committee Members**

41 State Street, Albany, New York 12231
(518) 474-2518
Fax (518) 474-1927
Website Address:http://www.dos.state.ny.us/coog/coogwww.html

John F. Cape
Mary O. Donohue
Stewart F. Hancock III
Heather Hegedus
Christopher L. Jacobs
J. Michael O'Connell
Michelle K. Rea
Dominick Tocci

December 7, 2006

Executive Director

Robert J. Freeman

E-Mail

TO:        Susan Edelman, New York Post

FROM:    Robert J. Freeman, Executive Director    RJF

<u>The staff of the Committee on Open Government is authorized to issue advisory opinions. The ensuing staff advisory opinion is based solely upon the information presented in your correspondence.</u>

Dear Ms. Edelman:

As you are aware, I have received your letter and a variety of materials relating to it. You have requested an advisory opinion concerning the status of the World Trade Center Captive Insurance Company, Inc. (hereafter "Captive") under the Freedom of Information and the Open Meetings Laws. Based on the analysis offered in the following commentary, I believe that Captive is subject to and required to comply with both of those statutes.

By way of background, a captive insurance company is a company that only insures all or part of the risks of its parent. Captive was required to be created pursuant to a grant agreement executed in November of 2004 and signed by Michael D. Brown, Under Secretary for Emergency Preparedness and Response at the U.S. Department of Homeland Security, and James W. Duffy, Governor Pataki's Authorized Representative. The Agreement identifies the State Emergency Management Office ("SEMO") as the Grantee and New York City as the Sub-Grantee. Article I, paragraph 2 of the Agreement provides that:

> "The Grantee through its Sub-Grant Agreement with the City attached
> hereto and incorporated by reference (Attachment A) shall ensure that
> the City will establish and incorporate a captive insurance company
> to be known as the WTC Captive Insurance Company, Inc. in the
> State of New York pursuant to the Certificate of Incorporation, the
> By-Laws, and the Liability Insurance Policy (attached hereto and
> incorporated herein as Attachments B, C, and D, respectively) to

Ms. Susan Edelman
December 7, 2006
Page - 2 -

> insure the City and its debris removal contractors, subcontractors and
> consultants at every tier, for claims arising from debris removal at the
> WTC site from September 11, 2001 (post collapse) through August
> 30, 2002."

A Sub-Grant Agreement was also executed in November 2004 and signed by the Governor's Authorized Representative and Mark Page, the City's Director of the Office of Management and Budget. That agreement states that Captive "would insure the City and the contractors for claims arising from the debris removal project, including for any environmental or professional liability."

Most significantly, its Certificate of Incorporation indicates that Captive is a not-for-profit corporation and that the Mayor of New York City appoints the members of and has control over the Captive's Board of Directors. Specifically, Paragraph Fifth provides that:

> "(a) The Board of Directors shall consist of five directors. All
> directors of the Company shall be appointed annually by the Mayor
> of the City of New York prior to the Company's annual meeting;
> provided, however, that one of such directors shall be appointed by
> the Mayor upon nomination of a person, which person shall be
> acceptable to the Mayor, in his sole discretion, by the Representative
> of the Contractors (as selected in accordance with paragraph (d) of
> this Article FIFTH); provided, further, that in event a nominee is not
> acceptable to the Mayor, the Representative, on behalf of the
> Contractors, shall have the right to select additional nominees until a
> nominee is deemed acceptable to the Mayor. Each year, immediately
> following the beginning of the Company's fiscal year, the Mayor shall
> be notified in writing by the President of the Company of the
> requirement to make the annual appointments to the Board of
> Directors of the Company. Directors shall succeed to office at the
> next annual meeting of the Board of Directors following their
> appointment.

> "(b) Each director shall be an employee, former employee or
> employee-on-leave of the City of New York or a person experienced
> in the insurance, construction, financial, professional, or other
> business or governmental communities of the City of New York.
> Each director shall be at least eighteen years of age and a citizen of
> the United States. At least two (2) of the directors shall be residents
> of New York State.

