UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOHN R. WALCOTT, FRANK MAISANO and MARY
E. BISHOP,

                                                    Docket No.:  07-CV-7072 (AKH)

                      Plaintiffs,

    -against-

WTC CAPTIVE INSURANCE COMPANY, INC.;
CHRISTINE LASALA; THE HONORABLE MICHAEL
BLOOMBERG; MARSH MANAGEMENT SERVICES,
INC.; GAB ROBBINS; MARC PAGE; LEWIS
FINKLESTEIN; JEFFERY FRIEDLANDER;
MEREDITH JONES; MARK MELSON; JAMES
SCHOENBECK; and KENNETH BECKER, ESQUIRE,

                      Defendants.

-------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS FOR FAILURE TO STATE A CLAIM**

Marc Jay Bern
W. Steven Berman
Denise A. Rubin
WORBY GRONER EDELMAN & NAPOLI BERN, LLP
***Attorneys for Plaintiffs***
115 Broadway, 12th Floor
New York, New York  10006
(212) 267-3700

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

THE STANDARD OF REVIEW ...................................................................................... 4

SUMMARY OF ARGUMENT ........................................................................................ 5

STATEMENT OF FACTS ............................................................................................. 12

    A.    The Captive's Purpose Includes Payment of Legitimate Claims............................ 12

    B.    Defendants Have Failed to Act In Accord With The Captive's
            Intended Purpose ....................................................................................... 20

    C.    The Captive Is A Public Authority Pursuant to New York Law ............................. 21

    D.    Statutory Violations ....................................................................................... 23

    E.    Defendants' Waste of Fund Assets ................................................................. 24

    F.    Plaintiffs Seek Only Equitable Relief .............................................................. 25

ARGUMENT .................................................................................................................. 26

POINT I.

    NO DEFENDANT ENJOYS PERSONAL STATUTORY IMMUNITY ............................. 26

    A.    The Statute's Express Terms Preclude Immunity..................................................... 26

    B.    Statutory Immunity Is Inapplicable To Defendants GAB Robbins,
            Inc. & Marsh Management Services, Inc................................................................. 33

    C.    Statutory Immunity Is Inapplicable to Plaintiffs' Demanded Equitable
            Relief....................................................................................................... 34

POINT II.

    PLAINTIFFS HAVE STANDING TO SEEK REDRESS AS MEMBERS OF
    THE PUBLIC AND AS THE INTENDED BENEFICIARIES OF THE
    LEGISLATION THAT CREATED THE CAPTIVE UNDER THE UNIQUE
    UNDERLYING FACTS OF THE WORLD TRADE CENTER DISASTER
    SITE LITIGATON ....................................................................................... 35

    A.    Plaintiffs Can Seek Redress For Breach Of Fiduciary Duties Owed
            By Public Servants And Entities............................................................... 36

    B.    Plaintiffs Have Standing As The Intended Beneficiaries Of A
            Specific Fund ....................................................................................... 44

POINT III.

    PLAINTIFFS HAVE ASSERTED VALID CLAIMS PURSUANT TO THE
    FREEDOM OF INFORMATION LAW AND THE OPEN MEETINGS LAW ..................... 48

POINT IV.

    THE COMPLAINT SUFFICIENTLY STATES CAUSES OF ACTION FOR
    CONVERSION AND REPLEVIN .......................................................................................... 51

POINT V.

    THE COMPLAINT MEETS APPLICABLE NEW YORK PLEADING
    STANDARDS ....................................................................................................................... 54

CONCLUSION................................................................................................................................ 56

# TABLE OF AUTHORITIES

## FEDERAL CASES

Al Makaaseb General Trading Co. v. U.S. Steel Intern., Inc.,
    412 F.Supp.2d 485 (W.D. Pa., 2006) .................................................................... 55

Aramony v. United Way,
    949 F.Supp. 1080 (S.D.N.Y.1996) ...................................................................... 52

Arista Records, Inc. v. Dalaba Color Copy Center,
    2007 WL 749737 (E.D.N.Y. 2007), .................................................................... 46

Bechtel v. Robinson,
    886 F.2d 644 (3d Cir. 1989) ................................................................................ 55

Bell v. Herbert,
    476 F.Supp.2d 235 (W.D.N.Y. 2007) .................................................................. 50

Branum v. Clark,
    927 F.2d 698  (2d Cir. 1991) ................................................................................. 4

Brennan v. N.Y.C. Bd. Of Educ.,
    260 F.3d 1231 (2d Cir. 2001) .............................................................................. 46

Century 21, Inc. v. Diamond State Ins. Co.,
    442 F.3d 79 (2d Cir.2006) ................................................................................... 56

Citadel Management, Inc. v. Telesis Trust, Inc.,
    123 F.Supp.2d 133 (S.D.N.Y., 2000) .................................................................. 52

Conley v. Gibson,
    355 U.S. 41 (1957) ........................................................................................... 4, 56

Dairy Engineering Corp. v. DeRaef Corp.,
    2 F.R.D. 378 (W.D.Mo. 1942) ............................................................................ 55

ESI, Inc. v. Coastal Power Production Company,
    995 F.Supp. 419 (S.D.N.Y.1998) ........................................................................ 52

Gage v. New York State Dept. of Health,
    204 F.Supp.2d 399 (N.D.N.Y. 2002) ................................................................... 35

Geisler v. Petrocelli,
    616 F.2d 636 (2d Cir. 1980) .................................................................................. 4

Genesco Entertainment v. Kotch,
    593 F.Supp. 743 (S.D.N.Y. 1984) ....................................................................... 43

High View Fund, L.P. v. Hall,
    27 F.Supp.2d 420 (S.D.N.Y.1998) ...................................................................... 52

In re Boland,
    79 F.R.D. 665 (D.C.D.C., 1978) ..................................................................... 55, 56

In re First Cent. Fin. Corp.,
    269 B.R. 502 (E.D.N.Y. 2001) .................................................................................. 41

In re World Trade Ctr. Disaster Site Litig.,
    456 F.Supp.2d 520 (S.D.N.Y. 2006) ................................................................... passim

Jackson Nat'l Life Ins. Co. v.Merrill Lynch & Co.,
    32 F.3d 697 (2d Cir. 1994) ....................................................................................... 4

Lopresti v. Terwilliger,
    126 F.3d 34  (2d Cir. 1997) ..................................................................................... 52

Mountaintop Condo. Assn. V. Dave Stabbert Master Builder,
    72 F.3 361 (3d Cir. 1995) ................................................................................... 46, 47

Phillips v. Girdich,
    408 F.3d 124 (2d Cir. 2005) ................................................................................... 55

Shmueli v. City of New York Id.,
    424 F.3d. 231 (2d Cir 2005) .................................................................................... 35

Simmons v. Abruzzo,
    49 F.3d 83 (2d Cir.1995) ........................................................................................ 56

Simpson v. Nickel,
    450 F.3d 303 (7th Cir. (Wisc.) 2006) ................................................................... 55

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002) ................................................................................................ 55

U.S. v. Adler,
    274 F.Supp.2d 583  (S.D.N.Y. 2003) ..................................................................... 39

Wynder v. McMahon,
    360 F.3d 73 (2d Cir. 2004) ..................................................................................... 56


**STATE CASES**

Abbot v. Page Airways, Inc.,
    23 N.Y.2d 502 (1969) ............................................................................................. 28

Abrams v. NYC Transit Auth.,
    39 N.Y.2d 990 (1976) ............................................................................................. 40

Abramson v. Blakely,
    25 Misc.2d 967 (Sup. Ct., N.Y. Cty. 1960) ........................................................... 40

Ackerman v. Vertical Club. Corp.,
    94 A.D.2d 665 (1st Dep't 1983) ............................................................................ 34

Agudist Council of Greater New York v. Imperial Sales Company,
    158 A.D.2d 683 (2d Dep't 1990) ............................................................................ 31

Alco Gravure, Inc. v. Knapp Found.,
  64 N.Y.2d 458 (1985) ................................................................. 45, 46

Astoria Gas Turbine Power, LLC v. Tax Com'n of City of New York,
  14 A.D.3d 553 (2d Dep't 2005) .................................................... 32

Beechwood Restorative Care Center v. Signor,
  11 A.D.3d 987 (4th Dep't 2004), aff'd  5 N.Y.3d 435 (2005). .............. 50

Boryszewski v. Brydges,
  37 N.Y.2d 361 (1975) ................................................................. 40

Breen v. Mortgage Commission of State of New York ,
  285 N.Y. 425 (1941) .................................................................. 28

Brown v. State,
  89 N.Y. 172 (1996) ................................................................ 28, 35

City of New York v. Dry Dock R. Co.,
  47 Hun 199, aff'd 112 N.Y. 137 (1889) ......................................... 27

Consumers Union of U.S. v. State of New York,
  5 N.Y.3d 327 (2005) ............................................................ 45, 46

Cotroneo v. Monroe County Bd. Of Elections,
   166 Misc.2d 63 (Sup. Ct., Monroe Cty., 1995) ............................... 42

Daily News Pub. Co. of Memphis, Tenn. v. Office of Court Admin. of
  State of N.Y.,
  186 Misc.2d 424 (Sup. Ct., N.Y. Cty. 2000) ................................... 49

Diamond v. Oreamuno,
  24 N.Y.2d 494  (1969) ........................................................... 35, 44

Eighth Avenue Coach Corporation v. City of New York,
  170 Misc. 243 (Sup. Ct., N.Y. Cty., 1939) aff'd 259 A.D. 870 (1st Dep't
  1940) aff'd 286 N.Y. 84 (1941) ..................................................... 27

Goetschius v. Board of Education of the Greenburgh Eleven Union Free
  School District,
  281 A.D.2d 416 (2d Dep't 2001) .................................................... 51

Goldman v. White Plains Center for Nursing Care, LLC,
  9 Misc.3d 977 (1st Dep't 2005) ..................................................... 38

Gottfried v. Gottfried
  269 A.D. 413 (1st  Dep't 1945) ..................................................... 52

In re Hicka,
  180 Misc. 173 (Sup. Ct., N.Y. Cty., 1943) ...................................... 28

John P. v. Whalen,
  54 N.Y.2d 89 (1981) ................................................................... 49

Kaplan v. Okun,
  15 A.D.2d 848 (3d Dep't 1962) ..................................................... 40

Knopfler v. Bohen,
    15 A.D.2d 922 (2d Dep't 1962) ............................................................ 40

Kwasnik v. City of New York
    262 A.D.2d 171 (1st Dep't 1999) .......................................................... 49

Landor-St. Gelais v. Albany Intern. Corp.,
    307 A.D.2d 641 (3d Dep't 2003) ........................................................... 28

Manhattan Eye, Ear & Throat Hosp. v. Spitzer,
    186 Misc.2d 126 (Sup. Ct., N.Y. Cty. 1999) ....................................... 41

Matter of Colella v. Board of Assessors,
    95 N.Y.2d 401 (2000) .......................................................................... 40

Matter of Dairylea Corp. v. Walkley,
    38 N.Y.2d 6 (1975) .............................................................................. 45

Matter of Douglaston Civic Assn. v. Galvin,
    36 N.Y.2d 1  (1974) ............................................................................. 45

Matter of UFT v. Health & Hospitals Corp.,
    104 Misc.2d. 623, (Sup. Ct., N.Y. Cty. 1980) ..................................... 49

Meese v. Miller,
    79 A.D.2d 237 (4th Dep't 1981) ........................................................... 52

Mobil Oil Corp. v. Rubenfeld,
    72 Misc.2d 392 (Civ.Ct., Queens Cty., 1972) *aff'd* 77 Misc.2d 962
    (App. Term, 2d Dep't 1974) *rev'd on other grounds*, 48 A.D.2d 428 (2d
    Dep't 1975) *aff'd mem* 40 N.Y.2d 936 (1976) ................................... 37

New York University v. Whalen,
    46 N.Y.2d 734 (1978) .......................................................................... 51

Orange County Publications v. Kiryas Joel Union Free School District,
    282 A.D.2d 604 (2d Dep't 2001) .......................................................... 50

Orange County Publications v. Orange County,
    120 A.D.2d 596 (2d Dep't 1986) *appeal dismissed* 68 N.Y.2d 807
    (1986) ................................................................................................... 51

Pasik v. State Bd. Of Law Examiners,
    114 Misc.2d 397, 403 (Sup. Ct., N.Y. Cty. 1982), *modified on other
    grounds*, 102 A.D.2d 395 (1st Dep't 1984) .................................... 49, 50

People v. Duggins,
    3 N.Y.3d 522 (2004) ............................................................................ 33

People v. Gellineau,
    178 Misc.2d 790 (Sup. Ct., Kings Cty., 1998) ................................... 32

People v. Kruger,
    87 A.D.2d 473 (2d Dep't 1982) ........................................................... 39

Pernet v. Peabody Engineering Corp.,
    20 A.D.2d 781 (1st Dep't 1964) ..................................................................... 56

Petro, Inc. v. Serio,
    9 Misc.3d 805 (Sup. Ct., N.Y. Cty.  2005) ..................................................... 32

Police Benev. Ass'n of New York State Troopers, Inc. v. Division of New
    York State Police, 29 A.D.3d 68 (3d Dep't 2006) .......................................... 44

Quintal v. Kellner,
    264 N.Y. 32 (1934) ........................................................................................... 52

Saratoga County Chamber of Commerce, Inc. v. Pataki,
    100 N.Y.2d 801 (2003) ..................................................................................... 40

Scheur Found. v. 61 Assoc.,
    179 A.D. 65 (1ˢᵗ Dep't 1992) ............................................................................ 43

Smith v. City University of New York,
    92 N.Y.2d 707 (1999) rearg. denied 93 N.Y.2d 889 (1999) ................ 38, 49, 50, 51

Smith v. State of New York,
    227 N.Y. 405 (1920) ......................................................................................... 28

Society of the Plastics Industry, Inc. v. County of Suffolk,
    77 N.Y.2d 761 (1991) ....................................................................................... 47

Vacco v. Diamandopoulos,
    185 Misc.2d 724  (Sup. Ct., N.Y. Cty. 1998) ..................................... 41, 51, 53

Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas,
    87 N.Y.2d 36 (1995) ......................................................................................... 52

Village of Massena v. St. Lawrence Water Co.,
    126 Misc. 524 (Sup. Ct., St. Lawrence Cty, 1926) .......................................... 27

Zakiva Comm. Corp. v. Horowitz,
    826 F.Supp. 86 (S.D.N.Y. 1993) ...................................................................... 43