> "(c) The Mayor may appoint an alternate for each director, which
> alternate, upon written notice to the Secretary, may attend meetings
> and exercise therein all the rights, powers, and privileges of the
> absent director; provided that in the event an alternate for the director
> nominated on behalf of the Contractors is nominated by the


Ms. Susan Edelman
December 7, 2006
Page - 3 -

> Representative thereof, such alternate, if acceptable to the Mayor in his sole discretion, shall be appointed by the Mayor; <u>provided, further,</u> that in the event of such nominee is not acceptable to the Mayor, the Representative of the Contractors shall have the right to select additional nominees until a nominee is deemed acceptable to the Mayor."

In consideration of the control of Captive exercised by the Mayor and judicial decisions rendered by the Court of Appeals, the state's highest court, regarding the application of the Freedom of Information and Open Meetings Laws, again, I believe that Captive's records and meetings fall within the coverage of those statutes.

The Freedom of Information Law is applicable to agency records, and §86(3) defines the term "agency" to mean:

> "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or other governmental entity performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the judiciary or the state legislature."

In consideration of the foregoing, as a general matter, the Freedom of Information Law pertains to entities of state and local government in New York.

Although not-for-profit corporations typically are not governmental entities and, therefore, fall beyond the scope of the Freedom of Information and Open Meetings Laws, the courts have found that the incorporation status of those entities is, alone, not determinative of their status under the statutes in question. Rather, they have considered the extent to which there is governmental control over those corporations in determining whether they fall within the coverage of those statutes.

In the first such decision, <u>Westchester-Rockland Newspapers v. Kimball</u> [50 NYS 2d 575 (1980)], the issue involved access to records relating to a lottery conducted by a volunteer fire company, the Court of Appeals found that volunteer fire companies, despite their status as not-for-profit corporations, are "agencies" subject to the Freedom of Information Law. In so holding, the Court stated that:

> "We begin by rejecting respondent's contention that, in applying the Freedom of Information Law, a distinction is to be made between a volunteer fire organization on which a local government relies for performance of an essential public service, as is true of the fire department here, and on the other hand, an organic arm of government, when that is the channel through which such services are delivered. Key is the Legislature's own unmistakably broad declaration that, '[a]s state and local government services increase and public problems become more sophisticated and complex and

Ms. Susan Edelman
December 7, 2006
Page - 4 -

> therefore harder to solve, and with the resultant increase in revenues and expenditures, it is incumbent upon the state and its localities to extend public accountability <u>wherever and whenever</u> feasible' (emphasis added; Public Officers Law, §84).

> For the successful implementation of the policies motivating the enactment of the Freedom of Information Law centers on goals as broad as the achievement of a more informed electorate and a more responsible and responsive officialdom. By their very nature such objections cannot hope to be attained unless the measures taken to bring them about permeate the body politic to a point where they become the rule rather than the exception. The phrase 'public accountability wherever and whenever feasible' therefore merely punctuates with explicitness what in any event is implicit" (<u>id.</u> at 579].

In another decision rendered by the Court of Appeals, <u>Buffalo News v. Buffalo Enterprise Development Corporation</u> [84 NY 2d 488 (1994)], the Court found that a not-for-profit corporation, based on its relationship to an agency, was itself an agency subject to the Freedom of Information Law. The decision indicates that:

> "The BEDC principally pegs its argument for nondisclosure on the feature that an entity qualifies as an 'agency' only if there is substantial governmental control over its daily operations (<u>see, e.g., Irwin Mem. Blood Bank of San Francisco Med. Socy. v American Natl. Red Cross</u>, 640 F2d 1051; <u>Rocap v Indiek</u>, 519 F2d 174). The Buffalo News counters by arguing that the City of Buffalo is 'inextricably involved in the core planning and execution of the agency's [BEDC] program'; thus, the BEDC is a 'governmental entity' performing a governmental function for the City of Buffalo, within the statutory definition.

> "The BEDC's purpose is undeniably governmental. It was created exclusively by and for the City of Buffalo...In sum, the constricted construction urged by appellant BEDC would contradict the expansive public policy dictates underpinning FOIL. Thus, we reject appellant's arguments," (<u>id.</u>, 492-493).

In the context of your inquiry, again, based on Captive's Certificate of Incorporation, each member of its Board of Directors is appointed by or "acceptable to" the Mayor.