## STATUTES

2003 Session Laws News of N.Y., Ch. 188 (A.8592) ......................................... 31, 37

Comment, Cons. Laws of N.Y., Statutes §292 ....................................................... 41

Cons. Laws of N.Y., Statutes § 124 ........................................................................ 32

Cons. Laws of N.Y., Statutes § 291 ........................................................................ 27

Cons. Laws of N.Y., Statutes § 76 .......................................................................... 28

Cons. Laws of N.Y., Statutes §14 ........................................................................... 32

Cons. Laws of N.Y., Statutes §321 .................................................................... 41, 42

Fed. R. Civ. P. 12(b)(6) ................................................................................ 4, 26, 32

Fed. R. Civ. P. 24(a) ................................................................................................ 46

Fed. R. Civ. P. 8 ............................................................................................. 54, 55

Gen. Cons. Laws of N.Y., Statutes §341 .......................................................... 41, 42

Gen. Mun. Law § 50-h ............................................................................................ 38

N.Y. Insurance Law § 107(14) ................................................................................ 31

N.Y. Insurance Law § 108(a)(1) .............................................................................. 37

N.Y. Insurance Law § 2601 .......................................................................... 7, 9, 24

N.Y. Insurance Law § 7002 ...................................................................................... 33

N.Y. Insurance Law § 7002(d) ......................................................................... 33, 43

N.Y. Insurance Law § 7003(5) ................................................................................ 41

N.Y. Insurance Law § 7003(c)(2)(E) ....................................................................... 30

N.Y. Insurance Law § 7003(c)(5) ............................................................................ 30

N.Y. Insurance Law § 7005(a) ................................................................................. 37

N.Y. Pub. Auth. Law § 2.2 ...................................................................................... 38

N.Y. Tax Law § 1500(a) ........................................................................................... 31

N.Y. Tax Law §1500 ................................................................................................. 37

Not-For-Profit Corporation Law § 402 .................................................................... 31

Not-For-Profit Corporation Law § 717 .................................................................... 41

Not-For-Profit Corporation Law §719 ..................................................................... 29

Not-For-Profit Corporation Law §719 .............................................................. 34, 41

Not-For-Profit Corporation Law §720 .............................................................. 34, 41

Pub. L. No. 108-7, 117 Stat. 517, 518 ..................................................................... 15

Pub. Officers Law §§10-12 ...................................................................................... 39

Pub. Officers Law §89 ............................................................................................. 48

Pub. Officers Law. §95 ............................................................................................ 48

Public Authorities Accountability Act of 2005 ....................................................... 40

Public Authorities Act  § 2824.7 ............................................................................. 24

Public Authorities Act § 2800.2 .............................................................................. 24

Public Authorities Act § 2824.1 .............................................................................. 24

Public Authorities Act § 2824.2 .............................................................................. 24

Public Authorities Act § 2824.4 .............................................................................. 24

Public Authorities Act § 2825.2 .............................................................................. 24

# INTRODUCTION

In addition to the instant matter, this Court presides over a related matter, *i.e.,* In re: World Trade Center Disaster Site Litigation, (21 MC 100 [AKH]), the primary case arising from the claimants' injuries incurred during their work, paid or voluntary, at the site of the World Trade Center and related sites (Fresh Kills Landfill, etc.) following the terrorist attacks of September 11, 2001.  In its comprehensive Order and opinion of October 17, 2006, deciding the defendants' summary judgment and dismissal motions in that litigation, this Court held, in relevant part:

> Having thus ruled, I concede a sense of disquiet. I have not come across federal legislation of the type we have here-providing a limit to how much aggregate liability the City can incur-except in bankruptcy or insolvency practice, and there is no suggestion of that here. Nor, except perhaps in the case of atomic energy disasters, have I encountered a contribution from the federal fisc to create a litigation defense fund, *and even in that case there is a significant difference*. Here, the City was given one billion dollars to assure against liability, *loss* or expense, while in the case of atomic energy disaster, there is a provision only of federal insurance. 42 U.S.C. § 2210 (2005).

> What, one may ask, was the City, and Congress, contemplating if not the kinds of suits as those over which I preside? Clearly, provisions of insurance do not concede liability, as Defendants stress, but never have we seen provisions as those we have here.

> Provisionally, and subject to further consideration as these cases progress, the case for preemption has not been made. But *neither is there to be a blank check to enrich lawyers with endless stratagems of motions and delays. Congress legislated for the public welfare*, and that translates in this instance to speedy proceedings towards the merits, to distinguish between cases proving injuries arising from the terrorist-related aircraft crashes and from the conditions resulting from those crashes, and cases lacking proof of such a right to recover, and to fashion remedies appropriate to those showing a right to relief. These are the goals that I set for the parties, and for myself in presiding over these cases, to bring these cases to a place where they can be settled or tried as speedily as the interest of justice allows.

1

*See*, In re World Trade Ctr. Disaster Site Litig., 456 F.Supp.2d 520, 546 (S.D.N.Y. 2006) (emphasis added).  Sadly, this Court's opinion has proven prophetic.  By the spring of 2007, the funds spent by the Captive for have done nothing but enrich lawyers with endless stratagems of motions and delays, with such fees and related expenses reaching and shortly to exceed $78 million, with no end in sight.

At the same time, not one toxic exposure claim has been investigated, adjusted nor settled.  It is now just a little more than six years since the tragic events of 9/11 and the heroic efforts by these plaintiffs that were subsequently made to remediate that harm to the City of New York and the nation as a whole.  Over three and a half years since the first personal injury suit was filed, we are no closer to resolving any of these claims, despite overwhelming evidence in the media that thousands of the heroes who placed their lives at risk in our city's darkest days are growing increasingly ill and dying with little or no recourse for relief from the contractors and other city agencies that failed so spectacularly in their obligations to protect the workers under the New York Labor Laws and other statutory protections.

Now, the defendant World Trade Center Captive Insurance Company, Inc., ("WTCC" or "Captive")  holds the keys to resolving the massive litigation that remains on this Court's docket.  The stewardship and resolution of *this* case will determine whether the pending litigation continues for decades or can be resolved in the timely fashion as referenced in this Court's October, 17, 2006 Order.

Plaintiffs John R. Walcott[1], Frank Maisano[2] and Mary E. Bishop[3] (hereinafter

"Plaintiffs") each sustained serious and debilitating injuries caused by their exposure to toxins

during the post-9/11 recovery and debris removal efforts at the World Trade Center disaster site.

They have brought the present action on behalf of all responders to demand accountability from

an out of control Captive and those who have so poorly and irresponsibly administered that

entity.  These Plaintiffs deserve to be treated with dignity and respect by the public servants who

are supposed to manage the affairs of the Captive, a quasi-governmental entity.[4]  There is no

---

[1] Plaintiff JOHN R. WALCOTT had served with the New York City Police Department since June 30, 1992, and by the time of the terrorist attacks on 9/11, had risen to the rank of Detective, where he was last assigned to Manhattan North Narcotics. Detective Maisano was stationed at Ground Zero from September 11 through September 14, 2001.  He worked 16 to 20 hours per day without any respiratory protection while rescuing victims and recovering bodies and body parts.  Thereafter, he worked at the forensic unit located at Fresh Kills Landfill site in Staten Island, New York in February, March and May, 2002. On January 8, 2003, Detective Walcott underwent a medical examination as part of The World Trade Center Worker and Volunteer Medical Screening Program at Mt. Sinai Hospital. The examination detected significantly abnormal clinical chemistry parameters, including elevated liver enzymes ALT (SGPT), Gamma GT with normal hematology studies obtained. In or about May 2003, Detective Walcott was diagnosed with acute myeloid leukemia (AML) with monocytic differentiation, a blood cancer tied to benzene exposure.  Other than his exposure to the fumes at the WTC site, including the benzene contained in the burning jet fuel, Detective Walcott had no prior exposures to benzene.

[2] Plaintiff FRANK MAISANO was formerly a Detective with the New York Police Department. He is a life-long non-smoker and a former Golden Gloves boxing champion for the NYPD. Detective Maisano has been diagnosed with restrictive lung disease and has been advised by his physicians that he requires a bilateral lung transplant.  He was forced to retire from the police force as disabled on the line of duty on August 31, 2004.  While working at Ground Zero and Fresh Kills, Plaintiff Maisano was never offered a respirator, was never told of the need for respirator use, and was never warned of any toxic exposure danger at these sites.

[3] Plaintiff MARY E. BISHOP was a civilian volunteer working at Ground Zero from September 11 through October 2, 2001, for upwards of 21 hours per day.  Ms. Bishop recovered and tagged body parts on the south side of the WTC site and then escorted them to the morgue. Ms. Bishop has been diagnosed with sarcoidosis and cancer and suffers from shortness of breath, chest pain, headaches, a chronic and potentially fatal lung infection and digestive distress from her exposure to toxins at Ground Zero.  Ms. Bishop was not offered a respirator, nor warned of the dangers of the toxic exposures  at any time during her work at and near the WTC site.  She was never advised of the need for personal protective (safety) equipment during her work at the WTC site.

[4] Section Fourteen of the WTC Captive's Certificate of Incorporation provides that the WTC Captive and the Certificate of Incorporation shall be construed to be *an integral part of the City of New York*, within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States IRS Code of 1986, as amended.

question that the Captive and its Board of Directors owe the public at large, and these plaintiffs a fiduciary duty. Because these defendants have failed to carry out the obligations each owes, the plaintiffs are compelled to seek judicial intervention for an accounting, access to board meetings, access to document wrongfully withheld, adherence to applicable statutes, adherence to the purposes for which the Captive was authorized and created and for the other equitable relief now sought.

### THE STANDARD OF REVIEW

A Rule 12(b)(6) motion requires the court to determine if the plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Branum v. Clark, 927 F.2d 698,705 (2d Cir. 1991). The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See* Jackson Nat'l Life Ins. Co. v.Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994). As this Court noted in its October 17, 2006 decision in In Re: World Trade Center Disaster Site Litigation: "[i]n determining motions for judgment on the pleadings, I am limited to consideration of the facts as alleged in the parties' pleadings and thus may not consider matters outside of the pleadings." In re World Trade Center Disaster Site Litigation  456 F.Supp.2d at 526.

## SUMMARY OF ARGUMENT

In spending appropriation P.L.108-7, Congress approved funding the non-risk transfer

mechanisms that had been previously proposed by the City of New York (hereinafter "the City")

and accepted by the Federal Emergency Management Agency (hereinafter "FEMA") that would

pay legitimate claims while safeguarding the fiscal health of the City.  In a letter dated August 1,

2007 on behalf of the Senate Committee on the Judiciary to defendant Christine LaSala, Senators

Patrick Leahy and Arlen Specter wrote:

> We are writing to express our serious concerns about the
> management of the World Trade Center Captive Insurance
> Company, which Congress formed "to provide the City of New
> York and its debris removal contractors with coverage for claims
> arising from debris removal performed after the collapse of World
> Trade Center (WTC) buildings on September 11, 2001." H.R.
> Conf. Rep. No. 108-10, at 1476 (2003).  It has come to our
> attention that close to $74 million of the tax payer money Congress
> appropriated to cover claims to compensate volunteers and workers
> who were harmed while removing the debris at ground zero has
> been spend on overhead costs and legal bills.  It is our
> understanding that to date not a single worker has been
> compensated for exposure to harmful substances now known to
> have been in the air at the time…

> After the terrorist attacks on September 11, 2001, *Congress
> provided $1,000,000,000 to cover claims by ground zero
> volunteers and workers who dutifully completed the momentous
> task of removing the debris of the fallen World Trade Center
> building*s.  Reports that the World Trade Center Captive Insurance
> Company has spent hundreds of thousands of dollars on salaries
> for administrators and over $45 million to private law firms are
> troubling.

*See*, August 1, 2007 letter from Senators Leahy and Spector, annexed to the Declaration of

Denise A. Rubin at Exhibit A[5] (emphasis added).  A year earlier, in similar correspondence to

Ms. LaSala, Senator Charles Schumer wrote:

---

[5] The remainder of the Exhibits consist of a volume of the documents referenced in the *Walcott*
Complaint.

> I write to express my concern over the way the captive insurance fund is handling the claims and litigation for Ground Zero recovery workers.  I am disappointed the federally-financed fund – which I shepherded through Congress – is not fulfilling the mission it was charged with: making sure these brave men and women have the resources they need to address the health impacts that resulted from clearing debris at the World Trade Center site.
>
> *Today, I am calling on the WTC Captive Insurance Company, Inc. to abandon its efforts of fighting every claim tooth and nail, and begin working on establishing the protocols and objective criteria so that this money can be distributed to needy recipients as quickly as possible.*  No one, including myself, involved with the establishment of this fund expected it to behave like a stingy, bottom-line obsessed corporation.  Rather it was birthed out of recognition that … those who suffered injuries while working at ground zero would deserve compensation.

*See* July 31, 2006 Letter from Senator Charles Schumer to Christine LaSala (emphasis added), Exhibit 21 in exhibit volume for Complaint.  As demonstrated by the correspondences of the very Senate that appropriated the Captive's funds, the plaintiffs are among and represent the legitimate claimants for whose benefit, at least in part, the WTC Captive Insurance Company, Inc. (hereinafter "the Captive") was funded and created.

The Captive and the monies it was appropriated are unique; without the specific statutory grant enacted at the City's and Governor's request here, this mechanism would not be permitted under New York law.  The Captive was created and the WTC policy it issued and administers became effective long after the torts at issue were known to have occurred, long after resulting injuries were known or anticipated and long after resulting claim payments (insurance "losses") were certain.

Accordingly, the Captive's unique insurance policy provides only ***retroactive*** non-risk transfer coverage for expected claims by a known and specific set of people.  There was uniquely no risk of loss for which insurance is typically provided because the losses – the liability and resulting financial obligation to pay – were already known and the injuries already sustained

6

(albeit in many cases, latent or as-yet-unmanifested), necessitating the creation of a legislative exception to New York's insurance laws to permit this otherwise prohibited insurance coverage.

The Captive is also unique because its funds, functioning and mission were entrusted to a public servant: the Mayor of the City of New York. The Mayor exercises control over the Captive by his at-will appointments of its Board of Directors and corporate officers, most of whom are also high ranking City employees and public servants. The billion dollars in public federal funds were entrusted to the Mayor of the City on whose behalf the Plaintiffs so arduously toiled and unknowingly sacrificed their health and well being to ensure that the Captive fulfilled its vital public purpose: to satisfy legitimate claims by individuals affected by the recovery operations. The Captive was duly incorporated as a not-for-profit corporation pursuant to the New York insurance statute that was expressly amended for that purpose. New York Insurance Law § 7005(a)(3) expressly gives the Mayor of NYC the discretion to form a captive insurance company as either "a public benefit corporation or not-for-profit corporation…that shall be exempt from all state and local taxes."