Most recently, in a case involving a not-for-profit corporation, the "CRDC", the court found that:

Ms. Susan Edelman
December 7, 2006
Page - 5 -

> "...the CRDC was admittedly formed for the purpose of financing the
> cost of and arranging for the construction and management of the
> Roseland Waterpark project. The bonds for the project were issued
> on behalf of the City and the City has pledged $395,000 to finance
> capital improvements associated with the park. The CRDC denies the
> City has a controlling interest in the corporation. Presently the Board
> has eleven members, all of whom were appointed by the City (see
> Resolution #99-083). The Board is empowered to fill any vacancies
> of six members not reserved for City appointment. Of those reserved
> to the City, two are paid City employees and the other three include
> the City mayor and council members. Formerly the Canandaigua City
> Manager was president of the CRDC. Additionally, the number of
> members may be reduced to nine by a board vote (see Amended
> Certificate of Incorporation Article V(a)). Thus the CRDC's claim
> that the City lacks control is at best questionable.

> "Most importantly, the City has a potential interest in the property in
> that it maintains an option to purchase the property at any time while
> the bonds are outstanding and will ultimately take a fee title to the
> property financed by the bonds, including any additions thereto, upon
> payment of the bonds in full. Further, under the Certificate of
> Incorporation, title to any real or personal property of the corporation
> will pass to the City without consideration upon dissolution of the
> corporation. As in Matter of Buffalo News, supra, the CRDC's
> intimate relationship with the City and the fact that the CRDC is
> performing its function in place of the City necessitates a finding that
> it constitutes an agency of the City of Canandaigua within the
> meaning of the Public Officers Law and therefore is subject to the
> requirements of the Freedom of Information Law..." (Canandaigua
> Messenger, Inc. V. Wharmby, Supreme Court, Ontario County, May
> 11, 2001).

I note that the Appellate Division unanimously affirmed the findings of the Supreme Court regarding the foregoing [aff'd 739 NYS 2d 509, 292 AD2d 835 (2002)].

Even if Captive is not itself an "agency", I believe that its records would fall within the scope of the Freedom of Information Law due to its relationship with the State and the City of New York. As indicated at the outset, that statute pertains to agency records, and §86(4) defines the term "record" expansively to include:

> "any information kept, held, filed, produced, reproduced by, with or
> for an agency or the state legislature, in any physical form whatsoever
> including, but not limited to, reports, statements, examinations,
> memoranda, opinions  folders, files, books, manuals, pamphlets,

Ms. Susan Edelman
December 7, 2006
Page - 6 -

> forms, papers, designs, drawings, maps, photos, letters, microfilms,
> computer tapes or discs, rules, regulations or codes".

The Court of Appeals has construed the definition as broadly as its specific language suggests. An early decision that dealt squarely with the scope of the term "record" involved a case cited previously concerning documents pertaining to a lottery sponsored by a fire department. Although the agency contended that the documents did not pertain to the performance of its official duties, i.e., fighting fires, but rather to a "nongovernmental" activity, the Court rejected the claim of a "governmental versus nongovernmental dichotomy" (see <u>Westchester Rockland, supra</u>, 581) and found that the documents constituted "records" subject to rights of access granted by the Law. Moreover, the Court determined that:

> "The statutory definition of 'record' makes nothing turn on the
> purpose for which it relates. This conclusion accords with the spirit
> as well as the letter of the statute. For not only are the expanding
> boundaries of governmental activity increasingly difficult to draw, but
> in perception, if not in actuality, there is bound to be considerable
> crossover between governmental and nongovernmental activities,
> especially where both are carried on by the same person or persons"
> (<u>id.</u>).

The point made in the final sentence of the passage quoted above appears to be especially relevant, for there appears to be "considerable crossover" in the activities of City officials and Captive.