However, the Captive, its board, officers and other defendants have failed to fulfill their duties and responsibilities and have otherwise violated applicable law, the Captive's charter and the Captive's by-laws. The defendants have refused and deliberately failed to investigate a single claim, in blatant violation of N.Y. Insurance Law § 2601, has failed to determine and set appropriate reserves, to provide financial information where defendants value each claim at $1,000 where they estimate the costs to litigate each claim as $19,000; they fail to accurately

estimate future losses, to attempt to settle any claims,[6] or to refer any disputed claims to arbitration or pay a single toxic-injury-related labor law claim.

At the same time, the Captive has nonetheless spent seventy-five million dollars in salaries and benefits to its staff and officers and in claimed administrative expenses and attorneys' fees over the past three years since it became operational, all of which has been deducted from the funds available to satisfy Plaintiffs' claims[7]. The Defendants deny that they have any obligation to use the funds entrusted to them or to see that these funds are used for anything other than litigating liability defenses on behalf of the City and its contractors, now and in the foreseeable future.

In the present litigation, the Plaintiffs seek: (1) to compel the Captive to fulfill the duties and responsibilities for which it was created and funded; (2) to compel those who control and manage the Captive's affairs to meet their duties and responsibilities; (3) to enjoin conduct by the Defendants that violates applicable law and compel compliance with applicable law; (4) to account for the monies spent and deducted from the Captive fund; (5) to return to the Captive fund any monies that were improperly spent or received; and (6) the removal and replacement of any officers and directors who have violated their obligations. The Plaintiffs seek equitable relief, not monetary damages, on behalf of the Captive fund in which they have a legally cognizable beneficial interest. The Plaintiffs *do not seek any personal remuneration* other than reimbursement of costs incurred in prosecuting this action. Rather, because of the Captive's

---

[6] Defendant Captive has settled only a single non-respiratory claim for a worker who was injured in a fall at the worksite, while the Captive's counsel argues in their Second Circuit Brief opposing the brief filed on behalf of the "non-respiratory" plaintiffs that all of the claims are the same.

[7] Most of these expenditures should have been met by existing primary insurance policies obtained by the City or contractors upon the commercial market. However, the Captive failed to give timely notice of these claims to the insurance carriers and, consequently, the carriers have disclaimed coverage resulting in the Captive bearing these costs. This malpractice on behalf of the Captive has resulted in losses of $75,000,000 plus interest and continuing from the res of the fund.

mismanagement by its Board of Directors, Legal Counsel and Chief Executive Officer, the Plaintiffs are now compelled to act to defend the Captive fund to prevent its continued waste.

By the instant Motions to Dismiss, defendants challenge the Plaintiffs' right to seek judicial review of the Captive's affairs based upon an unfair and myopic review of the Plaintiff's pleadings, as well as the misapplication of statutory and legal authority. Rather than accept as true and address the Plaintiffs' detailed, fact-laden pleadings, Defendants have elected to recast and alter them to suit their arguments.

Perhaps most incredulously, Defendants argue that the Captive's "mandated purpose is to provide risk insurance to the City and its contractors" (Defendants' memorandum, p. 9), and that, moreover, the Captive is merely an ordinary insurance company with the ordinary duties of an insurance company solely and exclusively to its named insureds. *See* Defendants' memorandum, at p. 2. These unsupported conclusions are contrary to the Complaint's factual allegations and cast the Captive into an historic and factual vacuum.[8] In fact, the Captive is like no other insurance company: it is organized as a not-for-profit corporation that was authorized and funded by Congress but left to the State of New York to implement and to public servants to administer. This quasi-government entity, funded with public money, has successfully rebuffed all attempts by the public for scrutiny of its affairs.

The Defendants even collaterally attack the well reasoned decision of the New York Committee On Open government, which determined that the Captive was and is controlled by the City and its Mayor and that it is subject to the requirements of the Freedom Of Information Law (hereinafter "FOIL") and Open Meeting Law (hereinafter "OML"). The Committee On

---

[8] At the same time, of course, Defendants deny that they are required to promptly investigate, set reserves and attempt to settle legitimate claims, the gravamen of Plaintiffs' Complaint, pursuant to New York's insurance laws. (Defs.' Mem., p. 20). This is directly contrary to Insurance Law § 2601.

Open Meetings is the New York State agency specifically vested with statutory authority to determine whether entities, including non-profit corporations, are public or quasi-public authorities. Based, in part, upon the same facts alleged in the Complaint, *this independent State fact finder* reasonably found that the Captive *is* a public entity, with resulting duties and obligations to the public[9]. The Complaint alleges, in part, that as a public authority controlled by the Mayor, the Captive, the Mayor and the directors and officers under the Mayor's control owe fiduciary obligations to the Plaintiffs.

However, to succeed in their Motion to Dismiss, Defendants must prove beyond doubt that Plaintiffs can prove no set of facts entitling them to relief. Because the Captive has *already* been found to be controlled by the City and its Mayor upon identical facts as those alleged in the Complaint by the Committee on Open Government, an official, independent and reasonable fact finder, those aspects of the defendants' pending motion alleging otherwise must fail as a matter of law.

Inexplicably, Defendants also concoct causes of action not plead by the Plaintiffs and then seek their dismissal. *See, e.g.,* Defendants' Memorandum, pp. 15-19, discussing defendants' contention that plaintiffs allege a violation of a single federal law, *i.e.,* Pub. L. No. 108-7, 117 Stat. 517, 518 (Feb. 12, 2003). Of course, this is flatly incorrect; plaintiffs allege a panoply of breaches of the defendants' fiduciary duties, mismanagement and waste of the res of the WTC Captive, and seek equitable relief. Defendants also wrongly contend that plaintiffs seek to transform the Captive into a claims processing center or victim's compensation fund "to unconditionally pay claims" (Defendants' Memorandum, p. 2), despite the lack of any such demanded relief in the Complaint.

---

[9] The Committee On Open Meetings decision directly dealt only with the FOIL and OML, but its findings and conclusions of law have import beyond those relatively narrow confines.

Similarly, the individual Defendants wrongly claim a statutory grant of absolute immunity from suit. However, the immunity claimed by these Defendants' grossly exceeds the qualified and limited immunity from liability for damages afforded by the statute, nor do the Plaintiffs seek personal damages from these Defendants. Rather, the Plaintiffs seek equitable relief to compel them to act in accord with applicable law and the Captive's founding documents. There is no statutory immunity from this kind of equitable relief in the statute at issue nor in New York jurisprudence.[10]  Nor does the statute provide immunity from suit. To the contrary, immunity only inures, if at all, upon a finding that the Mayor and affected officers and directors have acted within the scope of their authority and in furtherance of the Captive's purposes. The Complaint avers, in detail, that the named individual Defendants have failed to act within the scope of their authority and that all Defendants have violated and failed to act in accord with the Captive's intended purpose. The Defendants may disagree with Plaintiffs' averred facts, but they cannot legitimately dispute them in their present motion nor rely upon different facts that are more to their liking.

In short, the Plaintiffs seek equitable relief that forces the Defendants to comply with their legal obligations and act in accord with Captive's intended purpose. Plaintiffs have standing to seek this redress to protect the fund in which they have a cognizable beneficial interest from those public servants into whose care the fund was entrusted. Neither the Captive, the Mayor, nor his appointees can be permitted to deny the obligations that they undertook and owe to the Plaintiffs.

---

[10] Indeed, there is not even immunity from damages when the Captive's officers and directors fail to act within the scope of their authority or when failing to carry out the Captive's purposes or powers.

## STATEMENT OF FACTS

The relevant facts are set forth, at length, in the Complaint that Defendants now seek to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   While no substitute exists for the actual Complaint which is herein incorporated by reference, Plaintiffs summarize their allegations, below and respectfully direct this Court's attention to the Complaint itself.

### A.  The Captive's Purpose Includes Payment of Legitimate Claims

The Plaintiffs all sustained serious and debilitating injuries resulting from their exposure to toxins during the recovery and debris removal work following the terrorist attacks of September 11, 2001.  *See* Complaint, ¶¶ 17-28.  Within a month after the debris removal commenced, the City was advised that the worldwide insurance market was unwilling to provide sufficient liability coverage due to the working conditions and toxic exposure experienced by the Ground Zero workforce, with expected claims and liability.  Id., at  ¶¶ 30-34.  As recounted in a Memorandum from the NYC Law Department to FEMA of May 13, 2002, by October of 2001, the insurance "marketplace has failed to offer any appropriate, commercially reasonable coverage for environmental or professional liability or to write general liability insurance excess of the $79 million we have placed.  Insurance carriers have taken the position that the liabilities at issue, especially environmental, *are not risks but known losses – the lawsuits and insurance costs are certain to happen – and thus they will not write traditional "risk transfer" insurance."* Id., at ¶ 30 (emphasis added).

The City, its contractors, FEMA and the State and Federal government, including the United States Congress, were acutely aware at the beginning of November, 2001 that the City and its contractors faced billions of dollars in future losses that were unindemnified by insurance. Id., at ¶ 40.  Rather than create a safe working environment to reduce or eliminate toxic exposure

and resulting insurance losses, the City and its contractors began lobbying Congress to reduce or eliminate their financial exposure. Id., at ¶¶ 40-45. In November 2001, Congress amended the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230 (2001) codified as amended at 49 U.S.C. §40101, to limit the City's liability. Id., at ¶ 41. In response to then-Mayor Guiliani's urgent request for indemnification, in February 2002, Congress proposed legislation entitled "The Ground Zero Recovery Protection Act," that would have provided $1 billion in federal indemnification for injury, death and property damage claims not otherwise compensable by private insurance procured for the risks involved in the WTC debris removal efforts by a federal claims handling entity. Id., at ¶¶ 43-44. Section (g) of the proposed legislation expressly anticipated that the federal government would assist in settling or defending any claim. Id., at ¶ 47. The proposed legislation had a significant caveat, however: it precluded federal indemnification for any claims arising from willful misconduct or lack of good faith. Id., at ¶ 45.

By memorandum dated March 6, 2002, Lawrence Martin, the City's special insurance counsel, confirmed to FEMA its interest "in replacing the proposed legislative indemnification of $1 billion [The Ground Zero Recovery Protection Act], with an insurance-based mechanism." The goal of the City and FEMA was to replace the federal government's role in claims handling required under the proposed legislation with an insurance mechanism that would achieve the same purpose: "Our starting point is simple – the insurance would match the parameters of the proposed legislative indemnification it replaces." Id., at ¶ 46 (emphasis added). In subsequent months as the work at Ground Zero neared completion, FEMA, the City and New York State representatives continued to meet, correspond and reach consensus about the proposed insurance mechanism. Id., at ¶¶ 49-53.

13

In both a memorandum  and in a formal funding request from the NYC Law Department to FEMA of May 13, 2002, the City emphasized the need for the contemplated indemnity from future "certain losses," given a revised Ernst & Young report that significantly upwardly revised the range of expected losses, with a high range of $4.2 billion and a median range of $2.3 billion. Id., at ¶ 51.  Accordingly, the City formally asked FEMA to consider approving $1 billion in non-risk-transfer insurance in the form of finite risk or a captive insurer, with the understanding that additional funding may be requested or applied for to meet future losses.  Id., at ¶ 52.

There can be no doubt that the purpose behind the requested $1 billion insurance fund was to satisfy and pay the expected claims and resulting losses filed against the City and its contractors for toxic exposure during the debris removal work.  Id., at ¶ 54.  This was expressly made clear by the thirty (30) members of the House of Representatives in their joint correspondence to FEMA of May 24, 2002, in support of the City's application.  Id., at ¶ 54. The Congress members stated in their aforesaid correspondence that: "The coverage envisioned in this proposal will ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors." Id., at ¶ 55.

FEMA formally accepted the City's funding proposal in correspondence dated June 20, 2002, less than two weeks before the work at Ground Zero was completed.  Id., at ¶ 56.  FEMA's response reiterated that the insurance mechanism for which Congressional funding would be sought was to be non-risk transfer insurance that was vital to meet the "midrange probable maximum loss amount as established in the May, 2002 Ernst & Young report," not simply to defend against claims. Id., at ¶ 57.  Indeed, "loss amount" as defined in the context of the WTC Insurance Program means the payment of claims, not simply litigating them.  Id., at ¶¶ 34, 57.

14

Congress acceded to the City's formal funding request to FEMA.  In Pub. L. No. 108-7, 117 Stat. 517, 518, (Feb. 12, 2003), a spending appropriation bill, Congress directed that FEMA "provide, from funds…. up to $1,000,000,000 to establish a captive insurance company or other appropriate insurance mechanism for claims arising from debris removal, which may include claims made by city employees."  Id., at ¶ 58.   Congress did not, however, implicitly or explicitly instruct: that a captive insurance company be established solely to defend the City of New York and its contractors from claims at all costs (Id., at ¶ 60); that all claims, let alone any claims, be litigated in the tort system.[11]  No particular form of insurance was specified, liability insurance was never even mentioned, nor does the statute require the formation of a captive or other appropriate insurance *entity*.  Rather, the Act requires the formation of a captive or other appropriate insurance *mechanism*.  Id., at ¶ 61.  As such, the provision of funding for the acquisition of insurance was the means to achieve the desired end, not the end itself.  That purpose was and remains loss indemnification while protecting the fiscal health of the City and contractors.  Id., at ¶¶ 61-62.

The FEMA Grant award authorized by P.L. 108-7, also expressly reiterates the duty and obligation of the WTC Captive to investigate, set reserves, adjust and pay legitimate claims.  Article VI requires that the WTC Captive's funds "be invested and used to pay all costs related to the operation of the Captive, including but not limited to *losses*, fees to service providers, taxes, administrative and defense costs."  Id., at ¶ 76 (emphasis added).  Similarly, Article VIII

---

[11] Many forms of liability insurance resolve claims without primary resort to litigation nor even determining the fault or liability of the insured including, without limitation, workman's compensation insurance, "no fault" coverage and third party medical payment coverage found in homeowners and CGL policies.  Indeed, the Liberty Mutual policy that provides primary coverage for the debris removal project has such a provision.  As discussed, infra, the Captive is authorized by its Certificate of Incorporation to provide such medical payment and funeral expense coverage regardless of the liability of its insureds, and both the Captive's by-laws and policy provide for non-litigious claim resolution, including arbitrations through AAA.

of the FEMA grant contemplates that quarterly reports must be prepared and submitted to FEMA "of losses incurred, losses paid…and changes in individual and aggregate case reserves and indicated reserves for losses incurred but not reported."  <u>Id</u>., at ¶ 77 (emphasis added).