Perhaps most pertinent is a determination rendered by the Court of Appeals in which it was found that materials received by a corporation providing services by contract for a branch of the State University were "kept" on behalf of the University, and, therefore, constituted "records" falling with the coverage of the Freedom of Information Law. I point out that the Court rejected "SUNY's contention that disclosure turns on whether the requested information is in the physical possession of the agency", for such a view "ignores the plain language of the FOIL definition of 'records' as information kept or held 'by, with or for an agency'" [see <u>Encore College Bookstores, Inc. v. Auxiliary Services Corporation of the State University of New York at Farmingdale</u>, 87 NY 2d 410, 417 (1995)]. Therefore, if a document is produced for an agency, it constitutes an agency record, even if it is not in the physical possession of the agency.

The foregoing is not intended to suggest that all Captive records must be disclosed. However, as a general matter, the Freedom of Information Law is based upon a presumption of access. Stated differently, all records of an agency are available, except to the extent that records or portions thereof fall within one or more grounds for denial appearing in §87(2)(a) through (j) of the Law.

Lastly, the Open Meetings Law is applicable to public bodies, and §102(2) defines the phrase "public body" to mean:



Ms. Susan Edelman
December 7, 2006
Page - 7 -

> "...any entity for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law, or committee or subcommittee or other similar body of such public body."

Based on the foregoing, a public body is, in my view, an entity required to conduct public business by means of a quorum that performs a governmental function and carries out its duties collectively, as a body.

In <u>Smith v. City University of New York</u>, the Court of Appeals held that:

> "in determining whether the entity is a public body, various criteria or benchmarks are material. They include the authority under which the entity is created, the power distribution or sharing model under which it exists, the nature of its role, the power it possesses and under which it purports to act, and a realistic appraisal of its functional relationship to affected parties and constituencies" [92 NYS2d 707, 714 (1998)].

A review of the by-laws of Captive clearly indicates that the government exercises substantial if not total control over the corporation and its Board of Directors. That being so, I believe that the Board constitutes a "public body" required to comply with the Open Meetings Law.

In a manner analogous to the Freedom of Information Law, the Open Meetings Law is based on a presumption of openness requiring that meetings of public bodies be conducted open to the public, except to the extent that an executive session may be held in accordance with paragraphs (a) through (h) of §105(1).

I hope that I have been of assistance. Should any further questions arise, please feel free to contact me.


RJF:jm

cc: David R. Biester



CLOSE WINDOW

**FOR IMMEDIATE RELEASE**
**PR- 050-07**
**February 13, 2007**

**MAYOR BLOOMBERG ACCEPTS PANEL RECOMMENDATIONS TO EXPAND RESPONSE TO HEALTH IMPACTS OF ATTACK ON THE WORLD TRADE CENTER**

*15 Recommendations Offered by Report Call for Full Funding of Treatment Centers, New Medical Working Group, WTC Health Coordinator, Re-opening of Victim Compensation Fund*

*Identifies $150 Million Annual Need for Essential Health and Mental Health Treatment and Monitoring*

Mayor Michael R. Bloomberg today accepted a comprehensive set of recommendations that will seek to ensure a sustained, high-quality public health response for individuals experiencing 9/11-related health conditions. The recommendations include requesting $150 million per year in federal funds for essential health and mental health programs; establishing new systems to keep policy-makers, physicians, and those who need assistance aware of emerging issues; and removing from the courtroom the painful issue of compensation by establishing a new Victim Compensation Fund.  The recommendations were made by the World Trade Center Health Panel, a group the Mayor appointed in September 2006 to assess the sufficiency of state and federal resources to address ongoing health needs and to ensure maximum coordination between City agencies. The report estimates that the health impacts of 9/11 cost the health care system $393 million per year. Deputy Mayor for Administration Edward Skyler and Deputy Mayor for Health and Human Services Linda Gibbs, who co-led the effort, joined the Mayor for the announcement.

"New York has always taken care of its own - and we are not about to abandon the men and women who helped lift our city back onto its feet during our greatest time of need," said Mayor Bloomberg. "Today's report is the first comprehensive look at their health needs and the path we need to follow to make sure they, and all those who develop health related issues, get the first rate medical care they deserve."

*Panel Findings*

Among the report's key findings are the following:

- There is no stable federal funding for 9/11 research and monitoring & treatment programs for first responders and the New York City Police Department (NYPD) has never received any federal funding for treatment or monitoring. The New York City Fire Department (FDNY) Medical Screening and Treatment program and the World Trade Center Medical Monitoring program at Mount Sinai are running out of operating funds.