Accordingly, the third section of the WTC Captive's Certificate of Incorporation, filed with the New York Secretary of State on or about July 9, 2004, and incorporated into the FEMA Grant Agreement that was funded by P.L. 107-8, indicates that the Captive is a not-for-profit corporation formed under N.Y. law to, in part, to insure against "*loss*, damage or expense incident to a claim of such liability (including the insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependants, beneficiaries or personal representatives of persons who are killed, irrespective of legal liability of the insured)."  <u>Id</u>., at ¶ 78 (emphasis added).

The FEMA Grant Agreement also expressly requires that the Captive establish the Advisory Committee (FEMA Grant Agreement, Article 1, paragraph 3) separately described in the Captive by-laws and Certificate of Incorporation that, as previously noted, were seperately incorporated into the FEMA Grant, itself.  This Advisory Committee is vested by section nine of the Certificate of Incorporation with considering claim disputes referred to the Board by the Captive's third party claim administrator, defendant GAB Robins, and with forwarding a recommendation to the Board for resolving each such dispute.  In the event that the Board disagrees with the Advisory Committee's recommendation and there is a remaining claim dispute, the Board is required to refer it to the American Arbitration Association pursuant to New York law, with the resulting decision binding on the Board of Directors and the Company.  <u>Id</u>., at ¶¶ 80-81.  Either there was the anticipated obligation to attempt to resolve claims, including outside the tort system, or these provisions are superfluous.  The express requirement of such an

16

Advisory Committee logically requires the conclusion that claim investigation and claim settlements are also required and part of the Captive's intended purpose.

Federal officials have subsequently confirmed that the insurance fund was intended to compensate Ground Zero workers, such as the Plaintiffs herein, for claims arising out of the debris removal process. Id., at ¶¶ 63-68. In September 2003, an official from the General Accounting Office testified before Congress that the one-billion-dollar fund "authorized FEMA to establish an insurance company to manage a $1 billion insurance fund and to settle claims filed by, among others, city and contractor workers who suffered ill health effects as a result of working on debris removal operations." Id., at ¶ 64. In his July 31, 2006, letter to Defendant Christine LaSala, Senator Charles E. Schumer unequivocally stated, in part, that he "worked closely with the City, contractors and the Administration, including OMB Director Daniels to … secur[e] $1 billion in federal funds *to ensure that anyone injured at the site would be compensated"* and that the mutual intent was to use this federal money to pay appropriate claims, not to fight claims." Id., at ¶¶ 65-66 (emphasis added).

Similarly, in his July 27, 2006, letter to Richard L. Skinner, Inspector General of the Department of Homeland Security, Congressman Jerrold Nadler stated, in part that "it was not the Congressional intent to provide $1 billion in federal taxpayers money simply to fight 9/11 heroes in court, without any provision for paying valid claims." Id., at ¶ 67. Senator Clinton's September 21, 2006 correspondence to Defendant Christine LaSala is in accord, stating that the WTC Captive "has *disproportionately* focused its efforts at *protecting New York City from the liability that may arise* from these claims instead of its responsibility to process the claims and

17

disburse all due compensation to those who were injured at Ground Zero.[12]" Id., at ¶ 68, (emphasis added).

      The Captive's mandate to investigate and pay legitimate claims was also acknowledged by State and City officials in connection with or following the passage of legislation in March, 2003, required to permit the city to create a captive insurer providing otherwise prohibited retroactive, non-risk transfer insurance. Id., at ¶¶ 69-75. In reviewing the Captive's license application, which by law included review of the Captive's proposed by-laws, Certificate of Insurance and Policy, N.Y. Insurance Law §7003(c)(5) expressly required the N. Y. Superintendent of Insurance to consider the WTC Captive's ability to meet "the unique risk insured by such captive and the source and limits of the premium payments along with any limitations on the acceptance of claims and the payment of accepted claims so long as such limitations provide an equitable basis for the allocation of the assets of such company to pay claims." Id., at ¶ 71.

      In a March 21, 2003 press release, then-Governor Pataki announced the swift passage of the New York enabling legislation, expressly quoted New York City Mayor Michael Bloomberg as saying: "The City of New York, together with State officials and the New York Congressional delegation, has fought long and hard for federally-paid insurance to protect the City and its contractors for claims arising from the massive debris removal work done in the World Trade Center. This legislation is necessary for the City *to expedite the payment of claims* relating to

---

[12] As noted, *supra*, subsequent to the filing of the above-captioned Complaint, Senators Leahy and Specter, the respective Chairman and ranking minority member of the Senate Judiciary Committee, wrote to defendant LaSala on August 1, 2007, demanding an explanation for the failure of the Captive to fulfill its intended purpose of claim resolution while wasting fund assets. The only known response to that inquiry is the present motion rejecting the Committee's expression of the Captive's intended purpose of paying legitimate claims, as the defendants have arrogantly rejected from each and every State and federal official in the past.

this effort." Id., at ¶ 74 (emphasis added).[13]  In his July 28, 2006, correspondence to defendant Christine LaSala, then-NY Insurance Superintendent Howard Mills informed the WTC Captive that the failure to pay claims from the $1 billion fund and its use solely to fund the Defendants' immunity litigation, evident from the "financial filings" with the Department, violates the "intended purpose" for which the WTC Captive was formed.  Id., at ¶ 75.

The Captive's mandate to benefit the public was also acknowledged at an early Captive board meeting soon after its incorporation.  The December 2, 2004, meeting minutes of the WTC board indicate at pp. 5-6, that Defendant LaSala "emphasized that the fundamental purpose behind the creation and funding of the WTC is to conserve and *disburse its assets in an equitable manner that maximizes compensation* to those parties who suffered damages as a result of the WTC debris removal program…Ms. LaSala commented that the WTC's charge is to implement a budgeting process pertaining to legal defense and other administrative expenses designed to *maximize indemnity to those parties able to demonstrate harm* from the debris removal.  *The Directors concurred*…" Id., at ¶ 90 (emphasis added).

Finally, but certainly not least, this Court has recognized and held that in approving P.L. 108-7, "Congress legislated for the public welfare" and not simply "to create a litigation defense fund" with "a blank check to enrich lawyers with endless stratagems of motions and delays."  In re: World Trade Center Disaster Site Litigation, 456 F.Supp.2d 520, 546 (S.D.N.Y. 2006).  The defendants deny this public purpose and continue to wrongly insist, as some did during their immunity motions, that Congress legislated only for the benefit of the City and its contractors. Consistent with the overwhelming documentary evidence and expressed views or every federal and state public official involved in or with knowledge of the Captive's actual legislative history

---

[13] This press release remains posted on the State's official web site.

and purpose, the Captive was created and funded to satisfy legitimate claims while safeguarding the fiscal health of the City and its contractors. Unquestionably, the plaintiffs are those members of the public for whom the Captive was created and publicly funded. (Complaint, ¶¶ 17-28, 59).

## B. Defendants Have Failed to Act In Accord With The Captive's Intended Purpose

In the nearly three years since the Captive's inception, the defendants have refused or approved and participated in the refusal to: investigate each and every toxic related claim; to establish any procedures for the submission of claim data and documents, including those relating to medical, hospital, surgical and disability benefits to injured persons and funeral and death benefits to dependants; to adjust each and every claim; to set adequate reserves for each or any claim; to provide an equitable basis for the allocation of the Captive's publicly funded assets entrusted into their care for the payment of valid claims; to offer any amount to settle any claim; to refer any claim disputes from their third party claim administrator to the Advisory Committee; to refer any claim disputes to arbitration; to do anything other than defend the Captive's named insureds in litigation as if the Captive was merely an extremely well endowed legal defense fund. Id., at ¶¶ 79-81, 91-94, 100-102, 104-107, 109-110, 129(h), 177, and 226.

Further, the Captive was never intended nor constituted to serve as the primary insurer for the City and its contractors. Rather, the funded insurance was to be excess to all other available coverage, including the $79 million that the City was able to place during the debris removal project, as well as the coverage separately maintained by the contractor defendants on their own behalf and/or on behalf of the City. However, from its inception, defendants have wrongly caused, permitted or approved the Captive's functioning as the City and contractor's primary and sole carrier. Id., at ¶¶ 36-38, 125-128.

20

Moreover, since its inception and with the defendants' knowledge and permission, the Captive has wrongly functioned as the primary litigation coordinator. As soon as a defendant is named in personal injury litigation, the Captive assigns litigation counsel, with the corresponding duty to locate other available coverage. However, neither the Captive nor its counsel, with the knowledge and consent of the other defendants, have investigated, located nor timely notified other available insurers of the pending claims. This is so even for the insurers providing the known $79 million in underlying primary coverage, whom the defendants did not notify or cause to be notified of pending claims until two years after litigation commenced. As indicated in the the answers to the complaint in *WTC Captive Insurance Company, Inc. v. Liberty Mutual, et al*., 07-CV-1209 [AKH] the known primary carriers, as well as carriers for various contractors, have denied coverage due to claimed late notice of claim. The Captive, with the defendants' knowledge and permission, has wrongly deviated from its intended purpose as excess carrier of last resort and has jeopardized available primary coverage with insufficient late claim notice or no notice at all. Id., at ¶¶ 36-38, 125-128, 164(g), 165, 225.

### C. The Captive Is A Public Authority Pursuant to New York Law

The WTCC is a Local Public Authority under New York Law, as defined in the Public Authorities Accountability Act of 2005, which provides, in pertinent part at Section 2.2:

> local authority shall mean: (a) a public authority or public benefit corporation created by or existing under this chapter or any other law of the state of New York whose members do not hold a civil office of the state, are not appointed by the governor or are appointed by the governor specifically upon the recommendation of the local government or governments; (b) a not-for-profit corporation affiliated with, sponsored by, or created by a county, city, town or village government; (c) a local industrial developmental agency or authority or other local public benefit corporation; or (d) an affiliate of such local authority.

N.Y. Pub. Auth. Law §2.2.   It is uncontestable that: the Captive is a not-for-profit corporation (Id., at ¶¶ 78, 82, 117), affiliated with the City (Id., at ¶ 86), created by the City (Id., at ¶¶ 115-116), for which the City was reimbursed $3 million by FEMA.  Id., at ¶ 115.

The City's affiliation with the Captive is demonstrated, in part, by the express language of its Certificate of Incorporation.  Section Fourteen of the WTC Captive's Certificate of Incorporation provides that "the WTC Captive and the Certificate of Incorporation shall be construed to be *an integral part of the City of New York*, within the meaning of G.C.M. 14407, XIV-1 C.B. 103 (1935), and Rev. Rul. 71-132, 1971-1 C.B. 29 or pursuant to Section 115 of the United States IRS Code of 1986, as amended."  Id., at ¶ 86 (emphasis added).

The Mayor's total or near-total control exercised over the Captive is further evidence of the Captive's affiliation with the City.  Pursuant to the Act's Section 2.4, "affiliate" or "affiliated with" means "a corporate body having substantially the same ownership or control as another corporate body."  Id., at ¶ 158.  N.Y. Insurance Law 7005(a)(3) expressly gave the Mayor the discretion to form a captive insurance company as either "a public benefit corporation or not-for-profit corporation…that shall be exempt from all state and local taxes."  Id., at ¶ 73.  The Captive's Certificate of Incorporation vests control over the Board with the City by and through its Mayor, all of whom are appointed by the Mayor in his sole discretion and at his will.  Id., at ¶¶ 117-118, 121.  Further, each of the mayor's appointees are either "an employee, former employee or employee-on-leave of the City of New York or a person experienced in the insurance, construction, financial, professional, or other business or governmental communities of the City of New York."  Id., at ¶ 119.  By and through these appointments, the City and its Mayor exercise total or near-total control over the Captive.  Id., at ¶ 123.

The integration of the Captive into the affairs of the City is further demonstrated by the City's delegation of the task of conducting hearings permitted by General Municipal Law § 50-h to defense counsel retained by the Captive, a function normally handled by City-employed attorneys.  Id., at ¶¶ 98-99.  As such, the Defendants are permitting the City to treat the Captive's retained counsel as its direct agents and servants, at rates and in a manner that is otherwise unacceptable for City employees, at no expense to the City but at the expense of the Captive's available funds, which are being unnecessarily and wrongfully depleted by such expenditures. Id., at ¶ 99.

On December 7, 2006, The Executive Director of the Committee on Open Government, the official entity authorized by New York law to make decisions and issue opinions as to the applicability of FOIL and the Open Meetings Law, issued a comprehensive opinion reviewing the Captive's history, Certificate of Incorporation and By-Laws with applicable New York State law.  *See*, December 7, 2006, Opinion of the Committee on Open Government, a true copy of which is attached to the Declaration of Counsel.  The Committee ruled that the Captive is and must be considered an agency of the City that is subject to both the FOIL and the Open Meeting Law, finding, in part, that the Mayor exercises "substantial if not total control over the corporation [Captive] and its Board of Directors." Id., at ¶ 134.

### D.  Statutory Violations

Defendants have elected to ignore the Committee's opinion, as they have similarly ignored each state and federal official with whom they disagree and every applicable statute that requires actions or conduct which they dislike or with which they disagree.  By so doing, the Complaint alleges that the Defendants have directly violated or permitted and assisted in the violation of, in part, the following applicable statutes:

(1)    N.Y. Insurance Law §2601 (requiring the prompt investigation by all insurers of all claims) (Id., at ¶ 100);

(2)    FOIL, by refusing to supply Plaintiffs' representatives with requested documents or even respond to their requests, the most recent of which was by letter dated March 15, 2007 (Id., at ¶¶ 134-137, 182-199);

(3)    The Open Meeting Law, by refusing to permit Plaintiffs' representatives attend Captive board meetings (Id., at ¶¶ 134-137, 202-214);

(4)    The Public Authorities Act ("PAA"), §2824.1 (administering and managing the Captive in an ethical manner) (Id., at ¶¶ 102, 124, 129, 130, 144-145, 164);

(5)    PAA §2825.2 (requiring that a majority of the board be independent) (Id., at  ¶¶ 150-152);

(6)    PAA §2800.2 (requiring the filing and publishing of certain reports and financial disclosures) (Id., at ¶¶ 141-143), PAA §2824.2 (requiring state approved training for board members and officers) (Id., at ¶ 146);

(7)    PAA §2824.4 (requiring an independent audit committee) (Id., at  ¶¶ 147-148) and

(8)    PAA  §2824.7 (requiring an independent governance committee (Id., at ¶ 149).