- Although the FDNY and NYPD have had strong monitoring and treatment resources available, New York City's World Trade Center health policies and treatment options are inconsistent across agencies.

- There is no federal funding for treatment of residents and other non first-responders. The World Trade Center Environmental Health Center at Bellevue Hospital is almost entirely City-funded and likely will need to be expanded.

- Many residents and other non-responders aren't aware of the Bellevue treatment program, or do not know that they are eligible to seek treatment.

- Although Red Cross funding for mental health treatment programs is ending, treatment capacity likely will need to be expanded since World Trade Center-related mental health problems persist.

- There is no central and accessible source of information about World Trade Center health effects and treatment options. This leads to confusion, especially for those not participating in existing treatment programs or the Department of Health and Mental Hygiene's World Trade Center Health Registry.

*Sustained Federal Funding for Treatment*

The report recommends that the City strengthen the support for entities providing medical care for those with 9/11-related symptoms. The report classifies three clinical centers as centers of excellence: the FDNY Medical Screening and Treatment program, which treats Firefighters and Emergency Medical Services personnel; the World Trade Center Medical Monitoring program at Mount Sinai, which treats first responders such as members of the NYPD and construction contractors; and Bellevue Hospital's World Trade Center Environmental Health Center, which treats any individual bearing symptoms of World Trade Center heath effects. Each center of excellence has developed a specialty in a particular area. The report recognizes that new sources of long-term funding are required to keep the clinics open beyond the end of this year, and in the case of the Bellevue WTC Environmental Health Center, expand to treat more patients in impacted populations and open at two other sites if required to meet these needs. The report calls for additional federal funding to sustain the Department of Health and Mental Hygiene's World Trade Center Health Registry and the Police Department's expanded monitoring of over 34,000 members who responded to the attacks and the subsequent recovery effort.  To this day, the NYPD, which represents the largest group of first responders, has not received any federal funding for monitoring or treatment.

*Expanded Tracking, Communication and Agency Coordination*

Recognizing that 9/11-related heath issues have evolved and will continue to do so, the report calls for the creation of a standing Medical Working Group to review existing and emerging scientific research and summarize the information in an annual report to the Mayor.

The panel will include experts from inside and outside of government. A new Citywide WTC Health Coordinator will make sure that the Medical Working Group's information is conveyed to the relevant populations, that policies among City agencies are uniform to the extent possible, and that outreach and communication is effective and widespread. The WTC Health Coordinator will also work with the Health and Hospitals Corporation to expand participation in the Bellevue WTC Environmental Health Center to all those who are eligible, and actively promote enrollment in the state's workers compensation registry before the August 14, 2007 deadline.  The coordinator will also oversee a new World Trade Center Health Resources website that will serve as a one-stop resource for current 9/11-related health information. The Office of Emergency Management is called upon, in a separate recommendation, to assess and enhance, as necessary, the environmental and health safety aspects of the City's disaster response plans.

*Compensate Claims Instead of Fight Them*

Finally, the Mayor also endorsed the recommendation that Congress re-open the Victim Compensation Fund (VCF) so that victims can quickly get fair compensation for injuries suffered as a result of the 9/11 terrorist attacks.  At the same time the VCF is re-opened, the report says Congress should eliminate the liability of the City and its contractors for claims arising out of the clean-up at the World Trade Center and, since the World Trade Center Captive Insurance Company would no longer be needed, Congress could also liquidate the insurance company and put its $1 billion into the re-opened VCF. The new proposal would use federal money to compensate claims without the need to prove fault on the part of the City, its contractors or anyone else and would eliminate the delay and expense

inherent in litigation. The re-opened Victims Compensation Fund would address those individuals who couldn't seek its help before the Fund's closure in December 2003. Kenneth Feinberg, the special master of the Victims Compensation Fund, is mentioned in the report as an ideal candidate to be called to serve as the steward of the re-opened fund.

*Panel Recommendations*

The full report of the panel, including the 15 recommendations, is available on the City website www.nyc.gov.

---

**MEDIA CONTACT:**

Stu Loeser/Jason Post   (212) 788-2958