### E.   Defendants' Waste of Fund Assets

The Complaint sets forth the continued waste and mismanagement of Fund assets,

including:

(1)    the failure to investigate, locate and timely notify primary insurers (Id., at ¶¶ 125-128);

(2)    the failure to timely initiate litigation to secure primary coverage (Id., at ¶ 127);

(3)    the payment of excessive salaries and compensation (Id., at ¶¶ 96, 169);

(4)    the payment of $8,585,736 for claim adjustment when no material claim adjustment has occurred (Id., at ¶ 103);

(5)    the payment of excessive fees for 50(h) hearings delegated to the Captive by the City (Id., at ¶¶ 97-99);

(6)     the payment of excessive legal fees of at least $45.7 million by April, 2007 (<u>Id</u>., at ¶ 93);

(7)     the payment of excessive administrative and operating expenses of at least $73,870,000 by April, 2007 (<u>Id</u>., at ¶ 93-94); and

(8)     the prosecution of frivolous legal positions (<u>Id</u>., at ¶ 129).

All of the Captive's administrative and defense fees are subtracted from the Fund, depleting the only source of remuneration available to the plaintiffs, who have a protected and special interest in the Fund *res*, which was established for their benefit.  <u>Id</u>., at ¶ 95.

### F.  Plaintiffs Seek Only Equitable Relief

Contrary to the defendants' allegations in support of their pending motion, plaintiffs do not seek personal damages as relief in the above-captioned matter.  To the contrary, plaintiffs seek only equitable relief, including: (1) a thorough and independent accounting;  (2) adherence to applicable law; (3) compliance with applicable statutes, including but not limited to FOIL, the OML and the PAA; (4) compliance with the Captive's intended purpose, including prompt claim investigation, the setting of appropriate reserves, proper claim adjustment and the attempted resolution of legitimate claims; (5) restitution to the fund of any payments determined to be excessive or improper; (6) the appointment of an independent receiver or trustee to oversee the Captive's affairs, if appropriate and necessary; (7) the removal of current officers and board members who are found to have violated their duties and fiduciary obligations, including Defendant LaSala. (*See*, Complaint, pp. 49-54).

## ARGUMENT

## POINT I.

## NO DEFENDANT ENJOYS PERSONAL STATUTORY IMMUNITY

### A.  The Statute's Express Terms Preclude Immunity

All defendants except the Captive claim that no one may hold them accountable for their acts or omissions that constitute breach(es) of their fiduciary obligations, violate the Captive's mission and purpose, waste corporate assets and for their mismanagement of corporate affairs as alleged in the Complaint, pursuant to N.Y. Insurance Law §7005(a)(3).  Defendants LaSala, Bloomberg, Marsh Management Services, Inc., GAB Robbins, Inc., Page, Finkleman, Friedlander, Jones, Melson, Schoenbeck & Becker claim that this alleged immunity is unqualified and unconditional (Defs.' Mem. at p. 9), but nonetheless, they dispute or ignore the allegations of the Complaint against them, as well as the nature of the relief that the Plaintiffs seek.

Instead, they improperly presume that they have met the statutory conditions for immunity based upon their own improper restatement of the facts that are relevant for this Rule 12(b)(6) motion.  Based upon this "bedrock" of irrelevant presumptions and conclusions, the above-named defendants claim absolute immunity from the claims against them.  In so doing, these defendants have grossly overstated the scope and nature of the immunity statutorily provided to them by the New York Legislature.

The relevant statutory provision provides, in pertinent part:

> In the case of a city with a population of one million or more, a pure captive insurance company also may be formed as a public benefit corporation or not-for-profit corporation at the discretion of the mayor of such city, for the purpose of providing insurance that is retroactive to September eleventh, two thousand one, for risks incurred by such city and its affiliated companies related to or arising out of activities in or near the World Trade Center site in response to the attacks of September eleventh, two thousand one… The members or directors… shall be

> appointed by the mayor of such city or by such other city official as the
> mayor may designate.  Neither the mayor of such city, nor any of the
> captive's members, directors, officers, employees or agents appointed by
> or with the approval of such city, nor any officials, officers, employees
> or agents of the city, while acting within the scope of their authority,
> shall be subject to any personal liability resulting from the exercise or
> carrying out of any of the city's or captive's purposes or powers under
> this article.

N.Y. Insurance Law §7005(a)(3).

The provision cited above is the *sole authority* upon which defendants premise their claimed immunity.  *See* Defs.' Mem., at pp. 9-11.  New York law has long held that "legislative grants of privilege are to be liberally interpreted in favor of the public, and strictly interpreted against the grantee… ."  McKinney's Cons. Laws of N.Y., Statutes § 291; Eighth Avenue Coach Corporation v. City of New York, 170 Misc. 243 (Sup. Ct., N.Y. Cty., 1939) *aff'd* 259 A.D. 870 (1st Dep't 1940) *aff'd* 286 N.Y. 84 (1941).  This "rule is particularly applicable to grants of special franchises and privileges to corporations, such grants being frequently expressed in the language of the grantees and passed upon their solicitation and primarily for their benefit."  Comment, McKinney's Cons. Laws of N.Y., Statutes § 291, *citing* City of New York v. Dry Dock R. Co., 47 Hun 199, *aff'd* 112 N.Y. 137 (1889).  No grant of immunity arises under New York law by implication.  Comment, McKinney's Cons. Laws of N.Y., Statutes § 291, *citing* Village of Massena v. St. Lawrence Water Co., 126 Misc. 524 (Sup. Ct., St. Lawrence Cty, 1926).  Indeed, the policy of this State has been to reduce, rather than increase, the obstacles to the recovery of just relief, whether the defendant is a private person or a public body.  Abbot v.

Page Airways, Inc., 23 N.Y.2d 502 (1969) (citations omitted).  Thus, the immunity afforded by §7005(a)(3) must be expressly stated and strictly construed against the Defendants.[14]

Initially, it must be noted that, as even the defendants impliedly acknowledge, the relevant statute provides only *qualified* immunity from *liability*, but *not immunity from suit*. New York law has long recognized the distinction between immunity from suit and immunity from liability.  Smith v. State of New York, 227 N.Y. 405 (1920), *superceded by statute, see* Brown v. State, 89 N.Y. 172 (1996).  When construing a statute, words are to be given their plain meaning, unless the statute specifies a technical or specific definition.  Landor-St. Gelais v. Albany Intern. Corp., 307 A.D.2d 641 (3d Dep't 2003);  McKinney's Cons. Laws of N.Y., Statutes § 76.  Nothing in the statute relied upon by the defendants, on its face, mentions any right to be free from suit.  To the contrary, §7005(a)(3) only confers qualified immunity from personal liability, and then only under certain limited circumstances.

Second, the statute's clear language narrowly limits the scope of the conferred immunity. First, immunity is limited to individuals, including the City's mayor and the Captive's members, directors, officers, employees or agents.  Second, the aforesaid persons must have been appointed by or with the approval of the City.  Third, immunity only attaches when the aforesaid persons are acting "within the scope of their authority."  Fourth, it is limited to immunity from personal liability.  Fifth, personal immunity only arises when or if the aforesaid persons' actions are furthering or carrying out any of the City's Captive's purposes or powers.[15]

---

[14] *See, e.g.*, Breen v. Mortgage Commission of State of New York , 285 N.Y. 425 (1941); In re Hicka, 180 Misc. 173 (Sup. Ct., N.Y. Cty., 1943), similarly strictly construing statutory immunity claimed by the State.

[15] By claiming that they are entitled to this statutory immunity, Defendants acknowledge that they were appointed or approved by the City and are furthering or carrying out the City's powers, substantiating the reasoning and conclusions reached by the Committee On Open Government's in its finding of December 7, 2006.  Defendants cannot legitimately both claim to satisfy the conditions for

Even a casual reading of the Complaint clearly demonstrates that the defendants have not been acting in an authorized manner and have not been furthering the purposes for which the Captive was approved, funded and created. To the contrary, the plaintiffs contend that the defendants have been acting in an unauthorized manner so as to frustrate the Captive's legitimate purposes – that is the primary basis for this litigation. Defendants may disagree with the plaintiffs' allegations and facts marshaled in support of those allegations, but they are not entitled to ignore *or* to dispute them at this time. A legitimate reading of the Complaint precludes the grant of immunity at this time if, for nothing else, the defendants are accused of failing to act in the manner upon which the personal statutory immunity is conditioned.

To the contrary, the Complaint is replete with accusations of specific statutory violations, waste of fund assets and mismanagement, including the failure to locate and notify available primary insurers, the payment of significant sums without due consideration and excessive salaries and compensation, self-dealing and the arrogant, knowing and contumacious disregard of the Captive's intended purpose. The Complaint further alleges that the individual defendants, including Mayor Bloomberg, either directly caused these infirmities or permitted them to occur, in derogation of their duties and responsibilities inuring from their respective positions. This personal involvement and resulting liability is also presumed as a matter of law, at least upon the Captive's board and officers. New York Not-For-Profit Corporation Law § 719 (directors and officers of non-profit corporations are deemed to have concurred in violations unless he or she votes to the contrary or submits written dissent)[16]. It cannot be seriously argued that such

---

statutory immunity and deny that they are subject to the FOIL, the OML and the Public Authorities Act, nor that they owe resulting fiduciary duties to the Plaintiffs.

[16] Although the beginning sections of the statute omit reference to officers, it is clear from the statute's latter provisions that it is equally applicable to officers. *See, e.g.* §719(d) and (e).

malfeasance or neglect of duty is in any way "authorized" nor in legitimate furtherance of the Captive's purpose or powers within the meaning of §7005(a)(3).

Nor are the defendants entitled to assume their conclusion that they further the Captive's purpose and are entitled to personal immunity solely by defending the City and its contractors without investigating or considering any claims, let alone paying legitimate ones. Rather than accept the plaintiffs' well documented contentions about the 2003 New York Captive legislation's intent and purpose, defendants once again base their requested relief upon their own self-serving and out-of-context recitation of relevant interpretative authority. Thus, it is not surprising that the defendants conclude "that the WTCC's mandated purpose is to provide risk insurance to the City and its contractors," (Defs.' Mem., at p. 9), although this is contrary to the Captive's intended purpose.

As set forth in the Complaint, when the legislature revised the captive statute to permit the issuance of an otherwise illegal retroactive insurance policy, the Superintendent of Insurance was required to scrutinize the Captive's founding documents to ensure that the Captive could meet "the *unique risk* insured by such captive…along with any limitations on the *acceptance of claims* and the *payment of accepted claims* so long as such limitations provide an equitable basis for the allocation of the assets of such company *to pay claims*." *See* Complaint, ¶¶ 69-75, (emphasis added), *citing* N.Y. Insurance Law §7003(c)(5). Typically, Defendants disparage this statutory language as pertinent only to the issuance of the Captive's license but not its corporate purpose. (Defs.' Mem, p. 21). This distinction is superficial and inane. The statute expressly states that the purpose of the Superintendent's review of documents is to ascertain whether a captive will be able to meet its obligations. N.Y. Insurance Law §7003(c)(2)(E). In this statutory

context, a corporations obligations are synonymous with its purpose, as both define a corporation's required duties and actions.

Further, the Superintendent is required to review every prospective captive's "certified copy of its charter[17] and bylaws, a financial statement certified by two principal officers, a plan of operation, which shall include an actuarial report prepared by a qualified independent actuary, and any other statements or documents required by the superintendent." By law, the purposes for which a corporation was formed are set forth in the corporation's charter. New York Not-For-Profit Corporation Law § 402; Agudist Council of Greater New York v. Imperial Sales Company, 158 A.D.2d 683, (2d Dep't 1990). As set forth in the Complaint, those purposes include the payment of medical, disability and funeral expenses *regardless of the City's liability*, (Complaint,¶78), as well as the resolution of legitimate claims by the third-party claims administrator (GAB Robbins, Inc.) or, if necessary, by the Captive's Advisory Committee or AAA arbitration. Complaint, ¶¶ 80-81. The Complaint alleges that defendants have intentionally refused to carry out these corporate purposes, without which there can be no immunity pursuant to §7005(a)(3).

Defendant's argument that the Captive's purpose is merely to function as an ordinary insurance corporation is contradicted by the very legislation that permitted its creation. The legislature *expressly* provided that the WTC Captive was not to be considered as a mere "insurance corporation." McKinney's 2003 Session Laws News of N.Y., Ch. 188 (A.8592); N.Y. Tax Law §1500(a).

---

[17] Defendants cavil about Plaintiffs' use of the word "charter" to interchangeably refer to the Captive's Certificate of Incorporation and deny that any corporate charter exists. (Defs.' Mem., p.24, n.12). Obviously, the legislature shares Plaintiffs' nomenclature and similarly interchanges "charter" for certificate of incorporation. That is because, by definition, a corporate charter "means the basic instrument, by whatever name called, prescribing the powers, *purposes* and organization of a corporation." N.Y. Insurance Law §107(14) (emphasis added).

Further, to the extent, if any, that the defendants' dispute over the Captive's intended purpose creates a valid issue or statutory ambiguity, New York law permits, in fact, *requires*, the consideration of the statute's contemporary history and the historical background as an aid to interpretation.  "In ascertaining the purpose and applicability of a statute, it is proper to consider the legislative history of the act, the circumstances surrounding the statute's passage, and the history of the times." McKinney's Cons. Laws of N.Y., Statutes §124; Astoria Gas Turbine Power, LLC v. Tax Com'n of City of New York, 14 A.D.3d 553, 557 (2d Dep't 2005).  Courts are similarly permitted to consider extrinsic sources such as legislative reports and letters from sponsoring legislators, Petro, Inc. v. Serio, 9 Misc.3d 805, 811 (Sup. Ct., N.Y. Cty.  2005), as well as statements or memoranda from New York's Governor acting in his "legislative capacity." Cons. Laws of N.Y., Statutes §14; People v. Gellineau, 178 Misc.2d 790 (Sup. Ct., Kings Cty., 1998) (citations omitted).

These sources were set forth, at length, in the Complaint; they unequivocally establish that the Captive's intended purpose was to "ensure that sufficient resources will be available to satisfy legitimate claims by individuals affected by the recovery operations while safeguarding the fiscal health of the City and the contractors." (Complaint, ¶55).  As set forth at length in the Statement of Facts and in the Complaint, this purpose has been attested to by every state and federal official involved in the creation of the Captive, including Senators Schumer and Clinton, Congressman Nadler, Congresswoman Maloney, former Governor Pataki, former Insurance Superintendent Howard Mills and various officials from FEMA, SEMO and the City.  Viewing this copious body of evidence in a light most favorable to the plaintiffs, as this Court must do in considering a motion pursuant to 12(b)(6), there can be no doubt that the Plaintiffs have properly alleged, and have factually established, that the defendants have failed miserably to fulfill their

obligations of good faith and fidelity to the claimants for whom this Captive Insurance Company was formed, and, moreover, that these defendants have contumaciously refused to act in accord with the Captive's intended purpose.  At a minimum, no defendant is entitled to the immunity from personal liability provided by §7005(a)(3).

### B. Statutory Immunity Is Inapplicable To Defendants GAB Robbins, Inc. & Marsh Management Services, Inc.

The statute does not define outside entities with whom a captive insurer contracts to manage or administer its affairs to be "agents" or otherwise entitled to the provided qualified immunity.   In N.Y. Insurance Law § 7002, the Captive Statute specifically defines certain terms for use throughout that article.  People v. Duggins, 3 N.Y.3d 522, 527-528 (2004).  "Captive manager" is statutorily defined as "any person or firm contracted by a captive insurance company to manage its affairs."  N.Y. Insurance Law §7002(d).  The Complaint unambiguously avers that defendants GAB Robbins, Inc., and Marsh Management Services, Inc., were, at all relevant times, entities with whom the Captive contracted to manage or administer its affairs, and these allegations are never contested by any defendant in their respective briefs.  However, §7005(a)(3) does not expressly provide any immunity for such "captive managers."

Further, qualified immunity is only provided from "personal liability" for persons "appointed by or with the approval of such city [New York City]."  The Complaint does not allege that these two defendants were contracted by the City, but rather, by the Captive, nor does the Complaint allege that the City directly "approved" their retention.  No defendant has even attempted to explain how a corporation can have immunity from "personal liability," the only species of immunity offered by the statute.  Defendants GAB Robbins, Inc., and Marsh Management Services, Inc., are simply not entitled to any immunity provided by § 7005(a)(3).

Defendants ignore these fatal definitional stumbling blocks with the ruse that GAB Robbins, Inc. and March Management Services, Inc., are described as being the Captive's agents in the section of the Complaint where parties are identified, so that they must be considered "agents" for purposes of the qualified personal statutory immunity. Their argument is unavailing, in part, because: the referenced description in the Complaint is in the disjunctive, with no legitimate conclusion that either entity was the Captive's agent at all time and for all purposes; defendants' position violates the cannons of statutory construction, *supra*, by relying upon an out-of-context reference to the pleadings while ignoring the plain wording of the statute that disproves their argument; and defendants essentially attempt to expand the scope of qualified statutory personal immunity, rather than narrowly construe the statute as required by New York law. Defendants GAB Robbins, Inc., and Marsh Management Services, Inc., are simply not entitled to their claimed statutory immunity.

### C. Statutory Immunity Is Inapplicable to Plaintiffs' Demanded Equitable Relief

The clear language of §7005(a)(3), on its face, pertains only to limit the "personal liability" of the Mayors and the Captive's directors, officers, employees and agents. It does not, however, affect the right to seek or procure a judgment against them for the equitable relief sought by the plaintiffs in the matter at bar. The Not-For-Profit Corporation Law, for example, distinguishes between actions to compel the type of equitable relief that Plaintiffs seek, McKinney's Not-For-Profit Corporation Law §720, from actions seeking to impose personal liability to recover damages from officers and directors, McKinney's Not-For-Profit Corporation Law §719.

Indeed, "personal liability" in the context of immunity is commonly understood to refer to damages. *See, e.g.*, Ackerman v. Vertical Club. Corp., 94 A.D.2d 665, 666 (1st Dep't 1983);

Brown, 89 N.Y.2d at 82.  These distinctions have been expressly recognized so that suit has been permitted even where public servants enjoy absolute immunity from personal liability.  Indeed, the Second Circuit held that even though a state public prosecutor enjoyed absolute immunity from suit, an "official's entitlement to absolute immunity from a claim for damages, however, *does not bar the granting of injunctive relief, or of other equitable relief.*"  Shmueli v. City of New York Id., 424 F.3d. 231, 239 (2d Cir 2005)(citations omitted)(emphasis added).   The Northern District similarly held that "[q]ualified immunity is not a defense to a cause of action seeking prospective equitable relief." Gage v. New York State Dept. of Health, 204 F.Supp.2d 399, 403 (N.D.N.Y. 2002)(citations omitted).

In the instant matter, plaintiffs do not seek damages from the defendants:  they seek equitable relief on behalf of the fund in which they have a protected interest.[18]  Given this State's strong public policy permitting such equitable relief even in the absence damages to a complainant as a means of preventing corporate wrongs (*see* Diamond v. Oreamuno, 24 N.Y.2d 494, 498 [1969]) and the narrow and strict interpretation to be accorded to immunity statutes, §7005(a)(3) should not be interpreted to prevent the Defendants from being required to account for their actions nor from enjoining improper actions and compelling compliance with relevant law.[19]   Any contrary ruling would effectively place the Defendants above the law and hold them unaccountable to the public in general, and to the plaintiffs in particular.

## POINT II.

### PLAINTIFFS HAVE STANDING TO SEEK REDRESS AS MEMBERS OF THE PUBLIC AND AS THE INTENDED BENEFICIARIES OF THE LEGISLATION THAT

---

[18] Such equitable relief does include restitution to the fund and reimbursement of costs and attorneys' fees, if awarded by the Court.

[19] It is axiomatic, but the Defendants are not immune for their violations of the FOIL and OML as §7005(a)(3) is expressly limited to duties arising under that particular insurance article, not other statutes.

### CREATED THE CAPTIVE UNDER THE UNIQUE UNDERLYING FACTS OF THE WORLD TRADE CENTER DISASTER SITE LITIGATON

**A. Plaintiffs Can Seek Redress For Breach Of Fiduciary Duties Owed By Public Servants And Entities**

As this Court has expressly recognized, the duties and fiduciary obligations owed by the City and its contractors to the Plaintiffs began shortly after the terrorist attacks.

> Special consideration must also be given where the obligation of good faith runs, not to third parties potentially injured by the attacks, but instead to those directly engaged, for all intents and purposes as employees, in the recovery effort. Those who engage others in their service owe definite and specific obligations which may not easily be abandoned.

In re World Trade Ctr. Disaster Site Litig., 456 F.Supp.2d at 553. These duties and fiduciary obligations were not extinguished upon completion of the debris removal operations but run along a temporal continuum including the solicitation and receipt of funds and authority to establish an insurance mechanism to protect the City's financial health while redressing legitimate claims by these former "employees," including the present plaintiffs. Those duties and responsibilities also require the use of those funds for their intended purpose by the public servants and agents of the City who control and administer the Captive and who are empowered to relieve at least some of the burdens now faced by these selfless Plaintiffs in the City's service.

The defendants, however, claim that plaintiffs lack standing to obtain equitable relief on behalf of the Captive fund because defendants, once again, deny that they owe plaintiffs any duties or fiduciary obligations, ignoring the holdings of this Court and the entreaties of every public servant involved in the Captive's creation and funding. As with their claimed immunity defense, defendants arguments alleging a lack of standing rest upon the fanciful premise that the Captive is nothing more than an "ordinary" insurance company subject to the same duties and obligations as for-profit insurance corporations. Indeed, all of the reported cases and authority

36

cited in Defendants' Memoranda pertain to such for-profit insurance corporations.  However, their authority is inapposite and their arguments without factual basis or merit.

As previously noted, when the insurance laws were revised to permit the existence of the Captive in 2003, the New York Legislature also revised the tax code in the same Session Law to reflect that the Captive was not to be considered an "insurance corporation." *See*, McKinney's 2003 Session Laws of N.Y., Ch. 188 (A.8529); McKinney's N.Y. Tax Law §1500.  The Legislature also expressly amended the insurance law to preclude the applicability of the "business corporation law" to the Captive[20].  McKinney's 2003 Session Laws of N.Y., Ch. 188 (A.8529); N.Y. Insurance Law §108(a)(1).  As a not-for-profit entity endowed with public funds and entrusted to the City's Mayor to administer for the welfare of specific members of the public, the Captive was entrusted to the Mayor's control and oversight, exercised by his power to appoint and control the Captive's board of directors.  McKinney's N.Y. Insurance Law § 7005(a) (the members or directors…shall be appointed by the mayor of such city).

Although a fiduciary relationship is not subject to any precise "litmus test," two well established standards for measuring fiduciary status include: (1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary.  Mobil Oil Corp. v. Rubenfeld, 72 Misc.2d 392, 399-400 (Civ.Ct., Queens Cty., 1972) *aff'd* 77 Misc.2d 962 (App. Term, 2d Dep't 1974) *rev'd on other grounds*, 48 A.D.2d 428 (2d Dep't 1975) *aff'd mem*. 40 N.Y.2d 936 (1976).

---

[20] All of the authority relied upon by the defendants to disclaim any duties owed to the plaintiffs pertains to for-profit corporations organized and governed by the general business law that is statutorily inapplicable and inapposite to the not-for-profit Captive.

Both tests are met in the present matter.  The specific charter or license granted by the Legislature to the Captive establishes it as a "quasi-governmental body."  Goldman v. White Plains Center for Nursing Care, LLC, 9 Misc.3d 977, 980 (1st Dep't 2005).  Contrary to the defendants' arguments, it is irrelevant that the Captive is separately incorporated from the City as a not-for-profit entity. Goldman, 9 Misc.3d at 981; N.Y. Pub. Auth. Law §2.2; Smith v. City University of New York, 92 N.Y.2d 707 (1999), *rearg denied* 93 N.Y.2d 889..   The Complaint clearly alleges that the Captive was funded, authorized and created for a specific purpose: financial protection for the City and its contractors and redress of legitimate claims by WTC-related workers, such as the plaintiffs.  This redress is limited to the certain, known and distinct class of beneficiaries, including the plaintiffs – those who toiled so arduously and selflessly on behalf of the City at the time of its greatest need – as opposed to the public at large.  It is respectfully submitted that no greater "special relationship" exists than that between the City and these injured and suffering heroes.

Moreover, the absolute or near absolute control exercised by the City through its Mayor over the Captive board, itself comprised almost entirely of City employees and public servants as well as the integration of the Captive into the affairs of the City establishes the important governmental nexus with resulting fiduciary responsibilities that the defendants owe to the Plaintiffs.  This nexus has been demonstrated in myriad ways, including the City's delegation of the task of conducting hearings permitted by Gen. Mun. Law § 50-h and the coordination of WTC litigation against the City to the Captive and its legal counsel, Patton Boggs, rather than the City's Law Department; the declaration in the Captive's Certificate of Incorporation that it shall be considered to be an integral part of the City of New York pursuant to Section 115 of the United States IRS Code of 1986; the December 7, 2006, determination by the Committee on

Open Government that the Captive is an agency of the City subject to the FOIL and OML and the specific inclusion of such not-for-profit corporations into the statutory definition of "local public authority" by N.Y. Pub. Auth. Law § 2.2(b) ("a not-for-profit corporation affiliated with, sponsored by, or created by a county, city, town or village government") and N.Y. Pub. Auth. Law § 2.4 ("'affiliate' or 'affiliated with' means "a corporate body having substantially the same ownership or control as another corporate body."[21]   Thus, even Community Boards operating throughout the City are considered governmental entities, subjecting even its uncompensated members appointed by public officials to the duties inherent to elected public servants and public employees.  People v. Kruger, 87 A.D.2d 473, 479 (2d Dep't 1982).  These facts, all alleged in the Complaint, sufficiently permit a fact finder to conclude that the Captive is a governmental or quasi-governmental entity and that the defendants either are public servants in their own right and/or by and through their affiliation with the Captive.

It is almost axiomatic that such public servants owe fiduciary obligations to members of the public such as the plaintiffs, herein.  Id.; U.S. v. Adler, 274 F.Supp.2d 583, 587 (S.D.N.Y. 2003).  Indeed, the Public Officers Law imposes fiduciary duties in the public sector associated with the public's intangible right to an individual's honest and faithful participation in governmental affairs, including where a person is a actually a public official or merely functioning as one.  See, Pub. Officers Law §§ 10-12.   For purposes of the present litigation, it is irrelevant that any or some individual or corporate defendant, *arguendo*, may not actually be a public servant because *all of these defendants* were either appointed by such public servants and/or are under their control - those who arguably participate in the affairs of government in an

---

[21] New York law defines "public servant" to mean "(a) any public officer or employee of the state or of any political subdivision thereof or of any governmental instrumentality within the state, or (b) any person exercising the functions of any such public officer or employee."  People v. Kruger, 87 A.D.2d 473, 479 (2d Dep't 1982).

insubstantial way are controlled by and answer to public officers owing fiduciary duties to the citizenry in general and to the plaintiffs, in particular.

As the Captive is a local public authority pursuant to statute; an entity under the control of the City; an entity affiliated with the City and an entity whose board consists of and is controlled by public servants, to whom public funds have been entrusted for "unique and important public policy considerations," (In re WTC Disaster Site Litig., 456 F.Supp.2d at 526, fn. 1) the plaintiffs have standing to require that the defendants account for their violations of their public trust in a court of law. Saratoga County Chamber of Commerce, Inc. v. Pataki, 100 N.Y.2d 801, 813-814 (2003); Abrams v. NYC Transit Auth., 39 N.Y.2d 990, 991 (1976).  That is particularly true here, where, in the event of a denial of standing as to all plaintiffs in this action, important issues of appreciable public significance would be effectively insulated from judicial review.  Boryszewski v. Brydges, 37 N.Y.2d 361, 364 (1975); Matter of Colella v. Board of Assessors, 95 N.Y.2d 401, 410-411 (2000).


The Complaint details, and this Memorandum has already summarized, many specific violations of defendants' fiduciary obligations sufficiently to state causes of action pursuant to the liberal pleading standards imposed by New York law.  Briefly, these include:  the violation of statutes, such as the FOIL, OML and the Public Authorities Accountability Act of 2005, Knopfler v. Bohen, 15 A.D.2d 922 (2d Dep't 1962); wasting and mismanaging the Captive's funds with excessive payments to counsel, G.A.B. Robbins and others without due consideration, Kaplan v. Okun, 15 A.D.2d 848 (3d Dep't 1962); wasting and mismanaging the Captive's funds with excessive compensation, including to defendant LaSala, Abramson v. Blakely, 25 Misc.2d 967 (Sup. Ct., N.Y. Cty. 1960); Vacco v. Diamandopoulos, 185 Misc.2d 724 (Sup. Ct., N.Y. Cty.

1998); wasting and mismanaging the Captive's funds with purposeless litigation, In re First Cent. Fin. Corp., 269 B.R. 502 (E.D.N.Y. 2001); and, perhaps most egregiously, violating the statutes, agreements corporate charter and corporate by-laws by contumaciously refusing to operate and administer the Captive consistent with its intended purpose, in violation of Not-For-Profit Corporation Law §§717, 719 & 720, *et seq.*

This latter duty is often referred to as the "duty of obedience," requiring that not-for-profit corporate officers and directors act faithfully to implement the purposes and goals of the corporation, since unlike for-profit business corporations, whose ultimate objective is to make money, nonprofit corporations are defined by their specific objectives, so that perpetuation of particular activities are central to the corporation's reason for existence. Manhattan Eye, Ear & Throat Hosp. v. Spitzer, 186 Misc.2d 126 (Sup. Ct., N.Y. Cty. 1999). As discussed, *supra*, the Captive's purposes include the "acceptance of claims and the payment of accepted claims…[on] an equitable basis for the allocation of the assets of [the Captive] to pay claims." N.Y. Insurance Law §7003(5).

Defendants, however, refute the importance of that provision (Defs.' Mem. pp. 20-21) so as to narrowly and strictly construe the statute to defeat its indeed remedial purpose, in violation of New York law. To the contrary, "remedial statutes are liberally construed to carry out the reforms intended and to promote justice," (Gen. Cons. Laws of N.Y., Statutes §321), and to promote the public good, (Gen. Cons. Laws of N.Y., Statutes §341). Similarly, "statutes which grant special franchises or privileges to corporations are strictly construed in favor of the public," so as to safeguard the public interest, Comment, Gen. Cons. Laws of N.Y., Statutes §292, and "will not be construed so as to advance a private interest at the expense of the public good." Comment, Gen. Cons. Laws of N.Y., Statutes §341.

Although there is no bright-line rule defining which statutes are remedial, generally, remedial statutes supply some kind of remedy to correct some kind of "mischief" where none previously existed.  Comment, McKinney's Gen. Cons. Laws of N.Y., Statutes §321.  These rules of construction found in the General Construction Law must be read into every statute subsequently enacted, including the Captive statute at issue.  Cotroneo v. Monroe County Bd. Of Elections, 166 Misc.2d 63, 64 (Sup. Ct., Monroe Cty., 1995).

Applying these principles, courts have held that statutes providing for the ascertainment and payment of damages to property caused by changes in street grades are remedial and should be liberally interpreted, Comment, Gen. Cons. Laws of N.Y., Statutes §321(citation omitted), as well as a statute setting aside certain allowances for widows, (Id.), and a statute creating a corporation for rescuing the "waifs" of society, Comment, Gen. Cons. Laws of N.Y., Statutes §341(citation omitted).  In a similar manner, the Captive statute at issue creates a fund to compensate the "Heroes of 9/11" for their legitimate claims of injury incurred during such service and must be regarded as remedial.  By contrast, the narrow and restrictive interpretation advanced by the defendants, *i.e.,* that the statute merely creates a litigation defense fund must, once again, be rejected.  In re WTC Disaster Site Litig., 456 F. Supp.2d at 546.

Similarly, defendants' efforts to hamstring the plaintiffs' pleadings with causes of action that are of defendants' own devise must be rejected.  To be clear, plaintiffs have not plead and do not claim direct causes of action pursuant to the federal and state statutes upon which the defendants rely to dismiss the present litigation, other than the FOIL and OML.  Rather, these statutes are cited by plaintiffs in their pleadings and relied upon to establish, in part, the duties owed to them by the defendants, as well as the defendants' misfeasance and malfeasance by their breach(es) of those statutes.  Defendants' arguments that these statutes, including but not limited

42

to P.L.108-7, the N.Y. Insurance Law and the N.Y Not-For-Profit Corporation Law, do not provide private causes of action are simply unavailing in the matters plead at bar.

Defendants' arguments pertaining to the FEMA grant and sub-grant and other agreements entered into by the City are similarly misplaced. Although, contrary to the defendants' inapposite authority, plaintiffs could legitimately claim a right of action for the contractual breaches outlined in the Complaint as injured third party beneficiaries (under New York law, all contracts entered into by municipalities are for the public's benefit, <u>Genesco Entertainment v. Kotch,</u> 593 F.Supp. 743, 748 (S.D.N.Y. 1984)), these breaches are again cited by Plaintiffs in their pleadings and relied upon to establish, in part, the duties owed to them by the Defendants, as well as the Defendants' misfeasance and malfeasance by their breach. The Defendants' arguments that these agreements do not provide direct, private rights of action are simply irrelevant.

Both defendants Marsh Management and GAB Robbins also minimize and ignore most of the allegations against them. To be clear, references in the Complaint to "the WTCC and its officers, directors, agents and managers" include and directly refer to both of these defendants, with whom the Captive contracted to manage its affairs. Indeed, as previously noted, the captive legislation expressly defined such entities as "Captive Managers." N.Y. Insurance Law § 7002(d). ("Captive manager" means "any person or firm contracted by a captive insurance company to manage its affairs."). Pursuant to New York law, such entities or persons who aid, assist, ignore or fail to prevent the kinds of breaches of fiduciary and other duties are or may be liable, along with the principles with whom they directly contracted. <u>Scheur Found. v. 61 Assoc.</u>, 179 A.D. 65 (1st Dep't 1992); <u>Zakiva Comm. Corp. v. Horowitz</u>, 826 F.Supp. 86 (S.D.N.Y. 1993). Certainly, in this post-Enron and Worldcom era, in which liability is even

43

being imposed upon counsel, professionals who abet or fail to enjoin the type of breaches of duties alleged in the present matter may be liable to the ultimate victims of such malfeasance.

Plaintiffs have established that the defendants owed them fiduciary duties that have been breached in sufficient detail to place defendants on notice of the claims against them, as required by New York law.  It is well established that no present damages need be sustained or alleged to state a claim for breach of fiduciary duty under New York law, (Diamond, 301 N.Y.S.2d at 81), nor is there any requirement that any harm necessary to confer standing be actual and in the present, rather than potential and in the future, as long as it is reasonably certain that the harm will occur is the challenged action is permitted to continue.  Police Benev. Ass'n of New York State Troopers, Inc. v. Division of New York State Police, 29 A.D.3d 68 (3d Dep't 2006)(citations omitted).  Here, the Plaintiffs have alleged both present harm to themselves and others similarly situated, as well as future harm due to the wasting and elimination of the Captive fund should the defendants' actions be permitted to continue.  The plaintiffs have met their pleading burden and their Complaint should not be dismissed.

### B.  Plaintiffs Have Standing As The Intended Beneficiaries Of A Specific Fund

As set forth, *supra*, the pertinent facts and circumstances are unique.  Unlike any other nonprofit entity, the Captive was specifically authorized and funded by Congress for the public welfare, (In re WTC Disaster Site Litig., 456 F. Supp.2d at 546), to remediate part of the harm caused by the 9/11 terrorist attacks to those injured in the rescue, recovery and debris removal efforts.

Because the authorized insurance was to be realized on the state, not federal level, and because such retroactive insurance was illegal and unavailable under New York law, the New York Legislature amended its own insurance laws to permit such unique, retroactive coverage in

this one instance.  It did so, however, by entrusting the operation of the resulting captive insurer

to the Mayor of the City for the benefit of those for whom the Captive was authorized and

funded.  Unlike any other insurer in the State of New York, the Captive is a nonprofit

corporation that is a local public authority administered and controlled by public servants.

Plaintiffs, as the intended beneficiaries of the fund administered by this public entity,

whose interests have been adversely affected by defendants' misfeasance and malfeasance, are in

a unique situation not generally anticipated nor provided for by the general provisions of New

York's not-for-profit corporate statute in seeking a remedy.  Admittedly, if not obviously,

plaintiffs are not within any of the classes of parties expressly authorized by the Not-For-Profit

Corporation Law to challenge the Captive's conduct.  However, there is authority permitting

standing where, as here, a limited class of intended beneficiaries seek to protect their interest in a

specific fund.

Generally, plaintiffs have standing to assert claims when they have " a sufficiently

cognizable stake in the outcome so as to cast[ ] the dispute in a form traditionally capable of

judicial resolution."  Consumers Union of U.S. v. State of New York, 5 N.Y.3d 327, 350

(2005)(citations and internal quotation marks omitted).  This standing requirement is generally

relaxed by New York courts whenever possible so that controversies can be decided on their

merits.  Matter of Douglaston Civic Assn. v. Galvin, 36 N.Y.2d 1, 6, (1974); Matter of Dairylea

Corp. v. Walkley, 38 N.Y.2d 6, 10-11(1975).

In Alco Gravure, Inc. v. Knapp Found., 64 N.Y.2d 458 (1985), the policy reasons for

limiting standing to sue a not-for-profit type "B" corporation to the Attorney-General[22] –

_____

[22] Defendants have also attacked plaintiffs' standing to remove Captive officers and/or directors
pursuant to McKinney's N-PCL §715.  Plaintiffs submit that N-PCL §715 standing follows that of N-PCL
§720, so that for the reasons stated above, Plaintiffs' standing to sue entitles them to their requested relief,
if so N-PCL §715ordered by the Court.

preventing vexatious litigation and suits by irresponsible parties who do not have a tangible stake in the matter and have not conducted appropriate investigations – to be satisfied when the intended beneficiaries of the fund at issue faced the complete elimination of the fund and brought suit to protect their interests in the fund. Id, 64 N.Y.2d at 465-466. In essence, the Court found an exception to the general nonprofit corporation standing rule "when a particular group of people has a special interest in funds held for a charitable purpose." Id.

The facts in the instant matter are closely analogous. Although the Captive's funds are not held for a "charitable purpose," they are held for remedial and public welfare purposes. Further, the funds are held by a governmental or quasi-governmental entity and administered and controlled by public servants, who collectively owe fiduciary duties to, and for the benefit of, a particular group of people, including the Plaintiffs herein. As in Alco Gravure, the Plaintiffs here face the impending dissolution of the fund established for their benefit, here by the continued waste and mismanagement of the Captive by the named Defendants. As in Alco Gravure, Plaintiffs have standing because similar "special interest" factors - the remedial purpose is being extinguished unless the present suit for enforcement is permitted to proceed – justify relaxing the usual rules of standing. Consumers Union, 5 N.Y.3d at 353.

Similar authority permits relaxing the usual rules of standing in the context of Fed. R. Civ. P. 24(a) intervention.[23] In Mountaintop Condo. Assn. V. Dave Stabbert Master Builder, 72 F.3 361 (3d Cir. 1995), cited with approval in Arista Records, Inc. v. Dalaba Color Copy Center, 2007 WL 749737 (E.D.N.Y. 2007), the Third Circuit held that "an intervenor's interest in a

---

[23] The standard for "interest" to intervene are identical to the standards for standing, for the purposes here. Brennan v. N.Y.C. Bd. Of Educ., 260 F.3d 1231 (2d Cir. 2001).

specific fund was sufficient to entitle intervention in a case affecting that fund," <u>Mountaintop</u>, 72 F.3d at 366, even where the fund did not have any charitable or public welfare-related purpose.

<u>Mountaintop</u> concerned the disposition of insurance proceeds paid to the board of a condominium association following a hurricane that damaged or destroyed individual units.  In violation of its corporate by-laws, the board failed to retain and impartial trustee to distribute the proceeds of the insurance policy entrusted to its care for the repair of both common elements and individual units.  Instead, the board distributed the insurance proceeds as it saw fit and deposited the remainder in an escrow account pending the resolution of litigation with one of its repair contractors.  In the even that the funds were released to the plaintiff in that litigation, the insurance proceeds would be exhausted without any repairs having been made to the prospective intervenor's unit.  The Court permitted the intervention, finding that the remaining fund had essentially been held in trust for the intervenor's benefit, as the board owed fiduciary duties to its unit owners, and that the intervenor had an interest in the fund to prevent its diversion in a manner that would defeat its intended purpose.  <u>Id.</u>, 366-368.

As in <u>Mountaintop</u>, plaintiffs here claim an interest in a specific fund that they seek to protect from diversion in a manner that would defeat the fund's purpose.  Plaintiffs do not seek possession of any portion of that fund in this proceeding.  Rather, as in <u>Mountaintop</u>, Plaintiffs seek to protect and preserve the fund from depletion caused by waste and the failure to use it for its intended purpose.  As in <u>Alco Gravure</u> and <u>Mountaintop,</u> the Plaintiffs have concrete legal interests capable of and deserving judicial resolution, the traditional test for standing.  <u>Society of the Plastics Industry, Inc. v. County of Suffolk</u>, 77 N.Y.2d 761, 772 (1991).  The Plaintiffs suit should not be dismissed.

**POINT III.**

**PLAINTIFFS HAVE ASSERTED VALID CLAIMS
PURSUANT TO THE FREEDOM OF INFORMATION LAW
AND THE OPEN MEETINGS LAW**

The Complaint avers that plaintiffs, by and through their representatives, have made

numerous requests for documents from the Captive pursuant to the Freedom of Information Law

("FOIL") Pub. Officer's Law §89, *et seq*. and have similarly made numerous requests to attend

and observe board meetings, as permitted by the Open Meetings Law ("OML"), Pub. Officers

Law. §95, *et seq*.  The Complaint further indicates that the Captive denied plaintiffs' request to

attend meetings, claiming that the OML does not apply to it but without ever supplying plaintiffs

with copies of meeting minutes.  The defendants never replied to any of the plaintiffs' document

requests, the last having been made by correspondence dated March 15, 2007.  Suit in the above-

captioned matter was filed on June 17, 2007.

In their respective memoranda, the defendants again deny that either the FOIL or the

OML apply to them because, they claim,  they are not public authorities but private corporations

(or individuals).  Defendants also claim that plaintiffs failed to exhaust administrative remedies

nor commence litigation in a timely manner within the four months required for such actions.

Defendants' positions are without merit and plaintiffs' causes of action should remain and be

redressed.

First, the issue of the applicability of the FOIL and OML have already been determined.

As set forth, *supra*, the N.Y. Committee On Open Government reviewed the relevant facts,

analyzed the relevant case law and applied both to the FOIL and OML in its well reasoned

opinion of December 7, 2006.   The Committee, the agency created and authorized by New York

law to make decisions and issue opinions as to the applicability of FOIL and the OML, issued a

comprehensive opinion reviewing the Captive's history, Certificate of Incorporation and By-

Laws.  The Committee ruled that the Captive was and is subject to both the FOIL and the OML, finding, in part, that the Mayor exercises "substantial if not total control over the corporation [Captive] and its Board of Directors."

As they have with all opinions with which they disagree, the defendants have wrongfully ignored and refused to comply with the Committee's findings and now urge this Court to do likewise.  However, pursuant to applicable New York law, courts should defer to opinions of the Committee on Open Government interpreting scope of the FOIL and OML.  Kwasnik v. City of New York  262 A.D.2d 171 (1st Dep't 1999); Daily News Pub. Co. of Memphis, Tenn. v. Office of Court Admin. of State of N.Y., 186 Misc.2d 424 (Sup. Ct., N.Y. Cty. 2000).   Here, the Committee reviewed only the statutes under its purview and interpreted them in a reasonable manner constant with the facts before it.  Its opinion should be upheld, not ignored.[24]

This is particularly true given the public policy that such requests are to be liberally construed and are presumptively valid.  Pasik v. State Bd. Of Law Examiners, 114 Misc.2d 397, 403 (Sup. Ct., N.Y. Cty. 1982), modified on other grounds, 102 A.D.2d 395 (1st Dep't 1984) (citations omitted).   Both laws are clearly applicable to private entities that are engaged with or controlled, public authorities.  Id.; Matter of UFT v. Health & Hospitals Corp., 104 Misc.2d. 623, (Sup. Ct., N.Y. Cty. 1980).  In Smith v. City University of New York, 92 N.Y.2d 707, 714 (1999) rearg. denied 93 N.Y.2d 889 (1999), the Court of Appeals held that:

> In determining whether an entity is a public body, various criteria
> or benchmarks are material.  They include the authority under
> which the entity was created, the power distribution or sharing
> model under which it exists, the nature of its role, the power it

---

[24] The authority solely relied upon by the Defendants is inapposite. John P. v. Whalen, 54 N.Y.2d 89 (1981) involved the confidentially of records in physician disciplinary proceedings subject to  Pub. Health Law §230.  The Court held that the Committee was not entitled to deference when interpreting statutes of other agencies – the opinion did not hold that the Committee's opinions were not entitled to deference when interpreting the FOIL and OML.

> possesses and under which it purports to act, and a realistic
> appraisal of its functional relationship to affected parties and
> constituencies.

The <u>Smith</u> Court held that a private association that administered student activity fees at the State

University of New York was a public body, given its duties and responsibilities, as well as its

affiliation with, and the control exercised by, an admittedly public entity.  <u>Id</u>.  Those principles

apply equally to the matter at bar.

Certainly, individuals personally involved in denying such requests are subject to suit.

<u>Bell v. Herbert</u>,  476 F.Supp.2d 235 (W.D.N.Y. 2007);  <u>Beechwood Restorative Care Center v.

Signor</u>, 11 A.D.3d 987 (4th Dep't 2004), *aff'd*  5 N.Y.3d 435 (2005) .

Nor are defendants correct in their argument that the plaintiffs failed to exhaust

administrative remedies.  New York law is clear that no exhaustion of administrative remedies is

required when an agency claims that it is totally exempt from the FOIL or OML, as defendants

do here.  <u>Pasik</u>, 114 Misc.2d at 406-407.

Defendants have also miscalculated the days from which the final FOIL request was

made.  The "clock" does not start to run on the four months provided for judicial action until any

denial becomes final.  <u>Orange County Publications v. Kiryas Joel Union Free School District</u>,

282 A.D.2d 604 (2d Dep't 2001).  For purposed of the FOIL, that does not occur until at least ten

days after an agency receives and fails to respond to a FOIL request.  Id.; McKinney's Pub.

Officer's Law §89.  The FOIL demand at issue was dated March 15, 2007, and presumably

received three days later.  Regardless of this later three-day period, this FOIL action was

commenced on July 17, 2007, was clearly within the mandated four month period.[25]  Similarly,

---

[25] The Defendants' attempt to cite to earlier FOIL demands and treat the March 15, 2007, demand as merely an extension of those demands is unsupported by anything in the record and based solely upon their misinterpretation of a differential allegation in the Complaint that the March letter could be

the "clock" does not begin to run on any OML claim until Plaintiffs receive the minutes of

meetings from which they were excluded from the Defendants.  Smith v. City University, 92

N.Y.2ds at 716.  Plaintiffs never received these meeting minutes from the defendants and

plaintiffs' claims are not time-barred.

       In furtherance of the objective of public accountability, courts are empowered in their

discretion and upon good cause shown, to fix the appropriate remedy for the public body's

actions in violation of the Open Meetings Law.  New York University v. Whalen, 46 N.Y.2d 734

(1978); Goetschius v. Board of Education of the Greenburgh Eleven Union Free School District,

281 A.D.2d 416 (2d Dep't 2001).  Persistent dereliction of the mandates of the Open Meetings

statute by those previously directed by Court Orders to comply permitted a contempt finding and

an award of counsel fees against them.  Orange County Publications v. Orange County, 120

A.D.2d 596 (2d Dep't 1986) *appeal dismissed* 68 N.Y.2d 807 (1986).  Those principles apply

equally here, where the defendants continue to ignore the December 7, 2006 opinion of the

Committee on Open Meetings, discussed *supra*.  At a minimum, the defendants should be

prospectively compelled to comply with both the FOIL and the Open Meetings Law.


## POINT IV.

### THE COMPLAINT SUFFICIENTLY STATES CAUSES OF ACTION FOR CONVERSION AND REPLEVIN

       To establish a cause of action for conversion, a complainant must allege facts

demonstrating a superior right of possession to specific personal property or to an identifiable

monetary fund, as well as an obligation that it be returned by the possessor.  Vacco, 185 Misc.2d

---

considered as an appeal of earlier demands.  The Complaint should not, however, be read in a manner that
rewards Defendants with such unfair inferences.

at 730.  Conversion is the "exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession." Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted); see Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas, 87 N.Y.2d 36, 44 (1995); Meese v. Miller, 79 A.D.2d 237 (4th Dep't 1981).  The plaintiff asserting a conversion claim must allege that it had "ownership, possession or control of the money before its conversion," ESI, Inc. v. Coastal Power Production Company, 995 F.Supp. 419, 433 (S.D.N.Y.1998) ( citing Aramony v. United Way, 949 F.Supp. 1080, 1086 (S.D.N.Y.1996)).

While New York recognizes that money is the sort of property that may be the subject of a conversion action, the money must be held in a "specific, identifiable fund and [subject to] an obligation to return *or otherwise treat in a particular manner the specific fund in question*." High View Fund, L.P. v. Hall, 27 F.Supp.2d 420, 429 (S.D.N.Y.1998) (emphasis added); Citadel Management, Inc. v. Telesis Trust, Inc., 123 F.Supp.2d 133, 147-148 (S.D.N.Y., 2000).  Any use of such property *beyond the authority which an owner confers upon a user or in violation of instructions given* is a conversion.  Quintal v. Kellner, 264 N.Y. 32 (1934) (emphasis added). Meese, 79 A.D.2d at 243.   Thus, a corporate officer who applies the funds of the corporation to purposes beyond the scope of his authority is guilty of conversion, and the corporation may maintain an action for money had and received against the recipient as well as any person who participates in the tort and accepts its fruits.  Gottfried v. Gottfried  269 A.D. 413, 419 (1st Dep't 1945).

It is respectfully submitted that the Complaint contains the required allegations with sufficient particularity to place all Defendants upon notice of the complained of transactions. Here, the plaintiffs do not assert their *own* superior right of possession to the Captive funds that

have been misappropriated, but the superior right on behalf of the Captive to those funds.  Given the defendants' refusal to comply with both the FOIL and OML, plaintiffs are unable, at this time, to specify what part of the $75 million in public WTCC funds were converted nor in what accounts these converted funds now repose.  Whether such converted funds constitute a specifically identifiable fund must await discovery and responses to plaintiffs' FOIL requests.  Vacco, 185 Misc.2d at 730.  Defendants should not be permitted to profit from their wrongful refusal to supply documents and information to the plaintiffs by now demanding more specific facts in the Complaint, when the information and documents upon which these allegations must be based are wrongfully in the defendants sole and exclusive control.

Similarly, plaintiffs seek the replevin of funds wrongfully paid to Defendant GAB Robbins for non-existing claim adjustment on behalf of the Captive, not on behalf of the plaintiffs.  The count in the Complaint for replevin is based upon the defendants' wrongful receipt and detention of the Captive's property.  Whether that property – the finds from the captive – have been converted into instruments of value such as certificates of deposit, bonds, stock, or other tangible objects of value or property, is unknown from due to the refusal to comply with requests for information, as set forth, *supra*.  Certainly, there are no facts of record that warrant an inference that the funds at issue were never converted into any property that would support a demand for replevin, at least not at this time.  The Plaintiffs have plainly met their burden of pleading sufficient facts to place GAB Robbins on sufficient notice of this claim against them, which should not now be dismissed.

53

## POINT V.

### THE COMPLAINT MEETS APPLICABLE NEW YORK PLEADING STANDARDS

A constant refrain in defendants' Memoranda is that plaintiffs' causes of action are conclusory and lack sufficient factual specificity.  Defendants' allegations in this regard are doubtlessly made by every defendant in every motion to dismiss in every case.  Here, plaintiffs face limitations caused by the defendants themselves, who have wrongfully denied documents, denied access to meetings and otherwise cloaked their activities in secrecy.  Nevertheless, plaintiffs submit that their Complaint avers sufficient facts and causes of action to fairly apprise defendants of the allegations against them and the grounds upon which they rest.

The present matter was originally filed in the Supreme Court of New York and alleges violations of New York law.  At this post-removal juncture, however, the Complaint meets both federal and state pleading requirements, which are similar if not identical.   New York's CPLR 3013 provides: "Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense."  Similarly, Fed. R. Civ. P. 8 provides, in relevant part, that

> pleadings which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain… (2) *a short and plain statement* of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

Fed. R. Civ. P. 8(a).

The Complaint here was far and above more than a "short and plain statement of the claim" required by federal procedure or "statements…sufficiently particular to give...notice of

the transactions…and material elements of each cause of action" required by New York

procedure.  The Complaint is 54 pages long and contained numerous references to events,

statements, testimony, dates, monetary figures, individual names, specific statutes and specific

actions supporting the claims set forth, with extensive reference to and incorporation of

documents by reference and other support.

      Under Fed. R. Civ. P. 8(a), *as long as an issue is pled*, the party does not have to state the

exact theory of relief in order to obtain a remedy. <u>Al Makaaseb General Trading Co. v. U.S.</u>

<u>Steel Intern., Inc</u>., 412 F.Supp.2d 485, 500 (W.D. Pa., 2006); <u>Bechtel v. Robinson</u>, 886 F.2d 644,

649 (3d Cir. 1989).   "Under the liberal pleading requirements of the Federal Rules of Civil

Procedure a complaint need contain only the most basic grounds upon which the court's

jurisdiction is based and a short statement of the claim and the relief sought.  <u>In re Boland</u>, 79

F.R.D. 665, 668 (D.C.D.C., 1978); Fed. R. Civ. P. 8(a); *see also* <u>Dairy Engineering Corp. v.</u>

<u>DeRaef Corp</u>., 2 F.R.D. 378,  379 (W.D.Mo. 1942) ("Rules of Civil Procedure … contemplate

the greatest liberality in the pleadings. Amendments are liberally allowed in the interest of

justice. Moreover, by Rule No. 8, a pleading which sets forth a claim, whether an original claim,

counter claim or cross-claim is sufficient if it contains 'a short and plain statement of the claim

showing that the pleader is entitled to relief.'")  Plaintiffs are not required to "lay out facts

corresponding to every 'element' of a legal theory." <u>Simpson v. Nickel</u>, 450 F.3d 303 (7th Cir.

(Wisc.) 2006); *accord* <u>Phillips v. Girdich</u>, 408 F.3d 124, 130 (2d Cir. 2005) (Rule 8(a) does not

require "a plaintiff to plead the legal theory, facts, or elements underlying [its] claim") (citation

omitted).  Rather, plaintiffs plead claims "which is to say, grievances," and need not allege

"either the factual or legal 'elements' of a prima facie case." <u>Simpson</u>, 450 F.3d at 305;

<u>Swierkiewicz v. Sorema N.A</u>., 534 U.S. 506 (2002).  A complaint must merely " 'give the

defendant[s] fair notice of what the plaintiff's claim is and the grounds upon which it rests."

Facts need not be "established" or even alleged (fact-pleading is unnecessary); a plaintiff

receives the benefit of any fact that could be established later consistent with the complaint's

allegations. *See, e.g.,* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355

U.S. 41, 45-46 (1957).  Fair notice is " 'that which will enable the adverse party to answer and

prepare for trial, allow the application of *res judicata,* and identify the nature of the case so that it

may be assigned the proper form of trial."  Wynder v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004)

*quoting* Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995). This notice pleading standard relies

on the " 'liberal opportunity for discovery and the other pretrial procedures" ' to more precisely

disclose " 'the basis of both claim and defense and to define more narrowly the disputed facts

and issues." ' Century 21, Inc. v. Diamond State Ins. Co., 442 F.3d 79, 83 (2d Cir.2006) *quoting*

Conley, 355 U.S. at 47-48.

Concomitantly, liberal discovery rules permit parties to flesh out their respective claims,

defenses, and counterclaims, in due course after issue has been joined. In re Boland, 79 F.R.D. at

668.  New York State authority is in accord.  Pernet v. Peabody Engineering Corp., 20 A.D.2d

781 (1st Dep't 1964).  Plaintiffs have more than met their pleading burden and their Complaint

should not be dismissed.

## CONCLUSION

There can be no reasonable argument that the plaintiffs' complaint did not meet the

relatively low threshold for prevailing on defendants' 12(b)(6) motions.  The complaint sets forth

concise, factually supported causes of action and claims for equitable relief on behalf of the

persons for whose benefit the Captive's monies were allocated by the United States Congress.

Since the Mayor and its Board of Directors will not act to correct the Captive's runaway waste of

its assets in overhead, administrative salaries and outside legal fees, plaintiffs have every right

and reasonable basis to seek the intervention of the Courts, and the defendants' motions to dismiss should be denied.

Dated: New York, New York
        September 19, 2007

                            Respectfully submitted,

                            WORBY GRONER EDELMAN & NAPOLI BERN, LLP
                            *Attorneys for Plaintiffs*

                            _____
                            Denise A. Rubin (DR5591)